UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ANDREA LaPIETRA, Individually and
as Power of Attorney, and DEASHON TARVER,

                              Plaintiffs,

        v.                                                        9:19-CV-1527
                                                                 (TJM/TWD)

CITY OF ALBANY POLICE DEPARTMENT, *et al.*,

                              Defendants.
_____

APPEARANCES:                              OF COUNSEL:

ANDREA LaPIETRA
  *Plaintiff, pro se*
1030 Washington Ave.
#2
Albany, NY 12203

DEASHON TARVER
  *Plaintiff, pro se*
Monte Mario Motel
Room 21
947 New Loudon Road
Latham, NY 12110

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

## I.      INTRODUCTION

This action was commenced by two *pro se* plaintiffs, Deashon Tarver ("Tarver") and

Andrea LaPietra ("LaPietra"), individually and "as Power of Attorney" for Tarver, pursuant to

42 U.S.C. § 1983 ("Section 1983").  (Dkt. No. 1.)  A complete history of this action to date can

be found in the prior Decisions and Orders of this Court filed on January 15, 2020, February 26,

2020, and April 6, 2020.  (*See* Dkt. Nos. 4, 11, 13.)  The Court previously granted LaPietra's

motion to proceed *in forma pauperis* and dismissed any claims that LaPietra asserted on behalf of Tarver.  (Dkt. No. 4 at 4-5.)  The Court also directed Tarver to comply with the filing fee requirements.  *Id*.

On May 22, 2020, Tarver complied with the Court's directives and submitted a motion to proceed *in forma pauperis* ("IFP Application").  (Dkt. No. 20.)  Upon review of Tarver's IFP application, the Court finds that he has demonstrated sufficient economic need.  *See* 28 U.S.C. § 1915(a)(2).  Accordingly, the Court grants Tarver's IFP Application.

The Court shall now consider the sufficiency of the allegations set forth in the Complaint in light of 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A.  (Dkt. No. 1.)  The Court will also address Tarver's motion to appoint counsel (Dkt. No. 21) and LaPietra's motion to appoint counsel (Dkt. No. 6), which was previously held in abeyance.  (*See* Dkt. No. 11.)

## II.    SUFFICIENCY OF THE COMPLAINT

### A.    Standard of Review

Having found that Plaintiffs meet the financial criteria for commencing this action *in forma pauperis*, and because Plaintiffs seek relief from an officer or employee of a governmental entity, the Court must consider the sufficiency of the allegations set forth in the Complaint in light of 28 U.S.C. §§ 1915(e) and 1915A.[1]  Section 1915(e) of Title 28 of the United States Code

---

[1]  Tarver was incarcerated at Mid-State Correctional Facility at the time the action was commenced.  *See* http://nysdoccslookup.doccs.ny.gov (DIN 18A1582) (last visited Sept. 27, 2020).  Therefore, 28 U.S.C. § 1915A is applicable.  *See Rogers v. New York City Police Dep't*, No. 12 CV 3042, 2012 WL 4863161, at *1 n.3 (E.D.N.Y. Oct. 12, 2012) (a plaintiff who has been released from incarceration is still considered a prisoner under § 1915A if he was imprisoned at the time the action was commenced); *see also Brown v. Jacobson*, No. 98 Civ. 0565, 1999 WL 1125122, at *5 (S.D.N.Y. Dec. 8, 1999) (prisoner's complaint subject to heightened scrutiny under the Prison Litigation Reform Act of 1999 even after release from custody because it concerns prison officials' misconduct).

directs that, when a plaintiff seeks to proceed in forma pauperis, "the court shall dismiss the case at any time if the court determines that – . . . (B) the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B).[2]

Similarly, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint . . . is frivolous, malicious, or fails to state a claim upon which relief may be granted; or . . . seeks monetary relief from a defendant who is immune from such relief."  28 U.S.C. § 1915A(b); *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (noting that Section 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee).

Additionally, when reviewing a complaint, the Court may also look to the Federal Rules of Civil Procedure ("Federal Rules").  Rule 8 of the Federal Rules provides that a pleading which sets forth a claim for relief shall contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief."  *See* Fed. R. Civ. P. 8(a)(2).  The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of *res judicata* is applicable."  *Hudson v. Artuz*, No. 95 Civ. 4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998) (quoting *Powell v. Marine Midland Bank*, No. 95-CV-0063 (TJM), 162 F.R.D. 15, 16 (N.D.N.Y. June 23, 1995) (other citations omitted)).  Although "[n]o technical

---

[2]  To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact."  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

form is required," the Federal Rules make clear that each allegation contained in the pleading "must be simple, concise, and direct."  Fed. R. Civ. P. 8(d).

Further, Rule 10 of the Federal Rules provides in pertinent part that:

> "[a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances.  A later pleading may refer by number to a paragraph in an earlier pleading.  If doing so would promote clarity, each claim founded on a separate transaction or occurrence – and each defense other than a denial – must be stated in a separate count or defense.

Fed. R. Civ. P. 10(b).  This serves the purpose of "provid[ing] an easy mode of identification for referring to a particular paragraph in a prior pleading[.]"  *Flores v. Graphtex*, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (quotation marks and citations omitted).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Id.*  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* (citing *Twombly*, 550 U.S. at 555).  Rule 8 of the Federal Rules "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.*  Thus, a pleading that contains only allegations which "are so vague as to fail to give the defendants adequate notice of the claims against them" is subject to dismissal.  *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009).

Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation and internal quotation marks omitted).  An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Id.* (citation omitted).

### B.      Summary of the Complaint

The incidents that form the foundation for the Complaint occurred on December 14, 2016, and while Tarver was confined at Albany County Correctional Facility ("Albany County C.F.").  The Complaint totals 259 pages and is a rambling, disjointed mix of conclusory allegations, that is, in large part, comprised of excerpts that appear to have been cut and pasted throughout the document from legal articles, statutes, and cases.  (Dkt. No. 1.[3])  Named as defendants are: City of Albany Police Department, Officer Jan Mika, Officer Adam Iannacito, Albany County C.F., CO Burns, Sgt. Remillard, Unknown Officers, Unknown Parole Officers, Unknown Plain Clothes Officer, Unknown Sgt., Unknown Correctional Officers, and Unknown Medical and Dental Workers.  The following facts are set forth as alleged by Plaintiffs.

On December 14, 2016, Plaintiffs were at LaPietra's second-floor apartment located at 1030 Washington Avenue, #2, in Albany, New York.  (Dkt. No. 1-1 at 5.[4])  Tarver, identified as

_____

[3] The Complaint includes exhibits.  (*See* Dkt. No. 1-1 through Dkt. No. 1-6.)  To the extent that the exhibits are relevant to the incidents described in the Complaint, the Court will consider the Complaint as well as any documents attached.  *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference).

[4] LaPietra is "part of an independent living program for a health-related reason."  (Dkt. No. 1-1 at 5.)  Her apartment is on the second floor.

LaPietra's "loved one" and boyfriend, was on parole supervision.  *Id.*  LaPietra left "to pick

something up" and Tarver stayed at the apartment.  *Id.*  She left her apartment keys with Tarver.

*Id.*  On the way back to the apartment, LaPietra received a telephone call from her "case

coordinator" informing her that Albany police officers were outside her apartment.  *Id.*

    When she returned to the apartment, Tarver "was sitting and being detained, handcuffed

in the back seat of a police vehicle that was parked in front of the apartment."  *Id.*[5]  Tarver was

"under arrest" but the police officers did not tell Tarver "what he was under arrest for" and did

not read him his "Miranda" rights.  *Id.*  "They threatened that they were going to taser him[.]"

*Id.*

    LaPietra states her "apartment was open and the police" had been through the apartment

and her personal belongings including "paperwork pertaining to [her] health, government

paperwork, [her] garbage, and everything."  *Id.* at 5, 6.  LaPietra was also questioned by police

officers and a sergeant.  *Id.* at 6.  She stated Tarver did not live with her but admitted he

sometimes stayed overnight "with the permission of his PO."  *Id.*  LaPietra was also asked other

personal questions, including "confidential" conditions of her residence program.  *Id.* at 6.

"They" also questioned LaPietra about "some items that were in the corner of the dining room"

because "they suspected that those items were stolen."  *Id.* at 7.  Officer Jan Mika said to

---

    [5]  According to Tarver, he was "coming down the stairs, and had the door to stairwell open a crack, and he and the officer saw each other through the glass cutout window in the door to the house/vestibule.  The officer pushed in on the door to the house and entered into the vestibule while [Tarver] was still in the stairwell.  At some point, he asked [Tarver] what he was doing there and he said he lived there; He cuffed him, sat him down on the outside stoop, asked what was in his pocket, and he told them the keys and his wallet and they took the keys and wallet out of his pocket and immediately went in the other 2 doors without even checking on who he was, that he had a parole condition, or where he lived, which could have been easily ascertained."

LaPietra, "oh by the way some parole officers were here earlier." *Id*. at 8-9.  She thought that was a "strange comment to make at the time because it did not fit into the context of what [they] were speaking about." *Id*. at 9.[6]

LaPietra "was outside with the officers they asked [her] to go sit in [her] car then another officer said no stand over here to the side of the driveway." *Id*. at 7.  LaPietra states she was "detained" and "questioned" for more than twenty-minutes and her apartment was searched without a warrant.  *Id*. at 7, 15-6.

During the course of Tarver's arrest, he was "pushed up against a police vehicle, his earring was ripping out of his ear . . . the police then threated to use a Taser on him . . . and then put him on the ground." *Id*. at 101.  Tarver was arrested without a warrant and charged with petty larceny.  *Id*. at 7.  Tarver was "arraigned judicially for a misdemeanor" and "maliciously prosecuted for a felony." *Id*. at 11.  Tarver ultimately "took a plea deal." *Id*. at 13.

The Complaint states that defendant "law enforcement officers observed the illegal nature of the search and seizure of the residence and willfully ignored it and participated." *Id*. at 10.  Plaintiffs claim that "fellow officers had an opportunity to intervene to prevent further harm and to report the misconduct.  Yet they failed to act or intervene." *Id*.  The Complaint further claims the Sergeant of the Albany Police Department "participated" in Tarver's arrest, was responsible for the supervision of the defendant police officers, failed to intervene and prevent the ongoing

---

[6]  LaPietra continues: "If there were parole officers there they were not there when I got there and they were not the ones who originally went into the apartment or conducted a search. They city officer who entered did not have a warrant to enter, but they had a witness [Tarver's] counsel later told me.  If there was a witness I saw no signs of them."  (Dkt. No. 1-1 at 9.)  "It would have been more than reasonable to doubt anything [Tarver] said and because the officer had access to [Tarver's] wallet and had him handcuffed it would have been reasonable enough to ascertain whose residence it was, and that [Tarver] had a parole condition, to contact his parole officer, or to obtain a warrant.  None of this was done." *Id*. at 9-10.

misconduct of the officers, "which resulted in the arrest and prosecution" of Tarver.  *Id*. at 10-11.[7]

Later that night, "they" took Tarver from the police station to the emergency room at Albany Medical Center "because he tried to hurt himself."  *Id*. at 92.  Tarver's hands and feet were shackled.  *Id*. at 92-93.  At the emergency room, Tarver was denied his right civil rights to use the bathroom and was subjected to excessive force.  *Id*.  Although Tarver was permitted to use the bathroom at least once while at the emergency room, which "went well," when it "came time for him to go to the bathroom again . . . the police said no."  *Id*.  Tarver became "emotionally upset and swore" and "stood up."  *Id*.  "They tackled him to try and force him to lay down onto the hospital bed."  *Id*.  "Then they shot him with Benadryl."  *Id*.  "An officer in the process of tackling him fractured his pinky finger.  Then they turned around and charged [Tarver] with Felony Assault on an Officer."  *Id*.  But Tarver had "no intention to either interfere with or assault an officer nor did he assault the officer."  *Id*.  The use of force aggravated Tarver's preexisting "AC separation."  (Dkt. No. 1-1 at 5.)

Tarver was confined at Albany County C.F. from December 2016 until April 2018.  During his confinement, Tarver did not receive proper medical care for "an AC separation."  (Dkt. No. 1-1 at 3-4, 85, 89.)  Although x-rays were taken of Tarver's shoulder, he was told by "a doctor" that, "[w]e don't do surgery here."  *Id*. at 85, 126; Dkt. No. 1-6 at 27.  Tarver received no other treatment or care for his shoulder complaints and his requests for an MRI and a visit with his personal physician were denied.  (Dkt. No. 1-1 at 136; Dkt. No. 1-6 at 27.)

---

[7]  The complaint further states that "They also called and invited parole officers to the scene to illegally search the residence as well.  Someone is responsible for the arrival of officers in plain clothes and parole officers who also illegally searched the residence."  (Dkt. No. 1-1 at 11.)

During his confinement at Albany County C.F., Tarver, who suffers from "Schizo Affective Disorder," depression, and PTSD, received seven different types of psychiatric medicine that were not administered "as scheduled."  (Dkt. No. 1-1 at 3, 124; Dkt. No. 1-6 at 73.)  Tarver was not provided with trauma therapy or a social worker.  (Dkt. No. 1-1 at 136.)

From October 2017 until April 2018, Tarver was denied adequate dental care for "extreme pain" that impacted his daily activities.  (Dkt. No. 1-1 at 4, 124; Dkt. No. 1-6 at 24.)  Tarver submitted numerous medical call slips and waited "months" to see a dentist.  (Dkt. No. 1-1 at 124; Dkt. No. 1-6 at 22, 24.)  When he finally saw a nurse in late October 2017, the nurse informed him that he would "see the dentist in five days" and gave him Motrin for his pain.  (Dkt. No. 1-1 at 126; Dkt. No. 1-6 at 22-23.)  When Tarver saw the dentist, he was told that there was an "issue with his wisdom teeth and a filling in another tooth" but the dentist "did nothing."  (Dkt. No. 1-1 at 126.)  In November 2017, Tarver was given Amoxycillin, however, the facility records do not indicate that he suffered from decay or infection.  *Id.*  Tarver continued to suffer from pain and was told, "we don't do root canals here."  *Id.* at 24; Dkt. No. 1-1 at 126.  As a result, Tarver had a "tooth fall straight out of his mouth" while at Albany County C.F.  (Dkt. No. 1-1 at 126; Dkt. No. 1-6 at 6, 23.)

Tarver also claims that his weight, blood sugar, and sleep apnea were not properly monitored at the facility.  (Dkt. No. 1-1 at 129; Dkt. No. 1-6 at 7, 27.)

On October 23, 2017, LaPietra wrote to Melanie Trimble ("Trimble") at the Capital Region ACLU, to complain about Tarver's medical and dental care.  (Dkt. No. 1-1 at 125.)  Trimble relayed LaPietra's concerns to Michael Lyons ("Lyons"), who was surprised that there was a dentist at Albany County C.F.  *Id.*  LaPietra also called the Sheriff's Office and spoke to Mr. Newman ("Newman").  *Id.*  Newman told LaPietra to speak with a sergeant or

superintendent during a visit with Tarver, but that the sergeant "can't do anything." *Id.* In December 2017, LaPietra wrote to the Commission of Correction and Inspector General's office to complain about Tarver's medical and dental care. *Id*. at 119-20. The Commission responded to Tarver and instructed him to file a grievance. *Id*. at 126-27.

On March 9, 2018, Tarver received a letter from Prisoner Legal Services "about his rights." (Dkt. No. 1-1 at 4; Dkt. No. 1-6 at 1, 25.) On March 13, 2018, one day after LaPietra filed "papers for this case in the Supreme Court Clerk's office," Tarver was assaulted by defendant C.O. Burns. *Id.* The assault occurred while another officer was performing "a squat and cough" of Tarver in his cell. *Id.* Burns willfully entered Tarver's cell "for the purposes of assault[.]" (Dkt. No. 1-1 at 148-52; Dkt. No. 1-6 at 25-26.) Burns told Tarver that he was not "coughing properly," pushed him onto the bed, punched him in the face, and sprayed him with mace. *Id.* At the time of the assault, Tarver was naked and in a squat position, with his back facing the officers. *Id.* Defendant Sgt. Remillard was present during the assault and did not intervene on Tarver's behalf. *Id.* Tarver was taken to the nurse so that his eyes could be flushed. (Dkt. No. 1-1 at 148-152; Dkt. No. 1-6 at 25-26.) As a result of being sprayed with mace, his face was swollen and his eyes were "red and bloodshot." (Dkt. No. 1-6 at 25-26.)

After the incident, Tarver was placed in "lockdown" without any writing utensils, legal materials, or mail. (Dkt. No. 1-1 at 129, 143; Dkt. No. 1-6 at 26-27.) The "charges" surrounding his lockdown were not properly or timely presented to him, he was not provided with an assistant related to the disciplinary charges, and he was terminated from his job. (Dkt. No. 1-1 at 164-66; Dkt. No. 1-6 at 26-27.) Tarver's property, including letters and books, were confiscated. (Dkt. No. 1-1 at 174, 178.) Tarver was also denied any outdoor or recreational time. *Id.* at 168.

10

In March 2018, LaPietra visited Tarver.  (Dkt. No. 1-1 at 156.)  At that time, Burns was "laughing" about the assault and told LaPietra that Tarver was a "bad boy," who hadn't coughed for him.  *Id*.  LaPietra telephoned the Commission of Corrections to report the assault and mailed a letter on April 2, 2018, to officially complain about the assault, Tarver's inability to file grievances, and mail tampering.  *Id*. at 162.

On May 3, 2018, LaPietra called the Commission of Corrections, spoke to Debbie Clark ("Clark") and reported the March 2018 assault.  *Id*. at 179.  Clark would not share any information with LaPietra.  *Id.*

During his confinement at Albany County C.F., Tarver was "blocked from and denied grievance[s]" related to medical and dental care and "solitary confinement in relation to his assault."  (Dkt. No. 1 at 2; Dkt. No. 1-1 at 127-128, 141 150; Dkt. No. 1-6 at 27.)  The facility also "interfered" with his legal mail.  (Dkt. No. 1-1 at 123-24, 144.)  For example, Tarver sent a letter to "Judge Keefe," a "consultant" with the Center for Law and Justice.  *Id.*  Tarver marked the envelope "Attorney Mail" and placed an address on it.  *Id.* at 122-23.  The mail did not reach the intended recipient and "may have affected his rights to bring a claim against the municipality in a timely manner."  *Id*. at 123-24.  Tarver was released from "solitary" in April 2018 and transferred to Downstate Correctional Facility, shortly thereafter.  *Id.* at 129.

LaPietra alleges that Albany County C.F. would not allow her to wear "a Native American necklace into the facility" in violation of her First Amendment rights.  (Dkt. No. 1-1 at 190-193.)

Construing the Complaint liberally, Tarver asserts the following: (1) Fourth Amendment claims for unreasonable search and seizure, false arrest, excessive force, and malicious prosecution; (2) Fourteenth Amendment claims for excessive force, failure-to-protect, and

conditions of confinement; (3) First Amendment retaliation claims; (5) Fourteenth Amendment claims related to his medical and dental care; (6) Fourteenth Amendment due process claims; (7) First Amendment access to court and mail interference claims; (8) constitutional claims related to the grievance process; (9) Fourteenth Amendment equal protection claims; (10) Sixth Amendment claims related to the right to counsel; (11) state law claims; and (12) claims pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* (*See* Dkt. No. 1-1 at 5, 10, 11, 17, 88, 96, 97, 102, 105, 113, 127, 128, 146, 152; 164, 172, 182; Dkt. No. 1-6 at 21-27.) LaPietra asserts the following: (1) Fourth Amendment claims for unreasonable search and seizure and false arrest; (2) state law claims; and (3) First Amendment freedom of religion claim. (*See* Dkt. No. 1-1 at 5, 10, 11, 17, 88, 190-193.)

Plaintiffs seek unspecified injunctive relief, monetary damages, and an order allowing them to file a late notice of claim in state court. (Dkt. No. 1 at 6; Dkt. No. 1-1 at 3, 184-85, 1-6 at 1-2.[8]) For a more complete statement of Plaintiffs' claims, reference is made to the Complaint.

---

[8] While not entirely clear, it appears Plaintiffs filed a "late notice of claim in regard to the Albany Police and Albany County Correctional Facility violating [their] civil rights," as alleged in Complaint but State Court Judge Hon. Kimberly A. O'Conner "denied" that request. (Dkt. No. 1-6 at 1.) The Court notes, however, "New York's General Municipal Law has only vested the power to grant notice of claim extensions to the New York State supreme courts and county courts." *Farquharson v. Lafayette*, No. 19-cv-3446 (NSR), 2020 WL 1699985, at *13 (S.D.N.Y. Apr. 7, 2020) (citing N.Y. Gen. Mun. Law § 50-e(7)). Thus, "[f]ederal courts are not authorized to grant such extensions." *Id.* (citing *Davis v. City of New York*, No. 12 Civ. 3297 (PGG), 2018 WL 10070540, at *13 (S.D.N.Y. Mar. 30, 2018) ("New York has given the power to extend deadlines for serving [a] notice of claim to state supreme courts and county courts, and federal courts are not authorized to grant such extensions."); *Dayton v. City of Middletown*, 786 F. Supp. 2d 809, 824-25 (S.D.N.Y. 2011) ("[T]his Court lacks jurisdiction, pursuant to § 50-e(7), to deem Plaintiffs' 5/30/09 Amended Notice of Claim for their state law claims against Orange County timely filed, or to grant an extension of time to file a late notice of claim."). The Court further notes that to the extent Plaintiffs seek to collaterally attack a state court's judgment rendered before filing this action in federal court, such claims may be barred under *Rooker-*

C.     **Nature of Action**

Plaintiffs seek relief pursuant to Section 1983, which establishes a cause of action for "'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990)); *see also Myers v. Wollowitz*, No. 95-CV-0272 (TJM), 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (finding that "[Section] 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights"). "Section 1983 itself creates no substantive rights, [but] . . . only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993). Thus, to state a cognizable claim under Section 1983, a complaint must allege "(1) 'that some person has deprived [the plaintiff] of a federal right,' and (2) 'that the person who has deprived [the plaintiff] of that right acted under color of state law.'" *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)) (alteration omitted).

The Court will construe the allegations in the Complaint with the utmost leniency. *See Haines v. Kerner*, 404 U.S. 519, 520 (1972) (holding that a *pro se* litigant's complaint is to be held "to less stringent standards than formal pleadings drafted by lawyers").

---

*Feldman* doctrine, which divests the federal court of jurisdiction to consider actions that seek to overturn state court judgments. *See generally District of Colombia Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). This doctrine also bars the federal court from considering claims that are "inextricably intertwined" with a prior state court determination. *Fernandez v. Turetsky*, No. 12-CV-4092, 2014 WL 5823116, at *3 (E.D.N.Y. Nov. 7, 2014) (citing *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)).

### III.    ANALYSIS

#### A.    City of Albany Police Department

The caption of the Complaint lists the City of Albany Police Department as a defendant. (Dkt. No. 1 at 1.)  "[U]nder New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued."  *Davis v. Lynbrook Police Dep't*, 224 F. Supp. 2d 463, 477 (E.D.N.Y. 2002) (dismissing § 1983 claim brought against the Lynbrook Police Department); *see also La Grande v. Town of Bethlehem Police Dep't*, No. 1:08-CV-0738 (LEK/DRH), 2009 WL 2868231, at *2 (N.D.N.Y. Sept. 1, 2009) ("Since the Bethlehem Police Department cannot be sued pursuant to 42 U.S.C. § 1983, [the plaintiff's] [c]omplaint is dismissed as against the Town of Bethlehem Police Department."); *Jenkins v. Liadka*, No. 5:10-CV-1223 (GTS/DEP), 2012 WL 4052286, at *5 (N.D.N.Y. Sept. 13, 2012) ("Because the Syracuse Police Department is merely an administrative arm of the City of Syracuse, it is not a proper defendant.").

However, in deference to Plaintiffs' *pro se* status, the Court will construe Plaintiffs' claims as if they had been brought against the City of Albany, the real party in interest.  *See Solis v. Cty. of Westchester*, No. 94-CV-5102, 1995 WL 14072, at *1 (S.D.N.Y. Jan. 10, 1995) (noting that the Westchester County Department of Corrections is not a legal entity and that the County of Westchester is the real party in interest).

Pursuant to the standard for establishing municipality liability laid out in *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978), in order to set forth a cognizable claim for municipal liability under Section 1983, a plaintiff must plead and prove that a deprivation of his constitutional rights "was caused by a governmental custom, policy, or usage of the municipality."  *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (citing

*Monell*, 436 U.S. 658); *see also Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) ("The plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer.")  A municipality may be liable for deprivation of constitutional rights under Section 1983 for policies or customs resulting in inadequate training, supervision, or hiring when the failure to train, supervise, or hire amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.  *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-89 (1989).  A plaintiff must also establish a causal connection – an affirmative link–between the policy and the deprivation of his constitutional rights.  *Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985) (plurality opinion).

Here, Plaintiffs have failed to identify or allege any facts plausibly showing the existence of a municipal policy or custom of the City of Albany authorizing, permitting, allowing, or tolerating "abuses in violation of the Constitution" including unreasonable search and seizure, false arrest, and excessive force incidents or any affirmative link between such a policy and defendants' alleged actions with regard to Plaintiffs.  (*See* generally Dkt. No. 1.)  Furthermore, Plaintiffs' conclusory allegations that the City of Albany failed to train and supervise defendants, *see id.*, without supporting factual allegations, fails to state a *Monell* claim against the City of Albany that is plausible on its face.  *See Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell's* requirement that the particular policy be the 'moving force' behind a constitutional violation.").

Based upon the foregoing, the Court recommends that Plaintiffs' claims under 42 U.S.C. § 1983 against City of Albany Police Department be dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b).

Moreover, notwithstanding a very liberal interpretation of the Complaint, to the extent that Plaintiffs' claims could be construed to be asserted against the City of Albany, as the real party in interest, it is recommended that the claims be dismissed without prejudice and with leave to amend pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### B.     Officer Jan Mika

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation."  *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).  Thus, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.'"  *Austin v. Pappas*, No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted).

Here, the Complaint states that Officer Jan Mika asked LaPietra questions on December 14, 2016, such as her "name, address, date of birth, etc." and also told her, "Oh by the way parole officers were here earlier."  (Dkt. No. 1-1 at 10, 46.)  However, Plaintiffs do not plead any facts sufficient to plausibly suggest that this defendant was personally involved in any conduct that violated either of Plaintiffs' constitutional rights and, therefore, the Complaint fails to state a cognizable claim against this defendant.  *See Cipriani v. Buffardi*, No. 06-CV-0889 (GTS/DRH), 2007 WL 607341, *1 (N.D.N.Y. Feb. 20, 2007) ("Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff.") (citation omitted).

Accordingly, it is recommended that Plaintiffs' claims against Officer Jan Mika be dismissed without prejudice and with leave to amend pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### C.   Unknown Officers, Unknown Parole Officers, Unknown Plain Clothes Officer, Unknown Sgt.

Separate from the substantive personal involvement requirement, discussed above, is a pleading requirement that, to adequately state a claim, a plaintiff's complaint must "differentiate which defendant[s] w[ere] involved in [what] unlawful conduct." *Ying Li v. City of New York*, No. 15-CV-1599, 2017 WL 1208422, at *6 (E.D.N.Y. Mar. 31, 2017); *see also Wright v. Orleans Cty.*, No. 14-CV-622, 2015 WL 5316410, at *13 (W.D.N.Y. Sept. 10, 2015) (noting in a § 1983 case that "[g]roup pleading is insufficient for purposes of Rule 8(a)(2), which requires a short and plain statement of the claim showing that the pleader is entitled to relief" (citation and quotation marks omitted)); *Holmes v. Allstate Corp.*, No. 11-CV-1543, 2012 WL 627238, at *7, *22 (S.D.N.Y. Jan. 27, 2012) ("Rule 8(a) is violated where a plaintiff, by engaging in 'group pleading,' fails to give each defendant fair notice of the claims against it.").

To satisfy the personal involvement requirement and the rule against group pleading, it is not necessary for a plaintiff to know the name of the defendant.  Where a plaintiff does not know the name of a defendant, the plaintiff may identify the defendant in the pleading as John or Jane Doe.  However, the pleading must still satisfy the rules governing personal involvement and group pleading as to the John or Jane Doe defendant.  *See Little v. Mun. Corp.*, 51 F. Supp. 3d 473, 493-94 (S.D.N.Y. 2014) (dismissing without prejudice excessive force claim asserted against "members of the 'Special Search Team' and 'ESU Officers'" and noting that, "[t]o the extent that [plaintiff] does not know the names of the members of the Special Search Team or ESU Officers involved, he may name 'John Doe' defendants and include as much identifying

information as he has knowledge of, for the purpose of filing an amended complaint, should [he] chose to do so"); *Williams v. 120 PCT Undercover*, No. 11-CV-4690, 2011 WL 13128209, at *1 (E.D.N.Y. Oct. 18, 2011) (dismissing complaint without prejudice where plaintiff's claims provided information about the alleged constitutional deprivations, but were brought against "the 120 Precinct and District 9, a police precinct and district of the New York City Police Department").

Here, Plaintiffs simply list different groups of unidentified defendants in the caption of the Complaint and generally allege that on December 16, 2014, their Fourth Amendment constitutional rights were violated. The use of the terms "they," or "the police" or "officer" as a name for alleged defendants is not adequate to state a claim against a "person" as required in § 1983 actions. *See Williams*, 2011 WL 13128209, at *1 (dismissing complaint with leave to amend where the "[p]laintiff alleges that unnamed undercover police officers used excessive force against him and caused him to sustain injuries on August 26, 2008 but does not identify any particular defendants.").[9]

Moreover, if the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior*) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk Cty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). Rather, supervisory officials may

---

[9] *See Williams*, 2011 WL 13128209, at *1 (giving the plaintiff leave to file an amended complaint to name the individuals responsible for the alleged deprivation of his rights and noting if "if plaintiff cannot identify the individual defendant(s) within the time allowed in this order or because they were undercover, he may designate the individual as John (or Jane) Doe #1, and so on.").

be considered "personally involved" if they (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

Based on the foregoing, the Court finds Plaintiffs have failed to adequately plead that any individual defendant was personally involved in any alleged wrongdoing on December 14, 2016, and has contravened the rule against group pleading.  Therefore, the Court recommends dismissing Plaintiffs' claims against these "Unknown" defendants without prejudice and with leave to amend pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.[10]

### D.    Officer Adam Iannacito

Tarver claims Iannacito used "excessive force on" him on December 14, 2016, in the Emergency Room by, *inter alia*, by "tackling" Tarver while he was restrained in shackles and prevented him from using the bathroom in violation of his constitutional rights, "which worsened [Tarver's] injury from a prior workplace assault, which was an AC separation."  (Dkt. No. 1-1 at 96-113, Dkt. No. 1-6 at 5-6, 20-21.)  It appears that during the assault, Iannacito fractured a finger and thereafter "maliciously prosecuted [Tarver] with felony assault on an officer."  *Id.*

To the extent Tarver asserts these claims under Section 1983, such claims are time-barred.  Although the statute of limitations is an affirmative defense, where it is clear from the

---

[10]  Inasmuch as the Court is recommending dismissal of Plaintiffs' Fourth Amendment claims without prejudice, the Court does not address the merits, timeliness, and/or whether any such claims are barred by *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994).

face of the complaint that a claim is barred by the applicable statute of limitations, the claim is subject to dismissal for failure to state a claim on initial review. *See Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) (holding that a complaint can be dismissed on initial review based on a defense that appears on the face of the complaint). The applicable statute of limitations for a Section 1983 action is governed by "the law of the state in which the cause of action arose." *Wallace v. Kato*, 549 U.S. 384, 387 (2007). In New York, the general statute of limitations for personal injury claims is three years. *See* N.Y. C.P.L.R. § 214(5).

Here, Tarver executed the Complaint on February 6, 2020. (*See* Dkt. No. 7.) The alleged assault and deprivations by Iannacito at the Emergency Room occurred on December 16, 2016. Accordingly, Tarver's Section 1983 claims against Iannacito are barred by the applicable statute of limitations.

To the extent these claims are asserted under New York law, claims for intentional torts, such as assault and battery, and intentional infliction of emotional distress, are governed by a one-year statute of limitations. N.Y. C.P.L.R. § 215(3); *see also Ashjari v. Nynex Corp.*, 182 F.3d 898 (2d Cir. 1999) ("Under N.Y. C.P.L.R. § 215(3), claims of assault and battery . . . must be brought within one year from the date the claim accrued."); *see also Forbes v. Merrill Lynch, Fenner & Smith, Inc*., 957 F. Supp. 450, 455 (S.D.N.Y. 1997) ("It is well established under New York law that a claim of intentional infliction of emotional distress has a one–year statute of limitations."). Accordingly, Tarver's claims against Iannacito, asserted under state law, are also barred by the applicable statute of limitations.

Therefore, the Court recommends dismissing Tarver's claims against Officer Adam Iannacito without prejudice and with leave to amend pursuant to 28 U.S.C. §§ 1915(e)(2)(ii) and 1915A(b)(1). Because a district court typically should not dismiss a claim as time-barred

without providing a *pro se* plaintiff with "notice and opportunity to be heard" as to whether there might be a meritorious tolling argument or other reason why the complaint might be considered, if Tarver files an amended pleading with claims asserted against this defendant arising from the alleged December 14, 2016, incidents, he should address the issue of timeliness. *See Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007).

### E.    Albany County C.F.

The caption of the Complaint lists Albany County C.F. as a defendant.  (Dkt. No. 1.) However, as set forth above, because the Albany County C.F. is an administrative arm of Albany County, without a legal identity separate and apart from the County, it lacks the capacity to be sued.  *See* Part III.A., *supra*.; *see also Lukes v. Nassau Cty. Jail*, No. 12-CV-1139, 2012 WL 1965663, at *2 (E.D.N.Y. May 29, 2012) (dismissing claims against defendant Nassau County Jail because it "is an administrative arm of Nassau County, without a legal identity separate and apart from the County"); *see Solis v. Cty. of Westchester*, No. 94-CV-5102, 1995 WL 14072, at *1 (S.D.N.Y. Jan. 10,1995) (noting that the Westchester County Department of Corrections is not a legal entity and that the County of Westchester is the real party in interest);

Based upon the foregoing, the Court recommends that Plaintiffs' claims under 42 U.S.C. § 1983 against Albany County C.F. be dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b).

Nevertheless, in deference to Plaintiffs' *pro se* status, the Court will construe Plaintiffs' claims as if they had been brought against Albany County, the real party in interest.  *See Shabazz v. Johnson City Police Dep't*, No. 3:18-CV-0570 (MAD/DEP), 2018 WL 5660406, at * (June 21, 2018) (reviewing complaint against the real party in interest).

As discussed above, municipal liability is limited under Section 1983 by *Monell*. *See* Part III.A., *supra*.

Here, with one minor exception discussed below, Plaintiffs have failed to identify or allege any facts plausibly showing the existence of a municipal policy or custom of Albany County authorizing, permitting, allowing, or tolerating "abuses in violation of the Constitution" including deliberate medical indifference and excessive force incidents or any affirmative link between such a policy and any defendants' alleged actions with regard to Tarver. *See* Dkt. No. 1-1 at 146-147. *See Missel v. Cty. of Monroe*, 351 F. App'x 543, 545 (2d Cir. 2009) (*Monell* claim requires "factual allegations that would support a plausible inference that the County[ ]'s 'policies' or 'customs' caused . . . violations . . . of rights."). Furthermore, Plaintiffs' conclusory allegations that Albany County failed to train and supervise defendants, *see id.*, without supporting factual allegations, fails to state a *Monell* claim against Albany County that is plausible on its face. *See Tuttle*, 471 U.S. at 824 n.8.

The Complaint states that "[t]he Albany County [C.F.] refused to allow [LaPietra] to wear a Native American necklace into the facility at a visitation stating that it is not a religion recognized by the United States government and that it had to be a religion like Christianity or the Muslim religion. This is a First Amendment rights violation. It is also inherently false that it is not a form of religion recognized by the United States government because the United States recognizes Natives through the American Indian Religious Freedom Act." (Dkt. No. 1-1 at 190.) Mindful of the Second Circuit's direction that a *pro se* plaintiff's pleadings must be liberally construed, *see Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), LaPietra has sufficiently plead, albeit thinly, a cognizable claim regarding the aforementioned policy at Albany County C.F.

Accordingly, based upon a very liberal interpretation of the Complaint, to the extent that Plaintiffs' claims could be construed to be asserted against Albany County as the real party in interest, it is recommended that only LaPietra's First Amendment *Monell* claim survives initial review and requires a response and that all other claims be dismissed without prejudice and with leave to amend pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.  The Court expresses no opinion as to whether LaPietra's First Amendment *Monell* claim can withstand a properly filed motion to dismiss or for summary judgment.

### F.   Fourteenth Amendment Excessive Force and Failure-to-Protect Claims Against Burns and Remillard

Tarver contends Burns assaulted him and that Remillard failed to intervene to protect him from harm at Albany County C.F. in March 2018.  *See generally* Dkt. No. 1-1.  In the context of excessive force and failure-to-protect claims asserted by pretrial detainees, the Supreme Court distinguished between Eighth and Fourteenth Amendment claims in holding that a pretrial detainee alleging that an officer used excessive force against him in violation of the Fourteenth Amendment need not demonstrate that such officer was subjectively aware that his use of force was unreasonable.  *See Kingsley v. Hendrickson*, 576 U.S. 389 (2015); *see also Francis v. City of New York*, No. 17-CIV-1453, 2018 WL 4659478, at *4 (S.D.N.Y. Aug. 21, 2018) (applying *Kingsley* to failure-to-protect claim).[11]  "[A] pretrial detainee must only show that the force purposely or knowingly used against him was objectively unreasonable to prevail on an excessive force claim."  *Kingsley*, 576 U.S. at 397.  "[I]f the use of force is deliberate – i.e.,

---

[11]   It is unclear whether Tarver was a pretrial detainee or was serving a sentence at the time of the events complained of in the complaint.  For purposes of this initial review, the Court assumes that Tarver was a pretrial detainee when his claims arose.

purposeful and knowing – the pretrial detainee's claim may proceed." *Id.*  Courts consider a number of factors when determining objective reasonableness, including:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.*

Mindful of the Second Circuit's direction that a *pro se* plaintiff's pleadings must be liberally construed, *see Sealed Plaintiff*, 537 F.3d at 191, Tarver has sufficiently plead Fourteenth Amendment excessive force and failure-to-protect claims against Burns and Remillard.

Therefore, the Court recommends that Tarver's Fourteenth Amendment excessive force and failure-to-protect claims against Burns and Remillard survive *sua sponte* review and require a response.  The Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

### G.    Assault and Battery Claims Against Burns

Tarver also asserts assault and battery claims against Burns.  To the extent that Tarver asserts these claims under Section 1983, it is duplicative of his excessive force claim and must be dismissed for failure to state a claim upon which relief may be granted.  *See Raymond v. Bunch*, 136 F. Supp. 2d 71, 81 (N.D.N.Y. 2001).  To the extent these claims are asserted under New York law, as discussed above, claims for intentional torts are governed by a one-year statute of limitations.  N.Y. C.P.L.R. § 215(3); *see also Ashjari v. Nynex Corp.*, 182 F.3d 898 (2d Cir. 1999) ("Under N.Y. C.P.L.R. § 215(3), claims of assault and battery . . . must be brought within one year from the date the claim accrued.").  As discussed above, although the statute of

limitations is an affirmative defense, where it is clear from the face of the complaint that a claim is barred by the applicable statute of limitations, the claim is subject to dismissal for failure to state a claim on initial review.  *See Pino*, 49 F.3d at 53.

Here, Tarver executed the Complaint on February 6, 2020.  (*See* Dkt. No. 7.)  The alleged assault by Burns occurred in March 2018.  Accordingly, Tarver's assault and battery claims, asserted under state law, are barred by the applicable statute of limitations.

Therefore, the Court recommends dismissing Tarver's assault and battery claims with leave to amend pursuant to 28 U.S.C. §§ 1915(e)(2)(ii) and 1915A(b)(1).  Because a district court typically should not dismiss a claim as time-barred without providing a *pro se* plaintiff with "notice and opportunity to be heard" as to whether there might be a meritorious tolling argument or other reason why the complaint might be considered, if Tarver files an amended pleading with a claim for assault and battery, he should address the issue of timeliness.  *See Abbas*, 480 F.3d at 640.

### H.    First Amendment Retaliation Claims Against Burns and Remillard

Tarver claims that Burns and Remillard acted with retaliatory intent when they assaulted him because he received legal mail and filed a state court lawsuit.  (*See generally* Dkt. No. 1-1.) Retaliation claims find their roots in the First Amendment.  *See Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004).  In a prison setting, prison officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights.  *Id.* at 381-83.  However, as the Second Circuit has repeatedly cautioned, such claims are easily incanted and prone to abuse, as inmates often attribute adverse actions to retaliatory animus.  *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).  Courts must therefore approach retaliation claims with "skepticism and

particular care." *Id*.  Accordingly, claims of retaliation must be supported by specific facts; conclusory statements are not sufficient.  *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds by Swierkiewicz*, 534 U.S. at 506.

 To establish a *prima facie* First Amendment retaliation claim, the plaintiff must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."  *Gill*, 389 F.3d at 380 (citing *Dawes*, 239 F.3d at 492).

 The filing of lawsuits and grievances is protected conduct for purposes of First Amendment retaliation claims.  *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir.1996).  Therefore, the allegations in the Complaint plausibly suggest that Tarver was engaged in protected conduct.  Moreover, the alleged assault constituted an "adverse action" against Tarver that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.  *See Rivera v. Goord*, 119 F. Supp. 2d 327, 339-340 (S.D.N.Y. 2000).

 An inmate bears the burden of showing "the protected conduct was a substantial or motivating factor" in the defendant's decision to take action against the plaintiff.  *Graham*, 89 F.3d at 79.  In evaluating whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, "a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation."  *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon*, 58 F.3d at 872-73).  "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the

adverse action." *Id.* A showing of temporal proximity, without more, has generally been found insufficient to survive summary judgment. *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (citations omitted).

Here, Tarver has not adequately stated a claim for retaliation against Burns and Remillard because he has not alleged facts to suggest that they were aware Tarver received a letter from Prisoner Legal Services or that LaPietra filed a lawsuit in state court. Moreover, there is no allegation that Burns or Remillard were defendants in that lawsuit. As a result, Tarver has failed to allege plausibly that the lawsuit was causally connected to Burns' or Remillard's allegedly adverse actions. *See Wilson v. Kelly*, No. 9:11-CV-00030 (MAD/RFT), 2012 WL 3704996, at *9 (N.D.N.Y. Aug. 27, 2012) (claim dismissed due to failure by plaintiff to allege plausibly that protected activity was causally connected to any alleged adverse action taken by the defendant where plaintiff failed to allege that the defendant was aware of the protected activity).

Therefore, the Court recommends that Tarver's retaliation claims against Burns and Remillard be dismissed with leave to amend pursuant to 28 U.S.C. §§ 1915(e)(2)(ii) and 1915A(b)(1).

I.     **ADA Claims**[12]

Tarver claims that, as a prisoner with a mental illness, he was entitled to modifications of his conditions of confinement in the SHU. (Dkt. No. 1-1 at 170.) Title II of the ADA provides, in pertinent part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The

---

[12] Tarver does not specify what portions of the ADA are triggered. Reading the complaint liberally, it appears that he brings this action under Title II.

ADA is applicable to inmates in state correctional facilities.  *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998).  "Under Title II of the ADA . . . prison officials may not discriminate against inmates on the basis of disability in administering work programs." *Harrington v. Vadlamudi*, No. 9:13-CV-795 (BKS/RFT), 2015 WL 4460994, at *3 (N.D.N.Y. July 21, 2015) (citations omitted).  To successfully plead a Title II claim, "[t]he inmate must establish that he (1) is a qualified individual with a disability; (2) is being excluded from participation in, or being denied benefits of some service, program or activity by reason of his or her disability; and (3) the entity providing the service is a public entity."  *Allah v. Goord*, 405 F.Supp.2d 265, 274 (S.D.N.Y. 2005).

Here, the Complaint does not clearly indicate who Tarver is suing for violations of his rights under the ADA and what relief, if any, he seeks with respect to that claim.  Assuming Tarver asserts this claim against individual officers, he has not indicated whether those officers are sued in their individual capacity, official capacity, or both.  (*See generally* Dkt. No. 1.)  To the extent that Tarver seeks monetary damages against any defendant, in his or her individual capacity, the Second Circuit has held Title II of the ADA does not provide for individual capacity suits for monetary damages.  *See Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001).  While individuals may be sued under the ADA in their official capacities, a plaintiff must plead that the defendant "was motivated by discriminatory animus or ill-will based on the plaintiff's disability."  *See Keitt v. New York City*, 882 F. Supp. 2d 412, 455-57 (S.D.N.Y. 2011) (holding that under *Garcia*, claims for money damages against state officials in their official capacities under Title II of the ADA are barred by the Eleventh Amendment, absent a showing that a violation was motivated by discriminatory animus or ill will due to the disability) (citing *Garcia*, 280 F.3d at 112).

Even assuming Tarver was disabled under the ADA, the Complaint fails to state a viable cause of action against any individual defendant because Tarver does not allege facts to plausibly suggest that any defendant discriminated against him. *See Wenger v. New York State Dep't of Health*, No. 5:14-CV-885 (DNH/TWD), 2015 WL 3397958, at *5 (N.D.N.Y. May 26, 2015) (dismissing the discrimination claim under ADA where the complaint "provide[d] few specifics regarding [the plaintiff's] care, the services of which he was allegedly deprived, or programs in which he was allegedly not allowed to participate, or any reasons therefor articulated by [the defendants").

Although "Title II [. . .] suits for prospective injunctive relief may . . . proceed against individual officers in their official capacity," *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), an inmate's request for injunctive relief becomes moot when the inmate is released from custody. *See Roque v. Armstrong*, 392 F. Supp. 2d 382, 386-87 (D. Conn. 2005) (finding that the plaintiff's request for injunctive relief under the ADA for the provision of medical care became moot when he was discharged from prison) (citations omitted); *see also McAlpine v. Thompson*, 187 F.3d 1213, 1215 (10th Cir. 1999) (noting that an inmate's claim for prospective injunctive relief regarding conditions of confinement is rendered moot upon his release from confinement). In April 2020, Tarver notified the Court that he was no longer incarcerated. (*See* Dkt. No. 15.)

Accordingly, the Court recommends dismissing Tarver's ADA claims for monetary damages and injunctive relief for failure to state a claim upon which relief may be granted.

**J.      Remaining Claims**

The remaining constitutional and state law claims are asserted by Tarver against "Unknown Corrections Officers," and "Unknown Medical and Dental Workers." (*See* Dkt. No. 1 at 1; Dkt. No. 1-1 at 1.)

29

The Complaint fails to identify any corrections officers or medical personnel involved in Tarver's medical treatment, dental treatment, the decision to confine Tarver to keeplock, decisions related to Tarver's mail or property, decisions related to grievances or visitors at the facility, or any of other remaining alleged constitutional violations.  As previously discussed, the use of the terms, "they," "corrections officers," "medical and dental workers," or "all facility employees" as a name for alleged defendants is not adequate to state a claim against a "person" as required in Section 1983 actions.  *See* Part.III.C., *supra*.; *see also Ferguson*, 1991 WL 115759, at *1 ("The allegations plaintiff makes against the Otisville Correctional Facility Medical Staff are not sufficient to state a cause of action.").  Moreover, the Court notes that while the Complaint includes a plethora of constitutional claims arising from Tarver's confinement at Albany County C.F., the pleading lacks any specificity related to those claims including dates, times, and locations of the alleged violations.

Because the Complaint fail to identify any individuals personally involved in the remaining alleged constitutional violations and state law claims, the Court recommends dismissing the remaining claims without prejudice and with leave to amend pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.  *See Martin v. UConn Health Care*, No. 3:99-CV-2158, 2000 WL 303262, at *1 (D. Conn. Feb. 9, 2000) (giving the plaintiff leave to file an amended complaint "provided he can identify at least one physician or other health care provider who has been deliberately indifferent to his medical needs") (citing *Soto v. Brooklyn Correctional Facility*, 80 F.3d 34 (2d Cir. 1996)

(permitting plaintiff to file amended complaint where inmate named only correctional facility

and was not aware of the requirement that he name individuals)).[13]

## IV.  MOTIONS TO APPOINT COUNSEL

It is well-settled that there is no right to appointment of counsel in civil matters.  *Burgos*

*v. Hopkins*, 14 F.3d 787, 789 (2d Cir. 1994).  Title 28 of United States Code Section 1915

specifically provides that a court may request an attorney to represent any person "unable to

afford counsel."  28 U.S.C. § 1915(e)(1).  Appointment of counsel must be done carefully in

order to preserve the "precious commodity" of volunteer lawyers for those litigants who truly

need a lawyer's assistance.  *Cooper v. A. Sargenti, Inc.*, 877 F.2d 170, 172-73 (2d Cir. 1989).

In *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335 (2d Cir. 1994), the Second Circuit

reiterated the factors that a court must consider in ruling upon such a motion.  In deciding

---

[13]  Rule 10(a) of the Federal Rules of Civil Procedure provides that, "the title of the complaint must name all the parties."  Fed. R. Civ. P. 10(a).  A party not named in the caption of the complaint is not a party to the action.  *Abbas v. U.S.*, No. 10-CV-0141, 2014 WL 3858398, at *2 (W.D.N.Y. Aug. 1, 2014) (the failure to name a party in the caption makes it "infeasible for the Court to determine which of the individual officers mentioned in the body of the complaint should be deemed to be defendants to which claims").  "If people are not also named in the caption of the [ ] complaint, they will not be defendants in the case."  *Whitley v. Krinser*, No. 06-CV-0575, 2007 WL 2375814, at *1 (W.D.N.Y. Aug. 15, 2007); *see also Robles v. Armstrong*, No. 3:03-CV-1634, 2006 WL 752857, at *1 n.1 (D. Conn. Mar. 17, 2006) ("The plaintiff refers to John Doe/Jane Doe of the Correctional Managed Health Care Program and John Doe/Jane Doe Members of the Revitalization Committee in the body of the amended complaint.  Rule 10(a) of the Federal Rules of Civil Procedure requires that all defendants be listed in the caption of the complaint.  Because the John and Jane Does are not listed in the caption of the amended complaint, they are not defendants and the court does not consider claims against them.").  In this instance, while LaPietra claims that she notified certain individuals about "the issues" at Albany County C.F., including Newman, Lyons, and Trimble, *see* Dkt. No. 1-1 at 136, 139; Dkt. No. 1-6 at 22, the aforementioned individuals are not identified as defendants in the caption of the complaint or the list of parties.  Thus, the Court will not construe the complaint to include any claims or causes of action against these individuals.  For the same reason, the Court will not construe the complaint to include any claims or cause of actions against other private individuals referenced in the body of the complaint, including attorneys and grocery store employees, as they are not identified as defendants in the caption of the complaint or list of parties.

whether to appoint counsel, the court should first determine whether the indigent's position seems likely to be of substance.  If the claim meets this threshold requirement, the court should then consider a number of other factors in making its determination.  *See id*. at 1341 (quoting *Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986)); *Sawma v. Perales*, 895 F.2d 91, 95 (2d Cir. 1990).  Among these are

> [t]he indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues, and any special reason . . . why appointment of counsel would be more likely to lead to a just determination.

*Hodge*, 802 F.2d at 61.  None of these factors are controlling, however, and each case should be decided on its own facts.  *Id*.

Here, the main facts upon which this Court may base its decision as to whether this lawsuit is of substance are those portions of Plaintiffs' Complaint wherein they state the facts surrounding their claims.  Where a plaintiff does not provide a Court with evidence, as opposed to mere allegations, relating to his or her claims, such party does not meet the first requirement imposed by the Second Circuit relative to applications seeking appointment of *pro bono* counsel.  *See Harmon v. Runyon*, No. 96-CV-6080, 1997 WL 118379 (S.D.N.Y. Mar. 17, 1997).

Furthermore, even if the Court were to assume that this case may be of substance, these claims do not present overly complex issues.  In addition, the record currently before the Court indicates that Plaintiffs have an ability to investigate pertinent facts and present the case.  While it is possible, should this case proceed to a trial, that there will be conflicting evidence implicating the need for cross-examination, as is the case in many actions brought by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel." *Velasquez v. O'Keefe*, 899 F. Supp. 972, 974 (N.D.N.Y. 1995).  Further, if this case proceeds to

trial, it is highly probable that this Court will appoint trial counsel at the final pretrial conference. This Court is not aware of any special reason why appointment of counsel at this time would be more likely to lead to a just determination of this litigation.

For all of these reasons, the Court finds that appointment of counsel is unwarranted and Plaintiffs' motions are denied without prejudice.  (Dkt. Nos. 6, 21.)  Plaintiffs may file another motion for appointment of counsel in the event that they can demonstrate that, in light of specific changed circumstances, consideration of the above factors warrants granting the application.

**WHEREFORE**, it is hereby

**ORDERED** that Tarver's IFP Application (Dkt. No. 20) is **GRANTED**;[14] and it is further

**RECOMMENDED** that Plaintiffs' claims against City of Albany Police Department and Albany County Corrections Facility be **DISMISSED WITH PREJUDICE** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted; and it is further

**RECOMMENDED** that the Clerk be directed to revise the docket sheet to **ADD** Albany County as a defendant in this action; and it is further

**RECOMMENDED** that Tarver's Fourteenth Amendment excessive force and failure-to-protect claims against C.O. Burns and Sgt. Remillard **SURVIVE** initial review and require a response; and it is further

---

[14]  Tarver should note that, although the Court has granted his IFP Application, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

**RECOMMENDED** that LaPietra's First Amendment *Monell* claim against Albany County **SURVIVES** initial review and requires a response; and it is further

**RECOMMENDED** that the remaining claims be **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AEMND**[15] pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel.  Any document received by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket.** Plaintiffs must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action.  All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions.  **Plaintiffs are also required to promptly notify the**

---

[15]  If the District Court approves this Report-Recommendation, and if Plaintiffs choose to file an amended complaint, any amended complaint must comply with Rules 8 and 10 of the Federal Rules.  Any such amended complaint must be signed by both Plaintiffs and clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act.  In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *See Bass*, 790 F.2d at 263.  Any such amended complaint will replace the existing Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court.  *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

Clerk's Office and all parties or their counsel, in writing, of any change in his or her address; their failure to do so may result in the dismissal of the action; and it is further

ORDERED that Plaintiffs' motions for counsel (Dkt. Nos. 6, 21) are DENIED WITHOUT PREJUDICE; and it is further

ORDERED that the Clerk of the Court shall serve a copy of this Report-Recommendation and Order on Plaintiffs, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[16]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85, 87 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

IT IS SO ORDERED.

Dated: October 5, 2020
      Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

---

[16]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

1998 WL 832708
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Theodore HUDSON, Plaintiff,

v.

Christopher ARTUZ, Warden Philip
Coombe, Commissioner Sergeant
Ambrosino Doctor Manion Defendants.

No. 95 CIV. 4768(JSR).
|
Nov. 30, 1998.

**Attorneys and Law Firms**

Mr. Theodore Hudson, Great Meadow Correctional Facility,
Comstock.

Alfred A. Delicata, Esq., Assistant Attorney General, New
York.

MEMORANDUM AND ORDER

BUCHWALD, Magistrate J.

**\*1** Plaintiff Theodore Hudson filed this *pro se* action
pursuant to 42 U.S.C. § 1983 on April 26, 1995. Plaintiff's
complaint alleges defendants violated his constitutional rights
while he was an inmate at Green Haven Correctional
Facility.[1] Plaintiff's complaint was dismissed *sua sponte* by
Judge Thomas P. Griesa on June 26, 1995 pursuant to 28
U.S.C. § 1915(d). On September 26, 1995, the Second Circuit
Court of Appeals vacated the judgment and remanded the case
to the district court for further proceedings.

[1]    Plaintiff is presently incarcerated at Sullivan
       Correctional Facility.

The case was reassigned to Judge Barbara S. Jones on
January 31, 1996. Defendants moved to dismiss the complaint
pursuant to Fed.R.Civ.P. 12(c) on November 25, 1996.
Thereafter, the case was reassigned to Judge Jed S. Rakoff
on February 26, 1997. On February 26, 1998, Judge Rakoff
granted defendants' motion to dismiss, but vacated the
judgment on April 10, 1998 in response to plaintiff's motion
for reconsideration in which plaintiff claimed that he never
received defendants' motion to dismiss.

By Judge Rakoff's Order dated April 14, 1998, this case was
referred to me for general pretrial purposes and for a Report
and Recommendation on any dispositive motion. Presently
pending is defendants' renewed motion to dismiss. Plaintiff
filed a reply on July 6, 1998. For the reasons discussed
below, plaintiff's complaint is dismissed without prejudice,
and plaintiff is granted leave to replead within thirty (30) days
of the date of the entry of this order.

FACTS

Plaintiff alleges that he was assaulted by four inmates in the
Green Haven Correctional Facility mess hall on March 14,
1995. (Complaint at 4.) He alleges that he was struck with
a pipe and a fork while in the "pop room" between 6:00
p.m. and 6:30 p.m. (Complaint at 4–5.) Plaintiff contends
that the attack left him with 11 stitches in his head, chronic
headaches, nightmares, and pain in his arm, shoulder, and
back. (*Id.*) Plaintiff also states that Sergeant Ambrosino
"failed to secure [the] area and separate" him from his
attackers. (Reply at 5.) Plaintiff's claim against Warden Artuz
is that he "fail [sic] to qualify as warden." (Complaint at
4.) Plaintiff names Commissioner Coombes as a defendant,
alleging Coombes "fail [sic] to appoint a qualified warden
over security." (Amended Complaint at 5.) Plaintiff further
alleges that Dr. Manion refused to give him pain medication.
(Complaint at 5.) Plaintiff seeks to "prevent violent crimes"
and demands $6,000,000 in damages. (Amended Complaint
at 5.)

Defendants moved to dismiss the complaint, arguing that: (1)
the Eleventh Amendment bars suit against state defendants
for money damages; (2) the plaintiff's allegations fail to state
a claim for a constitutional violation; (3) the defendants are
qualifiedly immune from damages; and (4) plaintiff must
exhaust his administrative remedies before bringing this suit.

DISCUSSION

I find that plaintiff's complaint runs afoul of Rules 8 and
10 of the Federal Rules of Civil Procedure and dismiss the
complaint without prejudice and with leave to amend. Federal
Rule 8 requires that a complaint contain "a short and plain
statement of the claim showing that the pleader is entitled to
relief." Fed.R.Civ.P. 8(a)(2). The purpose of this Rule "is to
give fair notice of the claim being asserted so as to permit the

adverse party the opportunity to file a responsive answer [and] prepare an adequate defense." *Powell v. Marine Midland Bank,* 162 F.R.D. 15, 16 (N.D.N.Y.1995) (quoting *Brown v. Califano,* 75 F.R.D. 497, 498 (D.D.C.1977)); *see Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) (stating that the "principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial").

**\*2** Rule 10 of the Federal Rules of Civil Procedure requires, *inter alia,* that the allegations in a plaintiff's complaint be made in numbered paragraphs, each of which should recite, as far as practicable, only a single set of circumstances. *Moore's Federal Practice,* Vol. 2A, ¶ 10.03 (1996). Rule 10 also requires that each claim upon which plaintiff seeks relief be founded upon a separate transaction or occurrence. *Id.* [2] The purpose of Rule 10 is to "provide an easy mode of identification for referring to a particular paragraph in a prior pleading." *Sandler v. Capanna,* 92 CV. 4838, 1992 WL 392597, \*3 (E.D.Pa. Dec.17, 1992) (citing 5 C. Wright & A. Miller, *Federal Practice and Procedure,* § 1323 at 735 (1990)).

[2]     Rule 10 states:

    (b) Paragraphs; Separate Statements. All averments of claim or defense shall be made in numbered paragraphs, the contents of each of which shall be limited as far as practicable to a statement of a single set of circumstances; and a paragraph may be referred to by number in all succeeding pleadings. Each claim founded upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth.

A complaint that fails to comply with these pleading rules "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of" a plaintiff's claims. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996). It may therefore be dismissed by the court. *Id.; see also Salahuddin v. Cuomo,* 861 F.2d at 42 ("When a complaint does not comply with the requirement that it be short and plain, the court has the power to, on its own initiative, ... dismiss the complaint"). Dismissal, however, is "usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible

that its true substance, if any, is well disguised." *Id.* In those cases in which the court dismisses a *pro se* complaint for failure to comply with Rule 8, it should give the plaintiff leave to amend when the complaint states a claim that is on its face nonfrivolous. *Simmons v. Abruzzo,* 49 F.3d 83, 87 (2d Cir.1995).

In determining whether a nonfrivolous claim is stated, the complaint's allegations are taken as true, and the "complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v.. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The complaint of a *pro se* litigant is to be liberally construed in his favor when determining whether he has stated a meritorious claim. *See Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972). Even if it is difficult to determine the actual substance of the plaintiff's complaint, outright dismissal without leave to amend the complaint is generally disfavored as an abuse of discretion. *See Salahuddin,* 861 F.2d at 42–42; *see also Doe v. City of New York,* No. 97 Civ. 420, 1997 WL 124214, at \*2 (E.D.N.Y. Mar.12, 1997).

Here, plaintiff's *pro se* complaint fails to satisfy the requirements of Federal Rules 8 and 10. The complaint is often illegible and largely incomprehensible, scattering what appear to be allegations specific to plaintiff within a forest of headnotes copied from prior opinions. Defendants have answered with a boilerplate brief, which is perhaps all a defendant can do when faced with such a complaint. The Court is left with an insurmountable burden in attempting to make a reasoned ruling on such muddled pleadings.

**\*3** Although plaintiff's complaint is substantially incomprehensible, it appears to plead at least some claims that cannot be termed frivolous on their face. For example, plaintiff clearly alleges that inmates assaulted him and that Dr. Manion refused to provide him medical attention. He also appears to assert that Sergeant Ambrosino failed to protect him from the attack or take steps to prevent future attacks. (Plaintiff's Reply at 5). It is well established that an inmate's constitutional rights are violated when prison officials act with deliberate indifference to his safety or with intent to cause him harm. *Hendricks v. Coughlin,* 942 F.2d 109 (2d Cir.1991). It is similarly well established that an inmate's constitutional rights are violated when a prison doctor denies his request for medical care with deliberate indifference to the inmate's serious medical needs. *Estelle v. Gamble,* 429

1998 WL 832708

U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Hathaway v. Coughlin,* 37 F.3d 63 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). Although plaintiff provides few facts to support his allegations, I disagree with defendants' assertion that outright dismissal is appropriate because it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Defendant's Memorandum at 5 (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Because plaintiff's complaint does not comply with Rules 8 and 10, it is hereby dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this Order. In drafting his second amended complaint, plaintiff is directed to number each paragraph and order the paragraphs chronologically, so that each incident in which he alleges a constitutional violation is described in the order that it occurred. Plaintiff is also directed to specifically describe the actions of each defendant that caused plaintiff harm, and to do so in separate paragraphs for each defendant. Plaintiff's complaint shall contain the facts specific to the incidents plaintiff alleges occurred, and not any facts relating to any case that has been decided previously by a court of law. Plaintiff's complaint shall also contain a clear statement of the relief he seeks in addition to monetary damages.

CONCLUSION

For the reasons set forth above, plaintiff's complaint is dismissed without prejudice, and plaintiff is granted leave to replead within thirty (30) days of the date of the entry of this Order.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 1998 WL 832708

---

    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

1995 WL 236245
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

James N. MYERS, Jr., Plaintiff,

v.

Heather WOLLOWITZ, Attorney, Defendant.

No. 95–CV–0272 (TJM) (RWS).
|
April 10, 1995.

**Attorneys and Law Firms**

James N. Myers, Jr., Troy, NY, pro se.

*DECISION AND ORDER*

McAVOY, Chief Judge.

*I. Background*

**\*1** Presently before this Court is the above-captioned plaintiff's application to proceed in forma pauperis and civil rights complaint. Plaintiff has not paid the partial filing fee required to maintain this action.

For the reasons stated below, plaintiff's complaint is dismissed pursuant to 28 U.S.C. § 1915(d) and Local Rule 5.4(a) of the General Rules of this Court as without arguable basis in law.

In his *pro se* complaint, plaintiff seems to claim that plaintiff was represented by defendant Wollowitz, a public defender for the County of Rensselaer, in a County Court proceeding. Plaintiff alleges that after a criminal proceeding in that Court, plaintiff was "sentenced to a illegal sentence." *Id.* at 2. Plaintiff contends that due to the ineffective assistance of his counsel, defendant Wollowitz, his constitutional rights were violated. For a more complete statement of plaintiff's claims, reference is made to the entire complaint filed herein.

*II. Discussion*

Consideration of whether a *pro se* plaintiff should be permitted to proceed in forma pauperis is a two-step process. First, the court must determine whether the plaintiff's economic status warrants waiver of fees and costs under 28 U.S.C. § 1915(a). If the plaintiff qualifies by economic status, the court must then consider whether the cause of action

stated in the complaint is frivolous or malicious. *Moreman v. Douglas,* 848 F.Supp. 332, 333 (N.D.N.Y.1994) (Scullin, J.); *Potnick v. Eastern State Hosp.,* 701 F.2d 243, 244 (2d Cir.1983) (per curiam).

In the present case, upon review of the plaintiff's inmate account statements, the Court has determined that plaintiff's financial status qualifies him to file or "commence" this action in forma pauperis. 28 U.S.C. § 1915(a). Turning to the second inquiry, a court may "dismiss the proceeding under 28 U.S.C. § 1915(d) if the court thereafter determines that ... the action is frivolous or malicious." *Moreman,* 848 F.Supp. at 333 (citation omitted).

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact. *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). Although the court has the duty to show liberality towards *pro se* litigants, *Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir.1990) (per curiam), and extreme caution should be exercised in ordering sua sponte dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir.1983), there is a responsibility on the court to determine that a claim is not frivolous before permitting a plaintiff to proceed with an action in forma pauperis. Dismissal of frivolous actions pursuant to 28 U.S.C. § 1915(d) is appropriate to prevent abuses of the process of the court, *Harkins v. Eldredge,* 505 F.2d 802, 804 (8th Cir.1974), as well as to discourage the waste of judicial resources. *Neitzke,* 490 U.S. at 327. *See generally Moreman,* 848 F.Supp. at 334.

**\*2** 42 U.S.C. § 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights. *See, e.g., Von Ritter v. Heald,* 91–CV–612, 1994 WL 688306, \*3, 1994 U.S.Dist. LEXIS 17698, \*8–9 (N.D.N.Y. Nov. 14, 1994) (McAvoy, C.J.). A party may not be held liable under this section unless it can be established that the defendant has acted under the color of state law. *See, e.g., Rounseville v. Zahl,* 13 F.3rd 625, 628 (2d Cir.1994) (noting state action requirement under § 1983); *Wise v. Battistoni,* 92–Civ–4288, 1992 WL 380914, \*1, 1992 U.S.Dist. LEXIS 18864, \*2–3 (S.D.N.Y. Dec. 10, 1992) (same) (citations omitted).

In the present case, the sole defendant named by plaintiff is the Rensselaer County public defender who apparently represented plaintiff in the criminal proceeding discussed in

his complaint. *See* Complaint at 2. However, "[i]t is well settled that an attorney's representation of a party to a court proceeding does not satisfy the Section 1983 requirement that the defendant is alleged to have acted under color of state law...." *Wise,* 1992 WL 380914 at *1, 1992 U.S.Dist. LEXIS 18864 at *2–3; *see also D'Ottavio v. Depetris,* 91–Civ–6133, 1991 WL 206278, *1, 1991 U.S.Dist. LEXIS 13526, *1–2 (S.D.N.Y. Sept. 26, 1991).

Since the plaintiff has not alleged any state action with respect to the Section 1983 claim presently before the Court, plaintiff's complaint, as presented to this Court, cannot be supported by any arguable basis in law and must therefore be dismissed pursuant to 28 U.S.C. § 1915(d). *Neitzke,* 490 U.S. at 328.

Accordingly, it is hereby

ORDERED, that leave to proceed or prosecute this action in forma pauperis is denied, and it is further

ORDERED, that this action is dismissed pursuant to 28 U.S.C. § 1915(d) and Local Rule 5.4(a) of the General Rules of this Court as lacking any arguable basis in law, and it is further

ORDERED, that the Clerk serve a copy of this Order on the plaintiff by regular mail.

I further certify that any appeal from this matter would not be taken in good faith pursuant to 28 U.S.C. § 1915(a).

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1995 WL 236245

---

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 2868231

2009 WL 2868231
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Quentin LA GRANDE, Plaintiff,

v.

TOWN OF BETHLEHEM POLICE
DEPARTMENT, et al., Defendants.

No. 1:08–CV–0738 (LEK/DRH).
|
Sept. 1, 2009.

**Attorneys and Law Firms**

Quentin La Grande, Albany, NY, pro se.

Nannette R. Kelleher, Bailey, Kelleher Law Firm, Albany, NY, for Defendants.

***DECISION AND ORDER***

LAWRENCE E. KAHN, District Judge.

**\*1** Plaintiff *pro se* Quentin La Grande ("Plaintiff" or "La Grande") commenced the instant action against Defendants Robert Helligrass [1], Stephen Kraz [2] and the Town of Bethlehem Police Department (collectively, "Defendants") pursuant to 42 U.S.C. § 1983. Complaint (Dkt. No. 1). Presently before this Court is Defendants' Motion to dismiss (Dkt. No. 13) and Plaintiff's Motion for summary judgment (Dkt. No. 12). For the following reasons, Defendants' Motion to dismiss is granted and Plaintiff's Motion for summary judgment is denied.

[1]    Incorrectly named in the Complaint as "R.J. Helliergrass." *See generally* Complaint (Dkt. No. 1).

[2]    Incorrectly named in the Complaint as "William Craz." *See generally* Complaint.

**I. BACKGROUND**

According to Plaintiff, "[o]n April 1, 2008 I was threaten by Patrol Officer William Craz. Patrol Officer called me a 'Nigger,' and also threaten to cause bodily harm to me. On April 2, 2008 I met with Seargent R.J. Helliergrass and was

interogated, and racial harrassed. On or about April 5, 10, 15, May 6, 8, 10, 15, and June 6, 2008, I have been followed by the Bethlehem Police Department." Compl. at 2. Plaintiff's jurisdictional statement asserts that the Complaint is being brought pursuant to 42 U.S.C. § 1983. *Id.* at 1.

In lieu of filing an answer, on March 11, 2009, Defendants filed the Motion to dismiss presently before the Court. Mot. to Dismiss (Dkt. No. 13). Plaintiff also filed a Motion for summary judgment on February 24, 2009, which is now before the Court. Mot. for Sum. Judg. (Dkt. No. 12).

**II. DISCUSSION**

**A. Defendants' Motion to Dismiss**

**a. Standard of Review**

In order to withstand a motion to dismiss, "a [pleading] must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A party must plead with such factual detail so as to sufficiently " 'nudge [ ][its] claims ... across the line from conceivable to plausible.' " *Iqbal,* 129 S.Ct. at 1950–51 (quoting *Twombly,* 550 U.S. at 570). While stating a claim does not require the recitation of detailed factual allegations, it does, however, require facts sufficient to state a claim to relief that is *prima facie* plausible. *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 555). The Court must accept the allegations in the well-pleaded complaint as true, *Albright v. Oliver,* 510 U.S. 266, 268, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), and draw all inferences in favor of the non-moving party. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1973); *Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 154 (2d Cir.2006); *King v. Am. Airlines, Inc.,* 284 F.3d 352, 356 (2d Cir.2002).

In assessing the legal sufficiency of the Complaint, the Court is mindful that La Grande is a *pro se* litigant and his submissions are subject to "less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (quoting *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)). The Court must "read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments they suggest.' " *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999); *see Hemphill v. New York,* 380 F.3d

680, 687 (2d Cir.2004) (" "It is well-established that 'when a plaintiff proceeds *pro se* the court is obligated to construe his pleadings liberally, particularly when they allege civil rights violations' ") (quoting *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004)). However, a plaintiff's *pro se* status "does not exempt [him] from compliance with relevant rules of procedural and substantive law." *Traguth v. Zuck,* 710 F.2d 90, 92 (2d Cir.1983).

#### b. Analysis

**\*2** Defendants move to dismiss Plaintiff's Complaint in its entirety pursuant to Rules 12(b)(6) of the Federal Rules of Civil Procedure.[3] Mot. to Dismiss (Dkt. No. 13) at 1. Defendants specifically argue that all causes of action against the Town of Bethlehem Police Department must be dismissed as it is not a legal entity subject to suit under 42 U.S.C. § 1983 and further that Plaintiff's entire Complaint should be dismissed for failing to state a cause of action. *Id.* at 4.

[3]  Defendants argue, alternatively, that Plaintiff's Complaint should be dismissed pursuant to 28 U.S.C. § 1915(e) and for failing to adhere to Rule 8(a) of the Federal Rules of Civil Procedure. The Court need not address these arguments as it is dismissing Plaintiff's Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).

#### i. Town of Bethlehem Police Department

The Town of Bethlehem moves to dismiss Plaintiff's Complaint on the ground that it is not susceptible to suit under 42 U.S.C. § 1983. While a municipality may be susceptible to suit under 42 U.S.C. § 1983, a municipal police department is not. *See Walker v. Waterbury Police Dep't.,* 08–cv–959 (JG)(AKT), 2009 U.S. Dist. LEXIS 7933, at \*5, 2009 WL 261527 (E.D.N.Y. Feb. 4, 2009). "Under New York law, departments which are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and cannot sue or be sued." *Id.* (citing *Hall v. City of White Plains,* 185 F.Supp.2d 293, 303 (S.D.N.Y.2002)). Accordingly, claims asserted under 42 U.S.C. § 1983 will be dismissed against a municipality's police department. *See Walker,* 2009 U.S. Dist. LEXIS 7933, at \*5, 2009 WL 261527 (internal citation omitted); *see also Baker v. Willett,* 42 F.Supp.2d 192, 198 (N.D.N.Y.1999).

Here, Plaintiff has sued the Town of Bethlehem Police Department along with two individual officers of the

department. *See generally* Compl. Plaintiff's Complaint asserts that it is brought pursuant to 42 U.S.C. § 1983 and does not provide any other basis for the claims. *Id.* at 1. Since the Bethlehem Police Department cannot be sued pursuant to 42 U.S.C. § 1983, Plaintiff's Complaint is dismissed as against the Town of Bethlehem Police Department.

Even assuming *arguendo* that Plaintiff's claims against the Town of Bethlehem Police Department can be construed as a claim against the Town of Bethlehem, Plaintiff's Complaint would still be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

In order to state a cause of action for municipal liability under 42 U.S.C. § 1983, "a plaintiff must allege that the municipality has adopted a custom or policy which is the moving force behind the [alleged constitutional violation]." *Zappala v. Albicelli,* 980 F.Supp. 635, 649 (N.D.N.Y.1997). A municipality cannot be held liable on the basis of *respondeat superior* and "a single incident alleged in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy." *Campanaro v. City of Rome,* 999 F.Supp. 277, 281 (N.D.N.Y.1998); *see also Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993).

Plaintiff's Complaint is devoid of any allegations that the Town of Bethlehem had a policy or custom of violating constitutional rights, nor does plaintiff allege or even allude that the Town was deliberately indifferent to his constitutional rights. The complete failure to plead such warrants dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, as the Complaint fails to state a cause of action for which relief can be granted under 42 U.S.C. § 1983. *See Campanaro,* 999 F.Supp. at 281; *Dwares,* 985 F.2d at 100.

#### ii. Defendants Kraz and Helligrass

**\*3** La Grande's Complaint alleges that between April and June 2008, he was "racially harassed," "threatened" and "interrogated" by Defendants Kraz and Helligrass, two officers of the Bethlehem Police Department. Compl. at 2. Specifically, La Grande alleges that on multiple occasions the officers addressed him with a racial epithet and followed him through town. *Id.* It is well settled in this Circuit that "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Murray v. Pataki,* No. 9:03–cv–1263, 2007 U.S. Dist. LEXIS 26959, at \*22, 2007 WL 956941 (N.D.N.Y. Mar. 29, 2007) (Kahn, J.) (quoting *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003)) (collecting cases).

"[V]erbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Murray,* 2007 U.S. Dist. LEXIS, at * 22 (quoting *Moncrieffe v. Witbeck,* 2000 U.S. Dist. LEXIS, at *3, 2000 WL 949457 (N.D.N.Y. June 29, 2000)); *see also Zeno v. Cropper,* 650 F.Supp. 138, 141 (S.D.N.Y.1986) ("vile and abusive language ... no matter how abhorrent or reprehensible cannot form the basis for a § 1983 claim) (internal citation and quotation omitted). Further, "threats do not amount to violations of constitutional rights." *Murray,* 2007 U.S. Dist. LEXIS, at *23 (quoting *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995)).

In this case, Plaintiff's claim for verbal harassment in the form of racial slurs and threats is not actionable under § 1983 and, therefore, fails to state a claim entitled to relief. Compl. at 2.

**B. Plaintiff's Motion for Summary Judgment**

Even assuming *arguendo* that this Court did not grant Defendants' Motion to dismiss, Plaintiff's Motion for summary judgment would still be denied. Under the Local Rules, *"all* motions ... require a memorandum of law, supporting affidavit, and proof of service on all the parties." N.D.N.Y. L.R. 7.1(a) (emphasis added). "All memoranda of law shall contain a table of contents and, wherever possible, parallel citations." *Id.* at 7 .1(a)(1). Further "[a]ny motion for summary judgment shall contain a Statement of Material Facts ... *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion." Id.* at 7 .1(a)(3) (emphasis in original).

Here, not only did the Plaintiff fail to submit a memoranda of law in support of his Motion for summary judgment and an affidavit but he also failed to submit a Statement of Material Facts. In fact, in his Motion for summary judgment filed on February 24, 2009, Plaintiff explicitly stated, "I will provide this Court with a 'Law Memorandum' in support of my motion; such will contain applicable law, and case law. I will submit this to the Court on or before March 6, 2009." Mot. for Sum. Judg. at 1. To date, this Court has nor received said memorandum of law. While this Court recognizes Plaintiff's *pro se* status, he has failed to comply with *all* of the Local Rules. *See Traguth v. Zuck,* 710 F.2d 90, 92 (2d Cir.1983) (a plaintiff's *pro se* status "does not exempt [him] from compliance with relevant rules of procedural and substantive law"). Accordingly, Plaintiff's Motion for summary judgment

is denied for failing to comply with the relevant rules of procedure. *See, e.g.,* N.D.N.Y. L.R. 7.1(a), 7.1(a)(3).

**C. Amended Complaint**

**\*4** Plaintiff also moves to amend his Complaint. Response (Dkt. No. 27). While *pro se* litigants are generally afforded wide latitude and an opportunity to amend, a District Court need not permit an amendment to a Complaint where it would be futile. *See Forman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (holding that although leave to amend should be freely given where justice so requires, a district court need not grant leave if amendment would be futile); *Acito v. Imcera Group, Inc.,* 47 F.3d 47, 55 (2d Cir.1995).

Here, Plaintiff's Complaint does not state any viable causes of action under 42 U.S.C. § 1983. Further, Plaintiffs Complaint does not state which, if any, of his constitutional rights were violated by Defendants nor does it plead any facts to establish municipal liability. Plaintiff's Complaint also does not plead any facts supporting his allegations that he was "racially harassed," "threatened" or "interrogated." Since, as the Court discussed above, none of the complained of actions provides the basis for a cognizable cause of action, leave to cure these defects would be futile. These deficiencies may have been excusable, albeit not cureable, had this Court not previously informed Plaintiff of the requirements for pleading a cause of action under 42 U.S.C. § 1983 against a municipality. *See La Grande v. Albany Police Dep't,* 1:07–CV–757 (Dkt. No. 4).[4] Given that leave to amend would be futile, this Court denies Plaintiff's request.

[4]     Notably, Plaintiff has also filed numerous Complaints in the Northern District, many of which include assertions of civil rights violations and racial discrimination or harassment, wherein Plaintiff has been granted leave to amend his complaints. Plaintiff has filed eleven suits in the Northern District since 2000, including the instant matter. In fact, on May 12, 2008, Chief United States District Judge Norman A. Mordue entered an order enjoining Plaintiff from filing any further actions or pleadings in this district without the prior permission of the Chief Judge. Dkt. No. 6. This Order was entered based on a record of vexatious and frivolous pleadings previously filed by La Grande.

2009 WL 2868231

## III. CONCLUSION

Based on the foregoing, it is hereby

**ORDERED,** that Defendants' Motion to dismiss (Dkt. No. 13) is **GRANTED in its entirety;** and it is further

**ORDERED,** that Plaintiff's request to amend his Complaint (Dkt. No. 27) is **DENIED;** and it is further

**ORDERED,** that Plaintiff's Motion for summary judgment (Dkt. No. 12) is **DENIED in its entirety;** and it is further

**ORDERED,** that the Clerk serve a copy of this Decision and Order on all parties.

**IT IS SO ORDERED.**

### All Citations

Not Reported in F.Supp.2d, 2009 WL 2868231

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4052286
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Sylvia JENKINS, Plaintiff,
v.
Mr. LIADKA, Syracuse Police Officer; Mr. Sands,
Syracuse Police Officer; John Doe, Syracuse Police
Officer; and Syracuse Police Dep't, Defendants.

No. 5:10–CV–1223 (GTS/DEP).
|
Sept. 13, 2012.

**Attorneys and Law Firms**

Sylvia Jenkins, Syracuse, NY, pro se.

Hon. Mary Anne Dougherty, Corporation Counsel for
City of Syracuse, Catherine Ena Carnrike, Esq., Assistant
Corporation Counsel, of Counsel, Syracuse, NY, for
Defendants.

*MEMORANDUM–DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Sylvia Jenkins ("Plaintiff") against Mr. Liadka,
Mr. Sands, John Doe, and Syracuse Police Department
("Defendants"), is Defendants' motion to dismiss Plaintiff's
Complaint for insufficient service of process pursuant to
Fed.R.Civ.P. 12(b)(5) and/or for failure to state a claim
pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 13.) For the
reasons set forth below, Defendants' motion is granted in part
and denied in part.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Complaint

Generally, construed with the utmost of special liberality,
Plaintiff's Complaint asserts three claims against Defendants
arising from an investigatory stop in September 2010, in
Syracuse, New York: (1) a claim that three Syracuse Police
Officers unreasonably searched her in violation of the Fourth
Amendment; (2) a claim that they unlawfully seized, and
failed to return, her personal property in violation of the

Fourth, Fifth, and/or Fourteenth Amendments; and (3) a claim
that they subjected her to excessive force in violation of
the Fourth Amendment. (*See generally* Dkt. No. 1 [Plf.'s
Compl.].)

Generally, in support of these claims, Plaintiff alleges as
follows: (1) on the evening of September 9, 2010, she was
stopped on Butternut Street in the City of Syracuse by
two officers, who questioned her regarding a call they had
received; (2) when she told the two police officers that she
did not know what they were talking about and "attempted
to go on about [her] business," the officers became "uptight,
rude, [and] abnormal in their conversations [and] behavior,"
and threatened her; (3) the officers then proceeded to conduct
a search of "all [of Plaintiff and her] personal property,"
and, in the process of doing so, twisted her arm and forced
her onto the front of their police vehicle; (4) a third police
officer arrived, and she was assaulted by all three officers
(hereinafter "Defendants"), who hit her on the back and threw
her onto the police vehicle; (5) following the deprivation on
September 9, 2010, Defendants denied her a post-deprivation
remedy through a combination of threats, intimidation and/
or nonresponsiveness; and (6) Defendants took these actions
against her intentionally because they did not personally like
her, given her previous interactions with the Syracuse Police
Department. (*Id.*)

Plaintiff further alleges that, as a result of this incident,
she suffered various injuries and losses, including (1) a
"tremendous setback in already trying to recover in an [sic]
grave overall manner of my life [and] lifestyle involving
officials internally [and] externally," (2) head and back pain,
and mental suffering, (3) loss of personal property, and, (4)
loss of employment. (*Id.*) As relief, Plaintiff requests an award
of twelve thousand dollars ($12,000) in damages. (*Id.* at ¶ 6.)

Familiarity with the remaining factual allegations supporting
Plaintiff's three claims is assumed in this Decision and Order,
which is intended primarily for review by the parties. (*See
generally* Dkt. No. 1.)

### B. Defendants' Motion

**\*2** On May 6, 2011, Defendants filed a motion to dismiss.
(Dkt. No. 13, Attach 2.) Generally, in support of their motion,
Defendants assert the following two arguments: (1) because
the Complaint was not served within the time allowed by
Fed.R.Civ.P. 4 or Local Rule 4.1 of the Local Rules of Practice
for this Court, the Court lacks jurisdiction over Defendants in
accordance with Fed.R.Civ.P. 4; and (2) the Complaint fails

to state a claim upon which relief can be granted, because (a) the Complaint fails to identify what constitutional rights Plaintiff is attempting to vindicate, (b) even if the Complaint has sufficiently identified a constitutional violation, the Complaint fails to allege facts plausibly suggesting the personal involvement of the individual Defendants in any such constitutional violation, (c) the City of Syracuse Police Department does not have the legal capacity to be sued, (d) even if Plaintiff's Complaint can be liberally construed as attempting to assert a claim against the City of Syracuse, the Complaint fails to allege facts plausibly suggesting that the individual Defendants' actions the result of a city policy or custom sufficient to confer municipal liability upon the City, (e) the Fifth Amendment does not govern a plaintiff's deprivation-of-property claim against state actors, (f) the Complaint fails to allege facts plausibly suggesting that force was used or that if force was used it was excessive for purposes of a Fourth Amendment claim, and (g) based on Plaintiff's factual allegations, Defendants Liadka and Sands are protected from liability as a matter of law by the doctrine of qualified immunity. (*See generally* Dkt. No. 13, Attach. 2.)

On June 2, 2011, Plaintiff filed a response to Defendants' motion. Generally, Plaintiff's response, which is handwritten and three pages in length, states that she "definitely oppose[s] [Defendants'] request" for the dismissal of her Complaint. (*See generally* Dkt. No. 17.) However, Plaintiff's response does not address the legal arguments asserted by Defendants for the dismissal of Plaintiff's Complaint. (*Compare* Dkt. No. 17 *with* Dkt. No. 13, Attach. 2.) Although Plaintiff's response was submitted two days after the expiration of the responsedeadline, the Court has accepted it, out of an extension of special solicitude to her as a *pro se* civil rights litigant.

In addition, Plaintiff has filed three letters to the Court on the following dates: July 6, 2011, August 22, 2011, and January 13, 2012. (Dkt. No. 18–20.) Generally, these letters contain assertions that Plaintiff believes that the police are treating her, treating her negatively, and responding unsatisfactorily to her telephone calls. (*Id.*) To the extent that these three letters are intended to constitute papers in opposition to Defendants' motion, the Court will not consider them, because (1) they are not responsive to the motion, and/or (2) they were not submitted in a timely manner. Moreover, to the extent that these three letters are intended to constitute a request for relief, the Court will not consider them, because do not state the relief sought, state with particularity the grounds for seeking the order, and attach a memorandum of law and affidavit, as required by Fed.R.Civ.P. 7(b) and Local Rule 7.1 of the Local Rules of Practice for this Court.

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions to Dismiss for Insufficient Service of Process

**\*3** Rule 4(m) of the Federal Rules of Civil Procedure provides, in pertinent part, as follows:

> If a defendant is not served within 120 days after the complaint is filed, the court-on motion or its own after notice to the plaintiff-must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed.R.Civ.P. 4(m).

The Local Rules of Practice for this Court shorten the service requirements under Fed.R.Civ.P. 4. Specifically, Local Rule 4.1(b) requires "service of process upon all defendants within sixty (60) days of the filing of the complaint. This expedited service is necessary to ensure adequate time for pretrial discovery and motion practice. In no event shall service of process be completed after the time specified in Fed.R.Civ.P. 4." N.D.N.Y. L.R. 4.1(b).

### B. Legal Standard Governing Motions to Dismiss for Failure to State Claim

It has long been understood that a defendant may base a motion to dismiss for failure to state a claim upon which relief can be granted on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such motions are often based on the first ground, a few words on that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading

2012 WL 4052286

contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n. 17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

**\*4** Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turning on the *conceivability* of an actionable claim,

the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id .* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* [1]

[1] It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, "Specific facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Twombly*-that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not show[n]-that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 [internal quotation marks and

citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice. *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[2] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[3] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28.

[2]     *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N . Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[3]     *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

**\*5** Finally, a few words are appropriate regarding what documents are considered on a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6). The court may consider the following documents without triggering the summary judgment standard: "(1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference into the complaint (and provided by the parties),

(3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case." *Planck v. Schenectady Cnty.,* 12–CV–0336, 2012 WL 1977972, at \*5 (N.D.N.Y. June 1, 2012) (Suddaby, J.). Moreover, "a pro se plaintiff's papers in response to a defendant's motion to dismiss for failure to state a claim may be considered as effectively amending the allegations of [her] complaint-to the extent those papers are consistent with the allegations in the complaint." *Planck,* 2012 WL 1977972, at \*5.

## C. Legal Standard Governing Unopposed Motions

In this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b) (3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini,* 07–CV–0279, 2009 WL 3672105, at \*1, n. 1 (N.D.N.Y.Oct.30, 2009) (Suddaby, J.) (collecting cases); *Este–Green v. Astrue,* 09–CV–0722, 2009 WL 2473509, at \*2 & n. 3 (N.D.N.Y. Aug.7, 2009) (Suddaby, J.) (collecting cases).

## D. Legal Standards Governing Plaintiff's Claims

Because the Court has, in its Decision and Order of March 7, 2011, addressed the relevant points of law contained in the legal standards governing Plaintiff's claims in this action, the Court will not again recite, in their entirety, those legal standards in this Decision and Order, 9 which is intended primarily for review by the parties. (*See generally* Dkt. No. 5 [Decision and Order].)

## E. Legal Standards Governing Defendants' Defenses

### 1. Defense of Lack of Separate Identity

"Under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality, and therefore, cannot sue or be sued." *Davis v. Lynbrook Police Dept.,* 224 F.Supp.2d 463, 477 (E.D.N.Y.2002). "Pursuant to Fed.R.Civ.P. 17, New York governs the capacity of

a police department to sue or be sued. In New York, police departments like the defendant, which are merely administrative arms of a municipal corporation, do not have a legal identity separate and apart from the *town." Loria v. Irondequoit* 775 F.Supp. 599, 606 (W.D.N.Y.1990). While a municipality can sue or be sued, the police department, which does not exist separate from that municipality, can not. *Baker v. Willett,* 42 F.Supp.2d 192, 198 (N.D.N.Y.1999).

### 2. Defense of Limited Municipal Liability

**\*6** It is well established that "[a] municipality may not be held liable in a Section 1983 action for the conduct of a lower-echelon employee solely on the basis of *respondeat superior.*" [4] "Rather, to establish municipal liability under § 1983 for unconstitutional acts by a municipality's employees, a plaintiff must show that the violation of [his or] her constitutional rights resulted from a municipal custom or policy ." [5] "Thus, to hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to ... prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." [6]

[4]  *Powell v. Bucci,* 04–CV–1192, 2005 WL 3244193, at \*5 (N.D.N.Y. Nov.30, 2005) (McAvoy, J.); *see also Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."); *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983) ("[A] [municipality] may not be held for the actions of its employees or agents under a theory of *respondeat superior."* ).

[5]  *Powell,* 2005 WL 3244193, at \*5; *Monell,* 436 U.S. at 690–691 ("[L]ocal governments ... may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."); *Batista,* 702 F.2d at 397 ("[M]unicipalities may be sued directly under § 1983 for constitutional deprivations inflicted upon private individuals pursuant to a governmental custom, policy, ordinance, regulation, or decision."); *Smith v. City of New York,* 290 F.Supp.2d 317, 321 (S.D.N.Y.2003) ("In order to establish the liability of [municipal] defendants in an action under §

1983 for unconstitutional acts by [its] employees, a plaintiff must show that the violation of [his or] her constitutional rights resulted from a municipal custom or policy.").

[6]  *Batista,* 702 F.2d at 397, *accord, Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995), *McKeon v. Daley,* 101 F.Supp.2d 79, 92 (N.D.N.Y.2000) (Hurd, J.), *Merriman v. Town of Colonie, NY,* 934 F.Supp. 501, 508 (N.D.N.Y.1996) (Homer, M.J.); *Douglas v. Cnty. of Tompkins,* 90–CV–0841, 1995 WL 105993, at \*12 (N.D.N.Y. March 2, 1995) (McCurn, J.), *Keyes v. Cnty. of Albany,* 594 F.Supp. 1147, 1156 (N.D.N.Y.1984) (Miner, J.).

With regard to the first element (the existence of a policy or custom), a "[p]laintiff may establish the 'policy, custom or practice' requirement by demonstrating: (1) a formal policy officially endorsed by the municipality ...; (2) actions taken by government officials responsible for establishing municipal policies related to the particular deprivation in question ...; (3) a practice so consistent and widespread that it constitutes a 'custom or usage' sufficient to impute constructive knowledge to the practice of policymaking officials ...; or (4) a failure by policymakers to train or supervise subordinates to such an extent that it amounts to 'deliberate indifference' to the rights of those who come in contact with the municipal employees...." [7] With regard to the second element (causation), a plaintiff must show "a direct causal link" or "an affirmative link" between the municipal policy or custom and the alleged constitutional deprivation (i.e., that the policy or custom was the "moving force" behind the deprivation). [8]

[7]  *Dorsett–Felicelli, Inc.,* 371 F.Supp.2d 183, 194 (N.D.N.Y.2005) (Kahn, J.) (citing three Supreme Court cases for these four ways), *accord, Dunbar v. Cnty. of Saratoga,* 358 F.Supp.2d 115, 133–134 (N.D.N.Y.2005) (Munson, J.); *see also Clayton v. City of Kingston,* 44 F.Supp.2d 177, 183 (N.D.N.Y.1999) (McAvoy, J.) (transposing order of second and third ways, and citing five more Supreme Court cases).

[8]  *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ("[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional

Case 9:19-cv-01527-TJM-TWD    Document 24    Filed 10/05/20    Page 50 of 259

deprivation."); *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, n. 8, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) ("The fact that municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell'* s requirement that the particular policy be the 'moving force' behind a constitutional violation. There must at least be an affirmative link between [for example] the training inadequacies alleged, and the particular constitutional violation at issue."); *Monell,* 436 U.S. at 694 ("[I]t is when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983. Since this case unquestionably involves official policy as the moving force of the constitutional violation [at issue] ... we must reverse the judgment below."); *Vippolis v. Village of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985) ("A plaintiff who seeks to hold a municipality liable in damages under section 1983 must prove that ... an official policy or custom [was] the cause of the deprivation of constitutional rights.... [T]he plaintiff must establish a causal connection-an affirmative link-between the policy and the deprivation of his constitutional rights.") [internal quotation marks and citation omitted]; *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiff's injury, *Monell* prohibits a finding of liability against the City."); *Powell,* 2005 WL 3244193, at *5 ("Ultimately, the plaintiff must demonstrate a direct causal link between a municipal policy or custom, and the alleged constitutional deprivation.") [internal quotation marks and citation omitted].

### 3. Defense of Qualified Immunity

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). As a result, a qualified immunity inquiry in a civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d

Cir.2004) [citations omitted], *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007) [citations omitted].

In determining the second issue (i.e., whether it would be clear to a reasonable official that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

**\*7** *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) [citations omitted], *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992).[9] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169–70 (2d Cir.2007) [citations omitted].[10] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).[11] As the Supreme Court has explained,

[9]  *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17–18 (2d Cir.1994); *Calhoun v. New York State Division of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

[10]  *See also Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)

2012 WL 4052286

("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.'") [citation omitted]; *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

11   *See also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) [citing cases]; *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341.[12]

12   *See also Hunter v. Bryant,* 502 U.S. 224, 299, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") [internal quotation marks and citation omitted].

## III. ANALYSIS

### A. Whether Plaintiff's Complaint Should Be Dismissed for Failure to Serve Process in Timely Manner

After carefully considering the matter, the Court must answer this question in the negative. By Defendants' own calculations, Plaintiff's Complaint was served on April 18, 2011–a mere 42 days after the Court granted Plaintiff's motion to proceed *in forma pauperis,* approved the filing of her

Complaint, and directed the Clerk of the Court to issue summonses and forward them with the Complaint to the United States Marshal's Service, for service on Defendants. (Dkt. No. 5 [Decision and Order filed March 7, 2011].) Indeed, Defendants acknowledge that Plaintiff completed the Civil Summonses and USM285 form, and returned them to the Clerk's Office (so that the Clerk's Office could forward them to the U.S. Marshal's Service for service of Plaintiff's Complaint) less than eight days after receiving them from the Clerk's Office. (Dkt. No. 13, Attach. 1, at ¶¶ 6–7; Dkt. No. 13, Attach. 2, at 9 [attaching page "8" of Defs.' Memo. of Law]; *see also* Dkt. Nos. 6, 8.) After that point in time, service was largely if not entirely outside of Plaintiff's control.

Under the circumstances, the Court finds that good cause exists to extend the deadline for service by 42 days. The Court notes that a contrary conclusion (e.g., a conclusion that Plaintiff had to serve her Complaint by December 13, 2010 pursuant to Local Rule 4.1, or even February 11, 2011 pursuant to Fed.R.Civ.P. 4) would render meaningless the Court's directive to the Clerk of the Court, on March 5, 2011, to take sufficient action to enable the United States Marshal's Service to effect service for Plaintiff.

### B. Whether Plaintiff's Complaint Should Be Dismissed for Failure to State a Claim Upon Which Relief Can Be Granted

### 1. Whether Plaintiff's Complaint Should Be Dismissed for Failing to Sufficiently Identify What Constitutional Rights She Is Attempting to Vindicate

**\*8**   After carefully considering the matter, the Court must answer this question also in the negative. In construing the pleadings of a *pro se* civil rights litigant in this Circuit, a district court's imagination should be limited only by the plaintiff's factual allegations, not by the legal claims set out in his or her pleadings. *See Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, Phillips has raised. In so doing, the court's imagination should be limited only by Phillips' factual allegations, not by the legal claims set out in his pleadings.").

Here, based on Plaintiff's (albeit scant and confused) factual allegations, the Court can imagine that she is attempting to assert the following three claims: (1) a claim of an unreasonable search under the Fourth Amendment; (2) a claim of an unlawful seizure of, and failure to return, her personal property under the Fourth, Fifth and/or Fourteenth

Amendments; and (3) a claim of excessive force under the Fourth Amendment.

### 2. Whether Plaintiff's Claims Against the Individual Defendants Should Be Dismissed for Failing to Allege Facts Plausibly Suggesting Their Personal Involvement in the Constitutional Violations Alleged

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach. 2, at 13 [attaching page "12" of Defs.' Memo. of Law].) The Court would add only the following three brief points.

First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. *See, supra,* Part III.C. of this Decision and Order. [13] Second, in any event, the Court would reach the same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, and finally, even when construed with the utmost of special liberality, the Complaint does not identify the precise location of the incident, which officers were responsible for violating her rights, how she suffered the head injury she alleges, what property was taken from her, and how Defendants frustrated her efforts to recover that property. *See Vogeler v. Colbath,* 04–CV–6071, 2005 U.S. Dist. LEXIS 44658, at \*29, 2005 WL 2482549 (S.D.N.Y. Oct. 6, 2005) ("Plaintiffs must also allege ... the personal involvement of the Defendant in the actions underlying their claim."). [14]

[13]    Under the circumstances, the Court finds that Plaintiff had sufficient notice of the consequences of failing to respond to the arguments asserted in Defendants' motion. For example, on October 14, 2010, Plaintiff was given a courtesy copy of the District's *Pro Se* Handbook and a courtesy copy of the Local Rules of Practice for the Northern District of New York. (Dkt. No. 4.) In addition, on May 6, 2011, Defendants advised Plaintiff of her need to respond to their arguments. (Dkt. No. 15.) Also, Plaintiff had extensive experience as a *pro se* civil rights litigant in this District, before responding to the motion in question. *See, infra,* Part III.D. of this Decision and Order.

[14]    Indeed, the Court notes that one of the officers that Plaintiff lists in her Complaint has not been

identified. In a prior decision by the Court, Plaintiff was ordered to take reasonable steps to ascertain the identity of the unnamed officer, immediately notify the Court, amend her complaint to include the identity of the third Defendant, and also to have that officer served. (Dkt. No. 5, at 14.) Because Plaintiff has not done so, her alleged physical injuries remain attributable to an unidentified person.

For all of these alternative reasons, Plaintiff's claims against the individual Defendants are dismissed.

### 3. Whether the Syracuse Police Department Should Be Dismissed as a Defendant

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach 2, at 13.) The Court would add only the following three brief points.

**\*9** First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. Second, in any event, the Court would reach the same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, and finally, "as Plaintiff has been told several times, under New York State law, departments, like the Onondaga County Sheriff's Department, that are merely administrative arms of a municipality, do not have a legal identity separate from the municipality and may not sue or be sued." *Jenkins v. Onondaga Cnty. Sheriff's Dep't,* 12–CV–0855, Report–Recommendation, at 5 (N.D.N.Y. filed June 28, 2012) (Baxter, J.) (citing *Hayes v. Cnty. of Sullivan,* 07–CV–0667, 2012 WL 1129373, at \*24 [S.D.N.Y. March 30, 2012] ). Because the Syracuse Police Department is merely an administrative arm of the City of Syracuse, it is not a proper defendant in this case. The real party in interest is the City of Syracuse itself.

For all of these alternative reasons, the Syracuse Police Department dismissed as a Defendant.

### 4. Whether, Even if the City of Syracuse Were Substituted for the Police Department, Plaintiff's Claims Against the City Should Be Dismissed for Failing to Allege Facts Plausibly Suggesting Municipal Liability

Jenkins v. Liadka, Not Reported in F.Supp.2d (2012)
Case 9:19-cv-01527-TJM-TWD   Document 24   Filed 10/05/20   Page 53 of 259
2012 WL 4052286

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach. 2, at 14–15 [attaching pages "13" and "14" of Defs.' Memo. of Law].) The Court would add only the following three brief points.

First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. Second, in any event, the Court would reach same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, even when it is construed with the utmost of special liberality, Plaintiff's Complaint has not alleged facts plausibly suggesting a widespread policy or custom promulgated by the municipal policy maker necessary to hold the City liable for her injuries. As indicated above in Part II.E.2. of this Decision and Order, Plaintiff must allege facts plausibly suggesting that the municipality "has adopted a 'custom' or 'policy' which is the 'moving force' behind [the violation]." *Zappala v. Albicelli,* 980 F.Supp. 635, 639 (N.D.N.Y.1997) (Scullin, J.) (citing, *inter alia, Monell v. Dept. of Soc. Servs. of City of New York,* 436 U.S. 658, 689 [1978] ). However, Plaintiff has not alleged *any* official policy or custom adopted by the City of Syracuse or its Police Department,[15] let alone one responsible for the alleged injuries she received. Because *Monell* prohibits the finding of liability against a City when there is no causal connection between a municipal policy and a resulting injury, Syracuse City Police Department cannot be responsible for Plaintiff's alleged injuries. *Monell,* 436 U.S. at 692. As a result, the City of Syracuse cannot be maintained as a Defendant in this action, and Plaintiff's Section 1983 claims against it are dismissed.

[15]   In addition to not alleging facts plausibly suggesting the existence of a department-wide policy or custom, Plaintiff has not alleged facts plausibly suggesting that Officers Liadka, Sands, and the unnamed officer created or promulgated that policy, or even that they were final policymakers. "A municipal official that exercises discretion, whether it be in a constitutional or unconstitutional manner, in an area of which that official is not the final policymaker, cannot, by itself, establish municipal liability." *Clayton v. City of Kingston,* 44 F.Supp.2d 177, 184 (N.D.N.Y.1999) (McAvoy, C.J.).

*10   For all of these reasons, Plaintiff's claims against the City of Syracuse Police Department and/or the City of Syracuse are dismissed on this alternative ground.

### 5. Whether, in the Alternative, Plaintiff's Deprivation–of–Property Claim Should Be Dismissed to the Extent It Is Grounded on the Fifth Amendment

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach. 2, at 16–17 [attaching pages "15" and "16" of Defs.' Memo. of Law].) The Court would add only the following four brief points.

First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. Second, in any event, the Court would reach the same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, a takings claim is not ripe where a state remedy is potentially available. *Vandor Inc. v. Militello,* 301 F.3d 37, 39 (2d. Cir.2002). As the Supreme Court has explained,

> An unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available. For intentional, as for negligent deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy.

*Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Police are not required to provide the owner with notice for state-law remedies, which are "established by published, generally available state statutes and case law." *City of W. Covina v. Perkins,* 525 U.S. 234, 240–241, 119 S.Ct. 678, 142 L.Ed.2d 636 (1999). "Once the property owner is informed that his property has been seized,

he can turn to these public sources to learn about the remedial procedures that are available to him. The City need not take other steps to inform him of his options." *City of W. Covina, 525 U.S. at 241.* Here, Plaintiff has not alleged facts plausibly suggesting that she attempted to recover her property in the proper manner (or even what property was taken). Fourth, and, finally, Plaintiff does not allege facts suggesting that her property was taken for public use in an unconstitutional manner that would require her to be paid just compensation. Instead, Plaintiff alleges that, after she attempted to escape from their investigation and was restrained by officers, she was searched and had property taken from her.

For all of these alternative reasons, Plaintiff's deprivation-of-property claim is dismissed to the extent that it is grounded on the Fifth Amendment.

**6. Whether, in the Alternative, Plaintiff's Excessive Force Claim Should Be Dismissed for Failing to Allege Facts Plausibly Suggesting Either that Force Was Used or that Any Such Force Was Excessive**

**\*11** After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach. 2, at 17–18 [attaching pages "16" and "17" of Defs.' Memo. of Law].) The Court would add only the following three brief points.

First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. Second, in any event, the Court would reach same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, as stated in the Court's Decision and Order of March 7, 2011, in evaluating a Fourth Amendment excessive-force claim, "courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." (Dkt. No. 5, at 13.) [16] Here, Plaintiff alleges the following facts, which could be construed as plausibly suggesting that, at the time the incident occurred, she had given Defendants probable cause to use the force at issue against her: (1) Defendants were dispatched to that location regarding a problem; (2) Defendants specifically chose to question Plaintiff about the incident; (3) Plaintiff was attempting to get away from Defendant when they were attempting to question her; (4) she acted in such a way as to cause Defendants to become "worked up"; (5) it became

necessary for a third unnamed officer to step in and assist Defendants Sands and Liadka in controlling Plaintiff. (Dkt. No. 1, at ¶ 4 & Attachment.) Simply stated, it is plausible, based on Plaintiff's factual allegations, that the amount of force used by the officers to pull her hands behind her back and detain her was necessary to keep her from getting away and "going about [her] business." (*Id.* at ¶ 4.) It is important to note that Plaintiff does not allege facts plausibly suggesting any physical injury other than vague "head & back pains." (*Id.* at ¶ 5.) [17]

[16]  More specifically, the standard governing constitutional excessive-force claims against government officials in "the course of making an arrest, investigatory stop, or other seizure" of a person is the Fourth Amendment's objective reasonableness standard. *Graham v. Connor,* 490 U.S. 386, 388, 391, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Pursuant to this standard, three elements must be objectively examined to determine whether excessive force was used for Fourth Amendment violations: "(1) the need for the application of force; (2) the relationship between that need and the amount of force that was used; and (3) the extent of the injury inflicted." *Graham,* 490 U.S. at 390, 397. It is essential to look at surrounding circumstances in each case, and analyze "whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. The "extent of intrusion on the suspect's rights" must be balanced against the "importance of governmental interests." *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

[17]  More specifically, Plaintiff's Complaint does not allege facts plausibly suggesting that her injuries were significant, how long the pain lasted, or that medical treatment was necessary (or even sought) following the incident. *See Smith v. City of New York,* 04–CV–3286, 2010 U.S. Dist. LEXIS 88774, at *27, 2010 WL 3397683 (S.D.N.Y. Aug. 27, 2010) ("Courts in this Circuit have consistently held that an injury is de minimis when it is temporary and/or minor in severity.") (collecting cases).

For all of these reasons, Plaintiff's excessive force claim is dismissed on this alternative ground.

**7. Whether, in the Alternative, Plaintiff's Claims Against the Individual Defendants Should Be Dismissed Because, Based on the Factual Allegations of the Complaint, Defendants Are Protected from Liability as a Matter of Law by the Doctrine of Qualified Immunity**

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach. 2, at 19–20 [attaching pages "18" and "19" of Defs.' Memo. of Law].) The Court would add only the following three brief points.

First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. Second, in any event, the Court would the reach same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, as indicated above in Part I.E.3. of this Decision and Order, "[u]nder federal law, a police officer is entitled to qualified immunity where (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Jenkins v. City of New York,* 478 F.3d 76, 87 (2d Cir.2007) (internal quotations and other citations omitted). Here, based on Plaintiff's own factual allegations, it is plausible that police officers of reasonable competence could disagree as to whether Defendants' actions were unlawful (e.g., given their need to question her, and her attempt to flee the scene).

**\*12** For all of these reasons, Plaintiff's claims against the individual Defendants are dismissed on this alternative ground.

**C. Whether the Court Should Give Plaintiff an Opportunity to File an Amended Complaint Before Dismissing This Action**

Generally, when a district court dismisses a *pro se* action, the plaintiff will be allowed to amend his action. *See Gomez v. USAA Fed. Savings Bank,* 171 F.3d 794, 796 (2d Cir.1999). However, an opportunity to amend is not required where the defects in the plaintiff's claims are substantive rather than merely formal, such that any amendment would be futile. As the Second Circuit has explained, "[w]here it appears that

granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (citations omitted), *accord, Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at \*1 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) ("[T]he court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile.") (citation omitted); *see also Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (denial not abuse of discretion where amendment would be futile); *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with Cuoco's causes of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied.") (citation omitted); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (citation omitted); *Health–Chem Corp. v. Baker,* 915 F.2d 805, 810 (2d Cir.1990) ("[W]here ... there is no merit in the proposed amendments, leave to amend should be denied").

This rule applies even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103; *Brown,* 1997 WL 599355, at \*1. As explained above in Part II.B. of this Decision and Order, while the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12; rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.

Here, the Court has some difficulty finding that the referenced defect in Plaintiff's Complaint is merely formal. Nor is the Court confident that granting Plaintiff an opportunity to amend her Complaint will be productive. The Court notes that the errors made by Plaintiff in this action were previously made by her, and not corrected, on many occasions. Plaintiff has been ordered numerous times to file amended complaints at risk of dismissal of her case. [18] Of the seven times an amended complaint was required, Plaintiff submitted an amended complaint only three times. [19] Two of these were one page documents which did not state a claim upon which relief could be granted and were rejected by the Court, and the other did not correct the deficiencies of the original complaint. [20] Plaintiff did not comply with the Court's order

2012 WL 4052286

to amend her complaint at all on four occasions.[21] In one case, Plaintiff was given an additional thirty day period to file her amended complaint after she failed to do so within the first 30 day period granted to her. *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060 (N.D.N.Y. filed Jan. 17, 2006). Similarly, in a separate case, Plaintiff did not follow up on her original claim because she failed to appear for three hearings the Court rescheduled despite warnings of her need to comply with the Court Orders. *Jenkins v. Onondaga Sheriffs' Dep't,* 05–CV–1457 (N.D.N.Y. filed Nov. 21, 2005). All seven of these cases resulted in dismissal, most for failure to prosecute, failure to comply with Court Orders, or failure to state a claim. Five of Plaintiff's cases were not given leave to amend because granting such leniency would have been futile.[22]

[18] *Jenkins v. Comm'r of Soc. Sec. Admin.,* 06–CV–0059 (N.D.N.Y. filed Jan 17, 2006); *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060 (N.D.N.Y. filed Jan. 17, 2006); *Jenkins v. Dep't Corr. Servs.,* 06–CV–0621 (N.D.N.Y. filed May 19, 2006); *Jenkins v. Onondaga Sheriff's Dep't.,* 06–CV–1092 (N.D.N.Y. filed Sept. 12, 2006); *Jenkins v. Sheriff's Dep't.,* 07–CV–0939 (N.D.N.Y. filed Sept. 11, 2007); *Jenkins v. Murphy,* 08–CV–0921 (N.D.N.Y. filed Aug. 8, 2008); *Jenkins v. Onondaga Cnty. Sheriff's Dep't.,* 12–CV–0855 (N.D.N.Y. filed May 23, 2012).

[19] *Jenkins v. Dep't Corr. Servs.,* 06–CV–0621 (N.D.N.Y. filed May 19, 2006); *Jenkins v. Comm'r of Soc. Sec. Admin.,* 06–CV–0059 (N.D.N.Y. filed Jan 17, 2006); *Jenkins v. Sheriff's Dep't.,* 07–CV–0939 (N.D.N.Y. filed Sept. 11, 2007).

[20] *Id.*

[21] *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060 (N.D.N.Y. filed Jan. 17, 2006); *Jenkins v. Onondaga Sheriff's Dep't.,* 06–CV–1092 (N.D.N.Y. filed Sept. 12, 2006); *Jenkins v. Murphy,* 08–CV–0921 (N.D.N.Y. filed Aug. 8, 2008); *Jenkins v. Onondaga Cnty. Sheriff's Dep't.,* 12–CV–0855 (N.D.N.Y. filed May 23, 2012)

[22] *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060 (N.D.N.Y. filed Jan. 17, 2006); *Jenkins v. Mohawk Corr. Facility,* 06–CV–1167 (N.D.N.Y. filed Sept. 29, 2006); *Jenkins v. Sheriff's*

*Dep't,* 07–CV–0939 (N.D.N.Y. filed Sept. 11, 2007); *Jenkins v. USA,* 09–CV0603 (N.D.N.Y. filed May 11, 2009); *Jenkins v. Rice,* 11–CV–1037 (N.D.N.Y. filed Aug. 31, 2011).

**\*13** However, the Court is mindful of the special solicitude that should be afforded to *pro se* civil rights litigants. For these reasons, before the Court dismisses Plaintiff's action, the Court will afford her an opportunity to file an Amended Complaint correcting the above-described pleading defects within thirty (30) days from the date of the filing of this Decision and Order.

If Plaintiff submits an Amended Complaint, she is encouraged to describe the acts of misconduct alleged therein and identify each individual who participated in the misconduct. Moreover, Plaintiff is advised that her Amended Complaint must be a complete pleading that will replace and supersede her original Complaint in its entirety. Finally, Plaintiff is cautioned that, if she fails to file, in a timely fashion, an Amended Complaint that successfully states a claim upon which relief can be granted, her action will be dismissed with prejudice without further Order of the Court.

### D. Whether This Case Should Be Forwarded to the Chief Judge with a Recommendation that an Anti–Filing Injunction Order Be Issued Against Plaintiff

A review of Plaintiff's litigation history on Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service reveals that, before filing the current action on October 13, 2010, she filed thirteen *pro se* civil actions in this District alone-twelve of which have been dismissed and the thirteen of which is being considered for dismissal.[23] A review of Plaintiff's litigation history has caused the undersigned to believe that (1) Plaintiff lacks a good-faith expectation in prevailing in her lawsuits, (2) she is vexatious and indeed incorrigible when proceeding pro se, (3) she has caused needless expense to other parties and placed an unnecessary burden on the Court and its personnel, and (4) no lesser sanctions (e.g., such as dismissal or chastisement) would be adequate to protect the Court and other parties.

[23] *Jenkins v. Onondaga Sheriffs' Dep't,* 05–CV–1457 (N.D.N.Y. filed Nov. 21, 2005); *Jenkins v. Dep't Corr. Servs.,* 06–CV–0621 (N.D.N.Y. filed May 19, 2006); *Jenkins Comm'r of Soc. Sec. Admin.,* 06–CV–0059 (N.D.N.Y. filed Jan. 17, 2006); *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060 (N.D.N.Y. filed Jan.17, 2006); *Jenkins v. City*

*of Syracuse,* 06–CV–1005 (N.D.N.Y. filed Aug. 21, 2006); *Jenkins v. Onondaga Sheriff's Dep't,* 06–CV1092 (N.D.N.Y. filed Sept. 12, 2006); *Jenkins v. Mohawk Corr. Facility,* 06–CV–1167 (N.D.N.Y. filed Sept. 29, 2006); *Jenkins v. City of Syracuse,* 07–CV–0930 (N.D.N.Y. filed Sept. 7, 2007); *Jenkins v. Sheriff's Dep't,* 07–CV–0939 (N.D.N.Y. filed Sept. 11, 2007); *Jenkins v. Murphy,* 08–CV–0921 (N.D.N.Y. filed Aug. 8, 2008); *Jenkins v. USA,* 09–CV–0603 (N.D.N.Y. filed May 11, 2009); *Jenkins v. Rice,* 11–CV–1037 (N.D.N.Y. filed Aug. 31, 2011); *Jenkins v. Onondaga Cnty. Sheriff's Dept.,* 12–CV–0855 (N.D.N.Y filed May 23, 2012).

For example, eight of Plaintiff's actions have resulted in a dismissal for failure to state a claim or frivolousness, another has resulted in the pending recommendation of a dismissal on that ground, three others have resulted in a dismissal for lack of subject-matter jurisdiction, and another has resulted in a dismissal for failure to prosecute. [24]

[24]    *Jenkins v. Onondaga Sheriffs' Dep't,* 05–CV–1457, Decision and Order (N.D.N.Y. filed Apr. 25, 2006) (Scullin, J.); *Jenkins Comm'r of Soc. Sec. Admin.,* 06–CV–0059, Decision and Order (N.D.N.Y. filed March 29, 2007) (Hurd, J.); *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060, Memorandum–Decision and Order (N.D.N.Y. filed April 14, 2006) (Scullin, J.); *Jenkins v. Dep't Corr. Servs.,* 06–CV–0621, Decision and Order (N.D.N.Y. filed July 5, 2006) (Kahn, J.); *Jenkins v. City of Syracuse,* 06–CV–1005, Order (N.D.N.Y. filed Oct. 5, 2006) (Mordue, C.J.); *Jenkins v. Onondaga Sheriff's Dep't,* 06–CV–1092, Decision and Order, (N.D.N.Y. filed Oct. 6, 2006) (McAvoy, J.); *Jenkins v. Mohawk Corr. Facility,* 06–CV–1167, Decision and Order (N.D.N.Y. filed Oct. 12, 2006) (Mordue, C.J.); *Jenkins v. City of Syracuse,* 07–CV–0930, Decision and Order (N.D.N.Y. filed Oct. 7, 2007) (Mordue, C.J.); *Jenkins v. Sheriff's Dep't,* 07–CV–0939, Decision and Order (N.D.N.Y. filed Nov. 21, 2007) (Hurd, J.); *Jenkins v. Murphy,* 08–CV–0921, Order (N.D.N.Y. filed Oct. 14, 2008) (McCurn, J.); *Jenkins v. USA,* 09–CV–0603, Decision and Order (N.D.N.Y. filed May 28, 2009) (McAvoy, J.); *Jenkins v. Rice,* 11–CV–1037, Decision and Order (N.D.N.Y. filed Oct. 11, 2011) (Kahn, J.); *Jenkins*

*v. Onondaga Cnty. Sheriff's Dept.,* 12–CV–0855, Report–Recommendation (N.D.N.Y filed June 28, 2012) (Baxter, M.J.).

Moreover, Plaintiff has sued the Onondaga County Sheriff's Department four times. [25] As a result, she has been repeatedly instructed on the legal standard for suing a municipality. For example, on October 6, 2006, she was specifically informed of the need to establish a custom or policy which is the moving force behind a resulting injury. *Jenkins v. Onondaga Cnty. Sheriff's Dep't.,* 06–CV–1092, Decision and Order, at 4 (N.D.N.Y. filed Oct. 6, 2006) (McAvoy, J.). However, despite receiving that specific information, she has *repeatedly* continued to file improper claims against the Onondaga County Sheriff's Department. [26]

[25]    *Jenkins v. Onondaga Sheriffs' Dep't,* 05–CV–1457 (N.D.N.Y. filed Nov. 21, 2005); *Jenkins v. Onondaga Sheriff's Dep't,* 06–CV–1092 (N.D.N.Y. filed Sept. 12, 2006); *Jenkins v. Sheriff's Dep't,* 07–CV–0939 (N.D.N.Y. filed Sept. 11, 2007); *Jenkins v. Onondaga Cnty. Sheriff's Dept.,* 12–CV–0855 (N.D.N.Y filed May 23, 2012).

[26]    *Jenkins v. Sheriff's Dep't,* 07–CV–0939, Decision and Order at 3 (N.D.N.Y. filed Oct. 2, 2007) (Hurd, J.); *Jenkins v. Sheriff's Dep't,* 07–CV–0939, Decision and Order at 2 (N.D.N.Y. filed Nov. 21, 2007) (Hurd, J.); *Jenkins v. Onondaga Cnty. Sheriff's Dept.,* 12–CV0855, Decision and Order, at 4–5 (N.D.N.Y filed May 24, 2012) (Baxter, M.J.); *Jenkins v. Onondaga Cnty. Sheriff's Dept.,* 12–CV–0855, Report–Recommendation, at 5–6 (N.D.N.Y filed June 28, 2012) (Baxter, M.J.); *see also, supra,* Part III.B.4. of this Decision and Order.

Finally, Plaintiff has repeatedly had to be ordered to comply with the Local Rules, and reminded that all factual allegations should be contained in the complaint itself, that paragraphs ought to be numbered, and that the individuals she alleges violated her rights must be identified. *See, e.g., Jenkins v. Dep't Corr. Servs.,* 06–CV–0621, Decision and Order (N.D.N.Y. filed July 5, 2006) (Kahn, J.); *Jenkins v. Onondaga Sheriff's Dep't,* 06–CV–1092, Order (N.D.N.Y. filed Oct. 6, 2006) (McAvoy, J.).

**\*14** Under such circumstances, a federal district court may impose reasonable filing restrictions on a *pro se* litigant in that particular court, pursuant to 28 U.S.C. § 1651(a) and its inherent authority to control and manage its own docket

so as to prevent abuse in its proceedings. For example, a federal district court may, after providing an appropriate opportunity to be heard, prohibit a vexatious litigant from filing, in that particular court, any action *pro se* (that is, without counsel), without prior leave of that court. *See Hong Mai Sa v. Doe,* 406 F.3d 155, 158 (2d Cir.2005) ("If a litigant has a history of filing vexatious, harassing or duplicative lawsuits, courts may impose sanctions, including restrictions on future access to the judicial system.") [internal quotations and citations omitted]; *In re Sassower,* 20 F.3d 42, 44 (2d Cir.1994) (where a *pro se* plaintiff has demonstrated a "clear pattern of abusing the litigation process by filing vexatious and frivolous complaints," a "leave to file" requirement may be instituted by the court as an appropriate sanction); *Moates v. Barkley,* 147 F.3d 207, 208 (2d Cir.1998) ( "[T]he district court may not impose a filing injunction on a litigant *sua sponte* without providing the litigant with notice and an opportunity to be heard."); *Azubuko v. Unknown Boston Police Officers,* 08–CV–0330, 2008 WL 1767067, at * 1 (N.D.N.Y. Apr.16, 2008) (McCurn, J.).

For all of these reasons, this case is forwarded to Chief United States District Judge Gary L. Sharpe with a recommendation that an Anti–Filing Injunction Order be issued against Plaintiff.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 13) is ***GRANTED* in part** and ***DENIED* in part;** and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is conditionally ***DISMISSED;*** and it is further

**ORDERED** that Plaintiff is permitted to file an Amended Complaint within **THIRTY (30) DAYS** of the filing date of this Order; and it is further

**ORDERED** that, *if Plaintiff fails to timely file an Amended Complaint, the Clerk shall enter judgment dismissing this action without further Order of this Court;* and it is further

**ORDERED** that, upon filing of the Amended Complaint, this file in this matter be returned to the Court for further review; and it is further

**ORDERED** that the Clerk of the Court is directed to forward this case to Chief United States District Judge Gary L. Sharpe with the recommendation of the undersigned that an AntiFiling Injunction Order be issued against Plaintiff.

*The Court hereby certifies, for purposes of 28 U.S.C. § 1915(a) (3), that any appeal taken from the Court's final judgment in this action would not be taken in good faith.*

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4052286

Case 9:19-cv-01527-TJM-TWD   Document 24   Filed 10/05/20   Page 59 of 259

Solis v. County of Westchester, Not Reported in F.Supp. (1995)

1995 WL 14072

1995 WL 14072
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Carlos SOLIS, Plaintiff,

v.

COUNTY OF WESTCHESTER, Norwood
Jackson, and Robert L. Davis, Defendants.

No. 94 Civ. 5102 (VLB).
|
Jan. 10, 1995.

**Attorneys and Law Firms**

Carlos Solis, plaintiff pro se.

Dov J. Vinar, Asst. Westchester County atty., White Plains,
NY, for defendant.

*MEMORANDUM ORDER*

VINCENT L. BRODERICK, District Judge.

I

**\*1** In this case brought by a prisoner *pro se* under 42 USC
1983, plaintiff claims his right to liberty under the Fourteenth
Amendment has been violated as a result of being confined
on administrative keeplock for an unreasonable length of time
without a hearing. The individual defendants, Jackson and
Davis, have moved to dismiss the complaint for failure to state
a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)
(6).

In support of their motion to dismiss, the defendants have
included an affidavit of an Assistant County Attorney which
is based on "the files and records maintained in the office
of the Westchester County Attorney, the Westchester County
Department of Correction and conversations with those
having personal knowledge."

Where a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6)
presents matters outside the pleadings and such matters are
not excluded by the court, the motion is converted into one
for summary judgment under Rule 56. Fed.R.Civ.P. 12(b).
Accordingly, the defendants current motion to dismiss will be

treated as one for summary judgment pursuant to Fed.R.Civ.P.
56.

II

The plaintiff is directed to present any evidence known to him
which creates a genuine issue of material fact and to set forth
any additional information not known to him necessary to
establish such an issue. Fed.R.Civ.P.Rule 56(c); *Celotex Corp
v. Catrett,* 477 US 317 (1986).

The defendants are likewise directed to present any evidence
which controverts the existence of a genuine issue of fact.

All evidence referred to above, both the plaintiff's and the
defendants', shall be presented to this court within 120 days
from the date of this memorandum order.

III

Though the current motion literally seeks dismissal only
as to the individual defendants Norwood and Jackson, the
defendants have asserted that the current named institutional
defendant, Westchester County D.E.P.T. Of Corrections, is
not a legal entity and that the real party in interest, the County
of Westchester, has not yet been formally served in the manner
called for by Fed.R.Civ.P. 4 or state law.

When dealing with *pro se* parties, courts interpret the rules
dealing with service of process liberally. See generally,
*Haines v. Kerner,* 404 US 519 (1972); *Romandette v.
Weetabix,* 807 F.2d 309 (2d Cir 1986); *Grammenos v.
Lemos,* 457 F.2d 1067, 1070 (2d Cir 1972). Where a party
contesting service of process has received actual notice,
service requirements under Fed.R.Civ.P. 4 are construed
liberally. *Romandette v. Weetabix,* 807 F.2d 309, 310–311 (2d
Cir 1986); *Grammenos v. Lemos,* 457 F.2d 1067, 1070 (2d
Cir1972). Deficiencies in the method of service are harmless
error under Fed.R.Civ.P. 61 when the party asserting deficient
service has actual knowledge of the action and no prejudice
results from the delay. *Thomas v. Yonkers Police Dept.,* 147
FRD 77, 79 (SDNY 1993).

The real party in interest, County of Westchester, has
actual notice of the current suit. To avoid unnecessary, time
consuming motions at some later date, the caption of this

1995 WL 14072

action is amended to rename Westchester County D.E.P.T. Of Corrections as the County of Westchester.

**All Citations**

**\*2**  SO ORDERED.

Not Reported in F.Supp., 1995 WL 14072

---

**End of Document**                                          © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 857528
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Richard AUSTIN, Plaintiff,
v.
Brian PAPPAS, John Does, Yonkers
Police Commissioner Charles C. Coles,
Westchester County, Defendants.

No. 04-CV-7263 (KMK)(LMS).
|
March 31, 2008.

**Attorneys and Law Firms**

Mr. Richard Austin, Stormville, NY, pro se.

Rory Carleton McCormick, Esq., Corporation Counsel, City of Yonkers, Yonkers, NY, for Defendants.

*ORDER ADOPTING REPORT & RECOMMENDATION*

KENNETH M. KARAS, District Judge.

**\*1** Richard Austin ("Plaintiff") filed this suit pursuant to 42 U.S .C. § 1983 ("Section 1983") against Yonkers Police Officer Brian Pappas ("Defendant Pappas"), several John Doe Yonkers Police Officers ("John Doe Defendants"), former Yonkers Police Commissioner Charles C. Cola ("Defendant Cola") (whose name is misspelled in Plaintiff's Complaint as Charles C. Coles), and Westchester County (collectively, "Defendants"), alleging violations of Plaintiff's civil rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution, along with various supplemental state law claims. [1] (Compl.¶¶ 17, 19.) Plaintiff alleged that these violations occurred when Defendants failed to protect Plaintiff from Franklyn Kelley, a private individual who physically attacked Plaintiff during the course of Plaintiff's May 16, 2003 arrest. (*Id.* ¶ 10.) Plaintiff alleged that Defendant Pappas and the John Doe Defendants handcuffed him and pinned him to the ground while Franklyn Kelley repeatedly kicked and punched Plaintiff in the face. (*Id.* ("The officers did nothing to protect the plaintiff from this vicious assault, even though plaintiff was helpless and in their custody [.]").) Defendants moved for summary judgment, and this Motion was referred by Judge McMahon to Chief

Magistrate Judge Lisa M. Smith for review pursuant to 28 U.S.C. § 636(b)(1). On August 2, 2007, Magistrate Judge Smith issued a thorough Report and Recommendation ("R & R"), concluding that this Court should grant Defendants' Motion for Summary Judgment on the ground that Plaintiff has failed to demonstrate that there exists a genuine issue of material fact as to whether his constitutional rights were violated. Plaintiff was advised of his right to file objections to the R & R, but he did not do so.

[1]     On August 8, 2005, Plaintiff's claim against Westchester County was dismissed by the Honorable Gerald E. Lynch, to whom this case was initially assigned. On February 28, 2006, the case was transferred to White Plains and reassigned to Judge Colleen McMahon. The case was reassigned to the undersigned on August 6, 2007.

A district court reviewing a report and recommendation " 'may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.' " *Donahue v. Global Home Loans & Fin., Inc.,* No. 05-CV-8362, 2007 WL 831816, at \*1 (S.D.N.Y. Mar. 15, 2007) (quoting 28 U.S.C. § 636(b)(1)(C)). Under 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, parties may submit objections to a magistrate judge's report and recommendation. The objections must be "specific" and "written," and must be made "within 10 days after being served with a copy of the recommended disposition." Fed.R.Civ.P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).

Where a party does not submit an objection, " 'a district court need only satisfy itself that there is no clear error on the face of the record.' " *Donahue,* 2007 WL 831816, at \*1 (quoting *Nelson v. Smith,* 618 F.Supp. 1186, 1189 (S.D.N.Y.1985)). In addition, a party's failure to object waives that party's right to challenge the report and recommendation on appeal. *See Fed. Deposit Ins. Corp. v. Hillcrest Assocs.,* 66 F.3d 566, 569 (2d Cir.1995) ("Our rule is that 'failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision.' " (quoting *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989))).

**\*2** Here, Plaintiff has not filed objections to the R & R. Accordingly, the Court has reviewed the R & R for clear error only. In so doing, the Court adopts the conclusion reached in the R & R that Defendants' Motion for Summary Judgment should be granted, but the Court does so in part on different grounds than those relied on in the R & R.

First, the Court agrees with Magistrate Judge Smith that Defendants' noncompliance with Local Civil Rule 56.2 should be overlooked because any prejudice resulting from noncompliance was cured by the following: (i) Magistrate Judge Smith advised Plaintiff of the nature of summary judgment during a March 23, 2007 conference; and (ii) Magistrate Judge Smith annexed a Rule 56.2 notice to the R & R, a document to which Plaintiff was free to file objections. See Narumanchi v. Foster, No. 02-CV-6553, 2006 WL 2844184, at *2 (E.D.N.Y. Sept. 29, 2006) (refusing to deny defendant's motion for summary judgment based on failure of defendant to comply with Local Civil Rule 56.2 because "[a]ny prejudice to pro se plaintiffs [was] cured" by court's actions).

As expressed in the R & R, though Plaintiff did not file any opposition to Defendants' Motion for Summary Judgment, Defendants were still required to meet their burden of demonstrating to the Court that "no material issue of fact remains for trial." See Amaker v. Foley, 274 F.3d 677, 681 (2d Cir.2001). The Court finds no clear error in Magistrate Judge Smith's determination that Defendants satisfied this burden.

With respect to Defendants Pappas and Cola, the Court finds that Plaintiff has failed to offer any evidence demonstrating that they were personally involved in the alleged violation of Plaintiff's constitutional rights. The " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " Back v. Hastings on Hudson Union Free Sch. Dist., 365 F.3d 107, 122 (2d Cir.2004) (quoting McKinnon v. Patterson, 568 F.2d 930, 934 (2d Cir.1977)). For purposes of Section 1983 liability, personal involvement can be established by evidence that:

> '(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ...

> by failing to act on information indicating that unconstitutional acts were occurring.'

Id. at 127 (quoting Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir.1995)); accord Hayut v. State Univ. of N.Y., 352 F.3d 733, 753 (2d Cir.2003); Schiller v. City of New York, No. 04-CV-7922, 2008 WL 200021, at *4 (S.D.N.Y. Jan. 23, 2008); Fair v. Weiburg, No. 02-CV-9218, 2006 WL 2801999, at *4 (S.D.N.Y. Sept. 28, 2006). Further, a Section 1983 plaintiff must "allege a tangible connection between the acts of the defendant and the injuries suffered." Bass v. Jackson, 790 F.2d 260, 263 (2d Cir.1986); see also Fair, 2006 WL 2801999, at *4 (citing Bass ).

*3 In support of their Motion for Summary Judgment, Defendants submitted evidence that Defendant Pappas did not directly participate in the arrest of Plaintiff, but he instead arrested Plaintiff's accomplice. For example, on April 8, 2004, at a hearing before the Honorable Richard A. Molea of the Westchester County Court, Defendant Pappas testified that he remained with Plaintiff's accomplice while other officers arrested Plaintiff. (Defs.' Affirmation in Supp., Ex. J, 50-51.) Further, in response to interrogatories served on him by Plaintiff, Defendant Pappas stated that he "did not observe what transpired during the course of plaintiff's arrest." (Id., Ex. L.) Finally, Defendants offer a police report indicating that "Pappas was detaining [Plaintiff's accomplice] in the garage area, as additional units arrived and placed [Plaintiff] into custody." (Id., Ex. C.)

Plaintiff has failed to offer any evidence refuting Defendant Pappas' version of events. In other words, Plaintiff has offered no evidence demonstrating that Defendant Pappas was actually one of the officers who arrested him and allegedly pinned him to the ground while Kelley assaulted him. In fact, during his deposition testimony, Plaintiff admitted that he was not sure whether Defendant Pappas was one of the police officers who arrested him, and that the reason Defendant Pappas was named as a defendant in the present suit was because Plaintiff had seen his name on Plaintiff's felony complaint. (Id., Ex. G, 32-35.) As such, the unrefuted evidence before the Court demonstrates that Defendant Pappas was not one of the officers directly involved in Plaintiff's arrest. Plaintiff therefore has failed to satisfy a prerequisite to liability under Section 1983- namely that Defendant Pappas had personal involvement in the alleged violation of Plaintiff's constitutional rights.

*See Back,* 365 F.3d at 122. Thus, Plaintiff's claim against Defendant Pappas must be dismissed.

Plaintiff alleged that Defendant Cola, Yonkers Police Commissioner at the time of Plaintiff's 2003 arrest, violated Plaintiff's constitutional rights by "authoriz[ing], tolerat[ing], as institutionalized practices, and ratif[ying] the misconduct [of Defendant Pappas and John Doe Defendants]." (Compl.¶ 14.) More specifically, Plaintiff charges Defendant Cola with failure to properly: (1) discipline subordinate officers; (2) take adequate precautions in hiring subordinate officers; (3) report criminal acts by police personnel to the Westchester County District Attorney; and (4) establish a system for dealing with complaints about police misconduct. (*Id.*) Plaintiff does not assert that Defendant Cola directly participated in the violation of his constitutional rights; instead, Plaintiff urges the Court to find Defendant Cola liable under Section 1983 based on his role as supervisor of Defendant Pappas and the John Doe Defendants.

"It is well settled, however, that the doctrine of respondeat superior standing alone does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity." *See Hayut,* 352 F.3d at 753 (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978)). Instead, it is necessary to establish a supervisory official's personal involvement in the alleged constitutional violation. *See id.; Fair,* 2006 WL 2801999, at *4.

**\*4** Plaintiff has failed to provide the Court with any evidence from which a reasonable jury could conclude that Defendant Cola was personally involved in the alleged violation of Plaintiff's constitutional rights. Plaintiff has offered no evidence demonstrating that Defendant Cola was aware of and failed to remedy constitutional violations by subordinate officers, or that he acted in a grossly negligent or deliberately indifferent manner in supervising or training subordinate officers. There is also no evidence in the record to support a theory that Defendant Cola created a policy or custom that fostered and led to the alleged violation of Plaintiff's rights. *See Hayut,* 352 F.3d at 754 (finding as fatal to plaintiff's Section 1983 claim the fact that there existed "no evidence that, after becoming aware of the alleged harassment, any of the [supervisory officials] failed to respond or remedy the situation, that any of these [supervisory officials] created or allowed a policy to continue under which alleged harassment could occur, or that they were grossly negligent in monitoring [the alleged harasser's] conduct"); *Harris v. City of New York,* No. 01-CV-6927, 2003 WL

554745, at *6 (S.D.N.Y. Feb. 26, 2003) ("[P]laintiff has put forth no evidence pointing to defendant ['s] personal involvement in plaintiff's alleged deprivation of rights .... Plaintiff's conclusory allegations regarding defendant['s] alleged supervisory role, without more, cannot withstand summary judgment."). Further, nothing in the record, even drawing all inferences in Plaintiff's favor, suggests any tangible connection between Defendant Cola's training or supervision of subordinate officers and the alleged violation of Plaintiff's rights. In fact, the record contains no evidence with regard to Defendant Cola whatsoever. Without such evidence, no reasonable jury could conclude that Defendant Cola had personal involvement in the alleged violation of Plaintiff's constitutional rights, which means that Plaintiff has failed to satisfy a prerequisite to Section 1983 liability, and therefore that Defendant Cola is entitled to summary judgment in his favor. *See Davis v. Kelly,* 160 F.3d 917, 921 (2d Cir.1998) ("After an opportunity for discovery, undisputed allegations that [a] supervisor lacked personal involvement will ultimately suffice to dismiss that official from the case.").

In sum, the Court finds that Plaintiff has failed to establish the personal involvement of Defendants Pappas and Cola in the alleged violation of his rights. For reasons set forth more fully in the R & R, the Court also dismisses the Complaint as to the John Doe Defendants because Plaintiff's time limit to amend the Complaint in order to substitute in named defendants has lapsed. Therefore, the Court finds it unnecessary to reach the question of whether Plaintiff has adequately established an underlying violation of his constitutional rights. Finally, having determined that no cognizable federal claims exist, the Court will follow Magistrate Judge Smith's recommendation in declining to exercise jurisdiction over the state law claims.

**\*5** Accordingly, it is hereby:

ORDERED that the Report and Recommendation dated August 2, 2007, is ADOPTED on the grounds set forth in this Order; and it is further

ORDERED that Defendants' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 is GRANTED.

The Clerk of Court is respectfully directed to enter judgment in favor of Defendants, to terminate Defendant's Motion (Dkt. No. 28), and to close this case.

SO ORDERED.

2008 WL 857528

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 857528

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 607341
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Paul CIPRIANI, Plaintiff,
v.
Harry C. BUFFARDI, Sheriff; Schenectady
County Jail; Cheryl Clark, M.D.;
Kevin J. O'Connor, Defendants.

No. 9:06-CV-0889(LEK/DRH).
|
Feb. 20, 2007.

**Attorneys and Law Firms**

Paul Cipriani, Plaintiff, pro se.

***DECISION and ORDER***

LAWRENCE E. KAHN, U.S. District Judge.

 **\*1** Presently before the Court is an amended complaint filed by Plaintiff Paul Cipriani ("Plaintiff"). Amended Compl. (Dkt. No. 10). This amended complaint was submitted in compliance with the Memorandum-Decision and Order issued by this Court on November 27, 2006 ("November Order"). Mem.-Decision and Order (Dkt. No. 7).

In its November Order, the Court advised plaintiff that he must set forth facts demonstrating that Defendants were personally involved in a violation of Plaintiff's rights. *Id.* at 4. Plaintiff was also advised that in order to establish the liability of a municipality, he must allege a custom or policy which is the moving force behind the violation. *Id.*

In his amended complaint, Plaintiff names thirteen defendants and asserts numerous claims against them arising from his confinement at Schenectady County Jail. Amended Compl. (Dkt. No. 10).

The Court notes that plaintiff has not named "Schenectady County Jail," "Cheryl Clark," or "Kevin J. O'Connor" in his amended Complaint. Therefore, "Schenectady County Jail," "Cheryl Clark," and "Kevin J. O'Connor" are hereby dismissed as defendants in this action.

The Court also notes that Plaintiff's amended Complaint mentions "Mr. Booth" and "Mr. Purdy" only in the caption, and fails to allege any act or omission by these individuals. Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff. *Gonzalez v. City of New York,* No. 97 CIV. 2246(MGC), 1998 WL 382055, at \*2 (S.D.N.Y. July 9, 1998) (citing *Crown v. Wagenstein,* No. 96 CIV. 3895(MGC), 1998 WL 118169, at \*1 (S.D.N.Y.Mar.16, 1998) (mere inclusion of warden's name in complaint insufficient to allege personal involvement) and *Taylor v. City of New York,* 953 F.Supp. 95, 99 (S.D.N.Y.1997)). Because plaintiff has failed to allege any personal involvement on the part of defendants "Mr. Booth" and "Mr. Purdy", they are hereby dismissed as defendants in this action.

In his amended Complaint, Plaintiff alleges that the remaining Defendants committed various violations of his constitutional rights, including inadequate medical care, breach of doctor-patient confidentiality, excessive force, denial of due process in a disciplinary proceeding, and interference with the grievance process. Amended Compl. (Dkt. No. 10).

Based on the foregoing, Plaintiff's amended complaint as against the remaining Defendants is accepted for filing.

Plaintiff is advised, however, that the U.S. Marshals cannot effect service on a "John Doe" defendant. In the event that plaintiff wishes to pursue this claim against the "John Doe" defendants named in the amended Complaint, he must take reasonable steps to ascertain their identities. Plaintiff may then file a Motion to amend his complaint and seek leave of the Court to add such individuals, by name, as defendants to this lawsuit. Plaintiff is further advised that if these individuals are not timely served, the action will be against them will be dismissed.

 **\*2**  WHEREFORE, it is hereby

**ORDERED,** that "Mr. Booth," "Mr. Purdy," "Schenectady County Jail," "Cheryl Clark," and "Kevin J. O'Connor" are **DISMISSED** as defendants in this action, and it is further

**ORDERED,** that the Clerk revise the docket to add "Schenectady County," "Mr. Burns," "Mr. Jones," "Mr. Adams," "Ms. Jones," "Ms. Hull," "John Doe # 1," "John Doe # 7," "John Doe # 10," and "Loraine Walker" as defendants in this action, and it is further

**ORDERED,** that the Clerk issue summonses naming the remaining defendants and forward them, along with copies of the amended Complaint (Dkt. No. 10), to the United States Marshal for service upon the defendants, together with a copy of this Order.[1] The Clerk shall also forward a copy of the summons and amended Complaint by mail to the County Attorney for Schenectady County, together with a copy of this Order, and it is further

[1] Plaintiff was granted leave to proceed with this action *in forma pauperis.* Mem.-Decision and Order (Dkt. No. 7).

**ORDERED,** that a formal response to Plaintiff's amended Complaint be filed by Defendants or their counsel as provided for in Rule 12 of *the Federal Rules of Civil Procedure* subsequent to service of process on Defendants, and it is further

**ORDERED,** that Plaintiff take reasonable steps to ascertain the identities of any other individual(s) that purportedly violated Plaintiff's civil and/or constitutional rights and, if appropriate, file a Motion to amend his complaint and add such individuals, by name, as defendants to this lawsuit, and it is further

**ORDERED,** that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. *Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be returned, without processing.* Plaintiff must comply with requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions, which must be returnable before the assigned Magistrate Judge with proper allowance for notice as required by the Rules. *Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel of any change in his address; his failure to do so will result in the dismissal of this action.* All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court; and it is further

**ORDERED,** that the Clerk serve a copy of this Order on plaintiff by regular mail.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 607341

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

246 F.Supp.3d 578
United States District Court, E.D. New York.

YING LI, Plaintiff,

v.

The CITY OF NEW YORK, Det. Matthew Degnan,
Lt. Thomas Conforti, Det. David Moser, Lt. John
Perdoch, Det. John Phelan, P.O. Yatyu Yam, Sgt.
Guisella Rodriguez, Lt. Arthur Hall, Det. Michael
Heffernan, Sgt. Timothy Cai, Det. Douglas Lee,
Det. Dennis Chan, Sgt. "FNU" Manfredi ("First
Name Unknown"), ADA P. Leigh Bishop, Dr. Kristen
Landi, "John Does 1–15" (Names Fictitious and
Presently Unknown), Dr. Fernanda Kupferman,
and Flushing Hospital Medical Center, Defendants.

15–CV–1599 (PKC)
|
Signed 03/31/2017

**Synopsis**

**Background:** Arrestee brought § 1983 action against city,
city employees, including police officers who allegedly
investigated her, county assistant district attorney, and
hospital and one of its employees, alleging that she was
wrongfully accused of being responsible for the death of her
infant daughter. Defendants filed motions to dismiss.

**Holdings:** The District Court, Pamela K. Chen, J., held that:

[1] arrestee adequately alleged that officer participated in the
initiation of arrestee's criminal proceeding, as required to state
malicious prosecution claim;

[2] arrestee adequately alleged that physician participated in
the initiation of arrestee's criminal proceeding, as required to
state malicious prosecution claim;

[3] arrestee sufficiently alleged a favorable termination for
purposes of her malicious prosecution claim;

[4] arrestee's malicious abuse of process claim accrued, and
three-year statute of limitations began to run, when criminal
case against arrestee was dismissed;

[5] arrestee failed to state claim for failure to intervene;

[6] arrestee's allegations were sufficient to support conspiracy
claim; and

[7] arrestee's allegations were sufficient to support claim for
unreasonably prolonged detention.

Motions granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss; Motion to
Dismiss for Failure to State a Claim.

West Headnotes (128)

**[1]** **Federal Civil Procedure** ⟬🔑⟭ **Matters
considered in general**

In considering defendants' motion to dismiss
for failure to state a claim in § 1983 action
brought by arrestee against, inter alia, city and
its employees alleging that she was wrongfully
accused of being responsible for the death of
her infant daughter, district court would consider
criminal complaint against arrestee, given that
arrestee's amended complaint in § 1983 action
repeatedly referred to the criminal complaint,
and therefore incorporated it by reference. 42
U.S.C.A. § 1983; Fed. R. Civ. P. 12(b)(6).

1 Cases that cite this headnote

**[2]** **Evidence** ⟬🔑⟭ **Historical facts**

**Evidence** ⟬🔑⟭ **Records and decisions in other
actions or proceedings**

District court would take judicial notice
of indictment, transcript of criminal court
conference, and two press releases in § 1983
action brought by arrestee against, inter alia,
city and its employees alleging that she was
wrongfully accused of being responsible for the
death of her infant daughter, for the limited
purpose of establishing their existence and legal
effect, and determining the statements that they
contained without considering the truth of those
statements; the criminal court records and the
press releases related to arrestee's allegations that
the criminal case was terminated favorably to her

and the date on which the criminal charges were dropped. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[3]** **Evidence** ⟜ Records and decisions in other actions or proceedings

District court declined to take judicial notice of grand jury minutes in underlying criminal proceeding in § 1983 action brought by arrestee against, inter alia, city and its employees alleging that she was wrongfully accused of being responsible for the death of her infant daughter, given that city sought to rely on the substance and truth of the testimony set forth in those minutes, and not just the fact of the testimony being given or the date on which it was given. 42 U.S.C.A. § 1983.

**[4]** **Civil Rights** ⟜ Substantive or procedural rights

Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of federal rights established elsewhere. 42 U.S.C.A. § 1983.

**[5]** **Civil Rights** ⟜ Nature and elements of civil actions

To state a claim under § 1983, a plaintiff must plausibly allege (1) that the defendants deprived him of a right secured by the Constitution or laws of the United States, and (2) that they did so under color of state law. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[6]** **Civil Rights** ⟜ Color of Law

As a general matter, liability under § 1983 is proper only with respect to individuals acting under "color of state law," i.e., state actors, or individuals acting in concert with a state actor. 42 U.S.C.A. § 1983.

**[7]** **Civil Rights** ⟜ Persons Liable in General

An individual defendant is not liable under § 1983 absent personal involvement. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[8]** **Civil Rights** ⟜ Complaint in general

Pleadings that do not differentiate which individual defendant was involved in the unlawful conduct are insufficient to state a claim under § 1983. 42 U.S.C.A. § 1983.

6 Cases that cite this headnote

**[9]** **Civil Rights** ⟜ Criminal law enforcement; prisons

Arrestee failed to allege personal involvement in criminal proceedings required to maintain action under § 1983 against police officers, alleging that she was wrongfully accused of being responsible for the death of her infant daughter; arrestee did not allege that any of the officers had even a minimal role in arresting, investigating, or prosecuting her. 42 U.S.C.A. § 1983.

**[10]** **Civil Rights** ⟜ Vicarious or respondeat superior liability in general

Individual defendant may not be held liable under § 1983 merely by his connection to the events through links in the chain of command. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[11]** **Civil Rights** ⟜ Arrest and detention

A claim for false arrest under § 1983, resting on the Fourth Amendment right to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as that under New York law. U.S. Const. Amend. 4; N.Y.McKinney's Const. Art. 1, § 12; 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[12]    Federal Courts** 🔑 **Constitutional rights, civil rights, and discrimination in general**

In analyzing § 1983 claims for false arrest, courts generally look to the law of the state in which the arrest occurred. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[13]    False Imprisonment** 🔑 **Nature and Elements of False Imprisonment**

Under New York law, a false arrest claim requires a plaintiff to show that the defendant intentionally confined him without his consent and without justification.

2 Cases that cite this headnote

**[14]    False Imprisonment** 🔑 **Nature and form of remedy**

Pursuant to New York law, false arrest and false imprisonment are synonymous.

3 Cases that cite this headnote

**[15]    Civil Rights** 🔑 **Time to Sue**

**Federal Courts** 🔑 **Civil rights and discrimination cases**

Statute of limitations for § 1983 claims filed in federal court in New York is determined by New York State's statute of limitations for personal injury actions. 42 U.S.C.A. § 1983; N.Y. CPLR § 214.

2 Cases that cite this headnote

**[16]    Federal Courts** 🔑 **Computation and tolling**

While the applicable limitations period of a § 1983 cause of action is determined by state law, the accrual date is a question of federal law. 42 U.S.C.A. § 1983.

**[17]    Limitation of Actions** 🔑 **Civil rights**

Under federal law, a § 1983 false arrest claim accrues at the time that the alleged false arrest

ends, i.e., when the arrestee becomes held pursuant to legal process, for example, when he is bound over by a magistrate or arraigned on charges. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[18]    Limitation of Actions** 🔑 **Civil rights**

Arrestee's § 1983 false arrest claim against, inter alia, city and its employees alleging that she was wrongfully accused of being responsible for the death of her infant daughter accrued, and three-year statute of limitations began to run, when arrestee made her initial appearance in state court or when she was arraigned on the indictment. 42 U.S.C.A. § 1983; N.Y. CPLR § 214.

**[19]    Limitation of Actions** 🔑 **Concealment of Cause of Action**

**Limitation of Actions** 🔑 **Suspension or stay in general;  equitable tolling**

Doctrine of equitable tolling is not limited to fraudulent concealment.

**[20]    Limitation of Actions** 🔑 **Estoppel to rely on limitation**

Equitable estoppel is applicable where the plaintiff knew of the existence of the cause of action, but the defendant's conduct caused plaintiff to delay in bringing suit.

**[21]    Limitation of Actions** 🔑 **Concealment of Cause of Action**

**Limitation of Actions** 🔑 **Suspension or stay in general;  equitable tolling**

Under doctrine of equitable tolling based on fraudulent concealment, when a defendant fraudulently conceals the wrong, the statute of limitations does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of action.

**[22]**   **Limitation of Actions** 🔑 **What constitutes concealment**

**Limitation of Actions** 🔑 **Suspension or stay in general; equitable tolling**

To benefit from doctrine of equitable tolling based on fraudulent concealment, the plaintiff must submit non-conclusory evidence of conspiracy or other fraudulent wrong which precludes his possible discovery of harms that he suffered.

**[23]**   **Limitation of Actions** 🔑 **Suspension or stay in general; equitable tolling**

Arrestee's conclusory allegation that defendants' fraud, misrepresentation, and deception, prevented her from filing a timely § 1983 false arrest claim against, inter alia, city and its employees alleging that she was wrongfully accused of being responsible for the death of her infant daughter were insufficient to support equitable tolling of three-year limitations period. 42 U.S.C.A. § 1983; N.Y. CPLR § 214.

**[24]**   **Malicious Prosecution** 🔑 **Nature and elements of malicious prosecution in general**

To establish a malicious prosecution claim under New York law, a plaintiff must prove: (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.

12 Cases that cite this headnote

**[25]**   **Civil Rights** 🔑 **Criminal prosecutions**

In establishing a violation of a Fourth Amendment right in relation to a § 1983 malicious prosecution claim, a plaintiff must demonstrate a sufficient post-arraignment deprivation of liberty. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[26]**   **Civil Rights** 🔑 **Criminal prosecutions**

The Fourth Amendment right implicated in a § 1983 malicious prosecution claim is the right to be free of unreasonable seizure of the person, i.e., the right to be free of unreasonable unwarranted restraints on personal liberty. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[27]**   **Malicious Prosecution** 🔑 **Instigation of or participation in prosecution**

In a malicious prosecution claim under New York law, to initiate or continue a criminal proceeding, a defendant must do more than report the crime or give testimony; he must play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.

7 Cases that cite this headnote

**[28]**   **Malicious Prosecution** 🔑 **Presumptions and burden of proof**

In a malicious prosecution claim under New York law, an active role in prosecution is inferred when a defendant had the plaintiff arraigned, filled out a complaining and corroborating affidavit, or signed a felony complaint.

5 Cases that cite this headnote

**[29]**   **Malicious Prosecution** 🔑 **Instigation of or participation in prosecution**

Defendant could have initiated a prosecution, for purposes of a malicious prosecution claim under New York law, by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor.

4 Cases that cite this headnote

**[30]**   **Civil Rights** 🔑 **Criminal prosecutions**

**Civil Rights** 🔑 Criminal law enforcement; prisons

Arrestee's allegations that police officer swore to criminal complaint accusing her of being responsible for the death of her infant daughter adequately alleged that officer initiated prosecution, as required to state malicious prosecution claim against officer under § 1983. U.S.C.A. Const. Amend. 4; 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

[31]  **Civil Rights** 🔑 Criminal prosecutions
     **Civil Rights** 🔑 Criminal law enforcement; prisons

Arrestee's allegations that physician employed by city who swore under oath in criminal complaint against her, which accused her of being responsible for the death of her infant daughter, and made assertions that were false and "unsupportable by any medical science or clinical or forensic evidence," adequately alleged that physician participated in the initiation of arrestee's criminal proceeding, as required to state malicious prosecution claim against physician under § 1983. U.S.C.A. Const. Amend. 4; 42 U.S.C.A. § 1983.

[32]  **Malicious Prosecution** 🔑 Mode of Termination

Under New York law, there are two ways to establish a favorable termination, for purposes of a malicious prosecution claim: (1) an adjudication of the merits by the tribunal in the prior action, or (2) an act of withdrawal or abandonment on the part of the party prosecuting the prior action.

1 Cases that cite this headnote

[33]  **Malicious Prosecution** 🔑 Mode of Termination

Fact that a criminal prosecution never reached the merits does not preclude a plaintiff from alleging a favorable termination, for purposes of a malicious prosecution claim under New York law.

2 Cases that cite this headnote

[34]  **Malicious Prosecution** 🔑 Mode of Termination

New York law does not require a malicious prosecution plaintiff to prove her innocence, or even that the termination of the criminal proceeding was indicative of innocence.

2 Cases that cite this headnote

[35]  **Malicious Prosecution** 🔑 Mode of Termination

Under New York law, any final termination of a criminal proceeding in favor of the accused, such that the proceeding cannot be brought again, qualifies as a favorable termination for purposes of a malicious prosecution action, unless the disposition was inconsistent with the innocence of the accused.

1 Cases that cite this headnote

[36]  **Civil Rights** 🔑 Criminal Law Enforcement; Police and Prosecutors

Arrestee's allegations that she was wrongfully accused of being responsible for the death of her infant daughter, and that district attorney had ultimately dismissed charges against her, sufficiently alleged a favorable termination for purposes of her malicious prosecution claim under § 1983, even though she did not allege the specific disposition of the underlying criminal case. U.S.C.A. Const. Amend. 4; 42 U.S.C.A. § 1983.

[37]  **False Imprisonment** 🔑 False imprisonment and malicious prosecution distinguished

Under New York law, probable cause for malicious prosecution is different from probable cause for false arrest.

10 Cases that cite this headnote

**[38]** **Malicious Prosecution** ⚷ Belief in guilt of accused

For a malicious prosecution claim under New York law, probable cause to prosecute consists of facts and circumstances that would lead a reasonably prudent person to believe the plaintiff guilty.

8 Cases that cite this headnote

**[39]** **Malicious Prosecution** ⚷ Criminal Prosecutions

Under New York law, probable cause to prosecute is evaluated in light of the facts known or reasonably believed at the time the prosecution was initiated, as opposed to at the time of arrest.

5 Cases that cite this headnote

**[40]** **Malicious Prosecution** ⚷ Finding of grand jury

Under New York law, a grand jury indictment gives rise to a presumption that probable cause exists and thereby defeats a claim for malicious prosecution.

2 Cases that cite this headnote

**[41]** **Malicious Prosecution** ⚷ Finding of grand jury

Under New York law, if plaintiff is to succeed in malicious prosecution action after he has been indicted, he must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith; plaintiff may demonstrate fraud or perjury through evidence establishing that the witnesses have not made a complete and full statement of facts either to the grand jury or to the district attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith.

**[42]** **Civil Rights** ⚷ Criminal law enforcement; prisons

Arrestee's allegations that grand jury indicted her based upon falsely reported facts in reports and search warrant affidavits, and fabricated oral statements of witnesses, in connection with accusation that she was responsible for the death of her infant daughter, and police officers failed to inform district attorney's office of exculpatory evidence and that hospital and physician made no efforts to seek a diagnosis other than "shaken baby syndrome," were sufficient to overcome presumption of probable cause afforded grand jury indictment, for purposes of arrestee's malicious prosecution claim under § 1983. U.S.C.A. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[43]** **Civil Rights** ⚷ Attorneys, jurors, and witnesses; public defenders

Grand jury witness is entitled to absolute immunity in § 1983 actions. 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**[44]** **Malicious Prosecution** ⚷ Necessity

To plead a malicious prosecution claim under New York law, plaintiff must allege malice for each of the defendants.

5 Cases that cite this headnote

**[45]** **Malicious Prosecution** ⚷ Nature and elements

**Malicious Prosecution** ⚷ Motive of prosecution

In a malicious prosecution claim under New York law, malice may be shown by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff.

3 Cases that cite this headnote

**[46]** **Civil Rights** ⚷ Criminal prosecutions

Arrestee's allegations that police officer signed criminal complaint accusing her of being responsible for the death of her infant daughter knowing that its content was false and fabricated

adequately pled malice as to officer, as required to state malicious prosecution claim under § 1983. U.S.C.A. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[47]    Civil Rights** 🔑 **Criminal prosecutions**

Arrestee's allegations that physician employed by city swore under oath in criminal complaint, which accused her of being responsible for the death of her infant daughter, and made a statement that was false and "unsupportable by any medical science or clinical or forensic evidence," adequately pled malice as to city physician, as required to state malicious prosecution claim under § 1983. U.S.C.A. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[48]    Civil Rights** 🔑 **Criminal prosecutions**

Arrestee's allegations that, despite lab results showing high alkaline phosphatase and low calcium, consistent with metabolic bone disease, hospital and physician made no effort to seek a diagnosis other than "shaken baby syndrome," based on their motives in concealing exculpatory medical evidence in order to assist prosecutor, adequately pled malice as to hospital and physician, as required to state malicious prosecution claim under § 1983. U.S.C.A. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[49]    Federal Courts** 🔑 **Constitutional rights, civil rights, and discrimination in general**

Court looks to state law for the elements of a § 1983 abuse of process claim. 42 U.S.C.A. § 1983.

**[50]    Process** 🔑 **Nature and elements in general**

Under New York law, a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with the intent to do harm without excuse of justification and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.

2 Cases that cite this headnote

**[51]    Process** 🔑 **Process, what constitutes**

In the context of an abuse of process claim under New York law, legal process means that a court issued the process, and the plaintiff will be penalized if he violates it.

1 Cases that cite this headnote

**[52]    Process** 🔑 **Improper, ulterior, collateral, or unlawful purpose**

The crux of a malicious abuse of process claim under New York law is the collateral objective element.

1 Cases that cite this headnote

**[53]    Process** 🔑 **Improper, ulterior, collateral, or unlawful purpose**

To plead collateral objective element of a claim under New York law for malicious abuse of process, a plaintiff must plausibly plead not that defendant acted with an improper motive, but rather an improper purpose; plaintiff must claim that the defendant aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution.

2 Cases that cite this headnote

**[54]    Limitation of Actions** 🔑 **Civil rights**

Arrestee's § 1983 malicious abuse of process claim against, inter alia, city and its employees alleging that she was wrongfully accused of being responsible for the death of her infant daughter accrued, and three-year statute of limitations began to run, when criminal case against arrestee was dismissed, without prosecution and following her husband's conviction, at which time prosecution's alleged purpose of using her as leverage to get her husband to plead guilty became clear. 42 U.S.C.A. § 1983; N.Y. CPLR § 214.

**[55]** **Limitation of Actions** 🔑 Torts

**Limitation of Actions** 🔑 Nature of harm or damage, in general

Under New York law, a claim for abuse of process accrues at such a time as the criminal process is set in motion, typically at arrest, against the plaintiff; however, accrual cannot be appropriate before such time as plaintiff is aware, or ought to be aware, of those facts providing a basis for his claim.

2 Cases that cite this headnote

**[56]** **Process** 🔑 Probable cause

Under New York law, probable cause is not a complete defense to malicious abuse of process. U.S. Const. Amend. 4.

2 Cases that cite this headnote

**[57]** **Process** 🔑 Particular cases

Arrestee's allegations that physician employed by city swore under oath in criminal complaint, which accused her of being responsible for the death of her infant daughter, and made a statement that was false and "unsupportable by any medical science or clinical or forensic evidence," and police officer signed criminal complaint knowing that its content was false and fabricated adequately pled involvement in the use of legal process, as required to state malicious abuse of process claim under New York law against physician and officer.

1 Cases that cite this headnote

**[58]** **Process** 🔑 Officers and public employees

Arrestee failed to allege certain police officers and other city employees participated in the investigation of the criminal case against her relating to the death of her infant daughter, including her arrest and detention, as required to maintain malicious abuse of process claim under New York law in § 1983 action against those officers and city employees. 42 U.S.C.A. § 1983.

**[59]** **Civil Rights** 🔑 Arrest, search, and detention

Arrestee's conclusory allegations that all defendants in her § action, namely city, city employees, including police officers who allegedly investigated her, county assistant district attorney, and hospital and one of its employees failed to intervene to prevent other defendants from violating her constitutional rights not to be subjected to false arrest, malicious prosecution, and abuse of process, in connection with accusation that arrestee was responsible for the death of her infant daughter, failed to state § 1983 claim for failure to intervene. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[60]** **Civil Rights** 🔑 Police, Investigative, or Law Enforcement Activities

Law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.

2 Cases that cite this headnote

**[61]** **Civil Rights** 🔑 Police, Investigative, or Law Enforcement Activities

**Civil Rights** 🔑 Use of force in general

**Civil Rights** 🔑 Arrest and detention

Law enforcement officer who fails to intercede in conduct of other officers is liable for preventable harm caused by action of other officers if officer observes or has reason to know that excessive force is being used, that citizen has been unjustifiably arrested, or that any constitutional violation has been committed by other law enforcement officials, and if observing officer had realistic opportunity to intervene to prevent harm from occurring.

3 Cases that cite this headnote

**[62]** **Conspiracy** 🔑 Definition and Elements in General

Case 9:19-cv-01527-TJM-TWD   Document 24   Filed 10/05/20   Page 75 of 259

To survive a motion to dismiss on a plaintiff's § 1983 conspiracy claim, the plaintiff must allege (1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[63]   Conspiracy** 🔗 Civil rights conspiracies

Complaints asserting § 1983 conspiracy claims that contain only conclusory, vague, or general allegations that defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[64]   Conspiracy** 🔗 Civil rights conspiracies

To state a § 1983 conspiracy claim against a private entity, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act. 42 U.S.C.A. § 1983.

**[65]   Conspiracy** 🔗 Civil rights conspiracies

Arrestee's allegations that city employees, including police officers and physician, and hospital and its employee acted jointly in wrongfully accusing her of being responsible for the death of her infant daughter were sufficient to support § 1983 conspiracy claim. 42 U.S.C.A. § 1983.

**[66]   Conspiracy** 🔗 Intracorporate conspiracy doctrine in general

Under the intra-corporate conspiracy doctrine, there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment.

1 Cases that cite this headnote

**[67]   Arrest** 🔗 Duration of detention and extent or conduct of investigation or frisk

**Arrest** 🔗 Custody and Disposition of Prisoner

**Civil Rights** 🔗 Arrest and detention

Unreasonably prolonged pretrial detention where exculpatory evidence is readily available can form the basis of a § 1983 claim against police officers as a violation of the Fourth Amendment's protection against unreasonable seizures. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[68]   Civil Rights** 🔗 Arrest and detention

To state a § 1983 claim for unreasonably prolonged detention, plaintiff must allege that (1) she has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) the actions of the officers violated that right, and (3) the officers' conduct shocks the conscience. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[69]   Arrest** 🔗 Custody and Disposition of Prisoner

**Criminal Law** 🔗 Prevention and Investigation of Crime

Arrestee's allegations that certain city employees, including police officers and physician, disregarded and concealed exculpatory evidence in criminal investigation relating to accusation that arrestee was responsible for the death of her infant daughter for over four years while arrestee remained in prison were sufficient to support § 1983 claim for unreasonably prolonged detention under Fourth Amendment. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[70]    Arrest** 🔑 **Duration of detention and extent or conduct of investigation or frisk**

**Arrest** 🔑 **Custody and Disposition of Prisoner**

**Criminal Law** 🔑 **Prevention and Investigation of Crime**

Failure to obtain or disclose evidence that is only arguably exculpatory does not shock the conscience, for purposes of § 1983 claim for unreasonably prolonged detention under the Fourth Amendment. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[71]    Constitutional Law** 🔑 **Local government**

Fourteenth Amendment's prohibition against states depriving a person of life, liberty, or property, without due process of law, applies to municipalities. U.S. Const. Amend. 14.

**[72]    Constitutional Law** 🔑 **Arbitrariness**

Due Process Clause was intended to secure the individual from the arbitrary exercise of the powers of government. U.S. Const. Amend. 14.

1 Cases that cite this headnote

**[73]    Constitutional Law** 🔑 **Procedural due process in general**

Procedural due process requires that government action depriving an individual of substantial interest in life, liberty, or property be implemented in a fair manner. U.S. Const. Amend. 14.

1 Cases that cite this headnote

**[74]    Constitutional Law** 🔑 **Substantive Due Process in General**

Substantive due process bars certain government actions regardless of the fairness of the procedures used to implement them, in order to prevent governmental power from being used for purposes of oppression. U.S. Const. Amend. 14.

**[75]    Constitutional Law** 🔑 **Substantive Due Process in General**

While a procedural due process claim challenges the procedure by which deprivation of liberty is effected, a substantive due process claim challenges the fact of the deprivation itself. U.S. Const. Amend. 14.

1 Cases that cite this headnote

**[76]    Constitutional Law** 🔑 **Duration and timing of deprivation; pre- or post-deprivation remedies**

Procedural due process violation occurs when the government deprives a person of a protected life, liberty, or property interest without first providing notice and an opportunity to be heard. U.S. Const. Amend. 14.

1 Cases that cite this headnote

**[77]    Constitutional Law** 🔑 **Particular claims**

**Constitutional Law** 🔑 **Duration and timing of deprivation; pre- or post-deprivation remedies**

To determine whether a § 1983 due process claim is plausibly alleged, the court evaluates the sufficiency of the allegations with respect to the liberty or property interest alleged and the process due before deprivation of that interest. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[78]    Constitutional Law** 🔑 **Right to fair trial in general**

Fair trial claim is a civil claim for violations of a criminal defendant's Fourteenth Amendment due process rights. U.S. Const. Amend. 14.

5 Cases that cite this headnote

**[79]    Constitutional Law** 🔑 **Investigative activity in general**

**Constitutional Law** 🔑 **Evidence**

Defendant's due process right to a fair trial is violated when exculpatory evidence is withheld, i.e., when a *Brady* violation occurs, and also when an officer forwards fabricated evidence to prosecutors. U.S. Const. Amend. 14.

1 Cases that cite this headnote

[80]   **Civil Rights** 🔑 Criminal prosecutions

**Constitutional Law** 🔑 Right to fair trial in general

**Criminal Law** 🔑 Official Action, Inaction, Representation, Misconduct, or Bad Faith

Plaintiff need not have gone to a full trial on the merits in order to have an actionable § 1983 due process claim based on the denial of a fair trial. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

4 Cases that cite this headnote

[81]   **Civil Rights** 🔑 Criminal prosecutions

**Constitutional Law** 🔑 Evidence

**Criminal Law** 🔑 Responsibility of and for police and other agencies

Police officers can be held liable for *Brady* due process violations under § 1983 if they withhold exculpatory evidence from prosecutors. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

[82]   **Criminal Law** 🔑 Responsibility of and for police and other agencies

Once a police officer turns over exculpatory evidence to the prosecutor, that officer satisfies his constitutional obligations under *Brady*. U.S. Const. Amend. 14.

[83]   **Criminal Law** 🔑 Constitutional obligations regarding disclosure

Elements of *Brady* violation are: (1) evidence at issue must be favorable to accused, either because it is exculpatory or because it is impeaching; (2) that evidence must have been suppressed by state, either willfully or inadvertently; and (3) prejudice must have ensued.

2 Cases that cite this headnote

[84]   **Criminal Law** 🔑 Materiality and probable effect of information in general

To establish prejudice, as element of *Brady* violation, a plaintiff must show the evidence was material, i.e., whether the evidentiary suppression undermines confidence in the outcomes of the trial.

[85]   **Constitutional Law** 🔑 Search, Seizure, and Confiscation

**Constitutional Law** 🔑 Investigative activity in general

**Constitutional Law** 🔑 Evidence

**Criminal Law** 🔑 Responsibility of and for police and other agencies

**Health** 🔑 Records and duty to report; confidentiality in general

Arrestee's allegations that police officers and physicians failed to disclose exculpatory evidence in investigation of her infant's death, did not document or inform the district attorney's office of exculpatory evidence, and falsely reported facts in reports and search warrant affidavits, and that prejudice ensued because it resulted in her arrest, were sufficient to support procedural due process claim based on *Brady* violation in § 1983 action. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

[86]   **Criminal Law** 🔑 Requisites of fair trial

Fabrication of evidence constitutes a violation of the right to a fair trial. U.S. Const. Amends. 5, 6, 14.

8 Cases that cite this headnote

[87]   **Criminal Law** 🔑 Requisites of fair trial

To state a fair trial claim based on fabrication of evidence, a plaintiff must allege that an (1) investigating official (2) fabricated information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5)

the plaintiff suffers a deprivation of life, liberty, or property as a result. U.S. Const. Amends. 5, 6, 14.

14 Cases that cite this headnote

**[88]** **Constitutional Law** 🔑 Protection of Children; Child Abuse, Neglect, and Dependency

**Constitutional Law** 🔑 Search, Seizure, and Confiscation

**Constitutional Law** 🔑 Investigative activity in general

**Infants** 🔑 False reports and accusations

Arrestee's allegations that certain city employees, including police officers and physician, knowingly provided and/or swore to false information in criminal complaint, reports, and search warrant affidavits accusing her of being responsible for the death of her infant daughter were sufficient to support procedural due process claim against city employees based on fabrication of evidence in § 1983 action. U.S. Const. Amends. 5, 6, 14; 42 U.S.C.A. § 1983.

**[89]** **Constitutional Law** 🔑 Protection of Children; Child Abuse, Neglect, and Dependency

**Infants** 🔑 Medical institutions and professionals in general

**Infants** 🔑 False reports and accusations

Arrestee's allegations that physician employed by hospital ignored evidence suggesting that her infant daughter's death was not caused by "shaken baby syndrome," including lab results that were consistent with metabolic bone disease, and provided false information to physician employed by city, who based her conclusions in criminal investigation on that false information, were sufficient to support procedural due process claim against hospital and its employee based on fabrication of evidence in § 1983 action. U.S. Const. Amends. 5, 6, 14; 42 U.S.C.A. § 1983.

**[90]** **Limitation of Actions** 🔑 Civil rights

Fabrication of evidence claims accrue when the plaintiff learns that evidence was fabricated and an injury was caused by the fabrication. U.S. Const. Amends. 5, 6, 14.

3 Cases that cite this headnote

**[91]** **Limitation of Actions** 🔑 Burden of proof in general

Because the statute of limitations is an affirmative defense, the burden is on the defendant to establish when a federal claim accrues.

**[92]** **Limitation of Actions** 🔑 Civil rights

Allegation that arrestee always believed in her innocence was insufficient for city employees, including police officers and physician, to establish that her *Brady* violation and fabrication of evidence claims accrued at the time of her arrest in § 1983 action alleging that she was wrongfully accused of being responsible for the death of her infant daughter. U.S. Const. Amends. 5, 6, 14; 42 U.S.C.A. § 1983.

**[93]** **Constitutional Law** 🔑 Substantive Due Process in General

Due process protection in the substantive sense limits what the government may do in both its legislative and its executive capacities. U.S. Const. Amend. 14.

**[94]** **Constitutional Law** 🔑 Personal and bodily rights in general

**Constitutional Law** 🔑 Families and Children

**Constitutional Law** 🔑 Privacy and Sexual Matters

The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity. U.S. Const. Amend. 14.

**[95]**   **Constitutional Law**   Substantive Due
Process in General

Criteria to identify what is fatally arbitrary, in
context of substantive due process claim, differ
depending on whether it is legislation or a
specific act of a governmental officer that is at
issue. U.S. Const. Amend. 14.

**[96]**   **Constitutional Law**   Egregiousness;
"shock the conscience" test

For executive action to violate substantive
due process, it must be so egregious, so
outrageous, that it may fairly be said to shock the
contemporary conscience; it is not enough that
the government act was incorrect or ill-advised,
rather, only the most egregious official conduct
can be said to be arbitrary in the constitutional
sense and therefore unconstitutional. U.S. Const.
Amend. 14.

**[97]**   **Constitutional Law**   Protection of
Children; Child Abuse, Neglect, and
Dependency

**Infants**   Medical institutions and
professionals in general

Arrestee's allegations that physician employed
by city as well as hospital and its employee
failed to "exhaust all possibilities" before
rendering "shaken baby syndrome" diagnosis in
investigation of her infant daughter's death were
insufficient to support substantive due process
claim based on failure to investigate in § 1983
action. U.S. Const. Amend. 14; 42 U.S.C.A. §
1983.

1 Cases that cite this headnote

**[98]**   **Constitutional Law**   Arbitrariness

The due process right to be free from arbitrary
government action, to the extent it exists, is the
right to be free of arbitrary government action
that infringes a protected right. U.S. Const.
Amend. 14.

**[99]**   **Civil Rights**   Arrest and detention

Arrestee's allegations in § 1983 action that she
was wrongfully accused of being responsible for
her infant daughter's death and held for more
than four years in pretrial detention, and that
defendants, including hospital and its employee,
encouraged this for the purpose of using her
confinement as a "bargaining chip" to pressure
her husband to plead guilty, were insufficient
to support speedy trial claim against hospital
and its employee, absent allegations supporting
a causal link between conduct of hospital and
its employee and the delay in arrestee's criminal
case being resolved. U.S. Const. Amend. 6; 42
U.S.C.A. § 1983.

**[100]**   **Civil Rights**   Common law or state law
torts

Section 1983 action, like its state tort analogs,
employs the principle of proximate causation. 42
U.S.C.A. § 1983.

**[101]**   **Civil Rights**   Arrest and detention

The chain of causation between a police officer's
unlawful arrest and a subsequent conviction
and incarceration is broken by the intervening
exercise of independent judgment, in civil rights
action arising from arrest.

**[102]**   **Civil Rights**   Arrest and detention

Arrestee's allegations in § 1983 action that
city employees, including police officers and
physician, wrongfully accused her of being
responsible for her infant daughter's death and
that she was held for more than four years in
pretrial detention for the purpose of using her
confinement as a "bargaining chip" to obtain a
guilty plea from her husband, coupled with her
criminal case being dismissed shortly after her
husband's conviction, were sufficient to state a
speedy trial claim as to the city employees who
were involved in her prosecution. U.S. Const.
Amend. 6; 42 U.S.C.A. § 1983.

**[103]   Constitutional Law 🔑 Conditions**

Pretrial detainee's claim of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment. U.S. Const. Amends. 8, 14.

**[104]   Civil Rights 🔑 Criminal law enforcement; prisons**

**Civil Rights 🔑 Criminal law enforcement; prisons**

Pretrial detainee's allegations in § 1983 action against city employees, including police officers and physician, as well as hospital and its employee, that defendants, inter alia, refused usual and customary medical services, forced her to give birth while handcuffed and shackled, refused her the opportunity to breastfeed or bond with her infant after childbirth, and took away her infant two-and-a-half days after delivery failed to support claim of unconstitutional conditions of confinement, absent factual allegations establishing the personal involvement of any defendant with respect to those conditions. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[105]   Civil Rights 🔑 Criminal law enforcement; prisons**

Arrestee's allegations in § 1983 action that city, with deliberate indifference, failed to provide adequate training for its police officers who worked on "shaken baby syndrome" cases or to properly instruct city employees of applicable laws were sufficient to state *Monell* claim against the city. 42 U.S.C.A. § 1983.

**[106]   Civil Rights 🔑 Governmental Ordinance, Policy, Practice, or Custom**

Municipality may be liable under § 1983 if a municipal policy or custom causes deprivation of rights protected by the Constitution. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[107]   Civil Rights 🔑 Complaint in general**

For a *Monell* claim to survive a motion to dismiss for failure to state a claim, a plaintiff must allege sufficient factual detail and not mere boilerplate allegations that the violation of the plaintiff's constitutional rights resulted from the municipality's custom or official policy. 42 U.S.C.A. § 1983; Fed. R. Civ. P. 12(b)(6).

5 Cases that cite this headnote

**[108]   Civil Rights 🔑 Governmental Ordinance, Policy, Practice, or Custom**

**Civil Rights 🔑 Lack of Control, Training, or Supervision;  Knowledge and Inaction**

A policy or custom may be established, for purposes of alleging municipal liability under § 1983, by any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom through which constructive notice is imposed upon policymakers; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised 'deliberate indifference' to the rights of the plaintiff. 42 U.S.C.A. § 1983.

**[109]   Civil Rights 🔑 Criminal law enforcement; prisons**

Arrestee's allegations in § 1983 action that physician employed by hospital had a history of overzealously diagnosing "shaken baby syndrome," of which hospital was aware and with knowledge that law enforcement would rely on those conclusions in directing the course of an arrest and prosecution, and that hospital perpetuated policy of having its staff conduct investigations for non-medical purposes in order to see those accused of "shaken baby syndrome" arrested, prosecuted, and convicted, were sufficient to state *Monell* claim against hospital. 42 U.S.C.A. § 1983.

**[110]    Civil Rights** 🔑 **Vicarious or respondeat superior liability in general**

Doctrine of respondeat superior is not available to render a supervisor liable under § 1983 for the unconstitutional conduct of his subordinates. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[111]    Civil Rights** 🔑 **Vicarious or respondeat superior liability in general**

Just as a municipal entity cannot be held liable under § 1983 pursuant to the doctrine of respondeat superior, a private corporation cannot be held liable under respondeat superior for the allegedly unconstitutional conduct of its employee. 42 U.S.C.A. § 1983.

**[112]    Civil Rights** 🔑 **Adequacy, Availability, and Exhaustion of State or Local Remedies**

**Civil Rights** 🔑 **Existence of other remedies; exclusivity**

There is no private right of action under the New York State Constitution where remedies are available under § 1983. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[113]    Civil Rights** 🔑 **Government Agencies and Officers**

District courts are encouraged to determine the availability of an absolute immunity defense in § 1983 action at the earliest appropriate stage. 42 U.S.C.A. § 1983.

**[114]    Civil Rights** 🔑 **Attorney General and prosecuting attorneys**

Prosecutors performing core prosecutorial functions are entitled to absolute immunity in § 1983 action. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

**[115]    Civil Rights** 🔑 **Attorney General and prosecuting attorneys**

Prosecutorial functions protected by absolute immunity in § 1983 action include conduct preliminary to the initiation of a prosecution, such as whether to present a case to a grand jury, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present. 42 U.S.C.A. § 1983.

**[116]    Civil Rights** 🔑 **Attorney General and prosecuting attorneys**

Prosecutor was entitled to absolute immunity in arrestee's § 1983 action alleging that she was wrongfully accused of being responsible for the death of her infant daughter, even though arrestee claimed that prosecutor concealed evidence and misrepresented facts. 42 U.S.C.A. § 1983.

**[117]    Civil Rights** 🔑 **Attorney General and prosecuting attorneys**

Prosecutor is entitled to absolute immunity in § 1983 action even in the face of allegations of deliberate withholding of exculpatory information or his knowing use of perjured testimony. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[118]    Federal Courts** 🔑 **Prosecutors and attorneys general**

To the extent arrestee's claims against prosecutor in § 1983 action alleging that she was wrongfully accused of being responsible for the death of her infant daughter were asserted against prosecutor in her official capacity, they were barred because prosecutor acted on behalf of state, which was immune under the Eleventh Amendment. U.S. Const. Amend. 11; 42 U.S.C.A. § 1983.

**[119]    Civil Rights** 🔑 **Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general**

2017 WL 1208422

Qualified immunity shields law enforcement officers from § 1983 claims for money damages provided that their conduct does not violate clearly established constitutional rights of which a reasonable person would have been aware. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

[120]   **Civil Rights**  🔑  Defenses;  immunity and good faith

Qualified immunity from § 1983 claims for money damages is an affirmative defense as to which the defendant officers or officials bear the burden of proof. 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

[121]   **Civil Rights**  🔑  Government Agencies and Officers

**Civil Rights**  🔑  Good faith and reasonableness;  knowledge and clarity of law; motive and intent, in general

In analyzing the applicability of qualified immunity from § 1983 claims for money damages, courts conduct a two-step analysis: first, courts determine whether the facts show that the officer's conduct violated plaintiff's constitutional rights, and second, if there was a constitutional violation, courts determine whether the right was clearly established at the time of the officer's actions; courts are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. 42 U.S.C.A. § 1983.

[122]   **Civil Rights**  🔑  Good faith and reasonableness;  knowledge and clarity of law; motive and intent, in general

Even if the constitutional right at issue was clearly established in certain respects, an officer is still entitled to qualified immunity from § 1983 claims for money damages if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context. 42 U.S.C.A. § 1983.

[123]   **Civil Rights**  🔑  Sheriffs, police, and other peace officers

Police officers were not entitled to qualified immunity as to arrestee's false arrest and malicious prosecution claims based on alleged fabrication of evidence and suppression of exculpatory evidence in § 1983 action alleging that she was wrongfully accused of being responsible for the death of her infant daughter; there were several plausible alternative explanations to "shaken baby syndrome" as the cause of death, including a genetic disorder and the child's prior medical history, that the officers chose to ignore. 42 U.S.C.A. § 1983.

[124]   **Federal Civil Procedure**  🔑  Fact issues

Where district court could not find, as a matter of law, that physician employed by city was acting in a prosecutorial role rather than an investigatory one in connection with accusation that arrestee was responsible for the death of her infant daughter, the availability of absolute immunity from arrestee's false arrest and malicious prosecution claims based on alleged fabrication of evidence and suppression of exculpatory evidence in § 1983 action could not be decided as a matter of law on motion to dismiss. 42 U.S.C.A. § 1983.

[125]   **Civil Rights**  🔑  Persons Protected, Persons Liable, and Parties

Physician employed by hospital who had diagnosed arrestee's infant daughter with "shaken baby syndrome," and who allegedly took an active role in criminal investigation accusing arrestee of being responsible for the death of infant, was not entitled to statutory immunity under the New York Child Protective Services Act from arrestee's false arrest and malicious prosecution claims based on alleged fabrication of evidence and suppression of exculpatory evidence on motion to dismiss in §

1983 action. 42 U.S.C.A. § 1983; N.Y. Social Services Law § 413(1)(a).

**[126]**    **Federal Civil Procedure** 🔑 Pleading over

Although it is the usual practice upon granting a motion to dismiss to allow leave to replead, such leave should be denied where the proposed amendment would be futile. Fed. R. Civ. P. 15(a).

**[127]**    **Federal Civil Procedure** 🔑 Pleading over

An amendment to a pleading is considered futile if the claim is time-barred due to the expiration of the applicable statute of limitations period. Fed. R. Civ. P. 15(a).

**[128]**    **Federal Civil Procedure** 🔑 Form and sufficiency of amendment; futility

District court would deny as futile arrestee's request for leave to amend her complaint a second time in § 1983 action against city, city employees, including police officers who allegedly investigated her, county assistant district attorney, and hospital and one of its employees, alleging that she was wrongfully accused of being responsible for the death of her infant daughter; the court already permitted arrestee the opportunity to amend the complaint and urged her to correct certain deficiencies, however, arrestee did not heed the court's advice, nor make good use of that opportunity to prune her complaint of invalid claims or to add useful or relevant factual allegations or particularity to her complaint. 42 U.S.C.A. § 1983; Fed. R. Civ. P. 15(a).

**Attorneys and Law Firms**

**\*591** Corey T. Lee, C.T. Lee & Associates, Ameer Nadav Benno, Benno & Associates P.C., Poupa Jenny Marashi, New York, NY, for Plaintiff.

Qiana Charmaine Smith–Williams, New York City Law Department, Gregory John Radomisli, Brian Scott Osterman,

Martin Clearwater & Bell LLP, New York, NY, for Defendants.

**MEMORANDUM & ORDER**

PAMELA K. CHEN, United States District Judge:

**\*\*1**  On March 26, 2015, Plaintiff Ying Li commenced this action against Defendants pursuant to 42 U.S.C. § 1983 ("Section 1983") and New York law. (*See* Dkt. 1.) Plaintiff's ten-count Amended Complaint alleges numerous theories of liability against Defendants. (*See* Dkt. 36, Amended Complaint ("Am. Compl.").) In general, Plaintiff alleges that she was wrongfully accused of being responsible for the death of her infant daughter. (*Id.*) The Amended Complaint makes claims against two groups of defendants: (i) the first group is **\*592** composed of the City of New York (the "City") and various City employees (collectively, the "City Defendants"), including twelve named New York City Police Department ("NYPD") officers who allegedly investigated Plaintiff (the "Officer Defendants") [1]; Dr. Kristen Landi ("Dr. Landi"), a physician employed by the City; Queens County Assistant District Attorney P. Leigh Bishop ("ADA Bishop"); and fifteen "John Doe" defendants; and (ii) the second group is composed of Flushing Hospital Medical Center ("Flushing Hospital" or "FHMC") and one of its employees, Dr. Fernanda Kupferman ("Dr. Kupferman") (collectively, the "Medical Center Defendants").

[1]    The twelve individual NYPD Officer Defendants are Det. Matthew Degnan ("Det. Degnan"), Lt. Thomas Conforti ("Lt. Conforti"), Det. David Moser ("Det. Moser"), Lt. John Perdoch ("Lt. Perdoch"), Det. John Phelan ("Det. Phelan"), P.O. Yatyu Yam ("P.O. Yam"), Det. Sgt. Guisella Rodriguez ("Sgt. Rodriguez"), Lt. Arthur Hall ("Lt. Hall"), Det. Michael Heffernan ("Det. Heffernan"), Sgt. Timothy Cai ("Sgt. Cai"), Det. Douglas Lee ("Det. Lee"), Det. Dennis Chan ("Det. Chan"), Sgt. "FNU" Manfredi ("First Name Unknown") ("Sgt. Manfredi").
Of these individual Officer Defendants, Dets. Moser, Phelan, Heffernan, and Sgt. Manfredi are not represented. (Dkt. 69.)

Plaintiff asserts the following ten counts, of which eight are against all Defendants: Count 1 (false arrest and imprisonment), Count 2 (malicious prosecution), Count 3 (malicious abuse of process), Count 4 (failure to intervene),

Count 5 (conspiracy), Count 6 (unreasonably prolonged detention), Count 7 (violation of due process), Count 8 (*Monell* liability against the City), Count 9 (*Monell*-type liability against Flushing Hospital), and Count 10 (violation of the New York State Constitution). Except for Count 10, all of Plaintiff's claims are alleged as federal claims pursuant to Section 1983.

Presently before the Court are two separate motions to dismiss filed by the two groups of Defendants pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP"). For the reasons set forth below, both the City Defendants' and Medical Center Defendants' motions are GRANTED IN PART and DENIED IN PART. Furthermore, all claims against the following Defendants are dismissed in their entirety: ADA Bishop, Lt. Conforti, Det. Perdoch, Sgt. Rodriguez, Lt. Hall, Det. Lee, Sgt. Manfredi, P.O. Yam, Sgt. Cai, and Det. Chan.

## BACKGROUND

### I. THE FACTS [2]

[2]   The Court takes the allegations in the Amended Complaint as true, as it must on a motion to dismiss under FRCP 12. *See EEOC v. Port Auth. of New York & New Jersey,* 768 F.3d 247, 253 (2d Cir. 2014) ("[W]e accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.").

**\*\*2**  Early in the morning of October 23, 2007, Annie, the 8-1/2–week-old daughter of Plaintiff and her husband Hang Bin Li, suddenly went limp while being fed. (Am. Compl. ¶¶ 92, 95.) The Lis called 911 and took Annie to the emergency room at Flushing Hospital. (Am. Compl. ¶¶ 95, 98, 108.) Annie was unresponsive when she arrived at the emergency room, where she was revived and placed on life support. (Am. Compl. ¶ 98.) [3]

[3]   A medical report from that day indicated that Annie had no external signs of trauma. (Am. Compl. ¶ 98.)

Suspecting child abuse, Flushing Hospital called Det. Phelan and the NYPD Child Abuse Squad that day. (Am. Compl. ¶ 101.) Det. Phelan went to the hospital, spoke **\*593** with the hospital staff, looked at medical charts, and met with the Lis. (Am. Compl. ¶¶ 101–103.) P.O. Yam, an officer who spoke Mandarin, accompanied Det. Phelan. (Am. Compl. ¶ 101.) The Lis were taken to Det. Phelan's office at the

Queens Child Abuse Squad. (Am. Compl. ¶ 104.) When they arrived at the 109th precinct, other officers and sergeants, including Defendant Manfredi, were present. (Am. Compl. ¶ 105.) Det. Heffernan also came to the Precinct that night. (Am. Compl. ¶ 105.) Dets. Phelan and Degnan interrogated Plaintiff, alone, for about an hour while P.O. Yam interpreted. (Am. Compl. ¶ 106.) They then interrogated Hang Bin Li. (Am. Compl. ¶ 106.) Afterwards, Dets. Degnan and Heffernan drove the Lis back to Flushing Hospital. (Am. Compl. ¶ 108.) At the hospital, Dets. Degnan and Heffernan had extended conversations with the hospital staff, including Dr. Kupferman. (Am. Compl. ¶ 108.)

The next day, October 24, 2007, Det. Phelan went to the Lis' house, and Plaintiff's husband gave written consent for Det. Phelan to search the home. (Am. Compl. ¶ 110.) Later, detectives from the 109th Precinct went to search the Lis' home after getting a warrant. (Am. Compl. ¶ 110.) Subsequently, the Lis were interviewed again by numerous people, including Dets. Heffernan and Moser, officers from the Queens Homicide Squad, and medical personnel at Flushing Hospital, including Dr. Kupferman. [4] (Am. Compl. ¶¶ 112–15.) Det. Chan served as an interpreter from the afternoon of October 24, 2007, until the morning hours of October 25, 2007. (Am. Compl. ¶ 112.) During these interviews, according to Plaintiff, Dets. Heffernan and Moser and Dr. Kupferman repeatedly screamed at the Lis that they had killed their daughter and that unless the Lis told them which one of them had hurt Annie, the doctors could not help her. (Am. Compl. ¶ 115.) They also promised the Lis that they could see Annie if they admitted to hurting her. (Am. Compl. ¶ 116.) After being repeatedly told this, Hang Bin Li stated that he might have inadvertently bumped Annie's head lightly against a table while trying to resuscitate her. (Am. Compl. ¶ 117.)

[4]   The Amended Complaint does not indicate where these interviews occurred. (Am. Compl. ¶¶ 112–15.)

On October 25, 2007, Dr. Kupferman conducted a "forensic interview" of Plaintiff. (Am. Compl. ¶ 120.) A day later, Annie was confirmed brain dead, and was diagnosed with "Shaken Baby Syndrome" ("SBS"). [5] (Am. Compl. ¶¶ 123, 134.) That evening, the Lis were again taken to the 109th precinct, and Dets. Degnan, Heffernan, and Chan questioned the Lis separately until the next morning. (Am. Compl. ¶ 124.) Hang Bin Li also gave a written statement regarding the events that had occurred on October 22 and 23. (*Id.*)

Ying Li v. City of New York, 246 F.Supp.3d 578 (2017)

2017 WL 1208422

Annie was removed from life support on October **\*594** 28. (Am. Compl. ¶ 125.) On October 29, Dets. Moser, Degnan, Heffernan, and Sgt. Cai questioned Hang Bin Li at the 109th precinct. (Am. Compl. ¶ 126.) Throughout the multiple investigations and interviews, Plaintiff denied any wrongdoing. (Am. Compl. ¶ 127.) Unidentified Defendants ordered Plaintiff to remain in and about her home from approximately October 26, 2007 up to her arrest five months later. (Am. Compl. ¶ 131.)

5      SBS is "a devastating form of child abuse caused by violently shaking a baby, resulting in traumatic brain injury, which is characterized by a constellation of injuries including subdural hematomas (i.e. bleeding in the brain), retinal hemorrhages, rib fractures and long-bone fractures." *Phelan ex rel. Phelan v. Torres*, 843 F.Supp.2d 259, 261 (E.D.N.Y. 2011) (citing, *inter alia*, Shaken Baby Syndrome, Medline Plus Medical Encyclopedia, a service of the U.S. National Library of Medicine, National Institutes of Health ("Medline Plus"), http://www.nlm.nih.gov/medlineplus/ency/ article/000004.htm). However, some courts have acknowledged that there is an "emergence of a legitimate and significant dispute within the medical community as to the cause of [ ] injuries" that used to be attributed to SBS. *See State v. Edmunds*, 308 Wis.2d 374, 746 N.W.2d 590, 599 (Wis. Ct. app. 2008); *see also Cavazos v. Smith*, 565 U.S. 1, 132 S.Ct. 2, 181 L.Ed.2d 311 (2011) (Ginsburg, J., dissenting) ("What is now known about shaken baby syndrome (SBS) casts grave doubt on the charge leveled against [petitioner].")

 **\*\*3** On March 11, 2008, Plaintiff and her husband were arrested for Annie's death based on the conclusion that Annie had died of SBS. (Am. Compl. ¶¶ 133–34.) Plaintiff was charged with two counts of Manslaughter in the First Degree, and one count of Endangering the Welfare of a Child. (Am. Compl. ¶¶ 146.) The grand jury indicted Plaintiff on various charges, including Manslaughter in the Second Degree. (Am. Compl. ¶ 181, 184, Ex. C.) Plaintiff pled not guilty to all charges. (Am. Compl. ¶ 179.) Plaintiff's husband was also indicted for one count of Murder in the Second Degree, two counts of Manslaughter in the Second Degree, and one count of Endangering the Welfare of a Child. (Am. Compl. ¶ 185.) Unable to make bail, Plaintiff was held at the Riker's Island correctional facility for about four years without a trial. (*See* Am. Compl. ¶¶ 180, 234.) On March 26, 2012, Plaintiff was

released after her bail was reduced. (Am. Compl. ¶ 197.) On January 2, 2013, ADA Bishop moved to dismiss the criminal charges against Plaintiff. (Dkt. 63–6, Ex. F.) Hang Bin Li's trial began the next day. (Am. Compl. ¶ 199.) On February 1, 2013, he was convicted of reckless manslaughter. (Am. Compl. ¶ 200.)

## II. PROCEDURAL HISTORY
Plaintiff filed this action on March 26, 2015. (Dkt. 1.) On November 19, 2015, she filed the Amended Complaint. (Dkt. 36.) On March 7, 2016, Defendants moved to dismiss the Amended Complaint pursuant to FRCP 12(b)(6). (Dkt. 53, 58.)

## DISCUSSION [6]

6      As an initial matter, the Court cautions Plaintiff's counsels that their scatter-shot, kitchen-sink approach to this litigation thus far has done a great disservice to her client's case. Plaintiff's 275– paragraph Amended Complaint indiscriminately asserts eight of her ten claims against every single Defendant, even though, as discussed herein, these claims clearly should not have been brought against many of these Defendants, and many of these Defendants should not have been named at all. Despite the Court's repeated suggestions at the pre- motion conference that Plaintiff's counsel focus on developing meritorious claims and arguments, and consider pruning this action of non-viable claims, Plaintiff not only persisted with all of her claims, but doubled down on her helter-skelter approach by responding to Defendants' motions to dismiss with two separate Memoranda of Law ("MOLs") with internal editing notes left for the Court to read, place-holders for citations, and multiple grammatical errors. (*See, e.g.*, Dkt. 61 at 22 n.36; *id.* at 41; Dkt. 66 at 29). "Not only does the 'kitchen sink' approach to briefing cause distraction and confusion, it also 'consumes space that should be devoted to developing the arguments with some promise.' " *Dynegy Marketing & Trade v. Multiut Corp.*, 648 F.3d 506, 512 (7th Cir. 2011) (citation omitted). Indeed, here, the Court has had to struggle to tease out of Plaintiff's MOLs legally coherent and supported positions. While the Court has done so in order to comply with its duty *at*

*this stage* to view the complaint in the light most favorable to Plaintiff, it will not be so forgiving as this case progresses.

## I. COURT'S CONSIDERATION OF MATERIAL EXTRANEOUS TO THE AMENDED COMPLAINT

Plaintiff and Defendants both seek to have the Court consider certain information and documents outside of the Amended Complaint. Both parties have attached to their moving papers the Queens County criminal court complaint ("criminal complaint") against Plaintiff (Dkt. 60, Ex. B; **\*595** Dkt. 63, Ex. B) and the transcript of the court conference at which ADA Bishop moved to dismiss the criminal charges against Plaintiff (Dkt. 60, Ex. C; Dkt. 63, Ex. F). The City Defendants also submitted the grand jury minutes (Dkt. 65, Ex. A) with their Reply brief. Plaintiff also has submitted a copy of the manslaughter indictment returned by the grand jury against her (Dkt. 63, Ex. C) and two press releases from the Queens District Attorney's Office, dated March 12, 2008, and September 11, 2015 (Dkt. 63, Exs. D, E). The March 12, 2008 press release discusses the District Attorney's charging of Plaintiff and her husband. (*See* Ex. D, Dkt. 63–4, at ECF 2.) [7] The September 11, 2015 press release notes that the Queens District Attorney and the New York City Chief Medical Examiner were to host the 2015 New York City Abusive Head Trauma / Shaken Baby Syndrome Conference. (*See* Ex. E, Dkt. 63–5 at ECF 2.)

[7]    Citations to "ECF" refer to the pagination generated by the Court's electronic docketing system and not the document's internal pagination.

**\*\*4** In determining the adequacy of a claim under Rule 12(b)(6), courts are generally limited to the facts alleged in the complaint, documents attached to the complaint, documents incorporated by reference in the complaint, and facts that may be judicially noticed. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)); *see also Wilson v. Kellogg Co.*, 628 Fed.Appx. 59, 60 (2d Cir. 2016) (summary order) (noting that the court may consider matters of which judicial notice may be taken in deciding a Rule 12(b)(6) motion). However, even if the complaint does not expressly cite a document, the document is deemed to include that document if it is "integral" to the complaint. *L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004)); *Sira*, 380 F.3d at 67 (document not expressly cited in the complaint was "incorporated into the pleading because

[it] was integral to [plaintiff's] ability to pursue" his cause of action); *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.") (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–153 (2d Cir. 2002)); Fed. R. Evid. 201 (a court may take judicial notice of "a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

[1]    [2]    By repeatedly referring to the criminal complaint, the Amended Complaint incorporates it by reference. [8] As for Plaintiff's other exhibits, *i.e.*, the indictment, the transcript of the criminal court conference, and the two press releases, the Court takes judicial notice of them, but for the limited purpose of establishing their existence and legal effect, and determining the statements that they contain without considering the truth of those statements. **\*596** *See, e.g., Bejaoui v. City of New York*, No. 13-cv-5667, 2015 WL 1529631, at \*6 (E.D.N.Y. Mar. 31, 2015) (recognizing disagreement among district courts in the Second Circuit as to whether incident reports, arrest reports, and police complaints may be judicially noticed, but still taking notice of the plaintiff's State court indictment and criminal court order to establish their existence and legal effect); *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." (quoting *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998))); *see, e.g., Garcia–Garcia v. City of New York*, No. 12-cv-1302, 2013 WL 3832730 (S.D.N.Y. July 22, 2013) (taking judicial notice of criminal complaints and indictments for the limited fact that plaintiff was arrested and charged with certain crimes. [9] Here, the criminal court records and the press releases relate to Plaintiff's allegations that the criminal case was terminated favorably to her and the date on which the criminal charges were dropped. [10] (Am. Compl. ¶¶ 201, 212.)

[8]    The Amended Complaint repeatedly refers to the criminal complaint in alleging Plaintiff's fabrication of evidence and malicious prosecution claims. (*See, e.g.,* Am. Compl. ¶ 145 ("Defendant DEGNAN signed the criminal court complaint ...

despite his knowing that there was no truth to those allegations...."); Am. Compl. ¶ 146 (alleging that the criminal court complaint was based on fabricated information provided to the District Attorney's Office); Am. Compl. ¶ 150 (alleging that Dr. Landi made a false statement in the criminal complaint)). Plaintiff also alleges that Dr. Landi made a false statement in the criminal complaint that Annie may have been saved had Plaintiff sought medical care for Annie sooner. (Am. Compl. ¶ 150.)

9      *See also McLoughlin v. People's United Bank, Inc.,* 586 F.Supp.2d 70, 73 (D. Conn. 2008) ("The Court may take judicial notice of the press releases of government agencies" (citing *In re Zyprexa Products Liability Litigation,* 549 F.Supp.2d 496, 501 (E.D.N.Y. 2008)); *Mitchell v. Home,* 377 F.Supp.2d 361, 367 n.1 (S.D.N.Y. 2005) ("The press release [from the New York Attorney General] may be considered on this motion to dismiss because ... this Court may take judicial notice of it as a matter of public record[.]"); *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir. 2007) ("If the court takes judicial notice, it does so in order to determine what statements they contained—but ... not for the truth of the matters asserted.").

10     Moreover, Plaintiff's counsel has also represented to the Court that she has used one of the press releases in order to identify the named Defendants (*see* 1/7/2016 Pre–Motion Conference Transcript), and the Court therefore may consider at least one of the press releases to be "integral" to the Complaint. *See Sira,* 380 F.3d at 67. The Court, however, will not consider the new factual assertions Plaintiff makes in her opposition papers. *See Green v. City of Mount Vernon,* 96 F.Supp.3d 263, 285 (S.D.N.Y. 2015) (citing, *inter alia, Fonte v. Bd. of Managers of Cont'l Towers Condo.,* 848 F.2d 24, 25 (2d Cir. 1988) ("Factual allegations contained in legal briefs or memoranda are also treated as matters outside the pleading[s] for purposes of Rule 12(b).")).

**5    [3]   The Court, however, declines to take judicial notice of the grand jury minutes in *People v. Hang Bin Li and Ying Li,* Indictment No. 603/08 (Dkt. 65, Ex. A), which the City Defendants have attached to their Reply brief, because the City seeks to rely on the substance and truth of the testimony

set forth in those minutes, and not just the fact of the testimony being given or the date on which it was given. *See St. John's Univ., N.Y. v. Bolton,* 757 F.Supp.2d 144, 156 (E.D.N.Y. 2010) ("[T]he court may, *at its discretion,* consider matters of which judicial notice may be taken...." (emphasis added) (citation omitted)).

## II. LEGAL STANDARD

Under Rule 12(b)(6) of the FRCP, a defendant may move for dismissal on the ground that the complaint "fail[s] to state a claim upon which relief can be granted." To withstand a Rule 12(b)(6) motion, a complaint must plead sufficient facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable **597 inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955). In ruling on a 12(b)(6) motion, a court must accept the factual allegations set forth in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *See Nielsen v. Rabin,* 746 F.3d 58, 62 (2d Cir. 2014). However, that " 'tenet is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' " *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal,* 556 U.S. at 668, 129 S.Ct. 1937). A complaint that "tenders 'naked assertion[s]' devoid of 'further factual enhancement' " will not suffice. *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955). Rather, "[f]actual allegations must be enough to raise a right to relief above the speculative level...." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955. A complaint should be dismissed where a plaintiff has not "nudged [its] claims across the line from conceivable to plausible[.]" *Id.* at 570, 127 S.Ct. 1955.

## III. PLAINTIFF'S SECTION 1983 CLAIMS

[4]   [5]   Plaintiff has brought this action pursuant to 42 U.S.C. § 1983 ("Section 1983"), which provides a cause of action for anyone subjected "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by a person acting under color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of [federal] rights established elsewhere." *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir. 1999) (citing *City of Oklahoma*

*City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)); *see Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). To state a claim under Section 1983, a plaintiff must plausibly allege "(1) that the defendants deprived him of a right 'secured by the Constitution or laws of the United States'; and (2) that they did so 'under color of state law.' " *Giordano v. City of New York*, 274 F.3d 740, 750 (2d Cir. 2001) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999)); *see Flynn v. James*, 513 Fed.Appx. 37, 39 (2d Cir. 2013).

### A. Liability of Medical Center Defendants as Private Actors

[6] Plaintiff asserts her federal claims not only against the City Defendants but also against the Medical Center Defendants, who ordinarily would be considered non-State actors. *See White v. St. Joseph's Hosp.*, 369 Fed.Appx. 225, 226 (2d Cir. 2010) ("[P]rivate actors and institutions, such as the hospitals ... are generally not proper § 1983 defendants because they do not act under color of state law.") (citing *Amer. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999)); *see also Kia P. v. McIntyre*, 235 F.3d 749, 756 (2d Cir. 2000) (finding that a hospital was not a State actor to the extent it acted in its capacity as a private provider of medical care). As a general matter, liability under Section 1983 is proper only with respect to individuals acting under "color of state law," *i.e.*, State actors, or individuals acting in concert with a State actor. *See* 42 U.S.C. § 1983; *Jones v. City of New York*, No. 12-cv-9144, 2013 WL 4028183, at *6 n.3 (S.D.N.Y. Aug. 8, 2013) ("Section 1983 addresses only those injuries caused by state actors or those acting under color of state law.") (quoting *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992)). For a private entity to be held liable under Section 1983, a plaintiff must establish that the private entity acted as a "willful participant in joint activity with the State or its agents." **\*598** *Betts v. Shearman*, 751 F.3d 78, 85 (2d Cir. 2014) (citation and quotation marks omitted).

**\*\*6** Although the Medical Center Defendants argue that they are not State actors and therefore not subject to liability under Section 1983, they also note that this issue may be more appropriate to be decided on summary judgment. (*See* Dkt. 55 at 19 n.3.) Because the Medical Center Defendants essentially defer arguing the issue, the Court reserves consideration of the issue for summary judgment. For purposes of ruling on Defendants' motions to dismiss, the Court assumes without deciding that the Medical Center Defendants are State actors who acted "under color of state law."

### B. City Defendants' Request to Dismiss the Individual Officer Defendants for Lack of Personal Involvement

[7] [8] The City Defendants point out—and rightfully so —that Plaintiff has failed to allege any personal involvement by many of the named Officer Defendants. (Dkt. 59 at 6.) "An individual defendant is not liable under § 1983 absent personal involvement." *Morris v. Eversley*, 282 F.Supp.2d 196, 202 (S.D.N.Y. 2003) (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)); *Spavone v. New York State Dept. of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). Pleadings that do not differentiate which defendant was involved in the unlawful conduct are insufficient to state a claim. *See, e.g., Wright v. Orleans Cnty.*, No. 14-cv-0622A, 2015 WL 5316410, at *13 (W.D.N.Y. Sept. 10, 2015) (noting in a § 1983 case that "[g]roup pleading is insufficient for purposes of Rule 8(a)(2) [of the FRCP] which requires a short and plain statement of the claim showing that the pleader is entitled to relief." (citation and quotation marks omitted)); *Holmes v. Allstate Corp.*, No. 11–civ–1543, 2012 WL 627238, at *7, *22 (S.D.N.Y. Jan. 27, 2012) ("Plaintiffs' method of group pleading is incoherent or illogical" and "[FRCP] 8(a) is violated where a plaintiff, by engaging in 'group pleading,' fails to give each defendant fair notice of the claims against it."); *Pierson v. Orlando Regional Healthcare Systems, Inc.*, 619 F.Supp.2d 1260, 1273 (M.D. Fla. 2009) (dismissing complaint because group-pleading method of collectively referring to individual defendants and two physician groups as "Peer Review Defendants" throughout complaint did not satisfy [FRCP] 9(a)).

#### 1. Lt. Conforti, Det. Perdoch, Sgt. Rodriguez, Lt. Hall, Det. Lee, and Sgt. Manfredi

[9] The Amended Complaint fails to allege facts from which it can be reasonably inferred that Lt. Conforti, Det. Perdoch, Sgt. Rodriguez, Lt. Hall, and Det. Lee had any involvement in Plaintiff's Queens County criminal proceedings. Though the lengthy Amended Complaint devotes six paragraphs to each of these Defendants (*see* Am. Compl. ¶¶ 19–22, 82–83 (for Lt. Conforti); Am. Compl. ¶¶ 27–30, 81–82 (for Det. Perdoch); Am. Compl. ¶¶ 39–42, 82–83 (for Sgt. Rodriguez); Am. Compl. ¶¶ 43–46, 82–83 (for Lt. Hall); Am. Compl. ¶¶ 55–58, 82–83 (for Det. Lee)), these paragraphs simply recite the same

conclusory, formulaic, and non-substantive allegations as to each of these Defendants, asserting that they were "acting within the course and scope of their employment" and "under color of state law," that they are being sued in their individual and official capacities, and that they should be referred to as "CITY DEFENDANTS" or "OFFICER DEFENDANTS." In short, Plaintiff does not allege that any of these five officers had even a minimal role in arresting, investigating, or prosecuting ***599** her. For Sgt. Manfredi, Plaintiff alleges nothing more than that he was present at the 109th Precinct when the Lis arrived with Det. Phelan. (*See* Am. Compl. ¶¶ 104–105.) [11]

11 Though Plaintiff alleges a claim of failure to intervene in her arrest and prosecution, the allegation that Sgt. Manfredi simply was present at the precinct when the Lis were brought there by Det. Phelan is still not enough to plausibly allege that Sgt. Manfredi was aware of the circumstances relating to Plaintiff's arrest or detention, such that he had a duty to intervene.

****7 [10]** Based on Plaintiff's counsel's representation at the pre-motion conference, it appears that Plaintiff named some of these individual Defendants because they were listed as having supervisory roles in the Queens County District Attorney's press release (dated March 12, 2008). (*See* Ex. D, Dkt. 63–4 at ECF 3.) Even though the Court takes judicial notice of the press release, as noted, it does not take judicial notice of the press release for the truth of its contents, *i.e.*, that the identified officers were, in fact, supervisors at the time of Plaintiff's arrest and prosecution. *See Roth*, 489 F.3d at 509. Furthermore, the mere listing of these officers as supervisors in a press release is insufficient to create an inference of personal involvement absent further allegations, especially because "a defendant [may not] be held liable merely by his connection to the events through links in the chain of command." *Reynolds v. Goord*, No. 98-cv-6722, 2000 WL 235278, at *7 (S.D.N.Y. Mar. 1, 2000); *Colon*, 58 F.3d at 873–74 ("The bare fact that [the defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain [plaintiff's] claim.").

2. P.O. Yam, Sgt. Cai, and Det. Chan

With respect to P.O. Yam, Sgt. Cai, and Det. Chan, the allegations in the Amended Complaint are also insufficient to show personal involvement in unlawful conduct that supports any of Plaintiff's claims. Based on the Amended Complaint, the participation of these officers was limited to serving as translators during the investigations of Plaintiff's criminal case. [12] (*See* Am. Compl. ¶¶ 35–38, 101, 104, 106 (for P.O. Yam); Am. Compl. ¶¶ 51–54, 126 (for Sgt. Cai); Am. Compl. ¶¶ 59–62, 112, 119 (for Det. Chan); Am. Compl. ¶ 82–83 (for all Defendants).) While these translating officers are alleged to have been present during the interviews of the Lis by the other City Defendants, there are no other allegations from which to infer that these three officers were involved, in any way, in the conduct that gives rise to Plaintiff's Section 1983 claims, *e.g.*, arresting Plaintiff without probable cause, initiating criminal process against her, forwarding false or fabricated evidence to the prosecution, or concealing exculpatory information from the prosecutors or the defense. The translating officers' mere presence at the Lis' interviews is simply not enough to allege their direct involvement in the *unlawful* conduct at issue in this case, as opposed to their incidental involvement in some of the events related to Plaintiff's arrest and detention. All claims against P.O. Yam, Sgt. Cai, and Det. Chan are, therefore, dismissed.

12 Plaintiff alleges that P.O. Yam interpreted on October 23, 2007 (Am. Compl. ¶¶ 101–06), that Sgt. Cai interrogated Hang Bin Li on October 29, 2007 (Am. Compl. ¶ 126), and that Det. Chan "served as an interpreter" from the afternoon of October 24, 2007, until the morning of October 25, 2007, when Heffernan and Moser interrogated the Lis (Am. Compl. ¶ 112).

3. Dets. Moser, Phelan, and Heffernan

With respect to Dets. Moser, Phelan, and Heffernan, the Court finds that Plaintiff has provided sufficient allegations as to ***600** their personal involvement in the conduct giving rise to some, but not all, of Plaintiff's claims, as discussed *infra.* (*See* Am. Compl. ¶¶ 112, 119, 126, 130 (alleging Det. Moser's involvement in the investigation of the Lis); ¶¶ 102–104, 106, 109–111 (alleging Det. Phelan's involvement to the extent that he went to the hospital, spoke to the hospital staff, examined relevant medical charts, and interrogated Ying Li); ¶¶ 112, 126, 130 (alleging Det. Heffernan's involvement to the extent that he interrogated Hang Bin Li and other witnesses).)

* * *

Accordingly, Lt. Conforti, Lt. Perdoch, Sgt. Rodriguez, Lt. Hall, Det. Lee, Sgt. Manfredi, P.O. Yam, Sgt. Cai, and Det. Chan are dismissed as Defendants due to the insufficiency of allegations establishing personal involvement. *See Zurich American Ins. Co. v. Dah Sing Bank, Ltd.* No. 03–civ–7778, 2004 WL 1328215, at *6 (S.D.N.Y. Jun. 15, 2004) (dismissing claims against one defendant bank where plaintiff did not put forth "a single factual allegation" but instead "lump[ed] the three bank defendants together and assert[ed] that they collectively processed the checks"); *Hernandez v. Goord*, 312 F.Supp.2d 537, 548 (S.D.N.Y. 2004) (dismissing individual defendants who were merely listed at the beginning of the complaint and were never connected in the complaint to any particular adverse action); *see also S.B. v. City of New York*, No. 14-cv-1021, 2016 WL 4530455, at *13 (E.D.N.Y. Aug. 29, 2016) (dismissing claims where the complaint did "not even directly name any of the defendants or allege the particular actions they undertook" (citation omitted)); *Barber v. Ruzzo*, No. 10-cv-1198, 2011 WL 4965343, at *2 (N.D.N.Y. Oct. 19, 2011) ("Simply stating that [defendants] were 'personally and actively involved in the continuation of criminal proceedings against [a plaintiff],' is grossly insufficient to establish personal involvement in the actual prosecution.").

## IV. FALSE ARREST

**\*\*8** **[11]** **[12]** **[13]** **[14]** A claim for false arrest under *Section 1983*, resting on the Fourth Amendment right to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as that under New York law.[13] *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). In analyzing *Section 1983* claims for false arrest, courts "generally look[ ] to the law of the state in which the arrest occurred." *Dancy v. McGinley*, 843 F.3d 93, 107 (2d Cir. 2016) (quoting *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006)). Under New York law, a plaintiff must establish, *inter alia*, that "the defendant intentionally confined him without his consent and without justification." *Id.* at 107 (quoting *Weyant*, 101 F.3d at 852) (quotation marks omitted); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (citing *Broughton v. State of New York*, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975)).

---

[13]    Plaintiff also alleges a false imprisonment claim under *Section 1983*. However, the Court does not address this claim separately, because pursuant to New York law, false arrest and false imprisonment

are "synonymous." *Posr v. Doherty*, 944 F.2d 91, 96 (2d Cir. 1991); *see also Singer*, 63 F.3d at 118 ("The common law tort of false arrest is a species of false imprisonment." (citing *Broughton v. State*, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975))).

### A. Plaintiff's False Arrest Claim is Barred by the Statute of Limitations

**[15]** The statute of limitations for *Section 1983* claims filed in federal court in New York is determined by New York State's statute of limitations for personal injury actions. *See* **\*601** *Owens v. Okure*, 488 U.S. 235, 251, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989) (discussing *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), which held that courts deciding claims under *Section 1983* should "borrow" the State statute of limitations for personal injury actions); *see also Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (citing *Owens* ). In New York State, the applicable statute of limitations for personal injuries is three years. N.Y. C.P.L.R. § 214 (McKinney). Thus, Plaintiff should have filed her false arrest claim within three years of the date on which the cause of action accrued.

**[16]** **[17]** While the applicable limitations period is determined by State law, the accrual date "is a question of federal law." *Wallace v. Kato*, 549 U.S. 384, 388, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007) ("[T]he accrual date of a § 1983 cause of action is a question of federal law that is *not* resolved by reference to state law." (emphasis in original)). Under federal law, a *Section 1983* false arrest claim accrues at the time that the alleged false arrest ends, *i.e.,* when the arrestee "becomes held pursuant to [legal] process —when, for example, he is bound over by a magistrate or arraigned on charges." *Wallace*, 549 U.S. at 389, 127 S.Ct. 1091; *see also Lynch v. Suffolk Cnty. Police Dep't, Inc.*, 348 Fed.Appx. 672, 675 (2d Cir. 2009) (summary order) (applying *Wallace* to find that plaintiff's § 1983 false arrest claim was time-barred).

**[18]** Here, the Medical Center Defendants and the City Defendants contend that Plaintiff's false arrest claim as to all Defendants is time-barred. (Dkt. 55 at 4; Dkt. 64 at 3.) Plaintiff concedes this (Dkt. 66 at 6), and the Court agrees. Plaintiff was arrested on March 11, 2008 in connection with her daughter's death. (Am. Compl. ¶ 133.) For Plaintiff's false arrest claim to be timely, she must have made an initial appearance or been arraigned on or after March 26, 2012, *i.e.*, three years from the filing of her complaint. *See Wallace*,

549 U.S. at 389, 127 S.Ct. 1091 (false arrest claim accrues when plaintiff's false arrest ends and plaintiff becomes held pursuant to legal process). However, Plaintiff alleges that she was arrested on March 11, 2008 and that she was incarcerated as of that date until March 26, 2012. [14] Because Plaintiff did not bring her false arrest claim until March 2015, it is plainly barred by the applicable three-year statute of limitations.

[14]   Although Plaintiff has not alleged in her Amended Complaint when she made her initial appearance in State court or when she was arraigned on the indictment, given her March 2008 arrest and incarceration date, her arraignment clearly took place long before March 2012.

### B. Equitable Tolling

**9 [19]   [20]   Recognizing that the statute of limitations has run, Plaintiff contends that equity demands tolling of the statute of limitations. (Dkt. 66 at 7.) Plaintiff's claim for equitable tolling is based on the notion of fraudulent concealment. [15]   See Pearl, 296 F.3d at 81–84 (noting that the "taxonomy of tolling, in the context of avoiding a *602 statute of limitations, includes at least three phrases: equitable tolling, fraudulent concealment of a cause of action, and equitable estoppel," and also recognizing that the Second Circuit equates both equitable estoppel and equitable tolling with fraudulent concealment).

[15]   The Court recognizes that "the application of the doctrine of equitable tolling is not limited to [fraudulent concealment]." Valdez ex rel. Donely v. U.S., 518 F.3d 173, 183 (2d Cir. 2008). However, based on Plaintiff's articulation of why equitable tolling should be granted, it is clear that she is seeking equitable tolling based on fraudulent concealment. Plaintiff's MOL also mentions "equitable estoppel," which is applicable "where the plaintiff knew of the existence of the cause of action, but the defendant's conduct caused plaintiff to delay in bringing suit." (Dkt. 66 at 7 n.7 (citing, inter alia, Cerbone v. Int'l Ladies' Garment Workers' Union, 768 F.2d 45, 49–50 (2d Cir. 1985)).) However, equitable estoppel is inapplicable here, because Plaintiff's theory is that she was unaware of her false arrest claim, not that she was aware of it, but Defendants' conduct caused her to delay bringing the claim. (See Am. Compl. ¶ 209; see also Dkt. 66 at 7 (asking the Court to toll

the statute of limitations until 2013, "when Plaintiff became aware-that she had, in fact, been falsely arrested...." (emphasis added)).)

[21]   [22]   When a "defendant fraudulently conceals the wrong, the [statute of limitations] does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of action." Pinaud v. Cnty. of Suffolk, 52 F.3d 1139, 1157 (2d Cir. 1995) (quoting Keating v. Carey, 706 F.2d 377, 382 (2d Cir. 1983)); Pearl, 296 F.3d at 81; see also Halstead v. City of New York, No. 13-cv-4874, 2015 WL 1506133, at *4 (E.D.N.Y. Mar. 31, 2015). To benefit from this doctrine of equitable tolling based on fraudulent concealment, the "plaintiff must submit non-conclusory evidence of conspiracy or other fraudulent wrong which precludes his possible discovery of harms that he suffered." Pinaud, 52 F.3d at 1157 (emphasis in original); see also Govt. Employees Ins. Co. v. U.S., No. 13-cv-4063, 2014 WL 582164 (E.D.N.Y. Feb. 14, 2014) ("the 'burden of demonstrating the appropriateness of equitable tolling ... lies with the plaintiff.' " (quoting Boos v. Runyon, 201 F.3d 178, 184–85 (2d Cir. 2000))). The Second Circuit has made clear that, "as a matter of fairness", the doctrine should only be applied "where a plaintiff has been 'prevented in some extraordinary way from exercising [her] rights' ". Pearl, 296 F.3d at 85 (citation and quotation marks omitted). Walker v. Jastremski, 430 F.3d 560, 564 (2d Cir. 2005) (noting that courts apply equitable tolling only in "rare and exceptional circumstances" (citation and internal quotation marks omitted)).

[23]   Here, Plaintiff presents only an unsupported, conclusory statement to justify equitable tolling: "[D]efendants' fraud, misrepresentation, and deception, induced plaintiff from filing a timely action. Defendants' misconduct caused the plaintiff to delay in bringing suit and/or wrongfully deceived or misled plaintiff in order to conceal the existence of a cause of action." (Am. Compl. ¶ 209.) The Amended Complaint does not allege (a) which of the numerous Defendants committed fraud, misrepresentation, or deception, (b) what information was kept from Plaintiff, or (c) how the alleged withholding of information made it impossible for Plaintiff to discover the harms she had suffered. See, e.g., Harrison v. Harlem Hosp., 364 Fed.Appx. 686, 688 (2d Cir. 2010) (summary order) ("The appellants have failed to identify any specific fact they have learned since the limitations period expired which, if known by them sooner, would have led them to file suit sooner." (emphasis in original)).

**\*\*10** In her opposition brief, Plaintiff claims that she became aware of her false arrest only "when Plaintiff's attorneys were told ... that there was no 'medical proof' that she could have saved her daughter," and that Plaintiff's reliance on Dr. Kupferman's assessment that earlier medical intervention could have saved Annie caused Plaintiff to delay filing her false arrest claim. (Dkt. 66 at 7.) However, as the Medical Center Defendants correctly point out, none of these factual allegations are in Plaintiff's Amended Complaint.[16]

16    In fact, there is a discrepancy between what Plaintiff argues in her MOL and what she alleges in the Complaint regarding the suppressed or concealed information that warrants equitable tolling. In the Complaint, Plaintiff alleges that Dr. Landi stated that Plaintiff's failure to get earlier medical care contributed to Annie's death. (Am. Compl. ¶ 150.) But in her MOL, she attributes that statement to Dr. Kupferman. (Dkt. 66 at 7 ("Plaintiff relied on false statements made by Kupferman that Annie's death was caused by Ying Li not obtaining lifesaving medical attention for Annie, and that had she come to the hospital sooner, she could have saved Annie.")).

**\*603** Furthermore, even assuming *arguendo* that Dr. Kupferman had concealed information that might have supported Plaintiff's false arrest claim, equitable tolling is still not warranted if this alleged concealment did not sufficiently justify Plaintiff's failure to pursue her cause of action. *Paige v. Police Dept. of City of Schenectady*, 264 F.3d 197 (2d Cir. 2001). In *Paige*, the plaintiff, a minor at the time, was sexually assaulted by a police officer. *Id.* at 198. She reported the assault to the police department soon after it occurred, but the department told her that there was insufficient evidence to pursue the case. *Id.* Fifteen years later, the plaintiff found out through a newspaper article that the police department might have had an investigatory file with information identifying the assaulting officer as the suspect, but chose not to pursue the case. *Id.* at 199. In bringing a Section 1983 claim against the City, the police department, and the suspected assaulting officer, the plaintiff argued that none of her claims was time-barred because (a) they did not accrue until the publishing of the newspaper article, and, in the alternative (b) the statute of limitations should be tolled until the date the article was published under the doctrine of equitable tolling. *Id.* The Second Circuit rejected both arguments finding, *inter alia*, that the plaintiff had sufficient knowledge to timely commence her causes of action without the investigatory file.

*Id.* at 200 ("Although some of the facts putatively concealed by the defendants might have strengthened [plaintiff's] case ... the absence of those facts did not sufficiently justify [plaintiff] in not pursuing her cause of action as to merit equitable tolling.")*; see also Pearl*, 296 F.3d at 78–85 (finding Section 1983 plaintiff, who alleged a brutal beating by four officers, was not entitled to equitable tolling, despite one of the officer's subsequent confession that the officers had fabricated evidence against plaintiff; explaining that plaintiff had full knowledge of his encounter with the officers and that the officer's recantation was "not newly developed awareness of a previously concealed cause of action", but simply "more persuasive evidence").

Even accepting Plaintiff's new, and improperly asserted, theory of fraudulent concealment, her case is indistinguishable from *Paige* and *Pearl*: Plaintiff "had full knowledge" of her actions relating to her child's death, including whether she knowingly delayed getting her child medical attention, and thus the purportedly withheld information that earlier medical intervention might not have saved Annie's life does not lead to a "newly developed awareness of a previously concealed cause of action", but simply provides potentially persuasive evidence for that claim. Indeed, Plaintiff fails to explain how Dr. Kupferman's purported diagnosis with regard to Annie made it "impossible" for Plaintiff to learn that she had a claim for false arrest. *See Pearl*, 296 F.3d at 85 (reiterating that, with respect to application of the equitable tolling doctrine, "we made it clear that we had in mind a situation where a plaintiff 'could show that it would have been *impossible* for a reasonably prudent person to learn' about [her] cause of action." (emphasis in original)). In fact, some allegations in the Amended Complaint suggest that Plaintiff always knew or believed that she had a false arrest claim. For example, she alleges that she had "steadfastly denied wrongdoing throughout the numerous interrogations **\*604** conducted by Defendants," even in the early stages of the investigation of Annie's death. (*See* Am. Compl. ¶ 127; *see also* Am. Compl. ¶ 118 ("Ying Li, however was positive that she did not harm her daughter, that she never saw Hang Bin do anything but love and treasure Annie. She maintained her innocence throughout.").) Plaintiff also pleaded not guilty to all counts in the criminal complaint and indictment. (Am. Compl. ¶ 179.) Furthermore, Plaintiff also alleges in the Amended Complaint that she made diligent attempts to disprove the shaken baby syndrome diagnosis of Annie, thereby demonstrating her belief from the time of her arrest that the diagnosis was wrong and that Plaintiff had been falsely arrested and accused of

2017 WL 1208422

causing her daughter's death, whether by SBS or failing to get her daughter prompt medical attention. (*See, e.g.*, AC ¶ 197 ("In May of 2012[,] Judge Gregory Lasak ordered further DNA testing done on [the Lis], after the OI [Osteogenesis Imperfecta] [17] gene had been detected in Hang Bin Li.").) While Plaintiff may have "diligently attempted to disprove Kupferman's ... diagnosis (Dkt. 66 at 7), in this case, it only reinforces the conclusion that Plaintiff was aware of her false arrest claim before 2013.

[17]    Osteogenesis imperfecta is "a group of genetic disorders that mainly affect the bones. The term 'osteogenesis imperfecta' means imperfect bone formation. People with this condition have bones that break easily, often from mild trauma or with no apparent cause. Multiple fractures are common, and in severe cases, can occur even before birth.... The milder forms of osteogenesis imperfecta ... are characterized by bone fractures during childhood and adolescence that often result from minor trauma.... Other types of osteogenesis imperfecta are more severe, causing frequent bone fractures that may begin before birth and result from little or no trauma.... The most severe forms of osteogenesis imperfecta ... can include an abnormally small, fragile rib cage and underdeveloped lungs. Infants with these abnormalities have life-threatening problems with breathing and often die shortly after birth." *See https://ghr.nlm.nih.gov/ condition/osteogenesis-imperfecta* (Last visited 3/25/2017.)

**\*\*11**  In sum, Plaintiff's Amended Complaint provides only an unsupported, conclusory assertion regarding "fraud, misrepresentation, and deception" that is patently insufficient to support equitable tolling with respect to her false arrest claim, which is barred by the three-year statute of limitations. Furthermore, even Plaintiff's belated and improper assertion of facts regarding the withholding of information by the Medical Center Defendants fails to show that Plaintiff could not have timely brought her false arrest claim, and thus even these facts, if accepted as true, would not support the application of the equitable tolling doctrine.

Accordingly, Defendants' motions to dismiss Plaintiff false arrest claim are granted. [18]

[18]    Because Plaintiff's false arrest claim is time-barred, the Court does not address the Defendants' argument that there was probable cause to arrest Plaintiff.

## V. MALICIOUS PROSECUTION

[24]    [25]    [26]  Plaintiff asserts a federal malicious prosecution claim against all Defendants. (Am. Compl. ¶ 211–213.) To allege a Section 1983 claim for malicious prosecution, a plaintiff must allege the four elements of a malicious prosecution claim under New York law—"(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions"—as well as a violation of the plaintiff's rights under the Fourth Amendment. [19] **\*605** *Manganiello v. City of New York*, 612 F.3d 149, 160–61 (2d Cir. 2010) (citations and quotation marks omitted); *Cornejo*, 592 F.3d at 129 ("And § 1983, in recognizing a malicious prosecution claim when the prosecution depends on a violation of federal rights, adopts the law of the forum state so far as the elements of the claim for malicious prosecution are concerned." (citation omitted)); *see also Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 116–117 (2d Cir. 1995) (relying in part on common law and New York State malicious prosecution law in analyzing § 1983 malicious prosecution claim). In establishing a violation of a Fourth Amendment right in relation to a Section 1983 malicious prosecution claim, a plaintiff must demonstrate "a sufficient post-arraignment deprivation[ ] of liberty." [20] *Singer*, 63 F.3d at 117; *see also Rohman v. New York City Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000) (noting that it is insufficient for a plaintiff to assert only the four elements of New York State malicious prosecution claim alone).

[19]    The Second Circuit in *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110 (2d Cir. 1995), left open the possibility of a plaintiff bringing a malicious prosecution claim premised on some other constitutional right. *Id.* at 116 n.5 ("It is theoretically possible ... for a plaintiff to premise a malicious prosecution claim on some other constitutional right. Where that is the case, it will be the standard governing that right that will determine whether there has been a constitutional violation.")

20     "The Fourth Amendment right implicated in a malicious prosecution action is the right to be free of unreasonable seizure of the person —*i.e.*, the right to be free of unreasonable unwarranted restraints on personal liberty. A plaintiff asserting a Fourth Amendment malicious prosecution claim under § 1983 must therefore show some deprivation of liberty consistent with the concept of 'seizure.' ... To maintain a § 1983 claim for malicious prosecution under the Fourth Amendment, the deprivation of liberty— the seizure—must have been effected 'pursuant to legal process.' " *Singer*, 63 F.3d at 116–17.

**12 The Medical Center Defendants contend that Plaintiff cannot satisfy three out of the five requisite elements— specifically, favorable termination, lack of probable cause, and malice. (Dkt. 55 at 5–9.) The City Defendants argue that Plaintiff's claim must be dismissed because there was probable cause and because none of the Officer Defendants initiated the prosecution against Plaintiff. (*See* Dkt. 59 at 7– 11.) For the reasons stated below, the Court finds that Plaintiff has adequately alleged a malicious prosecution claim against Det. Degnan, Dr. Landi, and also Dr. Kupferman, but not as to all of the other Defendants. The malicious prosecution claim is dismissed as to Dets. Moser, Phelan, and Heffernan, Lt. Conforti, Lt. Perdoch, Sgt. Rodriguez, Lt. Hall, Det. Lee, Sgt. Manfredi, P.O. Yam, Sgt. Cai, and Det. Chan.

**A. Initiation of a Criminal Proceeding**

[27] [28] [29] To initiate or continue a criminal proceeding, "a defendant must do more than report the crime or give testimony. He must play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Manganiello*, 612 F.3d at 163 (quoting *Rohman*, 215 F.3d at 217) (alteration and internal quotation marks omitted). An active role in prosecution is inferred when a defendant had the plaintiff arraigned, filled out a complaining and corroborating affidavit, or signed a felony complaint. *See Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) (noting that a police officer can initiate prosecution by filing charges or other accusatory instruments); *see also Costello v. Milano*, 20 F.Supp.3d 406, 415 (S.D.N.Y. 2014). Additionally, a defendant could have initiated a prosecution "by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor." *Costello*, 20 F.Supp.3d at 415; *see also Llerando-Phipps v. City of New York*, 390 F.Supp.2d 372, 383 (S.D.N.Y.

2005) ("[A]n arresting **606 officer may be held liable for malicious prosecution [if he] creates false information likely to influence a jury's decision and forwards that information to prosecutors." (citation and quotation marks omitted)); *Webster v. City of New York*, 333 F.Supp.2d 184, 198– 99 (S.D.N.Y. 2004) (noting that police officers could be held liable for malicious prosecution if they provided false information to prosecutors).

The Medical Center Defendants do not dispute that they took part in the initiation of the criminal proceeding (*see* Dkt. 55), whereas the City Defendants contend that Plaintiff's Amended Complaint only alleges active participation in the prosecution by Det. Degnan (*see* Dkt. 59 at 9 n.10). The Court finds that the Amended Complaint contains sufficient factual allegations to support a plausible inference that not only Det. Degnan, but also Dr. Landi, initiated Li's prosecution. [21] (*See* Am. Compl. ¶ 149.)

21     The Court notes that Plaintiff's opposition did little to assist the Court in resolving this issue. In her response, Plaintiff directed the Court to thirty paragraphs in the Amended Complaint, many of which did not allege facts related to whether the City Defendants initiated Plaintiff's prosecution. (*See* Dkt. 61 at 10 (citing to paragraphs 168–198 of the Amended Complaint).) For example, paragraph 179 states, "As plaintiff did not commit or aid/ abet in the any of the offenses with which she was charged, she pleaded not guilty to all counts, and bail was set at $250,000." (Am. Compl. ¶ 179.) This plainly has nothing to do with whether Plaintiff has adequately alleged, for each of the City Defendants, participation in the prosecution. Plaintiff is reminded that "[w]hile the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out." *Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 292 (2d Cir. 2000) (quotations and citations omitted); *see also 24/7 Records, Inc. v. Sony Music Entertainment, Inc.*, 429 F.3d 39, 46 (2d Cir. 2005).

**13 [30] [31] Plaintiff has adequately alleged that Det. Degnan initiated the prosecution, because the Amended Complaint alleges that Det. Degnan swore to the criminal complaint. (*See* Am. Compl. ¶ 145.) Plaintiff has also alleged

2017 WL 1208422

that Dr. Landi "swore under oath in the criminal complaint against plaintiff" and made assertions that were "false, misleading, and perjurious, and entirely unsupported and unsupportable by any medical science or clinical or forensic evidence." (Am. Compl. ¶¶ 149–150.) *See Cameron*, 598 F.3d at 63 (noting that a police officer can initiate prosecution by filing charges or other accusatory instruments). The Amended Complaint also alleges that Dr. Landi "played an active role in the prosecution of Ying Li. She provided advice and encouragement, that went well beyond her role, and into ancillary and forensic aspects of motive, culpability, and the veracity of Ying Li." (Am. Compl. ¶ 155.)

These City Defendants "cannot hide behind the decision of the DA to prosecute" when they, according to Plaintiff's allegations, provided the prosecutor with false information. *Blake v. Race*, 487 F.Supp.2d 187, 211 (E.D.N.Y. 2007) (rejecting the defendants' argument that officers, not the officers, initiated the prosecution); *Zahrey v. Coffey* ("*Coffey*"), 221 F.3d 342, 352 (2d Cir. 2000) ("[I]t is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty.") Therefore, the Court finds that Plaintiff has adequately alleged that Det. Degnan and Dr. Landi participated in the initiation of Plaintiff's criminal proceeding.

By contrast, the Amended Complaint contains no factual allegations to support the inference that Dets. Moser, Phelan, **\*607** and Heffernan, Lt. Conforti, Lt. Perdoch, Sgt. Rodriguez, Lt. Hall, Det. Lee, Sgt. Manfredi, P.O. Yam, Sgt. Cai, and Det. Chan played an active role in initiating Plaintiff's prosecution. Therefore, as to these Defendants, the malicious prosecution claim is dismissed. *See, e.g., Jean–Laurent v. Bowman*, No. 12-cv-2954, 2014 WL 4662221, at *6 (E.D.N.Y. Jul. 7, 2014) (finding that plaintiff failed to demonstrate that some of the defendants played an active role in commencing the criminal prosecution against plaintiff, even though plaintiff alleged that they "authorized, approved and/or participated" in plaintiff's criminal prosecution, because the defendants neither swore out a criminal complaint or corroborating affidavit, nor presented any information to the prosecutor).

**B. Favorable Termination**
The second element of a malicious prosecution claim is termination of the criminal proceeding in the plaintiff's favor. The Medical Center Defendants argue that Plaintiff's criminal

proceeding did not terminate in her favor because (i) the prosecution was not terminated on its merits, (ii) Plaintiff does not set forth factual allegations to support an inference that the charges were dropped because she was innocent, and (iii) a dismissal "in the interest of justice" does not constitute a favorable termination. (*See* Dkt. 56 at 5–8.) The Court disagrees, and finds that Plaintiff has sufficiently alleged a favorable termination for purposes of her malicious prosecution claim. [22]

[22]    At this stage, the Court need not decide whether the termination of Plaintiff's criminal case was, in fact, a favorable one; rather, the only issue before the Court is whether Plaintiff has sufficiently *alleged* a favorable termination. *See Bacquie v. City of New York*, No. 99 CIV10951, 2000 WL 1051904, at *3 (S.D.N.Y. Jul. 31, 2000).

[32]    [33]    The Court looks to New York law to determine whether Plaintiff has sufficiently alleged a favorable termination of her Queens County criminal proceeding. *Neal v. Fitzpatrick*, 250 F.Supp.2d 153, 154 (E.D.N.Y. 2003) (citing *Hygh v. Jacobs*, 961 F.2d 359, 367 (2d Cir. 1992)). "Under New York law, there are two ways to establish [a] favorable termination: '(1) an adjudication of the merits by the tribunal in the prior action,' or (2) 'an act of withdrawal or abandonment on the part of the party prosecuting the prior action.' " *Liberty Synergistics, Inc. v. Microflo Ltd.*, 50 F.Supp.3d 267 (E.D.N.Y. 2014) (quoting *Morgan v. Nassau County*, No. 03-cv-5109, 2009 WL 2882823, at *8 (E.D.N.Y. Sept. 2, 2009) and citing *Castro v. East End Plastic, Reconstructive & Hand Surgery, P.C.*, 47 A.D.3d 608, 850 N.Y.S.2d 483, 485 (2008)); *Castro*, 850 N.Y.S.2d at 485 ("The favorable termination element must be established by evidence that 'the court passed on the merits of the charge or claim ... under circumstances as to show ... nonliability,' or evidence that the action was abandoned under circumstances 'which fairly imply the plaintiff's innocence.' ") (citation and internal quotation marks omitted). Thus, the fact that a criminal prosecution never reached the merits does not preclude a plaintiff from alleging a favorable termination. *See Castro*, 850 N.Y.S.2d at 485; *see also Norton v. Town of Brookhaven*, 47 F.Supp.3d 152, 158 (E.D.N.Y. 2014) (noting, on reconsideration, "the fact that the underlying prosecutions against the Plaintiff [were] dismissed pursuant to statutes that] did not reach the merits does not, without more, render the termination of the prosecution inconsistent with innocence"); *Verboys v. Town of Ramapo*, 12 A.D.3d 665, 785 N.Y.S.2d

Case 9:19-cv-01527-TJM-TWD   Document 24   Filed 10/05/20   Page 96 of 259

496, 497 (2004) (holding that favorable termination can be shown by "the formal abandonment of the proceedings").

 **\*\*14** **[34]** **[35]** Furthermore, "New York law does not require a malicious prosecution **\*608** plaintiff to prove her innocence, or even that the termination of the criminal proceeding was indicative of innocence." *Rothstein v. Carriere*, 373 F.3d 275, 286 (2d Cir. 2004) (citing *Smith– Hunter v. Harvey*, 95 N.Y.2d 191, 195–96, 712 N.Y.S.2d 438, 734 N.E.2d 750 (2000)). "[A]ny final termination of a criminal proceeding in favor of the accused, such that the proceeding cannot be brought again, qualifies as a favorable termination for purposes of a malicious prosecution action," *Smith–Hunter*, 95 N.Y.2d at 195–96, 712 N.Y.S.2d 438, 734 N.E.2d 750, unless the disposition was "inconsistent with the innocence of the accused," *Cantalino v. Danner*, 96 N.Y.2d 391, 396, 729 N.Y.S.2d 405, 754 N.E.2d 164 (2001). *See Rothstein*, 373 F.3d at 275 (discussing New York Law regarding the favorable termination element and citing to both *Smith–Hunter*, 95 N.Y.2d 191, 712 N.Y.S.2d 438, 734 N.E.2d 750, and *Cantalino*, 96 N.Y.2d 391, 729 N.Y.S.2d 405, 754 N.E.2d 164); *see also Stampf v. Long Island R. Co.*, 761 F.3d 192, 201 (2d Cir. 2014) (applying *Smith–Hunter*, 95 N.Y.2d 191, 712 N.Y.S.2d 438, 734 N.E.2d 750 (2000)).

While New York and federal courts in this circuit have consistently applied the *Cantalino* "not inconsistent with innocence" standard in deciding whether a termination is favorable, there is open disagreement and divergence in this circuit on the constituent issue of whether the termination of a criminal case "in the interest of justice" is a favorable termination, *i.e.*, a termination that is not inconsistent with innocence. [23]  *See Gem Financial Serv., Inc. v. City of New York*, No. 13-cv-1686, 2014 WL 1010408, at \*10 n.10 (E.D.N.Y. Mar. 17, 2014) (recognizing "an apparent fissure amongst Second Circuit opinions with respect to the proper standard for assessing a favorable termination" where an "interest of justice" dismissal is involved). On the one hand, the New York Court of Appeals in 2001 held in *Cantalino* that there is no "per se rule that a dismissal in the interest of justice can never constitute a favorable termination." 96 N.Y.2d at 396, 729 N.Y.S.2d 405, 754 N.E.2d 164. [24] Nonetheless, in 2009, the Second Circuit in a summary order in *Lynch v. Suffolk County Police Dep't, Inc.* found, "as a matter of law," that a dismissal in the interest of justice could not "provide the favorable termination required as the basis for a claim of malicious prosecution", because such a dismissal was "neither an acquittal of the charges nor any determination of the merits[, and left] the question of guilt

or innocence unanswered". 348 Fed.Appx. 672, 675 (2d Cir. 2009) (citing *Hygh*, 961 F.2d 359). Even after the *Lynch* decision, district courts in this circuit have continued to apply *Cantalino* to find that an "interest of justice" termination can be deemed favorable in a malicious prosecution action. *See Norton*, 47 F.Supp.3d at 160 (collecting district court cases that adopted *Cantalino* even after *Lynch* ); **\*609** *Guzman v. United States*, No. 11-CV-5834, 2013 WL 543343, at \*8 (S.D.N.Y. Feb. 14, 2013) (collecting cases decided by the Southern District of New York that applied *Cantalino* even after the Second Circuit decided *Lynch* ); *see, e.g.*, *Genovese v. Cnty. of Suffolk*, 128 F.Supp.3d 661, 672 n.3 (E.D.N.Y. 2015) (declining to apply the standard set forth in *Lynch*, noting that it is a non-binding summary order failing to cite to *Cantalino*, which had already been decided at the time *Lynch* was decided). Other courts, however, have followed *Lynch* in dismissing malicious prosecution claims involving "interest of justice" dismissals. *See Norton*, 47 F.Supp.3d at 160–161 (citing *Tribie v. Parwanta*, No. 10 Civ. 6016, 2012 WL 246619, at \*8 (S.D.N.Y. Jan. 26, 2012) and *Paulin v. Figlia*, 916 F.Supp.2d 524, 533 (S.D.N.Y. 2013)). However, as discussed below, notwithstanding the Medical Center Defendants' argument, the Court need not resolve this issue in order to determine whether Plaintiff has sufficiently *alleged* a favorable termination.

23    The Medical Center Defendants cite *Singer*, 63 F.3d 110, in support of their argument. (Dkt. 56 at 5.) However, as discussed below, because the New York Court of Appeals decision in *Cantalino* largely negates this aspect of *Singer,* the Court does not address *Singer*. In any event, the Medical Center Defendants need not rely on *Singer*, given the numerous federal court decisions, including one by the Second Circuit, reaching the same conclusion as *Singer.*

24    Significantly, reiterating part of its holding in *Smith–Hunter*, the Court of Appeals in *Cantolino* stated, "[t]o be sure, there are circumstances where a dismissal in the interest of justice is inconsistent with innocence because it represents 'mercy requested or accepted by the accused' ". 96 N.Y.2d at 396, 729 N.Y.S.2d 405, 754 N.E.2d 164 (quoting *Smith–Hunter*, 95 N.Y.2d at 197, 712 N.Y.S.2d 438, 734 N.E.2d 750).

 **\*\*15** **[36]** The Court now turns to the Medical Center Defendants' three arguments. First, the argument that Plaintiff cannot show a favorable termination because her criminal

case was not terminated on the merits is plainly unavailing. As discussed, there are "two ways to establish a favorable termination", one of which is the "act of withdrawal or abandonment" of the case by the prosecution, which is what Plaintiff alleges happened here. (Am. Comp. ¶ 201 ("Contemporaneously with the commencement of Hang Bin's trial, all charges against plaintiff were dismissed.").)

Second, the argument that Plaintiff has not sufficiently alleged malicious prosecution because she has not alleged facts from which it can be inferred that the criminal charges against her were dropped because she was innocent similarly lacks merit. As the New York Court of Appeals made clear in *Smith–Hunter*, a claim of malicious prosecution does not require that the plaintiff prove her innocence of the charges that were dropped, or even that the termination of her prosecution was indicative of innocence. 95 N.Y.2d at 195–96, 712 N.Y.S.2d 438, 734 N.E.2d 750.[25] *610 Rather, all that is required after *Smith–Hunter* and *Cantalino* is that the termination of Plaintiff's case was "final," *e.g.*, that the charges were dismissed with prejudice, and that the termination did not fall into one of the exceptions recognized by *Cantalino*, *e.g.*, that the disposition of Plaintiff's criminal case was "inconsistent with innocence". *Cantalino*, 96 N.Y.2d at 396, 729 N.Y.S.2d 405, 754 N.E.2d 164. Thus, the absence of any allegations demonstrating that the termination of Plaintiff's prosecution is indicative of her innocence of the charges that were dropped does not preclude her malicious prosecution claim.

[25] The Medical Center Defendants rely on decisions that define a favorable termination as one that "involves the merits and indicates the accused's innocence." *MacFawn v. Kresler*, 88 N.Y.2d 859, 644 N.Y.S.2d 486, 666 N.E.2d 1359, 1360 (1996); (*see* Dkt. 55 at 6–7) (citing *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995); *Singleton v. City of New York*, 632 F.2d 185, 193 (2d Cir. 1980), *Fulton v. Robinson*, 289 F.3d 188, 196 (2d Cir. 2002); *Hershey v. Goldstein*, 938 F.Supp.2d 491, 518 (S.D.N.Y. 2013)). However, the Court does not find this authority persuasive in light of *Smith–Hunter*, which implicitly rejected this position in favor of the principle that "a criminal proceeding is terminated favorably to the accused when 'there can be no further proceeding upon the complaint or indictment, and no further prosecution of the alleged offense' ", recognizing only a few exceptions to this rule. *Smith–Hunter*, 95 N.Y.2d at 195–96, 712 N.Y.S.2d 438, 734 N.E.2d 750

(noting as exceptions termination "inconsistent with innocence"; charges withdrawn pursuant to a voluntary compromise with the accused; and charges being dismissed out of mercy requested or accepted by the accused (citing *Robbins v. Robbins*, 133 N.Y. 597, 599, 30 N.E. 1 (1892))). Notably, *Smith–Hunter* also distinguished *MacFawn* on the basis that it involved a dismissal *without* prejudice, which also distinguishes it from the instant case. *Id.* at 197, 712 N.Y.S.2d 438, 734 N.E.2d 750 (noting that *MacFawn* was "[f]ar from controlling in the case at hand" and "simply held that a plaintiff in a malicious prosecution action must show, as a threshold matter, that the criminal proceeding was *finally* terminated.") (emphasis in original).

Though the Court did not factor this into its decision, at the status conference in which the charges against Plaintiff were dismissed, Plaintiff explicitly refused any conditions, *i.e.*, any compromise (Dkt. 63–6, Ex. F at 3:22–24; *see Smith–Hunter*, 95 N.Y.2d at 196, 712 N.Y.S.2d 438, 734 N.E.2d 750 ("noting that an action terminated by settlement cannot sustain a malicious prosecution claim").)

**16 Third, the Medical Center Defendants argue that the termination of Plaintiff's prosecution was an "interest of justice" dismissal and therefore does not constitute a favorable termination. However, the Court cannot make that determination at this stage, because it cannot determine the reason or reasons for the District Attorney's dismissal of the charges against Plaintiff. The Amended Complaint simply alleges that, "Defendants ... caused plaintiff to be prosecuted with malice and without probable cause—*a prosecution that terminated in plaintiff's favor....*"[26] (Am. Compl. ¶ 212 (emphasis added).) Although Plaintiff does not allege the specific disposition of the case, the Court finds she has sufficiently alleged favorable termination to survive a motion to dismiss. *See Rivers v. Towers, Perrin, Foster & Crosby Inc.*, No. 07-cv-5441, 2009 WL 817852, at *4 (E.D.N.Y. Mar. 27, 2009) ("There is nothing implausible about a bare allegation that the prosecution terminated in plaintiff's favor and hence there is no need to amplify that allegation by pleading specific facts."); *see also Norton*, 47 F.Supp.3d at 161 (reinstating plaintiff's malicious prosecution claim on reconsideration after concluding that the court cannot conclude that the dismissal of the charges was inconsistent with plaintiff's innocence); *McLennon v. New York City*, No. 13-cv-128, 2015 WL 1475819, at *6 n.16 (E.D.N.Y. Mar. 31, 2015); *Peros v. Castano*, No. CV-01-4457, 2002 WL

2017 WL 1208422

603042, at *4 (E.D.N.Y. Mar. 22, 2002) (stating, "Although there apparently is some uncertainty as to the precise basis of the state court's dismissal of the criminal charges, I cannot say at this point that there is no set of facts on which plaintiff could satisfy the favorable termination element of his claim," when plaintiff's Complaint alleged "[t]hat after the Plaintiff was arraigned on [ ] charges [and] appeared in Court ... the case was finally disposed of by the Court granting the Motion to Dismiss." (citation omitted)); *accord Tommy Hilfiger Lic., Inc. v. Bradlees, Inc.*, No. 99-CIV-4677, 2002 WL 737477, at *6 (S.D.N.Y. Apr. 25, 2002) (finding that the defendant sufficiently alleged favorable termination to withstand a motion to dismiss because the basis for the dismissal of the criminal action was unclear at that particular stage of litigation) (citation omitted); *Bacquie v. City of New York*, No. 99-CIV-10951, 2000 WL 1051904, at *3 (denying defendant's motion to dismiss plaintiffs' malicious prosecution claim where the plaintiffs alleged that the charges against them were dismissed by the district attorney's **\*611** motion and where, at the early stage in the litigation, the Court could not tell why the charges had been dropped); *but see Campbell v. Giuliani*, No. 99-cv-2603, 2000 WL 194815, at *4 (E.D.N.Y. Feb. 16, 2000) ("I find that the bare allegation of dismissal, absent any explanation of the basis on which the case was dismissed, is insufficient to meet the favorable termination requirement."); *Weaver v. Warrington*, No. 14-cv-7097, 2015 WL 4645298, at *5 (E.D.N.Y. Aug. 4, 2015) (directing plaintiff to amend the complaint alleging additional facts that make clear whether the dismissal was under circumstances not inconsistent with plaintiff's innocence). It is important to note that while the Court has taken judicial notice of the criminal court records submitted by Plaintiff and the City Defendants, including the transcript of the conference at which Plaintiff's case was dismissed, the Court has only considered those documents to establish the date and fact of the dismissal, but not for the truth of statements made by ADA Bishop at the conference as to why Plaintiff's case was being dismissed. *See Global Network Commc'ns, Inc.*, 458 F.3d at 157 ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.").

26    Even if the Court were to consider the City Defendants' Exhibit B, the dismissal hearing transcript, and draws all inferences in favor of Plaintiff—as it must at this stage—the transcript indicates that dismissal of the criminal prosecution was with prejudice. (Ex. F, Dkt. 63–6 at 7:8–9.)

While the transcript also includes the prosecution's explanation for why it is dismissing the charges (*see* Ex. F, Dkt. 63–6 at 5:29–6:18), it is inappropriate for the Court to interpret articulated reasons given by the prosecutor as the real motivation for the government's dismissal of the case. *See Liang v. City of New York*, 2013 WL 5366394, at *5; *see also Nielsen*, 746 F.3d at 62 (noting that the court must draw all reasonable inferences in favor of the plaintiff).

Accordingly, the Court finds that Plaintiff has adequately alleged a favorable termination of her criminal proceedings.

### C. Probable Cause

The Medical Center Defendants also contend that Plaintiff's malicious prosecution claim must be dismissed because there was probable cause. (Dkt. 55 at 8.) Specifically, they assert that the Amended Complaint's factual allegations regarding Annie's condition when she arrived at FHMC and her subsequent medical test results are sufficient to establish the existence of probable cause at the time criminal proceedings were initiated against Plaintiff. (Dkt. 55 at 8.) They also argue that there is a presumption of probable cause unless the indictment was procured through improper means. (Dkt. 55 at 9.) For the reasons explained below, the Court finds that Plaintiff has rebutted the presumption of probable cause, and that the facts alleged in the Amended Complaint support a plausible inference that there was no probable cause for Plaintiff's prosecution.

**[37]**   **[38]**   **[39]** As an initial matter, the Court notes that probable cause for malicious prosecution is different from probable cause for false arrest. *See Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999) ("The defendants seem to conflate probable cause to arrest with probable cause to believe that [the plaintiff] could be successfully prosecuted. Only the latter kind of probable cause is at issue with respect to the malicious prosecution claim...."). For a malicious prosecution claim, probable cause to prosecute consists of "facts and circumstances [that] would lead a reasonably prudent person to believe the plaintiff guilty." *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003) (citing *Colon v. City of New York*, 60 N.Y.2d 78, 82, 455 N.E.2d 1248, 468 N.Y.S.2d 453 (N.Y. 1983)). Probable cause to prosecute is evaluated "in light of the facts known or reasonably believed at the time the prosecution was initiated, as opposed to at the time of arrest." *Drummond v. Castro*,

522 F.Supp.2d 667, 677–78 (S.D.N.Y. 2007) (citations and quotation marks omitted).

**\*\*17** **[40]**    **[41]**  A grand jury indictment "gives rise to a presumption that probable cause exists" and thereby defeats a claim for malicious prosecution. *Rentas v. Ruffin*, 816 F.3d 214, 220 (2d Cir. 2016) (quoting *McClellan v. Smith*, 439 F.3d 137, 145 (2d Cir. 2006)). "If plaintiff is to succeed in his malicious prosecution action after he has been indicted, he must establish that the **\*612** indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *McClellan*, 439 F.3d at 145 (quoting *Colon*, 60 N.Y.2d at 83, 468 N.Y.S.2d 453, 455 N.E.2d 1248). A plaintiff may demonstrate fraud or perjury through "evidence establishing that the [ ] witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." *Rothstein*, 373 F.3d at 283 (quoting *Colon*, 60 N.Y.2d at 82–93, 468 N.Y.S.2d 453, 455 N.E.2d 1248).

### 1. Rebutting the Presumption of Probable Cause as to the City Defendants

 **[42]**  Plaintiff alleges that the indictment against her was procured by bad faith on the part of the City Defendants. Plaintiff alleges that "the Officer Defendants failed to obtain or disclose evidence inconsistent with plaintiff's guilt, did not document or inform the district attorney's office of exculpatory evidence, falsely reported facts in reports and search warrant affidavits, and fabricated oral statements of witnesses. Officers sought to strengthen their case against plaintiff in order to avoid acquittal, leading them to falsify and omit information in their reports and representations to the district attorney's office." (Am. Compl. ¶ 178; *see also id.* ¶ 181.) More specifically, Plaintiff alleges that "it was apparent from medical evidence that [she] was innocent." (Am. Compl. ¶ 201.) Plaintiff also alleges that Dr. Landi "enthusiastically and with commitment" sought the Lis' prosecution and conviction "despite the lack of any evidence connecting them with any crime whatsoever." (Am. Compl. ¶ 171.) The Amended Complaint further alleges that Dr. Landi misrepresented that the medical evidence conclusively showed Plaintiff's guilt. (Am. Compl. ¶ 208.)

Taking these allegations as true and given the circumstantial nature of the case against Plaintiff, which, in turn, rested

almost entirely on Dr. Landi's and Dr. Kupferman's medical conclusions, the Court finds that these allegations are sufficient to rebut the presumption of probable cause created by the grand jury indictment. *See Anilao v. Spota*, 774 F.Supp.2d 457, 494 (E.D.N.Y. 2011) (denying defendant's motion to dismiss finding that plaintiff sufficiently overcame the presumption of probable cause by alleging that the grand jury indictment was based on falsified evidence and testimony in spite of defendant's knowledge of significant exculpatory evidence, and that the defendants agreed to present false evidence to the grand jury); *McLennon*, 2015 WL 1475819, at \*8 (finding sufficient allegations similar to Plaintiff's allegations about Defendants procuring indictment in bad faith); *see also Brandon v. City of New York*, 705 F.Supp.2d 261, 273–74 (S.D.N.Y. 2010) (denying summary judgment to defendant with respect to malicious prosecution claim where jury could reasonably find that the indictment was secured through bad faith or perjury).

Accordingly, the Court finds that Plaintiff has sufficiently rebutted the presumption of probable cause.

### 2. Rebutting the Presumption of Probable Cause Against the Medical Center Defendants

Plaintiff also sufficiently alleges that the indictments were procured in bad faith by the Medical Center Defendants. For example, Plaintiff alleges that "Defendant FHMC and Kupferman made no efforts to seek a diagnosis other than SBS."[27] (Am. **\*613** Compl. ¶ 122.) This claim is analogous to an allegation that a police officer failed to obtain evidence inconsistent with a plaintiff's guilt, which has been considered sufficient to allege that an indictment was procured in bad faith. *See McLennon*, 2015 WL 1475819, at \*8 (finding bad faith sufficiently alleged where officer defendants accused of, *inter alia*, failing to obtain or disclose evidence inconsistent with plaintiff's guilt and not informing the district attorney's office of exculpatory evidence).

[27]    The Complaint also alleges that "Dr. Kupferman testified to the forensic interrogation she conducted with Ying Li ... [and] deliberately testif[ied] falsely under oath that 'If you read any book, it is a classical case of shaken baby syndrome.' Defendant Kupferman knew that these statements were false and misleading and contrary to all valid

and reliable medical evidence." (Am. Compl. ¶ 160.)

**\*\*18** **[43]** While the Court acknowledges that a grand jury witness is entitled to absolute immunity in Section 1983 actions, *Rehberg v. Paulk*, 566 U.S. 356, 132 S.Ct. 1497, 182 L.Ed.2d 593 (2012), the Second Circuit's decision in *Coggins v. Buonora*, 776 F.3d 108 (2d Cir. 2015), provides a clarification of this principle that is applicable to Plaintiff's malicious prosecution claim against Dr. Kupferman. In *Coggins*, the plaintiff was arrested and charged with various felonies based on allegations made by two officers in police paperwork and also verbally to the grand jury. 776 F.3d 108. The Second Circuit affirmed the district court's denial of absolute immunity to one of the police officers because the plaintiff's Section 1983 claims against that officer were based on alleged misconduct "prior to and independent of [the police officer's] perjurious grand jury appearance." *Id.* at 113 ("The fact that [the police officer's] grand jury testimony paralleled information he gave in other contexts does not mean that [plaintiff's] malicious prosecution claim was 'based on' [the officer's] grand jury testimony[;] ... [thus,] the district court properly found that absolute immunity is inappropriate.") Similarly, here, Plaintiff alleges that, separate and apart from Dr. Kupferman's grand jury testimony, the Medical Center Defendants, including Dr. Kupferman, diagnosed Annie with SBS in bad faith and provided false information about the cause of Annie's death to the prosecutor. (*See* Am. Compl. ¶¶ 122, 150–52.)[28] Therefore, even assuming that Plaintiff cannot rebut the presumption of probable cause based on Dr. Kupferman's grand jury testimony alone, Plaintiff has done so based on other allegedly wrongful acts by Dr. Kupferman. Accordingly, the Court finds that Plaintiff has rebutted the presumption of probable cause.

[28]   In her Amended Complaint, Plaintiff alleges that despite Annie's "lab results ... consistent with metabolic bone disease[, an alternative explanation for Annie's injuries,] Dr. Kupferman made no effort to seek a diagnosis other than SBS." (Am. Compl. ¶ 122.) Plaintiff also alleges that Dr. Landi falsely "swore under oath in the criminal complaint" as to Annie's death and that her opinion was "largely based on the evidence" presented by Dr. Kupferman. (*Id.* ¶¶ 150–52.) From this, the Court can reasonably infer that Dr. Kupferman also provided false information that eventually was relayed to the prosecutor.

### 3. Amended Complaint Sufficiently Alleges Lack of Probable Cause to Prosecute

For the same reasons just discussed, the Court finds that the allegations in the Amended Complaint are sufficient to create a plausible inference that there was no probable cause to prosecute Plaintiff at the time she was indicted. The case against Plaintiff was almost entirely circumstantial and depended upon the accuracy of the Medical Center Defendants' determination that SBS and the failure to obtain prompt medical attention caused Annie's death. Plaintiff's allegations that both the Medical Center Defendants and the City Defendants **\*614** failed to obtain evidence that would have contradicted these findings—*i.e.*, that Annie suffered from osteogenesis imperfecta, and that Annie's brain damage was so extensive that prompter medical intervention would not have saved her life—and the resulting communication of false or incomplete information to the prosecutors support a plausible inference that there was no probable cause to prosecute when Plaintiff was indicted.

### D. Malice

**[44]** **[45]** To plead a malicious prosecution claim, Plaintiff must also allege malice for each of the Defendants. *Manganiello*, 612 F.3d at 160–61. "[M]alice may be shown by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff." *Id.* at 163; *see also TADCO Const. Corp. v. Dormitory Auth. of State of New York,* 700 F.Supp.2d 253, 271 (E.D.N.Y. 2010) ("Actual malice requires pleading facts that show the defendant 'commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.' " (citation and quotation marks omitted)); *Manbeck v. Micka,* 640 F.Supp.2d 351, 377 (S.D.N.Y. 2009) ("Malice in this context does not have to be actual spite or hatred." (citation, internal quotation marks, and alteration omitted)); *Newton v. City of New York,* 566 F.Supp.2d 256, 273 (S.D.N.Y. 2008) (Malice is "a wrong or improper motive[.]" (citations and quotation marks omitted)). "[A] lack of probable cause *generally* creates an inference of malice." *Manganiello,* 612 F.3d at 163 (citation and quotation marks omitted) (emphasis added); *see also Lowth v. Town of Cheektowaga,* 82 F.3d 563, 573 (2d Cir. 1996) ("In most cases, the lack of probable cause—while not dispositive —'tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of

probable cause.' " (quoting *Conkey v. State*, 74 A.D.2d 998, 427 N.Y.S.2d 330, 332 (1980))).

### 1. The City Defendants' Malice

**\*\*19** **[46]** **[47]** Drawing all inferences in favor of Plaintiff, the Court finds that Plaintiff has adequately pled malice only for Det. Degnan and Dr. Landi. (Am. Compl. ¶ 145 (alleging that Degnan swore the criminal complaint knowing that its content was false and fabricated); *see also* Am. Compl. ¶ 150 (alleging that Dr. Landi swore under oath in the criminal complaint and made a statement that was false, perjurious, and entirely unsupported by any medical science or clinical or forensic evidence).) Plaintiff incorrectly argues that she has "plainly alleged malice" for all Defendants and directs the Court to Paragraph 215 of the Complaint. However, that paragraph is conclusory and is one of the numerous instances where Plaintiff resorts to "group pleading" against all the Defendants.[29] While Paragraph 215 properly alleges an improper motive for her prosecution, *i.e.*, to "us[e] plaintiff as a bargaining chip to pressure Hang Bin Li to plead guilty and covering up defendants' illegal actions in **\*615** knowingly arresting plaintiff without any legal basis, justification, or probable cause[,]" it fails to allege any facts upon which to plausibly infer that *each* of the City Defendants acted out of this improper motive, and instead categorically states that they *all* had the same improper motive. Such conclusory allegations are not enough to infer malice on the part of all City Defendants. The Court, therefore, finds that malice has been sufficiently alleged only as to Det. Degnan and Dr. Landi.

[29] Paragraph 215 states, "Defendants, acting in concert and within the scope of their employment and authority, employed regularly issued process against plaintiff compelling the performance or forbearance of prescribed acts. The purpose of activating the process was intent to harm plaintiff without economic or social excuse or justification, and the defendants were seeking a collateral advantage or corresponding detriment to plaintiff which was outside the legitimate ends of the process. Such collateral objectives included, but were not limited to, using plaintiff as a bargaining chip to pressure Hang Bin Li to plead guilty and covering up defendants' illegal actions in

knowingly arresting plaintiff without any legal basis, justification, or probable cause."

### 2. The Medical Center Defendants' Malice

**[48]** Notwithstanding Plaintiff's failure to cite to the relevant paragraphs in the Complaint, the Court finds that Plaintiff has adequately alleged malice on the part of the Medical Center Defendants. Plaintiff alleges that Defendants "arrested and imprisoned [her] despite knowing that there was no legal justification ... in order to pressure plaintiff to testify against her husband ... or to put pressure on plaintiff's husband to plead guilty." (Am. Compl. ¶ 196.) More specifically, Plaintiff alleges that "[d]espite lab results showing high alkaline phosphatase and low calcium, consistent with metabolic bone disease," FHMC and Dr. Kupferman "made no effort to seek a diagnosis other than SBS." (Am. Compl. ¶ 122). Plaintiff also alleges, in describing "the interrogations and searches of [the Lis'] home by three separate squads ... [and] forensic interrogations by several medical personnel at Flushing Hospital," that she was treated with "suspicion and unconcealed and unrestrained racism." (Am. Compl. ¶ 114.) Drawing inferences in the light most favorable to Plaintiff, the Court finds that Plaintiff has sufficiently alleged malice on the part of the Medical Center Defendants, based on their motives in concealing exculpatory medical evidence to enable the prosecutor's use of Plaintiff as a "bargaining chip" against Plaintiff's husband[30] and conducting racially biased "forensic interrogations" of her.

[30] While Plaintiff may face a steep challenge in ultimately proving that the Medical Center Defendants colluded with the City Defendants to the extent of sharing the alleged goal of using Plaintiff as leverage against her husband, at this stage, the Court finds that she has sufficiently alleged facts to support a plausible inference of such a coordinated effort.

\* \* \*

Accordingly, the Medical Defendants' motion to dismiss the malicious prosecution claim is denied in its entirety, and the City Defendants' motion to dismiss Plaintiff's malicious prosecution claim is denied as to Det. Degnan and Dr. Landi, but is granted as to all other City Defendants.[31]

31    The Court discusses *infra* Defendants' claims of immunity with respect to all claims. In sum, the Courts finds that: (1) ADA Bishop is entitled to absolute immunity from all claims; (2) the Officer Defendants and Dr. Landi are not entitled to qualified immunity at this juncture; and (3) Dr. Kupferman is not entitled to statutory immunity. (*See infra* at Section XIII.)

## VI. ABUSE OF PROCESS

**\*\*20** **[49]** **[50]** **[51]** Plaintiff also asserts a claim of abuse of process under Section 1983 against the City Defendants.[32] As with malicious prosecution, the Court looks to State law for the elements of a Section 1983 abuse of process claim. *Mangino v. Incorporated Village of Patchogue,* 808 F.3d 951, 958 n.5 (2d Cir. 2015) (citing *Cook v. Sheldon,* 41 F.3d 73, 80 (2d Cir. 1994) and *Savino v. City of New York,* 331 F.3d 63, 76–77 (2d Cir. 2003)). Under New **\*616** York law, "a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with the intent to do harm without excuse of justification and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino,* 331 F.3d at 76 (quoting *Cook,* 41 F.3d at 80); *Hoffman v. Town of Southampton,* 523 Fed.Appx. 770, 771 (2d Cir. 2013) (summary order) (citing *Savino,* 331 F.3d 63). In the context of an abuse of process claim, "legal process means that a court issued the process, and the plaintiff will be penalized if he violates it." *Cook,* 41 F.3d at 80 (quoting *Mormon v. Baran,* 35 N.Y.S.2d 906, 909 (Sup. Ct. 1942)). So, for example, an arrest executed by the officers for a " 'collateral objective outside the legitimate ends of the process', satisfies the first element of an abuse of process claim." *Crockett v. City of New York,* No. 11-CV-4378, 2015 WL 5719737, at \*10 (E.D.N.Y. Sept. 29, 2015) (citation and quotation marks omitted); *see also Cook,* 41 F.3d at 80 (finding, with respect to abuse of process claim, that New York State Troopers who stopped and arrested plaintiff "clearly employed criminal process against [plaintiff] by having him arraigned on charges" that caused him to be held in custody). Notably, in *TADCO Const. Corp.,* the court found that allegations that defendants "improperly contributed to [plaintiff's] arrest, but not that they took any further actions in his prosecution" were sufficient to withstand a motion to dismiss an abuse of process claim. 700 F.Supp.2d at 272 (recognizing "split of opinion" on whether mere act of issuing process is sufficient for first element of malicious abuse of process claim).

32    Plaintiff withdrew her malicious abuse of process claim against the Medical Center Defendants. (*See* 1/7/2016 Minute Entry.)

**[52]** **[53]** "The crux of a malicious abuse of process claim is the collateral objective element." *Kraft v. City of New York,* 696 F.Supp.2d 403, 416 (S.D.N.Y. 2010), *aff'd,* 441 Fed.Appx. 24 (2d Cir. 2011). To plead a collateral objective, a plaintiff must plausibly plead not that defendant acted with an "improper motive," but rather an "improper purpose": "[A plaintiff] must claim that [the defendant] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Savino,* 331 F.3d at 77.

**[54]** The City Defendants argue that Plaintiff's abuse of process claim should be dismissed because the claim accrued at the time of Plaintiff's arrest, and therefore the three-year statute of limitations expired sometime around March 2011. (Dkt. 59 at 21.) The Court, however, finds that because Plaintiff could not have discovered one of the two collateral objectives she alleges until her prosecution was dismissed on January 12, 2013, her complaint in this action was timely filed.

**[55]** A claim for abuse of process accrues "at such a time as the criminal process is set in motion—typically at arrest—against the plaintiff. However, accrual cannot be appropriate before such time as plaintiff is aware, or ought to be aware, of those facts providing a basis for his claim." *Duamutef v. Morris,* 956 F.Supp. 1112, 1118 (S.D.N.Y. 1997) (Sotomayor, J.) (citing *Rose v. Bartle,* 871 F.2d 331, 350 (3d Cir. 1989) and *Singleton,* 632 F.2d at 192); *see also Hadid v. City of New York,* No. 15-cv-19, 2015 WL 7734098, at \*5 (E.D.N.Y. Nov. 30, 2015) (citing *Duamutef,* 956 F.Supp. at 1118). Unlike the plaintiffs in other cases, Plaintiff in this case does not even allege in the Complaint when she learned of her abuse of process claim. *See, e.g., Duamutef,* 956 F.Supp. at 1118–19 (finding that plaintiff's abuse of process claim was not time-barred because "[a]ccording to the allegations in [plaintiff's] Complaint, plaintiff was unaware that he was being retaliated against until September 28, 1995, when he received an affidavit detailing defendants' intention to stifle his **\*617** political activities through a criminal prosecution"); *Lukowski v. Cnty. of Seneca,* No. 08-cv-6098, 2009 WL 467075, at \*8 (W.D.N.Y. Feb. 24, 2009) ("The Complaint alleges that plaintiffs learned of the allegedly illegal conduct of the defendants in 'late March 2007, ... after being contacted by Ontario County District Attorney Michael Tantillo[.]' ")

**\*\*21**  Here, Plaintiff alleges that Defendants had two collateral objectives for prosecuting her: (1) using her as a "bargaining chip" to get her husband to plead guilty; and (2) covering up their illegal arrest of her. (*See* Am. Compl. ¶ 215). While these two objectives are sufficient to state an abuse of process claim [33], the "cover-up" objective does not provide a basis for finding this claim timely. As the Court has already found in connection with Plaintiff's false arrest claim, Plaintiff believed from the time of her arrest that her arrest was illegal, and thus Plaintiff was aware of or should have been aware of the facts providing a basis for her claim, *Duamutef*, 956 F.Supp. at 1118, that at least one purpose of her prosecution was to cover up this illegal arrest. Were Plaintiff's abuse of process claim based solely on this objective, that claim would have accrued, as the City Defendants maintain, on the date of her arrest, and therefore would be time-barred.

[33]    *See, e.g., Pinter v. City of New York*, 976 F.Supp.2d 539, 569 (S.D.N.Y. 2013) (finding that there was a collateral objective for plaintiff's arrest where the defendant "us[ed] prostitution arrests for leverage in negotiations over nuisance abatement, without any apparent interest in conviction").

However, Plaintiff also alleges that another purpose of her prosecution was to use her as leverage to get her husband to plead guilty. As to that collateral objective, the Court finds that Plaintiff was not reasonably aware of that possible objective until the dismissal of her case, without any effort to pursue her prosecution during the four years of her pretrial incarceration and only after her husband was convicted. It was only when Plaintiff's case was dismissed, without prosecution and following her husband's conviction, did the objective of using Plaintiff as a "bargaining chip" become clear. [34] Accordingly, the Court finds that Plaintiff's abuse of process claim did not accrue until the date on which her case was dismissed, January 2, 2013, and thus her abuse of process is not time-barred. [35]

[34]    Although Plaintiff has not made this exact argument, the Court has the obligation at this stage to draw all reasonable inferences in Plaintiff's favor. *See Nielsen*, 746 F.3d at 62.

[35]    The Court also rules that, for the time being, her abuse of process claim can proceed on the basis of both collateral objectives, even though, as previously discussed, a claim based solely on the "cover-up" objective would have been time-

barred. *See Bacchus v. New York City Bd. of Ed.*, 137 F.Supp.3d 214 (E.D.N.Y. 2015) (finding that "better course" was not to dismiss claim based on same evidence as surviving claims); *Thibodeaux v. Travco Ins. Co.*, 13–CV–5599, 2014 WL 354656, at \*2 (E.D.N.Y. Jan. 31, 2014) ("If one of a number of integrally related causes of action have to be tried, it makes little sense to grant a motion to dismiss as to one or more of them, as it may prove necessary to hold yet another trial in the event that it is determined on appeal that the motion to dismiss was improperly granted.").

However, to the extent that Plaintiff argues in her MOL (Dkt. 61) that another "collateral motive ... [for Plaintiff's arrest was to obtain Hang Bin's confession because] such confessions are very valuable to promoting the City's agenda in promoting the truth of SBS science," Plaintiff will not be permitted to pursue this as part of her abuse of process claim, since there is nothing remotely related to this allegation in the Complaint, nor does Plaintiff cite to any paragraph in the Complaint to support this newly proffered objective.

 **[56]**  The Court briefly addresses the City Defendants' two other grounds for **\*618** dismissing Plaintiff's abuse of process claim. First, they contend that neither police officers nor medical examiners, such as Dr. Landi, have the authority to offer and/or to induce defendants to accept plea deals and that, therefore, Plaintiff's abuse of process claim against them fails "as a matter of practicality." (Dkt. 59 at 20.) However, the City Defendants do not cite any legal authority for this contention, and it is unclear to the Court why the police officers and medical examiners would not be liable if they worked with the prosecutors to pursue Plaintiff's prosecution for the purposes of getting Plaintiff's husband to plead guilty or covering up an unlawful arrest. Second, the City Defendants argue that, although "there is a split in the Second Circuit as to whether probable cause is a defense against abuse of process claims", the Court should follow the line of cases finding probable cause to be a complete defense to this claim. (Dkt. 59 at 21 n.17.) The Court declines that invitation, and instead adheres to the view that "[t]he Second Circuit has long recognized that probable cause is not a complete defense to malicious abuse of process." *Goldring v. Zumo*, No. 14–Civ–4861, 2015 WL 148451, at \*5 (E.D.N.Y. Jan. 12, 2015). In any event, as the Court has already found, in connection with Plaintiff's malicious prosecution claim, the Amended Complaint contains sufficient allegations from

which the absence of probable cause to prosecute Plaintiff can be reasonably inferred.

 **\*\*22**  [57]   [58]  While the Court finds that Plaintiff has sufficiently and timely pled an abuse of process claim, she has not adequately alleged that claim as to all City Defendants. Plaintiff, again, indiscriminately group pleads her abuse of process claim against *all* Defendants. (*See* Am. Compl. ¶¶ 215–217.) As with Plaintiff's malicious prosecution claim, however, her abuse of process claim is only properly pled as to Det. Degnan and Dr. Landi. These are the only City Defendants as to whom Plaintiff has adequately pled involvement in the use of legal process, *i.e.*, arresting and detaining Plaintiff on the basis of allegedly false or incomplete evidence, and thus these are the only Defendants as to whom the pursuit of one or both of the alleged collateral objectives could be plausibly inferred. Although the court in *TADCO Const. Corp.* suggested that individuals who "improperly contributed" to the plaintiff's arrest could be held liable for malicious abuse of process there, the defendants were alleged to have directly contributed to the plaintiff's arrest. Here, while Dets. Moser, Phelan, and Heffernan are alleged to have participated in the investigation of Plaintiff's case, there is nothing in the Amended Complaint from which to infer that they participated in the actual legal process that was used against Plaintiff, *i.e.*, her arrest and detention. [36]

[36]    By contrast, as discussed *infra*, the involvement of these detectives in the investigation is sufficient to state a claim against them for Section 1983 conspiracy, unreasonably prolonged detention, and violating some of Plaintiff's substantive due process rights.

Accordingly, Defendants' motion to dismiss Plaintiff's abuse of process claim is denied as to Det. Degnan and Dr. Landi, and granted as to all other City Defendants.

## VII. FAILURE TO INTERVENE

 [59]  The Amended Complaint asserts, as part of Plaintiff's Section 1983 claim, that *all* Defendants failed to intervene to prevent other Defendants from violating her constitutional rights not to be subjected to false arrest, malicious prosecution, and abuse of process. Both groups of Defendants argue for dismissal of this claim on the grounds that Plaintiff's claim is based on conclusory allegations. The Court agrees. Moreover, the Court independently  **\*619**  finds these allegations irreconcilable with Plaintiff's theory of direct participation by each Defendant.

 [60]   [61]  "It is widely recognized that law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official." *Anderson*, 17 F.3d at 557 (citations omitted). To establish a claim for failure to intervene, a plaintiff must show (1) the officer's failure "permitted fellow officers to violate [plaintiff's] clearly established statutory or constitutional rights," and (2) it was "objectively unreasonable for him to believe that his fellow officers' conduct did not violate those rights." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997) (citation and quotation marks omitted). Additionally, Plaintiff must show that the officer had a "realistic opportunity to intervene to prevent the harm from occurring" but failed to do so. *See Cerbelli v. City of New York*, No. 99-CV-6846, 2008 WL 4449634, at \*11 (E.D.N.Y. Oct. 1, 2008) (citation and quotation marks omitted).

Plaintiff's failure to intervene claim is dismissed as to all Defendants for two reasons. [37] First, Plaintiff's allegations are merely conclusory. [38] Second, Plaintiff resorts to conclusory generalized allegations asserting her failure to intervene claim against every single Defendant and refers to the numerous defendants collectively. Such conclusory and generalized allegations do not give any of the Defendants "fair notice of what [Plaintiff's] claim is and the grounds upon which it rests." *Jackson v. Onondaga Cnty.*, 549 F.Supp.2d 204, 212 (N.D.N.Y. 2008) (quotation marks omitted); *see*  **\*620** *Bouche v. City of Mount Vernon*, No. 11–Civ–5246, 2012 WL 987592, at \*7 (S.D.N.Y. Mar. 23, 2012) (dismissing the plaintiff's failure to intervene claim because the plaintiff "only refer[red] to the defendants in the collective, never identifying which defendants were responsible for specific actions"); *see also Clay v. Cnty. of Clinton*, No. 8:10-cv-00239, 2012 WL 4485952, at \*14 (N.D.N.Y. Sep. 27, 2012) (granting motion for judgment on the pleadings as to plaintiff's failure to intervene claim because the plaintiff "fail[ed] to distinguish which ... Defendant was responsible for actually violating Plaintiff's constitutional rights and which, if any, Defendant failed to intervene to prevent such

Ying Li v. City of New York, 246 F.Supp.3d 578 (2017)
Case 9:19-cv-01527-TJM-TWD   Document 24   Filed 10/05/20   Page 105 of 259
2017 WL 1208422

violations from occurring"). As the district court explained in *Hardy v. City of New York*, No. 12–Civ–17, 2013 WL 5231459, at \*4 (S.D.N.Y. Jul. 9, 2013), "restatement of the legal standard ... does not sufficiently allege constitutional violations in which the [defendants] might have intervened. Where were the [defendants] in relation to Plaintiff and in relation to each other? What impermissible actions did they take? Which officers observed those actions? Plaintiff does not say. Accordingly, he fails to nudge his failure to intervene claim from possible to plausible."

37    In addition to the deficiencies the Court discusses here, the City Defendants also argue that the failure to intervene claim is time-barred. (Dkt. 59 at 23.) Specifically, they argue that "because the alleged constitutional violations were being committed 'by other police officers,' and such conduct necessarily would have taken place during or before plaintiff's arrest in March 2008, the three-year statute of limitations has run." (*Id.*) The Court finds this argument unclear and unpersuasive. Plaintiff's Complaint alleges constitutional violations that are not limited to false arrest, and it is conceivable that her constitutional rights were violated after March 2008 since she was in prison—awaiting trial—for over four years. (Am. Compl. ¶¶ 234, 236.) In any event, because Plaintiff's claim fails to include sufficient factual allegations, the Court cannot even determine whether the statute of limitations has expired as to virtually all of the Defendants. The Court also finds Plaintiff's response to the City Defendants' argument deficient at best. Plaintiff simply recites, in a footnote, the law that the statute of limitations for Section 1983 actions arising in New York is three years and that New York law determines the tolling of the limitations period while federal law determines when the claim accrues. (Dkt. 61 at 21 n.35.) This recitation of boilerplate law is in no way responsive or illuminating on the issue of whether Plaintiff's failure to intervene claim is time barred.

38    Plaintiff alleges that "[e]ach individual defendant had an affirmative duty to intervene on behalf of plaintiff, whose constitutional rights were being violated in that defendant's presence by other police officers, but failed to intervene to prevent the unlawful conduct, despite having had a realistic opportunity to do so, in violation

of plaintiff's right under the First, Fourth, and Fourteenth Amendments to the United States Constitution." (Am. Compl. ¶ 219.)

**\*\*23** Such a generalized pleading, which fails to differentiate between the Defendants, is especially problematic where, as here, Plaintiff is also alleging that Defendants are all liable under a theory of direct participation. 39 *See Chepilko v. City of New York*, No. 06-CV-5491, 2012 WL 398700, at \*8 n.5 (E.D.N.Y. Feb. 6, 2012) (finding that if a defendant "may be liable under a theory of direct participation, there is no claim against [that defendant] for failure to intervene"); *see also Buchy v. City of White Plains*, No. 14-CV-1806, 2015 WL 8207492, \*3 (S.D.N.Y. Dec. 7, 2015) (same) (citation omitted). Plaintiff's failure to specify which Defendants participated directly in the unlawful conduct, as opposed to failed to intervene in it, is fatal to her claim, even at this stage.

39    Indeed, Plaintiff names every Defendant in all but her *Monell* and malicious abuse of process claims. (*See* Compl; *see also* Dkt. 61 at 21 ("Defendant Officers collectively caused Plaintiff's constitutional violations and each of those officers also can be found liable for failing to intervene to prevent his fellow officers from committing those acts." (citation omitted)).)

Accordingly, Defendants' motion to dismiss with regard to Plaintiff's failure to intervene claim is granted as to all Defendants. 40

40    Given the deficient pleading of Plaintiff's failure to intervene claim, the Court need not address the Medical Center Defendants' argument that, as a non-governmental hospital and a medical expert who provided testimony and information to the prosecuting authority, they had no affirmative duty to intervene to prevent the alleged false arrest, malicious prosecution, or abuse of process. (*See* Dkt. 55 at 10.)

## VIII. CONSPIRACY

[62]  [63]  [64]  Plaintiff asserts a Section 1983 conspiracy claim against all Defendants. (Am. Compl. ¶¶ 221–223.) "[T]o survive a motion to dismiss on [a plaintiff's] § 1983 conspiracy claim, [the plaintiff] must allege (1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done

in furtherance of that goal causing damages." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002). "[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Id.* (quoting **\*621** *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993)). To state a Section 1983 conspiracy claim against a private entity, "the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act."[41] *Id.* at 324 (quoting *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992)). For the reasons stated below, the Court finds that Plaintiff has sufficiently pled a claim of conspiracy against specific City Defendants and the Medical Center Defendants.

[41]    Given that the parties have not, at this stage, delved into the issue of whether the Medical Center Defendants can be considered "joint actors" that can be held liable under Section 1983, the Court's finding that Plaintiff has adequately pled her conspiracy claim is limited to whether Plaintiff's claim overcomes a 12(b)(6) motion.

 **[65]** While Plaintiff's pleading of her conspiracy claim is hardly robust, drawing all reasonable inferences in her favor, the Court finds that Plaintiff has adequately pled this claim as to Dets. Degnan, Moser, Heffernan, and Phelan, Dr. Landi, and Dr. Kupferman. The Complaint provides factual allegations that these Defendants acted jointly. For example, Plaintiff alleges that Det. Degnan was present at the autopsy of Annie that Dr. Landi performed (Am. Compl. ¶ 129) and that "Defendant Degnan and Heffernan engaged in lengthy communications with FHMC staff, including Defendant Kupferman" (Am. Compl. ¶ 108). Plaintiff also alleged that Dr. Kupferman joined Dets. Heffernan and Moser in screaming at her during an investigation (Am. Compl. ¶ 115) and that Dr. Landi "made her determination largely based on the evidence presented to her by" Dr. Kupferman and other City Defendants (Am. Compl. ¶ 152). Moreover, Plaintiff alleges that Det. Phelan and Det. Degnan together interrogated the Lis, and participated in the early stages of investigating Plaintiff's criminal case. (*See, e.g.,* Am. Compl. ¶¶ 102–104, 106, 110.)

 **\*\*24** Pointing to Plaintiff's allegations in paragraphs 157 and 158 that Dr. Kupferman acted "as a deputy of the NYPD and the Queens County D.A.'s office," the Medical

Center Defendants argue that they are "legally incapable of conspiring" with the City Defendants under the intra-corporate conspiracy doctrine. (*See* Dkt. 55 at 11–12.) Plaintiff responds that she has adequately pled facts to support this claim[42] and that "[j]ust because one is alleged to be [sic] State Actor, does not make them members of the NYPD, or break intro-corporate [sic] conspiracy." (*See* Dkt. 66 at 16–17.) In their reply, the Medical Center Defendants clarify that Plaintiff's counsel misconstrues the argument: "[T]he doctrine applies [not simply because Plaintiff alleged that Dr. Kupferman was a state actor but] because plaintiff alleged that Kupferman 'acted as a deputy of the NYPD and the Queen County D.A.'s office[.]' " (Dkt. 56 at ECF 15.)

[42]    Though making this argument, Plaintiff does not, in fact, provide adequate citation to the Amended Complaint. For example, Plaintiff argues in her MOL that "Dr. Kupferman did not begin her extensive investigation notes imbedded in the medical records until October 25, 2007, two days after police were first notified of possible child abuse." (Dkt. 66 at 16.) However, she fails to provide relevant citation to the Amended Complaint to support this statement.

 **[66]** Under the intra-corporate conspiracy doctrine, "there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978) (citation omitted). While the Court must accept the factual allegations **\*622** set forth in the complaint as true, it must also draw all reasonable inferences *in favor* of the plaintiff. *See Nielsen*, 746 F.3d at 62. Here, the Court infers from paragraphs 157 and 158 that Plaintiff is alleging—albeit in exaggerated language —that Dr. Kupferman acted in concert with or "acted as a part of the team" that is the NYPD and the Queens County D.A.'s Office, not that Dr. Kupferman was an actual "employee" of the NYPD or District Attorney's Office. Indeed, any inference that Dr. Kupferman actually worked for those offices is belied by the Amended Complaint's allegations that Dr. Kupferman worked for FMHC. (Am. Compl. ¶ 108.) In *Herrmann*, the case on which the Medical Center Defendants rely, there was no question that all defendants accused of conspiracy belonged to a single corporation. *See* 576 F.2d 453, 459 ("Every one of the defendants ... was either a trustee or faculty member of the Brooklyn Law School[.]") Therefore, at this stage of the proceedings, the Court does not find it appropriate

to dismiss Plaintiff's conspiracy claim against Dr. Kupferman based on the intra-corporate conspiracy doctrine.

\* \* \*

Accordingly, the City Defendants' motion to dismiss Plaintiff's conspiracy claim is denied as to Dets. Degnan, Moser, Heffernan, and Phelan, and Dr. Landi, but granted as to all other City Defendants; the Medical Center Defendants' motion to dismiss Plaintiff's Section 1983 conspiracy claim is denied. [43]

[43]     Furthermore, to the extent that Dr. Kupferman is alleged to have acted as an agent of FHMC, the hospital is also liable for the Section 1983 conspiracy. *See Niemann v. Whalen*, 911 F.Supp. 656, 664 (S.D.N.Y. 1996) (where bank employees who allegedly violated plaintiff's constitutional rights were acting as agents of defendant bank, plaintiff could bring § 1983 action against bank).

## IX. UNREASONABLY PROLONGED DETENTION

Plaintiff also asserts a Section 1983 claim for unreasonably prolonged detention in violation of her Fourth Amendment rights. (Am. Compl. ¶¶ 225–229.) Specifically, Plaintiff alleges that Defendants' mishandling, concealing, and suppressing of exculpatory evidence, and their intimidation and coercion of witnesses, caused her unreasonably prolonged detention. (*Id.* (citing *Russo v. City of Bridgeport*, 479 F.3d 196 (2d Cir. 2007).).)

 \*\*25 [67]     [68]     Unreasonably prolonged pretrial detention where exculpatory evidence is readily available can form the basis of a Section 1983 claim against police officers as a violation of the Fourth Amendment's protection against unreasonable seizures. *Russo*, 479 F.3d at 208–09. To state such a claim, Plaintiff must allege that (1) she has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) the actions of the officers violated that right, and (3) the officers' conduct "shocks the conscience." *Russo*, 479 F.3d at 205 (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). In *Russo*, the Second Circuit considered the following three factors in determining whether the plaintiff's detention was excessive in violation of the Fourth Amendment: (1) the length of time the plaintiff was

incarcerated; (2) the ease with which the exculpatory evidence in the officers' possession could have been checked; and (3) the alleged intentionality of the defendants' behavior. *Id.* at 209.

Applying these standards, the Court finds that Plaintiff has adequately alleged an unreasonably prolonged detention claim against some of the City Defendants, but **\*623** not against the Medical Center Defendants.

### A. The City Defendants

[69]     The City Defendants argue that this claim should be dismissed because (1) Plaintiff only recites the elements of the cause of action, and (2) Plaintiff cannot allege the third element, *i.e.*, that the alleged conduct "shocks the conscience", because the exculpatory evidence at issue is not equivalent to the exculpatory evidence in *Russo*.

First, the Court disagrees with the City Defendants' contention that Plaintiff only recites the elements of unreasonably prolonged detention and nothing more. In the Amended Complaint, Plaintiff alleges that she was held at Riker's Island Jail for about four years (Am. Compl. ¶¶ 180, 234), and that Defendants "disregarded plainly exculpatory evidence" (Am. Compl. ¶ 173), "failed to ... disclose evidence inconsistent with plaintiff's guilt" (Am. Compl. ¶ 182), and mishandled and suppressed "exculpatory ... evidence" (Am. Compl. ¶ 225). Had Plaintiff only alleged this, her claim would have been conclusory. However, Plaintiff provides specifics regarding these broad allegations. For example, she alleges that Defendants mishandled evidence that "Annie's injuries could have been caused by osteogenesis imperfecta or other natural causes" (Am. Compl. ¶ 137), and that Dr. Landi's statement was "entirely ... unsupportable by any medical science" (*see* Am. Compl. ¶ 150). She also alleges that Dr. Landi withheld exculpatory evidence (Am. Compl. ¶ 154), falsely "swore under oath in the criminal complaint" that the Lis could have prevented Annie's death by getting her prompt medical attention the night she died (Am. Compl. ¶ 150), and "ignored signs of rib anterior flaring, and [the need for] any kind of thorough eye [sic] exam for eyes, or bones." (Am. Compl. ¶ 152.) To the extent that Dets. Degnan, Moser, Phelan, and Heffernan took an active role in investigating the Lis, the Court can infer that any exculpatory evidence concealed by Dr. Landi was also known by these Officer Defendants. From these allegations, the Court can plausibly infer that these City Defendants failed to disclose medical evidence that would have contradicted Dr. Landi's diagnosis

and thus suppressed evidence that would have exculpated Plaintiff sooner.

[70] Second, the Court disagrees with the City Defendants' contention that the exculpatory evidence in this case—*i.e.*, that Annie could not have been saved even if medical care was sought out sooner or that she died due to a condition other than SBS—is not equivalent to the definitive and conclusive exculpatory evidence contemplated by the Second Circuit in *Russo*. (Dkt. 59 at 25.) The failure to obtain or disclose evidence that is only arguably exculpatory does not shock the conscience. *See, e.g., Wilson v. City of New York*, 480 Fed.Appx. 592, 595 (2d Cir. 2012) (summary order) (distinguishing *Russo* because the evidence in *Wilson* was conflicting and some of the testimonial evidence at issue identified the defendant as an accomplice to the charged crime). In *Russo*, the exculpatory evidence at issue was a video surveillance tape that showed the perpetrator of the robbery in question without tattoos on his arms; Russo, who was arrested for the robbery, had distinctive tattoos covering his arms and repeatedly alerted the defendant-officers that the surveillance video would establish his innocence. *Id.* at 200. Here, the exculpatory evidence that Plaintiff alleges was concealed is the *absence* of any medical support for the charge that she caused Annie's death by SBS. (*Id.* ¶¶ 150, 135 (asserting that charge of SBS was "*entirely ...* unsupportable by *any* medical science," that the "there was *no* evidence, and *no reasonable basis* to believe, that plaintiff had any time **\*624** engaged in any conduct which could have caused or contributed to Annie's injuries and death," and that "there was *no* clinical or diagnostic medical evidence to support a finding of SBS [based on Annie's condition]." (emphasis added)).) Although the Amended Complaint is not a model of clarity, the Court infers that Plaintiff's unreasonably prolonged detention claim is based on the allegation that the City Defendants knew from conversations with, or information provided by, the Medical Center Defendants that there was no medical support for the conclusion that Annie died from SBS or that earlier medical intervention could have prevented her death—conclusions that were central to the case against Plaintiff—and that the City Defendants concealed this information for over four years while Plaintiff remained in prison. At this stage of the litigation, the Court takes these allegations as true—*i.e.*, that there was definitive and conclusive exculpatory evidence—and finds that Plaintiff has adequately pled the third element of her unreasonably prolonged detention claim.[44]

44    While the City Defendants cite to a string of cases in support of their argument that Plaintiff has failed to adequately plead a claim of unreasonable detention (*see* Dkt. 59 at 26), the courts in those cases dismissed the claim either at the stage of summary judgment or after a trial was conducted. *See Nzegwu v. Friedman*, No. 10-CV-02994, 2014 WL 1311428 (E.D.N.Y. Mar. 31, 2014); *Harewood v. Braithwaite*, 64 F.Supp.3d 384 (E.D.N.Y. 2014); *Thompson v. City of New York*, 603 F.Supp.2d 650 (S.D.N.Y. 2009); *Jackson v. City of New York*, 29 F.Supp.3d 161 (E.D.N.Y. 2014). Citations to such cases are not persuasive.

**\*\*26** Accordingly, the City Defendants' motion to dismiss Plaintiff's unreasonably prolonged detention claim is denied as to Dets. Degnan, Moser, Phelan, and Heffernan, and Dr. Landi, but granted as to all other City Defendants.

### B. The Medical Center Defendants

The Medical Center Defendants contend that Plaintiff cannot state a claim for unreasonably prolonged detention against Dr. Kupferman because that claim can only be brought against law enforcement officers. (Dkt. 55 at 12.) Plaintiff, citing no legal authority, argues that the Second Circuit's holding in *Russo* should be extended to non-law-enforcement officials. (Dkt. 66 at 19.) Plaintiff also argues that as long as the defendant acted under color of state law, that defendant is subject to an unreasonably prolonged detention claim recognized by the court in *Russo*. The Court disagrees with Plaintiff's overly expansive and unsupported reading of *Russo*.

In *Russo*, the Second Circuit specifically stated that a plaintiff has a right to be free from prolonged detention "stemming from *law enforcement officials'* mishandling or suppression of exculpatory evidence...." *See Russo*, 479 F.3d at 205 (emphasis added). Indeed, all three prongs of the test for determining whether an unreasonably prolonged detention has occurred expressly references conduct by a law enforcement officer. *See id.* There is nothing in *Russo* or any case applying *Russo* that suggests that non-State individuals or entities can be held liable for unreasonably prolonged detention. *See, e.g., Jackson v. City of New York*, 29 F.Supp.3d 161, 178 (E.D.N.Y. 2014) ("*Russo* has been narrowly construed to involve situations where a law enforcement official has mishandled or suppressed readily available exculpatory evidence...."); *Harewood v. Braithwaite*, 64 F.Supp.3d 384, 401–03 (E.D.N.Y. 2014);

*Thompson v. City of New York*, 603 F.Supp.2d 650, 656 (S.D.N.Y. 2009); *Wilson v. City of New York*, 480 Fed.Appx. 592, 594–95 (2d Cir. 2012) (summary order); *Nelson v. Hernandez*, 524 F.Supp.2d 212, 224–25 (E.D.N.Y. 2007). Nor does Plaintiff cite any such case law.

**\*625** Accordingly, the Medical Center Defendants' motion to dismiss Plaintiff's unreasonably prolonged detention claim as to them is granted in its entirety.

## X. DUE PROCESS

[71] Under the Due Process Clause of the Fourteenth Amendment, no State shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. This prohibition applies to municipalities. *See Horvath v. Westport Library Ass'n*, 362 F.3d 147, 151 (2d Cir. 2004) (stating that the Fourteenth Amendment due process right applies only to government entities whose action may be fairly attributed to the State).

[72] [73] [74] [75] The Due Process Clause was "intended to secure the individual from the arbitrary exercise of the powers of government." *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (quoting *Hurtado v. California*, 110 U.S. 516, 527, 4 S.Ct. 292, 28 L.Ed. 232 (1884)). Procedural due process requires that government action depriving an individual of substantial interest in life, liberty, or property "be implemented in a fair manner." *United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Substantive due process, as recognized by the Supreme Court, bars "certain government actions regardless of the fairness of the procedures used to implement them," in order to "prevent governmental power from being used for purposes of oppression." *Daniels*, 474 U.S. at 331, 106 S.Ct. 662 (citation and quotations marks omitted); *McClary v. O'Hare*, 786 F.2d 83, 88 (2d Cir. 1986). "In other words, while a procedural due process claim challenges the procedure by which [deprivation of liberty] is effected, a substantive due process claim challenges the 'fact of the [deprivation]' itself." *See Southerland v. City of New York*, 680 F.3d 127, 142 (2d Cir. 2012) (alteration in original omitted) (differentiating a procedural due process claim from a substantive due process claim); *see also Kerry v. Din*, ––– U.S. ––––, 135 S.Ct. 2128, 192 L.Ed.2d 183 (2015) ("[T]here are two categories of implied rights protected by the Due Process Clause: really fundamental rights, which cannot be taken away at all absent a compelling state interest; and not-so-fundamental rights,

which can be taken away so long as procedural due process is observed.").

**\*\*27** The Court interprets Plaintiff's due process claim, set forth in her seventh cause of action, to be based on the alleged (1) concealment of exculpatory evidence, *i.e.*, a *Brady* violation (Am. Compl. ¶¶ 232–233), (2) fabrication of evidence (*id.*), (3) failure to investigate (Am. Compl. ¶ 235), (4) violation of the right to a speedy trial (Am. Compl. ¶ 234), and (5) violation of the right to be treated with dignity during her pretrial detention (¶ 236). While Plaintiff does not clearly articulate which due process claims are procedural and which are substantive, the Court interprets the first two claims, regarding the mishandling of evidence, to be procedural [45], and the others to be substantive.

[45] "The Supreme Court has never definitively held whether *Brady* is based on substantive or procedural due process. Nevertheless, it seems clear that it is a procedural due process aspect of the criminal defendant's right to a fair trial." Martin A. Schwartz, *The Supreme Court's Unfortunate Narrowing of the Section 1983 Remedy for Brady Violations*, Champion, May 2013 at 58, 59. As for Plaintiff's fabrication of evidence claim, it is unclear whether Plaintiff characterizes it as a procedural or substantive due process claim. (*See* Dkt. 66 at 20 ("Dr. Kupferman's actions [of fabricating evidence, *inter alia*,] deprived Plaintiff of the right to a fair trial under the doctrine of *procedural* due process." (emphasis added)); *but see* Dkt. 61 at 24–25 (first laying out the law of substantive due process and then immediately following it with a discussion of Plaintiff's claim of fabrication of evidence, among other claims).) Regardless, courts in this Circuit have characterized the right to be protected against the deprivation of liberty based on fabricated evidence as a procedural due process issue. *See Coffey*, 221 F.3d at 348–49 (the use of fabricated evidence amounts to a deprivation of liberty without due process); *see also Jean–Laurent v. Bowman*, No. 12-cv-2954, 2014 WL 4662221, at \*12 (E.D.N.Y. Jul. 7, 2014); *Zachary v. City of Newburgh*, 13–cv–5737, 2014 WL 1508705, at \*4–5 (S.D.N.Y. Apr. 1, 2014) (dismissing plaintiff's substantive due process claim but finding that plaintiff alleged a procedural due process claim based on fabricated evidence); *Maldonado v. City of New York*, No. 11-

cv-3514, 2014 WL 787814, at *12 (S.D.N.Y. Feb. 26, 2014) (dismissing plaintiff's substantive due process claim but noting that plaintiff's fabrication of evidence claims may proceed "via the Fourth Amendment and the procedural component of the Fourteenth Amendment's Due Process Clause"); *Pinter v. City of New York*, 976 F.Supp.2d 539, 576 (S.D.N.Y. 2013) (recognizing a separate "fabrication-based due process claim").

**\*626 A. Procedural Due Process**

 **[76]**   **[77]**   A procedural due process violation occurs when the government deprives a person of a protected life, liberty, or property interest without first providing notice and an opportunity to be heard. *See B.D. v. DeBuono*, 130 F.Supp.2d 401, 432–33 (S.D.N.Y. 2000). "To determine whether a Section 1983 due process claim is plausibly alleged, the Court evaluates the sufficiency of the allegations with respect to the liberty or property interest alleged and the process due before deprivation of that interest." *Norton v. Town of Islip*, 97 F.Supp.3d 241, 266 (E.D.N.Y. 2015); *see also Ciambriello*, 292 F.3d at 313.

 **[78]**   **[79]**   **[80]**   Here, Plaintiff has asserted Section 1983 due process claims that are often referred to as fair trial claims. "A fair trial claim is a civil claim for violations of a criminal defendant's Fourteenth Amendment due process rights." *Fappiano v. City of New York*, 640 Fed.Appx. 115, 118 (2d Cir. 2016) (citing *Ramchair v. Conway*, 601 F.3d 66, 73 (2d Cir. 2010)). A defendant's right to a fair trial is violated when exculpatory evidence is withheld, *i.e.*, when a *Brady* violation occurs (*see Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)), and also when an officer forwards fabricated evidence to prosecutors, *Ricciuti*, 124 F.3d at 130. "A plaintiff need not have gone to a full trial on the merits in order to have an actionable Section 1983 claim based on the denial of a fair trial." *Marom v. City of New York*, No. 15-CV-2017, 2016 WL 916424, at *9 (S.D.N.Y. Mar. 7, 2016); *see Ricciuti*, 124 F.3d at 127 (plaintiffs who brought a Section 1983 claim for right to a fair trial had their criminal charges dismissed pretrial).

 **\*\*28**  The Court finds that Plaintiff has adequately alleged fair trial claims against Dets. Degnan, Moser, Phelan, and Heffernan, Dr. Landi, and the Medical Center Defendants.

1. *Brady* violation claim

 **[81]**   **[82]**   The Supreme Court held that a prosecutor violates a criminal defendant's due process right when the prosecutor fails to disclose favorable material to the defendant, "irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87, 83 S.Ct. 1194; *see also Poventud v. City of New York*, 750 F.3d 121, 155 (2d Cir. 2014) ("[T]he constitutional right defined by *Brady* ... is the criminal defendant's procedural due process right to the disclosure of 'evidence that is material to his guilt or punishment.' ") (quoting *Cone v. Bell*, 556 U.S. 449, 469, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009)). Police officers also "can be held liable for *Brady* due process violations under § 1983 if they withhold exculpatory evidence from prosecutors." *Bermudez v. City of New York*, 790 F.3d 368, 376 n.4 (2d Cir. 2015). **\*627** Once a police officer turns over exculpatory evidence to the prosecutor, that officer satisfies his obligations under *Brady. Walker v. City of New York*, 974 F.2d 293, 299 (2d Cir. 1992) ("It is appropriate that the prosecutors, who possess the requisite legal acumen, be charged with the task of determining which evidence constitutes *Brady* material that must be disclosed to the defense."); *see also Blake v. Race*, 487 F.Supp.2d 187, 215–16 (E.D.N.Y. 2007) (noting that the Second Circuit has extended the *Brady* obligations to police officers in that they are required to turn exculpatory evidence over to the prosecutors).

 **[83]**   **[84]**   "A classic *Brady* violation contains three elements: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' " *Fappiano v. City of New York*, 640 Fed.Appx. 115, 118 (2d Cir. 2016) (summary order) (quoting *United States v. Rivas*, 377 F.3d 195, 199 (2d Cir. 2004)). "To establish prejudice, a plaintiff must show the evidence was material; i.e., whether the 'evidentiary suppression undermines confidence in the outcomes of the trial.' " *Id.* at 118 (quoting *Leka v. Portuondo*, 257 F.3d 89, 104 (2d Cir. 2001)).

 **[85]**   Here, Plaintiff has sufficiently pled her *Brady* violation claim against Dets. Degnan, Moser, Phelan, and Heffernan, Dr. Landi, and Dr. Kupferman. [46] The Amended Complaint states that "the Officer Defendants failed to ... disclose evidence inconsistent with plaintiff's guilt, *did not document or inform the district attorney's office of exculpatory evidence*, [and] falsely reported facts in reports and search warrant affidavits." (Am. Compl. ¶ 178 (emphasis added).) Plaintiff also alleges that Defendants "*maliciously*

concealed *material* exculpatory evidence" (Am. Compl. ¶ 233 (emphasis added)), and that prejudice ensued because it resulted in her arrest (Am. Compl. ¶ 238). In addition, as previously discussed, the Amended Complaint describes the nature of this exculpatory evidence as relating to the false conclusions of Dr. Landi and/or Dr. Kupferman regarding the causes of Annie's death, which implicated Plaintiff and her husband in their daughter's death. (*Id.* ¶¶ 150, 152, 164.)

46    Plaintiff's due process claim under *Brady* is distinct from her malicious prosecution claim. *See Fappiano*, 640 Fed.Appx. at 120–21 (differentiating plaintiff's malicious prosecution claim from his "fair trial" claim stemming from defendants alleged *Brady* violation); *Alexander v. McKinney*, 692 F.3d 553, 556–57 (7th Cir. 2012) (listing the elements of a malicious prosecution claim and the elements of a due process claim under *Brady*, and identifying lack of probable cause as a requirement only of the former).

### 2. Fabrication of Evidence claim

**\*\*29** [86] Separate from her malicious prosecution claim, Plaintiff alleges a procedural due process violation based on Defendants' alleged fabrication of evidence. (*See* Am. Compl. ¶ 233.)[47] The claim of denial of the right to a fair trial due to fabricated evidence stems from the Sixth Amendment and the Due Process clauses of the Fifth, Sixth, Fourteenth Amendments of the U.S. Constitution. *See Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986); *Zahrey v. City of New York*, No. 98-4546, 2009 WL 1024261, at \*16 (S.D.N.Y. Apr. 15, 2009) (characterizing plaintiff's right to a fair trial claim as an action for violation of his right to procedural **\*628** due process rooted in the Fifth, Sixth, and Fourteenth Amendments). Fabrication of evidence constitutes a violation of this right to a fair trial. *Coffey*, 221 F.3d at 344 ("[T]here is a constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity, at least where the officer foresees that he himself will use the evidence with a resulting deprivation of liberty."); *Brandon v. City of New York*, 705 F.Supp.2d 261, 276 (S.D.N.Y. 2010) (noting that the Second Circuit has permitted "claims for both malicious prosecution and a denial of his right to trial based on the same alleged fabrication of evidence") (citing *Ricciuti*, 124 F.3d at 130–31); *see also Zahrey*, 2009 WL 1024261, at \*8 n.14 (S.D.N.Y. Apr. 15, 2009) ("Because

evidence fabrication serves to both improperly charge and/or arrest a plaintiff as well as unfairly try him, the *Coffey* violation, in its essence, involves aspects of both the Fourth Amendment and procedural due process."); *Myers v. Cnty. of Nassau*, 825 F.Supp.2d 359, 367 (E.D.N.Y. 2011) (noting that when a police officer turned over fabricated evidence to the prosecutor, such conduct can be redressed, not as a *Brady* violation, but as a deprivation of liberty on the basis of false and fabricated evidence).

47    Specifically, Plaintiff alleges that Defendants "created and fabricated evidence to create the appearance of probable cause to believe that plaintiff had abused her daughter[,] ... [and] developed and cultivated witnesses to testify falsely...." (Am. Compl. ¶ 233.)

[87] To state a claim of fabrication of evidence, a plaintiff must allege that "an (1) investigating official (2) fabricat[ed] information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 280 (2d Cir. 2016).

### a) The City Defendants

[88] The City Defendants assert that Plaintiff's fabrication of evidence claims should be dismissed for three reasons: (1) none of the City Defendants could have possibly fabricated the SBS medical evidence, and the Complaint does not credibly allege that Dr. Landi "fabricated" evidence of SBS; (2) ADA Bishop is absolutely immune from the claims; and (3) the claims are time-barred, because Plaintiff was always aware of her theory that Annie died from a genetic disorder and not from any action taken by Plaintiff or her husband. (Dkt. 59 at 27–28.) Plaintiff provides a somewhat haphazard analysis in response and argues, "[Det.] Degnan states 'that he was informed by Dr. Landi that earlier medical attention for the complainant could have resulted in the complainant's survival, and that the lack of immediate medical attention contributed to the complainant's death' .... Whether such a statement was fabricated is discoverable." (Dkt. 61 at 25 (citing Plaintiff's Exhibit B, Criminal Court Complaint in *People v. Ying Li* )). Notwithstanding Plaintiff's cursory response to the City Defendants' arguments, the Court finds that Plaintiff has adequately alleged a plausible claim

of fabrication of evidence against Dets. Degnan, Moser, Heffernan, and Phelan, and Dr. Landi.

Although Plaintiff fails to identify the relevant paragraphs of the Amended Complaint, except for Paragraph 233, the Amended Complaint does contain allegations of fact that support her fabrication of evidence claim with regard to these City Defendants. (*See* Am. Compl. ¶¶ 145, 146, 150, 160, 178.) Specifically, Plaintiff alleges that Det. Degnan signed the criminal court complaint in spite of his knowing that its content was not true (Am. Compl. ¶ 145), that Plaintiff was arraigned based on the fabricated information Defendants forwarded to the District Attorney's Office (Am. Compl. ¶ 146), and that Defendants "falsely reported facts in reports and search warrant affidavits, and fabricated oral statements of witnesses." (Am. Compl. **\*629** ¶ 178.)[48] Plaintiff also alleges that Dr. Landi swore under oath in the criminal complaint that had Annie received medical care sooner, she could have survived—a fact that was, according to the Complaint, "false, misleading, and perjurious, and entirely unsupported ... by any medical science...." (Am. Compl. ¶ 150.) At this stage of the litigation, the Court takes these allegations as true—*i.e.*, that the content of the criminal complaint, reports, and search warrant affidavits contained false information that certain City Defendants knowingly provided and/or swore to—and finds that Plaintiff has adequately pled her fabrication of evidence claim against Dets. Degnan, Moser, Heffernan, and Phelan, and Dr. Landi.

[48]     As previously discussed, because the Amended Complaint does not allege direct involvement by all Defendants in the investigation of Plaintiff's case, these group pleadings are insufficient in themselves to state a fabrication of evidence claim as to those City Defendants as to whom there are no specific allegations of involvement.

#### b) The Medical Center Defendants

**\*\*30** **[89]** As previously discussed (*see supra* Sections X.A.1), Plaintiff has alleged that Dr. Kupferman ignored evidence suggesting that Annie's death was not caused by SBS and provided false information to Dr. Landi, who based her conclusions on that false information.

Although the Medical Center Defendants argue that "the [Amended] Complaint does not contain an allegation regarding violation of plaintiff's right to a fair trial" (*see* Dkt.

56 at 10), the Court disagrees, given the numerous allegations of fabrication of evidence and Dr. Kupferman's alleged failure to consider Annie's lab results that were consistent with metabolic bone disease. (*See* Am. Compl. ¶¶ 122, 145, 146, 150, 178, 232, 233.) Even though, as the Medical Center Defendants point out, the Amended Complaint does not specifically mention the Fifth Amendment, the Court finds that the factual allegations in the complaint have given the Medical Center Defendants sufficient notice of this claim.[49]

[49]     The Medical Center Defendants also assert that even assuming that Dr. Kupferman diagnosed Annie with SBS and that she failed to consider alternative causes for Annie's death, Dr. Kupferman cannot be liable for violating Plaintiff's right to a fair trial because Plaintiff's indictment was based on her failure to seek timely medical attention and not based on Dr. Kupferman's opinions on the cause of Annie's death. (Dkt. 56 at 10.) The Court this argument unpersuasive as it is plausible that Dr. Kupferman's conclusion that Annie died of SBS proximately caused Plaintiff's indictment for failure to seek medical attention sooner.

#### 3. Statute of Limitations With Respect to Fair Trial Claims

Having found that Plaintiff adequately pled both her *Brady* violation and fabrication of evidence claim against the City Defendants and the Medical Center Defendants, the Court turns to those Defendants' argument that these claims are time-barred (*see* Dkt. 59 at 28). The City Defendants contend that Plaintiff's fair trial claim accrued at the time of her arrest because "she was always aware of her theory that her baby died from a genetic disorder and not any action taken by plaintiff or her husband." (*Id.*) In response to this argument, Plaintiff simply states, without citing any legal authority, that her procedural due process claim is not time barred because "Federal equitable tolling standards should apply." (Dkt. 61 at 25.) Plaintiff makes no other argument. Notwithstanding Plaintiff's inadequate response, the Court finds the City Defendants' argument unpersuasive.

**[90]**     **[91]**     Fabrication of evidence claims accrue "when the plaintiff learns that evidence was fabricated and an injury was **\*630** caused by the fabrication." *Carr v. City of New York*, No. 11–Civ–6982, 2013 WL 1732343, at *6 (S.D.N.Y. Apr. 19, 2013)* ("[P]laintiff arguably learned of the alleged

fabrication as soon as the criminal complaint was filed and certainly no later than when [the defendant] took the stand at [ ] trial...."); *see also Garnett v. Undercover Officer C0039, No. 13-cv-7083, 2015 WL 1539044, at \*4 (S.D.N.Y. Apr. 6, 2015)* ("[A fabrication of evidence] claim accrues when the officer forwards the false information to the prosecutors."). Because the statute of limitations is an affirmative defense, "[t]he burden is on the defendant to establish when a federal claim accrues." *Gonzalez v. Hasty,* 651 F.3d 318, 322 (2d Cir. 2011).

 **\*\*31** **[92]** Here, the Court finds that the City Defendants have not established that Plaintiff knew all along that she had *Brady* violation and fabrication of evidence claims simply because she believed in her innocence; the City Defendants' contrary assertion is too sweeping. At a January 2, 2013 status conference, Plaintiff learned that ADA Bishop moved to dismiss the criminal charges against Plaintiff because Dr. Kupferman informed ADA Bishop that Annie's brain injuries were so severe that immediate medical intervention would likely not have saved her. (*See* Dkt. 63 at Ex. F at ECF 6.) Therefore, it is plausible to infer that in January 2013 Plaintiff specifically learned that she might have a fabrication of evidence claim against the City Defendants based on Dr. Landi's earlier contrary assessment of how Plaintiff was responsible for Annie's death, in part, because Plaintiff failed to get medical attention for her daughter quickly enough. *See Mitchell v. Home,* 377 F.Supp.2d 361, 373 (S.D.N.Y. 2005) ("[A] fair trial claim premised on fabrication of evidence accrues when the plaintiff learns or should have learned that the evidence was fabricated and such conduct causes the claimant some injury[.]") (citing *Veal v. Geraci,* 23 F.3d 722, 724–25 (2d Cir. 1994)); *see also Bailey v. City of New York,* 79 F.Supp.3d 424, 444 (E.D.N.Y. 2015) (same). [50]

[50]  This conclusion is not inconsistent with the Court's finding that the fact that Plaintiff might not have known until long after her arrest that there was evidence that could have supported her claim of innocence—such as Dr. Kupferman's contrary conclusion about the preventability of Annie's death—did not warrant equitable tolling. *See supra* at Section IV.B. In analyzing specifically the accrual of a fabrication of evidence claim, when Plaintiff learned of the alleged fabricated evidence *is* the triggering date, but not so for a claim of false arrest or malicious prosecution.

As for Plaintiff's *Brady* violation claim, the Court cannot assess when it was that the claim could have plausibly accrued because Plaintiff does not specifically allege what exculpatory evidence the City Defendants concealed. However, because the City Defendants have the burden of establishing that the statute of limitations has expired, and in light of the cursory argument put forth by the City Defendants, the Court denies the City Defendants' motion to dismiss Plaintiff's fair trials claims on statute of limitations grounds with respect to Dets. Degnan, Moser, Phelan, Heffernan, and Dr. Landi. For the reasons previously discussed, the Medical Center Defendants' motion to dismiss Plaintiff's fair trials claims against them is also denied.

**B. Substantive Due Process**

**[93]**  **[94]**  **[95]**  **[96]**  "[D]ue process protection in the substantive sense limits what the government may do in both its legislative, and its executive capacities...." *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 845, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (citing *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) and **\*631** *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)). "The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). "[C]riteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue." *Cnty. of Sacramento,* 523 U.S. at 845, 118 S.Ct. 1708. "[F]or executive action to violate substantive due process, it must be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Bolmer v. Oliveira,* 594 F.3d 134, 142 (2d Cir. 2010) (citation and quotations marks omitted). "It is not enough that the government act [was] 'incorrect or ill-advised[.]' " *Cox v. Warwick Valley Cent. Sch. Dist.,* 654 F.3d 267, 275 (2d Cir. 2011) (quoting *Kaluczky v. City of White Plains,* 57 F.3d 202, 211 (2d Cir. 1995)). "Only the most egregious official conduct can be said to be arbitrary in the constitutional sense and therefore unconstitutional." *Id.* (citation and quotation marks omitted).

1. Failure to Investigate

Against the Medical Center Defendants and Dr. Landi, Plaintiff asserts a claim best characterized as a claim of failure to investigate, in violation of Plaintiff's substantive due

process rights. (*See* Am. Compl. ¶ 235; *see also* Dkt. 66 at 20.) [51] More specifically, this claim is based on the argument that the Medical Center Defendants and Dr. Landi failed to "exhaust all possibilities" before rendering an SBS diagnosis, and therefore violated Plaintiff's liberty. (*See* Dkt. 66 at 20–21; Am. Compl. ¶ 238 ("Defendants' conduct precipitated and caused the sequence of events that ultimately resulted in the deprivation of plaintiff's liberty....").)

> [51]  The City Defendants interpret Paragraph 235 of the Amended Complaint as stating a claim of professional malpractice, and argues that "such a claim is not cognizable under § 1983." (Dkt. 59 at 28–29; *id.* at 26 ("For good measure, [Plaintiff] appears to include a professional malpractice claim of sorts against defendants Landi, Kuperman and FHMC....").) This is a misunderstanding of Plaintiff's allegation. A more suitable reading of Plaintiff's allegation in Paragraph 235 would be that it is touching on the "professional judgment" standard that is discussed in the context of substantive due process claims. The Supreme Court has articulated this "professional judgment" standard in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). The Supreme Court held in *Youngberg* that State officials are liable for treatment decisions concerning involuntarily committed mental health patients only if the officials' decisions were "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323, 102 S.Ct. 2452 (citation and quotation marks omitted).

**\*\*32** Both groups of Defendants contend that all of Plaintiff's substantive due process claims are solely based on Plaintiff's Fourth Amendment claims of false arrest, malicious abuse of process, and conspiracy, and thus are duplicative of her Fourth Amendment claims and should be dismissed. (*See* Dkt. 55 at 14; Dkt. 56 at 10; Dkt. 59 at 26.) Plaintiff responds that "the Fourth Amendment does not 'cover a cause of action for government abuse of process in the investigation or pursuit of a suspect', and that she therefore has a separate, standalone substantive due process claim against certain Defendants for failing to investigate other explanations for Annie's death before concluding that she died from SBS. (Dkt. 66 at 20 (citing *Russo v. City of Hartford*, 184 F.Supp.2d 169, 184 (D. Conn. 2002)).)

**[97] [98]** "The right [to be free from arbitrary government action,] to the extent it exists, is the right to be free of arbitrary **\*632** government action *that infringes a protected right.*" *O'Connor v. Pierson*, 426 F.3d 187, 200 n. 6 (2d Cir. 2005). Here, Plaintiff does not provide adequate legal support for her assertion of a substantive due process right to have investigating officials "exhaust all possibilities" that could have explained the cause of Annie's death before concluding that it was SBS. (*See* Dkt. 66 at 20–21.) [52] Moreover, even though Plaintiff attempts to distinguish her substantive due process claim from her Fourth Amendment claims, Plaintiff's failure to investigate claim, at the end of the day, is based on her substantive due process right to be free of prosecution and arrest *without probable cause.* [53] *Cf. Campbell*, 2000 WL 194815, at \*3 ("allegations of an officer's failure to investigate are considered under the rubric of false imprisonment, false arrest, or malicious prosecution."). This is evidenced by Plaintiff's own brief and the Amended Complaint, which both state that Defendants' failure to investigate "effectuated Plaintiff's arrest." [54] (Dkt. 66 at 22.)

> [52]  In her MOL, Plaintiff argues that, "Plaintiff properly pleads that [the Medical Center] Defendants failed to exhaust all possibilities before rendering an SBS diagnosis and adopted an improper burden shifting presumption that presumes subdural hemorrhaging is caused by abuse. (FAC ¶¶ 122, 160, 208, 235, 257).... Kupferman's actions shocked the conscious [sic] because Plaintiff had the right to liberty protected under the Fifth Amendment and Kupferman and FHMC acted 'so outrageous [sic], that it may fairly be said to shock the contemporary conscience.' " (Dkt. 66 at 20–21 (citation omitted).) Plaintiff cites to one Middle District of Pennsylvania case, *Isbell v. Bellino*, 983 F.Supp.2d 492 (M.D.P.A. 2012), but does not discuss the case. Setting aside the fact that this case is not Second Circuit law, *Isbell* does not even support a finding that the protection of substantive due process creates an obligation for a government official to follow alternative investigatory paths. Indeed, the court in *Isbell* concluded that where the plaintiff went "to the emergency room with an infant suffering from subdural hematomas, retinal hemorrhaging, reinoschisis, and rib fractures ... [and] the injuries were later revealed to have been caused by a

Vitamin D deficiency and congenital rickets," the defendant's child abuse diagnosis *did not* shock the conscience. *Id.* at 500. The *Isbell* court also explained that "mere negligence or deliberate indifference on the part of the Defendants [under Third Circuit law was] insufficient to support a substantive due process claim." *Id.* at 499–500.

53    The Court is not persuaded by Plaintiff's reliance on *Russo v. City of Hartford*, 184 F.Supp.2d 169 (D. Conn. 2002) in attempting to distinguish her substantive due process failure-to-investigate claim from her Fourth Amendment claims. In *Russo,* the court stated, "[W]hile claims arising from a plaintiff's arrest and prosecution would fall within the scope of the Fourth Amendment, that Amendment would not cover a cause of action for government abuse of process in the investigation or pursuit of a suspect." *Id.* at 184. However, the plaintiff in *Russo* specifically argued that "allegations of a conspiracy to discredit him, jeering *after* his arrest, and continued harassment state a claim for substantive due process." *Id.* It also appears that the plaintiff in *Russo* alleged injury besides his arrest and prosecution that was caused by the defendant's violation of his substantive due process rights. *Id.* ("Supporting his substantive due process cause of action, Russo claims that the [defendants] conspired to ruin Russo's credibility...."). In contrast, the sole injury Plaintiff alleges here relating to her substantive due process violation claim is deprivation of liberty, *i.e.*, her arrest and incarceration. (*See* Am. Compl. ¶ 238.)

54    The overlap between Plaintiff's substantive due process failure to investigate and her Fourth Amendment claims is further evidenced by the Due Process section of the Amended Complaint, which begins with a paragraph stating, "By the conduct and actions described above, defendants ... violat[ed] rights secured to plaintiff by the Constitution of the United States ... including, but not limited to, Plaintiff's Fourth and Fourteenth Amendment rights." (Am. Compl. ¶¶ 231, 238) and closes with, *inter alia*, a paragraph that states, "Defendants' conduct precipitated and caused the sequence of events that *ultimately resulted in the*

*deprivation of plaintiff's liberty....*" (Am. Compl. ¶ 238.)

**33   *633   "As a general matter, [the U.S. Supreme Court] has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Albright*, 510 U.S. at 271–72, 114 S.Ct. 807 (citing *Collins v. Harker Heights*, 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). The Supreme Court has instructed that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process,' must be the guide for analyzing these claims." *Id.* at 273, 114 S.Ct. 807 (quoting *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) and holding that substantive due process cannot afford plaintiff relief when the plaintiff "ask[ed] [the Supreme Court] to recognize a substantive right under the Due Process Clause of the Fourteenth Amendment to be free from criminal prosecution except upon probable cause"). In light of this guidance and given the plain overlap between Plaintiff's substantive due process claim alleging a failure to investigate and her Fourth Amendment claims, the Court finds that, to the extent Plaintiff has a viable failure to investigate claim [55], it falls under the Fourth Amendment rubric. Here, Plaintiff's claim of failure to investigate, as a practical matter, will be subsumed by all of her other Section 1983 claims.

55    Whether the alleged failure to investigate gives rise to a constitutional claim is far from clear. Courts have explained that failure to pursue a particular investigative path does not give rise to an independent due process claim apart from claims of false arrest, malicious prosecution, or violation of right to a fair trial. *See, e.g., Blake v. Race*, 487 F.Supp.2d 187, 212 n.18 (E.D.N.Y. 2007) (rejecting an independent due process claim of failure to investigate and finding the allegations of failure to investigate should be regarded as part of plaintiff's false arrest and malicious prosecution claims); *Stokes v. City of New York*, No. 5-CV-0007, 2007 WL 1300983, at *6 (E.D.N.Y. May 3, 2007) ("[I]t is well-settled that there is no independent claim for a police officer's purported failure to investigate; rather, such allegations are considered, to the extent they are relevant, within the framework of claims for false arrest, false

imprisonment, or malicious prosecution."); *Newton v. City of New York*, 566 F.Supp.2d 256, 278 (S.D.N.Y. 2008) ("[T]here is no constitutional right to an adequate investigation. Accepting [plaintiff's] allegations as true, his rights were violated as a result of the malicious prosecution, not the failure to investigate."); *McCaffrey v. City of New York*, No. 11-cv-1636, 2013 WL 494025, at *5 (S.D.N.Y. Feb. 7, 2013) ("[A] 'failure to investigate' is not independently cognizable as a stand-alone claim.").

Accordingly, both the City Defendants' and the Medical Center Defendants' motions to dismiss Plaintiff's substantive due process claim based on a failure to investigate are granted.

## 2. Speedy Trial

 **[99]**  Plaintiff also alleges that she was denied a speedy trial, in violation of her right under the speedy trial clause of the Sixth Amendment. (*See* Am. Compl. ¶ 234.) The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. Specifically, Plaintiff alleges that she was held for more than four years in pretrial detention and that all Defendants encouraged this for the purpose of using Plaintiff's confinement as a bargaining chip to pressure her husband to plead guilty. (Am. Compl. ¶ 234.)

The Medical Center Defendants argue that Plaintiff failed to allege, other than in conclusory fashion, the causation element of this claim with respect to the Medical Center Defendants. (*See* Dkt. 55 at 14.) The Court agrees.

 **\*634**  **[100]**  **[101]**  A Section 1983 action, "like its state tort analogs, employs the principle of proximate causation." *Townes v. City of New York*, 176 F.3d 138, 146 (2d Cir. 1999); *see also Higazy v. Templeton*, 505 F.3d 161, 181 (2d Cir. 2007) (Jacobs, C.J., concurring) ("Our cases affirm that traditional tort law principles apply equally to a Section 1983 plaintiff and require him to show the causal link from the original police misconduct up to the point of injury in order to proceed on his claim."). "It is well settled that the chain of causation between a police officer's unlawful arrest and a subsequent conviction and incarceration is broken by the intervening exercise of independent judgment." *Townes*, 176 F.3d at 147. Here, Plaintiff fails to allege any facts to support a causal link between the Medical Center's alleged conduct and the unreasonable delay in Plaintiff criminal case being resolved.

 **\*\*34**  **[102]**  The City Defendants do not discuss Plaintiff's speedy trial claim in their briefing. In any event, the Court finds that Plaintiff's allegations that Defendants sought to use her as a "bargaining chip" to obtain a guilty plea from her husband, coupled with the four-year delay in her case being resolved and her case being dismissed shortly after her husband's conviction, is sufficient to state a speedy trial claim as to the City Defendants who were involved in her prosecution.

Accordingly, the Court denies the City Defendants' motion to dismiss Plaintiff's speedy trial claim as to Dets. Degnan, Moser, Phelan, Heffernan, and Dr. Landi, but grants the Medical Center Defendants' motion to dismiss this claim as to them.

## 3. Unconstitutional Conditions of Confinement

 **[103]**  Plaintiff also alleges that certain conditions of confinement violated her substantive and procedural due process rights. (Am. Compl. ¶ 236.) [56] "A pretrial detainee's claim of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment." *Darnell v. City of New York*, 849 F.3d 17, 29 (2d Cir. 2017) (citing, *inter alia*, *Benjamin v. Fraser*, 343 F.3d 35, 49 (2d Cir. 2003)).

[56]    Specifically, Plaintiff alleges that every Defendant violated her due process right during her detention by (1) refusing to tell Plaintiff where her daughter's body was buried, (2) refusing the usual and customary medical services, including OB–GYN care, (3) forcing Plaintiff to give birth to her second daughter while handcuffed and shackled, (4) refusing Plaintiff the opportunity to breastfeed or bond with her infant daughter after childbirth, and (5) taking away Plaintiff's infant daughter two-and-a-half days after delivery. (Am. Compl. ¶ 236.) While Plaintiff argues that these deprivations constitute both a substantive and procedural due process violation (Am. Compl. ¶ 237), the Court need not decide whether these claims allege substantive or procedural due process violations because they must be dismissed due to the lack of connection to any Defendant in this case.

Only the Medical Center Defendants discuss this claim; they assert that their conduct did not proximately cause Plaintiff's condition of detention. (*See* Dkt. 55 at 14.) Not only does Plaintiff fail to respond to this argument, she does not discuss this claim at all, and therefore abandons it. *See deVere Grp. GmbH v. Op. Corp.*, 877 F.Supp.2d 67, 70 n.3 (E.D.N.Y. 2012) ("Because plaintiff did not address defendants' motion to dismiss with regard to this claim, it is deemed abandoned and is hereby dismissed.") (quoting *Hanig v. Yorktown Cent. Sch. Dist.*, 384 F.Supp.2d 710, 723 (S.D.N.Y. 2005)); *Harley v. City of New York*, 14–CV–5452, 2016 WL 552477, at *7 (E.D.N.Y. Feb. 10, 2016) (finding plaintiff's claims abandoned where plaintiff's response to motion to dismiss "did not dispute, and in fact wholly ignore[d], **\*635** defendants' argument" (citing *Jackson v. Federal Exps.*, 766 F.3d 189 (2d Cir. 2014))); *Moccio v. Cornell Univ.*, No. 09–Civ–3601, 2009 WL 2176626, at *4 (S.D.N.Y. Jul. 21, 2009) ("Whatever the merit of [the defendants'] argument [for dismissal], plaintiff has abandoned the ... claim, as her motion papers fail to contest or otherwise respond to defendants' contention."), *aff'd*, 526 Fed.Appx. 124 (2d Cir. 2013); *see also Simon v. City of New York*, No. 14-CV-8391, 2015 WL 4092389, at *2 (S.D.N.Y. Jul. 6, 2015) (collecting cases).

**\*\*35** **[104]** In any event, the Medical Center Defendants are correct. Plaintiff's claim of unconstitutional conditions of confinement must be dismissed as to all Defendants because the Amended Complaint does not allege any facts establishing the personal involvement of any Defendant with respect to those conditions. *See Spavone*, 719 F.3d at 135; *Johnson v. Barney*, 360 Fed.Appx. 199, 201 (2d Cir. 2010) (summary order) (finding that plaintiff's claim failed "as a matter of law" where plaintiff failed to allege sufficient personal involvement on the part of the prison superintendent); *Scott v. Fischer*, 616 F.3d 100, 110 (2d Cir. 2010) (dismissing claim against Department of Correctional Services ("DOCS"), where plaintiff had argued that DOCS violated her constitutional rights by arresting her for non-compliance with her post-release supervision ("PRS"), since "the practice of re-incarcerating persons who violated their administratively-imposed PRS was a practice of the Division of Parole, and not of [DOCS]"). [57]

[57] To the extent Plaintiff has a viable claim based on the conditions of her confinement in a State correctional facility, that claim should have been brought against the State, the correctional facility, or the prison officials, not the prosecutor or police

officers who handled Plaintiff's criminal case. *See, e.g., Women Prisoners of District of Columbia Dep't of Corrections v. District of Columbia*, 877 F.Supp. 634 (D.D.C. 1994), *modified in part on other grounds*, 899 F.Supp. 659 (D.D.C. 1995), *vacated in part and remanded on other grounds*, 93 F.3d 910 (D.C. Cir. 1996); *Nelson v. Correctional Medical Services*, 583 F.3d 522 (8th Cir. 2009) (en banc); *Brawley v. Washington*, 712 F.Supp.2d 1208 (W.D. Wash. 2010); *Zaborowski v. Dart*, No. 08–cv–6946, 2011 WL 6660999 (N.D. Ill. Dec. 20, 2011); *Villegas v. Metropolitan Govt. of Nashville*, 709 F.3d 563 (6th Cir. 2013).

Accordingly, the Court grants the Medical Center Defendants' motion to dismiss Plaintiff's conditions of confinement claim as to them. The Court also dismisses that claim *sua sponte* as to the City Defendants since there are no factual allegations in the Amended Complaint that support such a claim as to these Defendants. *See, e.g., Barreto v. Suffolk Cnty.*, No. 10-CV-0028, 2010 WL 301949, at *2 (E.D.N.Y. Jan. 20, 2010) ("When a complaint fails to comply with the requirements of Rule 8, district courts have the authority to dismiss the complaint *sua sponte*." (citing *Salahuddin v. Cuomo*, 861 F.2d 40, 41 (2d Cir. 1988))); *LeBarron v. Warren Cnty. Sheriff's Office*, No.1:13-CV-1572, 2015 WL 2248749 (N.D.N.Y. May 13, 2015) (*sua sponte* dismissing plaintiff's claim where the claim failed to allege facts plausibly suggesting personal involvement of individual defendants even though the defendants did not raise a lack-of-personal-involvement challenge to the claim); *Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (recognizing that district courts have power to *sua sponte* dismiss complaints "in order to preserve scarce judicial resources").

## XI. *MONELL* CLAIMS

### A. Against the City

**[105]** Plaintiff asserts a *Monell* claim against the City based on her Section 1983 claims for false arrest, malicious prosecution, and violation of right to a fair trial, alleging a theory of "deliberate indifference" **\*636** to provide adequate training for its officers who work on SBS cases or to properly instruct Defendants of "applicable provisions of [New York] State Penal Law ... federal and state constitutional limitations...." (*See* Am. Compl. ¶ 243, 244, 248.) The Court finds Plaintiff's allegations of municipal liability adequate to state a *Monell* claim against the City.

[106] [107] [108] A municipality may be liable under
Section 1983 if a municipal "policy or custom" causes
"deprivation of rights protected by the Constitution." *Monell
v. Dep't of Soc. Servs. of N.Y.,* 436 U.S. 658, 690–91,
98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *see also Jones v.
Town of E. Haven,* 691 F.3d 72, 80 (2d Cir. 2012). For a
*Monell* claim to survive a motion to dismiss, a plaintiff must
allege "sufficient factual detail" and not mere "boilerplate
allegations" that the violation of the plaintiff's constitutional
rights resulted from the municipality's custom or official
policy. *Plair v. City of New York,* 789 F.Supp.2d 459, 469
(S.D.N.Y. 2011) (collecting cases). "A policy or custom
may be established by any of the following: (1) a formal
policy officially endorsed by the municipality; (2) actions or
decisions made by municipal officials with decision-making
authority; (3) a practice so persistent and widespread that
it constitutes a custom through which constructive notice is
imposed upon policymakers; or (4) a failure by policymakers
to properly train or supervise their subordinates, such that the
policymakers exercised 'deliberate indifference' to the rights
of the plaintiff." *Moran v. Cnty. of Suffolk,* No. 11 Civ.3704,
2015 WL 1321685 (E.D.N.Y. Mar. 24, 2015) (citing *Parker
v. City of Long Beach,* 563 Fed.Appx. 39 (2d Cir. 2014), *as
amended,* (Apr. 21, 2014) (failure to train); *Matusick v. Erie
Cnty. Water Auth.,* 757 F.3d 31, 62 (2d Cir. 2014) (widespread
and persistent practice); *Hines v. Albany Police Dep't,* 520
Fed.Appx. 5, 7 (2d Cir. 2013) (actions of policymakers);
*Schnitter v. City of Rochester,* 556 Fed.Appx. 5, 8 (2d Cir.
2014) (failure to train or supervise); *Missel v. Cnty. of
Monroe,* 351 Fed.Appx. 543, 545 (2d Cir. 2009) (formal
policy and act of a person with policymaking authority for the
municipality)).

**36 Here, Plaintiff advances two theories of municipal
liability. First, Plaintiff asserts that the City has a custom of
zealously promoting "debated science", here, the diagnosis of
SBS. (Dkt. 61 at 26–27.) Second, Plaintiff asserts that the City
failed to train its employees, especially child abuse detectives,
regarding SBS cases. (Dkt. 61 at 29, 30). [58] The City contends
that Plaintiff's *Monell* claim must be dismissed because the
claims against individual City Defendants are without merit
(Dkt. 59 at 29) and because Plaintiff has not identified any
municipal policy that could serve as the basis of a *Monell*
claim (*id.* at 31). [59] The Court disagrees.

[58]    It appears that Plaintiff is also arguing that the
City's failure to train its employees as to SBS is

consistent with the custom of zealously promoting
a diagnosis of SBS. (*See* Dkt. 61 at 28 ("Instead of
training its Detectives on diligently and cautiously
investigating SBS cases to avoid constitutional
violations[,] ... the District Attorney's Office, in
conjunction with the Office for the Chief Medical
Examiner puts on yearly conferences advocating
for the continued finding of SBS.").)

[59]    The City also denies Plaintiff's allegation that the
police abdicated their investigatory obligations to
medical professionals when arresting Plaintiff, and
her allegation that Defendants were deliberately
indifferent. (*Id.* at 31.)

Plaintiff has alleged that "the NYPD and their precinct(s) and/
or the OCME [Office of Chief Medical Examiner of the City
of New York] ... [r]outinely conclude[ed] that Shaken Baby
Syndrome is responsible for many infant fatalities despite the
absence of evidence necessary to make such a finding." (Am.
Compl. ¶ 243a.) *637 Additionally, Plaintiff alleges, *inter
alia,* that the NYPD and the OCME routinely ignored the
existence of debate and doubt in the medical community
concerning SBS diagnoses (*id.* ¶ 243b), and routinely failed
to perform tests to rule out SBS or consider evidence that
contradicts an SBS diagnosis (*id.* ¶ 243c-d). [60] Plaintiff also
alleges that the City "with deliberate indifference failed to
provide adequate training and standards and policies and
practices for its police officers in SBS related cases." (*id.* ¶
243.) The Court finds these allegations sufficient to overcome
a 12(b)(6) motion.

[60]    The Amended Complaint includes many more
allegations in support of Plaintiff's *Monell*
claim that are generally conclusory, insufficient,
or irrelevant. For example, she alleges that,
"[t]he foregoing customs, policies, practices ...
include, but are not limited to, making
arrests without probable cause, initiating and
continuing prosecutions without probable cause,
and committing perjury." (Am. Compl. ¶ 243).
She also alleges that the City failed to properly
instruct Defendants on the "proper and prudent use
of force" (*id.* ¶ 248).

**B. "*Monell*-type" claim against FHMC**

[109] Plaintiff brings a "*Monell*-type" claim [61] against
FHMC based on multiple theories: (1) FHMC has a policy
pursuant to which its employees, such as Dr. Kupferman,

conduct forensic and factual investigation of SBS cases "for non-medical purposes, in order to reach non-medical conclusions, and with knowledge that law enforcement will rely on these investigative conclusions in directing the course of an arrest and prosecution" (Am. Compl. ¶ 257); (2) FHMC "perpetuated this policy [of having its staff conduct investigations for 'non-medical purposes'] in order to see those accused of SBS arrested, prosecuted, and convicted, despite the lack of any evidence connecting them with any crime whatsoever" (Am. Compl. ¶ 259); (3) FHMC failed to train its staff on advances in the field of Child Abuse Diagnosis and Investigation, including SBS (Am. Compl. ¶ 260); (4) FHMC was aware that its employees, including Dr. Kupferman, had a tendency to jump to conclusions and to diagnose SBS without supporting evidence (Am. Compl. ¶ 264); (5) FHMC failed to supervise its employees (Am. Compl. ¶¶ 265–266); and (6) FHMC failed to adequately screen and hire its employees "to respect the constitutional rights of those individuals with whom FHMC comes in contact" (Am. Compl. ¶ 266).

61    In *Rojas v. Alexander's Dept. Store, Inc.*, 924 F.2d 406 (2d Cir. 1990), the Second Circuit explicitly extended *Monell* to Section 1983 suits against private entities. *Id.* at 408–09 ("Private employers are not liable under § 1983 for the constitutional torts of their employees, unless the plaintiff proves that 'action pursuant to official ... *policy* of some nature caused a constitutional tort.' Although *Monell* dealt with municipal employers, its rationale has been extended to private businesses." (quoting *Monell* )).

**37   While Plaintiff's pleading of a *Monell*-type claim against FHMC is largely based on conclusory allegations,[62] Plaintiff does **638 specifically allege that Dr. Kupferman had a history of overzealously diagnosing SBS of which FHMC was aware, and that Dr. Kupferman was a "final policymaker"[63] with respect to these diagnoses, which resulted in no confirmation being sought with respect to her conclusion that "Annie's death was due to SBS." (Am. Compl. ¶ 164.)[64] Taking Plaintiff's allegations as true, the Court finds that she has nudged her *Monell* claim against FHMC across the line from merely "conceivable to plausible." *See Iqbal*, 556 U.S. at 680, 129 S.Ct. 1937.

62    FHMC argues that Plaintiff's *Monell* claim is deficient because: (1) Plaintiff fails to allege the

existence of a policy or custom; (2) Plaintiff puts forth an implausible allegation that "a private hospital dedicated to the well-being of its patients had a policy and procedure for its staff 'to reach non-medical conclusions' 'in order to see those accused of SBS [ ] arrested, prosecuted, and convicted, despite the lack of any evidence connecting them with any crime whatsoever' "; (3) Plaintiff fails to sufficiently allege a *Monell* claim based upon failure to train; (4) co-Defendants' actions were an intervening cause; (5) "by requesting discovery to determine whether FHMC 'even had a policy in place' for diagnosing and investigating child abuse and SBS cases," Plaintiff has acknowledged that she has no basis to support a *Monell* claim against the hospital; (6) Plaintiff has not alleged facts that Dr. Kupferman was a policymaker; and (7) Plaintiff has not alleged well-settled "custom or usage" to imply the acquiescence of policymaking officials at FHMC because she has not alleged that anyone other than Dr. Kupferman at FHMC engaged in allegedly unconstitutional actions. (*See* Dkt. 56 at 12–15.) The Court explicitly addresses some of these arguments, but has considered FHMC's other arguments and deemed them meritless or irrelevant at this stage.

63    Although Plaintiff argues that Dr. Kupferman was a policymaker with final authority because she was a Child Abuse Specialist and "was the Director of Continuity Clinics" at FHMC with "responsibility to overview patient care and training of residents" (Dkt. 66 at 26), none of this is alleged in the Complaint. It is thus improper for the Court to consider such factual allegations in deciding the motion to dismiss. *See Green v. City of Mount Vernon*, 96 F.Supp.3d 263 (S.D.N.Y. 2015) (collecting cases in which the court declines to consider additional facts set forth in plaintiff's opposition papers that are not in the complaint).

64    FHMC asserts that because Plaintiff only alleges facts as to Dr. Kupferman's unconstitutional actions pertaining to this particular case, there could be no policy or custom inferred on the part of FHMC. (Dkt. 56 at 13.) However, at this stage, given Plaintiff's allegation that Dr. Kupferman, on multiple occasions, overzealously diagnosed SBS and ignored contradictory evidence, the Court

finds that the claim survives the Medical Center Defendants' 12(b)(6) motion.

Accordingly, FHMC's motion to dismiss Plaintiff's *Monell* claim against it is denied.

### C. Liability Based on *Respondeat Superior*

**[110]** **[111]** Plaintiff also argues that FHMC should be held liable under the doctrine of *respondeat superior* and therefore Plaintiff need not show that a violation of Plaintiff's constitutional rights by FHMC's employees was due to a policy or custom. (Dkt. 66 at 21–22.) However, the doctrine of *respondeat superior* is not available to render a supervisor liable under Section 1983 for the unconstitutional conduct of his subordinates. *Connick v. Thompson,* 563 U.S. 51, 60, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011) ("[U]nder § 1983, local governments are responsible only for 'their *own* illegal acts.' ... They are not vicariously liable under § 1983 for their employee's actions."). In *Connick,* the Supreme Court unequivocally stated that *respondeat superior* cannot be applied either to superiors or to local government entities. *See id.*; *Monell,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (holding that Section 1983's language demands a causal relationship between the conduct of the defendant and the plaintiff's constitutional deprivation, and that this relationship is absent when liability is imposed solely on the basis of *respondeat superior* ). In *Rojas,* the Second Circuit extended *Monell* to Section 1983 suits against private entities. 924 F.2d 406. And just as a municipal entity cannot be held liable under *respondeat superior,* a private corporation cannot be held liable under *respondeat superior* for the allegedly unconstitutional conduct of its employee. *Green v. City of New* York, 465 F.3d 65 (2d Cir. 2006) (citing *Rojas,* 924 F.2d at 408); *see also Feder v. Sposato,* No. 11-CV-193, 2014 WL 1801137, at *10 (E.D.N.Y. May 7, 2014) (noting that under *Rojas* a plaintiff must prove an official policy that caused a constitutional tort rather than relying on *respondeat superior* theory).[65]

[65] Notably, Plaintiff does not even acknowledge *Rojas* and instead "respectfully requests this Court to line with the 7th Circuit [ ] and find FHC liable under the theory of *respondeat superior.*" (Dkt. 66 at 22.)

**\*\*38** **\*639** Accordingly, the Medical Center Defendants' motion to dismiss Plaintiff's claim against FHMC based on the doctrine of *respondeat superior* is granted.

## XII. STATE CONSTITUTIONAL CLAIM

Plaintiff's tenth claim against all Defendants alleges violation of Plaintiff's rights under the New York State Constitution to be free of unreasonable and unlawful searches and seizures under Article I, Section 12 and to be free of deprivation of liberty and property without due process of law under Article I, Section 6. (Am. Compl. ¶¶ 270–275.)

**[112]** Plaintiff's State constitution claims must be dismissed because "[d]istrict courts in this circuit have consistently held that there is no private right of action under the New York State Constitution where, as here, remedies are available under § 1983." *Campbell v. City of N.Y.,* No. 09-CV-3306, 2011 WL 6329456, at *5 (E.D.N.Y. Dec. 15, 2011) (citation and quotation marks omitted); *see also Biswas v. City of New York,* 973 F.Supp.2d 504, 522 (S.D.N.Y. 2013) (dismissing plaintiff's State constitutional tort claims of unlawful seizures and arrest because the plaintiff had a remedy at common law for false arrest/false imprisonment and a § 1983 claim based on the same grounds and stating that "the state constitutional tort is usually available only in cases in which a plaintiff ... has no alternative remedy."); *see also Wahad v. F.B.I.,* 994 F.Supp. 237, 240 n.4 (S.D.N.Y. 1998) ("Section 1983 need not provide the exact same standard of relief in order to provide an adequate remedy").

Here, Plaintiff has a remedy based on Section 1983. Furthermore, Plaintiff has asserted the same due process claim under Section 1983, making Plaintiff's State constitutional claim duplicative. Accordingly, Defendants' motion to dismiss Plaintiff's State constitutional claim is granted.

## XIII. IMMUNITY

### A. Absolute Immunity of ADA Bishop

**[113]** District courts "are encouraged to determine the availability of an absolute immunity defense at the earliest appropriate stage." *Norton v. Town of Brookhaven,* 33 F.Supp.3d 215, 229 (E.D.N.Y. 2014) (citation and quotation marks omitted), *reconsidered on other grounds,* 47 F.Supp.3d 152 (E.D.N.Y. 2014). ADA Bishop claims absolute immunity from liability for her prosecutorial actions (Dkt. 59 at 15). *See Giraldo v. Kessler,* 694 F.3d 161, 165 (2d Cir. 2012) (defendant claiming absolute immunity bears burden of showing that immunity doctrine applies).

**[114]** **[115]** Prosecutors performing core prosecutorial functions are entitled to absolute immunity. *See Warney v. Monroe Cnty.*, 587 F.3d 113, 120 (2d Cir. 2009) (citing *Imbler v. Pachtman*, 424 U.S. 409, 430–31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)). They are entitled to absolute immunity "because their prosecutorial activities are 'intimately associated with the judicial phase of the criminal process, and thus [are] functions to which the reasons for absolute immunity apply with full force.' " *Cornejo*, 592 F.3d at 127 (quoting *Imbler*, 424 U.S. at 430, 96 S.Ct. 984) (modification in the original). Prosecutorial functions protected by absolute immunity include conduct "preliminary to the initiation of a prosecution," such as "whether to present a case to a grand jury ... whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present." ***640** *Giraldo*, 694 F.3d at 165. The Supreme Court has "made clear that absolute immunity may not apply when a prosecutor is not acting as 'an officer of the court,' but is instead engaged in other tasks, say, investigative or administrative tasks." *Van de Kamp v. Goldstein*, 555 U.S. 335, 342, 129 S.Ct. 855, 172 L.Ed.2d 706 (2009) (citing *Imbler*, 424 U.S. at 431 n.33, 96 S.Ct. 984). A prosecutor who engages in such activities is protected only by qualified immunity. *Sclafani v. Spitzer*, 734 F.Supp.2d 288, 296 (E.D.N.Y. 2010) (citing *Van de Kamp*, 555 U.S. 335, 129 S.Ct. 855).

***39** **[116]** Plaintiff argues that ADA Bishop's conduct was administrative and investigatory in nature. (*See* Dkt. 61 at 15–17.) In support of this argument, Plaintiff notes that ADA Bishop "was an initial point of contact for the hospital, and had been in communications with its staff [and] had investigators ... from the DA's Office involved...." (*Id.* at 16.) However, none of this is alleged in the Complaint, and Plaintiff does not direct the Court to any relevant portion of the Complaint in support of these assertions. Moreover, because information from FHMC staff was crucial to the prosecution of the Lis, ADA Bishop's communications with them are considered part of the prosecutorial process. *See, e.g., Schnitter v. City of Rochester*, 556 Fed.Appx. 5 (2d Cir. 2014) (summary order) (finding ADA's interview of crucial witness to be a core part of the prosecutorial process).

**[117]** Plaintiff's other allegations regarding ADA Bishop also relate to prosecutorial functions. Plaintiff alleges that ADA Bishop "failed to examine the medical reports and ask relevant questions as to [Annie's medical] history" (Am. Compl. ¶ 169), and also "ignored evidence ... and [the] absence of witnesses" (Am. Compl. ¶ 174). However, these

allegations "amount[ ] to the claim that [ADA Bishop] sought an indictment based on insufficient or unpersuasive evidence[,] ... [thus challenging] an essential prosecutorial decision." *Schnitter*, 556 Fed.Appx. at 7. Moreover, a prosecutor is entitled to absolute immunity even in the face of allegations of "deliberate withholding of exculpatory information" or "his knowing use of perjured testimony." *Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005) (citing *Imbler*, 424 U.S. at 431 n.34, 96 S.Ct. 984); *see also Warney v. Monroe Cnty.*, 587 F.3d 113, 125 (2d Cir. 2009) ("[I]f the prosecutors had tested all the evidence, and then sat on the exculpatory results for at least 72 days, they may well have violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); but they would be absolutely immune from personal liability"). Thus, absolute immunity applies even though Plaintiff alleges that ADA Bishop "concealed evidence" (Am. Compl. ¶ 175) and "misrepresented facts" (Am. Compl. ¶ 208). [66]

[66]     Furthermore, the Court does not find that Plaintiff's allegation that ADA Bishop "encouraged and, in effect, deputized Drs. LANDI and KUPFERMAN to forensically and factually investigate the case against the [Lis]" (Am. Compl. ¶ 170) creates a plausible inference that ADA Bishop acted in an investigative or administrative capacity. Plaintiff provides no factual or legal support for her "deputization" theory. This allegation is simply too conclusory to pierce the grant of absolute immunity here.

**[118]** To the extent that Plaintiff's claims are asserted against ADA Bishop in her official capacity, they are barred because Bishop acted on behalf of New York State, which is immune under the Eleventh Amendment. *See Caldwell v. James*, 14–CV–5384, 2015 WL 427980, at *3 (E.D.N.Y. Jan. 30, 2015) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against ***641** the State itself." (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989))); *see, also Caldwell*, 2015 WL 427980 at *3 (collecting cases where courts dismissed claims against State officials on Eleventh Amendment grounds); *Reid v. Schuman*, 83 Fed.Appx. 376, 377 (2d Cir. 2003) (summary order) ("We have held that when a District Attorney is prosecuting a criminal matter, she represents the State, not the municipality.") (citing *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993)).

Accordingly, Plaintiff's claims against ADA Bishop are dismissed with prejudice.

**B. City Defendants**

**\*\*40** The City Defendants also contend that the Officer Defendants are entitled to qualified immunity as to Plaintiff's Fourth Amendment claims of false arrest and malicious prosecution. [67] However, for the reasons explained below, the Court cannot find qualified immunity at this stage of the litigation.

[67]    Although the City Defendants do not specify which claims they direct their qualified immunity defense against, to the extent they assert the defense based on the existence of probable cause, the defense goes to Plaintiff's claims of false arrest and malicious prosecution. (*See* Dkt. 59 at 12–27.)

**[119]    [120]** "Qualified immunity shields law enforcement officers from § 1983 claims for money damages provided that their conduct does not violate clearly established constitutional rights of which a reasonable person would have been aware." *Barboza v. D'Agata*, 676 Fed.Appx. 9, 12, 2017 WL 214563, at \*2 (summary order) (2d Cir. 2017) (citing *Ashcroft v. al–Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Zalaski v. City of Hartford*, 723 F.3d 382, 388 (2d Cir. 2013)). It is an affirmative defense as to which the defendant officers or officials bear the burden of proof. *Harlow*, 457 U.S. at 815, 102 S.Ct. 2727.

**[121]    [122]** In analyzing the applicability of qualified immunity, courts conduct a two-step analysis: "First, do the facts show that the officer's conduct violated plaintiff's constitutional rights? Second, if there was a constitutional violation, was the right clearly established at the time of the officer's actions?" *Barboza*, 676 Fed.Appx. at 12, 2017 WL 214563, at \*2 (citation omitted); *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). In short, "[e]ven if the right at issue was clearly established in certain respects, ... an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue *in its particular factual context*." *Barboza*, 676 Fed.Appx. at 12, 2017 WL 214563, at \*2 (emphasis in original) (quoting *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007)). Moreover, courts are "permitted to exercise their sound discretion in deciding which of the

two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236, 129 S.Ct. 808.

At this juncture, the Court cannot find that the Officer Defendants are entitled to qualified immunity, especially where Plaintiff's theory of liability is based on the alleged fabrication of evidence and suppression of exculpatory evidence. (*See, e.g.,* Am. Compl. ¶ 145 (with respect to malicious prosecution claim, stating that a criminal complaint containing false information was signed with knowledge that there was no legal basis to prosecute Plaintiff; Am. Compl. ¶ 222 (with respect **\*642** to Section 1983 conspiracy claim, noting that Defendants conspired to accuse Plaintiff of a crime she did not commit; Am. Compl. ¶ 225 (with respect to unreasonably prolonged detention claim, noting that Defendants mishandled exculpatory evidence; Am. Compl. ¶ 234 (noting that Plaintiff was in pretrial detention because of Defendants' collateral motive.)

Based on these allegations, Plaintiff has sufficiently demonstrated potential violations of her constitutional right to be free from prosecution based on fabricated or suppressed exculpatory evidence. Those rights were clearly established at the time of her prosecution and pretrial detention, such that no reasonable officer could believe that fabricating evidence or suppressing exculpatory evidence is constitutional. *See Coggins v. Cnty. of Nassau*, 988 F.Supp.2d 231, 245, n.8 (E.D.N.Y. 2013) ("It is beyond cavil that [ ] conspiring to and actually falsifying police records, evidence, and testimony violates clearly established rights.... and [ ] no public official would think it was objectively reasonable to violate those rights."); *see also Coggins*, 776 F.3d 108 (affirming the district court's conclusion that qualified immunity was inappropriate); *Blake v. Race*, 487 F.Supp.2d 187, 214 (E.D.N.Y. 2007) ("The [Second Circuit] found qualified immunity unavailable because conspiring to fabricate and forward to prosecutors a known false confession 'violates an accused's clearly established constitutional right, and no reasonably competent police officer could believe otherwise.' ") (quoting *Ricciuti*, 124 F.3d at 130); *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) ("The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right.").

**\*\*41    [123]** The City Defendants assert that the Officer Defendants are entitled to qualified immunity because a police officer who signs a supporting deposition under penalty of perjury may be entitled to qualified immunity from a

malicious prosecution claim if he reasonably relied on the statement of a witness. *See, e.g., Jean–Laurent v. Bowman, 2014 WL 4662221, at \*4* (citing *Loria v. Gorman, 306 F.3d 1271, 1289–90 (2d Cir. 2002)*). However, because Plaintiff contends that Dr. Kupferman's and Dr. Landi's diagnoses of Annie's condition and the cause of her death were "entirely unsupported and unsupportable by any medical science or clinical or forensic evidence" (*see* Am. Compl. ¶¶ 150, 160), the Court cannot determine at this point whether it was reasonable for the officers—some of whom are members of the NYPD Child Abuse Squad—to rely on the statements of witnesses, such as Dr. Kupferman or Dr. Landi. Moreover, Plaintiff alleges that the Officer Defendants (and Dr. Kupferman) ignored her claims of innocence out of "unconcealed and unrestrained racism" (Am. Compl. ¶ 114), and that this led to her arrest and prosecution. No reasonable officer would believe seeking arrest and prosecution based on such improper motives was constitutional.

Additionally, in support of their argument, the City Defendants cite to *V.S. v. Muhammad, 595 F.3d 426 (2d Cir. 2010)*. Although *V.S.* may seem similar to the instant case, the two are distinguishable in that the "reasonably objective" decision made by the defendants in *V.S.* was in a very different circumstance from the challenged conduct of the Officer Defendants here. In *V.S.*, the Second Circuit held that a caseworker at the New York City Administration of Child Services was entitled to qualified immunity because she sought a court order permitting the removal of a child from the parent. *Id.* at 431. On summary judgment, the district court found that qualified immunity could not be granted given the plaintiff's allegation that the caseworker had relied on a diagnosis **\*643** by a doctor who was known to have repeatedly misdiagnosed children's injuries as evidence of child abuse. *Id.* at 431 (district court reasoned that "reliability of [the doctor's] diagnosis ... is an issue of material fact that goes directly to the objective reasonableness of the caseworker in seizing and removing the child from his mother"). The Second Circuit reversed the district court's decision on qualified immunity, holding that "to impose on [a] caseworker the obligation in such circumstances of assessing the reliability of a qualified doctor's past and present diagnoses would impose a wholly unreasonable burden of the very kind qualified immunity is designed to remove." *Id.* However, in *V.S.*, the caseworker was making a time-sensitive decision to remove a child from a potentially dangerous and abusive environment. *See V.S. ex rel. T.S. v. Muhammad, 581 F.Supp.2d 365, 388 (E.D.N.Y. 2008)* (noting defendants' argument that "in light of [the doctor's diagnosis

of injury caused by child abuse], the caseworker's belief in the imminent danger to the child was reasonable and their removal of [the child] into protective custody was justified"); *see also Cornejo, 592 F.3d at 128–29* (recognizing that the caseworker defendants were forced to "choose between difficult alternatives" and were reasonable to believe that "immediate temporary removal" of the children from a potentially abusive environment was justified).

Here, in determining whether the officers reasonably believed that there was probable cause to prosecute Plaintiff, the Court notes that the decision to prosecute was not made under the same threat of imminent harm or time-sensitivity; there was no child to be protected from a potentially abusive parent, as the Lis' only child had already died. Nor was the decision to prosecute a temporary one. Moreover, in *V.S.*, the Second Circuit found that the caseworker's actions were reasonable because the doctor had diagnosed the child with SBS "*in the absence of any plausible alternative." V.S., 595 F.3d at 431* (emphasis added). By contrast, Plaintiff alleges that there were several plausible alternative explanations to SBS as the cause of death, including a genetic disorder and the child's prior medical history, that the Officer Defendants chose to ignore. (Am. Compl. ¶ 173.) Plaintiff also alleges that at some point, the Officer Defendants became aware of information that cast doubt on the medical opinions, including the SBS diagnosis, upon which the investigation was premised, but the officers failed to disclose that information to the prosecution or consider it before deciding to prosecute Plaintiff or continue that prosecution. (*See, e.g.,* Am. Compl. ¶ 178.) At this stage, the Court must accept these allegations as true, and thus *V.S.* does not dictate that the Officers are entitled to qualified immunity.

**\*\*42** Accordingly, the Court does not find that the Officer Defendants are entitled to qualified immunity as to Plaintiff's false arrest and malicious prosecution claims.

### C. Dr. Landi

The City Defendants contend that Dr. Landi is entitled to absolute and qualified immunity. (Dkt. 59 at 17.) Again, at this stage of the litigation, the Court finds it inappropriate to dismiss claims against Dr. Landi based on immunity.

1. <u>Absolute Immunity</u>

In determining whether Dr. Landi's acitivity was investigative or prosecutorial, the Court applies a "functional approach" and looks to the function being performed rather than to the office or identity of the defendant. *See Cornejo, 592 F.3d at 127* (citing *Briscoe v. LaHue, 460 U.S. 325, 342, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983)*); *see also Warney v. Monroe Cnty., 587 F.3d 113, 121 (2d Cir. 2009)* (identifying prosecutorial immunity "not by the identity of **\*644** the actor but by reference to the 'function' performed"); *Ying Jing Gan v. City of New York, 996 F.2d 522, 530 (2d Cir. 1993)* (noting that immunity attaches to the "function performed, not [ ] the office itself").

In arguing that Dr. Landi is entitled to absolute immunity, the City Defendants rely heavily on *Newton v. City of New York, 738 F.Supp.2d 397 (S.D.N.Y. 2010)*. However, the Court does not find *Newton* to be applicable here. In *Newton*, the plaintiff, who had been convicted of rape, brought a civil rights action against a forensic scientist, employed by the Office of the Chief Medical Examiner of the City of New York, for allegedly failing to conduct proper DNA testing that would have exonerated the plaintiff. *Id. at 400–03.* The forensic scientist had conducted a DNA test three years after the plaintiff was convicted for a court-ordered adversarial post-conviction proceeding. The district court held that the scientist was entitled to absolute and qualified immunity. *Id. at 411, 416.* However, in granting absolute immunity, the court stated that "the protection of absolute immunity may not be appropriate in a pre-conviction context where the jury's determination of guilt may result from a faulty scientific process, and where the laboratory scientist's role is primarily an investigative one." *Id. at 411.* That distinction is critical here, given that Dr. Landi, unlike the forensic scientist in *Newton*, was involved in Plaintiff's criminal case in a *pre*-conviction context and is alleged to have provided false statements and analyses in support of the criminal complaint and the NYPD's investigation.

[124]  Based on the allegations in the Complaint, the Court cannot find, as a matter of law, that Dr. Landi was acting in a prosecutorial role rather than an investigatory one. *See Hill v. City of New York, 45 F.3d 653 (2d Cir. 1995)* ("[W]hen it may not be gleaned from the complaint whether the conduct objected to was performed ... in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss."); *see also Wilkins v. Herky, No. 11-cv-6104, 2013 WL 2385065, at \*7 (W.D.N.Y. May 29, 2013)* ("[I]t is appropriate to address absolute

immunity in a 12(b)(6) context *if the complaint clearly indicates the nature of the function for which the defendant is being sued....*" (emphasis added)); *also compare Newton, 738 F.Supp.2d at 408, 412* (noting that the defendant-scientist was entitled to absolute immunity because the scientists' role in the plaintiff's criminal case was in an advocacy capacity and *not* for the purpose of identifying potential suspects) *with Cornejo, 592 F.3d at 128* (finding that the district court was incorrect to find that a caseworker was entitled to absolute immunity because the caseworker's initiation of the child's removal from his mother's custody was functionally equivalent to police officers making arrests in criminal cases).

## 2. Qualified Immunity

 **\*\*43**  The City Defendants also argue that Dr. Landi is entitled to qualified immunity because she did not violate Plaintiff's Fourth Amendment rights. (Dkt. 59 at 19.) The City Defendants contend that Dr. Landi could not have falsely arrested or maliciously prosecuted Plaintiff and thus there was no violation of Plaintiff's clearly established constitutional right. (*Id.*) However, the Court has ruled that Plaintiff's malicious prosecution claim will, in fact, proceed against Dr. Landi and several Officer Defendants. Furthermore, Plaintiff's claims against Dr. Landi are not limited to false arrest and malicious prosecution. For example, as previously discussed, Plaintiff also asserts fair trial claims, based on alleged fabrication of evidence and concealment of exculpatory evidence, against Dr.  **\*645**  Landi. Accordingly, the Court cannot find, at this time, that Dr. Landi is entitled to qualified immunity.

## D. Dr. Kupferman Is Not Entitled to Statutory Immunity

 [125]  The Medical Center Defendants assert that Dr. Kupferman is entitled to statutory immunity under the New York Child Protective Services Act. (Dkt. 55 at 2–3.)

Section 413 of the Child Protective Services Act requires physicians, such as Dr. Kupferman and FHMC's staff, to report suspected child abuse if they have "reasonable cause" to believe that a child has been abused. *See N.Y. Soc. Serv. Law § 413(1)(a)* (McKinney). Failure to report a case of suspected child abuse is a class A misdemeanor. N.Y. Soc. Serv. Law § 420 (McKinney). Section 419 of the Child Protective Services Act provides good faith immunity from

any liability to individuals who report suspected cases of child abuse. That section states in pertinent part:

> Any person, official or institution participating in good faith in ... the making of a report [of suspected child abuse] ... pursuant to this title shall have immunity from any liability, civil or criminal, that might otherwise result by reason of such actions. For the purpose of any proceeding, civil or criminal, the good faith of any such person, official or institution required to report cases of child abuse or maltreatment ... shall be presumed....

Contrary to the Medical Center Defendants' assertion, the Court does not find *Thomas v. Beth Israel Hospital Inc.*, 710 F.Supp. 935 (S.D.N.Y. 1989) to be particularly relevant. In *Thomas*, the court held that the defendant-physician who examined an infant and reported suspected child abuse had immunity under Section 419 of the Child Protective Services Act because the physician had "reasonable cause" to suspect abuse when the examination revealed multiple abrasions and black and blue marks. *Id.* at 941–42. In contrast to *Thomas*, however, Plaintiff alleges that Dr. Kupferman's role went beyond simply reporting suspected child abuse. Plaintiff alleges that Dr. Kupferman took on an active role in investigating the Lis. (*See* Am. Compl. ¶ 115 (Kupferman "repeatedly screamed at [the Lis] that they killed their daughter...."); Am. Compl. ¶ 120 ("Kupferman conducted a 'forensic interview' of plaintiff.")).

Similarly, the Court is not convinced by the Medical Center Defendants' reliance on *Storck v. Suffolk County Dep't of Social Servs.*, 62 F.Supp.2d 927, 946 (E.D.N.Y. 1999) because, there, the court "clearly" found that the defendant doctors were acting "in the discharge of their duties and within the scope of their employment." Here, Plaintiff's allegations, accepted as true, suggest that Dr. Kupferman's conduct may have exceeded the scope of her employment with FHMC. (*See, e.g.*, Am. Compl. ¶ 157 (Kupferman "acted as a deputy of the *NYPD* and the *Queens County D.A.'s Office*" (emphasis in original)); Am. Compl. ¶ 161 (Kupferman "played an active role in the prosecution of Ying Li ... that went well beyond her role, and into ancillary and forensic aspects of determining motive, culpability, and the

veracity of Ying Li.").) Moreover, Plaintiff alleges that Dr. Kupferman's determination that Annie died of SBS was "such a substantial departure from accepted professional judgment, practice, or standards" (Am. Compl. ¶ 235), and that Dr. Kupferman failed to consider other pertinent information that might have suggested alternative causes for Annie's death (*see, e.g.*, Am. Compl. ¶ 122). Taking these allegations as true, such alleged acts "go beyond mere error and amount to willful misconduct," and thus Dr. Kupferman would not be entitled to statutory immunity based on the lack of **\*646** "good faith". *See* Section 419 of the Child Protective Services Act; *see also Estiverne v. Esernio–Jenssen*, 581 F.Supp.2d 335, 347 (E.D.N.Y. 2008) (allowing plaintiffs to proceed with discovery to prove their allegations of bad faith on the part of the Medical Center Defendants and denying statutory immunity, given that plaintiff alleged that the defendant-doctor's "diagnosis of child abuse was not supported by *any* medical evidence ... [and] that she disregarded the medical assessment of a colleague.").

**\*\*44** Accordingly, because the Court cannot determine at this time whether Dr. Kupferman enjoys immunity under the Child Protective Services Act, the Court denies the Medical Center Defendants' motion to dismiss the claims against Dr. Kupferman on the ground that she is statutorily immune.

## XIV. LEAVE TO AMEND

Plaintiff has requested leave to amend her complaint in the event any of her claims are dismissed. For the reasons discussed below, the Court denies that request in its entirety.

**[126]** **[127]** Federal Rules of Civil Procedure 15(a) provides that a court "should freely give leave [to amend] when justice so requires." "Although 'it is the usual practice upon granting a motion to dismiss to allow leave to replead, such leave should be denied where the proposed amendment would be futile.' " *S.B. v. City of New York*, No. 14-CV-1021, 2016 WL 4530455, at \*18 (E.D.N.Y. Aug. 29, 2016) (citation and quotation marks omitted); *see also Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011). An amendment to a pleading is considered futile if the claim is time-barred due to the expiration of the applicable statute of limitations period. *See, e.g., Kwon v. Santander Consumer U.S.A.*, No. 15-CV-3352, 2016 WL 6518578, at \*6 (E.D.N.Y. Oct. 6, 2016) (dismissing with prejudice claims that are time-barred while allowing the plaintiff to replead his other claims); *Johnson v. New York City Police Dept.*, 651 Fed.Appx. 58 (2d Cir. 2016) (summary order) (affirming district court's dismissal of the plaintiff's Section 1983 claims "without granting him an opportunity

to amend or discussing whether leave to amend would be appropriate" because the three-year statute of limitations expired).

**[128]** First, the Court denies, as futile, leave to amend any time-barred claims and all claims against ADA Bishop, whom the Court has found is entitled to absolute immunity. *See, e.g., Harrison v. Cnty. of Nassau*, No. 15-cv-2712, 2016 WL 4083381, at *6 (E.D.N.Y. Aug. 1, 2016) (denying leave to replead claims against ADAs "because it is clear that all of plaintiff's allegations relate to their involvement in [plaintiff's] prosecution and are therefore protected by absolute immunity"); *Johnson*, 651 Fed.Appx. at 61 (finding leave to amend would be futile where the district court found the prosecutor was entitled to absolute immunity); *Contreras v. Perimenis*, 562 Fed.Appx. 50 (Summary Order) (2d Cir. 2014) (same).

Second, the Court exercises its discretion to deny Plaintiff leave to amend as to the other claims that the Court has dismissed. *Avent v. Doe*, No. 2008 WL 877176, at *14 (N.D.N.Y. Mar. 31, 2008) ("Plaintiff has already filed one amended complaint in this action, and this court has found that the complaint does not state a claim[.]"). The Court already permitted Plaintiff the opportunity to amend the complaint, and, in fact, at the pre-motion conference held in connection with Defendants' motions to dismiss, urged Plaintiff to correct the deficiencies identified in Defendants' pre-motion conference requests and at the conference, and to pare down her claims to only viable ones. However, as noted throughout this decision, Plaintiff **\*647** did not heed the Court's advice, nor make good use of that opportunity to prune her complaint of invalid claims or to add useful or relevant factual allegations or particularity to her complaint, which is currently 275 paragraphs. To allow Plaintiff to attempt to amend her complaint again would be an act of futility and a waste of resources. The Court therefore denies Plaintiff leave to amend her complaint a second time.

**\*\*45** In summary, the following claims are dismissed:

• Count 1 (False Arrest and Imprisonment)—as to all Defendants;

• Count 2 (Malicious Prosecution)—as to all Defendants, except Defendants Degnan and Landi, and the Medical Center Defendants;

• Count 3 (Malicious Abuse of Process)—as to all Defendants, except Defendants Degnan and Landi;

• Count 4 (Failure to Intervene)—as to all Defendants;

• Count 5 (Section 1983 Conspiracy)—as to all Defendants, except Defendants Degnan, Moser, Phelan, Heffernan, and Landi, and the Medical Center Defendants;

• Count 6 (Unreasonably Prolonged Detention)—as to all Defendants, except Defendants Degnan, Moser, Phelan, Heffernan, and Landi;

• Count 7 (Due Process)—as to all Defendants, except Defendants Degnan, Moser, Phelan, Heffernan, Landi, and Medical Center Defendants. However, the speedy trial aspects of Plaintiff's due process claim is dismissed as to the Medical Center Defendants. Moreover, Plaintiff's due process claim of failure to investigate and conditions of confinement are dismissed as to all Defendants.

• Count 10 (State Constitution)—as to all Defendants.

## CONCLUSION

For the reasons stated above, the City Defendants' motion to dismiss is GRANTED in part and DENIED in part. The Medical Center Defendants' motion to dismiss is GRANTED in part and DENIED in part. Plaintiff shall proceed on the following claims:

• Malicious Prosecution against Defendants Degnan, Landi, and the Medical Center Defendants;

• Malicious Abuse of Process against Defendants Degnan and Landi;

• Section 1983 Conspiracy against Defendants Degnan, Moser, Phelan, Heffernan, Landi, and the Medical Center Defendants;

• Unreasonably Prolonged Detention against Defendants Degnan, Moser, Phelan, Heffernan, and Landi;

• Due Process (*Brady* violation and fabrication of evidence) against Defendants Degnan, Moser, Phelan, Heffernan, and Landi, and the Medical Center Defendants;

• Due Process (speedy trial) against Defendants Degnan, Moser, Phelan, Heffernan, and Landi;

• *Monell* claims against the City and FHMC.

2017 WL 1208422

Given that several Defendants as to whom claims are proceeding are not yet represented (*see supra* footnote 1), Plaintiff shall by April 14, 2017 advise the Court in writing how she intends to proceed with respect to these Defendants.

SO ORDERED.

**All Citations**

246 F.Supp.3d 578, 2017 WL 1208422

---

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 5316410
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

David WRIGHT and Sarah Harris, Plaintiffs,

v.

ORLEANS COUNTY, Orleans County Sheriff,
County of Orleans Major Crime Task Force, Albion
Police Department, Village of Albion, Town of
Albion, New York State Office of Fire Prevention
and Control, Niagara County Sheriff, Albion Fire
Department, Rocco Sidari, both individually and in
his capacity as Albion Fire Chief, Jeremy Grahm,
both individually and in his capacity as an employee
of Albion Fire Department, Jeffrey Gifaldi, both
individually and in his capacity as Investigator for
the Village of Albion Police Department, Joseph
Fuller, both individually and in his capacity as
a police officer for the Village of Albion Police
Department, John Doyle, both individually and
in his capacity as police officer for the Village of
Albion Police Department, Karol L. Hughes, both
individually and in his capacity as police officer for
the Village of Albion Police Department, Erik Holter,
both individually and in his capacity as Investigator
with the New York State Office of Fire Prevention
and Control, Donald Clawson, Michael Jutrowski,
Adriean Ann Park, Paul E. Savage, Randi Shadic,
Steven M. Nassivera, Nicholas Long, The Hartford,
and Sentinel Insurance Company, Ltd., Defendants.

No. 14–CV–00622A(F).
|
Signed Sept. 10, 2015.

**Attorneys and Law Firms**

Elliott, Stern & Calabrese, LLP David S. Stern, of Counsel,
Rochester, NY, for Plaintiffs.

Webster Szanyi, LLP, Michael P. McClaren, Andrew
Dylan, and Florina Altshiler, of Counsel, Buffalo, NY,
for Defendants Orleans County, Oleans County Sheriff,
County of Orleans Major Crime Task Force, Albion Police
Department, Village of Albion, Town of Albion, Niagara

County Sheriff, Jeffrey Gifaldi, Joseph Fuller, John Doyle,
and Karol L. Hughes.

Eric T. Schneiderman, New York State Attorney General,
STephanie Joy Calhoun, Assistant Attorney General, of
Counsel, Buffalo, NY, for Defendants New York State Office
of Fire Prevention and Control, Eric Holter, and Randi Shadic.

Gennet Kallman Antin & Robinson, P.C. Mark Leigh Antin,
and Michael Scott Leavy, of Counsel New York, NY, for
Defendant Paul E. Savage.

Leclair Korona Giordano Cole LLP, Laurie A. Giordano,
and Michael E. Nicholson, of Counsel, Rochester, NY, for
Steven M. Nassivera, The Hartford, and Sentinel Insurance
Company, Limited.

Walsh, Roberts & Grace, Buffalo, NY, for Albion Fire
Department, Rocco Sidari, and Jeremy Grahm.

REPORT and RECOMMENDATION

DECISION and ORDER

LESLIE G. FOSCHIO, United States Magistrate Judge.

*JURISDICTION*

**\*1** This action was referred to the undersigned by Honorable
Richard J. Arcara on October 16, 2014, for all pretrial
matters including preparation of a report and recommendation
on dispositive motions. The matter is presently before the
court on motions to dismiss filed on October 15, 2014,
by Defendants Orleans County, Orleans County Sheriff,
County of Orleans Major Crime Task Force, Albion Police
Department, Village of Albion, Town of Albion, Niagara
County Sheriff, Jeffrey Gifaldi, Joseph Fuller, John Doyle,
and Karol L. Hughes (Doc. No. 22), on November 3, 2014 by
Defendants Steven M. Nassivera, The Hartford, and Sentinel
Insurance Company, Limited (Doc. No. 28), on November 7,
2014, by Defendant Paul E. Savage (Doc. No. 30), and on
November 17, 2014, by Defendants New York State Office
of Fire Prevention and Control, Eric Holter, and Randi Shadic
(Doc. No. 33), as well as Plaintiffs' motion for leave to file an
amended complaint, filed December 8, 2014 (Doc. No. 36). [1]

[1]     Although Defendants' motions to dismiss are
        dispositive, while Plaintiffs' motion to amend

is nondispositive, the undersigned addresses all pending motions in this combined Report and Recommendation/Decision and Order in the interest of judicial economy.

### BACKGROUND

Plaintiffs Sarah Harris ("Harris"), and David Wright ("Wright") (together, "Plaintiffs"), commenced this civil rights action on August 1, 2014, alleging Defendants violated their constitutional rights in connection with the investigation of a fire that destroyed Harris's business, and subsequent indictment, arrest, and prosecution of Plaintiffs for arson and criminal mischief in connection with the fire. Defendants to this action include Orleans County ("Orleans County"), Orleans County Sheriff ("Orleans County Sheriff"), County of Orleans Major Crime Task Force ("the Crime Task Force"), Albion Police Department ("Albion Police"), Village of Albion ("the Village"), Town of Albion ("the Town"), New York State Office of Fire Prevention and Control ("Fire Prevention Office"), Niagara County Sheriff ("Niagara County Sheriff"), Albion Fire Department ("Fire Department"), Rocco Sidari ("Sidari"), Jeremy Grahm ("Grahm"), Jeffrey Gifaldi ("Gifaldi"), Joseph Fuller ("Fuller"), John Doyle ("Doyle"), Karol L. Hughes ("Hughes"), Erik Holter ("Holter"), Donald Clawson ("Clawson"), Michael Jutrowski ("Jutrowski"), Adrian Ann Park ("Park"), Paul E. Savage ("Savage"), Randi Shadic ("Shadic"), Steven M. Nassivera ("Nassivera"), Nicholas Long ("Long"), The Hartford ("Hartford"), and Sentinel Insurance Company, LTD ("Sentinel") (together, "Defendants"). Plaintiffs assert four claims for relief including (1) false arrest, Complaint ¶¶ 43–52 ("false arrest claim"); (2) malicious prosecution, Complaint ¶¶ 53–61 ("malicious prosecution claim"); (3) negligent hiring, supervision and retention, Complaint ¶¶ 62–69 ("supervisory liability claim"); and (4) false arrest, malicious prosecution, and deprivation of a fair trial in violation of Plaintiffs' civil rights under 42 U.S.C. § 1983 (" § 1983"), and the New York State Constitution, Complaint ¶¶ 70–75 ("civil rights claim"). On September 26, 2014, Defendants Fire Department, Grahm, and Sidari ("Fire Department Defendants"), filed an Answer (Doc. No. 12).

**\*2** On October 15, 2014, Defendants Orleans County, Orleans County Sheriff, the Crime Task Force, Albion Police, the Village, the Town, Niagara County Sheriff, Gifaldi, Fuller, Doyle, and Hughes ("Prosecuting Defendants") filed a motion to dismiss (Doc. No. 22) ("Prosecuting Defendants'

Motion"), supported by the attached Declaration of Andrew Dylan, Esq. (Doc. No. 22–1) ("Dylan Declaration"), and the Memorandum of Law in Support of Motion to Dismiss (Doc. No. 22–2) ("Prosecuting Defendants' Memorandum"). On November 3, 2014, Defendants Hartford, Sentinel and Nassivera ("Insurance Defendants"), filed a motion to dismiss (Doc. No. 28) ("Insurance Defendants' Motion"), attaching the Memorandum of Law in Support of Motion to Dismiss (Doc. No. 28–1) ("Insurance Defendants' Memorandum"). On November 7, 2014, Defendant Savage filed a motion to dismiss or, alternatively, for summary judgment (Doc. No. 30) ("Savage's Motion"), attaching in support the Memorandum of Law of Defendant Paul E. Savage (Doc. No. 30–1) ("Savage's Memorandum"), a Statement of Facts in Support of Motion for Summary Judgment (Doc. No. 30–2) ("Savage's Statement of Facts"), the Affidavit of Paul E. Savage in Support of Motion to Dismiss or for Summary Judgment (Doc. No. 30–3) ("Savage's Affidavit"), and the Declaration of Michael S. Leavy, Esq., in Support of Motion to Dismiss or for Summary Judgment (Doc. No. 30–4) ("Leavy Declaration"), with exhibits 1 through 4, and 5 (Docs. Nos. 30–5 through 30–10, and exhibit 3 (Doc. No. 31) ("Savage's Exh(s). ___"). On November 17, 2014, Defendants Fire Prevention Office, Holter, and Shadic ("Fire Prevention Defendants"), filed a motion to dismiss (Doc. No. 33) ("Fire Prevention Defendants' Motion"), attaching Defendants' New York State Office of Fire Prevention and Control, Erik Holter, and Randi Shadic Memorandum of Law in Support of Motion to Dismiss for Failure to State a Claim Pursuant to F.R.C.P. 12(b)(6) (Doc. No. 33–1) ("Fire Prevention Defendants' Memorandum").

In opposition to the motions to dismiss, Plaintiffs filed on December 8, 2014, the Cross–Notice of Motion [*sic*] (Doc. No. 36) ("Plaintiff's Motion"), seeking leave to file an amended complaint, attaching the Declaration of David S. Stern, Esq. ("Stern Declaration"), the Memorandum in Support of Plaintiff [*sic*] Opposition to Defendants' Motions to Dismiss Complaint and in Support of Cross Motion Permitting Plaintiffs to Amend Their Complaint ("Plaintiffs' Memorandum"), with a copy of the proposed amended complaint attached as Exh. A ("Proposed Amended Complaint"). Plaintiffs' Memorandum contains legal argument in support of Plaintiffs' Motion seeking leave to file an amended complaint but does not respond to the various arguments made by the Defendants moving to dismiss.

On December 23, 2014, Prosecuting Defendants filed in further support of dismissal the Reply Declaration of Florina Altshiler, Esq. (Doc. No. 38) ("Altshiler Reply Declaration"), attaching exhibits A and B ("Prosecuting Defendants' Reply Exh(s). ___"). On January 12, 2015, Savage filed the Reply Memorandum of Law of Defendant Paul E. Savage in Further Support of Motion to Dismiss Complaint Pursuant to Fed.R.Civ.P. 12(b)(6), or, Alternatively, for Summary Judgment Pursuant to Fed.R.Civ.P. 56(a) (Doc. No. 41) ("Savage Reply"). On January 14, 2015, the Insurance Defendants filed the Attorney Declaration of Laurie A. Giordano, Esq. (Doc. No. 42) ("Giordano Reply Declaration"), attaching the Memorandum in Reply to Plaintiffs' Opposition to Motion to Dismiss and in Opposition to Plaintiffs' Motion to Amend the Complaint (Doc. No. 42–1) (Insurance Defendants' Reply"), the Fire Prevention Defendants filed the Declaration of Assistant Attorney General Stephanie Joy Calhoun (Doc. No. 43) ("Calhoun Reply Declaration"), and the Prosecuting Defendants filed the Amended Reply Declaration of Florina Altshiler, Esq. (Doc. No. 44) ("Amended Altshiler Reply Declaration"), attaching exhibits A and B ("Prosecuting Defendants' Exh(s). ___"). Oral argument was deemed unnecessary.

**\*3** Based on the following, the Prosecuting Defendants' Motion should be GRANTED in part and DENIED in part; the Insurance Defendants' Motion should be GRANTED; Savage's Motion should be GRANTED insofar as it seeks to dismiss the Complaint for failure to state a claim and is DISMISSED as moot as to the alternative request for summary judgment; and the Fire Prevention Defendants' Motion should be GRANTED; Plaintiffs' Motion is GRANTED in part and DENIED in part.

### FACTS

Because the motions pending before the court include motions by various Defendants to dismiss for failure to state a claim, and Plaintiffs' crossmotion for leave to file an amended complaint alleging additional facts so as to avoid dismissal of the action, the court, in the interest of completeness and clarity, separately considers the facts of both the Complaint and the Proposed Amended Complaint, as well as facts found in a report prepared by an insurance investigator incorporated by reference into the Proposed Amended Complaint.

### The Complaint

The facts as pleaded in the Complaint, although sparse, assert that on August 13, 2012, "Defendants began an arson investigation of the Plaintiffs herein arising from a fire loss that occurred on or about that date located at 158 Hamilton Street, Albion, New York." Complaint ¶ 32. Defendants appeared before an Orleans County grand jury ("the Grand Jury") [2] and presented evidence resulting in an indictment on March 15, 2013 ("the Indictment"), [3] charging Plaintiffs with violations of New York Penal Law ("N.Y. Penal Law") § 150.10(1) (Arson in the Third Degree) ("the arson charge"), and § 145.00(1) (Criminal Mischief in the Fourth Degree) ("the criminal mischief charge") (together, "the criminal charges"). After the Indictment was returned, Plaintiffs were arrested on the charges and tried in Orleans County Court, before County Court Judge James P. Punch ("Judge Punch") ("the trial"). The trial commenced on November 12, 2013, and continued through November 22, 2013, when Judge Punch dismissed both charges against Harris [4] and the jury returned a verdict acquitting Wright on both charges. Plaintiffs maintain that the investigation and prosecution damaged their personal and social reputations, as well as their business reputation and standing in the business community and that those involved in investigating the fire failed to thoroughly discern whether the fire was electrical in nature and not an arson.

[2]   Plaintiffs do not specify which Defendants appeared before the Grand Jury.

[3]   Exh. A.

[4]   Why the criminal charges were dismissed against Harris is not stated in the record.

### The Proposed Amended Complaint

The Proposed Amended Complaint Plaintiffs seek leave to file provides more facts including that on March 13, 2012, Plaintiff Harris opened her own business, a novelty/smoke shop and second-hand clothing store ("the shop"), located at 158 Hamilton Street, in Albion, New York. Proposed Amended Complaint ¶¶ 33–34. The building in which the shop was located had recently been purchased and extensively renovated by Harris and her boyfriend, Plaintiff Wright, and Plaintiffs, in addition to their hard work and labor, invested $ 18,000 in the premises, $ 45,000 in inventory, $ 10,000 in display cases, and $ 35,000 in "tattoo flash" [5] and artwork. *Id.* ¶¶ 35–37. On August 12, 2012, a fire ("the fire"), heavily damaged the shop and resulted in a total loss of its inventory

and contents. *Id.* ¶¶ 38, 40. Harris was notified of the fire by a customer, one Amber M. Mesita ("Mesita"), who telephoned Plaintiff in the early morning of August 12, 2012. Harris and Wright then "rushed" to the shop and were told by Mesita that she informed Defendant Ablion Police Officer John Doyle ("Doyle"), who was the first police officer to arrive at the scene of the fire, that Mesita smelled what she recognized as the odor of an electrical fire. *Id.* ¶ 45. Doyle interviewed both Harris and Wright, preparing written statements for their signatures, *id.* ¶ 46, but never recorded Mesita's observation regarding the odor of an electrical fire. *Id.* ¶ 47. On August 13, 2012, Defendants commenced an arson investigation of the fire ("the investigation"). Plaintiffs cooperated with the investigation, including consenting to further interviews by insurance investigators Defendants Paul Savage ("Savage") and Steve Nassivera ("Nassivera"), and insurance adjuster Jennifer Holler ("Holler"),[6] as well as Defendants Albion Police Officer Jeffrey Gifaldi ("Gifaldi") and Sergeant Joseph Fuller ("Fuller"). Proposed Amended Complaint ¶¶ 48–50. Defendant Donald Clawson ("Clawson"), who was known in the community to have a psychiatric and criminal history, contacted the Albion Police, the Orleans County Sheriff, and Defendant Hartford Insurance Company ("Hartford"), reporting that Wright burned down the shop, hoping to receive reward money for reporting the arson. *Id.* ¶¶ 51– 53. According to Plaintiffs, "the investigators in this case were overcome by their eagerness and zeal of convicting Plaintiffs demonstrated by their conduct in selectively choosing evidence and ignoring blunt holes in their case." *Id.* ¶ 54. Plaintiffs assert that Clawson reported Wright started the fire in a red plastic bucket, despite Savage and Holter's conclusion that if the fire originated in the red plastic bucket, it would have been burnt beyond recognition. *Id.* ¶ 55. Plaintiffs allege Defendant Albion Fire Department Chief Rocco Sidari ("Sidari"), failed to hire an arson investigator to conduct a proper investigation of the fire and coached witnesses, including Albion Fire Department employee Jeremy Grahm ("Grahm"), and another, unidentified firefighter, to testify that "the fire appeared as if it were from an incendiary origin...." *Id.* ¶¶ 57–59. Plaintiffs similarly assert Defendant police investigator Gifaldi, despite knowing Clawson's reputation, "cajoled" witnesses, including Defendants Adrian Park ("Park"), and Michael Jutrowski ("Jutrowski"), into testifying at trial against Plaintiffs with threats of jail. *Id.* ¶¶ 60–62. Plaintiffs' describe Park's trial testimony as informing the jury Gifaldi had forced her to testify against Plaintiffs, while Jutrowski testified Wright started the fire "by flipping a cigarette above the inflammable ceiling tiles," *id.* ¶¶ 63, which

conflicted with Prosecuting Defendants' own investigation. *Id.* ¶ 64.

[5]     "Tattoo flash" refers to "common designs, usually drawn on paper or cardboard and displayed prominently on the walls or in binders in tattoo shops." What is Tattoo Flash?, available at http://tattoo.about.com/od/tattoosartandphotoss/fl/What-is-Tattoo-Flash.htm, last visited September 9, 2015.

[6]     Holler is not named as a Defendant in either the Complaint or in the Proposed Amended Complaint.

**\*4**  Harris's insurance company, Defendant Hartford, retained fire origin and cause investigation firm PT & C Forensic Consulting Services, P.A. ("PT & C"),[7] based in Atlanta, Georgia, to conduct a forensic investigation of the fire's origin and caused, which was conducted on August 15, 2012, by Savage, PT & C's Senior Fire & Explosion Consultant. Proposed Amended Complaint ¶ 65. In his report ("Investigative Report"), dated September 10, 2012, Savage, based on his investigation including three fire debris samples for which laboratory analysis revealed no accelerants present, concluded the fire originated along the rear wall of the shop's office, that the ignition source, the first material ignited, and ignition sequence were all unknown, and the fire's "cause classification" was "undetermined with incendiary not eliminated." *Id.* ¶¶ 65–66. Although Gifaldi subsequently provided Savage with Defendant Niagara County Sheriff's Office Forensic Laboratory report ("Niagara County Forensic Laboratory Report"), indicating accelerants were present in one of two fire debris samples, consistent with a "medium petroleum distillate," such as mineral spirits, paint thinners, and charcoal starters, such findings did not change Savage's conclusion in the Investigative Report. *Id.* ¶ 67. Plaintiffs assert Gifaldi agreed with Savage's conclusion that the fire originated in the shop's rear office wall near Harris's desk, *id.* ¶ 68, yet Defendant Albion Police employees, including Doyle, Fuller, Gifaldi, and Hughes, failed to secure video footage from a security digital video recorder ("DVR"), which Plaintiffs maintain would have established Plaintiffs did not set the fire. *Id.* ¶ 71.

[7]     PT & C is not named as a defendant to this action.

Plaintiffs assert Defendant Erik Holter ("Holter"), an investigator with Defendant Fire Prevention Office, failed to conduct a proper fire investigation to determine whether an electrical short caused the fire, and instead simply rubber-

stamped Gifaldi's investigation despite its obvious short-comings. Proposed Amended Complaint ¶ 72. According to Plaintiffs, Nassivera intentionally misused tape recorded statements of Plaintiffs when testifying at the trial, interpreting inaudible portions of the audio recordings so as to slant the meaning against Plaintiffs. *Id.* ¶ 73. Gifaldi allegedly "interviewed witnesses of known doubtfulness," and provided false Grand Jury testimony to secure the Indictment, including stating the shop's security system and DVR were not operating at the time of the fire, and that Plaintiffs had purposefully shut off a fire alarm system which Plaintiffs maintain was abandoned by the shop's former tenant. *Id.* ¶ 74. Gifaldi allegedly embellished his job title at the trial, claiming to be a "Level II" arson investigator when no such designation exists, and also falsely testified that he failed to take any contemporaneous hand written notes which were contradicted by witnesses who reported observing Gifaldi taking notes.

**Fire Investigative Reports**

**\*5** The Proposed Amended Complaint refers to both the Investigative Report prepared by Savage and a supplement to the Investigative Report ("Supplemental Report"), prepared by Savage regarding the Niagara County Forsenic Laboratory Report. In particular, Savage reported that Defendant Albion Police Department ("Albion Police"), initially listed the fire's cause as "undetermined pending further investigation." Investigative Report at 2. According to Savage, although there was smoke and heat damage throughout the shop, most of the shop's fire damage occurred in the shop's office, particularly at the rear wall near Harris's desk and a large sofa. *Id.* at 3. Wright's desk, located at the office's doorway, had less damage but the remains of a medium sized red plastic trash can with "fire/melt damage" and which had "melted into itself," was found in front of Wright's desk instead of in its regular location between Harris's desk and the large sofa. *Id.* The caption to photo 52 accompanying the Investigative Report ("Photo 52") [8] depicting the red plastic trash can states "[t]he red trash can did not burn here, there is no corresponding fire damage to [Wright's] [9] wood desk. This may have been moved/kicked around by fire department personal [*sic*] during suppression. It should have been at the rear wall next to [Harris's] desk."

[8]    Savage's Exh. 2–b (Doc. No. 30–7) at 26.

[9]    Unless otherwise indicated, all bracketed material has been added.

Savage reported that close examination of the shop's rear entry door revealed a "very loose" striker plate that "was not loose from pry damage, but would have to [have] been loosened by unscrewing the two large metal/steel screws that hold it in place against the jamb." Investigative Report at 3. Because the loosened strike plate moved, the rear door hardware "plunger was not able to seat properly in the striker plate and could move easily." *Id.* Savage essentially ruled out the fire's cause as electrical as "[e]xamination of structural electrical conductors and receptacles showed no arc damage or any indication of being related to the cause of the fire." *Id.* A power strip on the floor near Harris's desk "sustained total fire damage" although Harris "stated it was not plugged in or being used." *Id.*

Savage reported that in an on-scene interview Harris stated that on Sunday, March 11, 2012, she was in the shop's office at 11:00 P.M ., reviewing bills and invoices while she waited for Wright to drive her home. Investigative Report at 4. Wright arrived around midnight and drove Harris to her home where they later received a telephone call notifying them the shop was on fire. *Id.* The fire had been extinguished by the time Plaintiffs returned to the shop, but the fire trucks remained on the scene. Harris stated that "things were not too good with bills." *Id.*

Savage also interviewed Wright who described helping Harris with the shop, receiving from his realtor ex-father-in-law household items and clothing from 'house clean outs' to be sold second-hand in the shop. Savage Report at 4. Wright stated he had received from a friend with a recent financial settlement two loans for the shop, the first for $ 20,000 and the second for $ 50,000. *Id.* Wright admitted the shop was behind on its bills. *Id.* Wright further stated he picked up Harris the night of the fire, setting the alarm system and turning on a DVR recorder for outside cameras before leaving with Harris at midnight, taking their laptop computers with them. *Id.* Wright and Harris went to Harris's home where they fell asleep and were awoken by a telephone call informing them of the fire at the shop. *Id.* Wright stated they "had to find a ride so they could get back to the shop taking about 30 to 40 minutes." *Id.* Both Harris and Wright denied having a key to the shop's rear door, stating "it could be secured with a good slam shut." *Id.*

**\*6** Savage concluded the fire originated along the rear wall of the store's office, that the fire's cause was "undetermined with incendiary not eliminated," and noting that no accelerants had been detected on any fire debris

samples collected at the scene of the fire. Investigative Report at 4. In his report, Savage also commented that

> This fire is still being investigated by the Albion Police. Several pieces of interview information are not clear. Although the lab report is negative for ignitable/flammable liquids in the samples collected, this does not remove the possibility of manual open flame to paper or other combustibles. There are other issues with regards to the structure and with the insured's ability to drive away from the shop at closing yet needing to "find a ride" back to the scene.

*Id.* at 5.

In a supplemental letter report issued on November 7, 2012 ("Supplemental Report"),[10] Savage indicated Defendant Albion Police Detective Jeff Gifaldi ("Gifaldi") had advised of the discovery in the fire debris of an accelerant consistent with a medium petroleum distillate such as mineral oil, but that the discovery did not change Savage's conclusion and the fire's cause remained undetermined "with incendiary still not eliminated." Supplemental Report at 1.

[10]   Savage's Exh. 5 (Doc. No. 31).

### *DISCUSSION*

Pending before the court are motions to dismiss filed by Prosecuting Defendants, Insurance Defendants, Defendant Savage, and Fire Prevention Defendants ("moving Defendants"). The other named Defendants to this action, including the Albion Fire Department, Rocco Sidari, Jeremy Grahm, Donald Clawson, Michael Jutrowski, Adriean Ann Park, and Nicholas Long (the non-moving Defendants"), have not moved to dismiss. In opposition to the motions to dismiss, Plaintiffs have moved for leave to file an amended complaint, but have not otherwise responded in opposition to the moving Defendants' arguments in support of dismissal.

### 1. Insufficient Service of Process

Defendant Crime Task Force moves to dismiss the Complaint for insufficient service of Process based on Plaintiffs' failure to file the affidavit required under Fed.R.Civ.P. 4(l) (1) indicating service was made. Prosecuting Defendants' Memorandum at 4. A review of the docket, however, establishes an Affidavit of Process Server was filed on October 3, 2014 (Doc. No. 21–2), stating that on August 27, 2014, one Eric Harling, an Investigator with the Crime Task Force, was personally served with a copy of the summons and verified Complaint. Accordingly, Prosecuting Defendants' Motion should be DENIED insofar as they seek dismissal of the action as against the Crime Task Force for insufficient service of process.[11]

[11]   Inasmuch as the Crime Task Force is not a suable entity, *see* Discussion, *infra*, at 17–18, the action should be dismissed as to this Defendant, and the issue of service on the Crime Task Force, the manner of which Prosecuting Defendants do not challenge, is academic.

### 2. Motion to Dismiss

Pending before the court are four motions to dismiss the Complaint filed by the Prosecuting Defendants, the Insurance Defendants, Savage, and the Fire Prevention Defendants. On a motion to dismiss under Fed.R.Civ.P. 12(b)(6) ( "Rule 12(b) (6)"), the court looks to the four corners of the complaint and is required to accept the plaintiff's allegations as true and to construe those allegations in the light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Goldstein v. Pataki,* 516 F.3d 50, 56 (2d Cir.2008) (court is required to liberally construe the complaint, accept as true all factual allegations in the complaint, and draw all reasonable inferences in the plaintiff's favor). The Supreme Court requires application of "a 'plausibility standard,' which is guided by '[t]wo working principles.' " *Harris v. Mills,* 572 F.3d 66, 71–72 (2d Cir.2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). "First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' " *Harris,* 572 F.3d at 72 (quoting *Iqbal,* 556 U.S. at 678). " 'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss,' and '[d]etermining whether a complaint states a plausible claim for relief will ...

be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' " *Id.* (quoting *Iqbal,* 556 U.S. at 679).

**\*7** "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570). "A claim will have 'facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Sykes v. Bank of America,* 723 F.3d 399, 403 (2d Cir.2013) (quoting *Ashcroft,* 556 U.S. at 678); *see Twombly,* 550 U.S. at 570 (the complaint must plead "enough facts to state a claim to relief that is plausible on its face" The factual allegations of the complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Twombly,* 550 U.S. at 570. " 'In adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached, and any document upon which the complaint heavily relies.' " *ASARCO LLC v. Goodwin,* 756 F.3d 191, 198 (2d Cir.2014) (quoting *In re Thelen LLP,* 736 F.3d 213, 219 (2d Cir.2013)).

In the instant case, a thorough review of the Complaint establishes it fails to state any viable claim against Prosecuting Defendants, Insurance Defendants, Savage, and Fire Prevention Defendants.

### A. Capacity to be Sued

Preliminarily, the court addresses the Prosecuting Defendants' argument, Prosecuting Defendants' Memorandum at 2–4, that the Orleans County Sheriff, the Crime Task Force, the Albion Police, and the Niagara County Sheriff lack the capacity to be sued, requiring dismissal of the Complaint as against them. Plaintiffs have not responded in opposition to this argument, nor have Prosecuting Defendants argued in further support of the argument.

The "[c]apacity to sue or be sued is determined ... by the law of the state where the court is located," Fed.R.Civ.P. 17(b), here, the law of New York which, as relevant, provides that a "municipal corporation" may sue or be sued. N.Y. General Municipal Law ("N.Y.Gen.Mun.Law") § 50. Further, a "municipal corporation," as defined, "includes only a county, town, city and village." N.Y. Gen. Mun. Law § 2.

An administrative arm of a municipal corporation, however, does not exist separate and apart from the municipality

and does not have its own legal identity. *Laboy v. Ontario County, N.Y.,* —— F.Supp.3d ——; 2015 WL 1977251, at \* 6 (W.D.N.Y. May 4, 2015). In the instant case, the Orleans County Sheriff and the Crime Task Force are administrative arms of Orleans County, the Albion Police is an administrative arm of the Village of Albion, and the Niagara County Sheriff is an administrative arm of the County of Niagara. *See Phillips v. Cortland City Police,* 2013 WL 5462951, at \* 2 (N.D.N.Y. Sept.30, 2013) ("Because the Defendant Police Department is an administrative arm of the City of Cortland, it lacks the capacity to be sued."); *McKenzie v. County of Erie,* 2013 WL 5348084, at \* 2 (W.D.N.Y. Sept.23, 2013) (dismissing claims against various Erie County departments, including the Erie County Sheriff's Department, the Erie County Holding Center, the Erie County Department of Health, and the Erie County Department of Mental Health, as each such department "is merely an administrative arm of the County, and they therefore lack the capacity to be sued."). As such, the Orleans County Sheriff, the Crime Task Force, the Albion Police, and the Niagara County Sheriff cannot sue or be sued. *Id.* Accordingly, the Prosecuting Defendants' Motion should be GRANTED as to all claims set forth in the Complaint against the Orleans County Sheriff, the Crime Task Force, the Albion Police, and the Niagara County Sheriff. [12]

[12]    Fire Prevention Defendants did not similarly argue in support of dismissal that the Fire Prevention Office also, as an administrative arm of the state, similarly lacks the capacity to be sued.

### B. Niagara County Sheriff

**\*8** Prosecuting Defendants also seeks dismissal of the malicious prosecution and negligence claims against Niagara County Sheriff for failing to plead any facts indicating the Niagara County Sheriff was involved in the criminal prosecution against Plaintiffs, which occurred in Orleans County. Prosecuting Defendants' Memorandum at 10–11. Plaintiffs have not responded in opposition to this argument.

A thorough reading of the Complaint reveals no factual allegations against Niagara County Sheriff. Further, the Complaint indicates that the criminal prosecution of which Plaintiffs complain occurred in Orleans County where the shop is located. The Complaint thus fails to state any viable claim against Niagara County Sheriff.

Prosecuting Defendants' Motion should thus be GRANTED as to Niagara County Sheriff.

#### C. Civil Rights Claims

The Prosecuting Defendants are alleged in the fourth claim pursuant to § 1983 to have violated Plaintiffs' civil rights. Complaint ¶¶ 70–75. An individual may seek damages against any person who, under color of state law, subjects such individual to the deprivation of any rights, privileges, or immunities protected by the Constitution or laws of the United States. 42 U.S.C. § 1983. Under § 1983 an action is permitted "against a 'person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.' " *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir.2004) (quoting 42 U.S.C. § 1983). Section § 1983, however, " 'is not itself a source of substantive rights.' " *Id.* (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Rather, § 1983 "merely provides 'a method for vindicating federal rights elsewhere conferred....' " *Id.* The elements of a § 1983 claim include (1) the deprivation of a federal constitutional or statutory right, (2) by a person acting under color of state law. *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir.2005). Thus, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); and *Baker*, 443 U .S. at 140).

In the instant case, Plaintiffs allege Prosecuting Defendants subjected them to unlawful arrest, malicious prosecution, and denial of a fair trial in violation of their Fourth, Fifth, Sixth and Fourteenth Amendment rights.

#### D. False Arrest and Malicious Prosecution Claims

Plaintiffs assert claims for false arrest and malicious prosecution under both New York common law and § 1983. Complaint ¶¶ 43–52 (New York common law false arrest); 53–61 (New York common law malicious prosecution); and 70–75 (§ 1983 false arrest and malicious prosecution). The common law false arrest claim and the civil rights claim are asserted only against some of the Prosecuting Defendants, including the Orleans County Sheriff, the Crime Task Force, and the Albion Police Department, whereas the common law malicious prosecution claim is asserted against all Prosecuting Defendants, Defendant Savage, the Insurance Defendants, and the Fire Prevention Defendants, as well as against the non-moving Defendants. As discussed below, the

existence of probable cause, as evidenced by the Indictment, requires the dismissal of these claims.

**\*9** Plaintiffs' first claim is a New York tort claim for false arrest. Complaint ¶¶ 43–52. "Under New York law, a plaintiff claiming false arrest must show, *inter alia*, that the defendant intentionally confined him without his consent and without justification." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir.1996) (citing *Broughton v. State*, 37 N.Y.2d 451, 373 N.Y.S.2d 87, 335 N.E.2d 310, 313–14 (N.Y.), *cert. denied*, 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975)). The elements of a false arrest claim under New York law include that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged. *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir.1994) (citing *Benjamin v. United States*, 554 F.Supp. 82, 85 (E.D.N.Y.1982)).

Plaintiffs' second claim is for malicious prosecution in violation of New York common law. Complaint ¶¶ 53–61. "To establish a malicious prosecution claim under New York Law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against the plaintiff; (2) the termination of the proceeding in plaintiff's favor; (2) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir.2010) (internal quotation marks and citations omitted).

The fourth claim alleges both false arrest and malicious prosecution in violation of § 1983. Complaint ¶¶ 70–75. The same false arrest and malicious prosecution claims Plaintiffs bring under New York common law may be brought under § 1983 because such claims invoke the Fourth Amendment's protection of an individual's liberty interest with respect to criminal prosecutions. *See Singer v. Fulton County Sheriff*, 63 F.3d 110, 115–16 (2d Cir.1995) (Fourth Amendment is the source of § 1983 claims for malicious prosecution and false arrest).

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law. *Weyant*, 101 F.3d at 852. "In analyzing § 1983 claims for unconstitutional false arrest, we have generally looked to the law of the state in which the arrest occurred." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir.2006)

(internal quotation marks omitted). Similarly, "[a] § 1983 claim for malicious prosecution looks to the relevant state common law." *Gonzalez v. City of Schenectady,* 728 F.3d 149, 162 (2d Cir.2013) (citing *Janetka v. Dabe,* 892 F.2d 187, 189 (2d Cir.1989)). Under New York law, a plaintiff must show that the underlying proceeding was terminated in his favor to make out a malicious prosecution claim. *Id.* " 'Where the prosecution did not result in an acquittal, it is deemed to have ended in favor of the accused, for these purposes, only when its final disposition is such as to indicate the innocence of the accused.' " *Id.* (quoting *Murphy v. Lynn,* 118 F.3d 938, 948 (2d Cir.1997)).

**\*10** As stated, Background, *supra,* at 4, Plaintiffs allege New York common law claims for false arrest and malicious prosecution, as well as § 1983 claims based on false arrest, malicious prosecution, and denial of a fair trial. The existence of probable cause for the arrest and malicious prosecution of Plaintiffs, however, is a complete defense to Plaintiffs' common law false arrest and malicious prosecution claims, as well as Plaintiffs' § 1983 false arrest and malicious prosecution claims. *See Manganiello v. City of New York,* 612 F.3d 149, 161–62 (2d Cir.2010) (probable cause is complete defense to malicious prosecution claim in violation of New York common law and § 1983); *Jaegly v. Couch,* 439 F.3d 149, 152 (2d Cir.2006) ("Under New York law, the existence of probable cause is an absolute defense to a false arrest claim."); (*Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995) (probable cause is complete defense to false arrest in violation of civil rights claim).

Further, an indictment by a grand jury establishes a rebuttable presumption of probable cause. [13] *Manganiello,* 612 F.3d at 162 (citing *Savino v. City of New York,* 331 F.3d 63, 72 (2d Cir.2003)). The presumption of probable cause "may be rebutted only 'by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.' " *Manganiello,* 612 F.3d at 162 (quoting *Savino,* 331 F.3d at 72 (quoting *Colon v. City of New York,* 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248, 1251 (N.Y.1983))). Where there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have 'lied in order to secure an indictment,' and 'a jury could reasonably find that the indictment was secured through bad faith or perjury,' the presumption of probable cause created by the indictment may be overcome." *Id.* (quoting *Boyd v. City of New York,* 336 F.3d 72, 77 (2d Cir.2003)). " 'Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police

officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process.' " *Id.* (quoting *Ricciuti v. N.Y.C. Transit Authority,* 124 F.3d 123, 130 (2d Cir.1997) (quoting *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)).

[13]   Although an indictment subsequent to an arrest does not give rise to a presumption of probable cause to defeat a false arrest claim, *Broughton v. State,* 37 N.Y.2d 451, 373 N.Y.S.2d 87, 335 N.E.2d 310, 313 (N.Y.1975) (holding arraignment and subsequent indictment of defendant did not generate presumption of probable cause to support arrest), in the instant case, according to the Complaint, Plaintiffs were indicted prior to the arrest. Complaint ¶ 39 ("as a result of said indictment the Plaintiffs were both arrested and deprived of their liberty ...."). An arrest is privileged if based on probable cause in accord with the fourth element under New York law. *See Bernard,* 25 F.3d at 102 (affirming district court's grant of summary judgment in favor of government on plaintiff's false arrest claim where the only element in dispute, *i.e.,* that the confinement was privileged, was established by the existence of probable cause to support the arrest).

Nevertheless, "probable cause can exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994) (citing *Colon v. City of New York,* 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (N.Y.1983). Further, "that plaintiff was ultimately acquitted after trial does not negate the existence of probable cause [rebutting the presumption of probable cause afforded by the indictment]." *Nadal v. City of New York,* 105 A.D.3d 598, 964 N.Y.S.2d 100, 101 (1st Dept.2013) (citing *Jenkins v. City of New York,* 2 A.D.3d 291, 770 N.Y.S.2d 22, 24 (1st Dept.2003)) ("Despite plaintiff's subsequent acquittal, there was nonetheless probable cause for the arresting officers' actions.")).

**\*11** In the instant case, the Indictment returned by the Orleans County Grand Jury on March 15, 2013, establishes the requisite probable cause to extinguish Plaintiffs' common law false arrest and malicious prosecution claims, as well as Plaintiffs' § 1983 claims based on false arrest and malicious prosecution. Significantly, Plaintiffs do not allege in the Complaint any facts which, if true, would establish that

the Indictment was secured through bad faith or perjury by persons acting under color of state law, such as law enforcement officers, so as to rebut the presumption of probable cause supporting the Indictment, and a plain reading of the Complaint reveals no allegations to that effect.

Accordingly, Plaintiffs' New York common law claims for false arrest and malicious prosecution, as well as the § 1983 claim for false arrest and malicious prosecution fail to state a claim for which relief could be granted and the motions to dismiss should be GRANTED as to these claims.

**E. Fair Trial**

Insofar as Plaintiffs' civil rights claim can be construed as alleging a violation of their right to a fair trial, *see* Complaint ¶ 33 (alleging unspecified Defendants appeared before the Grand Jury and intentionally or negligently misrepresented and falsified facts and evidence); ¶ 34 (alleging unspecified Defendants presented false, fraudulent and perjured testimony to the Grand Jury and at trial); and ¶ 73 (alleging violations of, *inter alia,* Plaintiffs' Fifth, Sixth, and Fourteenth Amendments), the Complaint may be liberally construed as asserting a denial of the fundamental right to a fair trial which must be dismissed for failure to state a claim. *See Bertuglia v. City of New York,* 839 F.Supp.2d 703, 723 (S.D.N.Y.2012) (" 'Pursuant to § 1983 and prevailing case law, denial of a right to a fair trial is a separate and distinct cause of action.' " (quoting *Nibbs v. City of New York,* 800 F.Supp.2d 574, 575 (S.D.N.Y.2011))).

"The Constitution guarantees a fair trial through the Due Process Clauses [of the Fifth and Fourteenth Amendments], but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment .... " *Strickland v. Washington,* 466 U.S. 668, 684–85, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (analyzing habeas petition asserting denial of fair trial based on violation of right to counsel under Sixth Amendment). Specifically, "the due process analysis is basically the same under both the Fifth and Fourteenth Amendments." *Chew v. Dietrich,* 143 F.3d 24, 28 n. 4 (2d Cir.1998). "[T]he [Supreme] Court has held that the due process clause of the Fifth Amendment prohibits federal action if the same action taken by a state would be proscribed under the Fourteenth Amendment." *United States Postal Service v. Brennan,* 574 F.2d 712, 717 n. 10 (2d Cir.1978) (citing *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954)). Here, however, Plaintiffs challenge only actions allegedly taken by Defendants under New York law and, as such, Plaintiffs allege only a violation of the

Fourteenth Amendment, rather than the Fifth Amendment. The Complaint thus fails to state any § 1983 claim based on a violation of the Fifth Amendment.

**\*12** Although a due process violation, including denial of the right to a fair trial, can be established by demonstrating that state action deprived Plaintiffs of a property or liberty interest protected by the Fourteenth Amendment, *Velez,* 401 F.3d at 85, the Fourteenth Amendment is relevant to Plaintiffs' fair trial claim only insofar as the Fourteenth Amendment's Due Process Clause make the Sixth Amendment applicable to Defendants as state actors. *See Tennesee v. Lane,* 541 U.S. 509, 523, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004) (recognizing the Sixth Amendment applies to the states via the Fourteenth Amendment). Further, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). Accordingly, because the Sixth Amendment provides the "explicit source of constitutional behavior" for Plaintiffs' fair trial claim, the claim cannot be analyzed under the Fourteenth Amendment.

The Sixth Amendment provides

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

U.S. Const. Amend. 6.

Further, that the government must prove the elements of the charged crime beyond a reasonable doubt "is a requirement and a safeguard of due process of law in the historic, procedural content of 'due process.'" *In re Winship,* 397 U.S. 358, 362, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (quoting *Leland v. Oregon,* 343 U.S. 790, 802–03, 72 S.Ct. 1002, 96 L.Ed. 1302) (1952) (Frankfurter, J., dissenting)).

"It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of the false evidence fabricated by a government officer." *Zahrey v. Coffey,* 221 F.3d 342, 355 (2d Cir.2000). "Such a claim based on fabrication of evidence may be properly pled where a plaintiff alleges that defendants fabricated evidence, which was likely to influence a jury's decision, and forwarded it to prosecutors." *McHenry v. Bell,* 2015 WL 2354438, at *8 (N.D.N.Y. May 15, 2015) (citing *Bertuglia,* 839 F.Supp.2d at 724; and *Ricciuti,* 124 F.3d at 130). " 'The constitutional right in question is the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity ... provided that the deprivation of liberty ... can be shown to be the result of the [officer's] fabrication of evidence." *Id.* (internal quotation marks and citations omitted). "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial...." *Ricciuti,* 124 F.3d at 130. Further, "[i]t has long been established that a prosecutor who knowingly uses false evidence at trial to obtain a conviction acts unconstitutionally." *Zahrey,* 221 F.3d at 355.

**\*13** In the instant case, although Plaintiffs allege unidentified Defendants presented falsified information to the Grand Jury as well as at trial, the failure to specify what constituted the allegedly falsified information is fatal to Plaintiffs' fair trial claim. Nor does Plaintiffs' assertion, Complaint ¶ 35, that exculpatory evidence was withheld from the Grand Jury require a different result because the prosecutor is not required to disclose to the grand jury "substantial exculpatory evidence" in its possession. *United States v. Williams,* 504 U.S. 36, 51–55, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) ("requiring the prosecutor to present exculpatory as well as inculpatory evidence would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body."). Here, none of the individual moving Defendants are alleged by Plaintiffs to have acted in a manner by which Plaintiffs' trial was unfairly compromised.

Accordingly, the motions to dismiss should be GRANTED insofar as Plaintiffs' claim they were denied a fair trial by any named Defendant.

### F. Personal Involvement

Prosecuting Defendants and Insurance Defendants argue in support of dismissal that Plaintiffs' have failed to allege the requisite personal involvement of individual Defendants in the asserted claims, relying instead on "group pleading" allegations which are insufficient to put the Defendants on notice as to the claims asserted against them and thus fail to comport with Fed.R.Civ.P. 8 ("Rule 8"). Prosecuting Defendants' Memorandum at 6–8; Insurance Defendants' Memorandum at 5–6. Fire Prevention Defendants argue the Complaint fails to allege any of the Fire Prevention Defendants were personally involved in the asserted unlawful conduct. Fire Prevention Defendants' Memorandum at 5–6.

" 'It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Spavone v. New York State Dept. of Correctional Services,* 719 F.3d 127, 135 (2d Cir.2013) (quoting *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). Pleadings that fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim. *See, e.g., Holmes v. Allstate Corp.,* 2012 WL 627238, at ——7 and 22 (S.D.N.Y. Jan.27, 2012) (commenting that "[p]laintiffs' method of group pleading is incoherent or illogical" and "Rule 8(a) is violated where a plaintiff, by engaging in 'group pleading,' fails to give each defendant fair notice of the claims against it." (citing *Pierson v. Orlando Regional Healthcare Systems, Inc.,* 619 F.Supp.2d 1260, 1273 (M.D.Fla.2009) (dismissing complaint because group-pleading method of collectively referring to individual defendants and two physician groups as "Peer Review Defendants" throughout complaint did not satisfy the "fair notice" requirement of Rule 8))); *Zurich American Ins. Co. v. Dah Sing Bank, Ltd.,* 2004 WL 1328215, at *6 (S.D.N.Y. June 15, 2004) (dismissing complaint as against one defendant bank against whom not "a single factual allegation" was made but, rather, "lumps the three bank defendants together and asserts that they collectively processed the checks."). Such "group pleading" is insufficient for purposes of Rule 8(a) (2) which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *See Iqbal,* 566 U.S. at 678 ("the pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-

2015 WL 5316410

defendant-unlawfully-harmed-me accusation." (citations and quotation marks omitted)).

**\*14** Here, Plaintiffs' failure to specify against which moving Defendants their claims are asserted requires dismissal of Plaintiffs' claims as to those Defendants.

### G. Supervisory Liability

Plaintiffs' third claim alleges supervisory liability under § 1983 and New York law against Defendants Orleans County, the Town, the Village, the Orleans County Sheriff, the Crime Task Force, the Fire Prevention Office, the Niagara County Sheriff, Hartford, and Sentinel for negligent hiring, supervision, and retention. Complaint ¶¶ 62–69.

#### 1. § 1983

Supervisory liability under § 1983

> can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)).

There can be no supervisory liability for gross negligence of a subordinate, however, unless the subordinate has actually violated a plaintiff's constitutional rights. *Raspardo v. Carlone,* 770 F.3d 97, 123 (2d Cir.2014) (citing *Poe v. Leonard,* 282 F.3d 123, 134 (2d Cir.2002) (holding a supervisor may not be held liable under § 1983 for acts of a subordinate unless both the subordinate's violation of the plaintiff's rights and the supervisory liability doctrine

under which the plaintiff wishes to hold the supervisor liable are clearly established). *See also Blyden v. Mancusi,* 186 F.3d 252, 265 (2d Cir.1999) ("Of course, for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation."); *Elek v. Inc. Village of Monroe,* 815 F.Supp.2d 801, 808 (S.D.N.Y.2011) (where the plaintiff "has not established any underlying constitutional violation, [the plaintiff] cannot state a claim for § 1983 supervisory liability."). In the instant case, because Plaintiff has failed to state any constitutional deprivation claim against any individual Defendant, there is no basis for any claim for supervisory liability as against Defendants Orleans County, Orleans County Sheriff, the Village, the Town, and Niagara County Sheriff.

Alternatively, assuming, *arguendo,* Plaintiff had stated an underlying § 1983 claim against an individual Defendant, "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior.*" *Hernandez,* 341 F.3d at 144 (citing *Al–Jundi v. Estate of Rockfeller,* 885 F.2d 1060, 1065 (2d Cir.1989)). " 'Absent some personal involvement by [the supervisory official] in the allegedly unlawful conduct of his subordinates,' he cannot be liable under section 1983.' " *Id.* at 144–45 (quoting *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987)). Even an imperfect investigation, without more, does not give rise to a constitutional violation. *Friedman v. New York City Admin. for Children's Services,* 502 Fed.Appx. 23, 27 (2d Cir. Nov.6, 2012) (citing *Wilkinson v. Russell,* 182 F.3d 89, 106 (2d Cir.1999)).

**\*15** A plaintiff, however, " 'cannot base liability solely on [a defendant's] supervisory capacity or the fact that he held the highest position of authority' within the relevant governmental agency or department." *Houghton v. Cardone,* 295 F.Supp.2d 268, 276 (W.D.N.Y.2003) (quoting *Burgess v. Morse,* 259 F.Supp.2d 240, 248 (W.D.N.Y.2003)). Simply put, "the conclusory assertion that a supervisory official was personally involved in the deprivation of constitutional rights, without support factual allegations, is not sufficient to state a claim under § 1983." *Roberites v. Huff,* 2012 WL 1113479, at \* 6 (W.D.N.Y. Mar.30, 2012).

Here, Plaintiffs merely allege that Defendants Orleans County, the Town, the Village, the Orleans County Sheriff, the Crime Task Force, the Fire Prevention Office, the Niagara County Sheriff, Hartford, and Sentinel "were grossly negligent in training and supervising the individual [*sic* ] named defendant officers who arrested the Plaintiff and

fabricated false charges against them with malice, with respect to the proper exercise of their police powers in a manner consistent with the Fourth and Fourteenth Amendments to the Constitution of the United States, and with the relevant provisions of the Constitution of the State of New York," Complaint ¶ 66, that "the negligence of the defendants in the aforesaid respects was so gross as to constitute deliberate indifference to the rights of the Plaintiff[s], *id.* ¶ 67, and that such Defendants "are vicariously liable to the Plaintiff for the actions of their employees .... " *Id.* ¶ 68. There are, however, no facts alleged to support these conclusory allegations. *See Otis–Wisher v. Medtronic, Inc.,* —— Fed.Appx. ——, 2015 WL 3557011, at * 2 (2d Cir. June 9, 2015) (conclusory allegations do not satisfy plausibility requirement under *Iqbal* ). As such, the Complaint fails to state a claim for supervisory liability as against Defendants Orleans County, the Town, the Village, the Orleans County Sheriff, the Crime Task Force, the Fire Prevention Office, the Niagara County Sheriff, Hartford, and Sentinel.

**2. New York Common Law**

Plaintiffs' negligent hiring, supervision and retention claim is also alleged under New York Law against Orleans County, the Town, the Village, Albion Police Department, Orleans County Sheriff, the Crime Task Force, the Fire Prevention Office, Niagara County Sheriff, Hartford, and Sentinel. Complaint ¶ 66. "Under New York law, a claim for negligent hiring, supervision or retention, 'in addition to the standard elements of negligence,' requires 'a plaintiff [to] show: (1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels." " *Bouchard v. New York Archdiocese,* 719 F.Supp.2d 255, 261 (S.D.N.Y.2010) (quoting *Ehrens v. Lutheran Church,* 385 F.3d 232, 235 (2d Cir.2004) (quoting *Kenneth R. v. Roman Catholic Diocese of Brooklyn,* 229 A.D.2d 159, 654 N.Y.S.2d 791, 792 (2d Dept.1997)). Here, Plaintiffs have failed to plead any of these elements.

**\*16** With regard to the first element, Plaintiffs have failed to allege that any of the individually named moving Defendants were in an employee-employer relationship with any of the other moving Defendants in a supervisory capacity. For example, none of the individually sued police officers, *i.e.,* Doyle, Fuller, Gifaldi, or Hughes, is alleged to be an employee of any of the sued municipal Defendants. Nor, have Plaintiffs

alleged any facts establishing any supervisory Defendant knew or should have known that any employee named as a Defendant had a propensity for the alleged unlawful conduct. Finally, there is no allegation that any tort was committed on any supervisory Defendant's property or with such Defendant's chattels. Accordingly, Plaintiffs' have failed to allege a claim for negligent hiring, supervision or retention under New York law.

The Motions to Dismiss should be GRANTED as to Plaintiffs' Third Claim alleging supervisory liability.

**H. Municipal Liability**

With regard to the claims against Orleans County, the Town, and the Village, it is settled that municipalities may not be held liable under § 1983 solely on the basis of *respondeat superior* unless the alleged "deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven,* 691 F.3d 72, 80 (2d Cir.2012) (citing *Monell v. Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a respondeat superior basis for the tort of its employee." *Id.* "[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Board of Commissioners of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). As such, municipal liability may be found "when the execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible for under § 1983." *Monell,* 436 U.S. at 691.

Here, Plaintiffs have not alleged that the Town, Village, or Orleans County maintained any policy pursuant to which Plaintiffs allegedly were subjected to false arrest and malicious prosecution or denial of a fair trial. Nor do Plaintiffs claim such moving Defendants routinely disregard any applicable policy in making arrests or conducting criminal prosecutions. Accordingly, insofar as Plaintiffs assert claims based on *respondeat superior* against the Town, Village and County, such claims must be dismissed.

**I. Statutory Immunity**

The Insurance Defendants assert statutory immunity insofar as Plaintiffs' claims are based on the release of information

relative to the fire investigation. Insurance Defendants' Memorandum at 8. As relevant, New York Insurance Law ("N.Y.Ins.Law") § 319 (" § 319"), provides that

> **\*17** Each insurer authorized to issue policies covering losses incurred to personal or real property through fire shall contact the appropriate law enforcement agency and release information in its possession resulting from an investigation conducted by it pertaining to any such fire loss, should the insurer be of the opinion that the fire was caused by other than accidental means.

N.Y. Ins. Law § 319(b).

Significantly, insurance providers are granted immunity for all conduct under § 319 pursuant to N.Y. Ins. Law § 3432 (" § 3432"), which provides

> In the absence of fraud or bad faith, there shall be no liability on the part of, and no cause of action of any nature shall arise against, an insurer ... or any person acting on their behalf with respect to obligations and duties performed pursuant to the sections referred to in subsection (b) hereof.

N.Y. Ins. Law § 3432(a).

As relevant, such civil or criminal "immunity shall apply to * * * information, reports, assistance in investigations, notification, made in the absence of fraud or bad faith, to any authorized law enforcement agency" pursuant to § 319. N.Y. Ins. Law § 3432(b)(4). Significantly, the Complaint is devoid of any allegation that any of the Insurance Defendants engaged in any fraud or bad faith so as to render the statutory immunity inapplicable. The Complaint thus fails to state a claim against the Insurance Defendants.

### J. Defendant Savage

Savage is a defendant only to Plaintiffs' New York common law malicious prosecution claim. Complaint ¶ 54. As discussed, Discussion, *supra,* at 22–24 (citing caselaw), the existence of probable cause, a required element of a malicious prosecution claim under New York law for which the Indictment creates a rebuttable presumption, is fatal to this claim. Furthermore, the Complaint is devoid of any factual allegations pertaining to Savage and, as such, falls far short of pleading the requisite malice for a malicious prosecution claim. The Complaint thus fails to state any claim against Savage whose motion to dismiss should be GRANTED.

### K. Non–Moving Defendants

As stated, Discussion, *supra,* at 15, the other named Defendants to this action, including the Albion Fire Department, Rocco Sidari, Jeremy Grahm, Donald Clawson, Michael Jutrowski, Adrieum Ann Park, and Nicholas Long, have not moved to dismiss the Complaint for failure to state a claim, and the court therefore expresses no opinion as to whether the claims asserted against the non-moving Defendants are viable. *See Grant v. County of Erie,* 542 Fed.Appx. 21, 24 (2d Cir. Oct.17, 2013) (reversing district court's *sua sponte* dismissal of action for failure to state a claim based on failure to provide plaintiff with notice of the grounds for dismissal and an opportunity to be heard).

### L. Dismissal with Prejudice

The moving Defendants seek dismissal of the Complaint with prejudice. *See* Insurance Defendants' Motion at 2 (seeking as relief "an order dismissing the action in its entirety as to [Insurance Defendants]"); Fire Prevention Defendants' Memorandum at 7; Altshiler Reply Declaration ¶¶ 5–6 (asserting probable cause requires dismissal of claims in their entirety); and Savage Reply at 2 (requesting dismissal with prejudice). Generally, the court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991). Nevertheless, where further amendment of the complaint would be futile, dismissal of the complaint with prejudice to filing an amended complaint is not an abuse of discretion. *See Van Buskirk v. the New York Times Co.,* 325 F.3d 87, 92 (2d Cir.2003) (affirming district court's dismissal of complaint with prejudice for failure to state a claim where amendment of complaint would have been futile).

**\*18** In the instant case, the futility of permitting Plaintiffs to file an Amended Complaint is discussed below. Discussion,

*infra*, at 37–49. Accordingly, based on that analysis, the Motions to Dismiss for failure to state a claim should be GRANTED as to Prosecuting Defendants, the Insurance Defendants, Savage, and the Fire Prevention Defendants against whom the Complaint should be DISMISSED with prejudice.

### 3. Motion to Amend

In opposing moving Defendants motions to dismiss, Plaintiffs move for leave to file an amended complaint which Plaintiffs assert should be granted because the "more detailed description of the Defendants [*sic* ] culpable conduct is provided in the [Proposed] Amended Complaint apprising each defendant of its specific acts and omissions presented in this litigation and will provide judicial economy for the Court and litigants." Plaintiffs' Memorandum at 11. Plaintiffs further argue that should leave to amend be granted, Defendants will not suffer any substantial prejudice, nor is Plaintiff's Motion brought for undue delay, in bad faith, or for any dilatory motive. *Id.* at 11–12. Moving Defendants argue in opposition that Plaintiffs' Proposed Amended Complaint fails to cure the deficiencies in the Complaint such that Plaintiffs' Motion is futile and should be denied. In particular, Prosecuting Defendants argue that the Proposed Amended Complaint fails to allege facts rebutting the presumption of probable cause attributed to the Indictment and truncating the false arrest and malicious prosecution claims against the Prosecuting Defendants, and also fails to allege facts supporting any claim for negligent hiring, supervision or retention, Altshiler Reply Declaration ¶¶ 4–6; Amended Altshiler Reply Declaration ¶¶ 8–10, and that insofar as Plaintiffs seek to allege Defendant Gifaldi "testified falsely" and "vaguely allege that 'defendants [*sic* ] own investigation proved their testimony to be false,' " Amended Altshiler Reply Declaration ¶ 4, witnesses, including law enforcement officials, are absolutely immune from liability for testimony, even if such testimony is perjured. *Id.* ¶¶ 5–6. Defendant Savage argues in opposition to Plaintiffs' Motion that the Proposed Amended Complaint is devoid of any allegation of wrongdoing against Savage and contains only an admission that Savage committed no tort. Savage Reply at 3–4. In opposition to Plaintiffs' Motion, Insurance Defendants argue the Proposed Amended Complaint fails to cure any of the group-pleading and vagueness deficiencies of the Complaint, Insurance Defendants' Reply at 3–4, also fails to address Insurance Defendants' statutory immunity under New York law, *id.* at 4, and thus is futile. *Id.* at 4–7. The Fire Prevention Defendants argue in opposition to Plaintiffs' Motion that the Proposed Amended Complaint

fails to allege any involvement by Defendant Shadic with the fire investigation and subsequent prosecution, Calhoun Reply Declaration ¶¶ 6–8, alleges only that Defendant Holter was involved in the fire investigation, *id.* ¶ 9, and did not conduct a proper arson investigation but instead "rubber-stamped" Gifaldi's investigation which fails to allege the malice required for a malicious prosecution. *Id.* ¶ 10. Fire Prevention Defendants further argue that Proposed Amended Complaint's lack of any allegation that Shadic or Holter was personally involved in any constitutional deprivation against Plaintiffs also precludes any supervisory liability claim against Defendant Fire Prevention Office.

**\*19** Under Fed.R.Civ.P. 15(a), leave to amend "shall be freely given when justice so requires." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Burns v. Imagine Films Entertainment, Inc.,* 165 F.R.D. 381, 384 (W.D.N.Y.1996) (quoting Fed.R.Civ.P. 15(a)). Therefore, "an amended pleading may be filed pursuant to Rule 15(a) where the new allegations do not unduly prejudice an opponent, are not the result of undue delay or bad faith, and are not futile." *Warren v. Goord,* 2006 WL 1582385, at * 7 (W.D.N.Y. May 26, 2006). Further, "[a]n amendment to a pleading is futile if it could not withstand a motion to dismiss under Rule 12(b)(6)." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals,* 282 F.3d 83, 88 (2d Cir.2002). In ruling on a motion under Rule 12(b)(6), and thus, in considering the plausibility of a proposed amended pleading, the court may consider only "the fact as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated into the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007). Here, Defendant Savage filed in support of his motion to dismiss [14] exhibits, including copies of the Investigative Report and its accompanying photographs, as well as the Supplementary Report, both of which the court may consider because Plaintiffs have referenced them in their Proposed Amended Complaint. *See Avon Pension Fund v. GlaxoSmithKline PLC,* 343 Fed .Appx. 671, * 3 n. 2 (2d Cir. Aug.24, 2009) (considering, on motion seeking leave to file amended complaint filed in opposition to motion to dismiss complaint, the transcript of physician's testimony not attached to proposed amended complaint but incorporated by reference).

14      Savage moved, in the alternative, for summary judgment. Based on the court's recommendation that the Complaint be dismissed as to Savage,

Savage's alternative motion for summary judgment is DISMISSED as moot.

In the instant case, moving Defendants do not argue that permitting Plaintiffs to file an amended complaint will result in any undue prejudice, undue delay, or bad faith; rather, moving Defendants maintain that Plaintiffs' Motion should be denied on the ground of futility because the Proposed Amended Complaint, like the Complaint, fails to state a claim for which relief can be granted. Here, a thorough reading of the Proposed Amended Complaint establishes that it fails to cure the defects of the Complaint, such that Plaintiffs' Motion should be denied as to the Prosecuting Defendants, the Insurance Defendants, Defendant Savage, and the Fire Prevention Defendants that have opposed Plaintiffs' Motion.

### 1. Prosecuting Defendants

The Proposed Amended Complaint asserts against the Prosecuting Defendants claims for common law false arrest, malicious prosecution, negligent hiring, and supervision, and retention, as well as § 1983 violations for false arrest, malicious prosecution and denial of a fair trial. The Proposed Amended Complaint, as discussed in connection with the Complaint, Discussion, *supra*, at 17–18, fails to establish any basis upon which Defendants Orleans County Sheriff, the Crime Task Force, the Albion Police, and the Niagara County Sheriff may be sued given that such Defendants, as administrative arms of municipal corporations, do not exist separate and apart from the municipality and thus do not have their own legal identity. *Laboy*, —— F.Supp.3d at ——; 2015 WL 1977251, at * 6 (W.D.N.Y. May 4, 2015).

**\*20** With regard to Defendants Orleans County, the Town, the Village, Doyle, Fuller, Gifaldi, and Hughes, as discussed, Discussion, *supra*, at 22–24, the Indictment creates a rebuttable presumption of probable cause that defeats the common law and § 1983 false arrest and malicious prosecution claims. Significantly, Plaintiffs do not describe what was put before the Grand Jury that Plaintiffs maintain was false or fraudulent and the Proposed Amended Complaint is devoid of any factual allegations that any Defendant cajoled or importuned any witness to appear to testify untruthfully before the Grand Jury so as to obtain the Indictment. *See Rohman v. New York City Transit Authority (N.Y.CTA)*, 215 F.3d 208, 217 (2d Cir.2000) (defendant to malicious prosecution claim must be shown to have knowingly provided false or fabricated evidence or importuned authorities to act). The Proposed Amended Complaint also lacks reasonable clarity as to whether Plaintiffs assert any moving Defendant

was responsible for submitting the Investigative Reports to the Grand Jury as evidence on which the Grand Jury could indict Plaintiffs. Nevertheless, that Plaintiffs sue Savage, whose only participation in the events leading to Plaintiffs' arrest and prosecution is the preparation of the Investigative Reports, strongly implies Plaintiffs believe the Investigative Reports were presented to the Grand Jury.

Nor is the Investigative Report inconsistent with a finding of probable cause, the absence of which is a necessary element of the false arrest and malicious prosecution claims. In particular, the Investigative Report states the Albion Police initially listed the fire's cause as "undetermined pending further investigation." Investigative Report at 2. Savage determined the fire's origin was located near the rear wall of the shop's office near Harris's desk and a large sofa where most of the fire damage had occurred. *Id.* at 3. Although the remains of a medium sized red plastic trash can with "fire/ melt damage" and which had "melted into itself," was found in front of Wright's desk instead of in its regular location between Harris's desk and the large sofa, *id.,* the caption to Photo 52 depicting the red plastic trash can indicates the trash can may have been kicked by fire department personnel while extinguishing the fire. An electrical cause of the fire, as Plaintiffs urge, Proposed Amended Complaint ¶¶ 45–47, is inconsistent with Savage's determination that "[e]xamination of structural electrical conductors and receptacles showed no arc damage or any indication of being related to the cause of the fire," Investigative Report at 3, and that a power strip on the floor near Harris's desk "sustained total fire damage" although Harris "stated it was not plugged in or being used." *Id.*

Further, the Investigative Report contains a motive for arson. In particular, when interviewed by Savage, both Harris and Wright reported the shop was having financial difficulties and Wright further stated he had personally borrowed $ 70,000 for the shop. Investigative Report at 4. It is noted in the Investigative Report that Plaintiffs' inability after being notified of the fire to return to the shop for 30 to 40 minutes because Plaintiffs "had to find a ride" was inconsistent with Plaintiffs' statements to Savage that Wright drove Plaintiff to her home where they both remained until learning of the fire. *Id.* at 5. The statement given by both Harris and Wright that the shop's rear door "could be secured with a good slam shut," *id.* at 4, is inconsistent with the finding that the door's striker plate was "very loose" such that "[t]he plunger was not able to seat properly in the striker plate and could easily move. *Id.* at 3. Moreover, although the Investigative Report

does not contain a conclusive determination of the cause of the fire, the Investigative Report states that "incendiary was not eliminated," *id.* at 4, and the Supplemental Report states that "incendiary still not eliminated." Supplemental Report at 1. It is significant that Plaintiffs do not challenge the accuracy of the Investigative or Supplemental Reports, nor do Plaintiffs attribute any part of the reports to fraud or bad faith. The Investigative Report and the Supplemental Report thus are not inconsistent with probable cause supporting both the Indictment and the subsequent arrest and prosecution of Plaintiffs. Thus, the Proposed Amended Complaint does not plausibly allege that any of the Prosecuting Defendants was responsible for the malicious prosecution of Plaintiffs as Plaintiffs allege, and is therefore futile.

**\*21** With regard to Defendant Doyle, the Proposed Amended Complaint alleges only that Doyle failed to report Mesita's observation that she perceived an electrical fire odor at the scene of the fire. Proposed Amended Complaint ¶¶ 45–47. Such allegations, however, assert a claim of negligent investigation which is not recognized under New York law, *see McCray v. City of New York,* 2007 WL 4352748, at \* 29 (S.D.N.Y. Dec.11, 2007) (citing *Jenkins v. City of New York,* 1992 WL 147647 at \* 8 (S.D.N.Y. June 15, 1992) (citing *Pandolfo v. U.A. Cable Systems,* 171 A.D.2d 1013, 568 N.Y.S.2d 981, 982 (4th Dept.1991))), nor is negligent investigation a basis for § 1983 liability in the absence of some special relationship creating an affirmative duty. *See, e.g., Daniels v. Williams,* 474 U.S. 327, 332–33 (1986) (negligent inaction will not suffice to establish a constitutional violation because Due Process clause is not implicated by a state official's negligent act causing unintended loss or injury to life, liberty, or property). *See also Daniels,* 474 U.S. at 332–33.

The Proposed Amended Complaint fails to set forth any allegation of unlawful conduct undertaken by Defendants Fuller and Hughes. Rather, Fuller is alleged to have conducted interviews of Harris and Wright at the Albion Police Station, Proposed Amended Complaint ¶ 49, which interview of Wright was subsequently lost by unidentified Albion Police, Proposed Amended Complaint ¶ 49, and both Fuller and Hughes are alleged to have informed Harris that the shop's security "DVR was sent out for testing to obtain the images captured on it during [ ] the evening in question," but "the Albion Police Department and its investigators failed to safeguard this important piece of exculpatory evidence." *Id.* ¶ 72. Both of these allegations assert, at most, that Fuller was negligent in investigating the fire which, as discussed,

Discussion, *supra,* at 43–44, is not a ground for liability under either state law or § 1983.

Defendant Gifaldi is named as a Defendant in the Proposed Amended Complaint's common law and § 1983 false arrest and malicious prosecution claims. As discussed, Discussion, *supra,* at 22–24, the Indictment creates a presumption of probable cause that is a complete defense to these claims, and none of the proposed factual allegations against Gifaldi rebuts the presumption. Specifically, Gifaldi is alleged to have failed to secure video footage from a security DVR which would have established Plaintiffs did not set the fire, Proposed Amended Complaint ¶ 71, but such failure, if true, constitutes investigatory negligence which is insufficient to sustain liability for false arrest and malicious prosecution under New York law or § 1983. *See Daniels,* 474 U.S. at 332–33 (negligent inaction not actionable under § 1983); *McCray,* 2007 WL 4352748, at \* 29 (negligent investigation not recognized under New York law). Gifaldi is also alleged to have "interviewed witnesses of known doubtfulness," and provided false Grand Jury testimony to secure the Indictment, Proposed Amended Complaint ¶ 74, embellished his job title at the trial, claiming to be a "Level II" arson investigator when no such designation exists, *id.* ¶ 75, and also falsely testified at trial that he failed to take any contemporaneous hand written notes which was contradicted by witnesses who reported observing Gifaldi taking notes. *Id.* ¶ 76. A law enforcement officer is absolutely immune from under § 1983 based on perjurious testimony either before the Grand Jury or given at trial. *Coggins v. Buonora,* 776 F.3d 108, 112 (2d Cir.2015) (citing *Rehberg v. Paulk,* ––––U.S. ––––, 132 S.Ct. 1497, 1506, 182 L.Ed.2d 593 (2012)). Further, Plaintiffs' assertions that Gifaldi coerced Defendants Adrian Parks ("Parks"), and Michael Jutrowski ("Jutrowski"), into falsely testifying against Plaintiffs, Proposed Amended Complaint ¶¶ 61–63, is negated by the assertion that "Defendants' own investigation provided [the testimony of Parks and Jutrowski] would be false and conflicted with the statements given by these witnesses." *Id.* ¶ 64. The Proposed Amended Complaint thus fails to state a claim against Gifaldi.

**\*22** Accordingly, Plaintiffs' motion is DENIED as to the Prosecuting Defendants.

### 2. Insurance Defendants

Insurance Defendants are listed as Defendants in the Proposed Amended Complaint's state common law malicious prosecution claim and negligent hiring, supervision and retention claims. Insurance Defendants are correct, Insurance

Defendants' Reply at 3–4, that the Proposed Amended Complaint fails to cure any of the group-pleading and vagueness deficiencies of the Complaint. *See* Discussion, *supra,* at 28–29. In particular, the Proposed Amended Complaint's allegations against the Insurance Defendants assert only that the Insurance Defendants never determined the fire's cause, Proposed Amended Complaint ¶ 39 ("the cause of the fire was never determined."), but that someone else alerted law enforcement that Plaintiffs intentionally started the fire. *Id.* ¶ 51 ("defendant Donald Clawson tipped off police Wright committed arson and burned down Harris's shop. Records indicate Clawson contacted Crime Stoppers and was seeking reward money for his lead."), and ¶ 52 ("Clawson contacted the Albion Police Department and/or Orleans County Sheriff and/or Hartford Insurance Co. and told these agencies and the insurance company David Wright committed arson and burned down Harris's shop."). No liability for malicious prosecution can be attributed to the Insurance Defendants based on the failure to determine the cause of the fire.

Nor is there any allegation that the Insurance Defendants improperly importuned or cajoled any law enforcement officers or the prosecutor to charge Plaintiffs. *Rohman,* 215 F.3d at 217 (defendant must have played an " ' active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act). Although the Proposed Amended Complaint asserts Nassivera, when testifying at trial, "intentionally misused tape recorded statements of the Plaintiffs," which "contained many inaudible portions and Nassivera filled in the blanks during his testimony with slanted interpretations" because Nassivera, as Hartford's agent "was motivated to sabotage Plaintiff Harris'[s] fire claim in any manner he could," Proposed Amended Complaint ¶ 73, Nassivera's trial testimony, even if perjured, is entitled to absolute immunity. *Coggins,* 776 F.3d at 112 (citing *Rehberg,* 132 S.Ct. at 1506).

Moreover, the Proposed Amended Complaint fails to avoid the Insurance Defendants' statutory immunity pursuant to § 3432(a) and (b)(4). Significantly, Plaintiffs failed to allege any fraud or bad faith on the part of the Insurance Defendants as to the "information, reports, assistance in investigations, [and] notifications" as required to avoid the applicable immunity. Even if the Insurance Defendants relied in some way on a source, Clawson, as a person of dubious credibility, such reliance is insufficient to support a malicious prosecution claim. *See Husbands v. City of New York,* 2007 WL 2454106, at * 8 (S.D.N.Y. Aug.16, 2007) (holding with regard to false

arrest and malicious prosecution claims that questionable credibility of witness's testimony "does not vitiate the basis for probable cause").

**\*23** Accordingly, Plaintiffs' Motion is DENIED on the basis of futility as to Insurance Defendants against whom the Proposed Amended Complaint fails to state a claim.

### 3. Defendant Savage

Savage is named in the Proposed Amended Complaint as a Defendant only to the malicious prosecution claim under New York common law. Proposed Amended Complaint ¶ 103. The Proposed Amended Complaint asserts only that Savage, working on contract with Hartford, performed a forensic investigation of the fire to determine the fire's origin and cause and prepared a report regarding the investigation in which Savage concluded the fire's origin was along the shop's office's rear wall, that the ignition source, the first material ignited, and the ignition sequence were "unknown," such that the fire's "cause classification" was "undetermined with incendiary not eliminated." Proposed Amended Complaint ¶ 65. Even upon being provided additional fire debris samples one of which, upon laboratory analysis, was positive for fire accelerant "consistent with a 'medium petroleum distillate' such as mineral spirits, some paint thinners, and some charcoal starters," Savage did not consider the findings sufficiently significant to support altering her original conclusion that the fire's cause was undetermined. *Id.* ¶ 67. Nothing within these allegations plausibly implies that Savage engaged in any fraud or bad faith so as to subject Savage to any liability in connection with Plaintiffs' arrest and criminal prosecution for the fire. *See Otis–Wisher,* 2015 WL 255701, at *1 (to withstand dismissal allegation must plausibly establish defendant's liability). Even assuming, *arguendo,* the New York and § 1983 claims for false arrest and malicious prosecution could be brought against Savage, a private actor, *see Velez v. Levy,* 401 F.3d 75, 84 (2d Cir.2005) (§ 1983 liability requires defendant act under color of state law), Savage's conclusion in the Investigative Report and the fire's cause was "undetermined with incendiary not eliminated," a conclusion favorable to Plaintiffs, simply cannot be the basis for any such claims.

Plaintiffs' Motion thus is DENIED as to Savage.

### 4. Fire Prevention Defendants

The Proposed Amended Complaint's malicious prosecution claim is asserted against all Fire Prevention Defendants,

Proposed Amended Complaint ¶ 103 (Holter and Shadic), and ¶ 109 (Fire Prevention Office), and the negligent hiring, supervision and retention claim is asserted against Fire Prevention Office. *Id.* ¶¶ 112, 115, and 117. Insofar as the Proposed Amended Complaint fails to allege any involvement by Defendant Shadic with the fire investigation and subsequent prosecution, it fails to state a claim as against Shadic and is therefore futile. The Proposed Amended Complaint's allegation that Defendant Holter was involved in the fire investigation, *id.* ¶ 9, and did not conduct a proper arson investigation but instead "rubber-stamped" Gifaldi's investigation, *id.* ¶ 10, fails to plead the requisite element of malice for a malicious prosecution claim because it, at most, asserts a claim for negligent investigation which, as discussed, Discussion, *supra,* at 43–44, does not support a false arrest or malicious prosecution claim. Further, absent any claim stated against either Shadic or Holter, there is no basis for finding Shadic or Holter was personally involved in either the alleged malicious prosecution of Plaintiffs, such that the Fire Prevention Office cannot be held liable for negligent hiring, supervision or retention of these individual Defendants. *See Bouchard,* 719 F.Supp.2d at 261 ("A cause of action for negligent hiring or retention requires allegations that the employer ... failed to investigate a prospective employee notwithstanding knowledge of 'facts that would lead a reasonably prudent person to investigate that prospective employee.' " (quoting *Richardson v. City of New York,* 2006 WL 3771115, at *3 (S.D.N.Y. Dec.21, 2006))).

**\*24**  Plaintiffs' Motion is DENIED as to the Fire Prevention Defendants.

### 5. Non-moving Defendants

Although Plaintiffs' Motion is DENIED with regard to the Prosecuting Defendants, the Insurance Defendants, Defendant Savage, and the Fire Prevention Defendants and, assuming the District Judge agrees with the undersigned's recommendation that the action be dismissed as against the moving Defendants for failure to state a claim, the non-moving Defendants have not opposed Plaintiffs' Motion seeking leave to file the Proposed Amended Complaint which, despite failing to cure the deficiencies of the Complaint, does provide additional facts which are helpful to understand Plaintiffs' claims. Accordingly, insofar as Plaintiffs' Motion is unopposed by the non-moving Defendants, Plaintiffs' Motion is GRANTED as to these non-moving Defendants. Plaintiffs are directed to file **within ten (10) days** the Amended Complaint only asserting claims

against the non-moving Defendants, but should not attempt to re-plead the claims for which dismissal with prejudice is recommended as to the moving Defendants. Nothing in the foregoing Report and Recommendation and Decision and Order is intended to indicate how the court may rule on any possible motions by nonmoving Defendants addressed to the Amended Complaint.

### *CONCLUSION*

Based on the foregoing, the Prosecuting Defendants' Motion (Doc. No. 22) should be GRANTED in part and DENIED in part; the Insurance Defendants' Motion (Doc. No. 28) should be GRANTED; Savage's Motion (Doc. No. 30) should be GRANTED insofar as it seeks to dismiss the Complaint for failure to state a claim and is DISMISSED as moot as to the alternative request for summary judgment; and the Fire Prevention Defendants' Motion (Doc. No. 36) should be GRANTED; Plaintiffs' Motion is GRANTED in part and DENIED in part.

SO ORDERED as to Plaintiff's Motion to Amend and Savage's Motion for Summary Judgment.

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiffs and the Defendants.

SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2015 WL 5316410

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Kolbe & Kolbe Millwork, Co., Inc. v. Manson Ins. Agency, Inc., W.D.Wis., October 25, 2013

2012 WL 627238
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Tyrone HOLMES and Samuel's Temple
Church of God in Christ, Inc., Plaintiffs,

v.

The ALLSTATE CORPORATION, Bryan M.
Harris, a.k.a. Bryan Michael Harris, Bluebox
Entertainment, Inc., Harris Financial Inc.,
Harris Financial Insurance Inc., Associate
Management LLC, B.M. Harris Inc., First One
Distributors, Inc., I Am Global Ent. LLC, Harris
Financial Insurance Services, Defendants.

No. 11 Civ. 1543(LTS)(DF).
|
Jan. 27, 2012.

REPORT AND RECOMMENDATION

DEBRA FREEMAN, United States Magistrate Judge.

**\*1 TO THE HONORABLE LAURA T. SWAIN, U.S.D.J.:**

In this diversity action, plaintiffs Tyrone Holmes ("Holmes") and the church of which he has claimed to be the Executive Pastor, Samuel's Temple Church of God in Christ, Inc. (the "Church" or "Samuel's Temple") (collectively, "Plaintiffs") have asserted a variety of state-law claims against defendants the Allstate Corporation ("Allstate"), Bryan M. Harris ("Harris"), and a number of corporate entities of which Harris is purportedly the principal (the "Harris Entities"[1]) (collectively, "Defendants"), essentially alleging that Defendants mismanaged or stole more than half a million dollars that Plaintiffs had entrusted to Defendants for investment or other purposes.

[1]     The Harris Entities include: Bluebox Entertainment, Inc. ("Bluebox"), Harris Financial, Inc. ("HF"), Harris Financial Insurance, Inc. ("HFI"), B.M. Harris, Inc. ("BMH"), First One

Distributors, Inc. ("First"), Associate Management LLC ("Associate"), I Am Global Ent. LLC, a/ k/a Attracknaphobia, LLC ("IAGE"), and Harris Financial Insurance Services, Inc. ("HFIS").

Currently pending before the Court for a report and recommendation are five separate motions:

(1) a motion by Allstate to dismiss Plaintiffs' Amended Complaint, as against Allstate (Dkt.18);

(2) a cross-motion by Plaintiffs for leave to file a Second Amended Complaint (Dkt.33);

(3) a motion by Allstate against Plaintiffs for Rule 11 sanctions for bringing a frivolous lawsuit against Allstate (Dkt.27);

(4) a motion by Plaintiffs against Allstate for Rule 11 sanctions, for making purportedly false and unsupported statements to the Court in motion papers (Dkt.51); and

(5) a motion by Harris and the Harris Entities (collectively, the "Harris Defendants") to dismiss Plaintiffs' Amended Complaint as against them (see Dkt. 55).[2]

[2]     The Harris Defendants never actually filed a "motion" to dismiss the Amended Complaint; rather, they only filed a memorandum, with two attached declarations, in support of such a motion. The Court's Docket Clerk advised counsel that a memorandum and declarations in support of a motion should not be filed until a formal "motion" had been filed (see Docket entries following Dkt. 56), but it does not appear that counsel ever complied with the Court's rules. Nonetheless, given the nature of the arguments raised by the Harris Defendants in their submission, which relate to the adequacy of Plaintiffs' pleading, this Court has determined that it would be in the interest of effective case management to deem that submission a motion and to consider it as such.

For the reasons set forth below, I respectfully recommend that Allstate's motion to dismiss (Dkt.18) be granted and that Plaintiffs' claims against Allstate be dismissed with prejudice. I further recommend that Plaintiffs' cross-motion to amend (Dkt.33) be denied, as nothing in Plaintiffs' proposed amended pleading would cure the defects in the Amended Complaint. As for the pending sanctions motions, I recommend that Allstate's motion against Plaintiffs (Dkt.27)

be granted and that Plaintiffs' motion against Allstate (Dkt 51) be denied, as Plaintiffs' claims against Allstate are patently frivolous and Plaintiffs' sanctions motion against Allstate is procedurally defective and meritless. On these motions, I recommend that Plaintiffs' counsel be ordered to pay to Allstate certain costs it has incurred, as set forth below. Finally, I recommend that the motion by the Harris Defendants to dismiss Plaintiffs' claims against them (Dkt.55) be granted, without prejudice to Plaintiffs' filing a Second Amended Complaint that satisfies the requirements of Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure, with respect to Plaintiffs' claims against these defendants.

## BACKGROUND

### A. *The Amended Complaint*

Initially proceeding *pro se,* Holmes filed the initial Complaint in this matter on his own behalf. (*See* Complaint, dated Mar. 7, 2011 (Dkt.1).) Holmes then retained as counsel Eric Suffin, Esq. ("Suffin"), of the Law Firm of Eric Andrew Suffin, and, on June 1, 2011, Suffin filed an Amended Complaint, on behalf of both Holmes and the Church. (*See* Amended Complaint, dated May 17, 2011 ("Am.Compl") (Dkt.17).)

### 1. *Factual Allegations*

**\*2** At its core, the Amended Complaint alleges that Holmes and the Church entrusted Harris with more than half a million dollars, that Harris promised to make certain investments and purchases with the funds and also promised certain benefits to Holmes and his family, and that Harris broke these various promises. The Amended Complaint alleges the following facts, which are accepted as true for purposes of the motions to dismiss:

Plaintiff Samuel's Temple is a non-profit religious organization that formerly owned a church in East Harlem, New York. (*Id.* at ¶¶ 6, 7.) According to the Amended Complaint, Holmes is the Executive Pastor and Music Director of Samuel's Temple. (*Id.* at ¶ 3.) Defendant Harris is an Allstate agent and franchisee (*id.* at ¶ 10), who also operates defendant HFIS (*id.* at ¶ 13.) The Amended Complaint does not describe the nature of HFIS or the other Harris Entities, other than to allege that they are all "alter egos" of one another. (*Id.* at ¶¶ 15–22.)

In 2006, Plaintiffs received $1 million from a developer (*id.* at ¶ 27), and Defendants suggested that Plaintiffs' capital

be invested with them (*id.* at ¶ 32.) [3] Defendants promised Plaintiffs at least a 15–20% profit within two years of their investment. (*Id.* at ¶ 33.) Harris was to serve as Plaintiffs' investment advisor and business manager for their capital investments, and Defendants proposed investments in real estate, insurance, an entertainment company (defendant Bluebox), and various securities and derivatives. (*Id.* at ¶¶ 34, 37, 49.) In connection with their proposal, Defendants also allegedly promised many personal benefits for Holmes, including housing for him and his family in Georgia, insurance for him and his family, and appointments to several executive positions at Bluebox. (*Id.* at ¶¶ 38, 47, 49.)

[3]     The Amended Complaint predominately refers to "plaintiffs," without distinguishing between Samuel's Temple and Holmes. (*See generally* Am. Compl.) Similarly, throughout the Amended Complaint, Plaintiffs refer generally to actions of the "defendants," without differentiating among Allstate, Harris, or any of the Harris Entities. (*See generally id.*)

On the basis of these representations, Plaintiffs allegedly invested approximately $513,000. [4] (*Id.* at ¶ 53.) More specifically, Plaintiffs made a series of wire transfers to Bluebox, from August 2006 through February 2007, in amounts that totaled approximately $500,000. [5] (*Id.* at ¶¶ 56–58, 60.) Plaintiffs also invested approximately $15,000 in cash with Defendants, and made a $28,000 down payment for a piece of real estate. (*Id.* at ¶¶ 55, 61.) Defendants sent Plaintiffs promissory notes regarding amounts of $320,000 and $50,000, promising repayment of these principal amounts, together with interest, at a rate of 8.5% per annum on the unpaid balance, and promising balloon payments in the form of cashier's checks. (*Id.* at ¶ 59.) Despite demand, Plaintiffs allege that they have not received any money back from their investments with Defendants, nor have they received an accounting regarding their investments. (*Id.* at ¶¶ 69–72.) As described more specifically below, Plaintiffs also allege that Defendants did not follow through on their various alleged promises.

[4]     Plaintiffs generally allege that they invested approximately $513,000 with Defendants (*id.* at 53), but the more specific allegations concerning Plaintiffs' investments suggest a total of $543,000 (*see id.* at ¶¶ 56–58, 60 (alleging various wire transfers to Bluebox in amounts totaling $500,000);

¶ 61 (alleging cash investment of $15,000); ¶ 55 (alleging downpayment of $28,000 for real estate)).

5    On or about August 17, 2006, Plaintiffs transferred approximately $80,000 to Bluebox; on or about August 21, 2006, Plaintiffs transferred approximately $50,000 to Bluebox; on or about September 12, 2006, plaintiffs transferred approximately $320,000 to Bluebox; and on or about February 3, 2007, Plaintiffs transferred approximately $50,000 to Bluebox. (*See id.* at ¶¶ 56–58, 60.)

### a. *Blue Box*

**\*3** Holmes alleges that, as part of the alleged investment deal, he was promised stock and a number of positions at the entertainment company Bluebox. (*Id.* at ¶ 47.) Holmes was allegedly to become the Chief Executive Officer of Bluebox, as well as its Director of Music Production and Video Production. (*Id.*) Holmes was also to be appointed as Musician, Webmaster, Digital Music Engineer, and Songwriter for Bluebox. (*Id.*) Holmes and Samuel's Temple, together, were to become 51% stockholders of Bluebox. (*Id.*) Harris agreed to reduce his own stock holdings in Bluebox to only 49%, although he promised to serve as Bluebox's Chief Financial Officer and Business Manager. (*Id.* at ¶ 48.) Finally, Defendants promised to file "any required annual tax documents relating to Bluebox, and plaintiff Holmes's personal income taxes as a salaried corporate officer and employee of Bluebox ." (*Id.* at ¶ 44.)

According to the Amended Complaint, Defendants have admitted to omitting Plaintiffs' names from documents regarding control of Bluebox. (*Id.* at ¶ 76.)

### b. *Real Estate*

### i. *921 Moreland Avenue*

According to Plaintiffs, part of their money was supposed to be used to buy a house that, at the time, belonged to Harris, and Holmes and his family were to live in it. (*Id.* at ¶¶ 47, 55 .) Under the agreement, Samuel's Temple would become the titleholder of the property, which was located at 921 Moreland Avenue, in Atlanta, Georgia. (*Id.* at ¶¶ 47, 55.) Defendants allegedly represented that they would secure a purchase mortgage for Plaintiffs and make mortgage payments with Plaintiffs' capital investment. (*Id.* at ¶ 77.) Plaintiffs allege that on or around March 16, 2006, Plaintiffs

gave Defendants $28,000 as a down payment on this house. (*Id.* at ¶ 55.)

On or around December 28, 2007, Harris sent Plaintiffs an email indicating that the Moreland Avenue property, which Holmes and his family were by then occupying, was in danger of being foreclosed. (*Id.* at ¶ 79.)

Then, at some point in 2008, while Holmes was in New York, Harris allegedly entered the Moreland Avenue property, which Holmes was still using as a residence, and removed personal property belonging to Holmes, including a rifle, hard drives, two speakers, video footage, sound tools, documents, video masters, and music masters. (*Id.* at ¶ 80.) A person believed to be an agent of the City of Atlanta Police Department allegedly stood outside of the Moreland Avenue property while Harris entered the home and left with Holmes' personal property. (*Id.* at ¶ 80.)

At a later point in 2008, the house at 921 Moreland Avenue was foreclosed and Plaintiffs were evicted. (*Id.* at ¶ 81.) Plaintiffs allege that, despite the representations made by Defendants, Defendants never obtained a purchase mortgage for Plaintiffs for the Moreland Avenue property, and Defendants failed to use Plaintiffs' capital investment to make mortgage payments on that property. (*Id.* at ¶ 77.)

### ii. *Other Allegations Regarding Real Estate*

**\*4** HFIS and Harris, as an agent of Allstate, had an office at 1133 Forest Parkway, in Forest Park, Georgia. (*Id.* at ¶ 14.) In April of 2007, Defendants told Plaintiffs that Defendants had sold the mall that contained this office. (*Id.* at ¶ 67.) The Court is unclear as to whether Plaintiffs are claiming any interest in this mall.

Plaintiffs also allege that "[i]n or about 2008, defendants represented to plaintiffs that defendants bought a parcel and properties for the benefit of plaintiffs and lost the parcel and properties." (*Id.* at ¶ 68.) It is not clear to the Court whether this allegation refers to the property at 921 Moreland Avenue, discussed above, or to another piece of property.

### c. *Insurance*

Plaintiffs allege that Defendants said that they would purchase and maintain life insurance for Holmes and his family. (*Id.* at ¶¶ 49, 39.) Although Defendants later represented that they had purchased a $5,000 life insurance policy, this policy allegedly lapsed in November of 2010. (*Id.* at ¶¶ 62, 63, 82.)

According to Plaintiffs, Defendants also represented that they had purchased "business insurance policies" for the benefit of Plaintiffs (*id.* at ¶ 62), but the Amended Complaint does not indicate whether Defendants actually made such purchases, or, if so, whether these insurance policies also lapsed.

### d. *Loans to an Elected Representative*

Plaintiffs allege that Defendants loaned $20,000 to Ron Sailor Jr. (identified in the Amended Complaint as a Georgia Congressman) [6] from Plaintiffs' capital investment. (*Id.* at ¶ 64.) Plaintiffs do not indicate whether this loan was authorized by Plaintiffs or whether the loan was repaid.

[6]     The Court takes judicial notice of the fact that Walter Ronnie Sailor, Jr., was a Georgia state assemblyman (not a member of the U.S. Congress), who left office after pleading guilty to federal wire fraud and money laundering charges. *See* http://www.justice . gov/usao/gan/press/2008/06–17–08.pdf

### e. *Documents*

At some point, Defendants allegedly sent Plaintiffs a large collection of Allstate documents containing personal information of thousands of Allstate policyholders and other policyholders. (*Id.* at ¶ 29.) Plaintiffs assert that they stored these documents for nine years, without compensation, incurring approximately $10,080 in storage costs. (*Id.* at ¶ 30.) [7]

[7]     At the initial case conference before this Court on July 26, 2011, the parties informed the Court that Holmes was in possession of certain Allstate documents, which contained confidential information related to Allstate's current or former policyholders (the "Allstate Documents"). According to Holmes' counsel, these documents had been given to Holmes, years ago, by Harris. (*See* July 26, 2011 Rule 16 Conference Transcript, at 12, Ex. D to Declaration of Elizabeth D. Schrero in Opposition to Plaintiffs' Motion for Sanctions Under Rule 11, dated Oct. 17, 2011 ("10/17/11 Schrero Decl.") (Dkt.57).) The Court directed Holmes to transfer the Allstate Documents to Allstate's counsel, and directed Allstate to maintain these documents in its possession and to preserve them for use as potential evidence in this case. (*See*

Scheduling Order, dated Aug. 4, 2011 (Dkt.30).) At the following case conference on November 1, 2011, the document transfer having been made, Allstate's counsel informed the Court that, among the transferred documents were certain documents in which Allstate claimed no interest, and which appeared, on their face, to be documents, such as ledgers, related to the operations of Harris's business(es). This Court directed Allstate to return that subset of the transferred documents (the "Harris Documents") to counsel for Holmes, and directed counsel for Holmes to maintain the Harris Documents as "Attorneys Eyes Only." This Court further directed counsel for Holmes either to deliver copies of the Harris Documents to counsel for Harris or to make the documents available to Harris's counsel for inspection and copying. (*See* Scheduling Order, dated Nov. 4, 2011 (Dkt.61).)

### 2. *Legal Claims and Alleged Damages*

Plaintiffs assert nine claims against Defendants. One of these claims—for *prima facie* tort—is asserted solely against Harris. The eight remaining claims are brought against all Defendants. These claims include: (1) conversion; (2) fraud; (3) violation of New York Debtor and Creditor Law § 276; (4) negligent misrepresentation; (5) promissory estoppel; (6) unjust enrichment; (7) breach of contract; and (8) negligent infliction of emotional distress.

Plaintiffs demand $10 million in damages for the death of a Samuel's Temple member (whose death was allegedly "[d]irectly related to the conduct of defendants"), loss of business opportunities, loss of the ability to operate a school, harm to reputation, financial distress, harm to familial relations, and loss of employment at Bluebox. (Am. Compl. at ¶¶ 15, 86, 87, 88, 89, 94.)

### B. *Motions before the Court*

#### 1. *Allstate's Motions To Dismiss and for Sanctions*

**\*5** On June 28, 2011, Allstate moved to dismiss the Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (*See* Notice of Motion To Dismiss Plaintiffs' Amended Complaint as Against Defendant the Allstate Corporation ("Allstate Mtn. To Dismiss"), dated June 28, 2011 (Dkt.18).) Allstate seeks dismissal on the grounds that the Amended Complaint consists of improper "group" allegations against "defendants," that it alleges no direct action by Allstate and no conduct by Allstate that could make

it liable for the actions of any of the other defendants, and that each individual claim fails for additional and independent reasons. (*See generally* Allstate Mtn. To Dismiss.)

Allstate has also filed a motion for sanctions against Plaintiffs, as well as their counsel, under Rule 11 of the Federal Rules of Civil Procedure and based on the Court's inherent authority. (*See* Notice of Motion For Sanctions Under Rule 11 ("Allstate's Sanctions Mtn."), dated July 29, 2011 (Dkt.27).) In its sanctions motion, Allstate contends that, as against Allstate, the Amended Complaint is frivolous and without any factual or legal basis. (*Id.*)

### 2. *Plaintiffs' Motions for Leave To Amend and for Sanctions*

On August 5, 2011, Plaintiffs opposed Allstate's motion to dismiss and filed a cross-motion for leave to file a Second Amended Complaint. (Notice of Cross–Motion, dated Aug. 5, 2011 (Dkt.33).) Plaintiffs argue that, because Harris was an agent and franchisee of Allstate, Allstate is liable for the acts alleged in the Amended Complaint. (Plaintiff's Memorandum of Law in Opposition to Defendant the Allstate Corporation's Motion To Dismiss Plaintiff's Amended Complaint and in Support of Plaintiff s Cross–Motion for Leave To File a Second Amended Complaint ("Pl. Opp. Mem. to Allstate Mtn."), dated Aug. 5 (Dkt.34[8]), at 4.) Primarily on this basis, Plaintiffs contend that each of their eight claims against Allstate is well-founded. (*Id.* at 6–11.) Nonetheless, Plaintiffs also request leave of Court to file the proposed Second Amended Complaint that they submit with their cross-motion. (*Id.* at 11.)

[8] Through an apparent filing error, Plaintiffs' opposition memorandum was filed, in various parts, as Docket entries 34, 36 and 38.

On September 30, 2011, Plaintiffs filed a motion for sanctions against Allstate. (Notice of Motion, dated Sept. 30, 2011 (Dkt.51) .) Plaintiffs allege that certain statements contained in Allstate's memoranda in support of its two motions, and in a Declaration supporting Allstate's motion to dismiss and opposing Plaintiffs' cross-motion for leave to amend, are without evidentiary support. (Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Rule 11 Sanctions, dated Sept. 30, 2011 ("Pl. Sanctions Mem.") (Dkt.53), at 2.)

### 3. *Motions of the Harris Defendants*

On October 11, 2011, the Harris Defendants filed their own motion to dismiss the Amended Complaint. (*See* Memorandum of Law in Support of the Motion of Defendants, Bryan M. Harris a/k/a Bryan Michael Harris, Bluebox Entertainment, Inc., Harris Financial Insurance Services, Inc., Harris Financial, Inc., Harris Financial Insurance, In. Associate Management LLC, B.M. Harris Inc., First One Distributors, Inc., I Am Global Ent. LLC a/k/a Attracknaphobia, LLC To Dismiss The Amended Complaint ("Harris Mtn. To Dismiss"), dated Oct. 9, 2011 (Dkt.55).) The Harris Defendants contend that Plaintiffs have no standing to bring their claims; that, as a general matter, the Amended Complaint is inadequately pleaded; and that the nine claims also fail for independent reasons. (*See id.*)

**\*6** In opposition to the Harris Defendants' motion, Plaintiffs argue that each of their claims against these defendants is sufficient as pleaded, and Plaintiffs also submit additional documents related to the issue of standing and ask for leave to file an "Alternative Second Amended Complaint," which they submit with their opposition papers. (*See* Plaintiffs' Memorandum of Law in Opposition to Harris Defendants' Motion To Dismiss ("Pl. Opp. Mem. to Harris Mtn."), dated Nov. 10, 2011 (Dkt.64); *see also* Affidavit of Tyrone Holmes, dated Nov. 7, 2011 (Dkt.65); *see also* Declaration of Eric Andrew Suffin in Opposition to Harris Defendants' Motion To Dismiss, dated Nov. 10, 2011 ("11/10/11 Suffin Decl.") (Dkt.66).)

### DISCUSSION

### I. *ALLSTATE'S MOTION TO DISMISS AND PLAINTIFFS' CROSS–MOTION TO AMEND*

### A. *Applicable Legal Standards*

### 1. *Rule 12(b)(6)*

A case is subject to dismissal under Rule 12(b)(6) where the complaint is not legally sufficient to state a claim upon which relief can be granted. *See Kopec v. Coughlin,* 922 F.2d 152, 155 (2d Cir.1991). In deciding a Rule 12(b)(6) motion, the Court "accept[s] as true all factual statements alleged in the complaint and draw[s] all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007) (citation omitted); *accord Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). A court should grant dismissal where, after considering the plaintiff's allegations in this generous light, "it appears beyond doubt that the plaintiff can prove no set of

facts in support of his claim which would entitle him to relief." *Walker v. City of New York,* 974 F.2d 293, 298 (2d Cir.1992), *cert. denied,* 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993). At the same time, "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP,* 464 F.3d 328, 337 (2d Cir.2006) (citation omitted). Rather, in order to withstand a motion to dismiss, a complaint must plead "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) ("[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

### 2. *Rule 15(a)*

Rule 15(a) of the Federal Rules of Civil Procedure governs the amendment of complaints and provides that the court "should freely give leave when justice so requires." Fed.R.Civ.P. 15(a). A motion to amend should be denied, however, "if there is an 'apparent or declared reason—such as undue delay, bad faith or dilatory motive ... repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of an amendment, [or] futility of amendment.' " *Dluhos v. Floating and Abandoned Vessel Known as "New York,"* 162 F.3d 63, 69 (2d Cir.1998) (quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

**\*7** An amendment is considered futile when the proposed new claim would not withstand a motion to dismiss, either for failure to state a cause of action, or on another ground. *See Milanese v. Rust-oleum Corp.,* 244 F.3d 104, 110 (2d Cir.2001). Thus, if a proposed amendment would be subject to "immediate dismissal" on some ground, the Court will not permit the amendment. *See Jones v. NY. State Div. of Military & Naval Affairs,* 166 F.3d 45, 55 (2d Cir.1999). If, on the other hand, the party seeking to amend "has at least colorable grounds for relief, justice ... require[s]" that its motion be granted. *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 783 (2d Cir.1984) (citation omitted).

### B. *Adequacy of Plaintiffs' Allegations Against Allstate*

Allstate makes a number of arguments for dismissing the claims against it. As an initial matter, Allstate argues that

in order to state a claim against it, Plaintiffs would have to proceed under a theory that Harris had apparent authority to act on Allstate's behalf, but that Plaintiffs have not pleaded any facts sufficient to support the conclusion that Harris had such authority. Allstate also argues that the Amended Complaint fails to satisfy Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure. Finally, Allstate advances arguments for dismissing each of the eight individual claims against it on independent grounds. As this Court agrees that Plaintiffs have not pleaded facts sufficient to support any claim based on apparent authority, on which all of Plaintiffs' claims necessarily rest, I recommend that Allstate's motion to dismiss be granted on that ground, without regard to Allstate's other arguments.

### 1. *Lack of Allegations of Apparent Authority*

The Amended Complaint contains few allegations that relate, in particular, to Allstate. Instead, as noted above (*see* n. 3, *supra* ), Plaintiffs claim that "defendants" made and broke a range of promises. At best, Plaintiffs' use of the term "defendants" throughout the Amended Complaint is vague. At other times, Plaintiffs' method of group pleading is incoherent or illogical.[9] Given that Plaintiffs do not allege that Allstate itself engaged in any activity that would give rise to independent liability, Allstate argues that Plaintiff's theory of liability must be premised on Harris's actions and the doctrine of apparent authority. Under this doctrine, as explained by the New York Court of Appeals,[10] liability against a principal may arise if the principal's affirmative conduct causes a third party reasonably to believe that an agent has authority to act on behalf of the principal:

[9]

> For example, the Amended Complaint alleges that "Plaintiffs and defendants agreed that plaintiff Holmes would be Chief Executive Officer, Director of Music Production and Video Production, Musician, Webmaster, Digital Music Engineer and Songwriter, of, for and with defendant Bluebox, while living in real estate purchased with plaintiffs' capital ... plaintiff Church to benefit from potential profits of defendant Bluebox, plaintiffs to be 51% stockholders of defendant Bluebox." (*Id.* at ¶ 47.) It is difficult to understand how defendant Allstate could have made such promises. As another example, Plaintiffs allege that "[i]n or about April, 2007 defendants told plaintiffs that defendants sold the mall that defendants' Forest Park, Georgia office was located in ." (*Id.* at ¶ 67.) Construing

the term "defendants" to include all of the Harris Entities, as well as Allstate, would make little sense in this instance because defendants Bluebox, HF, HFI, BMH, First, Associate, and IAGE are not alleged to have had any connection to an office in Forest Park, Georgia, nor does it seem likely that these defendants or Allstate would have been involved in the alleged sale of the mall that contained this office. (*See id.* ¶¶ 12–14.)

10 In this diversity action, plaintiff Holmes alleges that he is a New York resident, and Samuel's Temple also appears to be located in New York. (*See* Am. Compl. at ¶¶ 2, 6, 7.) Defendant Harris is alleged to be a resident of Georgia, and the Harris Entities allegedly have principal places of business, or are incorporated, in Georgia. (*See id.* at ¶¶ 11, 12, 14, 23.) Defendant Allstate is alleged to have its principal place of business in Illinois. (*See id.* at ¶ 9.) The subject matter of the alleged contract(s) at issue was located in Georgia, and the alleged promises seem to have been made while Harris was in his Georgia office. (*See id.* at ¶¶ 37, 38, 54, 79.) Although this could potentially raise choice of law issues, the parties' submissions all cite New York case law. Such "implied consent ... is sufficient to establish choice of law." *Khubani v. Ionic White, Inc.,* No. 05 Civ. 3706(DC), 2008 U.S. Dist. LEXIS 30610, at *3 (S.D.N.Y. Apr. 3, 2008) (citing *In re Tehran–Berkeley Civil & Environmental Engineers,* 888 F.2d 239, 242 (2d Cir.1989)); *see also Global Switching Inc. v. Kasper,* No. CV–06–412 (CPS), 2006 U.S. Dist. LEXIS 44450, at *32 n. 10 (E.D.N.Y. June 29, 2006) ("In any event, where, as here, the parties are silent about the choice of law question, the Court may apply the law of the forum .") (citing *Michele Pommier Models v. Men Women N.Y. Model Mgmt.,* 14 F.Supp.2d 331, 336 (S.D.N.Y.1998)).

Essential to the creation of apparent authority are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction. The agent cannot by his own acts imbue himself with apparent authority. Rather, the existence of 'apparent authority' depends upon a factual showing that the third party relied upon the misrepresentation of the agent because of some misleading conduct on the part of the principal-not the

agent. Moreover, a third party with whom the agent deals may rely on an appearance of authority only to the extent that such reliance is reasonable.

 **\*8** *Hallock v. State of New York,* 64 N.Y.2d 224, 231, 485 N.Y.S.2d 510, 474 N.E.2d 1178 (1984) (internal quotations and citations omitted); *see also Ford v. Unity Hospital,* 32 N.Y.2d 464, 472–73, 346 N.Y.S.2d 238, 299 N.E.2d 659 (1973) ("The apparent authority for which the principal may be held liable must be traceable to him; it cannot be established by the unauthorized acts, representations or conduct of the agent"). Here, Allstate argues that Plaintiffs have not sufficiently alleged any facts that could support a finding that Harris was authorized by Allstate to make the promises or engage in the transactions that form the basis of Plaintiffs' claims.

Plaintiffs do not deny that they are proceeding against Allstate on a theory of apparent authority (*see* Pl. Opp. Mem. to Allstate Mtn. at 4), but they maintain that their allegations are sufficient to implicate Allstate under that theory. Specifically, the Amended Complaint contains the following allegations regarding the nature of Allstate's business, its relationship with Harris, and the role that Plaintiffs were supposedly led to believe that Allstate would take with respect to Plaintiffs' money and investments:

- Allstate "is purportedly an insurance, retirement, investment, and banking company, purporting to offer Asset Protection, Wealth Transfer, Family Protection Insurance, Financial Products, Asset Management and Accumulation, and Asset Management Short-term Financial Objectives. (Am. Compl. at ¶ 8.)

- Harris "was and is an Agent and Franchisee with, of and for defendant Allstate." (*Id.* at ¶ 10, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

- "[A]s an Agent of defendant Allstate[,] defendant Harris offered Allstate financial services, while simultaneously operating under the corporate name of defendant Harris Financial Insurance Services, Inc." (*Id.* at ¶ 13, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

- "At the time the plaintiffs received one million dollars in or about 2006 plaintiff Holmes believed that defendant Harris operated the most successful Allstate operation/business in the southeast region of the United States of America for the previous ten years, pursuant to representations to that effect by defendants." (*Id.* at ¶ 31, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

2012 WL 627238

- "Defendants represented to plaintiffs that capital invested by plaintiffs with defendants would be invested with defendant Allstate in the name of plaintiff Church." (*Id.* at ¶ 36, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

- "Defendants Harris, HFIS, Bluebox, HF, HFI, BMH, First, Associate, and IAGE used the Allstate name and logo to convince plaintiffs to invest with defendants, assuring plaintiffs that the investments were to be with Allstate."(*Id.* at ¶ 46, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

- "Defendants represented that plaintiffs' capital investment would be maintained and supervised by Allstate." (*Id.* at ¶ 52, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

- "On the basis of the representations made to plaintiffs by defendants, and relying upon defendants' advice and representation that Allstate was exercising certain controls and safeguards upon defendant Harris, plaintiffs invested approximately five hundred and thirteen thousand dollars with defendants." (*Id.* at ¶ 53, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

 **\*9**  • Harris "openly conducted plaintiffs' business and discussed plaintiffs' financial transactions during business hours while in Allstate offices, acting as an Agent of Allstate." (*Id.* at ¶ 54, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

- "Defendants represented to plaintiffs that defendant Allstate was the entity that sold certain securities and derivatives, life insurance policies and business insurance policies to plaintiffs." (*Id.* at ¶ 65, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

Plaintiffs also generally allege that each defendant is an "alter ego" of the other defendants. (*Id.* at ¶¶ 15–22, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

Yet, while these allegations may suggest that Harris, holding himself out as an Allstate agent, made certain representations to Plaintiffs regarding Allstate's involvement in the planned investment transactions, missing from the Amended Complaint is any allegation that Allstate *itself* engaged in any affirmative conduct that could have caused Plaintiffs reasonably to believe that Harris had the authority to bind Allstate to promises regarding how Plaintiffs' money would be spent or invested. *See Imburgio v. Toby,* 82 A.D.3d 653, 920 N.Y.S.2d 43, 43 (1st Dep't 2011) (granting

motion to dismiss where plaintiffs failed to allege facts that would impute liability to defendant, holding that, "[w]hile plaintiffs asserted that defendant's employee was vested with apparent authority based upon the employee's representations concerning the transactions at issue, such authority may arise only from the conduct of the principal, not the agent").

Despite its repeated references to actions undertaken by "defendants," the Amended Complaint implies that Harris made the promises and engaged or failed to engage in the conduct that underlies this action. (*See* Am. Compl. at ¶ 54 ("Defendant Harris openly conducted plaintiffs' business and discussed plaintiffs' financial transactions during business hours while in Allstate offices, acting as an Agent of Allstate.").) Indeed, even Plaintiffs' allegations that refer generally to the conduct of "defendants" suggest, in context, that Harris was the actor. For example, when Plaintiffs allege that they made wire transfers to Bluebox, a Harris company, "relying upon defendants' advice and representation that Allstate was exercising certain controls and safeguards" (*id.* at ¶¶ 56–58), Plaintiffs identify no action or words *by Allstate* regarding its involvement with Bluebox, much less any action or words by Allstate that could have led Plaintiffs to have the reasonable belief that Allstate was indeed exercising any such "controls and safeguards." In short, the Amended Complaint contains no allegations that Allstate did anything to make Plaintiffs believe that Harris had the authority to bind Allstate to any promises or that Harris's promises were being made on Allstate's behalf. In fact, neither the Amended Complaint nor common sense suggest any basis on which a reasonable person could have believed that Harris had the authority to bind Allstate to the types of promises alleged. [11]

[11]    For example, it is nearly inconceivable that Allstate would have authorized the transfer to Holmes of a large volume of Allstate documents containing confidential information of other policyholders, or that Allstate would—or even could—have authorized the loan of Plaintiffs' funds to a state legislator or the promise of Holmes' employment with Harris's entertainment company.

 **\*10**  In opposition to Allstate's motion to dismiss, Plaintiffs rely on *Kirschner v. KPMG LLC,* 15 N.Y.3d 446, 912 N.Y.S.2d 508, 938 N.E.2d 941 (2010), for the proposition that "[a] corporation must ... be responsible for the acts of its authorized agents even if particular acts were unauthorized." *Id.* at 465, 912 N.Y.S.2d 508, 938 N.E.2d 941 (cited in Pl. Opp. Mem., at 4.) Plaintiffs' reliance on *Kirschner* is

misplaced, as, even assuming that Plaintiffs have adequately pleaded, or can plead, that Harris was an authorized Allstate *insurance agent,* "[t]he mere creation of an agency for some purpose does not automatically invest the agent with 'apparent authority' to bind the principal without limitation." *Ford v. Unity Hospital,* 32 N.Y.2d 464, 472–73, 346 N.Y.S.2d 238, 299 N.E.2d 659 (1973). Rather,

> [a]n agent's power to bind his principal is coextensive with the principal's grant of authority. One who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority. Upon failure to properly determine the scope of authority, and in the face of damages resulting from an agent's misrepresentations, 'apparent authority' is not automatically available to the injured third party to bind the principal ... The very basis of the doctrine of apparent authority indicates that the principal can be held liable under the doctrine only where he was responsible for the appearance of authority in the agent to conduct *the transaction in question.*

*Id.* (internal citations and quotations omitted) (emphasis added). Here, other than stating, in general terms, that Allstate, as a company, offers a number of financial services (Am. Compl. at ¶ 8), Plaintiffs have made no factual allegations to support their claim that Allstate ever authorized Harris to act as its agent for any purpose other than, perhaps, the placement of insurance. Plaintiffs' bare allegation that Harris was an "agent" of Allstate is simply insufficient to plead liability by Allstate, under the doctrine of apparent authority, for the wide variety of claims Plaintiffs assert.

Finally, although Plaintiffs allege that Harris was supposed to provide insurance policies for them through Allstate, the Amended Complaint does not allege any failure by Allstate to provide insurance [12] or to honor any insurance obligations. Nor do Plaintiffs allege that Allstate made any false statements regarding the terms of any policy issued to them or regarding whether such a policy had been renewed. Rather, to the extent any insurance policy is even implicated

in the Amended Complaint, Plaintiffs merely appear to complain that Harris failed to use Plaintiffs' funds to make regular payments of policy premiums, after promising that he would. Again, this does not suggest any culpable conduct by Allstate.

[12]    The Amended Complaint alleges, in fact, that a life insurance policy for Holmes and his children was issued (*id.* at ¶ 82), although Plaintiffs do not make clear whether this policy was issued by Allstate or by another carrier.

In sum, the Amended Complaint fails to allege *any* factual basis for Plaintiffs' position that Harris had apparent authority to bind Allstate with respect to any of the many investment schemes alleged in this case. It also fails to allege *any* conduct, whatsoever, by Allstate that could have induced reliance on the part of Plaintiffs. While Plaintiffs allege that "defendants" failed to keep numerous promises, Plaintiffs do not specify that a single promise was ever made or sanctioned by Allstate. For these reasons, Plaintiffs' claims against Allstate cannot stand, and the Amended Complaint should be dismissed, as against Allstate, under Rule 12(b) (6), for failure to state a claim. [13]

[13]    As the Amended Complaint is defective for the reasons stated herein, the Court need not address Allstate's alternative arguments for dismissal.

**2. Futility of Plaintiffs' Proposed Second Amended Complaint**

**\*11** In response to Allstate's motion to dismiss, Plaintiffs seek leave to file a Second Amended Complaint, presumably in an attempt to cure any pleading defect. Plaintiffs, however, have actually submitted three different versions of a proposed Second Amended Complaint to the Court. Through what the Court assumes was attorney error, Plaintiffs filed one version of a proposed amended pleading on the Court's Electronic Case Filing ("ECF") system, but apparently served on Allstate (and submitted to this Court as a "courtesy copy") a nonconforming version. (*See* Second Amended Complaint ("2d Am. Compl."), Ex. A to Declaration of Eric Andrew Suffin, dated Aug. 5, 2011 ("8/5/11 Suffin Decl.") (Dkt.35); *see also* Service Copy of Second Amended Complaint ("Served 2d Am. Compl."), Ex. A to 8/5/11 Suffin Decl.) Then, later, in response to the Harris Defendants' separate motion to dismiss, Plaintiffs filed yet a third version, styled as an "Alternative Second Amended Complaint." (*See* Alternative Second Amended Complaint

("Alt.2d Am.Compl."), Ex. A to 11/10/11 Suffin Decl.) With regard to allegations concerning Allstate, all three versions differ only slightly from the Amended Complaint, and none of the versions cure the defects discussed above, as none allege facts sufficient to show that Harris had apparent authority to bind Allstate to any of the alleged promises.

In their proposed amended pleadings, Plaintiffs first add an allegation that, outside Harris's Forest Park office, there were signs that displayed (1) the Allstate logo, (2) a telephone number for "Forest Park Allstate," and (3) the names of both Harris and defendant HFIS. (*See* 2d Am. Compl. at ¶ 51; Alt.2d Am. Compl. at ¶ 59; *see also* Served 2d Am. Compl. at ¶ 48.) Plaintiffs also add a number of allegations about information available on Allstate's corporate website, as follows:

- "Defendant Allstate maintains and at other relevant times maintained an internet website address accessible to the public @ www.allstate.com." (2d Am. Compl. at ¶ 10; Alt.2d Am. Compl. at ¶ 16; *see also* Served 2d Am. Compl. at ¶ 10.)

- "At defendant Allstate's website and at other websites advertising defendant Allstate[,] defendant Allstate represents to the public that defendant Allstate offers 'financial' 'products' or 'services.' " (2d Am. Compl. at ¶ 52; Alt.2d Am. Compl. at ¶ 60; *see also* Served 2d Am. Compl. at ¶ 49 (same, except for omission of reference to "services").)

- "Initially in 2004 or 2005, in 2006 and in 2007 before investing with defendants plaintiffs visited www.allstate.com and observed that defendant Allstate does stocks and investor relations." (2d Am. Compl. at ¶ 59; Alt.2d Am. Compl. at ¶ 67; *see also* Served 2d Am. Compl. at ¶ 56 (same except for omission of reference to dates).)

- "Between 2005 and 2011 plaintiffs have visited the www.allstate.com website many times since first observing that defendant Allstate does stocks and investor relations." (2d Am. Compl. at ¶ 60; Alt.2d Am. Compl. at ¶ 68; *see also* Served 2d Am. Compl. at ¶ 57 (same, except for omission of reference to dates).)

**\*12** Lastly, Plaintiffs add an allegation that their claims "may be supported by documents, including but not limited to documents attached as Exhibits A, B, C and D." (2d Am. Compl. at ¶ 121; Alt.2d Am. Compl. at ¶ 129; *see also* Served

2d Am. Compl. at ¶ 118.) The four referenced exhibits are attached to all three versions of Plaintiffs' proposed Second Amended Complaint. Exhibit A is a photograph of a block of signs. There is a sign for Allstate at the top of the block, and underneath the Allstate sign is a sign that reads "Harris Financial Insurance Services, Inc.," with a phone number. (Ex. A to 2d Am. Compl., Alt.2d Am. Compl.; Served 2d Am. Compl.) At the lower right of the block, another sign reads "Allstate Bryan Harris." (*Id.*)

Exhibit B appears to be a series of screen prints of web pages. (Ex. B to 2d Am. Compl., Alt.2d Am. Compl., Served 2d Am. Compl.) The first page, which appears to have been taken from an Allstate website, lists services offered by Allstate. (*Id.*) The next two pages seem to be results from some type of Internet search involving Harris and Allstate. (*See id.*) None of the listed search results are Allstate websites. (*Id.*) The next several pages include, *inter alia*, a screen print apparently taken from another Allstate web page, referring to Harris and stating, in part: "Bryan Harris is licensed to sell Allstate insurance products only in the state(s) of Georgia. If you do not reside in the state(s) of Georgia or you're not insuring property located in the state(s) of Georgia, please go to the *Find an Agent* section on allstate.com to search for another agent." (*Id.*) Also included are a number of web pages taken from non-Allstate websites, such as superpages.com, insiderpages.com, and citysearch.com, which refer in some way to Allstate or Harris. (*Id* ) The exhibit also includes what appears to be a screen print of a webpage from a Bluebox Entertainment website, listing Harris as the CEO and Director of Operations. (*Id.*) The last page of the exhibit appears to be a screen print of an Allstate web page that refers to an individual named Sam Noah, identified on the page as a Personal Financial Representative in New York; this individual is nowhere mentioned in Plaintiffs' Amended Complaint or memoranda. (*See id.*)

Exhibit C is comprised of several email messages, together with two unsigned promissory notes and certain other documents, which seem to have been email attachments. (*See* Ex. C to 2d Am. Compl ., Alt.2d Am. Compl., Served 2d Am. Compl.) The promissory notes, which are the first documents appearing in this exhibit, do not bear Allstate's name or logo, and, while they identify "Samuel's Temple" as the lender, they do not identify the borrower or the guarantor. (*See id.*) At least some of the emails contained in the exhibit seem to be correspondence between Holmes and Harris, and relate to a variety of topics, including "Blue Box Wiring Information," "Life Insurance," "Bishop Long," and "Tax ID Info." (*See id.*)

In certain of the emails, Harris is identified as "Director of Operations" of Bluebox. (*See id.*) The entire exhibit seems disjointed, as the pages do not appear to be in any sort of order, and the pages are variously forwards, backwards, right-side-up, and upside-down. (*See id.*) The meaning of the emails themselves is far from clear, [14] and is not explained anywhere by Plaintiffs. [15]

[14]     For example, an email dated October 18, 2006, from Shane Moody, of Clayton Signs Inc., to "Ty" (presumably Holmes), states, in part, "Here is the contract for the Allstate location." (*Id.*) Yet Plaintiffs do not identify Clayton Signs Inc., attach the referenced contract, or explain what it is. Another email, dated January 16, 2007, from Harris to "Ty Maximus" (presumably Holmes), states, "U are spending it before we make it you just have to stop taking 25 to 30,000 a month out of the account and you can keep your inheritance! [Y]ou need to stop and think! I will send over the reports!" (*Id.*) Yet another email, from "Ty Maximus," to Harris, which is embedded in an email dated June 12, 2008, states, "Hey Bryan, We are days away from ending this nightmare ... We now have Jews involved in the purchase of the 125 st property ... Br[y]a[ ]n, I need $150.00 to get my Son back home. They are stuck in Columbia SC, with my over due serviced benz ..." (*Id.*)

[15]     The Court also notes that some of the documents in both Exhibits C and D appear to contain personal identifying information, including financial account numbers and at least one taxpayer identification number. It thus appears that Plaintiffs' counsel has violated Rule 5.2(a) of the Federal Rules of Civil Procedure by filing these exhibits publicly, without appropriate redaction. By separate Order of January 23, 2011, this Court has directed that these exhibits be placed under seal, pending their appropriate re-submission by Plaintiffs, in accordance with the requirements of Rule 5.2.

**\*13** Exhibit D contains an assortment of unrelated documents. It includes a copy of a fund transfer application and some documents related to a wire transfer. (Ex. C to 2d Am. Compl., Alt.2d Am. Compl., Served 2d Am. Compl.) None of these documents bear Allstate's name or logo. (*Id.*) Also included in Exhibit D is a single document that

appears to be from Allstate, but nearly all of the identifying information is redacted. (*See id.*) This document may be an example of the type of documents regarding other Allstate policyholders that Harris allegedly transferred to Holmes and that Holmes then stored (*see id., see also supra* at 8 and n. 7), as the document does not appear to relate to Holmes or to any member of his family. Also included in Exhibit D are documents related to a criminal case against former Georgia state representative Walter Ronnie Sailor, Jr. (*Id.; see also supra* at 8, and nn. 6, 11.) Exhibit D also includes documents that appear to have been printed from the Georgia Secretary of State's website and contain corporate information regarding the Harris Defendants. (*Id.*) Finally, Exhibit D contains what appears to be a screen print of a page from a Bluebox website. (*Id.*)

Finally, the version of the proposed Second Amended Complaint that Plaintiffs served, but did not file, contains an Exhibit E, which is comprised of a series of photographs, the subjects of which are barely discernable and are not identified in any way. (Ex. E to Served 2d Am. Compl.)

Nothing contained in any of Plaintiffs' proposed new allegations, or in any of the above-described proposed exhibits, can render Plaintiffs' claims against Allstate viable. If anything, the new allegations detract from, rather than support, Plaintiffs' arguments regarding the potential liability of Allstate in this case. Citing general statements on Allstate's website regarding the nature of its financial services business cannot substitute for pleading affirmative conduct by Allstate that could have led Plaintiffs to believe that Allstate had authorized *Harris* to act as an investment counselor or to plan investments for clients. In fact, to the extent Plaintiffs' proposed exhibits suggest that Allstate, on its website, ever made any mention of Harris, those exhibits suggest only that Harris was licensed by Allstate to sell insurance in the State of Georgia, not to engage in any other business in Allstate's name or on its behalf. Nor can the necessary authority be reasonably inferred from the fact that Harris, who is claimed to have been an Allstate insurance agent, had an "Allstate" sign outside his office. Nor do Plaintiffs' jumbled array of email messages aid them, as none appear to have been sent from any Allstate account; in fact, all of the emails authored by Harris appear to have been sent from his private email accounts, where he identified himself solely as the Director of Operations of Bluebox.

As nothing contained in any version of Plaintiffs' proposed Second Amended Complaint would cure the defects in

Case 9:19-cv-01527-TJM-TWD  Document 24  Filed 10/05/20  Page 159 of 259
Holmes v. Allstate Corp., Not Reported in F.Supp.2d (2012)

2012 WL 627238

Plaintiffs' claims against Allstate, I recommend that Plaintiffs' cross-motion for leave to amend, as against Allstate, [16] be denied as futile. Further, as Plaintiffs are apparently unable to plead any factual foundation, whatsoever, for their claim that Harris had apparent authority to act for Allstate, I recommend that Plaintiffs' claims against Allstate be dismissed with prejudice.

[16]  To the extent Plaintiffs seek to amend their claims against the Harris Defendants, Plaintiffs' application is addressed below.

## II. *ALLSTATE'S AND PLAINTIFFS' SANCTIONS MOTIONS*

### A. *Applicable Legal Standards*

#### 1. *Rule 11*

**\*14**  Under Rule 11 of the Federal Rules of Civil Procedure, when an attorney files a complaint, motion, or other written paper, he or she is representing to the Court that, "to the best of [his or her] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, it is not being presented for any improper purpose," Fed.R.Civ.P. 11(b)(1), and that the claims, defenses, and other legal contentions therein "are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law," Fed.R.Civ.P. 11(b)(2). Further, in signing the submission, the attorney is representing that, after reasonable inquiry, he or she believes that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed.R.Civ.P. 11(b)(3).

A party that believes Rule 11 has been violated may move for sanctions. Fed.R.Civ.P. 11(c)(2). Rule 11, however, provides a "safe harbor": the sanctions motion may not be filed with the Court if, within 21 days of service of the motion, the offending party withdraws the challenged claim or appropriately corrects it. *Id.* Thus, the motion—which "must describe the specific conduct" that allegedly violates the Rule—must be served, but not filed until at least 21 days after service. *Id.* It has been noted that this provision of the Rule, which, in "plain language[,] ... expressly requir[es] the serving of a formal motion," exists for "good reason," *Lancaster v. Zufle,* 170 F.R.D. 7, 7 (S.D.N.Y.1996), as it places the movant's adversary on notice of the motion it will face if the matter is not remedied, *see id.* The Rule 11

"safe harbor" requirement is "strictly construed," *Banfield v. UHS Home Attendants, Inc.,* No. 96 Civ. 4850, 1997 WL 342422, at \*2 (S.D.N.Y. June 23, 1997) (JFK) (citing *Hadges v. Yonkers Racing Corp.,* 48 F.3d 1320, 1328 (2d Cir.1995)), and has even been described as "jurisdictional in nature," *R.B. Ventures, Ltd. v. Shane,* No. 91 Civ. 5678(CSH), 2000 WL 1010400, at \*2 (S.D.N.Y. July 20, 2000); *see also ESI, Inc. v. Coastal Corp. .,* 61 F.Supp.2d 35, 68 (S.D.N.Y.1999) (where movant had not complied with mandatory "safe harbor" requirement, sanctions motion "must be denied without a discussion of the merits of the motion"). It is an abuse of a court's discretion to impose sanctions under Rule 11, where the Rule's "safe harbor" requirement has not been met. *See Hadges,* 48 F.3d at 1328.

In determining whether a plaintiff has engaged in conduct violating Rule 11's requirements, courts apply an objective standard of reasonableness, and look to see whether the attorney's conduct was objectively reasonable at the time the pleading was signed. *See Morley v. Ciba–Geigy Corp.,* 66 F.3d 21, 25 (2d Cir.1995); *Greenberg v. Chrust,* 297 F.Supp.2d 699, 703 (S.D.N.Y.2004). Where a court finds that claims or defenses have been asserted for the sake or harassment or some other improper purpose, or that they lack any evidentiary support, a court has the discretionary authority under Rule 11(c) to impose monetary sanctions on either the offending party or its counsel, or both. *Morley v. Ciba–Geigy Corp.,* 66 F.3d 21, 24 (2nd Cir.1995). Where the violation is the assertion of an unwarranted legal claim or defense, however, a court may only impose monetary sanctions against counsel, not the represented party. Fed.R.Civ.P. 11(c)(5)(A). A court may also "award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion," Fed.R.Civ.P. 11(c) (2); such an award may be made against either a party or its counsel, *see* Fed.R.Civ.P. 11(c)(5); *see also Calloway v. Marvel Entertainment Group,* 854 F.2d 1452, 1474 (2d Cir.1988) (holding that Rule 11 sanctions may be imposed upon a represented party when the party "had actual knowledge that filing the paper constituted wrongful conduct, *e.g.* the paper made false statements or was filed for an improper purpose."), *rev 'd on other grounds by Pavelic & LeFlore v. Marvel Entertainment Group,* 493 U.S. 120, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989).

**\*15**  The 1993 Advisory Committee Note to Rule 11 sets forth certain factors that may be considered by the court when deciding whether to impose sanctions or what sanctions are appropriate in the given circumstances. Those factors include: (1) "[w]hether the improper conduct was willful,

or negligent"; (2) "whether it was part of a pattern or activity, or an isolated event"; (3) "whether it infected the entire pleading, or only one particular count or defense"; (4) "whether the person has engaged in similar conduct in other litigation"; (5) "whether it was intended to injure"; (6) "what effect it had on the litigation process in time or expense"; (7) "whether the responsible person is trained in the law"; (7) what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case"; and (8) "what amount is needed to deter similar activity by other litigants." Fed.R.Civ.P. 11 advisory committee note to 1993 amendments; *see also, e.g., Kochisarli v. Tenoso,* No. 02 Civ. 4320, 2006 WL 721509, at \*8 (E.D.N.Y. Mar.21, 2006) (applying factors, and citing *Simpson v. Putnam County Nat. Bank of Carmel,* 112 F.Supp.2d 284, 291–92 (S.D.N.Y.2000)).

### 2. The Court's Inherent Authority

A court's inherent authority to award attorneys' fees and costs derives from "a court's need to manage its affairs so as to achieve an orderly and expeditious resolution of cases." *Bowler v. U.S. Immigration and Naturalization Service,* 901 F.Supp. 597, 605 (S.D.N.Y.1995). Attorneys' fees may be imposed if a party has continued an action "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* (internal citations omitted). The Second Circuit has reasoned that sanctions under the court's inherent authority should be based on findings that the offending party has asserted colorless claims and has acted in bad faith. *See Eisemann v. Green,* 204 F.3d at 396. [17]

[17] "To ensure ... that fear of an award of attorneys' fees against them will not deter persons with colorable claims from pursuing those claims, we have declined to uphold awards under the bad-faith exception absent both clear evidence that the challenged actions are entirely without color, and are taken for reasons of harassment or delay or for other improper purposes and a high degree of specificity in the factual findings of the lower courts." *Eisemann v. Green,* 204 F.3d at 396 (quoting *Dow Chem. Pacific Ltd. v. Rascator Maritime S.A.,* 782 F.2d 329, 344 (2d Cir.1986) (emphasis added) (internal citations, quotation marks, and brackets omitted).

### B. Allstate's Motion for Sanctions

Allstate's motion for Rule 11 sanctions against Plaintiffs and their counsel, Suffin, was properly made and demonstrates that sanctions are warranted, as against Suffin.

### 1. Plaintiffs' Failure To Take Advantage of Rule 11's "Safe Harbor"

As a preliminary matter, Allstate complied with the procedural requirements of Rule 11(a). On June 14, 2011, Allstate sent Suffin a letter, which outlined Plaintiffs' pleading deficiencies in detail, and requested that Plaintiffs voluntarily withdraw the Amended Complaint. (Letter from Allstate to Suffin, dated June 14, 2011, Ex. C to Declaration of Elizabeth D. Schrero in Support of Motion of Defendant the Allstate Corporation for Sanctions Under Rule 11, dated July 29, 2011 ("2/29/11 Schrero Decl.") (Dkt.28).) Counsel for Allstate and Suffin then participated in a telephone conference on June 16, 2011, during which Allstate's counsel reiterated her request for Plaintiffs to withdraw the Amended Complaint. (*See* Memorandum of Law in Support of the Motion of Defendant the Allstate Corporation for Sanctions under Rule 11, dated July 29, 2011 ("Allstate's Sanctions Mem."), (Dkt.29) at 3.) In response, Suffin apparently requested that Allstate consent to an amendment of Plaintiffs' pleadings. (*Id.*) Counsel for Allstate refused to consent without first being presented with any evidence that supported Plaintiffs' claims against Allstate, but told Suffin that, before proceeding with motion practice, she would consider any evidence he could show her that could support Plaintiffs' claims. As AUstate's counsel describes their conversation, she asked Suffin to "come forward with *any* support/evidence of a factual basis for an allegation that Allstate made representations to Plaintiffs concerning Harris' scope of authority in connection with the funds Plaintiffs allegedly sent to Harris and Harris' alleged investment schemes." (*Id.*) (emphasis in original). AUstate's counsel also sent Suffin a letter memorializing their June 16, 2011 telephone conference. (*Id.* at 4.)

\*16 When Plaintiffs neither withdrew the Amended Complaint nor came forward with any support for their allegations against Allstate, Allstate filed its motion to dismiss on June 28, 2011. (*Id.*) Allstate also prepared a motion for sanctions, which, in accordance with Rule 11(c)(1)(A), it served on Plaintiffs on July 6, 2011 (together with a "safe harbor" letter), but did not file. (*See* Letter from Allstate to Holmes, dated July 6, 2011, Ex. F to July 29 Schrero Decl.) When Plaintiffs did not withdraw their claims within 21 days, Allstate proceeded to file its sanctions motion with the Court. (*See* Allstate's Sanctions Motion.) Accordingly, Allstate's sanctions motion is properly before the Court, and

Case 9:19-cv-01527-TJM-TWD  Document 24  Filed 10/05/20  Page 161 of 259
Holmes v. Allstate Corp., Not Reported in F.Supp.2d (2012)

2012 WL 627238

the Court must now determine whether sanctions are justified, and, if so, whether sanctions should be imposed against Plaintiffs, Suffin, or both.

### 2. *The Relevant Factors Weigh in Favor of Sanctioning Plaintiffs' Counsel.*

On balance, the relevant factors suggest that the imposition of sanctions against Suffin (although not Plaintiffs) would be appropriate in this case. In this regard, the Court notes that the core deficiency in the Amended Complaint is the assertion of claims against Allstate that are not warranted based on the law, a matter that falls under Rule 11(b)(2). Under this section, as noted above, Rule 11 sanctions against a party may not be imposed; such sanctions, where warranted, may only be imposed on counsel. *See Morley,* 66 F.3d at 24.

This case actually began with the filing of a *pro se* Complaint by Holmes. When Suffin then appeared on behalf of Holmes and the Church, Suffin proceeded to file an Amended Complaint. Instead of substantively revising Holmes' pleading, though, Suffin signed and filed an amended pleading that adopted the same flawed theory as Holmes' original *pro se* pleading, as to the claimed liability of Allstate. In other words, in his role as counsel, Suffin appears to have done nothing to disabuse Holmes of the notion that he had viable claims against Allstate for, *inter alia,* conversion and fraud, based solely on Harris's conduct and alleged representations; rather Suffin simply filed a revamped version of the same flawed allegations against Allstate. In fact, the Amended Complaint increased the damages originally claimed by Holmes from $3 million to $10 million (sought "jointly and severally" from each defendant), with an unspecified part of that sum purportedly representing damages for the death of a Church member. (Am. Compl. at ¶ 94.) Nowhere does the Amended Complaint explain how Holmes and the Church could have standing to seek damages for a congregant's death, much less how Allstate could possibly be responsible for that death.

While this Court cannot conclude that Suffin filed the Amended Complaint in bad faith, *i.e.,* with the deliberate intent to harass Allstate or to cause it harm, it appears that, at a minimum, he failed to give adequate counsel to his clients. Further, even if not "willful," Suffin's decision to adhere to his client's former position (and even to expand it) in the face of Allstate's repeated efforts to point out the obvious legal flaws in those claims was at least reckless. While this litigation is still in an early stage, it is also worth emphasizing that Suffin not only filed an Amended Complaint

that contained no allegations capable of supporting Plaintiffs' claims against Allstate, but also submitted three versions of a proposed Second Amended Complaint that are equally deficient. As discussed below, Suffin also met AUstate's sanctions motion by filing a procedurally defective and utterly baseless sanctions motion of his own, against Allstate. (*See* discussion *infra,* at 34–39.) This is sufficient to show a pattern of frivolous filings. *See Kochisarli v. Tenoso,* No. 02 Civ. 4320(DRH)(MLO), 2006 WL 721509, at *8 (E.D.N.Y. Mar. 21, 2006) (imposing sanctions under Rule 11 for, *inter alia,* "submitting essentially the same indecipherable set of counterclaims for a third time").

**\*17** Moreover, this is not the first time that Suffin has been criticized by the Court for filing a frivolous pleading. In *Bibb v. New York City Housing Authority,* 09 Civ. 9956(NRB), 2010 WL 3958646 (S.D.N.Y. Sept. 30, 2010), as Allstate points out (*see* Allstate's Sanctions Mtn. at n. 5.), Suffin received a warning from the Honorable Naomi Reice Buchwald, U.S.D.J., for filing a complaint that the Court found "wholly lacking in merit, even if every fact in the complaint and supporting affidavit [were] accepted as true." (*Id.* at *6.) Judge Buchwald acknowledged that the defendant's Rule 11 motion—brought against Suffin, his law firm, and plaintiff for filing "baseless and frivolous" claims—was "not unwarranted," but "given Suffin's recent admission to the bar," she "hope[d] a word of caution [would] be sufficient to encourage him to be more circumspect before commencing other actions." (*Id.* at *6–7.) She cautioned:

> We wish to stress to Suffin that it is part of his function as an attorney, when appropriate, to explain to his client that she does not have a legitimate legal claim. Such action may assist the client in appreciating the situation in which she finds herself ... We are hopeful that Suffin will use better judgment in the future.

(*Id.* at *7.)[18] It does not appear that Suffin took the Court's "word of caution" to heart, in this case. Further, while Judge Buchwald noted, in her 2010 opinion, that Suffin was "recently admitted to the bar," he now holds himself out as having been in practice for four years and as having handled matters in a wide range of practice areas.[19] At this point,

there is less reason to be forgiving of Suffin's unwillingness or inability to educate and guide his clients when they lack a legitimate claim.

18    Allstate also points out the Court has previously sanctioned Suffin for violating its rules. *See Dvorkin v. New York–Presbyterian Hospital,* 10 Civ. 3680(GBD)(AJP), 2011 WL 280801, at *4 (S.D.N.Y. Jan. 19, 2011) (affirming, although modifying, sanction imposed by magistrate judge for counsel's failure to bring his client to a settlement conference, as directed by the Court) (cited in Allstate Mem., at n. 5).

19    *See* http://lawyers .law.cornell.edu/lawyer/eric–andrew–suffin–1327035.

In addition, the pleading defect at issue here—the lack of any allegations capable of supporting a legal claim against Allstate—infected Plaintiffs' entire pleading, as to Allstate. Suffin's filing of a deficient pleading, and equally deficient proposed amended pleadings has also slowed the litigation and necessitated the expenditure of both time and money by Allstate to move against Plaintiffs' claims and to oppose his futile cross-motion to amend.

All of these factors suggest that, while (in the absence of a showing of bad faith) the Court should not exercise its inherent authority to sanction Suffin, at least some Rule 11 sanction would be warranted here. The Court notes, however, that Suffin is a solo practitioner, who may not have significant resources to pay a substantial sanctions award. It is difficult for the Court to determine, without additional information, the amount of a sanctions award that would be needed to deter Suffin from further Rule 11 violations, or, by extension, to deter similar activity by others. This Court will return to this question after first addressing the merits of Plaintiffs' sanctions motion against Allstate, given that Allstate is not only seeking sanctions on its own motion, but is also seeking sanctions for having to oppose Plaintiffs' motion.

### C. *Plaintiffs' Sanctions Motion Against Allstate*

**\*18** After Allstate moved for Rule 11 sanctions against Plaintiffs and their counsel, Plaintiffs filed a Rule 11 motion against Allstate. Unlike Allstate's motion, however, Plaintiffs' motion was not properly made, and should not be considered by the Court because of its procedural defects. In any event, even if the Court were to consider the motion, it should be

denied as wholly lacking in merit. Indeed, Plaintiffs' sanctions motion is itself frivolous.

### 1. *Plaintiffs' Failure To Satisfy the Procedural Requirements of Rule 11*

On August 22, 2011, Plaintiffs sent a letter to Jay Cho, Esq. ("Cho"), counsel for Allstate, stating that Allstate had violated Rule 11(b)(b)(3). (*See* Letter from Suffin to Cho, dated Aug. 22, 2011 ("8/22/11 Suffin Ltr."), Ex. A to Declaration of Eric Andrew Suffin in Support of Plaintiffs' Motion for Rule 11 Sanctions, dated Sept. 30, 2011 ("9/30/11 Suffin Decl.") (Dkt.52) .) This is the provision of Rule 11 under which an attorney is supposed to certify to his or her reasonable, informed belief that "the factual contentions [made in a pleading or other written submission] have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed.R.Civ.P. 11(b)(3). Here, Suffin's August 22 letter listed certain statements from submissions made by Allstate and, without any elaboration or explanation, merely claimed that the statements were false and without evidentiary support. The letter only stated that, "[p]ursuant to Fed.R.Civ.P. 11(c) and for the specific reasons described below, we request that the parts of the memos and Declaration in violation of Fed.R.Civ.P. 11(b)(3) be withdrawn or appropriately corrected within 21 days or within some other time set by the court." (8/22/11 Suffin Ltr., at 1–2.) The letter did not explicitly state that Plaintiffs were going to file a sanctions motion, and it did not enclose a copy of any sanctions motion.

On August 30, 2011, Suffin wrote another letter to Cho. (Letter from Suffin to Cho, dated Aug. 30, 2011 ("8/30/11 Suffin Ltr."), Ex. B to 11/30/11 Suffin Decl.) The language of the August 30 letter mirrored the language of the August 22 letter, but also complained of additional statements by Allstate. (*See* 8/30/11 Suffin Ltr., at 2.) Like the earlier letter, the August 30 letter did not explicitly state that Plaintiffs were going to file a sanctions motion and it did not include a copy of the sanctions motion that was eventually filed by Plaintiffs. (*Id.*) As explanation for the request to withdraw the listed statements, Suffin merely wrote that they did "not have evidentiary support as required by Fed.R.Civ.P. 11(b)(3) and were false." (*Id.*)

Plaintiffs then went ahead and filed their Rule 11 motion on September 30, 2011, in disregard of the "safe harbor" procedural requirements set out in the Rule. Although Plaintiffs now ask the Court to "treat the August 22, 2011 and

August 30, 2011 letters ... as fulfilling Plaintiffs' requirement to serve the Rule 11 Motion twenty one (21) days before presenting it to the Court" (Plaintiffs' Memorandum of Law in Further Support of Plaintiff's Motion for Rule 11 Sanctions, dated Oct. 24, 2011 ("Pl. Reply to Pl. Sanctions Mtn.") (Dkt.59), at 2), this Court has repeatedly refused to impose sanctions based on mere warning letters, even where the challenged conduct was sanctionable. *See Gamla Enterprises North America, Inc. v. Lunor–Brillen Design U. Vertriebs GMBH,* No. 98 Civ. 992, 2000 WL 193120, at *3 (S.D.N.Y. Feb.17, 2000) (denying meritorious Rule 11 motion where warning to offending party was given by letter alone, even where warning letter "conformed to the spirit of the rule"); *see also Diamonds.net LLC v. Idex Online, Ltd.,* 254 F.R.D. 475, 476–77 (S.D.N.Y.2008) (finding that a warning letter does not satisfy the Rule 11 requirement of serving a formal motion); *Weeks Stevedoring Co. Inc. v. Raymond Int'l Builders, Inc.,* 174 F.R.D. 301, 305 (S.D.N.Y.1997 (same); *Bellistri v. US,* No. 94 Civ. 3768(KMW), 1997 WL 115545, at *3 (S.D.N.Y. Mar.14, 1997) (same); *Gal v. Viacom International, Inc.,* 403 F.Supp.2d 294, 309 (S.D.N.Y.2005) (same); *Schweizer v. Mulvehill,* 93 F.Supp.2d 376, 413 (S.D.N.Y.2000) (same). [20]

[20] *But see Jeffreys v. Rossi,* 275 F.Supp.2d 463, 480 (S.D.N.Y.2003) (finding that movant substantially complied with Rule 11 procedural requirements by serving a "detailed letter," with attached evidentiary support).

**\*19** Accordingly, based on the express language of Rule 11 and this Court's precedent, Plaintiffs' sanctions motion should be denied as procedurally defective.

### 2. *Plaintiffs' Motion Is Also Meritless*

In any event, even if Rule 11's procedural requirements could be deemed satisfied by the service of Suffin's warning letters, Plaintiffs' sanctions motion would completely fail on its merits, as it does nothing more than catalog five statements made at various points, by Allstate or its counsel, and assert—without any explanation-that these statements lack evidentiary support. (Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Rule 11 Sanctions, dated Sept. 30, 2011, ("Pl. Sanctions Mem.") (Dkt.53), at 2.) The challenged Allstate statements are as follows:

    (1) "... Holmes is claiming to be in wrongful possession of confidential documents belonging to Allstate (which, if true, would have been taken without Allstate's authorization), the reference to those documents can

have no purpose other than to attempt to prompt a settlement offer from Allstate." (Memorandum of Law in Support of the Motion of Defendant the Allstate Corporation To Dismiss the Amended Complaint as Against the Allstate Corporation, dated June 28, 2011 ("Allstate Mtn.–To–Dismiss Mem.") (Dkt.20), at 22, n. 7.)

    (2) "... where, as here, the Plaintiff's attorney: (1) has advanced meritless factual allegations that have no evidentiary support; and (2) has failed to investigate the law before bringing an action and filing and serving a complaint that fails woefully to comply with the well established pleading requirements of the FRCP, Allstate must turn to Rule 11 for legal recourse." (Allstate Sanctions Mem. at 1.)

    (3) "... there is no good faith basis for Plaintiffs to proceed with the instant action against Allstate." (*Id.*)

    (4) "The obvious frivolity of the Complaint ..." (*Id.*)

    (5) "A copy of a black-lined version of the Proposed Second Amended Complaint showing a comparison against the Complaint, dated August 3, 2011, is attached hereto as Exhibit 'A.' " (Declaration of Elizabeth D. Schrero in Further Support of Motion of Defendant the Allstate Corporation To Dismiss the Amended Complaint and in Opposition to Plaintiffs' Cross–Motion for Leave To Amend Their Amended Complaint, dated Aug. 19, 2011 (Dkt.45), ¶ 2.)

(*Id.* at 2–3.)

Most of these statements-including statements that Plaintiffs' counsel failed to comply with pleading requirements, lacked good faith in proceeding with unsupported claims against Allstate, and filed an obviously frivolous pleading—are in the nature of arguments advanced on Allstate's motions to dismiss and for sanctions. As they are not "factual contentions," these statements are not even not covered by the provision of Rule 11 on which Plaintiffs rely for their sanctions motion. (*See* Plaintiffs' Sanctions Mem. at 2 (citing Fed.R.Civ.P. 11(b) (3).) Moreover, for the reasons discussed above, this Court generally agrees that Plaintiffs' claims against Allstate *were* unsupported and frivolous.

**\*20** To the extent Plaintiffs complain about Allstate's supposition that Plaintiffs may have been attempting to exact a settlement from Allstate by referring to Holmes' cache of confidential Allstate documents, this Court also agrees

that this is how Plaintiffs' conduct appeared; indeed, on this subject, Plaintiffs' counsel himself made statements to the Court that lend credence to Allstate's stated concerns. During a case management conference on July 26, 2011, Allstate's counsel told the Court that she had spoken with Suffin about the confidential documents, and that Suffin had demanded $30,000 for the transfer of the documents to Allstate. (July 26, 2011 Rule 16 Conference Transcript, at 10, Ex. D to 10/17/11 Schrero Decl.) Suffin said that counsel had misunderstood his statements, and that he had only "discussed that there may be a dollar amount that would be involved in the transfer." (*Id.* at 12.) Nonetheless, Suffin did not deny that he had mentioned the $30,000 figure to Allstate's counsel in their conversation (*see id*. at 13), and when asked by the Court why Holmes even had possession of Allstate documents bearing confidential, personal information of policyholders, Suffin repeatedly expressed his understanding that Holmes believed the documents were "collateral" for his investments. (*See id.* at 12, 13, 14.) Under the circumstances, Allstate's suggestion that Holmes may have been trying to "prompt a settlement offer" is hardly unsupported.

Finally, the Court could not even discern what Plaintiffs were complaining about, with regard to Allstate's proffered black-lined version of the proposed Second Amended Complaint until Plaintiffs argued, on reply, that Allstate's black-lining did not incorporate the exhibits attached to the proposed amended pleading. (*See* Pl. Reply to Pl. Sanctions Mtn. at 5.) Plaintiffs' contention on this point is patently frivolous. A black-lined document is intended to track changes made in the text of a document, and Plaintiffs apparently have no quarrel with whether Allstate accurately tracked any proposed modifications to their original allegations. Moreover, Allstate's black-lined document, submitted for the convenience of the Court, shows that exhibits were added to the proposed Second Amended Complaint. (*See* Ex. A to 8/19/11 Schrero Decl., ¶¶ 48 (highlighting addition of reference to Ex. A), 118 (highlighting addition of allegation that "Plaintiff's causes of action may be supported by documents, including but not limited to documents attached as Exhibits A, B, C and D").)

As Plaintiffs have not demonstrated that a single statement made by Allstate was, in fact, either false or unsupported, Plaintiffs' sanctions motion cannot succeed, even apart from its procedural flaws. To the contrary, it is a plainly meritless motion, and Allstate legitimately asks that Plaintiffs or their counsel be made to bear Allstate's fees and costs in having to respond to it. (*See* Defendant The Allstate Corporation's

Memorandum of Law in Opposition to Plaintiffs' Motion For Sanctions Under Rule 11, dated Oct. 17, 2011 (Dkt.58), at 16; *see also* Fed.R.Civ.P. 11(c) (2) (allowing a court to award the fees and costs of a sanctions motion to the prevailing party).)

### D. *Appropriate Sanctions Award in This Case*

**\*21** Based on the flaws in Plaintiffs' pleaded claims against Allstate, the fact that Plaintiffs, through counsel, insisted on proceeding with these defective claims despite notice of the defects, and the fact that Allstate has, as a result, incurred fees and costs in what should have been unnecessary motion practice, I recommend that sanctions be awarded in Allstate's favor, and that the award be made against Suffin, as counsel.

As noted above, however, the Court is not currently in a position to determine the appropriate amount of a monetary sanction, given that it lacks information regarding Suffin's financial circumstances. Accordingly, I recommend that Allstate be directed to submit to the Court an itemized statement of the attorneys' fees and costs it incurred on its motion to dismiss, as well as on both of the sanctions motions, and that Suffin be directed to submit a sworn affidavit or declaration made under penalty of perjury, setting out the net income earned by his law practice over the past 12 months. I further recommend that Suffin be required, under Rule 11(c), to pay to Plaintiffs the reasonable fees and expenses incurred in filing or opposing the referenced motions, up to a cap of 10 percent of the annual net income received from his law practice, as reflected in his financial affidavit or declaration. *See Weinraub v. Glen Rauch Securities, Inc., 419 F.Supp.2d 507, 520 (S.D.N.Y.2005)* (noting that under Rule 11, a court must consider the financial circumstances of the sanctioned party); *see also Association of Holocaust Victims for Restitution of Artwork and Masterpieces v. Bank Austria Creditanstalt AG,* No. 04 Civ. 3600(SWK), 2005 WL 3099592, at \*8 (S.D.N.Y. Nov.17, 2005) ("As a final matter of the [Rule 11] sanctions determination, courts must take into account the financial circumstances of the sanctioned party." (citing *Sassower v. Field,* 973 F.2d 75, 81 (2d Cir.1992)); *Anschutz Petroleum Marketing Corp. v. E.W. Saybolt & Co., Inc.,* 112 F.R.D. 355, 357 (S.D.N.Y.1986) (finding that "adequate deterrence may permissibly fall short of full compensation," and that the court has the discretion to fashion a Rule 11 sanction for purposes of deterrence which awards part, but not all, of the opposing party's attorney's fees); *Becker v. Dunkin' Donuts of America, Inc.,* 665 F.Supp. 211, 217–18 (S.D.N.Y.1987) (taking into consideration offending litigant's ability to pay, even though sanctions were fully warranted).

2012 WL 627238

## III. *THE HARRIS DEFENDANTS' MOTION TO DISMISS*

As noted above (*see* n. 2, *supra* ), the Harris Defendants never properly filed their motion to dismiss on the Court's ECF system, and the Court would be entitled to reject the motion on that basis. I do not recommend this, however, as some of the pleading issues raised by the motion are significant, and, for the sake of efficient case management, it would be preferable to resolve those issues as early as possible. For this reason, this Court has considered the merits of the Harris Defendants' motion.

### A. *Applicable Legal Standards*

 **\*22** The standards governing motions to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure are set forth in connection with this Court's discussion of Allstate's motion to dismiss. (*See supra*, at 12.) Additionally relevant to the Harris Defendants' motion are Rules 8(a) and 9(b), which address the question of how specific a plaintiff s allegations must be.

Rule 8(a) states that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Under this Rule, a pleading "does not have to set out in detail the facts on which the claim for relief is based, but must give the court and the defendant fair notice of what [the] plaintiffs claim is and the grounds upon which it rests." *Owens v. Suter,* 02 Civ. 8198(SHS), 2003 WL 942554, at \*1 (S.D.N.Y. Mar. 7, 2003) (internal citations and quotations omitted); *see Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("The statement should be plain because the principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted."). Rule 8(a) is violated where a plaintiff, by engaging in "group pleading," fails to give each defendant fair notice of the claims against it. *Pierson v. Orlando Regional Healthcare Systems, Inc.,* 619 F.Supp.2d 1260, 1273 (M.D.Fla.2009) (dismissing complaint because group-pleading method of collectively referring to individual defendants and two physician groups as "Peer Review Defendants" throughout complaint did not satisfy the "fair notice" requirement of Rule 8).

Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). To state a claim for fraud under New York law, a party must plead that: (1) the defendant(s) made a material false representation or omission, (2) the defendant(s) intended to

defraud the plaintiff(s) thereby, (3) the plaintiff(s) reasonably relied upon the representation, and (4) the plaintiff(s) suffered damage as a result of this reliance. *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank,* 57 F.3d 146, 153 (2d Cir.1995) (relying on New York law) (citations omitted). To satisfy the Rule 9(b) pleading requirements, a complaint alleging fraud must: "(1) specify the statement [or omissions] that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements [or omissions] were made, and (4) explain why the statements [or omissions] were fraudulent. *Scantek Medical, Inc. v. Sabella,* 583 F.Supp.2d 477, 493 (S.D.N.Y.2008) (internal quotations and citations omitted).

In addition, a fraud complaint must also "allege facts that give rise to a strong inference of fraudulent intent," which may be accomplished "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* Motive involves "concrete benefits that could be realized by one or more of the false statements ... alleged" and opportunity is shown by "the means and likely prospect of achieving concrete benefits by the means alleged." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir.1994). To allege conscious misbehavior or recklessness, "the Complaint must link the misleading statement with facts that give rise to an inference that the speaker had a basis for knowing it was false." *Shahzad v. H.J. Meyers & Co.,* 923 F.Supp. 57, 60 (S.D.N.Y.1996) (citations omitted).

 **\*23** Rule 9(b) also requires plaintiffs to "connect the allegations of fraud to each individual defendant." *Trustees of Plumbers and Pipefitters Nat. Pension Fund v. De–Con Mechanical Contractors, Inc.,* 896 F.Supp. 342, 347 (S.D.N.Y.1995); *see also Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.' "). Plaintiffs alleging fraud "may not rely on sweeping references to acts by all or some of the defendants because each named defendant is entitled to be apprised of the facts surrounding the alleged fraud." *Trustees of Plumbers and Pipefitters Nat. Pension Fund,* 896 F.Supp. at 347. Further, the allegations must demonstrate that "each [d]efendant had a specific intent to defraud either by devising, participating in, or aiding and abetting the scheme." *Id.*

The pleading requirements of Rule 9(b) apply both to fraud claims and to "other claims that are premised on fraud."

2012 WL 627238

*Daly v. Castro Llanes,* 30 F.Supp.2d 407, 414 (S.D.N.Y.1998) (citing *O'Brien v. Nat'l Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991)). The particularity requirements of Rule 9(b) also apply to negligent misrepresentation claims. *In re Marsh & McLennan Cos. Sec. Litig.,* 501 F.Supp.2d 452, 495 (S.D.N.Y.2006) ("Negligent misrepresentation claims must be pleaded with particularity pursuant to Rule 9(b).."). Accordingly, Plaintiffs' claims of fraud, negligent misrepresentation, and violation of New York York Debtor and Creditor Law § 276 are all subject to Rule 9(b)'s pleading requirements. *See also In re Sharp Intern. Corp.* 403 F.3d 43, 54 (2d Cir.2005) (noting that New York Debtor and Creditor Law § 276 must be pleaded with specificity, under Rule 9(b)).

**B. *Adequacy of Plaintiffs' Allegations Against the Harris Defendants***

In their motion to dismiss, the Harris Defendants argue, first, that Holmes does not have authority to speak for Samuel's Temple and thus lacks "standing" to assert claims on the Church's behalf. Second, the Harris Defendants argue that Plaintiffs' claims as to them fail under Rules 8(a), 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure. While their asserted "standing" argument appears misplaced, the Harris Defendants' arguments for dismissal of the Amended Complaint on the basis of pleading deficiencies are persuasive.

**1. *Propriety of Naming Samuel's Temple as a Plaintiff***

As an initial matter, the Harris Defendants contend that Samuel's Temple is not controlled by Holmes and that the Church itself never assented to bringing this action. (*See* Harris Defs. Mem., at 6; *see also id.,* at 8 (stating that Holmes "has no authority whatsoever to bring this lawsuit on behalf of the Church").) Rather, the Harris Defendants assert that the person with authority to act for the Church is Shirley Holmes Sulton ("Sulton"), Senior Pastor (and purportedly the only pastor) of Samuel's Temple and Harris's mother, who, they contend, has not authorized this lawsuit. (*Id.*) In support of their position on this point, the Harris Defendants attach a declaration of Sulton, in which she states:

> **\*24** My son Tyrone is not the pastor, nor has he ever been the pastor of Samuel's Temple. Furthermore, he has no executory or signatory powers associated with the church. I maintain and control all financial

matters concerned with the church. Neither the church nor I have instituted any lawsuit or proceedings against Mr. Bryan Michael [Harris]. Any monies that I have sent to Mr. Bryan Michael Harris, whom I consider a loyal and committed son, are personal matters between Mr. Harris and me. I am not, nor will I become a party to the current lawsuit fostered by my son against Mr. Harris. Samuel's Temple COGIC is also not a party to the suit. My son, Tyrone, does not possess the signatory powers of the church to institute a suit against Mr. Harris.

(Declaration of Frank Wheaton in Support of Defendants' Motion to Dismiss the Amended Complaint of Plaintiffs, dated Oct. 10, 2011 ("Wheaton Decl.") (Dkt.56), at Ex. C (Declaration of Shirley Holmes–Sulton, dated Aug. 12, 2011 ("Sulton Decl.")), at 1.) The Harris Defendants also appear to contend that the funds at issue in this case are *Church* funds, and that Holmes has no personal standing to assert claims for recovery of those funds. (*See* Harris Defs. Mem., at 8–9.)

In response to these arguments, Plaintiffs submit certain documents purporting to show the Church's authorization for the suit. (*See* 11/10/11 Suffin Decl., at Ex. C (email from Sulton to Holmes, dated Oct. 18, 2011, and attachment), Ex. D (Resolution and Minutes of Special Meeting of the Samuel Temple Church of God in Christ, Inc.).) Plaintiffs also submit their proposed "Alternative Second Amended Complaint" in response to the Harris Defendants' arguments. (Alt.2d Am.Compl.)

Given that Samuel's Temple has itself been named as a plaintiff in this case and is asserting claims on its own behalf, it is evident that the Harris Defendants' argument regarding the Church is not appropriately styled as a "standing" argument. Certainly, the Church would be a real party in interest to a dispute over the disposition of Church funds. What the Harris Defendants actually argue, with respect to the Samuel's Temple, is that whoever purported to act on its behalf in authorizing this lawsuit was without power to do so. As shown by the parties' competing submissions, this raises an issue of fact that cannot be resolved without a more complete record.

As for the Harris Defendants' seeming argument that Holmes has no standing to challenge the alleged conversion of funds belonging to the Church, it is unclear whether Holmes may be claiming any personal interest in the money, or, alternatively, whether he may be seeking to proceed as a third-party beneficiary to agreements allegedly made between the Church and any of the Harris Defendants regarding the use of the funds in question. For example, while Holmes may have never had a right to direct Harris to purchase a home for him with Church money, if this was something that Harris promised to Samuel's Temple, and Holmes stood to benefit from the purchase, then he may have standing to assert claims against Harris in his own right, for breach of that promise. Moreover, several of the allegations in the Amended Complaint, while confusing because they draw no clear distinction between the two plaintiffs, appear to relate to personal claims by Holmes. For instance, Holmes seems to claim that Harris promised him employment at Bluebox, and then reneged on that promise. Regardless of the viability of such claims, there seems to be little question that Holmes would have a personal stake in their outcome.

**\*25** For these reasons, the Harris Defendants' challenge to Plaintiffs' "standing" should be rejected at this time, without prejudice to raise the issue again at a later juncture, on a clearer pleading and a more complete record, should the case proceed.

### 2. *Sufficiency of Pleading Under Rules 8(a) and 9(b)*

The Harris Defendants are more persuasive in their argument that the Amended Complaint fails to satisfy the pleading requirements of Rules 8(a) and 9(b). The most glaring defect, under both rules, is Plaintiffs' pervasive "group pleading," both with respect to (a) the injuries sustained by "plaintiffs" (referred to collectively) and (b) the alleged misconduct of "defendants" (also referred to collectively). As to the former, as noted above, the Amended Complaint fails to specify whether Holmes entrusted any of his own money to any defendant, and, if not, the nature of the consideration he may have provided for any promises made to him personally. As to the latter, it appears that Plaintiffs or their counsel may have simply conducted an online search for companies of which Harris was an officer (*see* Ex. D to proposed 2d Am. Compl.), and then named those companies as additional defendants without any knowledge or information as to what role, if any, each of them may have played in the transactions alleged.

Plaintiffs' failure to differentiate among the Harris Entities, so as to allege the nature of each particular defendant's misconduct, has resulted in a failure by Plaintiffs to give each defendant "fair notice" of Plaintiffs' claims and "the grounds upon which [they] rest[ ]," as required by Rule 8(a). *Owens,* 2003 WL 942554, at \*1 (internal citations and quotations omitted). For essentially the same reason, and as the Amended Complaint also wholly fails to particularize any statements by Defendants that were allegedly false or misleading, Plaintiffs have grossly violated Rule 9(b), as well. *See Trustees of Plumbers and Pipefitters Nat. Pension Fund,* 896 F.Supp. at 347.

As to the Harris Defendants' arguments regarding the independent insufficiency of each of Plaintiffs' claims under Rule 12(b)(6),[21] the vagueness of much of the Amended Complaint makes it difficult for the Court even to consider those arguments. It is impossible to determine, for example, whether Plaintiffs' conversion claim necessarily duplicates their breach-of-contract claim, as the Harris Defendants argue (*see* Harris Defs. Mem., at 15 (citing *Salem v. Software Guidance and Assistance, Inc.,* No. 96 Civ. 8437(AGS), 1997 WL 777402, at \*5 (S.D.N.Y. Dec.16, 1997))), when the particular contract(s) at issue are not well identified and when the subject of Plaintiffs' claim of conversion may be money, but may also be tangible goods. (*See, e.g.,* Am. Compl. at ¶ 84 (alleging that Defendants "comingled and fraudulently converted plaintiffs' investment capital for defendant Harris's pecuniary gain"); ¶ 80 (alleging conversion of "various personal property owned by plaintiff Holmes, including a rifle, hard drives, two (2) Mackie speakers, video footage, and sound tools essential to plaintiff Holmes's music and television production, documents, video masters, and music masters").)

[21]    The Court notes that the arguments advanced by the Harris Defendants, with respect to whether Plaintiffs have adequately pleaded the elements of their individual claims, appear to have been copied nearly verbatim from Allstate's memorandum in support of its motion to dismiss. *Compare* Allstate Mtn.–To–Dismiss Mem. at 4–7; 11–22, *e.g., with* Harris Defs. Mem., at 12–14; 14–23.

**\*26** Similarly, the Court cannot discern whether, as the Harris Defendants argue, Plaintiffs' conversion claim is barred by the applicable three-year statute of limitations (*see* Harris Defs. Mem., at 15), given that the Amended Complaint alleges that Harris converted the physical property

of Holmes "[a]t some point in 2008" (Am. Compl. at ¶ 80), but does not specify when in 2008 the alleged conversion occurred. Further, to the extent Plaintiffs are claiming the conversion of money, *see, e.g., Ehrlich v. Howe,* 848 F.Supp. 482, 492 (S.D.N.Y.1994) (noting that an action for conversion of money may lie if the pleading alleges that "the money converted was in specific tangible funds of which the claimant was the owner and entitled to immediate possession"), the Amended Complaint only alleges when certain funds were transferred to the Harris Defendants (*see* Am. Compl. at ¶¶ 55–58, 60), not when any particular acts of conversion occurred.

Because of the significant pleading defects present in the Amended Complaint against the Harris Defendants—defects that are not remedied by any version of Plaintiffs' proposed Second Amended Complaint—I recommend that the Harris Defendants' motion to dismiss be granted under Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure. In this instance, though, I recommend that the dismissal be without prejudice to filing an amended pleading that actually addresses the defects identified herein, as Plaintiffs may have viable claims against Harris and/or one or more of the Harris Entities, for, *inter alia,* misappropriating a large sum of money allegedly entrusted to them. *See* Fed.R.Civ.P. 15(a) (stating that courts "should freely give leave [to amend] when justice so requires"); *Rich v. Maidstone Fin., Inc.,* No. 98 Civ. 2569(DAB), 2001 WL 286757, at *12 (S.D.N.Y. Mar.23, 2001) (holding that leave to amend should be given when the court "cannot determine that the plaintiff could not, under any circumstances, sufficiently allege its claims" (internal quotation marks and citation omitted)).

Finally, given the defects that have, to date, been manifest in each of Plaintiffs' pleadings or proposed pleadings, I further recommend that Plaintiffs and their counsel be strongly cautioned by the Court that, if they choose to proceed with a further amendment, (1) they take care to plead the claims of the Church and of Holmes individually, with allegations that show a basis for each claim, as to the plaintiff asserting it, (2) they not name as a defendant any corporate entity without a good faith basis for believing that the particular entity engaged in any activity that constituted an actionable wrong, and they provide each such defendant with notice of its specific alleged wrongdoing, and (3) they plead all claims falling within the ambit of Rule 9(b) with the particularity necessary to satisfy that Rule's requirements, as described herein.

### CONCLUSION

For all of the foregoing reasons, I respectfully recommend that the Court:

**\*27**  (1) grant Allstate's motion to dismiss the Amended Complaint (Dkt.18), with prejudice;

(2) deny Plaintiffs' cross-motion for leave to amend as against Allstate (Dkt.33);

(3) grant Allstate's sanctions motion to the extent it seeks Rule 11 sanctions against Plaintiffs' counsel, and otherwise deny the motion (Dkt.27);

(4) deny Plaintiffs' motion for sanctions against Allstate (Dkt.51);

(5) impose Rule 11 sanctions on Plaintiffs' counsel in the manner set forth *supra* at 39–41;

(6) grant the Harris Defendants' motion to dismiss the Amended Complaint (*see* Dkt. 55), without prejudice; and

(7) afford Plaintiffs 30 days to file a Second Amended Complaint that cures the pleading defects against the Harris Defendants, as discussed herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Laura T. Swain, United States Courthouse, 500 Pearl Street, Room 755, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 525, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Swain. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 627238

Williams v. 120 PCT Undercover, Not Reported in Fed. Supp. (2011)

2011 WL 13128209

2011 WL 13128209
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, E.D. New York.

Ozan WILLIAMS, Plaintiff,

v.

120 PCT UNDERCOVER; District 9, Defendants.

11-CV-4690 (KAM) (CLP)
|
Signed October 17, 2011
|
Filed 10/18/2011

**Attorneys and Law Firms**

Ozan Williams, Fishkill, NY, pro se.

### MEMORANDUM AND ORDER

MATSUMOTO, United States District Judge

**\*1** *Pro se* plaintiff Ozan Williams, currently incarcerated at the George R. Vierno Center on Rikers Island, filed the instant action on September 21, 2011 pursuant to 42 U.S.C. § 1983. As set forth below, the court grants plaintiff's request to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915 and directs him to file an amended complaint within 30 days of the entry date of this order.

### Background

Plaintiff alleges that on August 26, 2008, "at 91 Broad Street, Staten Island, N.Y. 10304" he was beaten twice by undercover cops "for no reason." (ECF No. 1, Complaint ("Compl.") at ¶ IV.) Plaintiff further alleges that he received medical treatment, but that he "still can't see good." (*Id.* at ¶ IV.A.) The remedy plaintiff seeks is unclear, but he states: "my health first and stop[p]ing these same police from getting me locked up ...." (*Id.* at ¶ V.)

### Standard of Review

The court is aware that plaintiff is proceeding *pro se* and "a *pro se* complaint, however inartfully pleaded, must be

held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted). The court is obliged to construe plaintiff's pleadings liberally and interpret them as raising the strongest arguments they suggest. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 471 (2d Cir. 2006). Nevertheless, 28 U.S.C. § 1915A requires the court to screen a civil complaint "in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and thereafter "dismiss the complaint, or any portion of the complaint," if it is "frivolous, malicious, or fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915A(a), (b)(1). *See Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (discussing *sua sponte* standard pursuant to § 1915A).

### Discussion

To sustain a claim pursuant to § 1983, a plaintiff must show that the defendants (a) acted under color of state law (b) to deprive the plaintiff of a constitutional right. *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994). Here, plaintiff has not named any parties who can be sued in this complaint.

To the extent plaintiff has named the 120 Precinct and District 9, a police precinct and district of the New York City Police Department are not a proper parties to this action. Section 396 of the Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law." N.Y. City Charter § 396 (2009). That provision has been construed to mean that "New York City departments, as distinct from the City itself, lack the capacity to be sued." *Ximines v. George Wingate High Sch.*, 516 F.3d 156, 160 (2d Cir. 2008); *Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007) (NYPD not a suable entity).

### Leave to Amend

If a liberal reading of the pleading "gives any indication that a valid claim might be stated," the court must grant leave to amend it. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). In this circuit, it is well settled that a "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).

Plaintiff alleges that unnamed undercover police officers used excessive force against him and caused him to sustain injuries on August 26, 2008 but does not identify any particular defendants. Therefore, the court grants plaintiff leave to file an amended complaint within 30 days from the date of this order. In the amended complaint, plaintiff must provide a short statement of claim, including the dates and times of all relevant events to the best of his recollection, and the relief he seeks. Plaintiff must also name the individuals responsible for the alleged deprivation of his civil rights. If plaintiff cannot identify the individual defendant(s) within the time allowed in this order or because they were undercover, he may designate the individual as John (or Jane) Doe #1, and so on. For example, *Police Officer John Doe #1, employed at _____ on _____ (date) and _____ (time); Police Officer John Doe #2, employed at_____ on (date) and _____ (time)*. The same defendants named in the caption of the amended complaint must also be named and their actions described in the statement of claim. The amended complaint shall replace the original complaint.

## Conclusion

*2 For the reasons set forth above, plaintiff must file an amended complaint in order to proceed with this action. If plaintiff elects to file an amended complaint, it shall be captioned "AMENDED COMPLAINT" and bear the same docket number as this order, 11-CV-4690 (KAM) (CLP) and shall be filed within 30 days from the entry of this order. If plaintiff fails to file an amended complaint within the time allowed or show good cause why he cannot comply, the case shall be dismissed without prejudice and judgment shall enter. The court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of an appeal. *Coppedge v. United States*, 369 U.S. 438, 444-45 (1962). The Clerk of Court is respectfully requested to serve a copy of this Order on plaintiff and note service in the docket.

**SO ORDERED.**

Dated: October 17, 2011.

**All Citations**

Not Reported in Fed. Supp., 2011 WL 13128209

KeyCite Overruling Risk - Negative Treatment

Overruling Risk Darnell v. Pineiro, 2nd Cir., February 21, 2017

2012 WL 1965663
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Steven LUKES, Plaintiff,

v.

NASSAU COUNTY JAIL, Armor Correctional
Health, Inc., John Doe and Jane Doe of the
Nassau County Jail, John Doe and Jane Doe
Ofarmor Correctional Health, Inc., Defendants.

No. 12–CV–1139(SJF)(AKT).
|
May 29, 2012.

**Attorneys and Law Firms**

Steven Lukes, East Meadow, NY, pro se.

*ORDER*

FEUERSTEIN, District Judge.

**I. Introduction**

**\*1** On March 7, 2012, *pro se* plaintiff Steven Lukes
("plaintiff") filed a complaint pursuant to 42 U.S.C. § 1983
("Section 1983"), accompanied by an application to proceed
*in forma pauperis*. Subsequently, plaintiff also moved for the
appointment of *pro bono* counsel to represent him in this
case. Plaintiff's financial status, as set forth in the declaration
in support of his application to proceed *in forma pauperis,*
qualifies him to commence this action without prepayment
of the filing fees. *See* 28 U.S.C. § 1915(a)(1). Accordingly,
plaintiff's application to proceed *in forma pauperis* is granted.
However, for the reasons set forth below, the complaint is
*sua sponte* dismissed pursuant to 28 U.S.C. §§ 1915(e)(2) and
1915A(b) and plaintiff's application for the appointment of
*pro bono* counsel is denied without prejudice.

**II. The Complaint**

Plaintiff alleges that while incarcerated at the Nassau County
Jail, he was denied "proper medical treatment" for injuries he
allegedly suffered as a result of "police brutality," as well as
for his hepatitis C. (Compl. at ¶ IV). Plaintiff seeks damages in

the amount of one hundred million dollars ($100,000,000.00).
(Compl. at ¶ V).

**III. Discussion**

**A. Standard of Review**

Under both the Prison Litigation Reform Act, 28 U.S.C. §
1915A, and the *in forma pauperis* statute, 29 U.S.C. § 1915(e)
(2), a district court must dismiss a complaint if it is frivolous
or malicious, fails to state a claim upon which relief may
be granted or seeks monetary relief from a defendant who is
immune from such relief. 28 U.S.C. §§ 1915A(b) and 1915(e)
(2)(B). *See Abbas v. Dixon,* 480 F.3d 636, 639 (2d Cir.2007)
(finding both Section 1915 and 1915A to be applicable to a
prisoner proceeding *in forma pauperis* ).

It is axiomatic that district courts are required to read *pro se*
complaints liberally, *see Erickson v. Pardus,* 551 U.S. 89, 94,
127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting *Estelle
v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251
(1976)); *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010),
and to construe them " 'to raise the strongest arguments
that [they] suggest[ ].' " *Chavis,* 618 F.3d at 170 (quoting
*Harris v. City of New York,* 607 F.3d 18, 24 (2d Cir.2010)).
Moreover, at the pleadings stage of the proceeding, the Court
must assume the truth of "all well-pleaded, nonconclusory
factual allegations" in the complaint. *Kiobel v. Royal Dutch
Petroleum Co.,* 621 F.3d 111, 124 (2d Cir. Sept.2010); *see also
Jackson v. Birmingham Board of Education,* 544 U.S. 167,
171, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005).

Nevertheless, a complaint must plead sufficient facts "to state
a claim to relief that is plausible on its face." *Bell Atlantic
Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 1974,
167 L.Ed.2d 929 (2007). The pleading of specific facts is
not required; rather a complaint need only give the defendant
"fair notice of what the * * * claim is and the grounds upon
which it rests." *Erickson,* 551 U.S. 89, 127 S.Ct. 2197, 167
L.Ed.2d 1081; *see also Arista Records. LLC v. Doe 3,* 604
F.3d 110, 119–20 (2d Cir.2010) (accord). "A pleading that
offers "labels and conclusions" or 'a formulaic recitation of
the elements of a cause of action will not do.' " *Ashcroft v.
Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868
(2009) (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955,
167 L.Ed.2d 929). "Nor does a complaint suffice if it tenders
'naked assertion[s]' devoid of 'further factual enhancement.'
" *Id.* (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955, 167
L.Ed.2d 929). "Factual allegations must be enough to raise a
right to relief above the speculative level, on the assumption

2012 WL 1965663

that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly,* 550 U.S. 544, 127 S.Ct. at 1959, 167 L.Ed.2d 929. The plausibility standard requires "more than a sheer possibility that defendant has acted unlawfully." *Iqbal,* 556 U.S. 662, 129 S.Ct. at 1949, 173 L.Ed.2d 868.

B. Section 1983

**\*2** Section 1983 provides that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ....

42 U.S.C. § 1983. To state a Section 1983 claim, a plaintiff must allege (1) that the challenged conduct was "committed by a person acting under color of state law," and (2) that such conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell,* 592 F.3d 121, 127 (2d Cir.2010); *cert. denied sub nom Cornejo v. Monn,* ─── U.S. ───, 131 S.Ct. 158, 178 L.Ed.2d 243 (2010) (quoting *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994)). Section 1983 does not create any independent substantive right; but rather is a vehicle to "redress ... the deprivation of [federal] rights established elsewhere." *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999).

1. Claims Against the Nassau County Jail

"[U]nder New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and therefore, cannot sue or be sued." *Davis v. Lynbrook Police Dep't,* 224 F.Supp.2d 463, 477 (E.D.N.Y.2002); *see also In re Dayton,* 786 F.Supp.2d 809, 818 (S.D.N.Y.2011); *Hawkins v. Nassau County Correctional Facility,* 781 F.Supp.2d 107, 109 at n. 1 (E.D.N.Y.2011); *Carthew v. County of Suffolk,* 709 F.Supp.2d 188, 195 (E.D.N.Y.2010). Since the Nassau County Jail is an administrative arm of Nassau County, without a legal identity separate and apart from the County, it lacks the capacity to be sued. Accordingly, plaintiff's claims against

the Nassau County Jail are dismissed in their entirety with prejudice. However, since plaintiff is proceeding *pro se,* his claims against the Nassau County Jail will be construed as claims against Nassau County.

a. Claims Against Nassau County

A municipality or municipal entity, such as Nassau County, cannot be held liable under § 1983 on a *respondeat superior* theory. *See Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Roe v. City of Waterbury,* 542 F.3d 31, 36 (2d Cir.2008). To prevail on a Section 1983 claim against a municipality, a plaintiff must show "that 'action pursuant to official municipal policy' caused the alleged constitutional injury." *Cash v. County of Erie,* 654 F.3d 324, 333 (2d Cir.2011), *cert. denied,* ─── U.S. ───, 132 S.Ct. 1741, 182 L.Ed.2d 528 (2012) (quoting *Connick v. Thompson,* ─── U.S. ───, ───, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011)); *see also Monell,* 436 U.S. at 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611. "Local governing bodies ... may be sued for constitutional deprivations pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell,* 436 U.S. at 690–691 (citations omitted). To establish the existence of a municipal policy or custom, the plaintiff must allege: (1) the existence of a formal policy which is officially endorsed by the municipality, *see Connick,* 131 S.Ct. at 1359; (2) actions taken or decisions made by municipal policymaking officials, i.e., officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights, *see Amnesty America v. Town of West Hartford,* 361 F.3d 113, 126 (2d Cir.2004); *Jeffes v. Barnes,* 208 F.3d 49, 57 (2d Cir.2000); (3) a practice "so persistent and widespread as to practically have the force of law," *Connick,* 131 S.Ct. at 1359; *see also Green v. City of New York,* 465 F.3d 65, 80 (2d Cir.2006) (accord), or that "was so manifest as to imply the constructive acquiescence of senior policy-making officials," *Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 226 (2d Cir.2004) (quotations and citations omitted); or (4) that "a policymaking official exhibit[ed] deliberate indifference to constitutional deprivations caused by subordinates," *Cash,* 654 F.3d at 334 (quotations and citations omitted); *see also Okin v. Village of Cornwall–On–Hudson Police Department,* 577 F.3d 415, 439 (2d Cir.2009) (holding that a municipal custom may be found when "faced with a pattern of misconduct, [the municipality] does nothing, compelling the conclusion that [it] has acquiesced in or tacitly authorized its subordinates' unlawful actions." (quotations and citations omitted), i.e., "a local government's decision

not to train certain employees about their legal duty to avoid violating citizens' rights * * * amount[ing] to deliberate indifference to the rights of persons with whom the untrained employees come into contact," *Connick,* 131 S.Ct. at 1359 (quotations, alterations and citations omitted), or a policymaking official's failure to investigate or rectify a potentially serious problem of unconstitutional conduct of which he or she had notice, evidencing deliberate indifference, "rather than mere negligence or bureaucratic inaction," *Amnesty America,* 361 F.3d at 128.

**\*3** Even liberally construing the complaint, plaintiff's allegations are insufficient to state a *Section 1983* cause of action against Nassau County. *See, e.g., White v. St. Joseph's Hospital,* 369 Fed. Appx. 225, 226 (2d Cir. Mar.10, 2010) (affirming *sua sponte* dismissal of *Section 1983* claim for the plaintiffs failure "to allege that any of the allegedly unconstitutional actions were taken pursuant to an official policy or custom, as is required to state a *§ 1983* claim against a municipality."); *see generally City of Waterbury,* 542 F.3d at 37–41. Plaintiff has not alleged: (1) the existence of a formal policy which is officially endorsed by the County or Nassau County Jail; (2) actions taken or decisions made by County or Nassau County Jail policymaking officials which caused the alleged violations of his civil rights; (3) a County or Nassau County Jail practice so persistent and widespread as to practically have the force of law; or (4) a failure by County or Nassau County Jail policymakers to properly train or supervise their subordinates, amounting to "deliberate indifference" to the rights of those who come in contact with their employees. Accordingly, plaintiff's claims, as construed to be against Nassau County, are dismissed with prejudice **unless plaintiff files an amended complaint stating plausible Monell claims against the County on or before July 2, 2012.** *See, e.g., Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) ("If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."); *Chavis,* 618 F.3d at 170 (when addressing a *pro se* complaint, a district court should not dismiss without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated.")

2. *Section 1983* Claims against the Remaining Defendants

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under *§ 1983.*" *Back v. Hastings on Hudson*

*Union Free School Dist.,* 365 F.3d 107, 122 (2d Cir.2004) (internal quotations and citation omitted); *see also Platt v. Incorporated Village of Southampton,* 391 Fed. Appx. 62, 65 (2d Cir. Aug.30, 2010); *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010). "Personal involvement" may be established by evidence of direct participation by the defendant in the challenged conduct, or by evidence of a supervisory official's "(1) failure to take corrective action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates." *Hayut v. State University of New York,* 352 F.3d 733, 753 (2d Cir.2003); *see also Rolon v. Ward,* 345 Fed. Appx. 608, 611 (2d Cir. Sept.4, 2009). "[A] defendant in a *Section 1983* action may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996); *see also Back,* 365 F.3d at 127; *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). A complaint based on a violation under *Section 1983* that does not allege facts establishing the personal involvement of a defendant fails as a matter of law. *See Costello v. City of Burlington,* 632 F.3d 41, 48–49 (2d Cir.2011); *Shomo v. City of New York,* 579 F.3d 176, 184 (2d Cir.2009).

**\*4** Plaintiff has not established, or even alleged, the direct participation of any defendant, or employee of a defendant, in any of the wrongdoing alleged in his complaint, nor any basis upon which to find any defendant, or employee of a defendant, liable in a supervisory capacity.

Moreover, "[a] convicted prisoner's claim of deliberate indifference to his medical needs by those overseeing his care is analyzed under the Eighth Amendment because the right the plaintiff seeks to vindicate arises from the Eighth Amendment's prohibition of 'cruel and unusual punishment.' " *Caiozzo v. Koreman,* 581 F.3d 63, 69 (2d Cir.2009) (quoting *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996)). However, "a person detained prior to conviction receives protection against mistreatment at the hands of prison officials under the Due Process Clause of the Fifth Amendment if the pretrial detainee is held in federal custody, or the Due Process Clause of the Fourteenth Amendment if held in state custody." *Id* . Regardless of whether the plaintiff is a convicted prisoner or pretrial detainee, however, "the standard for deliberate indifference is the same under the Due Process Clause of the

Fourteenth Amendment [or Fifth Amendment] as it is under the Eighth Amendment." *Id.* at 70–71, 72.

A claim for deliberate indifference to medical needs has both an objective and subjective component. *See Collazo v. Pagano,* 656 F.3d 131, 135 (2d Cir.2011); *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir.2011).

Objectively, "the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain, exists." *Hill,* 657 F.3d at 122 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). In order to determine whether an alleged deprivation of medical care was objectively serious, the court must inquire (1) whether the inmate was "actually deprived of adequate medical care," i.e., whether the prison officials acted reasonably in response to the inmate's medical needs; and (2) "whether the inadequacy in medical care [was] sufficiently serious," i.e., how the challenged conduct was inadequate and what harm, if any, the inadequacy has caused or will likely cause the inmate. *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006).
"Subjectively, the official must have acted with the requisite state of mind, the 'equivalent of criminal recklessness,' " *Collazo,* 656 F.3d at 135 (quoting *Hathaway,* 99 F.3d at 553); *see also Wilson v. Seiter,* 501 U.S. 294, 299, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (holding that a deliberate indifference claim "mandate[s] inquiry into a prison official's state of mind."), i.e ., the official must have "act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm will result. *Salahuddin,* 467 F.3d at 280; *see also Caiozzo,* 581 F.3d at 72 (holding that the plaintiff must establish that the official "knew of and disregarded an excessive risk to [the plaintiff's] health or safety and * * * was both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and also drew the inference." (alterations and quotations omitted)). Generally, "mere allegations of negligent malpractice do not state a claim of deliberate indifference." *Hathaway,* 99 F.3d at 553; *see also Estelle,* 429 U.S. at 106, 97 S.Ct. 285, 50 L.Ed.2d 251 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim * * * under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Farid,* 593 F.3d at 249 ("[N]egligence is insufficient to support an Eighth Amendment claim."); *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (" 'Deliberate indifference' describes a mental state more

blameworthy than negligence * * * [and] is a state of mind that is the equivalent of criminal recklessness. * * * A showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, i.e., an act or a failure to act * * * that evinces a conscious disregard of a substantial risk of serious harm." (internal quotations and citations omitted)).

**\*5** Even liberally read, the complaint fails to state a claim for deliberate indifference to plaintiff's medical needs because, *inter alia,* plaintiff does not allege the personal involvement of any defendant in any of the alleged wrongdoing and plaintiff's allegations indicate only his dissatisfaction with the care provided to him during his incarceration at the Nassau County Jail and, at most, state a claim for negligence or medical malpractice. Accordingly, plaintiff's complaint is *sua sponte* dismissed in its entirety with prejudice pursuant to 28 U.S.C. § 1915A(b)(1) and § 1915(e)(2)(B)(ii) unless plaintiff files an amended complaint alleging the personal involvement of any defendant in the alleged constitutional deprivation and stating a plausible claim for deliberate indifference to medical needs **on or before July 2, 2012** . The amended complaint must be labeled "Amended Complaint;" bear the same docket number as this Order; and clearly identify the individual(s) personally responsible for any alleged violation of his constitutional rights. In the event plaintiff does not know the names of such individuals, he must identify each of them as "John Doe Correctional Officer# 1" or "Jane Doe Medical Officer # 2, "or the like; identify the roles each of them played in the alleged constitutional deprivation; describe each of them with as much specificity as possible to enable their identification; and, where possible, identify the specific dates of the alleged wrongdoing.

C. Application for Appointment of *Pro Bono* Counsel
28 U.S.C. § 1915(e)(1) provides that a "court may request an attorney to represent any person unable to afford counsel." Courts possess substantial discretion to determine whether appointment of counsel for civil litigants is appropriate, *Ferrelli v. River Manor Health Care Center,* 323 F.3d 196, 203 (2d Cir.2003), "subject to the requirement that [they] be 'guided by sound legal principle.' " *Cooper v. A. Sargenti Co., Inc.,* 877 F.2d 170, 171–72 (2d Cir.1989) (quoting *Jenkins v. Chemical Bank,* 721 F.2d 876, 879 (2d Cir.1983)).

When deciding whether to appoint counsel to an indigent civil litigant under § 1915(e)(1), the threshold inquiry is whether there is "some likelihood of merit" to the litigant's position. *Johnston v. Maha,* 606 F.3d 39, 41 (2d Cir.2010); *see also*

*Carmona v. United States Bureau of Prisons,* 243 F.3d 629, 632 (2d Cir.2001) ("counsel should not be appointed in a case where the merits of the indigent's claim are thin and his chance of prevailing are therefore poor."); *see also Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986) (stating that "the district judge should first determine whether that indigent's position seems likely to be of substance").

If the threshold showing has been met, the court should next consider the following prudential factors:

> [T]he indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

**\*6** *Hodge,* 802 F.2d at 61–62; *see also Johnston,* 606 F.3d at 42 (applying the *Hodge* factors); *Carmona,* 243 F.3d at 632 (holding that "[o]nly after an initial finding that a claim is likely one of substance, will we consider secondary factors such as the factual and legal complexity of the case, the ability of the litigant to navigate the legal minefield unassisted, and any other reason why in the particular case appointment of counsel would more probably lead to a just resolution of the dispute"). However, those factors are not exclusive and "[e]ach case must be decided on its own facts." *Hodge,* 802 F.2d at 61.

Plaintiff has not established a threshold showing of merit to any of his claims. Accordingly, plaintiff's application for the appointment of *pro bono* counsel is denied without prejudice.

## IV. Conclusion

For the reasons set forth above, plaintiff's application to proceed *in forma pauperis* is granted; the complaint is *sua sponte* dismissed with prejudice pursuant to 28 U.S.C. §§ 1915A and 1915(e)(2) **unless plaintiff files an amended complaint in accordance with this Order on or before July 2, 2012;** and plaintiff's application for the appointment of *pro bono* counsel is denied without prejudice. Pursuant to Rule 77(d)(1) of the Federal Rules of Civil Procedure, the Clerk of the Court is directed to serve notice of entry of this order upon all parties, including mailing a copy of this order to plaintiff at his last known address in accordance with Rule 5(b)(2)(C).

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1965663

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-01527-TJM-TWD  Document 24  Filed 10/05/20  Page 177 of 259

Shabazz v. Johnson City Police Department, Not Reported in Fed. Supp. (2018)

2018 WL 5660406

2018 WL 5660406
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Salih R. SHABAZZ, Plaintiff,
v.
JOHNSON CITY POLICE
DEPARTMENT, et al., Defendants.

Civil Action No. 3:18-CV-0570 (MAD/DEP)
|
Signed 06/21/2018

**Attorneys and Law Firms**

FOR PLAINTIFF: SALIH R. SHABAZZ, Pro se, 16-B-3163, Attica Correctional Facility, Box 149, Attica, NY 14011.

ORDER, REPORT, AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

 **\*1**  This is a civil rights action brought by *pro se* plaintiff Salih R. Shabazz, a New York State prison inmate, against the Johnson City Police Department ("JCPD"), a JCPD patrolman, and a JCPD detective sergeant pursuant to 42 U.S.C. § 1983. Plaintiff's complaint alleges that defendants unlawfully searched and arrested him, handcuffed him to a bench for hours, and denied him access to an attorney.

Plaintiff's complaint and accompanying application for leave to proceed in the action *in forma pauperis* ("IFP") have been forwarded to me for review. Based upon my consideration of those materials, plaintiff's IFP motion is granted, but I recommend that certain of his causes of action be dismissed with leave to replead.

I. BACKGROUND

Plaintiff commenced this action on or about May 14, 2018. Dkt. No. 1. Because plaintiff's complaint was unaccompanied by either the required filing fee or an application for leave to proceed IFP, the action was administratively closed by District Judge Mae A. D'Agostino. Dkt. No. 2. Plaintiff thereafter filed a motion for leave to proceed IFP on May 29, 2018, and the court reopened the action. Dkt. Nos. 3, 4.

As defendants, plaintiff's complaint names Christopher Ketchum, a detective sergeant, and Patrolman Conrad (Badge #140), both of whom are alleged to be employed by the JCPD, which is also named as a defendant. Dkt. No. 1 at 1-2. Plaintiff's complaint alleges that on February 26, 2016, he was stopped by defendant Ketchum at the corner of Harrison Street and Grand Avenue in Johnson City, handcuffed, and searched for contraband. *Id.* at 2-3. During the course of the search, and while handcuffed and in view of the public, defendant Ketchum pulled plaintiff's pants. *Id.* at 3. Plaintiff alleges that he told defendant Ketchum during the search that he is a Muslim. *Id.* Defendant Conrad subsequently conducted an additional search of plaintiff's person and found no contraband. *Id.* Following the searches, plaintiff was arrested. *Id.* at 4.

According to plaintiff, he was transported to JCPD headquarters after being arrested, where he was handcuffed to a bench for several hours without access to food, water, a telephone, or an attorney. Dkt. No. 1 at 4.

Plaintiff claims that his rights under the First, Fourth, Eighth, and Fourteenth Amendments were violated and asserts a municipal liability claim against defendant JCPD under *Monell v. Dep't of Soc. Servs. v. City of N.Y.*, 436 U.S. 658 (1978). Dkt. No. 1 at 4-5. As relief, plaintiff requests monetary damages in the amount of $2 million jointly and severally against the individual defendants and $1 million against defendant JCPD. *Id.* at 6.

II. DISCUSSION

  A. IFP Application
When a civil action is commenced in a federal district court, the statutory filing fee, currently set at $400, must ordinarily be paid. 28 U.S.C. § 1914(a). [1] A court is authorized, however, to permit a litigant to proceed *in forma pauperis* if it determines that he is unable to pay the required filing fee. 28 U.S.C. § 1915(a)(1). In this instance, because I conclude that plaintiff meets the requirements for IFP status, his application for leave to proceed without prepayment of fees is granted. [2]

---

[1]     The total cost for filing a civil action in this court is $400.00, consisting of the civil filing fee of $350.00, *see* 28 U.S.C. § 1914(a), and an administrative fee of $50.00. Although an inmate granted IFP status is not required to pay the $50.00 administrative fee, he is required to pay, over time,

Case 9:19-cv-01527-TJM-TWD  Document 24  Filed 10/05/20  Page 178 of 259

Shabazz v. Johnson City Police Department, Not Reported in Fed. Supp. (2018)

2018 WL 5660406

the full amount of the $350.00 filing fee regardless of the outcome of the action. *See* 28 U.S.C. § 1915(b)(3).

2    Plaintiff is reminded that, although his IFP application has been granted, he will still be required to pay fees that he incurs in this action, including copying and/or witness fees.

### B. Sufficiency of Plaintiff's Complaint

### 1. Standard of Review

**\*2** Because I have found that plaintiff meets the financial criteria for commencing this case IFP, I must next consider the sufficiency of the claims set forth in his complaint in light of 28 U.S.C. § 1915(e). Section 1915(e) directs that, when a plaintiff seeks to proceed IFP, "the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). Similarly, 28 U.S.C. § 1915A(b) directs a court to review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity," and to "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) ("[W]e have found both sections [1915 and 1915A] applicable to prisoner proceedings *in forma pauperis*.").

In deciding whether a complaint states a colorable claim, a court must extend a certain measure of deference in favor of *pro se* litigants, *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to address the sufficiency of plaintiff's allegations, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983). The court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a *pro se* plaintiff's complaint to proceed. *See, e.g., Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint,

notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint.' " *Aguilar v. United States*, Nos. 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) ); *see also Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory, for purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint.").

When reviewing a complaint under section 1915(e), the court is guided by applicable requirements of the Federal Rules of Civil Procedure. Specifically, Rule 8 of the Federal Rules of Civil Procedure provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, J.) (quotation marks and italics omitted).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the court should construe the factual allegations of a complaint in a light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2) ).

Shabazz v. Johnson City Police Department, Not Reported in Fed. Supp. (2018)

2018 WL 5660406

**\*3** Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which "establishes a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortgage Corp.*, 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983) ). It " 'is not itself a source of substantive rights[,] ... but merely provides 'a method for vindicating federal rights elsewhere conferred[.]' " *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979) ). In order to state a claim pursuant to section 1983, a plaintiff must allege "(1) 'that some person has deprived him of a federal right,' and (2) 'that the person who has deprived him of that right acted under color of state ... law.' " *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) ).

### 2. Analysis

#### a. First Amendment

The First Amendment to the United States Constitution provides, in relevant part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof[.]" U.S. Const. amend. I. Although plaintiff identifies himself as a Muslim in his complaint, and allegedly did so on the date of his arrest while defendant Ketchum conducted a search of plaintiff's person, there are no allegations in the complaint explaining how the search conducted by defendant Ketchum violated his right to exercise his religion. Accordingly, I recommend that plaintiff's First Amendment claim be dismissed for failure to state a claim upon which relief may be granted.

#### b. Eighth Amendment

Any cause of action asserted by plaintiff arising under the Eighth Amendment is not cognizable in light of plaintiff's status at the relevant times as a pretrial detainee. *Younger v. City of N.Y.*, 480 F. Supp. 2d 723, 730-31 (S.D.N.Y. 2007) (citing *Whitley v. Albers*, 475 U.S. 312, 318-19 (1986) ). Accordingly, I recommend that plaintiff's Eighth Amendment claims be dismissed.

#### c. JCPD as a Named Defendant

The JCPD is an agency of Johnson City and is not an independent entity subject to suit. The proper defendant, instead, is Johnson City. *See, e.g., Krug v. Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) ("A city police department is not an independent, suable entity separate and apart from the municipality in which the police department is organized."). For that reason, I recommend that defendant JCPD be dismissed from the action. Additionally, for the sake of judicial efficiency, and because I find plaintiff's complaint alleges sufficient facts at this juncture concerning plaintiff's *Monell* claim to survive review under section 1915(e), I recommend that Johnson City be substituted for JCPD as a defendant.

#### d. Remaining Causes of Action

Mindful of the court's obligation to liberally construe a *pro se* litigant's pleadings, I find that plaintiff's remaining causes of action, including claims of false arrest, denial of access to counsel, and denial of due process, which are asserted under the Fourth, Sixth, and Fourteenth Amendments, respectively, are sufficiently stated at this early juncture to survive review under section 1915(e) and require a response from defendants. In arriving at this conclusion, I express no opinion concerning whether plaintiff's complaint can withstand a properly filed motion to dismiss or for summary judgment or whether plaintiff's claims may ultimately prevail at trial.

### C. Whether to Permit Amendment

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires."); *see also Mathon v. Marine Midland Bank, N.A.*, 875 F. Supp. 986, 1003 (E.D.N.Y. 1995) (permitting leave to replead where court could not "determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48

Shabazz v. Johnson City Police Department, Not Reported in Fed. Supp. (2018)

2018 WL 5660406

(2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, No. 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).

 *4  In this case, it is possible that, with better pleading, plaintiff could amend his complaint to assert a cognizable First Amendment claim against the individual defendants. Accordingly, I recommend that plaintiff be granted an opportunity to amend his complaint concerning that claim. With respect to plaintiff's Eighth Amendment claims, however, in light of his status at the time of his arrest as a pretrial detainee, no legally cognizable action would arise under that provision. For that reason, I recommend dismissal of those claims with prejudice.

If plaintiff chooses to file an amended complaint, he should note that the law in this circuit clearly provides that " 'complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.' " *Hunt v. Budd*, 895 F. Supp. 35, 38 (N.D.N.Y. 1995) (McAvoy, J.) (quoting *Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir. 1987) ); *Pourzandvakil v. Humphry*, No. 94-CV-1594, 1995 WL 316935, at *7 (N.D.N.Y. May 22, 1995) (Pooler, J.). Therefore, in any amended complaint, plaintiff must clearly set forth the facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, plaintiff is informed that any such amended complaint will replace the existing complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (quotation marks omitted) ).

IV. SUMMARY AND RECOMMENDATION

The IFP application that was submitted by plaintiff subsequent to the filing of his complaint in this action appears to be complete and reflects his eligibility for IFP status. Accordingly, his motion for leave to proceed in the action without prepayment of fees is granted.

Turning to the merits of plaintiff's claims, I conclude that the claims arising under the Eighth Amendment to the United States Constitution are legally deficient and therefore recommend that they be dismissed without leave to replead. Concerning plaintiff's First Amendment claim, although the currently drafted complaint fails to state a cognizable religious exercise claim, it is possible that plaintiff could amend his pleading to assert a plausible cause of action. As to the remaining claims, I recommend that they survive initial review under section 1915(e) and defendants be required to respond to the complaint. Based upon the foregoing it is hereby

ORDERED that plaintiff's motion for leave to proceed *in forma pauperis* (Dkt. No. 3) is hereby GRANTED; and it is further hereby respectfully

RECOMMENDED that plaintiff's claims under the Eighth Amendment to the United States Constitution be dismissed with prejudice;

RECOMMENDED that plaintiff's First Amendment claim be dismissed with leave to replead; and it is further

RECOMMENDED that Johnson City be substituted as a named defendant in the action in the place of Johnson City Police Department; and it is further

 *5  RECOMMENDED that the remainder of plaintiff's complaint be accepted for filing; and it further hereby respectfully

RECOMMENDED that, in the event this order is adopted, the court issue an order requiring the following:

(1) The clerk of the court shall issue summonses and forward them with copies of the complaint to United States Marshal, along with packets containing General Order 25, which sets forth this district's Civil Case Management Plan, for service upon the named defendants.

(2) The clerk is directed to schedule a Rule 16 conference.

**Shabazz v. Johnson City Police Department, Not Reported in Fed. Supp. (2018)**

2018 WL 5660406

(3) Subsequent to service of process on defendants, defendants or their counsel shall file a formal response to plaintiff's complaint in accordance with the Federal Rules of Civil Procedure.

(4) All pleadings, motions, and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. **Any paper sent by a party to the court or the clerk must be accompanied by a certificate showing that a true and correct copy of same was mailed to all opposing parties or their counsel. Any document received by the clerk or the court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be returned, without processing.** Plaintiff must comply with any requests by the clerk's office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions, which must be returnable before the assigned district judge with proper allowance for notice as required by the Rules. **Plaintiff is also required to promptly notify the clerk's office and all parties or their counsel of any change in plaintiff's address; his failure to do so may result in the dismissal of this action;** and it is further

ORDERED that the clerk of the court shall serve a copy of this order on plaintiff in accordance with the court's local rules.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. [3] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

[3]     If you are proceeding *pro se* and are served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

**All Citations**

Not Reported in Fed. Supp., 2018 WL 5660406

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-01527-TJM-TWD    Document 24    Filed 10/05/20    Page 182 of 259

Francis v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 4659478

2018 WL 4659478
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Malik FRANCIS, Plaintiff,
v.
The CITY OF NEW YORK, et al., Defendants.

17 Civ. 1453 (LAK)(HBP)
|
Signed 08/21/2018

**Attorneys and Law Firms**

Joel Wertheimer, Winston & Strawn, David Bradley Shanies, David B. Shanies Law Office, New York, NY, for Plaintiff.

Hannah Victoria Faddis, New York City Law Department, New York, NY, for Defendants.

OPINION AND ORDER

HENRY PITMAN, United States Magistrate Judge

I. Introduction

 *1  Plaintiff moves for an Order pursuant to Fed.R.Civ.P. 15 to file an amended complaint substituting the names of individual defendants for the captioned "John/Jane Doe" defendants and adding a claim for municipal liability against defendant City of New York pursuant to 42 U.S.C. § 1983. For the reasons set forth below, the motion is granted.

II. Facts

This is a civil rights action brought pursuant to 42 U.S.C. § 1983. Plaintiff alleges, in pertinent part, that in or about April 2016, he applied for, and was granted, a court order to be placed in protective custody while he was a pre-trial detainee at the George Motchan Detention Center ("GMDC") on Rikers Island because of "a specific and credible threat of physical harm against" him (Complaint, dated Feb. 27, 2017 (Docket Item ("D.I.") 1) ("Compl.") ¶¶ 13-14). On or about April 24, 2016, corrections officers at GMDC removed plaintiff from protective custody and placed him in general population, despite his protests that he was in "physical danger" (Compl. ¶¶ 17, 23-24). According to plaintiff, within minutes of being removed to general population, he was slashed in the face by several unidentified inmates, causing

him to suffer serious and permanent injuries (Compl. ¶¶ 27-28).

Plaintiff now seeks to substitute Anna Pressley, Brian Calloway and Charlton Lemon (collectively "Individual Defendants") for "John/Jane Does Numbered 1-10" and to add a Section 1983 claim against the City of New York based on new information plaintiff obtained in discovery (Memorandum in Support of Motion to Amend, dated Oct. 30, 2017 (D.I. 20-1) ("Pl. Memo.") ). Specifically, plaintiff now alleges that the Individual Defendants personally authorized plaintiff's involuntary removal from protective custody in violation of a court order and with deliberate indifference to a specific and substantial threat to plaintiff's safety (Proposed Amended Complaint, dated Oct. 30, 2017 (D.I. 20-3) ("PAC") ¶ 3). Plaintiff also alleges, and defendants concede, that plaintiff was removed from protective custody and transferred to general population because he committed an "infraction" (PAC ¶¶ 25-27; Memorandum of Law in Opposition to Plaintiff's Motion to Amend the Complaint, dated Nov. 15, 2017 (D.I. 24) ("Def. Memo.") at 6).[1] Plaintiff maintains that the foregoing warrants adding a Section 1983 claim against the City of New York because Department of Corrections ("DOC") Policy 6007R-A authorizes members of DOC's Operations Security and Intelligence Unit ("OSIU") to remove inmates from protective custody for punitive purposes without any regard for the security concerns that caused the inmate to be housed in protective custody in the first place (PAC ¶ 8). Thus, plaintiff contends, the city's municipal policy was the moving force behind his injuries.

[1]    Neither side describes the nature of this infraction other than to state that plaintiff was "antagonizing" a corrections officer (PAC ¶¶ 4, 25; Def. Memo. at 6).

Defendants object to both amendments on futility grounds.

III. Analysis

A. Applicable Legal Standards

 *2  The standards applicable to a motion to amend a pleading are well settled and require only brief review. Leave to amend a pleading should be freely granted when justice so requires. Fed.R.Civ.P. 15(a); Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); Medina v. Tremor Video, Inc., 640 F. App'x 45, 47 (2d Cir. 2016) (summary order); Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 190 (2d Cir. 2015); Dluhos v. Floating &

Case 9:19-cv-01527-TJM-TWD   Document 24   Filed 10/05/20   Page 183 of 259

Francis v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 4659478

Abandoned Vessel, Known as "New York", 162 F.3d 63, 69 (2d Cir. 1998); Gumer v. Shearson, Hammill & Co., 516 F.2d 283, 287 (2d Cir. 1974). This "permissive standard ... is consistent with [the] strong preference for resolving disputes on the merits." Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, supra, 797 F.3d at 190 (internal quotation marks omitted). "[M]otions to amend should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 126 (2d Cir. 2008) (per curiam), citing Foman v. Davis, supra, 371 U.S. at 182, 83 S.Ct. 227; accord American Home Assurance Co. v. Jacky Maeder (Hong Kong) Ltd., 969 F.Supp. 184, 187-88 (S.D.N.Y. 1997) (Kaplan, D.J.); see also Lee v. Regal Cruises, Ltd., 916 F.Supp. 300, 303 (S.D.N.Y. 1996) (Kaplan, D.J.), aff'd, 116 F.3d 465 (2d Cir. 1997) (summary order), citing Foman v. Davis, supra, 371 U.S. at 182, 83 S.Ct. 227.

A proposed amended complaint is futile when it fails to state a claim. AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., 626 F.3d 699, 726 (2d Cir. 2010); Health-Chem Corp. v. Daker, 915 F.2d 805, 810 (2d Cir. 1990); Mina Inv. Holdings Ltd. v. Lefkowitz, 184 F.R.D. 245, 257 (S.D.N.Y. 1999) (Sweet, D.J.); Parker v. Sony Pictures Entm't, Inc., 19 F.Supp.2d 141, 156 (S.D.N.Y. 1998) (Kaplan, D.J.), aff'd in pertinent part, vacated in part on other grounds sub nom., Parker v. Columbia Pictures Indus., 204 F.3d 326 (2d Cir. 2000). See generally Dluhos v. Floating & Abandoned Vessel, Known as "New York", supra, 162 F.3d at 69-70. The party opposing the amendment has the burden of demonstrating that leave to amend would be futile. Staskowski v. County of Nassau, No. 05-CV-5984 (SJF) (WDW), 2007 WL 4198341 at *4 (E.D.N.Y. Nov. 21, 2007) (adopting Report & Recommendation); Lugosch v. Congel, No. 00-CV-784, 2002 WL 1001003 at *1 (N.D.N.Y. May 14, 2002), citing Blaskiewicz v. County of Suffolk, 29 F.Supp.2d 134, 137-38 (E.D.N.Y. 1998).

An amendment to a complaint may, therefore, be denied as futile if a defendant can show that there is no "set of facts consistent with the allegations in the complaint" which would entitle the plaintiff to relief. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 563, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A proposed amended complaint is not futile when the "[f]actual allegations [are sufficient] to raise a right to relief above the speculative level on the assumption that all of the allegations

in the complaint are true." Bell Atlantic Corp. v. Twombly, supra, 550 U.S. at 555, 127 S.Ct. 1955.

It is well settled that a court's review of the viability of a proposed amended complaint is generally limited to the "four corners of [the] complaint." See Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 71 (2d Cir. 1998); Arnold v. Research Found. for State Univ. of N.Y., 216 F.Supp.3d 275, 284 (E.D.N.Y. 2016); Joinnides v. Floral Park-Bellerose Union Sch. Dist., No. CV 12-5682 (JS)(AKT), 2015 WL 1476422 at *15 (E.D.N.Y. Mar. 31, 2015). It is also well settled that in determining whether a proposed amended complaint is futile, the court must assume the truth of the allegations set forth therein. Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114, 119 (2d Cir. 2012); Wallace v. Warden of M.D.C., 14 Civ. 6522 (PAC)(HBP), 2016 WL 6901315 at *3 (S.D.N.Y. Nov. 23, 2016) (Pitman, M.J.); Max Impact, LLC v. Sherwood Grp., Inc., 09 Civ. 902 (LMM) (HBP), 2012 WL 3831535 at *2 (S.D.N.Y. Aug. 16, 2012) (Pitman, M.J.); Edwards v. City of New York, No. 07-CV-5286 (CPS)(RML), 2009 WL 1910740 at *2 (E.D.N.Y. June 29, 2009); Binder v. National Life of Vt., 02 Civ. 6411 (GEL), 2003 WL 21180417 at *2 (S.D.N.Y. May 20, 2003) (Lynch, then D.J., now Cir. J.); Gabourel v. Bouchard Transp. Co., 901 F.Supp. 142, 144 (S.D.N.Y. 1995) (Chin, then D.J., now Cir. J.).

*3  To the extent a proposed amendment would add new parties, the motion is technically governed by Rule 21, which provides that "the court may at any time, on just terms, add or drop a party." Fed.R.Civ.P. 21; Otegbade v. New York City Admin. for Children Servs., 12 Civ. 6298 (KPF), 2015 WL 851631 at *2 (S.D.N.Y. Feb. 27, 2015) (Failla, D.J.); FTD Corp. v. Banker's Tr. Co., 954 F.Supp. 106, 109 (S.D.N.Y. 1997) (Stein, D.J.). However, "the same standard of liberality" applies under Rule 21. Otegbade v. New York City Admin. for Children Servs., supra, 2015 WL 851631 at *2; FTD Corp. v. Banker's Tr. Co., supra, 954 F.Supp. at 109, citing Expoconsul Int'l, Inc. v. A/E Sys., Inc., 145 F.R.D. 336, 337 n.4 (S.D.N.Y. 1993) (Preska, D.J.) and Fair Hous. Dev. Fund Corp. v. Burke, 55 F.R.D. 414, 419 (E.D.N.Y. 1972); see Sly Magazine, LLC v. Weider Publ'ns L.L.C., 241 F.R.D. 527, 532 (S.D.N.Y. 2007) (Casey, D.J.); Chowdhury v. Haveli Rest., Inc., 04 Civ. 8627 (RMB)(JCF), 2005 WL 1037416 at *1 (S.D.N.Y. May 3, 2005) (Francis, M.J.).

B. Application of the Foregoing Principles

Case 9:19-cv-01527-TJM-TWD   Document 24   Filed 10/05/20   Page 184 of 259

Francis v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 4659478

1. Substituting Individual Defendants' Names

Defendants argue that the proposed amended complaint is futile because it does not state a claim against the Individual Defendants. Specifically, defendants argue that (1) plaintiff fails to allege sufficiently that the Individual Defendants were deliberately indifferent; (2) plaintiff fails to allege sufficiently that the Individual Defendants were personally involved in a constitutional violation and (3) the Individual Defendants are entitled to qualified immunity. In moving to substitute Individual Defendants' names in place of John/Jane Does, plaintiff has not materially altered the substantive allegations of the original complaint. Rather, he is only seeking to add the names of the corrections officers who allegedly authorized his removal from protective custody now that he has learned their identities. As explained below, defendants have not demonstrated that the proposed amended complaint fails to state a claim as to the Individual Defendants and thus, have failed to show futility.

To the extent the Individual Defendants oppose plaintiff's motion on the ground that the allegations set forth in the proposed amended complaint are not true, their argument is not appropriately made in opposition to a motion to amend and I do not consider it. As noted above, at this stage of the proceedings, I must assume the truth of the allegations set forth in the proposed amended complaint. Innis v. City of New York, 17 Civ. 323 (LTS)(HBP), 2017 WL 4797904 at *2 (S.D.N.Y. Oct. 24, 2017) (Pitman, M.J.).

a. Deliberate Indifference

It is well settled that "[p]rison officials have a duty to ... protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 828, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), quoting Cortes-Quinones v. Jimenez-Nettleship, 842 F.2d 556, 558 (1st Cir. 1977); see also Ross v. Correction Officers John & Jane Does 1-5, 610 F. App'x 75, 76-77 (2d Cir. 2015) (summary order); Villante v. Dep't of Corr., 786 F.2d 516, 522-23 (2d Cir. 1986). As plaintiff correctly points out, because he was a pre-trial detainee and not a convicted prisoner at the time of the assault, his constitutional claims are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishment Clause of the Eighth Amendment. Kingsley v. Hendrickson, ––– U.S. ––––, 135 S.Ct. 2466, 2475, 192 L.Ed.2d 416 (2015) ("pretrial detainees (unlike

convicted prisoners) cannot be punished"); Darnell v. Pineiro, 849 F.3d 17, 36 (2d Cir. 2017); Howard v. Brown, 15 Civ. 9930 (ER), 2018 WL 3611986 at *3-*4 (S.D.N.Y. July 28, 2018) (Ramos, D.J.); Taylor v. City of New York, 16 Civ. 7857 (NRB), 2018 WL 1737626 at *11 (S.D.N.Y. Mar. 27, 2018) (Buchwald, D.J.). Prior to Kingsley, the analysis of the two-prong test for deliberate indifference for failing to protect an inmate was the same under the Eighth and Fourteenth Amendments. Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009), overruled by Darnell v. Pineiro, supra, 849 F.3d at 35. First, plaintiff had to show that "the deprivation alleged [was], objectively, 'sufficiently serious.' " Farmer v. Brennan, supra, 511 U.S. at 834, 114 S.Ct. 1970. Second, plaintiff had to show "a prison official [had] a 'sufficiently culpable state of mind,' " namely, "one of 'deliberate indifference' to inmate health or safety." Farmer v. Brennan, supra, 511 U.S. at 834, 114 S.Ct. 1970, quoting Wilson v. Seiter, 501 U.S. 294, 297, 302-03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991); see also Wassmann v. County of Ulster, 528 F. App'x 105, 106 (2d Cir. 2013). Under this second prong, courts applied a "subjective" standard in which a prison official was liable if he "disregard[ed] a risk of harm [of] which he [was actually] aware." Farmer v. Brennan, supra, 511 U.S. at 836-37, 114 S.Ct. 1970; see also Caiozzo v. Koreman, supra, 581 F.3d at 69-70.

**\*4** However, following the Supreme Court's decision in Kingsley v. Hendrickson, supra, ––– U.S. ––––, 135 S.Ct. 2466, the Second Circuit altered the analysis under the second prong to an objective, rather than a subjective, standard. See Darnell v. Pineiro, supra, 849 F.3d at 32-36; Howard v. Brown, supra, 2018 WL 3611986 at *4. Under the current standard, the prison official "need only 'recklessly fail[ ] to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee [where] defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.' " Howard v. Brown, supra, 2018 WL 3611986 at *4, quoting Darnell v. Pineiro, supra, 849 F.3d at 35 (emphasis added). This standard of "deliberate indifference means the same thing for each type of claim under the Fourteenth Amendment." Darnell v. Pineiro, supra, 849 F.3d at 33 n.9; accord Walker v. Wright, 17-CV-425 (JCH), 2018 WL 2225009 at *5 (D. Conn. May 15, 2018) (same standard applied to unconstitutional conditions of confinement and deliberate indifference to serious medical needs under the Fourteenth Amendment); Taylor v. City of New York, supra, 2018 WL 1737626 at *11 (same standard applied to a failure-to-protect claim under the Fourteenth Amendment).

Francis v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 4659478

Defendants principally argue that the proposed amended complaint does not state a claim for deliberate indifference because its factual allegations are not true. Defendants maintain that plaintiff failed to describe adequately the threat against him to show it was "sufficiently serious" under the first prong of the analysis and that it was impossible for the Individual Defendants to know there was still a threat to plaintiff's safety three weeks after he was initially granted protective custody under the second prong (Def. Memo. at 4-6). Defendants further argue that it was reasonable for the Individual Defendants to remove plaintiff from protective custody after he committed an infraction (Def. Memo. 6-7).

As noted above, I must assume the truth of the allegations in the proposed amended complaint and, thus, all factual disputes must be resolved in favor of plaintiff. New York ex rel. Khurana v. Spherion Corp., 15 Civ. 6605 (JFK), 2017 WL 1437204 at *3 (S.D.N.Y. Apr. 21, 2017) (Keenan, D.J.). With this deferential standard in mind, I find that plaintiff's amended complaint states a plausible failure-to-protect claim under the Fourteenth Amendment.

"Courts have found that, when an inmate informs corrections officers about a specific fear of assault and is then assaulted, this is sufficient to proceed on a claim of failure to protect." Beckles v. Bennett, 05 Civ. 2000 (JSR), 2008 WL 821827 at *17 (S.D.N.Y. Mar. 26, 2008) (Rakoff, D.J.); see also Rogers v. Salius, 16-CV-1299 (JCH), 2017 WL 1370695 at *4-*5 (D. Conn. Apr. 13, 2017) (denying motion to dismiss where plaintiff alleged that prison officials knew of a threat prior to the assault against him); Morgan v. Dzurenda, 14-cv-966 (VAB), 2017 WL 1217092 at *6 (D. Conn. Mar. 31, 2017) (denying summary judgment where prison officials denied plaintiff's repeated requests for protective custody and plaintiff informed them of a serious threat hours before he was assaulted); Henry v. County of Nassau, 13-cv-7427 (SJF) (ARL), 2015 WL 2337393 at *4 (E.D.N.Y. May 13, 2015) (denying motion to dismiss as to prison officials "alleged to be personally involved" in the decision to place plaintiff in general population rather than protective custody after credible threats of gang retaliation made against plaintiff); Lojan v. Crumbsie, 12 Civ. 320 (VB), 2014 WL 6643070 at *4-*5 (S.D.N.Y. Oct. 6, 2014) (Briccetti, D.J.) (downgrading plaintiff's protective custody status could constitute deliberate indifference if prison officials were personally aware of a specific threat against plaintiff); Caldwell v. Reynolds, No. 95-CV-1586 (RSP/RWS), 1997 WL 141671 at *1 (N.D.N.Y. Feb. 27, 1997) (denying motion to dismiss where plaintiff

alleged "that he was placed in general population over [his] protests that he had 'enemies' there who wished to hurt him, and that as a result he was seriously attacked").

**\*5** Plaintiff alleges that the Individual Defendants were aware of the threats to his physical safety when they ordered him to be removed from protective custody (PAC ¶ 26-27). Plaintiff's removal was ordered a mere three weeks after DOC and a Justice of the New York State Supreme Court had concluded that plaintiff was at risk from other inmates and could not be housed in the general prison population (PAC ¶ 31). Furthermore, the proposed amended complaint alleges plaintiff was slashed and suffered serious injuries within minutes of being released into general population (PAC ¶ 44-46). While defendants may be correct that it was reasonable to remove plaintiff from protective custody after he committed an infraction due to institutional safety concerns, that is a factual issue that cannot be resolved at this early pleading stage. Drawing all reasonable inferences in favor of plaintiff, the proposed amended complaint's allegations, taken as true, sufficiently plead that (1) plaintiff was incarcerated under conditions that posed a substantial risk of harm to his physical safety and (2) the Individual Defendants knew or should have known of this risk and failed to mitigate it.

### b. Personal Involvement

Defendants next contend that the proposed amended complaint fails to allege personal involvement on the part of the Individual Defendants.

" 'It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " Farid v. Ellen, 593 F.3d 233, 249 (2d Cir. 2010), quoting Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006). Personal involvement of a state official can be shown by:

> (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such policy or custom to continue, (4) grossly

Francis v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 4659478

Case 9:19-cv-01527-TJM-TWD   Document 24   Filed 10/05/20   Page 186 of 259

negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003), citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995);[2] see also Avenue v. New York, 157 F. App'x 375, 377 (2d Cir. 2005) (summary order); Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003); Lewis v. Fisher, 08 Civ. 3027 (JG)(LB), 2009 WL 689803 at *3 (E.D.N.Y. Mar. 12, 2009).

[2]   The five types of personal involvement listed in the text were first set forth by the Second Circuit in Colon v. Coughlin, supra, 58 F.3d at 873. In Aschroft v. Iqbal, 556 U.S. 662, 677, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the Supreme Court rejected the argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the constitution." There is, therefore, some question as to whether all the types of personal involvement set forth in Colon, particularly those which involve supervisory liability, survive Iqbal. The Court of Appeals has acknowledged that the continuing vitality of all the Colon categories remains unresolved following Iqbal. See e.g., Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2014) ("Although the Supreme Court's decision in Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations, we need not reach Iqbal's impact on Colon in this case...."); Reynolds v. Barrett, 685 F.3d 193, 205 n.14 (2d Cir. 2012) ("We need not determine if the pattern-or-practice framework can ever be used in a § 1983 suit against a policy-making supervisory defendant, although we note our considerable skepticism on that question, in light of the Supreme Court's decision in Ashcroft v. Iqbal, 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)."). The continuing validity of all of the Colon categories remains unresolved and the issue continues to be a matter of disagreement among District Judges within the Circuit. Corbett

v. Annucci, 16 Civ. 4492 (NSR), 2018 WL 919832 at *6 n.5 (S.D.N.Y. Feb. 13, 2018) (Roman, D.J.).

**\*6** Plaintiff alleges that the Individual Defendants are members of the OSIU within DOC and that, after reviewing plaintiff's reported infraction, they personally authorized plaintiff's removal from protective custody into general population (PAC ¶¶ 17-19, 26-30). In doing so, plaintiff contends that Individual Defendants were fully aware of the ongoing threat to plaintiff's safety and recklessly disregarded it when they authorized his transfer to general population. While the proposed amended complaint could be more specific about the role each of the Individual Defendants played in this decision, plaintiff has adequately alleged personal involvement. See Taylor v. City of New York, supra, 2018 WL 1737626 at *9-*10 (plaintiff adequately pled personal involvement of two prison officials who he alleged "ignored the Order of the Kings County Supreme Court to place him in protective custody and assigned him to" general population (internal quotation marks omitted)); Brown v. City of New York, 13 Civ. 6912 (TPG), 2017 WL 1390678 at *10 (S.D.N.Y. Apr. 17, 2017) (Griesa, D.J.) (allegations that defendants' actions caused plaintiff "to be improperly placed in the general prison population" survives a motion to dismiss premised on lack of personal involvement).

### c. Qualified Immunity

Finally, defendants argue that substituting the names of the Individual Defendants in the proposed amended complaint would be futile because they are entitled to qualified immunity.

"[T]he Second Circuit has stated that in regards to a qualified immunity defense, even though a plaintiff may 'ultimately be unable to prevail because of that defense ... [t]hat possibility is not a valid basis for denying leave to amend the complaint ... for such immunity is an affirmative defense that the defendants have the burden of raising in their answer and establishing at trial or on a motion for summary judgment.' " Trudeau v. New York State Consumer Prot. Bd., 05-CV-1019 (GLS/RFT), 2006 WL 1229018 at *6 (N.D.N.Y. May 4, 2006), quoting Oliver Sch. v. Foley, 930 F.2d 248, 253 (2d Cir. 1991); see also Black v. Coughlin, 76 F.3d 72, 75 (2d Cir. 1996). Even in the Rule 12(b)(6) context, dismissal based on qualified immunity is only granted if "the facts supporting the defense appear on the face of the complaint." Hyman v. Abrams, 630 F. App'x 40, 42 (2d Cir. 2015) (summary order); see also Birch v. City of New

Case 9:19-cv-01527-TJM-TWD   Document 24   Filed 10/05/20   Page 187 of 259

Francis v. City of New York, Not Reported in Fed. Supp. (2018)
2018 WL 4659478

York, 184 F.Supp.3d 21, 28 (E.D.N.Y. 2016) (advocating caution when considering qualified immunity on a motion to dismiss), aff'd, 675 F. App'x 43 (2d Cir. 2017) (summary order). Because plaintiff has stated a plausible failure-to-protect Fourteenth Amendment claim against the Individual Defendants, facts supporting a defense of qualified immunity clearly do not appear on the face of the proposed amended complaint. See Rogers v. Salius, supra, 2017 WL 1370695 at *8 (facts supporting qualified immunity not on the face of the complaint where plaintiff stated plausible claims for failure to protect); Morgan v. Dzurenda, supra, 2017 WL 1217092 at *8 (same).

### d. Summary

Thus, because defendants have not demonstrated that the proposed amended complaint fails to state a claim or that there are judicially noticeable facts proving that the allegations in the proposed amended complaint are not plausible, they have failed to show futility as to plaintiff's Section 1983 claims against the Individual Defendants.

### 2. Monell Claim

Defendants also oppose plaintiff's motion to add a Section 1983 claim against the City of New York (Def. Memo. at 12-13).

With respect to "a municipality like the City of New York, in order to state a Section 1983 claim, a plaintiff must additionally allege that the denial of his or her constitutional right was caused by an official policy or custom." Smith v. City of New York, 1 F.Supp.3d 114, 121 (S.D.N.Y. 2013) (Schofield, D.J.), citing Monell v. Dep't of Social Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) and Torraco v. Port Auth. Of N.Y. & N.J., 615 F.3d 129, 140 (2d Cir. 2010). " '[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes plaintiff to be subjected to (3) a denial of a constitutional right.' " Torraco v. Port Auth. Of N.Y. & N.J., supra, 615 F.3d at 140, quoting Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007). Liability can only be imposed on a municipality if its "policy or custom" was the "moving force" behind an alleged injury. Monell v. Dep't of Social Servs., supra, 436 U.S. at 694, 98 S.Ct. 2018. Furthermore, "to challenge a [DOC] policy or lack of a policy,

an inmate must show that he or she suffered a concrete injury and that the injury resulted from the policy or lack thereof." Smith v. Martuscello, 10-CV-1532 (NAM/RFT), 2011 WL 5881803 at *1 (N.D.N.Y. Nov. 23, 2011), citing Amador v. Andrews, 655 F.3d 89, 99 (2d Cir. 2011).

*7 Plaintiff alleges that DOC Policy 6007R-A permits OSIU to remove an inmate from protective custody and place him in general population for any reason, including to discipline or punish the inmate, without regard for the inmate's safety concerns (PAC ¶ 8). Plaintiff contends that this policy of essentially unfettered discretion was the moving force behind the serious injuries he suffered after the Individual Defendants removed him from protective custody. Defendants, on the other hand, maintain that this discretion is necessary to ensure safety within DOC facilities and that courts historically grant broad deference to DOC when it comes to matters of prison security (Def. Memo. at 7-8).

While defendants, again, may ultimately be correct in their assertions, whether plaintiff will be able to ultimately succeed on his Monell claim is not the issue here; rather, the question is whether there are facts within the four corners of the proposed amended complaint that could entitle plaintiff to relief on his claim of municipal liability against the City of New York. "Although inmates rarely succeed in proving [constitutional] claims predicated on housing violent and nonviolent inmates together, such claims typically survive motions to dismiss, at least when the plaintiff alleges he suffered a resulting harm." Hubsher v. Nassau County, 16 Civ. 5842 (JS)(ARL), 2017 WL 4334130 at *5 (E.D.N.Y. Sept. 28, 2017) (denying motion to dismiss municipal liability claim where plaintiff was assaulted after being transferred from protective custody to general population) (internal quotation marks and citations omitted); see also Lojan v. Crumbsie, 12 Civ. 0320 (LAP), 2013 WL 411356 at *2-*4 (S.D.N.Y. Feb. 1, 2013) (Preska, D.J.) (denying motion to dismiss municipal liability claim where plaintiff was sexually assaulted after she was moved from strict protective custody to protective custody); Barreto v. County of Suffolk, 762 F.Supp.2d 482, 491-92 (E.D.N.Y. 2010) (denying motion to dismiss where plaintiff alleged through a fellow inmate's battery, "a direct causal link between the challenged [DOC housing] policy and his injury" to allow him "a shot at proving [his constitutional claim]" through the discovery process").

The proposed amended complaint plausibly alleges that DOC Policy 6007R-A authorized plaintiff to be involuntarily removed from protective custody and that there was a

direct causal link between this policy and the deprivation of plaintiff's constitutional right to be protected from an inmate-on-inmate assault. Thus, defendants have not demonstrated that this Section 1983 claim against the City of New York is futile.

IV. Conclusion

Accordingly, for all the foregoing reasons, plaintiff's motion to file an amended complaint is granted. Plaintiff is directed

to serve and file his amended complaint within 14 days of the date of this Order.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 4659478

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 3704996
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Michael L. WILSON, Plaintiff,

v.

Charles KELLY, Deputy Superintendent Security.
Great Meadow Correctional Facility, in his
individual and official capacity; Peter Besson,
Lieutenant, Great Meadow Correctional Facility, in
his individual and official capacity; Craig Goodman,
Lieutenant, Great Meadow Correctional Facility, in
his individual and official capacity; Paul Zarnetski,
Lieutenant, Great Meadow Correctional Facility,
in his individual and official capacity; Nicholas
Deluca, Sergeant, Great Meadow Correctional
Facility, in his individual and official capacity;
Richard Vladyka, Sergeant, Great Meadow
Correctional Facility, in his individual and official
capacity; Deborah Black, Principal Store Clerk,
Great Meadow Correctional Facility, in her
individual and official capacity, Defendants.

No. 9:11–cv–00030 (MAD/RFT).
|
Aug. 27, 2012.

Attorneys and Law Firms

Michael L. Wilson, Comstock, NY, pro se.

Office of the New York, State Attorney General, Cathy Y.
Sheehan, AAG, of Counsel, Albany, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

MAE A. D'AGOSTINO, District Judge.

**I. INTRODUCTION**

*1  On January 5, 2011, Plaintiff, a New York State prison
inmate, commenced this civil rights action, pursuant to
42 U.S.C. § 1983. See Dkt. No. 1. Plaintiff claims that
Defendants violated his rights under the First and Fourteenth
Amendments to the United States Constitution. See id.

Plaintiff seeks monetary damages, as well as declaratory and
injunctive relief. See id. at ¶ 2.

On September 29, 2011, Defendants moved to dismiss the
complaint pursuant to Rule 12(b)(6) of the Federal Rules
of Civil Procedure. See Dkt. No. 25. On June 22, 2012,
Magistrate Judge Treece issued a Report–Recommendation
and Order recommending that the Court grant-inpart and
deny-in-part Defendants' motion to dismiss. See Dkt. No. 29.

Currently before the Court are Plaintiff's objections to
Magistrate Judge Treece's ReportRecommendation and
Order. See Dkt. No. 31.

**II. BACKGROUND**

**A. Factual background**
Plaintiff is presently in the custody of the New York State
Department of Corrections and Community Supervision
("DOCCS") at Great Meadow Correctional Facility ("Great
Meadow"), which serves as the location of the events giving
rise to this complaint. See Dkt. No. 1 at ¶¶ 5, 17. Plaintiff
describes himself as "a devoted practicing Muslim, who
attends religious services every Friday afternoon, including
all religious classes." See id. at ¶ 15. Moreover, Plaintiff was
an Inmate Liaison Representative for an unspecified period of
time and currently works in Great Meadow's metal furniture
shop. See id. at ¶¶ 15, 17.

On or about October 25, 2009, Plaintiff submitted a letter
to Thomas LaValley, Superintendent of Great Meadow,
concerning "harassment and discrimination against the
Muslim faith" by staff members at Great Meadow. See Dkt.
No. 1 at Exhibit "A." In this letter, Plaintiff recounts, among
others, the following events: (1) an October 24, 2009 incident
in which a sergeant, who is not a defendant in this action,
stopped him while he was on his way to Arabic/Salat class
and advised him that his pants were in violation of prison
regulations because they were too short; (2) harassment
and discrimination suffered by Muslim inmates; and (3)
Lieutenant Sawyer's assault on Plaintiff in the sergeant room
while Officer Green, who is not a defendant in this action,
watched. See id.[1]  In this letter to Superintendent LaValley,
after informing him of the various problems he has with the
staff at Great Meadow, Plaintiff states that "I would like for
you to address this matter because I can start things also." See
id. Plaintiff proceeds to state that "I really don't want to start
anything but if I'm force[d] to I will." See id. Finally, in his

letter, Plaintiff makes the following request: "I ask that you respond back or speak with me whenever you can ... but once again, I ask that you clear this up because I really don't want to take this out [of] the facility without giving you the chance to correct the matter first." *See id.*

[1]   Plaintiff did not report this incident and later found out that "Lieutenant Sawyer" is actually Defendant Goodman.

**\*2** On October 31, 2009, Plaintiff received a misbehavior report, authored by Defendant DeLuca, regarding the "threat" made in his letter and also for refusing a direct order when Plaintiff refused to be interviewed by Defendant DeLuca about his comment that he "can start things also." *See id.* at Exhibit "B." Plaintiff claims that he did not report to Defendant DeLuca because he feared for his safety because Defendant DeLuca "has a history of assaults on inmates." *See id.* at ¶ 24.

Defendant Zarnetski held a disciplinary hearing on the misbehavior report. *See id.* at ¶ 25. Plaintiff claims that Defendant Zarnetski was biased during the hearing and repeatedly referred to him as "nigger," stupid," and "asshole." *See id.* Plaintiff also objected to Defendant Goodman being present at the hearing as an observer because he was not a witness or a party to the misbehavior report. *See id.*

Defendant Zarnetski found Plaintiff guilty of issuing a threat but not guilty of refusing to obey a direct order. *See id.* at ¶ 27 and Exhibit "C." Initially, the misbehavior report determination was upheld by Defendant Kelly, the Deputy Superintendent for Security. *See id.* at Exhibit "C." On February 12, 2012, however, Defendant Kelly reversed the hearing determination and expunged Plaintiff's record because the hearing was not completely recorded, per established procedure. *See id.* at Exhibit "E."

On February 5, 2010, Plaintiff was issued another misbehavior report, charging him with altering state property, giving false statements or information, and refusing a direct order. *See id.* at ¶ 33 and Exhibit "G." Defendant Black indicated on the misbehavior report, "per Hearing Lt. Goodman, this will be I/M Wilson's third time being cited for altered clothing. Also I/M has been given numerous direct orders from staff members not to wear hemmed pants that are hemmed incorrectly/illegally." *See Id.* at Exhibit "G." During the hearing on this misbehavior report, Plaintiff objected to Defendant DeLuca's testimony as biased. *See id.* at ¶ 35. Plaintiff was found guilty on all charges and sentenced to

fifteen-days keeplock confinement. *See id.* at Exhibit "H." Thereafter, on February 23, 2010, Plaintiff's FOIL request for a copy of the tape of the hearing was denied because the tape was "expunged/not available." *See id.* at Exhibit "L." On February 24, 2010, Defendant Kelly reversed and expunged this hearing disposition from Plaintiff's record. *See id.* at Exhibit "K."

As a result of the hearing determinations and resulting forty-five days combined keeplock confinement, Plaintiff missed seven religious services. *See id.* at ¶ 15. Plaintiff also alleges that, for two years, he volunteered as an inmate cook during the Muslim Ramadan Id festival. *See Id.* at ¶ 18. Plaintiff had also worked in the kitchen and mess hall "as an assigned program without incident." *See id.* On or about July 30, 2010, Defendant Vladyka removed Plaintiff's name from the kitchen assignment list for the Ramadan festival. *See id.* at ¶ 20. Prior to this, Defendant Vladyka made comments about Plaintiff filing complaints and grievances against staff. *See id.* Defendant Vladyka claimed that Plaintiff was a security risk because of his behavior. *See id.* at ¶ 21.

**B. Magistrate Judge Treece's June 22, 2012 Report–Recommendation and Order**

**\*3** In his June 22, 2012 Report–Recommendation and Order, Magistrate Judge Treece recommended that the Court grant in part and deny in part Defendants' motion to dismiss. *See* Dkt. No. 29. Specifically, Magistrate Judge Treece recommended that the Court deny the motion as to Plaintiff's First Amendment retaliation claim against Defendant DeLuca, but grant the motion as to Plaintiff's First Amendment retaliation claims against the remaining Defendants. *See id.* at 9–12. Moreover, Magistrate Judge Treece recommended that the Court grant Defendants' motion to dismiss Plaintiff's First Amendment Free Exercise claims because Plaintiff failed to allege facts indicating that a substantial burden was placed on his religious beliefs and because Plaintiff failed to allege the personal involvement of any Defendant. *See id.* at 12–14. Magistrate Judge Treece also recommended that the Court dismiss Plaintiff's conspiracy claim against all Defendants because he failed to plausibly allege an agreement between two or more actors. *See id.* at 14–15.

Next, regarding Plaintiff's due process claims, Magistrate Judge Treece found that neither the fifteen nor the thirty day keeplock sentence imposed upon Plaintiff constituted a significant or atypical hardship. *See id.* at 17–18. Further, he found that "Plaintiff's inability to attend seven Muslim religious services, loss of his honor block cell status and

loss of wages, which all occurred because he was held in keeplock confinement, do not constitute deprivation of a liberty interest." *See id.* at 18. As such, Magistrate Judge Treece recommended that the Court grant Defendants' motion to dismiss as to these claims. *See id.*

Finally, Magistrate Judge Treece found that Defendant DeLuca is entitled to Eleventh Amendment immunity as to Plaintiff's claim for money damages against him in his official capacity. *See id.* at 21. However, Plaintiff's claims against Defendant DeLuca in his official capacity for injunctive and declaratory relief may proceed. *See id.*

## C. Plaintiff's objections to Magistrate Judge Treece's Report–Recommendation and Order

Plaintiff raises five numbered objections to the Report–Recommendation and Order. *See* Dkt. No. 31. First, Plaintiff argues that Defendant Kelly should not be dismissed from this action because when he initially upheld the disciplinary hearing's outcome relating to the October 31, 2009 misbehavior report, he inaccurately stated that "the hearing was held in accordance with departmental directive # 4932 and established procedure" because it was later determined that there was no tape of the hearing as required by the directive. *See id.* at ¶ 1. Further, Plaintiff contends that Defendant Kelly's decision to reverse his initial decision to uphold the disciplinary hearing's outcome and expunge his record was because Plaintiff requested that the Superintendent review the matter and this would allow Defendant Kelly to avoid "being censored by his supervisor." *See id.*

**\*4** Second, Plaintiff objects to the recommended dismissal of Defendant Black because her "verbal harassment of [his] religious choice, and her prohibiting [him] from having pants hemmed, and her initiating the disciplinary proceeding (which lead to 15 days of confinement & the miss[ing] of (3) obligatory religious services) ... violated [his] freedom of religion." *See id.* at ¶ 2. Plaintiff claims that in her misbehavior report, Defendant Black fails to provide the name of the official(s) who allegedly gave Plaintiff a direct order that was ignored or who had allegedly cited Plaintiff in the past for his behavior. *See id.*

Third, Plaintiff objects to the recommended dismissal of Defendant Zarnetski because he violated his due process right to a fair hearing by creating a "hostile and intimidating hearing environment" and because he failed to record the hearing, thereby preventing Plaintiff from exercising his right to a meaningful appeal. *See id.* at ¶ 3. Plaintiff claims

that Defendant Zarnetski purposely failed to record the disciplinary hearing in an effort to deprive him of his rights and to retaliate against him. *See Id.*

Fourth, Plaintiff objects to the recommended dismissal of Defendant Besson because Defendant Besson failed to provide him with a fair and adequate hearing. *See id.* at ¶ 4. Plaintiff claims that the evidence at the hearing was clearly contradictory and finding Plaintiff guilty of refusing a direct order but not guilty on the tampering with state property charge was inconsistent with the evidence. *See id.* As such, Plaintiff claims that Defendant Besson's "clear contradiction demonstrates pure vindictiveness." *See id.* Plaintiff asserts that Defendant Besson's vindictiveness is further demonstrated by the fact that his written disposition finding Plaintiff guilty was drafted and signed by Defendant Besson on February 17, 2010, one day prior to the conclusion of the hearing. *See id.*

Finally, Plaintiff objects to the recommended dismissal of Defendant Vladyka. *See id.* at ¶ 5. Plaintiff claims that he "provided sufficient information within the complaint for a reasonable jury to determine if defendant Vladyka ['s] actions w[ere] motivated by a retaliatory act, since defendant had refused to state or show his reasoning for declaring plaintiff a security concern and not allowing plaintiff to cook during the month of [R]amadan as [he] had done (2) consecutive years prior to filing of his grievances." *See id.* Plaintiff asserts that, before he began filing complaints against staff, there were no reports or rumors of security concerns from the staff at Great Meadow. *See id.*

## III. DISCUSSION

### A. Standard of review

#### 1. Review of a report-recommendation and order

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1) (2006). When a party, however, files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, *1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court

may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1) (2006).

**\*5** A litigant's failure to file objections to a magistrate judge's report-recommendation, even when that litigant is proceeding *pro se,* waives any challenge to the report on appeal. *See Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir.2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point" (citation omitted)). A *pro se* litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. *See Frank v. Johnson,* 968 F.2d 298, 299 (2d Cir.1992); *Small v. Sec 'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a) and former 6(e) of the Federal Rules of Civil Procedure).

### 2. Motion to dismiss standard

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark,* 508 F.3d 106, 111–12 (2d Cir.2007). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949–50 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by reference into, the pleading. *See Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir.2006) (quoting *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir.2002)).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," *see* Fed.R.Civ.P. 8(a) (2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief[,]' " *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 557 (2007) (quotation omitted). Under this standard, the

pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *See id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 129 S.Ct. at 1949 (citation omitted). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief." ' " *Id.* (quoting [*Twombly,* 550 U.S.] at 557, 127 S.Ct.1955). Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly,* 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the [ ] complaint must be dismissed[,]" *id.* at 570.

**\*6** Despite this recent tightening of the standard for pleading a claim, complaints by *pro se* parties continue to be accorded more deference than those filed by attorneys. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (quotation omitted). As such, *Twombly* and *Iqbal* notwithstanding, this Court must continue to " 'construe [a complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggests.' " *Weixel v. Bd. of Educ.,* 287 F.3d 138, 146 (2d Cir.2002) (quotation omitted).

When a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citations omitted). Of course, an opportunity to amend is not required where "[t]he problem with [the plaintiff's] cause of action is substantive" such that "better pleading will not cure it ." *Id.* (citation omitted).

### 3. 42 U.S.C. § 1983

Section 1983 imposes liability for "conduct which 'subjects, or causes to be subjected' the complainant to a deprivation of a right secured by the Constitution and laws." *Rizzo v. Goode,* 423 U.S. 362, 370–71 (1976) (quoting 42 U.S.C. § 1983). Not only must the conduct deprive the plaintiff of rights and privileges secured by the Constitution, but the actions or omissions attributable to each defendant must be the proximate cause of the injuries and consequent damages that the plaintiff sustained. *See Brown v. Coughlin,* 758 F.Supp. 876, 881 (S.D.N.Y.1991) (citing *Martinez v. California,* 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481, *reh. denied,* 445 U.S. 920, 100 S.Ct. 1285, 63 L.Ed.2d 606 (1980)). As such,

for a plaintiff to recover in a section 1983 action, he must establish a causal connection between the acts or omissions of each defendant and any injury or damages he suffered as a result of those acts or omissions. *See id.* (citing *Givhan v. Western Line Consolidated School District,* 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979)) (other citation omitted).

" '[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quotation and other citations omitted). " '[W]hen monetary damages are sought under § 1983, the general doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendant is required.' " *Id.* (quoting *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.)). There is a sufficient showing of personal involvement of a defendant if (1) the defendant directly participated in the alleged constitutional deprivation; (2) the defendant is a supervisory official who failed to correct the wrong after learning about it through a report or appeal; (3) the defendant is a supervisory official who created a policy or custom under which the constitutional deprivation occurred, or allowed such a policy or custom to continue; or (4) the defendant is a supervisory official that was grossly negligent in managing subordinates who caused the constitutional deprivation. *See id.* (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)).

**B. First Amendment retaliation**

 **\*7**  "Courts properly approach prisoner retaliation claims 'with skepticism and particular care,' because 'virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.' " *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (quotation and other citation omitted). "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show ... '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir .2009) (quoting *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004)).

"Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis,* 320 F.3d at 353 (internal quotation marks and citation omitted). In making this determination, courts are to "bear in mind" that "prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (internal quotation marks and citations omitted). The "test is objective, not subjective, and must be so, since the very commencement of a lawsuit would otherwise be dispositive on the issue of chilling." *Davidson v. Bartholome,* 460 F.Supp.2d 436, 447 (S.D.N.Y.2006) (citations omitted).

*1. Defendant Kelly*

In his complaint, Plaintiff alleges that Defendant Kelly initially upheld the misbehavior report determination, but, on February 12, 2010, Defendant Kelly reversed the hearing determination and expunged Plaintiff's record because the hearing was not completely recorded, per established procedure. *See* Dkt. No. 1 at Exhibits "C" & "E." Similarly, Plaintiff alleges that Defendant Kelly reversed the second misbehavior report on February 21, 2010, again because of Defendant Besson's failure to record the disciplinary hearing. *See id.* at ¶¶ 36–37 and Exhibits "K"-"L." Plaintiff claims that Defendant Kelly's failure to reverse these determinations upon his first review of the matter demonstrates that Defendant Kelly retaliated against him and that he, "for the sole purpose of punitive retaliation[,] utilized and manipulated the Tier appeal process to maximize and extract the full penalty of sanctions[.]" *See id.* at ¶ 52. [2]

[2]     Although Plaintiff states that this is a retaliation claim against Defendant Kelly, the Court believes that this claim is more appropriately viewed as alleging a denial of due process. In light of Plaintiff's *pro se* status, the Court will review the merits of this claim as both a First Amendment retaliation claim and a Fourteenth Amendment due process claim.

Plaintiff's conclusory allegations against Defendant Kelly fail to allege a plausible claim of retaliation. Plaintiff does not allege any facts giving rise to an inference of retaliation and fails to allege a causal connection between his letter to Superintendent LaValley—the protected activity—and Defendant Kelly's decision to initially affirm the appeal. Moreover, upon review of Plaintiff's letter to Superintendent LaValley, it is clear that language was used that could reasonably be construed as threatening, thereby providing

a reasonable basis for affirming the disciplinary hearing determination. Finally, courts in this circuit have held that the fact that a deputy superintendent affirms a disciplinary hearing determination on appeal is, without more, insufficient to establish the personal involvement of that official. *See Ramsey v. Goord,* No. 05–CV–47A, 2005 WL 2000144, *6 (W.D.N.Y. Aug. 13, 2005) (citations omitted).

**\*8** Based on the foregoing, the Court finds that Magistrate Judge Treece correctly determined that Plaintiff has failed to allege facts plausibly suggesting that Defendant Kelly retaliated against him in violation of his First Amendment rights.

### 2. Defendant Black

Plaintiff alleges that Defendant Black filed a misbehavior report against him in retaliation for filing a "grievance/ complaint," as well as for his religious beliefs. *See* Dkt. No. 1 at ¶ 33. Plaintiff claims that Defendant Black did this "independently and/or at the behest of Goodman[.]" *See id.* at ¶ 55.

Again, Plaintiff's conclusory allegations are insufficient to state a plausible retaliation claim against Defendant Black. Although Plaintiff claims that he filed grievances/complaints against prison officials, he fails to allege when he filed these grievances or even who the grievances were filed against. Without such information or other non-conclusory allegations regarding Defendant Black's conduct, Plaintiff has failed to adequately plead that there was a causal connection between the protected speech and the adverse action. Further, even assuming that Plaintiff's October 25, 2009 letter to Superintendent LaValley is the "grievance/complaint" to which Plaintiff refers, Defendant Black is not discussed in the letter and Defendant Black did not file a misbehavior report against Plaintiff until February 5, 2010—more than three months after Plaintiff's protected activity. *See Allan v. Woods,* No. 9:05–CV–1280, 2008 WL 724240, *9 (N.D.N.Y. Mar. 17, 2008)* (finding "no connection" when "almost three months" had elapsed from the filing of the grievance to the alleged retaliatory action). Had Plaintiff's "grievance/ complaint" been filed against Defendant Black, Plaintiff's retaliation claim against her may have been plausible. *See Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir .2009) (citations omitted). In the absence of such an allegation, however, Plaintiff has failed to allege a plausible retaliation claim against Defendant Black.

Based on the foregoing, the Court finds that Magistrate Judge Treece correctly determined that Plaintiff has failed to allege facts plausibly suggesting that Defendant Black retaliated against him in violation of his First Amendment rights.

### c. Defendant Zarnetski

In his complaint, Plaintiff alleges that Defendant Zarnetski was biased during his disciplinary hearing on November 4, 2009, and that he repeatedly called Plaintiff a "Nigger", "Stupid," and "Asshole." *See* Dkt. No. 1 at ¶ 25. Further, Plaintiff claims that Defendant Zarnetski improperly allowed Defendant Goodman to be present at the hearing, because Defendant Goodman was a direct party to the misbehavior report. *See id.*

Again, Plaintiff has failed to allege any plausible connection between this alleged retaliatory action and any of Plaintiff's protected activities. There are no allegations in the complaint to suggest that Defendant Zarnetski, acting as a hearing officer, found Plaintiff guilty of issuing a threat in retaliation for Plaintiff having filed a grievance. *See Monroe v. Janes,* No. 9:06–CV–0859, 2008 WL 508905, *6 (N.D.N.Y. Feb. 21, 2008)* (citation omitted). Moreover, as discussed above, a review of Plaintiff's October 25, 2009 letter to Superintendent LaValley can reasonably be read as containing several threats. [3]

[3]     The Court believes that, although this claim has been treated as a First Amendment retaliation claim, it is more appropriately analyzed as a Fourteenth Amendment due process claim. In light of Plaintiff's *pro se* status, the Court will treat Plaintiff's allegations against Defendant Zarnetski as alleging claims under both the First and Fourteenth Amendments.

**\*9** Based on the foregoing, the Court finds that Magistrate Judge Treece correctly determined that Plaintiff has failed to allege facts plausibly suggesting that Defendant Zarnetski retaliated against him in violation of his First Amendment rights.

### d. Defendant Besson

According to the complaint, Defendant Besson conducted the February 7, 2010 disciplinary hearing on Plaintiff's misbehavior report dated February 5, 2010. *See* Dkt. No. 1 at ¶¶ 33–35. In his fourth claim, Plaintiff claims that "Defendant Besson violated [his] clearly established right to

2012 WL 3704996

due process for the sole purpose of punitive retaliation by violating established procedure as outlined in 7 NYCRR V, by not conducting a fair and impartial hearing as alleged[.]" *See id.* at ¶ 51.

Magistrate Judge Treece correctly determined that, although Plaintiff has sufficiently alleged the first prong of his retaliation claim, Plaintiff has failed to allege that Defendant Besson knew of his constitutionally protected activity, *i.e.,* the October 25, 2009 letter to Superintendent LaValley or any other unidentified grievance Plaintiff may have filed. As such, Plaintiff has failed to plausibly allege that his protected activity was causally connected to any alleged adverse action taken by Defendant Besson.

Based on the foregoing, the Court finds that Magistrate Judge Treece correctly determined that Plaintiff has failed to allege facts plausibly suggesting that Defendant Besson retaliated against him in violation of his First Amendment rights.

### e. Defendant Vladyka

Plaintiff claims that Defendant Vladyka retaliated against him by having his "name removed from the kitchen Ramadan list due to the above ... actions of filing grievances and complaints." *See* Dkt. No. 1 at ¶ 20. Plaintiff further alleges that Defendant Vladyka, before removing him from his kitchen assignment, made comments regarding the grievances and complaints that he has filed against correctional staff at Great Meadow. *See id.* at ¶¶ 20, 53.

Regarding Defendant Vladyka, Plaintiff has alleged that he filed grievances between October 2009 and August 2010, and that Defendant Vladyka commented on his grievance activities prior to unjustly removing him from his kitchen assignment on July 30, 2010. Although somewhat vague, Plaintiff has adequately pled a First Amendment retaliation claim against Defendant Vladyka. Unlike Plaintiff's allegations against the Defendants discussed above, here Plaintiff has alleged facts that can plausibly suggest that Defendant Vladyka's conduct—having Plaintiff removed from his kitchen assignment—was done in retaliation for Plaintiff filing grievances against corrections personnel. The fact that Defendant Vladyka made comments to Plaintiff regarding the grievances he filed, regardless of whether Defendant Vladyka was named as a party to any of the grievances, renders this claim not merely conceivable but plausible. *See Bibbs v. Early,* 541 F.3d 267, 274 (5th Cir.2008) (denying the defendants' motion for summary judgment as to the plaintiff's retaliation claim and holding that "the lapse of a

month between the filing of his last grievance and the alleged retaliation does not foreclose a finding of a genuine issue of material fact on the causation question, particularly given the comments of the guards directly referring to inmates' filing of grievances"). Finally, as courts in this circuit have held, an inmates reassignment from a job or its termination can constitute adverse action necessary to support a claim of retaliation. *See Vega v. Lareau,* No. 9:04–CV–0750, 2010 WL 2682307, *8 (N.D.N.Y. Mar. 16, 2010) (citing cases).

**\*10** Based on the foregoing, the Court finds that Magistrate Judge Treece improperly determined that Plaintiff failed to state a First Amendment retaliation claim against Defendant Vladyka. As such, the Court rejects Magistrate Judge Treece's Report–Recommendation and Order insofar as it recommends the dismissal of Plaintiff's First Amendment retaliation claim against Defendant Vladyka.

### C. Freedom to practice religion

The First Amendment to the United States Constitution guarantees the right to free exercise of religion. *See* U.S. Const. amend. I; *Cutter v. Wilkinson,* 544 U.S. 709, 719 (2005). As is true with regard to the First Amendment generally, the free exercise clause applies to prison inmates, subject to appropriate limiting factors. *See Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (holding that "[p]risoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause" (citing *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974)). Thus, for example, under accepted free exercise jurisprudence, inmates are guaranteed the right to participate in congregate religious services under most circumstances. *See, e.g., Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993) (citing cases).

The right of prison inmates to exercise their religious beliefs, however, is not absolute or unbridled, but instead is subject to valid penological concerns, including those relating to institutional security. *See O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348 (1987); *Salahuddin,* 993 F.2d at 308. For example, a determination of whether an inmate's constitutional rights have been infringed by the refusal to permit his attendance at a religious service hinges upon the balancing of the inmate's First Amendment free exercise right against the institutional needs of officials tasked with the increasingly daunting task of operating prison facilities. This determination is "one of reasonableness, taking into account whether the particular [act] affecting [the] constitutional right ... is 'reasonably related to legitimate penological

interests.' " *Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (quoting *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261 (1987)).

In the present matter, Plaintiff alleges the combined forty-five days that he spent under keeplock confinement caused him to be "restrained from Seven (7) combined religious services[.]" *See* Dkt. No. 1 at ¶¶ 15, 47. This allegation is insufficient to survive Defendants' motion to dismiss. Notably, Plaintiff does not assert any factual allegations indicating what "combined religious services" he was not able to attend during the time in question or that he was not provided with an alternative method of practicing his religion. *See Williams v. Weaver,* No. 9:03–CV–0912, 2006 WL 2794417, *5 (N.D.N.Y. Sept. 26, 2006)* (citation omitted). Further, Plaintiff has not pled that his attendance at congregate religious services was "cental or important" to his religious beliefs. *See Washington v. Chaboty,* No. 09 Civ. 9199, 2011 WL 102714, *8 (S.D.N.Y. Jan. 10, 2011).*

**\*11** Moreover, as Magistrate Judge Treece correctly found, Plaintiff has failed to allege that any of the Defendants were personally involved in causing him to miss the seven congregate religious services while he was sentenced to keeplock confinement. *See Hernandez v. Keane,* 341 F.3d 145 (2d Cir.2003) (citation omitted). Although Defendants Zarnetski and Besson rendered the keeplock confinement punishments that ultimately resulted in Plaintiff missing the seven religious services, Plaintiff has not alleged that any of the Defendants were responsible for the creation or implementation of a policy that caused him to miss religious services. Since personal involvement in the alleged unconstitutional conduct is a prerequisite to recovery under section 1983, Plaintiff's failure to allege the personal involvement of any of the Defendants in this alleged conduct requires the Court to grant Defendants' motion to dismiss Plaintiff's First Amendment Free Exercise claims. *See id.* (citation omitted).

Based on the foregoing, the Court finds that Magistrate Judge Treece correctly determined that Plaintiff has failed to allege facts plausibly suggesting that Defendants violated his First Amendment Free Exercise rights.

### D. Due Process

Plaintiff asserts that Defendants Besson and Zarnetski violated his due right to due process by not conducting fair and impartial disciplinary hearings. *See* Dkt. No. 1 at ¶¶ 50–51. Plaintiff claims that Defendant Besson and

Zarnetski violated 7 N.Y.C.R.R. §§ 250.2 and 253, and N.Y. Corrections Law § 138, which outline procedures for disciplinary hearings.

The Fourteenth Amendment to the Constitution provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship." *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004) (citations omitted).

As a threshold matter, an inmate asserting a violation of his right to due process must first establish that he had a protected liberty interest in remaining free from the confinement that he challenges and, if so, that the defendant deprived the plaintiff of that liberty interest without due process. *See Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir.1996). To establish a protected liberty interest, a prisoner must satisfy the standard set forth in *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995). In *Sandin v. Conner,* the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483–84 (1995). Thus, to show that a liberty interest is sufficient to invoke the protections of the Due Process Clause, a prisoner must establish both that his resulting confinement or restraint creates an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" and that the state has enacted a regulation or statute which grants inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at 484; *see also Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996). When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335–36 (2d Cir.1998).

**\*12** The fact that an inmate has been sentenced to serve forty-five days of keeplock confinement, without

2012 WL 3704996

more, is insufficient to establish an atypical and significant deprivation. In the present matter, Plaintiff was sentenced on two separate occasions to thirty days of keeplock confinement and fifteen days of keeplock confinement. Plaintiff does not allege that his keeplock confinement was "atypical and significant" or that it affected the overall length of his criminal sentence. *See Jermosen v. Cahill,* 159 F.3d 1347 (2d Cir.1998) (citations omitted). Even if the keeplock sentences are aggregated for a total of forty-five days, Plaintiff has failed to allege a sufficient liberty interest. The Second Circuit has held that, "with respect to 'normal' SHU confinement, ... a 101–day confinement does not meet the *Sandin* standard of atypicality." *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (citation omitted). Plaintiff's complaint fails to allege that his forty-five days of keeplock confinement was an atypical and significant hardship; and, therefore, the Court finds that Magistrate Judge Treece correctly determined that the Court should grant Defendants' motion to dismiss as to this claim.

### E. Plaintiff's remaining claims

In addition to the claims discussed above, Plaintiff's complaint also attempts to allege a section 1983 conspiracy claim against Defendants. *See* Dkt. No. 1 at ¶¶ 48, 55. In his response to Defendants' motion to dismiss, Plaintiff also asserts that Defendants Besson, Black, DeLuca, Goodman, Kelly, and Zarnetski all conspired to have him confined to his cell and removed from honor block. In his June 22, 2012 Report–Recommendation and Order, Magistrate Judge Treece recommended that the Court dismiss these claims because Plaintiff failed to failed to allege an agreement between the members of the alleged conspiracy to violate Plaintiff's rights. *See* Dkt. No. 29 at 15. Plaintiff did not object to this portion of Magistrate Judge Treece's ReportRecommendation and Order.

Having reviewed these claims and Magistrate Judge Treece's recommended disposition, the Court finds that Magistrate

Judge Treece correctly determined that Plaintiff has failed to allege facts which plausibly suggest a conspiracy pursuant to section 1983. Therefore, the Court grants Defendants' motion to dismiss Plaintiff's conspiracy claims.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, Magistrate Judge Treece's Report–Recommendation and Order and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Magistrate Judge Treece's June 22, 2012 Report–Recommendation and Order is **ADOPTED in part and REJECTED in part** for the reasons stated herein; and the Court further

**ORDERS** that Defendants' motion to dismiss is **GRANTED in part** and **DENIED in part;** and the Court further

**ORDERS** that Defendants DeLuca and Vladyka shall file an answer to Plaintiff's complaint in compliance with the Federal Rules of Civil Procedure; and the Court further

 **\*13  ORDERS** that all further pretrial matters are referred to Magistrate Judge Treece; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3704996

---

**End of Document** © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 4460994
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

David HARRINGTON, Plaintiff,

v.

Dr. VADLAMUDI, Doctor, Marcy Correctional
Facility, Sandra Martin Smith, Nurse
Administrator, Marcy Correctional Facility,
Marcy Correctional Facility, Defendants.

No. 9:13–cv–795 (BKS/RFT).
|
Signed July 21, 2015.

**Attorneys and Law Firms**

David Harrington, Fort Edward, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of
New York, Joshua E. McMahon,, Assistant Attorney General,
Albany, NY.

**MEMORANDUM–DECISION AND ORDER**

Hon. BRENDA K. SANNES, District Judge.

**I. INTRODUCTION**

**\*1** Plaintiff David Harrington, a former New York State
inmate, commenced this civil rights action under 42 U.S.C.
§ 1983, the Americans with Disabilities Act ("ADA"),
42 U.S.C. §§ 12101–12213, and Section 504 of the
Rehabilitation Act of 1973, 29 U.S.C. § 794, against
defendants Dr. Vadlamudi, Sandra Martin Smith, and Marcy
Correctional Facility. Dkt. Nos. 1, 33. Plaintiff alleges
that defendants were deliberately indifferent to his serious
medical needs, in violation of the Eighth Amendment,
retaliated against him for filing grievances, in violation of
the First Amendment, and discriminated against him based
on his disability in violation of the ADA and Rehabilitation
Act. Dkt. No. 33. Defendants moved under Rule 12(c)
of the Federal Rules of Civil Procedure for judgment on
the pleadings solely with respect to plaintiff's disability
discrimination claim. Dkt. No. 35.

On April 29, 2015, United States Magistrate Judge Randolph
F. Treece issued a Report–Recommendation and Order

recommending that the Court grant defendants' motion
and dismiss with prejudice plaintiff's claims against them
under the ADA and Rehabilitation Act. Dkt. No. 41.
Magistrate Judge Treece advised the parties that, under 28
U.S.C. § 636(b)(1), failure to file written objections to the
Report–Recommendation within fourteen days "will preclude
appellate review." Dkt. No. 41, p. 8. Plaintiff requested and
received an extension, until June 15, 2015, "to appeal ... the
ADA and rehabilitation act" claims. Dkt. Nos. 43, 44. On June
12, 2015, plaintiff filed a second amended complaint. Dkt.
No. 45. To date, plaintiff has not filed any objections to the
Report–Recommendation. [1]

[1]   In his letter request for an extension of time to file
      objections, plaintiff states that there:

          was an error in the [Report–
          Recommendation] on page seven and on the
          second paragraph w[h]ere they claim that I
          am the highest paid employee [in] Marcy
          facility. I received my food handle certificate
          at Au[ ]burn Correction[al] Facility and then
          I was trained for nine years and worked for
          Mid State Correction[al] Facility. When I was
          transferred to Marcy Correction Facility, I was
          given a physical. I was told I could no longer
          work for the kitchen because of my disability.
          I was given a job as reporter, making 15 cent
          [sic] hour and food handle certificate was
          strike from me.

      Dkt. No. 43. The Court need not determine
      whether plaintiff's identification of this alleged
      error constitutes an objection to dismissal of his
      ADA and Rehabilitation Act claims warranting
      de novo review because the Court rejects
      the Report–Recommendation to the extent it
      recommends dismissal of plaintiff's disability
      discrimination claims.

**II. REPORT–RECOMMENDATION**

As no objections to the Report–Recommendation have been
filed, and the time for filing objections has expired, the
Court reviews the Report–Recommendation for clear error.
*See Glaspie v. N.Y.C. Dep't of Corr.,* No. 10 CV 00188(GBD)
(JCF), 2010 WL 4967844, at \*1, 2010 U.S. Dist. LEXIS
131629, at \*2–3 (S.D.N.Y. Nov. 30, 2010) (explaining that
when no objections to report and recommendation are made,
"the Court may adopt [it] if there is 'no clear error on the face
of the record.' ") (quoting *Adee Motor Cars, LLC v. Amato,*
388 F.Supp.2d 250, 253 (S.D.N.Y.2005)).

**A. Dr. Vadlamudi and Sandra Martin Smith**

Magistrate Judge Treece recommended dismissing plaintiff's ADA and Rehabilitation Act claims against Dr. Vadlamudi and Sandra Martin Smith on the basis that "they may neither be sued in their individual nor official capacities." Dkt. No. 41, p. 7. The Court adopts this recommendation having found no clear error in the recommended dismissal of the claims against these defendants in their individual and official capacities, particularly where, as here, defendant Marcy Correctional Facility "is the real party in interest." *Alster v. Goord,* 745 F.Supp.2d 317, 339 (S.D.N.Y.2010) (explaining that "[w]here, as here, a plaintiff may proceed on his ADA claims against the State entity directly, courts in this Circuit dismiss the official capacity claims because they are redundant of the claims against the government entity.") (internal quotation marks and brackets omitted); *see also Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn,* 280 F.3d 98, 107 (2d Cir.2001) (the ADA does not provide for individual capacity suits against state or city officials).

**B. Marcy Correctional Facility**

**\*2** Magistrate Judge Treece recommended dismissing plaintiff's ADA and Rehabilitation Act claims against defendant Marcy Correctional Facility on the basis that he failed to plead a *prima facie* case. Dkt. No. 41, p. 7. In reaching this conclusion, Magistrate Judge Treece discussed plaintiff's claim as follows:

> Plaintiff may be a qualified individual with a disability as he suffers from Autism Spectrum Disorder and debilitating epileptic seizures, but his Amended Complaint is otherwise devoid of any facts that would indicate he was excluded from Marcy's programs or services due to discrimination based on his disability. Instead, Plaintiff provides the Court with threadbare recitals of an ADA claim. For instance, he claims "I was one of the highest paid individuals in the facility. At the point I was told by the doctors that because of my disability I could no longer work in the kitchen." And then concludes, "I was discriminated against because of my disability[.]"

Dkt. No. 41, pp. 7–8 (internal citations omitted).

The Report–Recommendation does not, however, address several factual allegations in the amended complaint or consider whether it states a plausible denial of reasonable accommodation claim. To state a *prima facie* claim under either the ADA or the Rehabilitation Act, which courts treat identically,[2] plaintiff must allege: "(1) that he is a 'qualified individual' with a disability;[3] (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability." *Hargrave v. Vermont,* 340 F.3d 27, 34–35 (2d Cir.2003). "A qualified individual can base a discrimination claim on any of 'three available theories: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation.' " *Fulton v. Goord,* 591 F.3d 37, 43 (2d Cir.2009) (quoting *Tsombanidis v. West Haven Fire Dep't,* 352 F.3d 565, 573 (2d Cir.2003)).

[2]  In general, "we treat claims under the two statutes identically." *Henrietta D. v. Bloomberg,* 331 F.3d 261, 272 (2d Cir.2003).

[3]  A "qualified individual" is

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2).

In the amended complaint, plaintiff alleges that he is a "chronic epileptic," with chronic seizures, who broke vertebrae in his back after having a grand mal seizure in September 2012. Dkt. 33, ¶¶ 4, 8, 68, 71. Plaintiff alleges that a doctor wrote a permit for a wheelchair so that he could go "to and from the mess hall, infirmary, and to the school building" because he could "not walk any amount of distance," *id.,* ¶¶ 33, 74; and that he struggled to walk without a wheelchair, *id.,* ¶ 34. Plaintiff further alleges that after he filed a grievance about his medical care, in November 2012, the nurse "confiscat[ed]" his wheelchair "without just cause" and in retaliation for having filed a grievance about his medical care. *Id.,* ¶¶ 34, 73–77. Plaintiff claims that this resulted in "excruciating pain and suffering falling and struggling to walk," *id.,* ¶ 34, and that he could "no longer make it down to the school" to teach a program. *Id.,* ¶¶ 76–77.

**\*3** Construed liberally, these allegations sufficiently state a *prima facie* case that defendant terminated plaintiff's work because of his disability and that he was denied a reasonable accommodation: (1) plaintiff was a qualified individual with a disability; (2) he was excluded from participating in Marcy Correctional Facility's programs after (a) he lost his job in the kitchen—his vocation of nine years, and (b) his wheelchair was confiscated rendering him unable to "make it down to the school" to teach a program; and (3) his doctors told him that he could not work in the kitchen anymore after giving him a physical and defendant Martin took his wheelchair, a reasonable accommodation, "without just cause." *Id.,* ¶ 34. "Under Title II of the ADA ... prison officials may not discriminate against inmates on the basis of disability in administering work programs." *Northrop v. Carucci,* No. 3:04–CV–103 RNC, 2007 WL 685173, at \*4, 2007 U.S. Dist. LEXIS 16491, at \*13 (D.Conn. Mar.5, 2007) (denying summary judgment where the plaintiff alleged "that he was discharged from his kitchen job and not provided a different job because of his disability"); *see also Coker v. Dallas Cnty. Jail,* No. 3:05–CV–005–M (BH), 2009 WL 1953038, at \*18, 2009 U.S. Dist. LEXIS 62978, at \*53 (N.D.Tex. Feb.25, 2009) (finding issue of fact as to whether prison had reasonably accommodated wheelchair-bound inmate when it confiscated his wheelchair for three months after having found contraband in it). Accordingly, having reviewed the face of the record and having found a number of facts alleged in the complaint that were not addressed in the Report–Recommendation, the Court declines to adopt the Report–Recommendation to the extent it recommends dismissal of plaintiff's ADA and Rehabilitation Act claims against defendant Marcy Correctional Facility.

### III. SECOND AMENDED COMPLAINT
In the second amended complaint, plaintiff alleges additional facts in support of his ADA and Rehabilitation Act claims. *See, e .g.,* Dkt. No. 45, ¶¶ 83–95. While mindful that it "should freely give leave [to amend] when justice so requires," Fed.R.Civ.P. 15(a)(2), for the reasons stated in section II.A., *supra,* the Court rejects the second amended complaint to the extent it continues to assert ADA and Rehabilitation Act claims against Dr. Vadlamudi and Sandra Martin Smith. The Court otherwise accepts the second amended complaint, as filed.

### III. CONCLUSION
For these reasons, it is

**ORDERED** that the Report–Recommendation (Dkt. No. 41) is **ACCEPTED** to the extent it recommends granting defendants' motion to dismiss (Dkt. No. 35) all ADA and Rehabilitation Act claims against defendants Dr. Vadlamudi and Sandra Martin Smith; and it is further

**ORDERED** that defendants' motion to dismiss (Dkt. No. 35) all ADA and Rehabilitation Act claims against defendants Dr. Vadlamudi and Sandra Martin Smith is **GRANTED;** and it is further

**\*4 ORDERED** that the Report–Recommendation (Dkt. No. 41) is otherwise **REJECTED;** and it is further

**ORDERED** that defendants' motion to dismiss (Dkt. No. 35) plaintiff's ADA and Rehabilitation Act claims against defendant Marcy Correctional Facility is **DENIED;** and it is further

**ORDERED** that the those portions of the second amended complaint that continue to assert ADA and Rehabilitation Act claims against Dr. Vadlamudi and Sandra Martin Smith are **stricken;** and it is further

**ORDERED** that the second amended complaint (Dkt. No. 45) is otherwise **accepted as filed;** and it is further

**ORDERED** that defendants' letter request (Dkt. No. 46) is **DENIED** to the extent they request that the Court strike the second amended complaint; and it is further

**ORDERED** that defendants' letter request (Dkt. No. 46) is **GRANTED** to the extent they seek additional time to file a response to the second amended complaint; and it is further

**ORDERED** that defendants shall respond to the second amended complaint on or before August 4, 2015;

**ORDERED** that the Clerk of Court shall mail a copy of this Memorandum–Decision and Order to plaintiff along with copies of the unpublished decisions cited in this decision.

**IT IS SO ORDERED.**

### All Citations

Not Reported in F.Supp.3d, 2015 WL 4460994

2015 WL 4460994

---

**End of Document**                                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

2015 WL 3397958
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Walter WENGER, Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF HEALTH;
Mark Lankes, Individually and as Director of Ddso
Region 2; Todd Podkowka, Individually and as
Director of Health Services; Matthew Johnson, Rn,
Individually and as Treatment Team Leader of Ira3;
Kay H. Romero, Individually and as Senior Attorney
for Opwdd; Charles Zelows, Individually and as
Treatment Team Leader of Ira3; David Viggiani,
individually and as Due Process Hearing Officer;
Laurie A. Kelley, Individually and as Acting Director
of Opwdd; and Kerry A. Delaney, Individually
and as Acting Director of Opwdd, Defendants.

No. 5:14–CV–885 (DNH/TWD).
|
Signed May 26, 2015.

**Attorneys and Law Firms**

Walter Wenger, Canastota, NY, pro se.

### *DECISION and ORDER*

DAVID N. HURD, District Judge.

*1 Pro se plaintiff Walter Wenger filed this civil rights action primarily on behalf of his son Steven Joseph Wenger, in his capacity as Steven's court appointed guardian. On April 17,

2015, the Honorable Thérèse Wiley Dancks, United States Magistrate Judge, advised by Report–Recommendation that plaintiff's complaint be dismissed without prejudice. No objections to the Report–Recommendation were filed.

Based upon a careful review of the entire file and the recommendations of the Magistrate Judge, the Report–Recommendation is accepted in whole. *See* 28 U.S.C. § 636(b)(1).

Therefore, it is

ORDERED that

1. Plaintiff's complaint is DISMISSED without prejudice; and

2. The Clerk serve a copy of this Decision and Order upon plaintiff in accordance with the Local Rules.

IT IS SO ORDERED.

### *ORDER AND REPORT–RECOMMENDATION*

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

**I. FACTUAL AND PROCEDURAL BACKGROUND**
The Complaint of *pro se* Plaintiff Walter Wenger was received for filing in the Northern District of New York on July 18, 2014, along with an application to proceed *in forma pauperis.* (Dkt. Nos. 1 and 2.) By Order of October 27, 2014, the Court granted Plaintiff's application to proceed *in forma pauperis.* (Dkt. No. 4.)

Although not indicated in the caption, the factual allegations, the claimed injuries, and the relief sought, show that while Plaintiff has asserted limited claims on his own behalf, he has brought this action primarily on behalf of his son Steven Joseph Wenger ("Steven"), in his capacity as Steven's court appointed guardian. (*See generally,* Dkt. Nos. 1 and 4.) Plaintiff was appointed sole guardian of Steven's person and property in 1998 after Steven received a traumatic brain injury in a 1991 automobile accident at the age of fifteen. (Dkt. No. 4 at 2.)

Plaintiff commenced this civil rights action pursuant to 42 U.S.C. § 1983 out of concern over Steven's care and treatment since he became a resident of IRA3 in Rome, New York on October 3, 2011.[1] (Dkt. No. 1 at ¶ 1.) IRA3 is a New York State Department of Health ("NYDOH") Individual Residential Alternative Group Home operated by the New York State Office for People with Developmental Disabilities ("OPWDD") and staffed by the Developmental Disabilities State Office ("DDSO"), Region 2. *Id.* According to Plaintiff, from the time Steven became a resident at IRA3, he has suffered from general neglect and has been denied services recommended by specialists and promised to Plaintiff, including an appropriate wheelchair; appropriate sensory stimulation; appropriate physical, occupational, and speech

therapy; development of a communication mechanism; and community inclusion through outings in the local community away from the IRA3 setting. *Id.* at ¶ 8. On December 9, 2013, Steven's arm was broken, allegedly by unnamed staff at IRA3. *Id.,* at ¶ 11. Thereafter, an order was issued stopping all therapy and inclusion activities for Steven. *Id.* at ¶ 14.

1    Because familiarity with the October 27, 2014, Order (Dkt. No. 4) setting forth in detail the factual background and the claims being pursued by Plaintiff on behalf of Steven and on his own behalf is presumed, only a brief summary is included herein.

**\*2** N.Y. Comp.Codes R. & Regs. ("NYCRR") Tit. 14, § 633.12 requires agencies providing facilities and community based waiver services to developmentally disabled individuals to develop policies and procedures establishing mechanisms, including administrative hearings, to resolve objections to services. § 633.12(a)(1). Guardians are included among those who may initiate objections. § 633.12(a)(4). Plaintiff filed three hearing requests in April of 2014 to address the provision of an appropriate wheelchair; coma stimulation; and physical, occupational and speed therapy for Steven. *Id.* at ¶ 18. The hearing requests were consolidated. *Id.* at ¶ 19. The hearing was not held within the time requirements set forth in § 633.12(a)(8)(c). *Id.*

Plaintiff got into a disagreement with the hearing officer during a pre-hearing telephone conference on June 19, 2014, and as a result the hearing was postponed to July 22, 2014. *Id.* at ¶¶ 20, 29. Plaintiff filed a motion for recusal of the hearing officer on June 16, 2014. *Id.* at 28. Upset over being subjected to what he believed to be arbitrary violations of procedure, Plaintiff submitted appeals on the three hearing requests to the OPWDD Commissioner on June 25 and 26, 2014, without waiting for the hearing to be held and a decision to be issued. *Id.* at 21. As of the filing of the Complaint in this action, Plaintiff had received no decisions on the appeals, even though decisions are required to be rendered no later than fourteen days after receipt of the appeal. *Id.* at 21.

On June 12, 2014, Plaintiff also filed a request for a hearing regarding Defendant Todd Podkowka's position that he cannot prescribe anything for Steven that is not FDA approved, and that it would not be paid for by insurance, as well as Johnson's email that all therapies provided "have to be FDA approved, not experimental, medically safe, and ordered by a licensed practitioner." *Id.* at ¶ 23. No hearing date had been set as of the filing of the Complaint. *Id.* at 25–26.

Plaintiff commenced this lawsuit prior to the administrative hearing scheduled for July 22, 2014, on his three consolidated requests. The suit includes challenges to both Defendants' handling of the state administrative procedure and the administrative procedure itself. (*See generally* Dkt. No. 1.)

Defendants in this action are the NYDOH; Laurie A. Kelley ("Kelley"), Acting Director of OPWDD; Kerry A. Delaney ("Delaney"), Acting Director of OPWDD; Mark Lankes ("Lankes"), Director of DDSO, Region 2; Matthew Johnson, RN, Team Treatment Leader Rome Office–BOA; Charles Zelows ("Zelows"), Treatment Team Leader of IRA3; Todd Podkowka ("Podkowka"), Director of Health Services; Kay Romero ("Romero"), Senior Attorney for OPWDD; and David Viggiani ("Viggiani"), hearing officer on Plaintiff's hearing requests.

Plaintiff has asserted claims for violation of Steven's and his own Fourteenth Amendment due process rights under § 633.12; violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.,* as amended, by denying Steven appropriate rehabilitation services and materials and denying him community inclusion by keeping him isolated in IRA3; [2] and the Health Insurance Portability and Accountability Act of 1966 ("HIPAA"), 42 U.S.C. § 1320, *et seq.* (Dkt. No. 1 at p. 4.)

2    Plaintiff describes part of his claim under Title II of the ADA as an "Olmstead Act" claim. (Dkt. No. 1 at ¶ 43.) In *Olmstead v. L.C. ex ret Zimring,* 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), the Supreme Court held that unjustified isolation or segregation of qualified individuals through institutionalization is a form of discrimination prohibited under the ADA. *See* 42 U.S.C. § 12101(a)(2) (identifying the isolation and segregation of individuals with disabilities as a form of discrimination). The decision was followed by Executive Order 13217, issued by President George W. Bush on June 18, 2001, which called upon the federal government to assist states and localities in the swift implementation of the decision.

**\*3** The relief sought by Plaintiff includes replacement of 14 NYCRR § 633.12; money damages to Steven for the harm, deprivation, and neglect he has suffered, including harm connected to his fractured arm; [3] money damages to

Wenger v. New York State Dept. of Health, Not Reported in F.Supp.3d (2015)

2015 WL 3397958

Plaintiff for his expenditures, time, and mental anguish for his efforts as Steven's guardian; making up lost services to Steven, including community outings and providing Steven with the services and rehabilitation measure recommended by Plaintiff and medical specialists; compensatory and punitive damages for the violation of § 1983; and an injunction enjoining Defendants from violating HIPAA and other laws affecting Steven and himself *Id.* at pp. 26–27.

3    Plaintiff seeks damages as a result of the fracture for both Steven and himself in this action despite acknowledging that there is a separate personal injury action pending with regard to the fracture. Id. at ¶ 11 and p. 27; Dkt. No. 5 at p. 8.

## II. Plaintiff's Motion for Appointment of Counsel

Because Plaintiff, who is not an attorney and not represented by counsel, may not appear on behalf of his developmentally disabled son Steven, *see Cheung v. Youth Orchestra Found. of Buffalo, Inc.,* 906 F.2d 59, 61 (2d Cir.1990), the Court deferred the requisite initial review of the Complaint pursuant to 28 U.S.C. § 1915(e) and stayed the case for ninety days in order to give Plaintiff time to retain counsel or move for the appointment of counsel. [4] (Dkt. No. 4 at 3.)

4    The Court deferred initial review as to the claims asserted on Steven's behalf as well as those asserted on Plaintiff's own behalf because the claims are intertwined and to some extent derivative, and the Second Circuit has instructed that no issues concerning litigation brought on an incompetent's behalf should be decided until the counsel issue is resolved. *See Cheung,* 906 F.2d 62.

Plaintiff has filed a motion for the appointment of counsel so that he may pursue the litigation on behalf of Steven. (Dkt. No. 5.) For reasons explained below, the motion is denied.

### A. Law Regarding Appointment of Counsel for an Incompetent

An incompetent person normally lacks the capacity to bring suit for himself. *Berrios v. New York City Hous. Auth.,* 564 F.3d 134, 134 (2d Cir.2009). Federal Rule of Civil Procedure Rule 17(c) provides that an incompetent person may be represented by a general guardian, a committee, or a similar fiduciary, *see* Fed.R.Civ.P. 17(c)(1), and that:

an incompetent person who does not have a duly appointed representative may sue by a next friend or by a guardian ad litem. The court must appoint a guardian ad litem or issue another appropriate order to protect ... an incompetent person who is unrepresented in an action.

Fed.R.Civ.P. 17(c)(2). "Thus, as to a claim on behalf of an unrepresented ... incompetent person, the court is not to reach the merits without appointing a suitable representative." *Berrios,* 564 F.3d at 134. If the representative of an incompetent person under Rule 17(c) is not an attorney, he or she must be represented by an attorney in order to conduct the litigation. Id. (citing *Wenger v. Canastota Central School Dist.,* 146 F.3d 123, 125 (2d Cir.1998) ("[W]ithout ... counsel, the case will not go forward at all."), *overruled on other grounds by, Winkelman ex. rel. Winkelman v. Parma City School Dist.,* 550 U.S. 533 (2007)). In *Wenger,* which also involved Plaintiff's attempt to litigate claims on behalf of Steven, the Court found that it was up to the district court whether under the predecessor to Rule 17(c)(2), counsel should be appointed for Steven, and directed the court to examine the issue pursuant to the standards for determining whether to appoint counsel to an indigent person under 28 U.S.C. § 1915(e). *Wenger,* 146 F.3d at 125.

**\*4** Although 28 U.S.C. § 1915(e)(1) authorizes the court "to request an attorney to represent any person unable to afford counsel," a civil litigant has no constitutional right to the assistance of counsel. *See Berrios,* 564 F.3d at 134. A court may deny a motion to appoint counsel, even for an incompetent, "when it is clear that no substantial claim may be brought on behalf of such a party." *Wenger,* 146 F.3d at 125. "If it is not clear to the court whether a substantial claim may be asserted on [the incompetent's] behalf, the court should decide whether to appoint counsel, taking into consider[ation] the fact that, without appointment of counsel, the case will not go forward at all." *Id .; see also Cooper v. A. Sargenti Co., Inc.,* 877 F.2d 170, 172 (2d Cir.1989) (appointment of counsel should only be made where the allegations raise a claim that is likely to be of substance). The complaint should be dismissed without prejudice when no counsel is secured or appointed for the incompetent. *Berrios,* 564 F.3d at 135.

In support of his motion, Plaintiff has included correspondence from a number of attorneys whom he has asked to represent Steven's interests in this action. (Dkt. No. 5 at A and pp. 6–15.) All have either declined representation or not responded. *Id.* Most significant to Plaintiff's motion is a December 17, 2014, letter from Mental Hygiene Legal Service ("MHLS"), Appellate Division, Fourth Department, [5] Senior Attorney Megan E. Dorr, Esq., in response to a request from Plaintiff that the MHLS represent Plaintiff and Steven in lawsuits Plaintiff believes are necessary to protect Steven's rights. Declining Plaintiff's request, Attorney Dorr wrote:

[5] "The MHLS provides legal services, advice and assistance to persons receiving care or alleged to be in need of care at inpatient and community-based facilities for the mentally disabled. Created in 1964 and organized under Mental Hygiene Law Article 47, MHLS represents such persons injudicial and administrative proceedings concerning ... treatment." (*See* https://www.nycourts.gov/courtsad4/mhls/mhls-index.html (last visited on April 1, 2015).

Please be advised that MHLS will continue to represent your son and take any action we believe, in our professional judgment, to be in his best interest. Based upon multiple contacts with Steven, multiple contacts with his service providers, and our review of many records related to the services he is provided, we do not believe any legal action is necessary.

*Id.* at p. 13.

**B. Analysis of Plaintiff's Request for Appointment of Counsel**

Although the allegations in the Complaint, along with litigation Plaintiff has pursued on Steven's behalf over the years, [6] clearly reveal Plaintiff's love and concern for Steven and his tireless devotion to the care of his son, I find that the Complaint does not warrant appointment of counsel. [7]

[6] Other litigation brought by Plaintiff on Steven's behalf over the years includes *Wenger v. Canastota Cent. School Dist.,* 181 F.3d 84 (2d Cir.1999) (unsuccessful action against the school district and individual officials under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, et seq.; Section 504 of the Rehabilitation

Act of 1973, 29 U.S.C. § 794, et seq.; and the due process clause of the Fourteenth Amendment); *Wenger,* 146 F.3d 123 (lawsuit asserting the same claims on Steven's behalf)

[7] My assessment of the claims asserted on behalf of Steven is undertaken solely for the purpose of determining Plaintiff's motion for the appointment of counsel and is not intended as an assessment on the merits of any claims Steven may have against Defendants. Because by Plaintiff's own admission, litigation regarding Steven's broken arm is pending in another forum, I have not considered claims arising out of the fracture.

1. *NYDOH, Kelley and Delaney*

Defendant NYDOH is entitled to sovereign immunity under the Eleventh Amendment with regard to Plaintiff's claims. *See Anghel v. New York State Dept. of Health,* 947 F.Supp.2d 284, 298 (E.D.N.Y.2013), *aff'd,* 589 F. App'x 28 (2d Cir.2015). The Complaint alleges no personal involvement on the part of OPWDD supervisory officials Acting Directors Kelley and Delaney in Steven's care and treatment or Plaintiff's hearing requests, as is required for a claim for money damages under 1983. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Further, there are no allegations in the Complaint suggesting that Kelley and Delaney, acting in their official capacities, have the authority to grant Plaintiff's request for injunctive relief abandoning the administrative procedures set forth in § 633.12 and replacing those with "the Federal Part 300 and New York Parts 200 Regulations currently in effect by the New York State Department of Education." (Dkt. No. 1 at p. 25.)

2. *Title II of the ADA*

**\*5** The allegations in the Complaint regarding Plaintiff's care and treatment, *i.e.,* having an appropriate wheelchair; appropriate sensory stimulation; appropriate physical therapy, occupational therapy, and speech therapy; and community inclusion appear to form the basis of the claim asserted on Steven's behalf under Title II of the ADA. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity." [8] 42 U.S.C. § 12132. In order to state a claim under Title II of the ADA, a plaintiff must allege that "(1) he or she is a qualified individual with a disability;

2015 WL 3397958

(2) ... defendants are subject to the ADA; and (3) that plaintiff was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants by reason of plaintiff's disabilities." *Shomo v. City of New York,* 579 F.3d 176, 185 (2d Cir.2009) (citation and internal punctuation omitted).

8      "Services, programs, or activities," not explicitly defined in the ADA have been construed by the Second Circuit as "a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context...." *Innovative Health Sys., Inc. v. City of White Plains,* 117 F.3d 37, 43 (2d Cir.1997), *superseded on other grounds as recognized by Zervos v. Verizon NY, Inc.,* 252 F.3d 163, 171 n. 7 (2d Cir.2001).

Although Title II of the ADA does not provide for individual capacity suits against public officials, *see Garcia v. State Univ. of N.Y. Health Scis. Ctr.,* 280 F.3d 98, 107 (2d Cir.2001), a Title II claim can be asserted against a public official in his or her official capacity. *See Keitt v. New York City,* 882 F.Supp.2d 412, 456–57 (S.D.N.Y.2011) ("Individuals in their personal capacities are not proper defendants on claims brought under the ADA ..., although individuals can be sued in their official capacities under [the ADA].") However, under *Garcia,* claims for money damages against state officials in their official capacities under Title II of the ADA are barred by the Eleventh Amendment, absent a showing that a violation was motivated by discriminatory animus or ill will due to the disability. *Id.* at 112. *See, however, Tennessee v. Lane,* 541 U.S. 509, 533–34, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004) (for an ADA Title II claim to overcome Eleventh Amendment immunity, the Title II claim must implicate a fundamental right under the Fourteenth Amendment). Given the foregoing, Plaintiff cannot assert a Title II of the ADA claim against any of the individual Defendants in their individual capacity and likely would be limited to prospective injunctive relief on official capacity claims.

The allegations in Plaintiffs Complaint show an ongoing dispute between Plaintiff, on the one hand, and Defendants Lankes, Johnson, Zelows, and Podkowka, on the other, regarding Steven's care and the services provided to him at IRA3. (*See generally* Dkt. 1.) The allegations in the Complaint are, however, conclusory in nature. The Complaint provides few specifics regarding Steven's care, the services of which he was allegedly deprived, or programs in which he was allegedly not allowed to participate, or any reasons therefor articulated by Defendants. Those allegations in

Plaintiff's Complaint which are specific, such as his allegation regarding Defendant Podkowka's position that he could not prescribe drugs or treatment for Steven that was not FDA approved, *id.* at ¶ 23, and the limitations imposed on Steven's activities by Podkowka and other staff because of his broken arm, *id.* at ¶ 14, do not appear to be sufficient to support a discrimination claim under Title II of the ADA.

### 3. *Procedural Due Process Claim*

**\*6** With regard to Plaintiff's Fourteenth Amendment due process claim arising out § 633.12, Defendant Viggiano, as hearing officer, is likely to be found entitled to absolute immunity with respect to Plaintiff's due process claims. (*See* Dkt. No. 1 at ¶ 21.) *See Butz v. Economou,* 438 U.S. 478, 514, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) (absolute judicial immunity extends to officers such as administrative law judges and hearing officers). The immunity has been found to extend to state hearing officers. *See, e.g., Bloom v. NYS Comm'n of Health,* 573 F.Supp.2d 732, 739 (E.D.N.Y.2004) (administrative law judge presiding over professional medical conduct bureau is entitled to absolute immunity).

The allegations in the Complaint that Defendant Romero, attorney for OPWDD, usurped the responsibilities of the hearing officer and Defendant Lankes, by performing her "role as it pertains to 14 NYCRR 633.12[of] assisting appropriate staff with obtaining a hearing officer, scheduling the hearing and preparing the Notice of Hearing" suggest nothing more than that Romero was performing her employment responsibilities. (Dkt. No. 1 at ¶¶ 29–31.) The allegations do not appear to support a due process claim against her.

The allegations against Lankes with respect to the administrative hearing are that he consolidated Plaintiff's hearing request and scheduled the hearings at a later time than allowed under § 633.12; informed Plaintiff that the June 19, 2014, hearing date had been changed to a pre-hearing telephone conference with the hearing officer; and postponed the June 19th hearing date when Plaintiff refused to agree to the hearing ground rules imposed by the hearing officer. *Id.* at ¶¶ 18–20. Those allegations in and of themselves, particularly given Plaintiff's complicity in the hearing delay, appear inadequate to support a denial of due process claim. *Id.* at ¶ 29.

Moreover, the allegations in the Complaint reveal that Plaintiff commenced this lawsuit prior to the administrative hearing scheduled for July 22, 2014. *Id.* at ¶ 29. Although

as a general rule there is no exhaustion of remedies requirement before commencing a § 1983 action, "to the extent a plaintiff claims a violation of procedural due process under the Fourteenth Amendment, failure to pursue available procedural remedies can preclude a § 1983 claim." *Forcucci v. Board of Educ. of Hamburg Central School Dist.,* No. 14–CV–830–A, 2014 WL 5393024, at * 5, 2014 U.S. Dist. LEXIS 150410, at * 12–13 (W.D.N.Y. Oct.23, 2014)[9] (Arcara, D.J.) (citing *Rivera–Powell v. N.Y. City Bd. of Elections.,* 470 F.3d 458, 467 n. 9 (2d Cir.2006)) ("Where a state law remedy gives a party a meaningful opportunity to challenge the state's action, he is not deprived of due process simply because he failed to avail himself of the opportunity.")

[9]     A copy of the unpublished decision will be provided to Plaintiff by the Clerk pursuant to *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

Section 633.12 provides for an administrative hearing (§ 633.12(a)(8)(c)), an appeal to the commissioner from the hearing officer's determination (§ 633.12(a)(8) (*d* )), and judicial review pursuant to N.Y. C.P.L.R. Article 78 (§ 633.12(a)(1 1)). While Plaintiff has alleged that the hearing was not held in a timely manner under the regulation, a hearing had been scheduled when this action was commenced, and Plaintiff, as Steven's guardian, failed to avail himself of that hearing and the rights to thereafter appeal to the commissioner and commence an Article 78 proceeding in state court if necessary. *See New York State Nat'l Org. for Women v. Pataki,* 261 F.3d 156, 169 (2d Cir.2001) ("[A] procedural due process violation cannot have occurred when governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies."). Furthermore, while Plaintiff has issues with the manner in which the administrative procedure was being handled and the administrative procedure itself, there are no allegations in the Complaint showing that, despite the delay in the hearing, exhaustion was futile. *See Coleman v. Newburgh Enlarged City School Dist.,* 503 F.3d 198, 205 (2d Cir.2007) ("To show futility, a plaintiff must demonstrate that adequate remedies are not reasonably available or that the wrongs would not have been corrected by resort to the administrative hearing process.") (citation and internal quotation marks omitted).

4. *HIPAA and Plaintiff's Alleged Right to Determine Steven's Medical Care*

**\*7** Plaintiff alleges in his Complaint that Defendants Lankes, Zelows, and Podkowka have violated Steven's rights under HIPAA and Steven's right, as exercised by Plaintiff as his guardian, to determine his medical care. (Dkt. No. 1 at ¶¶ 44, 53.) As with the other claims, I find that the Complaint does not appear to show the existence of a claim of sufficient substance to warrant appointment of counsel.

Courts addressing the issue have overwhelmingly concluded that there is no private right of action under HIPAA. *See, e.g., Wilkerson v. Shineski,* 606 F.3d 1256, 1267 n. 4 (10th Cir.2010); *Miller v. Nichols,* 586 F.3d 53, 59 (1st Cir.2009). The allegations in Plaintiff's Complaint with respect to decisions concerning Steven's medical care show a general, ongoing dispute between Plaintiff and Steven's caretakers at IRA3 regarding his medical care and disclosure of medical information. *Id.* at ¶¶ 23, 39, 44–53. According to the Complaint, Lankes' position with regard to Plaintiff's medical care is that "[a]s you have entrusted Steven's physical custody, medical care and overall protective oversight to us at the OPWDD certified residence, we have a responsibility to assure that Steven's health care needs are met." *Id.* at 48. Plaintiff's position is that as Steven's guardian, he has the right to determine Steven's medical care. *Id* . at 44.

The two specific instances complained of where Defendants took action with respect to Steven's health care without Plaintiff's consent involved making appointments for Steven at the Joslin Clinic and ENT Clinic at SUNY Upstate. *Id.* at ¶ 45. According to the Complaint, Plaintiff was notified by Zelows that the appointments had been made. *Id.* Plaintiff's complaint is that his approval was not sought ahead of time so that he could consult with the medical professionals before the appointments. *Id.* at 46. Plaintiff has not alleged facts showing that the appointments were not in Steven's best interest, that the appointments or other specific actions taken by Defendants with regard to Steven's medical care were injurious to Steven, or that Steven has been injured as a result. *Id.* at ¶¶ 45–53. In fact, Plaintiff claims that whether or not he agrees with particular medical services is irrelevant; that the issue is that he was told of the appointments without having been given the opportunity to conduct the proper investigation and decline the services as Steven's guardian. *Id.* at ¶ 49.

5. *Recommendation of Dismissal of Complaint without Prejudice With Regard to Claims Asserted on Behalf of Steven*

Under Second Circuit case law, my denial of Plaintiff's motion for appointment of counsel to represent Steven in this

action requires that all claims asserted on Steven's behalf in Plaintiff's Complaint be dismissed without prejudice. *Berrios, 564 F.3d at 135* (requiring dismissal of the complaint without prejudice when no counsel is secured or appointed for the incompetent). Therefore, I recommend that the claims asserted on Steven's behalf by Plaintiff be dismissed without prejudice.

## III. RECOMMENDATION UPON INITIAL REVIEW

### A. Legal Standard for Initial Review of Complaint

**\*8** Plaintiff has also asserted claims on his own behalf against Defendants. Even when, as in this case, a plaintiff meets the financial criteria for *in forma pauperis,* 28 U.S.C. § 1915(e) directs that when a plaintiff proceeds *in forma pauperis,* "the court shall dismiss the case at any time if the court determines that ... the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B)(i)-(iii). The Court previously deferred initial review pending resolution of the representation issue. (Dkt. No. 4.)

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact. *Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). "An action is frivolous where either: (1) the factual contentions are clearly baseless such as when the claims are the product of delusion or fantasy, or (2) the claim is based on an indisputably meritless legal theory." *Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir.1998) (citations and internal quotation marks omitted). Although extreme caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir.1983), the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *See, e.g., Thomas v. Scully,* 943 F.2d 259, 260 (2d Cir.1991) (*per curiam* ) (holding that a district court has the power to dismiss a complaint *sua sponte* if the complaint is frivolous).

To survive dismissal for failure to state a claim, a complaint must plead enough facts to state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-harmed-me accusation." *Id.* In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994) (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal, 556 U.S. at 678.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

**\*9** Where a plaintiff proceeds *pro se,* the pleadings must be read liberally and construed to raise the strongest arguments they suggest. *Sealed Plaintiff v. Sealed Defendant,* 537 F.3d 185, 191 (2d Cir.2008) (citation omitted). A *pro se* complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000).

### B. Claims Asserted by Plaintiff on his Own Behalf

In the Complaint, Plaintiff claims that: (1) witnessing Steven's physical and emotional suffering associated with his broken arm and Steven's isolation has caused Plaintiff to suffer emotional harm; and (2) Plaintiff's life has been greatly disrupted by Defendants' actions, and he has expended and continues to expend significant resources in attempting to obtain services and benefits guaranteed to Steven by law. (Dkt. No. 1 at pp. 24–25.) Plaintiff seeks compensatory damages for his expenditures and time in connection with his efforts on behalf of Steven and for his mental anguish caused by the harm, deprivation and neglect long endured by Steven. *Id.* at p. 27.

The Complaint can be construed as an attempt by Plaintiff to pursue his own due process claim under § 1983 relating to the administrative procedure set forth at § 633.12, and his own claim under Title II of the ADA for expenditures made by

him to enforce Steven's rights under the provision. *See, e.g., A.M. ex rel. J.M. v. NYC Dept. of Educ.,* 840 F.Supp.2d 660, 674–675 (E.D.N.Y.2012) (concluding that under *Winkelman,* 550 U.S. 516, 127 S.Ct. 1994, 167 L.Ed.2d 904, the parent of a child with a disability has standing to pursue claims under the ADA on his own behalf), *aff'd, sub. nom. Moody ex rel. J.M. v. NYS Dept. of Educ.,* 513 F. App'x 95 (2d Cir.2013), cert. denied, ——U.S. ——, 134 S.Ct. 809, 187 L.Ed.2d 597 (2013).

I recommend that the § 1983 due process and Title II of the ADA claims asserted by Plaintiff on his own behalf be dismissed without prejudice for failure to state a claim, and that the Court, in the exercise of its discretion, decline to exercise supplemental jurisdiction over Plaintiff's state law claim arising out of Steven's broken arm.

### 1. *Due Process Claim*

14 NYCRR § 633.12 gives Plaintiff, as Steven's father and guardian, the right to object on Steven's behalf to a plan of services for his son and sets forth the administrative procedure available for doing so. However, the Court finds that Plaintiff has failed to state a Fourteenth Amendment due process claim against Defendants because while the consolidated hearing was not held in a timely manner, and Plaintiff did not agree with the ground rules imposed by the hearing officer, there are no allegations suggesting that he was precluded from going through the administrative process or that doing so would have been futile, particularly given that there was a hearing scheduled to be held a few days after Plaintiff commenced this lawsuit. Furthermore, Plaintiff cannot be said to have been deprived of due process simply because he failed to avail himself of each of the steps of the available administrative procedure. *See Forcucci,* 2014 WL 5393024, at * 5.

### 2. *Claim Under Title II of the ADA*

 **\*10** While Plaintiff may have standing to pursue a claim under Title II of the ADA on his own behalf, he has no claim under Title II of the ADA against the individual defendants in their individual capacities. *See Garcia,* 280 F.3d at 107. Moreover, there are no allegations in the Complaint suggesting that Plaintiff's Title II of the ADA money damages claim against Defendants in their official capacities would not be barred by the Eleventh Amendment. *Id.* In addition, because of the conclusory nature of the allegations in the Complaint discussed above, I find that Plaintiff has failed to state a claim on his own behalf under Title II of the ADA.

### 3. *Plaintiff's Claim for Emotional Distress Damages for Steven's Broken Arm*

As previously noted, a separate personal injury action regarding Steven's broken arm is pending in the New York State Court of Claims. (Dkt. Nos. 1 at ¶ 11; 5 at p. 8.) In the very unlikely event Plaintiff could be found to have a state law claim for damages for emotional harm suffered by him as a result of witnessing Steven's suffering associated with his broken arm and related isolation, that claim is logically related to Steven's personal injury claim and should be asserted in the pending personal injury action. Therefore, even if Plaintiff is found by the District Court to have federal claims surviving initial review, I recommend that the District Court, in its discretion, decline to exercise supplemental jurisdiction over Plaintiff's state law claim. *See Kolari v. New York–Presbyterian Hosp.* 455 F.3d 118, 120 (2d Cir.2006) (exercise of supplemental jurisdiction under 28 U.S.C. § 1367(a) is discretionary, not a right).

**ACCORDINGLY,** it is hereby

**ORDERED,** that Plaintiff's motion for appointment of counsel (Dkt. No. 5) is **DENIED WITHOUT PREJUDICE;** and it is hereby

**RECOMMENDED,** that the Complaint (Dkt. No. 1) be dismissed without prejudice; and it is hereby

**ORDERED,** that the Clerk serve a copy of this Order and Report–Recommendation on Plaintiff, along with a copy of the unpublished decision in *Forcucci v. Board of Educ. of Hamburg Central School Dist.,* No. 14–CV–830–A, 2014 WL 5393024 (W.D.N.Y. Oct.23, 2014) in accordance with *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72.

Filed April 17, 2015.

2015 WL 3397958

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 3397958

---

**End of Document**                                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2000 WL 303262
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Andrew C. MARTIN,

v.

UCONN HEALTH CARE et al.

No. 3:99CV2158 (DJS).
|
Feb. 9, 2000.

Ruling and Order

SQUATRITO.

**\*1** The plaintiff, an inmate currently confined at the Northern Correctional Institution in Somers, Connecticut, brings this civil rights action *pro se.* The plaintiff alleges that he has been provided inadequate and inappropriate medical and mental health care since his incarceration. For the reasons that follow, the complaint is dismissed with leave to amend.

When a prisoner files a civil action, the court must dismiss the case at any time if it determines that the complaint fails to meet certain requirements. "[T]he court shall dismiss the case at any time if the court determines that ... the action ... is frivolous or malicious; ... fails to state a claim on which relief may be granted; or ... seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

An action is "frivolous" when either: (1) "the 'factual contentions are clearly baseless,' such as when allegations are the product of delusion or fantasy"; or (2) "the claim is 'based on an indisputably meritless legal theory.' " *Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir.1990) (per curiam) (quoting *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 1833, 104 L.Ed.2d 338 (1989)). A claim is based on an "indisputably meritless legal theory" when either the claim lacks an arguable basis in law, *Benitez v. Wolff,* 907 F.2d 1293, 1295 (2d Cir.1990) (per curiam), or a dispositive defense clearly exists on the face of the complaint. *See Pino v.*

*Ryan,* 49 F.3d 51, 53 (2d Cir.1995). *Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir.1998). The court construes *pro se* complaints liberally. *See Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972).

The plaintiff names as defendant in this action UConn Heath Care and Correctional Management. It is well settled that a state agency is not a "person" within the meaning of § 1983. *See Fisher v. Cahill,* 474 F.2d 991, 992 (3d Cir.1973) (state prison department cannot be sued under § 1983 because it does not fit the definition of "person" under § 1983); *Ferguson v. Morgan,* No. 90 Civ. 6318(JSM), 1991 WL 115759, at \*1 (S.D.N.Y.1991) (Otisville Correctional Facility medical staff not a person under § 1983); *Grabow v. Southern State Correctional Facility,* 726 F.Supp. 537, 538–38 (D.N.J.1989) (Department of Corrections not a person under § 1983); *Sittig v. Illinois Dep't of Corrections,* 617 F.Supp. 1043, 1044 (N.D.Ill.1985) (Illinois Department of Corrections not a person under § 1983); *Allah v. Commissioner of Dep't of Correctional* Services 448 F.Supp. 1123, 1125 (N.S.N.Y.1978) (New York Department of Correctional Services not a person under § 1983). Thus, the plaintiff's claims against the defendant lack an arguable legal basis and must be dismissed. *See Neitzke,* 480 U.S. at 325.

The complaint is DISMISSED without prejudice. See 28 U.S.C. § 1915(e)(2)(B)(i) and (ii). The plaintiff is given leave to file an amended complaint within thirty days of the date of this order provided he can identify at least one physician or other health care provider who has been deliberately indifferent to his medical needs. *See Soto v. Brooklyn Correctional Facility,* 80 F.3d 34 (2d Cir.1996) (permitting plaintiff to file amended complaint after limitations period had expired where inmate named only correctional facility and was not aware of the requirement that he name individuals). In addition, the plaintiff's application to proceed *in forma pauperis* [doc. # 1] is DENIED as moot, the plaintiff having paid the filing fee in this case.

**\*2** SO ORDERED this 9th day of February, 2000, at Hartford, Connecticut.

**All Citations**

Not Reported in F.Supp.2d, 2000 WL 303262

Case 9:19-cv-01527-TJM-TWD Document 24 Filed 10/05/20 Page 212 of 259

Harmon v. Runyon, Not Reported in F.Supp. (1997)

1997 WL 118379

1997 WL 118379
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jeanette HARMON, Plaintiff,

v.

Marvin T. RUNYON, Postmaster General,
United States Postal Service, Defendant.

No. 96 CIV. 6080(SAS).
|
Mar. 17, 1997.

**Attorneys and Law Firms**

Jeanette Harmon, pro se.

Aaron Katz, Asst. U.S. Atty., New York, N.Y., for Defendant.

*MEMORANDUM ORDER*

SCHEINDLIN, District Judge.

**\*1** On August 12, 1996, plaintiff filed this action pursuant to 42 U.S.C. §§ 2000e to 2000e–17 and § 29 U.S.C. §§ 621 to 634 for employment discrimination on the basis of her age, race and gender. On November 21, 1996, plaintiff applied for the appointment of counsel on the grounds that she lacks sufficient knowledge of the law to continue to maintain her claims *pro se*. For the reasons set forth below, plaintiff's application for appointment of counsel is denied with leave to renew.

Discussion As an initial matter, there is no constitutional right to appointed counsel in civil cases. Moreover, due to the scarcity of volunteer attorneys, the Second Circuit has cautioned against the routine appointment of *pro bono* counsel in civil cases. *See Cooper v. A.*

*Sargenti Co. Inc.,* 877 F.2d 170, 172 (2d Cir.1989). In *Hodge v. Police Officers,* 802 F.2d 58, 61–62 (2d Cir.1986), *cert. denied,* 502 U.S. 986, 112 S.Ct. 596, 116 L.Ed.2d 620 (1991), the Second Circuit set forth the factors courts should consider in deciding whether to grant a *pro se* plaintiff's request for the appointment of counsel. As a threshold requirement, the court must decide whether the plaintiff's claim "seems likely to be of substance." *Hodge,* 802 F.2d at 61. If the plaintiff meets this requirement, the court must next consider factors including:

the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

Id. at 61–62. As plaintiff is not indigent, the court is also required to consider plaintiff's efforts to obtain a lawyer. *Cooper,* 877 F.2d at 172, 174.

In the instant case, plaintiff has not met the threshold requirement set forth in *Hodge*. Plaintiff has presented no evidence whatever to support her claims regarding defendant's allegedly improper actions. Without presenting any evidence to support her claims, Harmon cannot meet the first requirement of the *Hodge* test described above. Accordingly, plaintiff's application is denied.

Given the early stage of these proceedings, it is possible that plaintiff eventually will be able to provide some evidence to support her claims. Plaintiff's application is therefore denied with leave to renew. If plaintiff wishes to apply again for the appointment of counsel, she must make some attempt to refer to evidence which supports her claims.

SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1997 WL 118379

1999 WL 1125122

1999 WL 1125122
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

John BROWN, Plaintiff,

v.

Michael JACOBSON, Commissioner, David
Schoenfeld, Warden, Officer Norris, # 4312
Officer Perez, # 14652, Individually and
in their Official Capacities, Defendants.

No. 98 Civ. 0565 LBS.
|
Dec. 8, 1999.

*MEMORANDUM AND ORDER*

SAND, J.

**\*1** Plaintiff, John Brown, appearing *pro se,* brings this action pursuant to 42 U.S.C. § 1983 against Michael Jacobson, the former Commissioner of the New York City Department of Corrections, David Schoenfeld, the Warden of the Beacon Correctional Center ("BCC") in East Elmhurst, New York, and two corrections officers, Norris and Perez. Mr. Brown alleges civil rights violations that allegedly occurred while he was confined at BCC. Presently before the Court is Defendant Perez's Motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim on which relief may be granted. For the reasons set forth below, Defendant's Motion is granted.

I. LEGAL STANDARD

On a motion to dismiss for failure to state a claim upon which relief may be granted, *see* Fed.R.Civ.P. 12(b)(6), we must "construe in plaintiff['s] favor factual allegations in the complaint.... Dismissal of the complaint is proper only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.,* 155 F.3d 59, 67 (2d Cir.1998) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957) (footnote omitted)) (citation omitted).

II. BACKGROUND

The following facts are taken from Plaintiff's Amended Complaint and are assumed to be true for purposes of considering this Motion.

At all times relevant to the Amended Complaint, Mr. Brown was an inmate at BCC and Defendants Norris and Perez were corrections officers at that facility. On August 14, 1997, Mr. Brown was transferred from "Side A" to "Side H" of BCC Block 6. Upon his arrival in Side H and after being locked into his new cell, Plaintiff checked to see whether all of his property had been moved to his new location and realized that certain of his legal documents were missing. Because he was now housed on the top floor of Block 6 and the Corrections Officers on duty were in a glass-enclosed semi-sound-proof "bubble" on a lower floor, the Corrections Officers would not have heard Plaintiff if he had verbally requested that he be allowed to search his former room for the missing documents. Mr. Brown therefore knocked on his cell door to get the officers' attention. Eventually, another inmate notified Officers Perez and Norris that Plaintiff sought to be let out of his cell.

When his cell door was opened, Mr. Brown proceeded to the bubble from which Officers Perez and Norris monitored the cell-block. Officer Perez used the prison intercom system to direct another prisoner, Eric Adoizro, # 349–97–01008, to search for Plaintiff's papers in Plaintiff's previous cell. Meanwhile, Officer Norris questioned Plaintiff regarding why he had knocked on his door so loudly.

Mr. Adoizro located Mr. Brown's papers but was directed by Officer Perez not to deliver them to him. Officer Norris instead took the papers and handed them to Officer Perez, while both remained in the bubble. When Mr. Brown asked the officers for his papers, Officer Norris told him that she would have to think about returning them because she did not approve of the way he had knocked on his cell door. Mr. Brown told Officer Norris that the papers were of great importance to him. Plaintiff's subsequent requests to speak with a captain about the matter were refused by both officers.

**\*2** Mr. Brown remained by the bubble as most other prisoners returned to their cells in order to be locked down for the night. Plaintiff thereafter made additional requests for the return of his papers, all of which Officer Norris refused to honor. Officer Perez then asked over the intercom whether

Plaintiff would return to his cell or whether Officer Perez should "call the goon squad." Officer Norris responded that Plaintiff would return to his cell, which Plaintiff did.

At roughly 4:00 a.m. on August 15, after the new shift of corrections officers came on duty, Plaintiff was allowed to leave his cell and enter the bubble to look for the relevant documents. Plaintiff could not find the documents but Corrections Officer Boyer, who is not a party to this action, spotted them near the shower on "Side A" of the block. Officer Boyer returned the package to Plaintiff who, moments later, discovered that certain of the documents were missing or out of place. In particular, Plaintiff discovered that a C.P.L.R. Article 78 petition that he had been drafting had been taken from the folder and that certain legal correspondence had been moved within the folder.

Plaintiff filed a Complaint in this Court on January 27, 1998, and an Amended Complaint on March 6. On July 16, Defendant Schoenfeld moved to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim on which relief may be granted. That Motion was granted, without opposition, on September 3, 1998. Defendant Jacobson's motion to dismiss was granted on January 11, 1999. *See Brown v.. Jacobson,* No. 98 Civ. 565(LBS) (S.D.N.Y. Jan. 11, 1999).

### III. DISCUSSION

Plaintiff's Amended Complaint alleges two causes of action. The first claims that "by denying plaintiff's request to retrieve his legal documents," the officers "placed a 'Chilling Effect' upon plaintiff's Right of Access to the Courts." (Am. Compl. at ¶ 55.) The second focuses on Mr. Brown's claim that Officer Perez threatened to call the "Goon Squad." (*See id.* at ¶ 36, 56.) Plaintiff alleges that that threat effected his "nerves" and "cause[d] him ... to stay up all night worrying" both about his documents and about the goon squad. (*Id.* at ¶ 56.)

Where, as here, Plaintiff proceeds *pro se,* the Court liberally construes the Complaint and holds it to less stringent pleading standards. *See Boddie v. Schnieder,* 105 F.3d 857, 860 (2d Cir.1997). We interpret a *pro se* plaintiff's complaint "to raise the strongest arguments they suggest." *Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). When we do so here, we discern two distinct claims: (1) a cause of action for denial of plaintiff's right of access to the courts; and (2) an Eighth Amendment claim arising out of the officers' threats. Because

both claims cannot be sustained on the basis of the facts alleged in the Amended Complaint, Defendant's motion to dismiss is granted.

### A. Right of Access to the Courts

**\*3** All persons, including prisoners, enjoy a constitutional right of access to the courts. *See Monsky v. Moraghan,* 127 F.3d 243, 246 (2d Cir.1997), *cert. denied, __ U.S. __, 119 S.Ct. 66 (1998).* But that right belongs solely "to litigants or those seeking to be litigants." *See Posr v. Court Officer Shield # 207,* 180 F.3d 409, 413 (2d Cir.1999). To state a claim for denial of access to the courts, therefore, the plaintiff must allege that the defendant's actions hindered the pursuit of a legal claim. *See id.* (citing *Monsky,* 127 F.3d at 247). That requirement—that an inmate show actual injury—"derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches." *Lewis v. Casey,* 518 U.S. 343, 349 (1996) (citing *Allen v. Wright,* 468 U.S. 737, 750–52 (1984); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471–76 (1982)).

Construing Plaintiff's complaint as liberally as we can, Mr. Brown seems to be presenting three distinct allegations of actual injury. His Amended Complaint claims that: (1) the officers' actions led to the loss of an Article 78 petition; (2) the loss of his legal documents caused him emotional distress; and (3) the officers' actions discouraged him from pursuing litigation. None of these allegations is sufficient to satisfy Plaintiff's burden of alleging an actual injury relevant to his claim of a denial of access to the courts.

### 1. Loss of an Article 78 Petition

Plaintiff alleges that "an Article 78 which [he] had been working on for over two months" was missing from his collection of legal documents after it was finally returned to him. (*See* Am. Compl. at ¶ 46.) "[T]he injury requirement," however, "is not satisfied by just any type of frustrated legal claim." *Lewis,* 518 U.S. at 354. The "universe of relevant claims has been extended only slightly," from criminal proceedings to include "civil rights actions—i.e., actions under 42 U.S.C. § 1983." *Shepherd v. Fraiser,* No. 96 Civ. 3283(JGK), 1999 WL 713839, at \*6 (S.D.N .Y. Sept. 14, 1999) (quoting *Lewis,* 518 U.S. at 354) (internal quotation marks omitted). The right has never been extended to Article 78 proceedings. Moreover, even if frustration of an Article 78 proceeding were actionable as a denial of the right of

access to the courts, Plaintiff would also have to allege that the officers' action "actually interfered with his access to the courts or prejudiced an existing action." *See Herrera v. Scully,* 815 F.Supp. 713, 725 (S.D.N.Y.1993). Mr. Brown's complaint alleges no facts suggesting that he was unable to file the Article 78 petition, or that the Article 78 proceeding was an existing action that was prejudiced by the loss of the paper in question. The allegation of loss of an "Article 78," therefore, does not establish an actual injury.

### 2. Emotional Distress

**\*4** Although Plaintiff alleges that the officers' actions affected his "nerves" and caused him to lose sleep as part of his second cause of action (*see* Am. Compl. at ¶ 56), we believe that, construing his complaint liberally, he might also be alleging emotional distress as an injury related to the loss of his legal documents. However, while "emotional distress and humiliation ... might be consequential damages components of a section 1983 claim in which actual injury to court access was sufficiently alleged, they are not the type of actual injury that gives rise to a constitutional claim of denial of access to the courts." *Monsky,* 127 F.3d at 247; *see also Brown v. Brabazon,* No. 98–2387, 1998 WL 953964, at *1 (2d Cir. Jan. 7, 1998). The allegations of nervousness and loss of sleep, therefore, do not satisfy the actual injury requirement.

### 3. Chilling Effect

Finally, Plaintiff's complaint might be read to allege that the combination of the threats, along with the confiscation of his legal documents, discouraged him from pursuing a legal claim or defense. We presume that this is the significance of his reference to a "chilling effect." (*See* Am. Compl. at ¶ 55.) Of the three possibilities we have considered, this claim is the most promising, although it, too, is ultimately unavailing. Several courts have recognized that a cause of action lies when a prison official threatens an inmate in so as to discourage the pursuit of litigation. *See, e.g., Hudspeth v. Figgins,* 584 F.2d 1345, 1348 (4th Cir.1978) (per curiam); *Brown v. Coughlin,* 965 F.Supp. 401, 404 (W .D.N.Y.1997); *Gloster v. Wong,* No. 94–CV–490 RSP/GJD, 1997 WL 151766, at *4–5 (N.D.N.Y. Mar. 28, 1997). But in each of those cases, the plaintiff alleged that the defendants' threats were related specifically to the plaintiff's continuation with particular legal proceedings. *See Hudspeth,* 584 F.2d at 1348; *Brown,* 965 F.Supp. at 405 (denying motion to dismiss when harassment followed immediately after plaintiff filed civil rights action); *Gloster,* 1997 WL 151766, at *4 (same). In

this case, by contrast, Plaintiff has not alleged that either Officer Norris' or Officer Perez's refusal to return his legal documents was related in any way to his having filed a legal or administrative claim, or even any plan he might have had to file such a claim. To be sure, he alleges that "[t]hese two (2) correctional Officers had to had [sic] been reading plaintiff's legal documents, and because they had read plaintiff's legal material illegally, they refused to bring those documents to plaintiff's new location ... as requested." But the fact that the officers may have read plaintiff's documents, even when considered together with all the other facts alleged in the complaint, does not create an inference that their conduct was related to some legal or administrative action taken or contemplated by the plaintiff. There is no allegation here that the threat of calling the goon squad was, in any way, designed to discourage Mr. Brown from pursuing a legal claim; it does not therefore satisfy Plaintiff's burden of alleging an actual injury.

### B. Eighth Amendment

**\*5** Plaintiff's allegation that Officer Perez's threat to call the goon squad caused him to become nervous and lose sleep could be characterized as a distinct cause of action alleging cruel and unusual punishment due to verbal abuse. However, "verbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) (citation and internal quotation marks omitted); *see also Powell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (per curiam); *Brown v.. Croce,* 967 F.Supp. 101, 104 (S.D.N.Y.1997); *Ramirez v. Holmes,* 921 F.Supp. 204, 210 (S.D.N.Y.1996); *Beal v. City of New York,* No. 92 Civ. 0718(KMW), 1994 WL 163954, at *6 (S.D.N .Y. Apr. 22, 1994). Plaintiff makes no allegation of any physical injury whatsoever, arising out of the incidents described in the Amended Complaint. His complaint does not, therefore, allege a violation of his right to be free from cruel and unusual punishment.

### C. Officer Norris

The final issue we must address arises from the fact that it is only Officer Perez's motion that is currently before the Court. (*See* Def.'s Mem. at 2 n. 2 (indicating that the Office of the Corporation Counsel does not represent Officer Norris).) According to court records, Officer Norris was served with summons and complaint on June 30, 1999. To

1999 WL 1125122

date, however, Officer Norris has filed neither an answer nor a responsive motion. Nevertheless, the Prison Litigation Reform Act of 1996, Pub.L. No. 104–134, 110 Stat. 1321–66 (codified in scattered sections of Title 18, 28, and 42 of U .S.C.) ("PLRA") requires the Court to dismiss a complaint in which a prisoner seeks redress from an officer or employee of a governmental entity if the complaint fails to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915A (West 1999). Although Mr. Brown is apparently no longer incarcerated, because his complaint was filed when he was "a prisoner" *see* 28 U.S.C. § 1915A(c) (West 1999), and because it advances concerns about prison officials' misconduct, it is nevertheless subject to the heightened scrutiny imposed by the PLRA. *See Johnson v. Hill,* 965 F.Supp. 1487, 1488 n. 2 (E.D.Va.1997). Having determined that Mr. Brown's Amended Complaint fails to state a claim on which relief may be granted against Officer Perez, and finding no meaningful distinction between the conduct of Officer Perez and Officer Norris with respect to Brown's allegations, we also conclude that Plaintiff's complaint fails to state a claim on which relief may be granted against Officer Norris. Therefore, pursuant to 28 U.S.C. § 1915A(b)(1), we dismiss *sua sponte* Plaintiff's claim against Officer Norris. *See Liner v. Goord,* __ F.3d __, No. 98–2925, 1999 WL 734693, at [*]2 (2d Cir. Sept. 22, 1999); *Tapia–Ortiz v. Winter,* 185 F.3d 8, 11 (2d Cir.1999).

### CONCLUSION

**\*6** For the foregoing reasons, Defendant Perez's motion to dismiss is granted and the Court dismisses Plaintiff's claim against Defendant Norris *sua sponte.* The Clerk of the Court is directed to close this case.

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 1125122

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 1699985
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Delia M. FARQUHARSON, Plaintiff,
v.
Reginald A. LAFAYETTE, Douglas A. Colety,
Jeanine L. Palazola, Dorothy L. DiPalo, and
Westchester County Board of Election, Defendants.

No. 19-cv-3446 (NSR)
|
Signed 04/07/2020

**Attorneys and Law Firms**

Lenworth Lester Williams, Law Office of Lenworth Williams, Mount Vernon, NY, Pierre Gooding, Pierre Gooding PLLC, New York, NY, for Plaintiff.

Frederick Mark Sullivan, Melissa-Jean Rotini, Haylei Peart, Westchester County Attorney's Office, White Plains, NY, for Defendants.

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

**\*1** Plaintiff Delia M. Farquharson ("Plaintiff") brings this action, pursuant to 42 U.S.C. § 1983 ("Section 1983") against Defendants Reginald A. Lafayette ("Lafayette"), Douglas A. Colety, Jeannie L. Palazola, s/h/a Jeanine L. Palazola, Dorothy L. DiPalo (together, the "Individual Defendants"), and Westchester County Board of Elections ("BOE") (collectively, "Defendants"). (Compl., ECF No. 1.) Plaintiff alleges that Defendants denied her an opportunity to run for Mayor of Mount Vernon, New York, in deprivation of her First, Fourth, Fifth and Fourteenth Amendment rights. (*Id.*) Plaintiff also asserts several state-law claims. (*Id.*)

Presently before the Court is Defendants' motion to dismiss. (ECF No. 32.) For the following reasons, Defendants' motion is GRANTED with leave to amend.

**BACKGROUND**

The following facts are taken from Plaintiffs' complaint and accompanying exhibits and are accepted as true for purposes of this motion.

**A. Lafayette's Alleged History of Targeting Plaintiff**

The allegations underlying Plaintiff's complaint primarily center around a long running and contentious relationship between Plaintiff and Lafayette. To this end, Plaintiff is a City Councilor in Mount Vernon and of Jamaican descent, while Lafayette is the Chairman and Commissioner of the BOE and the Chairman of the Mount Vernon Democratic Committee ("MVDC"). (Compl. ¶ 4.)

According to Plaintiff, Lafayette wields tremendous power as Commissioner of MVDC. For example, Plaintiff avers that, on July 27, 2015, Maria Caraballo, a two-time City Council candidate in Mount Vernon, stated in "Black Westchester Magazine" that Lafayette "[c]ontrols Mt. Vernon Politics." (*Id.* ¶ 11 (internal quotations omitted).) Caraballo explained that "if you are not liked by Reggie Lafayette, you are not going to be elected. There will never be an election in Mt. Vernon[ ] that will not be fixed as long as Reggie Lafayette is in office." (*Id.* (internal quotations omitted).) According to Plaintiff, during his time as commissioner, Lafayette has made disparaging remarks regarding individuals of West Indian descent (particularly Jamaicans) during public meetings. (*Id.* ¶¶ 5, 11. [1] )

[1]     The complaint contains two paragraphs numbered 11. This is a reference to the second paragraph 11.

Plaintiff contends that Lafayette also routinely targeted Plaintiff during political events and nomination processes. (*Id.* ¶ 12.) For example, during the 2017 MVDC nomination process, Lafayette succeeded in installing Marcus Griffith in Plaintiff's place, even though Plaintiff had already been voted to be a nominee. (*Id.* ¶ 13.) The next year, in 2018, Lafayette delivered a message about "people wanting to be elected but not understanding how things work" in response to Plaintiff's expressing an intention to assume the role of City Council President. (*Id.* ¶ 14.)

Plaintiff and Lafayette's contentious history persisted into 2019. Specifically, on January 2, 2019, at a City Council committee meeting attended by Plaintiff and Lafayette (who is not a City Council member), Lafayette "looked directly at Plaintiff" as she entered the meeting and asked, "[A]re we going to have a smooth night[?]" (*Id.* ¶ 15.) This question was purportedly in reference to Plaintiff's plan to speak

about the political properness of some of the City Council nominations. (*Id.*) When asked for clarification, Lafayette responded, "[A]m I going to have to respond to anything as commissioner." (*Id.*) Then, during the meeting, Lafayette "placed himself in the direct vicinity of Plaintiff," thereby making her feel uncomfortable both in her official and personal capacity. (*Id.*)

**B. Plaintiff Files Untimely Petitions and Defendants Refuse to Return Them**

**\*2** On or around February 7, 2019, Plaintiff completed all filing requirements to run for Mayor of Mount Vernon. (*Id.* ¶ 16.) Thereafter, in conjunction with at least six team members, Plaintiff collected 985 signatures from members of the Mount Vernon community (the "Petitions"). (*Id.* ¶ 17.)

On March 19, 2019 Plaintiff went to BOE with her Petitions. (*Id.* ¶ 18.) When she arrived, the clerk informed Plaintiff that the filing period in New York was from April 1, to April 4, 2019. (*Id.*) In response, Plaintiff asked the clerk if BOE would accept Plaintiff's Petitions for review, notwithstanding the deadline. (*Id.*) The clerk called Lafayette, who was in a back office of BOE, and informed him that Plaintiff was "here to submit petitions." (*Id.*) The clerk took the Petitions and went to the back office to meet with Lafayette. (*Id.*) At some point, either during the call or meeting, Lafayette decided, or authorized the clerk to decide, to take Plaintiff's Petitions. (*Id.* ¶ 19.) The clerk stamped the Petitions and made copies to distribute to Plaintiff. (*Id.*)

Shortly after, Plaintiff heard from community members that BOE planned to invalidate the Petitions. (*Id.* ¶ 20.) She further learned that BOE was planning to invalidate any signatures on the Petitions. (*Id.* ¶ 27.) As a result, on March 25, 2019, Plaintiff returned to BOE to obtain her Petitions.[2] (*Id.* ¶ 21.) Then, on March 27, 2019, Plaintiff received a call from Taijan Nelson, which informed Plaintiff that BOE had sent a letter, dated March 25, 2019, to Plaintiff. (*Id.* ¶ 22.)

[2]   The Complaint does not specify whether Plaintiff was able to re-obtain her Petitions. However, in her letter to BOE, dated March 27, 2019, Plaintiff notes BOE's "failure to return" her Petitions "for possible amendment." (Compl. Ex. II.)

In that letter, BOE informed Plaintiff that "[a]fter a prima facie examination of [the Petitions] purporting to nominate [Plaintiff] as a candidate for Mayor in the City of Mount Vernon, it was determined that the Petition ... was not

timely filed." (*Id.* Ex. A; *see also id.* ¶ 23.) BOE cited Section 6-158(1) of the New York State Election Law ("N.Y.E.L."), which established April 1, 2019 as the earliest date to file designating petitions. (*Id.* Ex. I.) BOE then noted that failure to file a petition within this timeframe "[was] a fatal defect." (*Id.*) BOE thus determined that Plaintiff's Petitions were "invalid" and informed her that her name would not appear on the Democratic Party ballot for Mayor of Mount Vernon primary election. (*Id.*) Plaintiff contends that, notwithstanding the letter's conclusion, BOE was not aware of what Plaintiff was going to do with her Petitions on or before April 1, 2019. (*Id.* ¶ 25.)

Plaintiff responded to BOE's letter on March 27, 2019. (*Id.* ¶ 26.) Plaintiff, through her counsel, informed BOE that the letter had "legal issues" and, in turn, urged for the BOE to reconsider its decision or provide Plaintiff with a hearing. (*Id.*) In the letter, Plaintiff acknowledged that Plaintiff's "Petitions were filed early" but argued that she nevertheless had a "timely claim to cure the violation[ ] and [was] entitled to attempt to do so."[3] (*Id.* Ex. II.)

[3]   BOE's counsel responded on April 1, 2019. (Compl. Ex. IV.) The letter reiterated the statutorily prescribed time period for submitting designating petitions for the 2019 primary election and noted that Plaintiff had submitted her Petitions outside of that period. (*Id.*) BOE further informed Plaintiff that she could not cure her Petitions' defects because the cure period would still conclude prior to the commencement of the statutorily mandated designating petition filing period. (*Id.*)

**\*3** The next day, on March 28, 2019, Plaintiff, her team members, and her attorney went to BOE in person. (*Id.* ¶ 28.) During the meeting, Lafayette laid out his concern with accepting Plaintiff's untimely Petition, explaining that "a major problem, [which] nobody can get a handle on, is a lot of people backdate signatures." (*Id.* ¶ 29.) Plaintiff then asked Lafayette why BOE accepted her Petitions if it knew it would later invalidate them. (*Id.* ¶ 30.) Lafayette explained that the Petitions were "already turned in by the time [the clerk] went to the back to speak with [him]." (*Id.*) Plaintiff, however, corrected him, noting that the Petitions were "unstamped" at that moment. (*Id.*) Although Plaintiff does not provide further details, she notes that "[n]o BOE hearing was ever scheduled by the BOE" regarding the Petitions. (*Id.* ¶ 31.)

### C. Plaintiff Files an Amended Cover Sheet but Remains Off the Primary Ballot

Notwithstanding her untimely March filing, Plaintiff timely filed an amended cover sheet for her Petitions on April 1, 2019. (*Id.* ¶ 32.) Upon this now-timely filing, Specific Objections ("Specs") to Plaintiff's petitions were lodged, some allegedly after the filing deadline was complete. (*Id.* ¶ 33.) Plaintiff maintains that these Specs came from individuals "affiliated with Lafayette." (*Id.*)

Plaintiff and her attorney eventually confronted Lafayette and told him that they believed BOE was engaged in illegal activity. (*Id.*) Plaintiff then asked Lafayette what dates he was using to determine whether the Specs were timely filed. (*Id.*) In that conversation, Plaintiff and Lafayette disputed whether one Spec at issue was filed on the fourth or eighth of April. (*Id.*) As it relates to this Spec, Lafayette explained that, although there was a Spec dated April 4th, a new Spec was timely filed on April 8th after Plaintiff again amended her Petition cover sheet. (*Id.*) Lafayette insisted that this was proper because "[o]nce [Plaintiff] amend[e]d [her Petition], [the time to file Specs] starts all over again." (*Id.*) At some point during this conversation, Lafayette then noted that Plaintiff had "time to even correct [her] mistakes" but the filing had to be kept by BOE. (*Id.*)

Plaintiff argues that Lafayette admitted that "Plaintiff's process of amending the cover sheet for [her] Petitions was proper, and that the process that the BOE engaged in prior to April 1, 2019 regarding the attempt to rule the Petitions out of the elections before giving an opportunity to amend the cover letter or cure the petitions was per se illegal." (*Id.* ¶ 34.) Plaintiff further avers that Lafayette "understood more than any other person" how a candidate could modify petitions until the filing deadline concluded but nevertheless "blocked" Plaintiff from running for office. (*Id.* ¶ 35.) BOE, according to Plaintiff, was "complicit" by failing to stop Lafayette's activity. (*Id.*)

### LEGAL STANDARDS

#### I. 12(b)(1)

When a court lacks the statutory or constitutional power to adjudicate a case, it should dismiss the case for lack of subject matter jurisdiction under Rule 12(b)(1). *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 94 (2d Cir. 2011). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). In assessing whether there is subject matter jurisdiction, the Court must accept as true all material facts alleged in the complaint, *Conyers v. Rossides*, 558 F.3d 137, 143 (2d Cir. 2009), but "the court may resolve [any] disputed jurisdictional fact issue by referring to evidence outside of the pleadings." *Zappia Middle E. Const. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000).

One example of when a court lacks subject matter jurisdiction is when the case becomes moot. *See Doyle v. Midland Credit Mgmt., Inc.*, 722 F.3d 78, 81 (2d Cir. 2013). Similarly, lack of standing may be grounds for dismissal under Rule 12(b)(1). *Buonasera v. Honest Co.*, 208 F. Supp. 3d 555, 560 (S.D.N.Y. 2016).

#### II. 12(b)(6)

**\*4** The relevant inquiry under Rule 12(b)(6) is whether a complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. To this end, to survive a motion to dismiss, a complaint must supply "factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). The Court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, but the Court is " 'not bound to accept as true a legal conclusion couched as a factual allegation,' " or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

The critical inquiry is whether the plaintiff has pled sufficient facts to nudge the claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555. A district court must consider the context and "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Ultimately, the allegations must "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

#### III. Section 1983

Under Section 1983, "[e]very person who, under the color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself the source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes it describes." Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979). To state a claim under Section 1983, a plaintiff must allege (1) the challenged conduct was attributable to a person who was acting under color of state law and (2) "the conduct deprived the plaintiff of a right guaranteed by the U.S. Constitution." Castilla v. City of New York, No. 09 Civ. 5446(SHS), 2013 WL 1803896, at *2 (S.D.N.Y. Apr. 25, 2013); see also Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010).

## DISCUSSION

### I. Defendants' Mootness and Standing Challenges

Defendants proffer two challenges to this Court's jurisdiction to hear Plaintiff's claims. *First*, Defendants argue that, because the primary election has already taken place, Plaintiff's claims related to the validity of the March Designating Petition are moot. (Defs. Mem. of Law in Supp. of Mot. to Dismiss ("Defs. Mot."), ECF No. 32, at 3.) *Second*, Defendants contend that Plaintiff lacks standing to assert her claims because she has failed to establish that she suffered an injury in fact, that her alleged harm is fairly traceable to Defendants' conduct, or that a favorable decision can redress her purported harm. (*Id.* at 5-7.) In response, Plaintiff argues that her claims are not moot because, even though the election has passed, the Court can still award, *inter alia*, damages related to her claims. (Pl. Opp. to Defs. Mot. (Pl. Opp.), ECF No. 37, at 4.) She further argues that she has standing to maintain her claims. (*Id.* at 6.)

As this Court must determine whether it has subject matter jurisdiction before it can rule on the merits of any claim, the Court assesses Defendants' challenges below. As will be explained, the Court concludes that, although Plaintiff's claims for injunctive and declaratory relief have been mooted by the passage of the primary election, her claims are not moot to the extent she seeks damages for Defendants' alleged constitutional violations. The Court further concludes that Plaintiff has easily established standing to pursue her claims, regardless of their ultimate merits.

### A. Mootness

**\*5** "The mootness doctrine, which is mandated by the 'case or controversy' requirement of Article III of the United States Constitution, requires that federal courts may not adjudicate matters that no longer present an actual dispute between parties." Catanzano v. Wing, 277 F.3d 99, 107 (2d Cir. 2001) (citing Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477-78 (1990)). "A case is moot 'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome,' " such that a court cannot provide any relief to redress a plaintiff's claimed injuries. Piccolo v. N.Y.C. Campaign Fin. Bd., No. 05 CV 7040(GBD)(MHD), 2007 WL 2844939, at *7 (S.D.N.Y. Sept. 28, 2007) (internal quotations and citations omitted).

As is relevant here, the "passage of an election does not necessarily render an election-related case moot." Freedom Party of N.Y. v. N.Y.S. Bd. of Elections, 77 F.3d 660, 662 (2d Cir. 1996) (citing Storer v. Brown, 415 U.S. 724 (1974)). The question courts must address in an election-related context is whether the issues alleged are "capable of repetition, yet evading review." See Lerman v. Bd. of Elections in City of N.Y., 232 F.3d 135, 142 (2d Cir. 2000). "[A] controversy is capable of repetition, yet evading review where both of the following two requirements are met: '(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again.' " Van Wie v. Pataki, 267 F.3d 109, 113-14 (2d Cir. 2001) (quoting Weinstein v. Bradford, 423 U.S. 147, 149 (1975)). Regardless of this inquiry, if a plaintiff seeks money damages, that claim will not be deemed moot. See id. at 115 n.4 ("We note that had the plaintiffs sought money damages in addition to their request for injunctive relief, this controversy would not be moot. Indeed, for suits alleging constitutional violations under 42 U.S.C. § 1983, it is enough that the parties merely request nominal damages.").

Here, Plaintiff seeks injunctive and declaratory relief that would render Plaintiff's filing timely and deem the "amended petition date [as] determinative for filing." (Compl. ¶ 78.) However, the mayoral primary was held on June 25, 2019. (Defs. Mot. 3.) Accordingly, as Plaintiff can no longer run for mayor in this election cycle, the passage of the primary has "eradicated the effects of the defendant's act or omission" regarding the validity of the Petitions. See Van Wie, 267 F.3d at 113 ("We conclude that this appeal is moot because the

March 2000 primary election, in which the appellants sought to participate, has passed."). And, although a moot case may still be justiciable if the dispute is capable of repetition, yet evading review, Plaintiff here has failed to make any showing that there is a reasonable expectation that she would be subjected to the same action again by Defendants in future elections. The Court hence has no basis to conclude that Plaintiff's claims for injunctive and declaratory relief remains justiciable.

To avoid this outcome, Plaintiff relies on *Arbor Hill Concerned Citizens v. Cty. of Albany*, 357 F.3d 260 (2d Cir. 2004) to contend that the Court could "call for a special election." (Pl. Opp. 4.) In citing *Arbor Hill*, Plaintiff quotes the Second Circuit's holding as follows: "it is within the scope of [the court's] equity powers to order a governmental body to hold special elections." (*Id.*) (quoting *Arbor Hill*, 357 F.3d at 262.) Plaintiff's reliance on *Arbor Hill*, however, is misplaced. The Second Circuit made it clear that this equity power relates to violations of the Voting Rights Act (a portion of the *Arbor Hill* quotation that Plaintiff noticeably omits). Plaintiff points to no other authority that establishes that the Court could order a special election as a remedy for a Section 1983 constitutional violation. The Court GRANTS Defendants' motion to dismiss Plaintiff's claims for injunctive and declaratory relief as moot, without prejudice.

*\*6* Plaintiff, however, has also sought damages as part of her requested relief for her various constitutional and state claims. (Compl. ¶ 78.) As a result, Plaintiff continues to maintain a legally cognizable interest in the outcome of this case, notwithstanding the passing of the mayoral primary election. *See, e.g., Marin v. Town of Southeast*, 136 F. Supp. 3d 548 (S.D.N.Y. 2015) ("[I]n general 'so long as the plaintiff has a cause of action for damages, a defendant's change in conduct will not moot the case.' "); *Sugarman v. Vill. of Chester*, 192 F. Supp. 2d 282, 290 (S.D.N.Y. 2002) ("Plaintiff has asserted a proper claim for nominal damages under § 1983 for the alleged constitutional violation. It therefore follows that plaintiff has a legally cognizable interest in the outcome of the dispute, and that her claims are not moot."). Thus, the Court concludes that Plaintiff's claims are not mooted to the extent that she seeks damages related to Defendants' purported constitutional violations.

The Court next turns to whether Plaintiff has standing to bring her claims.

**B. Standing**

To ensure that there is a case or controversy, the Supreme Court has held that parties before federal courts must have standing to bring their claims. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff has standing if he or she has suffered "(1) an injury that is (2) 'fairly traceable to a defendant's allegedly unlawful conduct' and that is (3) 'likely to be redressed by the requested relief.' " *Id.* 560-61 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). For purposes of standing, an injury must be an injury in fact, meaning "an invasion of a legally protected interest which is (a) concrete and particularized ... and (b) actual or imminent, not 'conjectural' or 'hypothetical.' " *Id.* at 560 (internal citations and quotations omitted). On a motion to dismiss, "the plaintiff has no evidentiary burden" and the "task of the district court is to determine whether the [p]leading 'allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue.' " *Am. Bird Conservancy v. Harvey*, 232 F. Supp. 3d 292, 301 (E.D.N.Y. 2017) (quoting *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016)).

Here, regardless of the ultimate merits of her claims, Plaintiff has established her standing to sue. *First*, Plaintiff has alleged an injury-in-fact that is concrete and particularized and actual, not conjectural. Specifically, Plaintiff has alleged that she was deprived of an opportunity to run for mayor because of purported impropriety related to the handling of her Petitions. *Second*, Plaintiff's harms, as alleged, were "fairly traceable" to Defendants' conduct, regardless of whether her claims are legally viable on the merits. As Plaintiff's pleadings aver, Defendants' decision making regarding Plaintiff's Petitions —whether or not unlawful or even the proximate cause of her harm—fall within the chain of causation leading to Plaintiff's absence from the mayoral primary ballot.[4] *See Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 627-28 (2d Cir. 1989) (explaining that plaintiff's injury did not "derive solely from the fact that she ultimately failed to win the presidency" but rather "the asserted harm also flow[ed] from [non-federal defendant's] allegedly partisan restriction of her opportunities to communicate her political ideas to the voting public at large" as well as the "federal defendants' tax treatment of the [non-federal defendant]"); *Harvey*, 232 F. Supp. 3d at 305 (explaining that, although there were several links in the causation chain, defendant's causal connection to Plaintiffs' claims were "neither hypothetical nor tenuous"). *Finally*, as to redressability, the Court again notes that Plaintiff seeks damages. As such, even without the injunctive and declaratory component of her requested relief, Plaintiff, if meritorious, could be redressed by a favorable ruling. Defendants' challenge to Plaintiff's standing fails.

[4]

Defendants fiercely dispute causation, contending that it was the combination of Plaintiff's failure to timely file her Petition under N.Y.E.L., as well as the objections invalidating the signatures in the Petitions after she filed an amended cover sheet, that caused Plaintiff's alleged injuries. (Defs. Mot. 5-6; Defs. Reply in Supp. of Defs. Mot. ("Defs. Reply"), ECF No. 35, at 4-5.) Defendants' argument, however, ultimately goes to the merits and plausibility of Plaintiff's claims, rather than her standing to bring them. On this point, the Court emphasizes that "just because Plaintiff[ ] here ha[s] alleged an injury-in-fact that is 'fairly traceable to the challenged conduct and redressable by a favorable judicial decision[ ]' [ ] does not mean that Plaintiff[ ] ha[s] a valid claim on the merits." *Maslow v. Bd of Elections in City of N.Y.*, No. 06-CV-3683 (NGG)(SMG), 2018 WL 2185370, at *4 (E.D.N.Y. May 23, 2008), *aff'd*, 658 F.3d 291 (2d Cir. 2011).

**\*7** The Court now turns to the merits of Plaintiff's Section 1983 claims.

## II. Plaintiff's Section 1983 Claims

Plaintiff has brought four separate causes of action under Section 1983. *First*, Plaintiff asserts a violation of her right to due process under the Fifth and Fourteenth Amendment. (Compl. ¶¶ 51-56.) *Second*, Plaintiff alleges "discrimination" under the First and Fourteenth Amendment. (*Id.* ¶¶ 61-64.) *Third*, Plaintiff asserts a claim for "disparate impact" under the First and Fourteenth Amendment. (*Id.* ¶¶ 65-68.) *Finally*, Plaintiff avers that Defendants' violated her "right to be secure from unreasonable seizures" under the Fourth Amendment. (*Id.* ¶¶ 42-51.) The Court considers each of these four causes of action below.

### A. Due Process Claim

Plaintiff maintains that Defendants violated her due process rights by failing to schedule a hearing related to the retention and propriety of Plaintiff's Petitions. (Pl. Opp. 11; Compl. ¶¶ 52-55.) Defendants counter that Plaintiff has failed to establish a due process violation, in part because she failed to avail herself to New York's state court review process under the N.Y.E.L. (Defs. Mot. 12-13.) The Court agrees.

The Fourteenth Amendment provides that "[n]o state shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "The Due Process Clause does not protect against all deprivations of constitutionally protected interests in life, liberty, or property, only against deprivations without due process of law." To maintain a due process claim, a plaintiff must first establish that he or she had a protected property or liberty interest. *White Plains Towing Corp. v Patterson*, 991 F.2d 1049, 1061-62 (2d Cir. 1976). Thereafter, to assess whether a due process violation occurred, courts must "ask what process the State provided[ ] and whether it was constitutionally adequate." *Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006) (quoting *Zinermon v. Burch*, 494 U.S. 113, 126 (1990)).

To determine whether a state or local government has complied with procedural due process, courts "distinguish between (1) claims based on established governmental procedures, and (2) claims based on random or unauthorized acts by public employees." *Vaher v. Town of Orangetown, N.Y.*, 133 F. Supp. 3d 574, 604 (S.D.N.Y. 2015) (quoting *G.I. Home Developing Corp. v. Weis*, 499 F. App'x 87, 88 (2d Cir. 2012)). "When the state conduct in question is random and unauthorized, the state satisfies procedural due process requirements so long as it provides meaningful post-deprivation remedy." *Rivera-Powell*, 470 F.3d at 465. Conversely, when the deprivation is pursuant to an established state procedure, "the availability of post-deprivation procedures will not, *ipso facto*, satisfy due process." *Id.* (quoting *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996)). Rather, in such cases, courts must evaluate the adequacy of the post-deprivation remedy by considering the following factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the

additional or substitute procedural requirement would entail.

**\*8** *Murawski v. Pataki*, 514 F. Supp. 2d 577, 585 (S.D.N.Y. 2007) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Here, the Court need not assess whether Defendants' conduct was characterized as random and unauthorized or the product of an established state procedure. As an initial matter (and although not addressed by either party), it is unclear that Plaintiff even has a property or liberty interest in her mayoral candidacy. Courts have routinely concluded that "a candidate for political office holds no property or liberty interest in an elected position." *Leroy v. N.Y.C. Bd. of Elections*, 793 F. Supp. 2d 533, 537 (E.D.N.Y. 2011) (candidate's due process claim, alleging that the board of elections violated her due process rights when they failed to certify her name for the ballot, failed because she had no property interest in her candidacy); *Douglas v. Niagara Cty. Bd. of Elections*, No. 07-CV-609A, 2007 WL 3036809, at \*4 (W.D.N.Y. Oct. 16, 2007) (no property interest where board of elections invalidated petition upon a finding of insufficient number of valid signatures); *Cornett v. Sheldon*, 894 F. Supp. 715, 725-26 (S.D.N.Y. 1995) (no property interest, and therefore no due process violation, where plaintiff had alleged that defendants failed to give him notice of the specifications to objections to his petition prior to a board of elections hearing). In the absence of a protected property or liberty interest, there is no due process violation.

In any event, the process accorded to Plaintiff easily passes Constitutional muster regardless of whether the conduct issue was random or pursuant to established state procedure.[5] As Defendants note, N.Y.E.L. § 16-102 ("Article 16") provides for expedited state-court proceedings to review the validity of petition designations. (Defs Mot. 12-13.) Courts in this circuit, in turn, have repeatedly concluded that Article 16 "satisfies due process requirements," "[e]ven in the absence of an opportunity to be heard prior to a [board of election's] decision."[6] *Murawski*, 514 F. Supp. 2d at 586 n.5; *see also EH Fusion Party*, 401 F. Supp. 3d at 38 (" '[A]fter the Board's action, [there is] the opportunity to obtain full judicial review under New York Election Law section 16-102, which provides for expedited proceedings as to designations.' This is an adequate post-deprivation remedy that 'satisfies due process.' " (internal quotation omitted)); *Bal*, 2018 WL 6528766 at \*8 ("Courts following *Rivera-Powell* have

categorized the expedited review provided by N.Y. Election Law § 16-102 as both pre- and post-deprivation review adequate to satisfy due process concerns."); *Leroy*, 793 F. Supp. 2d at 540-41 ("In any case, New York Election Law § 16-102, if not a 'pre-deprivation' remedy, provided Leroy, as in *Rivera–Powell*, with the opportunity to obtain full 'post-deprivation' judicial review."); *Douglas*, 2007 WL 3036809 at \*5 ("[E]ven if the Court were to hold that the plaintiff had a property interest in his candidacy, the availability of an expedited special proceeding under NYS Elec. Law § 16-102 to address the merits of his petition satisfies the requirements of procedural due process."); *Cornett*, 894 F. Supp. at 727 (describing Article 16 as a "comprehensive and expeditious state court process which attempts to adjudicate election law disputes promptly" and finding no due process violation where plaintiff failed to take advantage of it).

5  This is true whether the property/liberty interest is characterized as Plaintiff's interest in being a primary candidate or if Plaintiff is attempting to maintain that the protected interest is in her Petitions.

6  Although both parties focused on Plaintiff's post-deprivation remedies, several courts that have considered the issue have concluded that Article 16 is more akin to a pre-deprivation remedy. *See, e.g.*, *Dekom v. Nassau Cty.*, No. 12-CV-3473 (JS)(ARL), 2013 WL 5278019, at \*7 (E.D.N.Y. Sept. 18, 2013) ("courts have addressed this very issue, finding that Section 16-102 provides a pre-deprivation remedy and thus denying due process claims strikingly similar to those Plaintiffs now raise."); *Leroy*, 793 F. Supp. 2d at 539-40 (noting that "if the denial of ballot access is a deprivation within the ambit of due process, deprivation occurs at the first moment a voter can cast a ballot in the subject election contest, if the candidate has not yet been reinstated to the ballot; *Murawski*, 514 F. Supp. 2d at 586 n.5 (describing Article 16 as a pre-deprivation remedy); *Douglas*, 2007 WL 3036809 at \*5 ("In the Court's view, the special proceeding [under Article 16] constitutes an adequate 'pre-deprivation' procedure."). Other courts, however, have classified Article 16 as a post-deprivation remedy. *See, e.g. EH Fusion Party v. Suffolk Cty. Bd. of Elections*, 401 F. Supp. 3d 376, 389 (E.D.N.Y. 2019) (describing Article 16 as a "post-deprivation remedy"). The distinction ultimately

does not impact the due process considerations outlined above. *See Bal v. Manhattan Democratic Party*, No. 16-cv-2416 (PKC), 2018 WL 6528766, at \*8 (S.D.N.Y. Dec. 12, 2018)

**\*9** As Plaintiff alleges here, she filed her Petitions on March 19, 2019, well before the April 1 to April 4, 2019 timeframe for filing petitions. (AC ¶ 18.) BOE then notified Plaintiff that her Petitions were not timely filed and that she would not appear on the ballot for this reason. (*Id.* ¶¶ 21-23; *see also id.* Ex. I.) Plaintiff wrote to BOE, demanding a hearing, but did not receive one at any point. (*Id.* ¶¶ 26, 31.) Although BOE never scheduled a hearing, Plaintiff had a comprehensive judicial mechanism, established by state law, at her disposal. That mechanism would have allowed her to challenge the BOE's determination, regardless of whether BOE provided her with the requested hearing. Plaintiff chose not to avail herself to the Article 16's procedure, but her decision has no impact on the adequacy of her due process rights in this case (to the extent they exist).[7] *See Bal*, 2018 WL 6528766 at \*9 ("Although he did not avail himself of either opportunity, that is of no moment in evaluating whether he was afforded due process of law."). The Court GRANTS Defendants' motion to dismiss Plaintiff's due process claim, with prejudice.

[7]   Plaintiff does not contend that she lacked awareness of Article 16. Nor could she. As Plaintiff concedes, she availed herself to this judicial review when BOE's determination of viability of her amended Petitions. (Pl. Opp. 7.) Plaintiff cannot now be heard to argue that an "established state procedure" by Defendants destroyed her entitlement to being on the ballot for the June 2019 mayoral primary. (*See id.* 11.)

### B. Equal Protection Claims/First Amendment Claims

#### 1. *Discrimination*

Plaintiff has brought a claim related to discrimination under the First and Fourteenth Amendment. (Compl. ¶¶ 61-64.) To this end, Plaintiff contends Defendants applied "policies that [were] neutral on their face" in a discriminatory manner. (*Id.* ¶ 62.) Defendants challenge these claims, contending that Plaintiff has failed to identify "the manner, type, or kind of alleged discrimination in processing her March Designating Petition." (Defs. Mot. 13.)

The Court initially notes that, although she frames her claims as sounding under both the First Amendment and Fourteenth Amendment, it does not appear as if Plaintiff is, in fact, pleading a First Amendment claim. It is true that "[c]ourts in this district have recognized that denial of ballot access can effect a deprivation of the First Amendment right to free association." *Marchant v. N.Y.C. Bd. of Elections*, 13 Civ. 5493(KPF), 2013 WL 4407098, at \*4 (S.D.N.Y. Aug. 16, 2013). But Plaintiff's complaint is devoid of allegations that Defendants' decisions regarding her Petitions were premised on Plaintiff's political affiliation, associational conduct, or even her speech.[8] Instead, the gravamen of Plaintiff's discrimination claim focuses on how Defendants purportedly treated Plaintiff differently than other primary candidates in its application of New York's election laws. (Pl. Opp. 9-10.) Plaintiff further avers that one potential basis for discrimination was Plaintiff's West Indian heritage." (*Id.* at 10.) Under this framing, the Court concludes that Plaintiff's discrimination claim sounds solely under the Equal Protection clause. To this end, the Court discerns two Equal Protection challenges: selective enforcement and intentional discrimination. The Court considers each below.

[8]   To the extent Plaintiff premises her First Amendment claims on Defendants' purported failure to provide her with a hearing regarding her challenge to their March 25, 2019 decision, her claim fails for the same reasons her due process challenge failed. It is well settled that, where a plaintiff's "First Amendment claims are 'virtually indistinguishable' from" his or her due process claims," a failure to state a due process claim "necessarily" means that plaintiff has failed to state a First Amendment claim." *See Dekom*, 2013 WL 5278019 at \*8 (citing *Rivera-Powell*, 470 F.3d at 468-69); *Marchant*, 2013 WL 4407098 at \*4 ("Plaintiffs' First Amendment claims are 'virtually indistinguishable' from their due process claims (and fail for the same reason), because they arise from the same alleged violation, namely, Plaintiff Lee's exclusion from the primary ballot due to errors in two cover sheets.").

**\*10** "The Equal Protection Clause of the Fourteenth Amendment directs that similarly situated individuals be treated alike." *Bal*, 2018 WL 6528766 at \*10 (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). To establish an equal protection violation, a plaintiff must prove (1) "purposeful discrimination directed at an

2020 WL 1699985

identifiable or suspect class," and (2) "that similarly situated people were treated differently." *Leroy*, 793 F. Supp. 2d at 542 (citing *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995); *Powell v. Powell*, 436 F.2d 84, 88 (2d Cir. 1970); *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 193 (2d Cir. 1994)). Critically, "a § 1983 action to remedy errors in the election process allegedly violating the equal protection clause does not exist unless the state action constituted 'intentional or purposeful discrimination.' " *Gold v. Feinberg*, 101 F.3d 796, 800 (2d Cir. 1996) (quoting *Powell*, 436 F.2d at 88 (internal quotations omitted)); *see also Gelb v. Bd. of Elections of City of N.Y.*, 224 F.3d 149, 154 (2d Cir. 2000) ("It is thirty-year-old doctrine in this Circuit that a § 1983 action invoking the Equal Protection Clause is not available to remedy election process errors in the absence of a showing of 'intentional or purposeful discrimination.' ").

An Equal Protection claim can be "sustained even if the plaintiff has not alleged class-based discrimination, but instead claims that she has been irrationally singled out." *Bal*, 2018 WL 6528766 at *11 (quoting *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 601 (2008)). Whether pursuing a "selective enforcement" or "class of one" theory, it is incumbent upon a plaintiff to sufficiently identify a similarly situated comparator and show that he or she was treated differently as compared to those others similarly situated. *Tower Props. LLC v. Vill. of Highland Falls*, No. 14 Civ. 4502 (NSR), 2017 WL 519267, at *4 (S.D.N.Y. Feb. 7, 2017).

Where discrimination is premised on a protected characteristic (such as race or national origin), a plaintiff must show that a defendant "intentionally discriminated against [him or her], either by adopting out of [ ] animus [to a protected characteristic] policies which are facially neutral but have a [ ] discriminatory effect, or by applying a facially neutral policy in a [ ] discriminatory manner." *Rivera-Powell*, 470 F.3d at 470 (citing *Hayden v. Cty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999)). "[C]onclusory allegation[s] of discrimination, [ ] 'without evidentiary support or allegations of particularized incidents, do[ ] not state a valid claim' and [ ] cannot withstand a motion to dismiss." *Id.* at 470 (quoting *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (internal quotations omitted)).

Here, Plaintiff's discrimination claim fails for two separate reasons. To start, Plaintiff has not sufficiently pled a similarly situated comparator who was treated differently by Defendants. Rather, Plaintiff offers a single conclusory allegation that Defendants applied "policies that are neutral

on their face" in a "discriminatory or punitive manner" and/or created policies to discriminate specifically against Plaintiff. (Compl. ¶ 62.) Such naked assertions plainly fail to sufficiently plead a discrimination claim. As a result, to seemingly cure this deficiency, Plaintiff substantially relies on state court's opinion in *Swiller v. Lecuona*, 56 Misc. 3d 1218(A) (N.Y. Sup. Ct. Westchester Cty. Aug. 16, 2017), to point to a "clear difference in how applicable time periods for filing Petitions were applied to candidates" other than Plaintiff. (Pl. Opp. 9.) The Court disagrees.

In *Swiller*, the respondents had filed a four-volume petition with cover sheets designating them as candidates in an upcoming Democratic Party primary election for the positions of Mayor and Common Council of the City of White Plains. 56 Misc. 3d 1218(A) at *1. Two days later, at the suggestion of a BOE member, the candidates re-filed the four petitions with amended cover sheets, this time providing (1) two volumes that listed all four candidates, (2) a volume listing only one candidate, and (3) volume listing the remaining three candidates. *Id.* at *1, *5. After BOE reviewed the designating petitions and accompanying objections, it concluded that the candidates had enough signatures to appear on the primary ballot. *Id.* at *1. The challenge to the amended cover sheets in *Swiller* related to whether the candidates could "unilaterally amend" them on the last day to file petitions after having filed the original cover sheets two days earlier. *Id.* at *5. Nothing in the *Swiller* opinion, however, suggests that the candidates filed their petitions *outside* of the statutorily prescribed timeframe detailed by N.Y.E.L. § 6-158 or that they were in anyway treated differently from Plaintiff during BOE's petition review process.[9] As such, the candidates in *Swiller* do not constitute similarly situated comparators for purposes of an Equal Protection violation.

[9]     If anything, the procedures reflected in *Swiller* appear consistent with what occurred in this case. As the *Swiller* opinion explains, BOE reviewed the objections filed against the candidates' designating petitions and, in turn, disqualified signatures as invalid. *Swiller*, 56 Misc. 3d 1218(A) at *1 ("Swiller and Walfish filed objections to the designating petitions with the Westchester County Board of Elections ("the Board"). The Board reviewed the objections and determined the Lecuona petitions contained 950 valid signatures, disqualifying 1,691 signatures as invalid."). This appears to be the same process that transpired with Plaintiff's Petitions upon the filing of her amended

cover sheet for the Petitions, notwithstanding Plaintiff's allegations of impropriety. (*See* Compl. ¶ 33.) The only difference is that, in *Swiller*, there were still enough valid signatures to allow the candidates to appear on the primary ballot. 56 Misc. 3d 1218(A) at *1.

**\*11** Plaintiff's discrimination claim also fails more fundamentally because she has not pleaded Defendants' intentional discrimination in their application of New York's otherwise facially neutral election law. Instead, Plaintiff merely contends, in conclusory fashion, that Lafayette "would not allow Plaintiff to exercise her constitutional and legal right to run for office free from discrimination." (Compl. ¶ 35.) Although Plaintiff claims that she was treated differently because she is of "West Indian" descent (Pl. Opp. 10), the complaint contains no allegations that suggest that this was a factor in any of the Defendants' decisions. Indeed, even factoring in Lafayette's historical disparagement of people of "West Indian" descent, the most charitable reading of Defendants complaint, as drafted, and its accompanying documents is that Defendants rejected Plaintiff's Petitions filed on March 19, 2019 because she failed to comply with N.Y.E.L. § 6-158—a "fatal defect" under the law—as opposed to some discriminatory purpose.[10] As such, the Court GRANTS Defendants' motion to dismiss Plaintiff's discrimination claims, without prejudice.

[10]    *See* N.Y.E.L. § 1-106(2) ("The failure to file any petition or certificate relating to the designation or nomination of a candidate for party position or public office or to the acceptance or declination of such designation or nomination within the time prescribed by the provisions of this chapter shall be a fatal defect.").

### 2. *Disparate Impact*

In addition to her discrimination claim under the First and Fourteenth Amendment, Plaintiff also brings a "disparate impact" claim under those same two Amendments. (Compl. ¶¶ 65-68.) The Court first notes that "First Amendment law does not recognize disparate impact claims." *United States v. Weslin*, 156 F.3d 292, 297 (2d Cir. 1998); *see also Incantalupo v. Lawrence Union Free Sch. Dist. No. 15*, 829 F. Supp. 2d 67, 74 (E.D.N.Y. 2010) ("[T]here is 'no disparate-impact theory in First Amendment law.' " (quoting *Terry v. Reno*, 101 F.3d 1412, 1419-20 (D.C. Cir. 1996); *United States v. Dinwiddie*, 76 F.3d 913, 923 (8th Cir. 1996))). Consequently,

like Plaintiff's discrimination claim, her disparate impact claim is properly analyzed solely under the Equal Protection clause.

Plaintiff's disparate impact claim, however, fails for the same reason as her discrimination claim: she has not established that Defendants' challenged conduct "was undertaken with discriminatory intent." *Brown v. City of Oneonta, N.Y.*, 221 F.3d 329, 338 (2d Cir. 2000) (citing *Washington v. Davis*, 426 U.S. 229, 239-41 (1976)). "Although [d]isproportionate impact is not irrelevant, to violate the Fourteenth Amendment the disproportionate impact must be traced to a purpose to discriminate on the basis of a [protected characteristic]." *Hayden v. Paterson*, 594 F.3d 150, 162-63 (2d Cir. 2010). As Plaintiff has not established a requisite discriminatory intent underlying any purported disparate impact, the Court GRANTS Defendants' motion to dismiss Plaintiff's disparate impact claim, without prejudice.

### C. Fourth Amendment Claim

Plaintiff asserts that Defendants violated the Fourth Amendment by "confiscating and then attempting to constructively and/or effectively destroy Plaintiff's valid Petitions." (Compl. ¶ 46.) Defendants retort that no Fourth Amendment seizure occurred, and that, in any event, retention of Plaintiff's Petitions that were filed in March was reasonable. (Defs. Mot. 11-12.) The Court agrees.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A 'seizure' of property ... occurs when 'there is some meaningful interference with an individual's possessory interests in that property.' " *Soldal v. Cook Cty., Ill.*, 506 U.S. 56, 61 (1992) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). A seizure can occur "even where privacy or liberty is not implicated." *Ostensen v. Suffolk Cty.*, 378 F. Supp. 2d 140, 147 (E.D.N.Y. 2005). Nevertheless, " 'reasonableness is [ ] the ultimate standard' under the Fourth Amendment." *Soldal*, 506 U.S. at 71 (internal citation omitted). "Determining the reasonableness of a seizure requires balancing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.' " *Kiyak v. Town of Fairfield*, No. 3:17-cv-1426(AWT), 2019 WL 2895640, at *3 (D. Conn. Mar. 25, 2019) (quoting *Scott v. Harris*, 550 U.S. 372, 3838 (2007)). And "[w]here ... an initial seizure of property was reasonable, defendants' failure to return [an] item[ ] does not, by itself,

state a separate Fourth Amendment claim of unreasonable seizure." *Shaul v. Cherry Valley-Springfield Cent. Sch. Dist.,* 363 F.3d 177, 187 (2d Cir. 2004).

**\*12** Here, when she went to BOE on March 19, 2019, Plaintiff knowingly submitted her Petitions outside the statutorily prescribed timeframe of April 1 to April 4, 2019. (*See* Compl. ¶ 18; *id.* Ex. II ("It is clear from the information on the cover sheet that the Candidate's Petitions were filed early.").) In opposing Defendants' motion, Plaintiff does not dispute this. (*See* Pl. Opp. 7-8.) Instead, Plaintiff's conclusory position—raised for the first time in her opposition—is that she submitted the Petitions because she was misled into thinking that BOE would review them. (*Id.* at 8, 10.) Plaintiff's complaint, however, does not explicitly allege misleading conduct or give rise to that inference. Although Plaintiff later learned that BOE "was planning on invalidating every petition" submitted on March 19, the complaint does not indicate that Defendants engaged in any impropriety to convince Plaintiff to go to BOE and part ways with her Petitions prior to April 1, 2019.

Plaintiff's contention that Defendants failed to return her Petitions, thereby unreasonably seizing them, also fails under a Fourth Amendment analysis. As Defendants note, and Plaintiff does not dispute, N.Y.E.L. prevents the removal of petitions "from the office of the board of elections for copying or any other purpose while in the custody, or under the supervision of a member or employee or employee of such board." *See* N.Y.E.L. § 3-220(6-a). Plaintiff cannot, therefore, credibly contend that Defendants' continued "seizure" of her Petitions was unreasonable. In fact, Defendants were seemingly acting consistent with New York law.

Finally, to the extent Plaintiff premises her Fourth Amendment seizure claim on purported "constructive[ ] and/ or effective[ ]" destruction of Plaintiff's valid petitions," Plaintiff has represented that she was able to "timely file an amended cover sheet for the Petitions on April 1, 2019." (Compl. ¶ 32). As she acknowledges in her opposition, at least implicitly, this timely filing "revive[d] her Designating Petition." (Pl. Opp. 6, 8.) Plainly, any purported "constructive destruction" is belied by Plaintiff's own factual representations. [11]

[11] Plaintiff claims that this case presents an issue of first impression because "[n]o cited cases deal[ ] with a situation where a Candidate is [misled] into handing over Petitions[ ] and then

not allowed, prior to any applicable deadline passing, to participate in the same process that other candidates used 2017 [a reference to the *Swiller* decision]." (Pl. Opp. 10.) However, as her complaint notes (Compl. ¶ 33), and Defendants observe (Defs. Reply 8), Plaintiff's failure to appear on the ballot related to objections to her Petitions that prevented her from meeting the election's signature requirement. As such, even assuming misleading conduct, Plaintiff provides no basis for this Court to conclude that her exclusion from the primary ballot was a Fourth Amendment violation.

In conclusion, even accepting all facts as true, the Court cannot conclude that Plaintiff has pled a Fourth Amendment claim that "raise[s] a right to relief above the speculative level." *See* ATSI *Commc'ns,* 493 F.3d at 98. The Court GRANTS Defendants' motion to dismiss Plaintiff's Fourth Amendment claim.

### III. Plaintiff's State Law Claims

In addition to her federal claims, Plaintiff also brings several causes of action under state law, namely civil theft, conversion, and spoliation. The Court preliminarily notes that Plaintiff's civil theft claim is duplicative of her conversion claim. *See* Smith Barney, Harris Upham & Co. Inc. v. Luckie, 245 A.D.2d 17, 19 (1st Dep't 1997) (noting that the "New York analogue" for civil theft is conversion). Moreover, although Plaintiff asserts a spoliation claim, New York does not recognize spoliation of evidence as an actionable tort. *See* Ortega v. City of New York, 9 N.Y.3d 69, 83 (2007) ("[W]e join the majority of jurisdictions to consider the issue and decline to recognize spoliation of evidence as an independent tort claim." (internal citation omitted)); *see also* Kamdem-Ouaffo v. Balchem Corp., No. 17-CV-2810 (KMK), 2018 WL 4386092, at \*18 (S.D.N.Y. Sept. 14, 2018) ("New York State law does not recognize an independent cause of action for spoliation."); Gardner v. Verizon Commc'ns, No. 16-CV-814 (RRM) (RML), 2018 WL 1513636, at \*1 (E.D.N.Y. Mar. 26, 2018) ("Spoliation is not a stand-alone cause of action in New York"). Accordingly, Plaintiff's only cognizable state cause of action is her conversion claim.

**\*13** The Court notes two issues that must be addressed related to this conversion claim. *First,* the Court will assess the impact of Plaintiff's failure to file a notice of claim as it relates to her conversion claim against BOE and the Individual Defendants in their official capacity. *Second,* because Plaintiff's federal claims are dismissed, there is a

question about whether this Court should retain jurisdiction over that conversion claim. 28 U.S.C. § 1367(c)(3).

### A. Plaintiff's Failure to File a Notice of Claim

Under New York law, a notice of claim is a condition precedent to bringing a tort lawsuit against a municipal corporation, or any of its officers, agents, or employees. N.Y. Gen. Mun. Law §§ 50-e(1), 50-i(1); *see Parise v. N.Y.C. Dep't of Sanitation*, 306 F. App'x 695, 697 (2d Cir. 2009); *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999). The "[n]otice of claim requirements are construed strictly by New York state courts, and failure to abide by their terms mandates dismissal of the action for lack of subject-matter jurisdiction." *Tulino v. City of New York*, No. 15-CV-7106 (JMF), 2016 WL 2967847, at *3 (S.D.N.Y. May 19, 2016) (internal quotation marks omitted); *see Hardy*, 164 F.3d at 793-94 ("Notice of claim requirements are construed strictly by New York state courts. Failure to comply with these requirements ordinarily requires a dismissal for failure to state a cause of action.").

Here, Plaintiff concedes that she has not filed a notice of claim, such that conversion claim is seemingly subject to dismissal under New York law. (Pl. Opp. 13.) Plaintiff nevertheless argues that she may seek leave to serve a late notice of claim under New York General Municipal Law § 50-e(5), such that dismissal is not warranted. (*Id.*) It is true that, under Section 50-e(5), "[u]pon application, [a] court, in its discretion, may extend the time to serve a notice of claim." N.Y. Gen. Mun. Law § 50-e(5). However, New York's General Municipal Law has only vested the power to grant notice of claim extensions to the New York State supreme courts and county courts. *Id.* § 50-e(7). Federal courts are not authorized to grant such extensions. *See, e.g., Davis v. City of New York*, No. 12 Civ. 3297 (PGG), 2018 WL 10070540, at *13 (S.D.N.Y. Mar. 30, 2018) ("New York has given the power to extend deadlines for serving notice of claim to state supreme courts and county courts, and federal courts are not authorized to grant such extensions."); *Dayton v. City of Middletown*, 786 F. Supp. 2d 809, 824-25 (S.D.N.Y. 2011) ("[T]his Court lacks jurisdiction, pursuant to § 50–e(7), to deem Plaintiffs' 5/30/09 Amended Notice of Claim for their state law claims against Orange County timely filed, or to grant an extension of time to file a late notice of claim"). As Plaintiff has neither filed a notice of claim nor indicated that she has applied to any state or county court to file a late notice of claim, the Court GRANTS Defendants' motion to dismiss Plaintiff's conversion claim against BOE and the Individual Defendants in their official capacity. The claim is dismissed

without prejudice upon a showing that Plaintiff has obtained leave to file a late notice of claim.

### B. Supplemental Jurisdiction

Once a court dismisses a claim over which it had original jurisdiction, § 1367(c) provides for "an occasion to decline to exercise supplemental jurisdiction." *Catzin v. Thank You & Good Luck Corps.*, 899 F.3d 77, 83 (2d Cir. 2018). "Under this prong, in a great many cases, the evaluation will usually result in the dismissal of the state-law claims." *Id.* (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also Lievre v. JRM Constr. Mgmt., LLC*, No. 17-CV-4439 (BCM), 2019 WL 4572777, at *22 (S.D.N.Y. Sept. 20, 2019) ("In the 'usual case' in which 'all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine ... will point toward declining to exercise jurisdiction over the remaining state-law claims.")). Still, "the fact that a federal law claim has been eliminated prior to trial does not automatically render dismissal of state law claims appropriate." *See Colón v. N.Y.S. Dep't of Corrs. and Cmty. Supervision*, No. 15 Civ. 7432 (NSR), 2019 WL 5294935, at *11 (S.D.N.Y. Oct. 17, 2019). Instead, a court should assess whether exercising jurisdiction will promote "economy, convenience, fairness, and comity." *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004) (citation omitted); *Kolari v. N.Y. Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional values of judicial economy, convenience, fairness, and comity." (quoting *Cohill*, 484 U.S. at 350)).

**\*14** Here, this case has yet to proceed beyond the pleading stage. Moreover, discovery has yet to be taken in any form. Courts have regularly exercised their discretion to decline supplemental jurisdiction in similar situations. *See, e.g., Ruotolo v. Fannie Mae*, 933 F. Supp. 2d 512, 527 (S.D.N.Y. 2013) (declining to exercise supplemental jurisdiction where federal law claims were dismissed before trial upon defendants' motion to dismiss); *Dellutri v. Vill. of Elmsford*, 895 F. Supp. 2d 555, 575 (S.D.N.Y. 2012) ("[T]his case remains in its initial stages, and the Parties have not yet proceeded to discovery. As all of Plaintiff's federal claims have been dismissed, the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims."); *Williams v. Berkshire Fin. Grp.*, Inc., 491 F. Supp. 2d 320, 329 (E.D.N.Y. 2007) (declining to supplemental jurisdiction where, inter alia, the "case ha[d] not progressed beyond the pleading stage[,] [n]o discovery has been taken[, and] [t]he parties ha[d] no investment in th[e] [c]ourt beyond the instant

2020 WL 1699985

motions [to dismiss].")". On balance, the considerations of judicial economy, fairness, and comity militate in favor of this Court declining to exercise supplemental jurisdiction at this time. The Court GRANTS Defendants' motion to dismiss Plaintiff's conversion claim against the Individual Defendants, without prejudice. [12]

[12]   Because the Court declines supplemental jurisdiction over the conversion claims, it will decline to adjudicate it on its merits. *See Monzert v. United Secrutiy, Inc.*, CV 14-3274, 2016 WL 3538368, at *1 n.3 (E.D.N.Y. June 21, 2016) ("Since the Court declines to exercise supplemental jurisdiction, it declines to comment or rule on the merits of Defendant's argument that Plaintiffs have failed to state a breach of contract claim."). The Court, however, notes that much of the same reasoning underlying the dismissal of Plaintiff's Fourth Amendment claim would be relevant to an analysis of Plaintiff's conversion claim. *See Okyere v. Palisades Collection, LLC*, 961 F. Supp. 2d 522, 534 (S.D.N.Y. 2013) ("To make out a claim for conversion, a plaintiff must show '(1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights.' 'Where possession of property is initially lawful, conversion occurs when there is a refusal to return the property upon demand.' " (internal quotations and citations omitted)).

**IV. Leave to Amend**

It is within the Court's discretion to *sua sponte* grant leave to amend. *See Grain Traders, Inc. v. Citibank, N.A.*, 160 F.3d 97, 106 (2d Cir. 1998); *Witkowich v. Gonzales*, 541 F. Supp. 2d 572, 590 (S.D.N.Y. 2008). To this end, under Federal Rule of Civil Procedure 15(a)(2), courts "should freely give leave" to amend a complaint "when justice so requires." When exercising this discretion, courts will consider many factors, including undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies, undue prejudice to the

opposing party, and futility. *Local 802, Associated Musicians of Greater N.Y. v. Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Here, the Court will grant Plaintiff leave to file an amended complaint as to those claims not dismissed with prejudice. Specifically, it is the Court's view that, notwithstanding the above explained deficiencies, Plaintiff could potentially plead facts that cure her complaint's defects. To be sure, Plaintiff has high hurdles to overcome. Nevertheless, the Court concludes that granting leave to amend in this case would not necessarily be futile at this juncture. Furthermore, as this case is still in its infancy, there would be minimal prejudice to Defendants in permitting an amendment at this time. The Court reminds Plaintiff that her amended complaint must comport with this Court's Opinion and Order.

**CONCLUSION**

For the foregoing reasons, Defendants' motion is GRANTED. Plaintiff, however, is granted leave to file an amended complaint as to any claims that have not been dismissed with prejudice. If she chooses to do so, Plaintiff will have until May 29, 2020 to file her amended complaint. Defendants are then directed to answer or otherwise respond by July 13, 2020. Failure to file an amended complaint within the time allowed, and without good cause to excuse such failure, will result in the dismissal of Plaintiff's federal claims with prejudice and dismissal of her state law claims without prejudice so that she may re-file in state court.

**\*15**   The Court respectfully directs the Clerk of the Court to terminate the motion at ECF No. 32.

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 1699985

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 10070540
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Tyre DAVIS, Plaintiff,
v.
The CITY OF NEW YORK, Police Officers
Joseph Murphy, Jose Ocasio, and John
Doe 1 & 2, Shield Numbers Unknown,
all of the 46 Precinct, Defendants.

12 Civ. 3297 (PGG)
|
Signed 03/30/2018

**Attorneys and Law Firms**

Steven H. Goldman, Steven Goldman Attorney at Law,
Bronx, NY, for Plaintiff.

Stephen Lloyd Drummond, Drummond & Squillance, PLLC,
Jamaica, NY, JoAnn Squillace, Drummond & Crawford, P.C.,
Queens Village, NY, for Defendant Police Officer Joseph
Murphy.

Mitchell Garber, Douglas LaBarbera, John William Burns,
Worth, Longworth & London, LLP, New York, NY, for
Defendant Police Officer Jose Ocasio.

**ORDER**

PAUL G. GARDEPHE, U.S.D.J.:

**\*1** This is a Section 1983 case in which Plaintiff Tyre Davis
claims that he was assaulted by two New York City Police
Department ("NYPD") officers – Defendants Joseph Murphy
and Jose Ocasio – on February 17, 2011. The Complaint
alleges a Section 1983 excessive force claim against Murphy
and Ocasio; a Monell claim against the City of New York
(the "City"); a negligence claim against all Defendants; and
battery and intentional infliction of emotional distress claims
against Murphy and Ocasio. (Cmplt. (Dkt. No. 1)) The City
has moved for summary judgment on all claims against it.
(Mots. (Dkt. Nos. 90, 97)) For the reasons stated below, the
City's motion will be granted.

**BACKGROUND**

**I. FACTUAL BACKGROUND** [1]

[1]
To the extent that this Court relies on facts
drawn from a party's Local Rule 56.1 statement,
it has done so because the opposing party has
either not disputed those facts or has not done
so with citations to admissible evidence. See
Giannullo v. City of New York, 322 F.3d 139,
140 (2d Cir. 2003) ("If the opposing party ...
fails to controvert a fact so set forth in the
moving party's Rule 56.1 statement, that fact will
be deemed admitted." (citations omitted)). Where
Plaintiff disputes the City's characterization of
cited evidence, and has presented an evidentiary
basis for doing so, the Court relies on Plaintiff's
characterization of the evidence. See Cifra v. Gen.
Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court
must draw all rational factual inferences in non-
movant's favor in deciding summary judgment
motion). Unless otherwise indicated, the facts cited
by the Court are undisputed.

On February 17, 2011, Plaintiff Tyre Davis and several others
were arrested by three NYPD officers – including Officer
Jose Ocasio – for blocking a sidewalk outside 240 East 180th
Street. (Def. R. 56.1 Stmt. (Dkt. No. 100) ¶ 4; Pltf. R. 56.1
Counterstmt. (Dkt. No. 121) ¶ 4; Ocasio Dep. (Dkt. No. 98-3)
at 7, 12, 16) [2] Ocasio brought Plaintiff to the 46th Precinct so
that a Desk Appearance Ticket could be issued to him, (Def.
R. 56.1 Stmt, (Dkt. No. 100) ¶ 5; Pltf. R. 56.1 Counterstmt.
(Dkt. No. 121) ¶ 5; Davis Dep. (Dkt. No. 98-2) at 8-12)
Plaintiff was placed in a holding cell. (Def. R. 56.1 Stmt. (Dkt.
No. 100) ¶ 6; Pltf. R. 56.1 Counterstmt. (Dkt. No. 121) ¶ 6)

[2]
The page numbers of documents referenced in this
Order correspond to the page numbers designated
by this District's Electronic Case Filing system.

After Plaintiff's name was called for issuance of the Desk
Appearance Ticket, he saw Officer Joseph Murphy. (Davis
Dep. (Dkt. No. 98-2) at 12) Murphy had arrested Plaintiff on
February 12, 2011 [3] – five days earlier – and had allegedly
slapped Plaintiff in the face while he was handcuffed in the
back of a patrol car. (Def. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 6-7;
Pltf. R. 56.1 Counterstmt. (Dkt. No. 121) ¶¶ 6-7; Davis Dep.
(Dkt. No. 98-2) 4-6) When Murphy saw Plaintiff, Murphy
said, "you're the kid I smacked." (Def. R. 56.1 Reply (Dkt. No.

103) ¶ 27; Davis Dep. (Dkt. No. 98-2) at 13) Murphy asked Plaintiff if he wanted Murphy's badge number, and Plaintiff responded that he already had it. (Davis Dep. (Dkt. No. 98-2) at 13; Def. R. 56. 1 Reply (Dkt. No. 103) ¶ 28) Murphy then took off his badge and hit Plaintiff in the face with it two to four times. (Davis Dep. (Dkt. No. 98-2) at 13-14; Def. R. 56. 1 Reply (Dkt. No. 103) ¶ 28)

3       The record does not reflect why Davis was arrested.

 **\*2** Other officers then intervened to separate Plaintiff and Murphy. (Def. R. 56.1 Reply (Dkt. No. 103) ¶ 29; Davis Dep. (Dkt. No. 120-14) at 3) At the front desk, an officer pushed Plaintiff against a radiator. (Def. R. 56.1 Reply (Dkt. No. 103) ¶ 29; Davis Dep. (Dkt. No. 120-14) at 4) He was then thrown out of the precinct. (Def. R. 56.1 Reply (Dkt. No. 103) ¶ 29; Davis Dep. (Dkt. No. 120-14) at 4) An officer threw Plaintiff's property and Desk Appearance Ticket out of the precinct, and Plaintiff picked up his things and began to walk home. (Def. R. 56.1 Reply (Dkt. No. 103) ¶ 30; Davis Dep. (Dkt. No. 120-14) at 5-7)

Shortly after Plaintiff started walking home, he noticed Ocasio and Murphy following him. (Def. R. 56.1 Stmt. (Dkt. No. 100) ¶ 10; Pltf. R. 56.1 Counterstmt. (Dkt. No. 121) ¶ 10; Davis Dep. (Dkt. No. 98-2) at 18-20) Plaintiff stopped and turned toward the officers, and Murphy placed his hand on Plaintiff's back and guided him into an alley. (Def. R. 56.1 Stmt. (Dkt. No. 100) ¶¶ 11-12; Pltf. R. 56.1 Counterstmt. (Dkt. No. 121) ¶¶ 11-12; Davis Dep. (Dkt. No. 98-2) at 25-26; Murphy Dep. (Dkt. No. 98-4) at 6-7) 4

4       Murphy testified that he "put [his] hand on Mr. Davis and pushed him in the direction of the wall[,] at which time[ ] [he] thought that Ocasio was going to do a search on him." (Murphy Dep. (Dkt. No. 98-4) at 6) Davis testified that "[o]ne of the officers put their hand out to guide me to the side" (see Davis Dep. (Dkt. No. 98-2) at 25), and that the officer made contact with "[t]he side of [his] back." (Id.)

"In the alley, [Plaintiff] was assaulted by Officers Ocasio and Murphy." (Def. R. 56.1 Stmt. (Dkt. No. 100) ¶ 13; Pltf. R. 56.1 Counterstmt. (Dkt. No. 121) ¶ 13) The incident was captured by a security camera. (Def. R. 56.1 Stmt. (Dkt. No. 100) ¶ 15; Pltf. R. 56.1 Counterstmt. (Dkt. No. 121) ¶ 15; Davis Dep. (Dkt. No. 98-2) at 28) 5 Ocasio initially testified that Murphy smacked Plaintiff with an open hand at least once

and kicked him. (Ocasio Dep. (Dkt. No. 98-3) at 21) Ocasio then punched Plaintiff, kicked him, and then told him "to get out of here and you're lucky I don't arrest you." (Id. at 22-23) After reviewing the video of the incident, Ocasio testified that the beating proceeded as follows: Murphy pushed Plaintiff; Ocasio punched him; Murphy then kicked and kneed him; Ocasio kicked him; and Murphy then kicked Davis again and slapped him. (Id. at 24-29) The two officers left Plaintiff on the ground and walked away. (Def. R. 56.1 Stmt. (Dkt. No. 100) ¶ 14; Pltf. R. 56.1 Counterstmt. (Dkt. No. 121) ¶ 14; Davis Dep. (Dkt. No. 98-2) at 27)

5       The security camera video is not in the record.

Plaintiff was treated at Bronx Lebanon Hospital for contusions, abrasions, swelling and tenderness, and a cut on his forehead. (Def. R. 56.1 Reply (Dkt. No. 103) ¶ 31; Davis Dep. (Dkt. No, 120-14) at 8-10) He was seventeen years old at the time of the assault. (Def. R. 56.1 Reply (Dkt. No. 103) ¶ 32; Cmplt. (Dkt. No, 1) ¶ 1)

Ocasio and Murphy were suspended from the NYPD and charged with Assault in the Third Degree, Official Misconduct, and Harassment in the Second Degree. (Def. R. 56.1 Stmt. (Dkt. No. 100) ¶ 16; Pltf. R. 56.1 Counterstmt. (Dkt. No. 121) ¶ 16; Ocasio Dep. (Dkt. No. 98-3) at 3; Murphy Dep. (Dkt. No. 98-4) at 3) Ocasio and Murphy proceeded to trial and were found guilty of Attempted Assault and Harassment. (Def. R. 56.1 Stmt. (Dkt. No. 100) ¶ 17; Pltf. R. 56.1 Counterstmt. (Dkt. No. 121) ¶ 17; Murphy Dep. (Dkt. No. 98-4) at 3) Officer Murphy was terminated by the NYPD, while Ocasio chose to retire before his departmental trial. (Def. R. 56.1 Stmt. (Dkt. No. 100) ¶ 18; Pltf. R. 56.1 Counterstmt. (Dkt. No. 121) ¶ 18; Murphy Dep. (Dkt. No. 98-4) at 5; Ocasio Dep. (Dkt. No. 98-3) at 4-6)

 **\*3** Prior to this incident, no force or violence complaints had ever been lodged against Ocasio. (Def. R. 56.1 Stmt. (Dkt. No. 100) ¶ 19; Pltf. R. 56.1 Counterstmt. (Dkt. No. 121) ¶ 19; Fudim Decl. (Dkt. No. 98) ¶ 10) Force complaints had been lodged against Murphy, but none were substantiated. (Def. R. 56.1 Stmt. (Dkt. No. 100) ¶ 20; Pltf. R. 56.1 Counterstmt. (Dkt. No. 121) ¶¶ 20, 44; Def. R. 56.1 Reply (Dkt. No. 103) ¶ 44; Fudim Decl., Ex. R. (Dkt. No. 102-2) at 1 (the one substantiated complaint against Murphy involved a failure "to make activity log entries regarding his participation in a stop and arrest"))

## II. PROCEDURAL HISTORY

Plaintiff did not file a timely Notice of Claim under New York General Municipal Law § 50-i(1). (Def. R. 56.1 Stmt. (Dkt. No. 100) ¶ 2; Pltf. R. 56.1 Counterstmt. (Dkt. No. 121) ¶ 2) Plaintiff filed a Petition to File a Late Notice of Claim in Supreme Court of the State of New York, Bronx County, on July 21, 2011. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 121) ¶ 1; Def. R. 56.1 Reply (Dkt. No. 103) ¶ 1) Plaintiff's Petition was denied on September 7, 2011. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 121) ¶ 4; Def. R. 56.1 Reply (Dkt. No. 103) ¶ 4) Plaintiff filed a second Petition to File a Late Notice of Claim on December 23, 2011. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 121) ¶ 5; Def. R. 56.1 Reply (Dkt. No. 103) ¶ 5; Goldman Decl, Ex. G (Dkt. No. 120-8) at 1-9) On April 7, 2015, this Petition was dismissed without prejudice. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 121) ¶ 7; Def. R. 56.1 Reply (Dkt. No. 103) ¶ 7; Goldman Decl., Ex. F (Dkt. No. 120-3) at 1)

The Complaint in this action was filed on April 26, 2012. (See Cmplt. (Dkt. No. 1)) On October 1, 2013, this Court stayed the case pending the resolution of the criminal case against Ocasio and Murphy and an NYPD Internal Affairs Bureau investigation. (Order (Dkt. No. 29)) The stay was lifted on July 7, 2015. (Order (Dkt. No. 37)) After the completion of discovery, the City moved for summary judgment on all claims against it. (Mots. (Dkt. Nos. 90, 97))

**DISCUSSION**

**I. LEGAL STANDARDS**

**A. Summary Judgment Standard**

Summary judgment is warranted where the moving party shows that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is considered material "if it 'might affect the outcome of the suit under the governing law,' " and a dispute about an issue of fact genuine "where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986)); see also Beyer v. Cty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (same).

Where the non-moving party will bear the burden of proof at trial, the moving party can satisfy his burden under Rule 56 " 'if he can point to an absence of evidence to support an essential element of the nonmoving party's claim.' " Goenaga v. Mar. of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d

Cir. 1995) (citing Celotex Corp. v. Caltrett, 477 U.S. 317, 322-23 (1986)). Accordingly, to defeat a motion for summary judgment, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial.' " Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (emphasis omitted)); Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993) (The nonmoving party "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." (citations omitted)).

**\*4** In deciding a summary judgment motion, the Court " 'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.' " Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (internal quotation marks and citation omitted)). The "district court is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." Weyant v. Okst, 101 F.3d 845, 854 (2d Cir. 1996) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)). However, "mere conclusory allegations or denials ... 'cannot by themselves create a genuine issue of material fact where none would otherwise exist.' " Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).

**B. _Monell_ Liability**

"[A] municipality cannot be held liable under § 1983 on a respondeat superior theory." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694. Accordingly, "[t]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007).

A plaintiff can satisfy the "policy or custom" requirement in one of four ways. The plaintiff may prove:

"(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a super-vising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees."

Vasquez v. Rockland Cty., 15 Civ. 8912 (KMK), 2017 WL 456473, at *4 (S.D.N.Y. Feb. 1, 2017) (quoting Brandon v. City of New York, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010)).

Here, Plaintiff proceeds on two theories: (1) failure to train and supervise officers as to the use of force; and (2) failure to discipline officers who have used excessive force. (See Pltf. Opp. Br. (Dkt. No. 119) at 4)

As to Plaintiff's failure to train and supervise theory, "[c]ourts have been skeptical of municipal liability claims predicated on an alleged failure to train, with the Supreme Court admonishing lower courts that '[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.' " Rodriguez v. City of New York, 16 Civ. 744 (KPF), 2018 WL 1276831, at *15 (S.D.N.Y. Mar. 5, 2018) (quoting Connick v. Thompson, 563 U.S. 51, 61 (2011)). Even so, "[a] municipality may nonetheless be deliberately indifferent, and thus liable, where 'city policy makers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights.' " Id. (quoting Connick, 563 U.S. at 61). Further, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Connick, 563 U.S. at 62 (quoting Board. of Cty. Comm'rs v. Brown, 520 U.S. 397, 408 (1997)). [6] " '[D]eliberate indifference' is a stringent standard of fault, [however,] requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Id. at 61 (quoting Board of Cty. Comm'rs, 520 U.S. at 410).

[6]   Proof of such a pattern is not necessary where "the unconstitutional consequences of failing to train could be so patently obvious that a city

should be liable under § 1983 without proof of a pre-existing pattern of violations." Connick, 563 U.S. at 64; see City of Canton v. Harris, 489 U.S. 378, 390 n.10 (1989) (pattern not necessary where, "[f]or example, city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force, see Tennessee v. Garner, 471 U.S. 1 (1985), can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights."); Chamberlain v. City of White Plains, 986 F. Supp. 2d 363, 391-92 (S.D.N.Y. 2013) (collecting cases where single-incident theory was supported, including where police officers received no training as to handling exculpatory evidence, jail personnel lacked any training on providing proper medical care to inmates, and jail employees had no training as to inmates who needed immediate medical attention). Plaintiff does not proceed on such a theory here. (See Pltf. Opp. Br. (Dkt. No. 119) at 17-18).

**\*5** "To establish 'deliberate indifference,' a plaintiff must show that [i] a policymaker knows 'to a moral certainty' that city employees will confront a particular situation; [ii] the situation either presents the employee with 'a difficult choice of the sort that training or supervision will make less difficult' or 'there is a history of employees mishandling the situation'; and [iii] 'the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.' " Wray, 490 F.3d at 195-96 (quoting Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992)). Plaintiff must also "establish not only that the officials' purported failure to train occurred under circumstances that could constitute deliberate indifference, but also that plaintiffs identify a specific deficiency in the city's training program and establish that that deficiency is 'closely related to the ultimate injury,' such that it 'actually caused' the constitutional deprivation." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 129 (2d Cir. 2004) (quoting City of Canton v. Harris, 489 U.S. 378, 391 (1989)).

As to failure to discipline, " '[a] municipality may be found to have a custom that causes a constitutional violation' if the city has been 'faced with a pattern of misconduct,' but 'does nothing, compelling the conclusion that [it] has acquiesced

in or tacitly authorized its subordinates' unlawful actions.' " Whitfield v. City of Newburgh, 8 Civ. 8516 (RKE), 2015 WL 9275695, at *28 (S.D.N.Y. Dec. 17, 2015) (quoting Okin v. Vill. of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 439 (2d Cir. 2009) (citations and internal quotation marks omitted)). "Such a claim requires evidence that [a city's] 'response to complaints of use of excessive force by [c]ity police officers was uninterested and superficial,' Fiacco v. City of Rensselaer, 783 F.2d 319, 331 (2d Cir. 1986), or of a 'persistent failure to discipline subordinates who violate civil rights.' Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983)." Perry v. Cty. of Westchester, 9 Civ. 9391 (NRB), 2011 WL 5978544, at *5 (S.D.N.Y. Nov. 29, 2011).

The Second Circuit recently stated that "a municipal policy of deliberate indifference to the use of excessive force by police officers may be shown by evidence that the municipality had notice of the use of such force but repeatedly failed to make any meaningful investigation into such charges. Thus, Monell liability, by its nature, will often turn on evidence concerning victims other than the plaintiffs and alleged misfeasors other than the individual defendants." Outlaw v. City of Hartford, 884 F.3d 351, 380 (2d Cir. 2018); Ricciuti v. N.Y.C. Transit Auth., 941 F.2d at 123; Fiacco v. City of Rensselaer, 783 F.2d at 326). Similarly, "a failure to investigate incidents of force, and by extension, a failure to discipline officers for use of excessive force, can amount to an actionable policy under § 1983 when such failure evidences 'deliberate indifference' to the rights of persons with whom the police come into contact." Moses v. Westchester Cty. Dep't of Corr., 10 Civ. 9468 (ER), 2017 WL 4386362, at *16 (S.D.N.Y. Sept. 29, 2017).

### C. State Law Notice of Claim Requirement

"Section 50-e [of the New York General Municipal Law] requires that a Notice of Claim be filed within ninety days of the incident giving rise to the claim." Horvath v. Daniel, 423 F. Supp. 2d 421, 423 (S.D.N.Y. 2006) (citing N.Y. Gen. Mun. Law § 50-i). "The burden is on the plaintiff to demonstrate compliance with the Notice of Claim requirement." Id. (citing Rattner v. Planning Comm'n of Vill. of Pleasantville, 156 A.D.2d 521, 526 (2d Dep't 1989)).

"Notice of claim requirements are construed strictly by New York state courts. Failure to comply with these requirements ordinarily requires a dismissal for failure to state a cause of action." Faruki v. City of New York, 10 Civ. 9614 (LAP), 2012 WL 1085533, at *9 (S.D.N.Y. Mar. 30, 2012), aff'd, 517 F. App'x 1 (2d Cir. 2013). " 'Filing a notice of claim

is a mandatory condition precedent to suit against the City and its employees; failure to comply with the notice of claim warrants dismissal.' " Id. (quoting Pettus v. City of New York, 10 Civ. 1442 (CBA) (JO), 2011 WL 4458901, at *11 (E.D.N.Y. Aug. 23, 2011), report and recommendation adopted, 10 Civ. 1442 (CBA), 2011 WL 4440209 (E.D.N.Y. Sept. 23, 2011)).

### II. *MONELL* CLAIM PREMISED ON FAILURE TO TRAIN AND SUPERVISE, AND FAILURE TO DISCIPLINE

**\*6** As discussed below, Plaintiff's Monell claim premised on a failure to train and/or supervise fails for numerous reasons. Plaintiff has not shown, inter alia, (1) a pattern of excessive force by NYPD officers; (2) that the City was on notice that its training and supervision were deficient; or (3) that Ocasio and Murphy were presented with a "difficult decision" that more training or supervision would have rendered less difficult. As to Plaintiff's failure to discipline theory, Plaintiff has not offered evidence that the NYPD's disciplinary policies demonstrate deliberate indifference to officers' use of excessive force.

### A. Whether There is a Pattern of Excessive Force

In order for Plaintiff to succeed on his failure to train and failure to discipline theories, there must be a pattern of similar misconduct. See Connick, 563 U.S. at 62 ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." (quoting Board of Cty. Comm'rs, 520 U.S. at 409)); Reynolds v. Giuliani, 506 F.3d 183, 192 (2d Cir. 2007) ("Monell's policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions.").

The City contends that there is no pattern of similar acts of criminal misconduct, and no evidence of

> a history of officers unjustifiably
> assaulting out-of-custody persons. In
> fact, plaintiff did not point to a single
> similar incident in his complaint,
> nor did he even seek, let alone

obtain discovery regarding[,] similar incidents by other officers.

(Def. Br. (Dkt. No. 99) at 11)

In response, Plaintiff cites two government reports aggregating data concerning use of force – a 2010 Annual Report issued by the Civilian Complaint Review Board (the "2010 CCRB Report"),[7] and a 2015 Report issued by the New York City Department of Investigation, Office of the Inspector General for the NYPD (the "2015 OIG Report"). (Pltf. Br. (Dkt. No. 119) at 9-12, 20-21)

[7]     According to the 2010 CCRB Report, the CCRB is an "independent agency ... empowered to receive, investigate, hear, make findings and recommend action on complaints against New York City police officers alleging the use of excessive or unnecessary force, abuse of authority, discourtesy or the use of offensive language. The Board's investigative staff, composed entirely of civilian employees, conducts investigations in an impartial fashion. The Board forwards its findings to the Police Commissioner." (Goldman Decl., Ex. L (Dkt. No. 120-12) (CCRB Report), Preface)

The 2010 CCRB Report indicates that in 2010, 6,476 complaints were lodged against officers, and there were 4,184 allegations against officers involving physical force. (Goldman Decl., Ex. L (Dkt. No. 120-12) (2010 CCRB Report) at 4-5)[8] 550 allegations against officers were "substantiated" by the CCRB in 2010,[9] 54 of which were related to the use of force. (Id. at 12) In total, the CCRB forwarded 260 substantiated complaints against 377 police officers to the NYPD. (Id. at 16) The data in the 2010 CCRB Report is not limited to use of force allegations – the Report addresses all types of complaints lodged against officers. (See id. at 5-6)

[8]     A single complaint may have multiple allegations. (See id. at 5)

[9]     According to the 2010 CCRB Report, "[a]fter a full investigation, if the Board finds misconduct in one or more of the allegations, then the complaint is deemed substantiated. Cases in which no allegation is substantiated are either deemed exonerated, unfounded, or unsubstantiated. In relatively few

cases, the officers are unidentified, or the officer is no longer a member of the NYPD." (Id. at 11)

**\*7** The 2015 OIG Report – entitled "Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices", focuses only on substantiated complaints and allegations related to the use of force. (Id., Ex. M (Dkt. No. 120-13) (2015 OIG Report), Preface) That report states that the "CCRB substantiated 207 allegations of force in 179 cases between 2010 and 2014, a notably modest number, given the size of the NYPD, and a positive indication of the NYPD's restraint." (Id. at 3) Of these allegations, 137 related to physical force. (Id. at 12) In 2010 and 2011, the CCRB substantiated 12 and 24 complaints involving physical force, respectively. (Id. at 13 fig. 2)[10]

[10]     The 2015 OIG Report indicates that the CCRB substantiated 22 complaints involving use of force in 2010 (Id., Ex. M (Dkt. No. 120-13) (2015 OIG Report) at 13 fig. 2), while the 2010 CCRB Report indicates that the CCRB substantiated 54 use of force allegations against officers in 2010. (Id., Ex. L (Dkt. No. 120-12) (2010 CCRB Report) at 12) These numbers are not inconsistent, as a single complaint may contain multiple use of force allegations.

Neither of these reports demonstrates a pattern of excessive physical force. As this Court stated in Dixon v. City of New York, 14 Civ. 4930 (PGG), 2017 U.S. Dist. LEXIS 119042 (S.D.N.Y. July 27, 2017),

accepting the findings of the OIG Report, for the period 2010 through March 2011, there were approximately 18 substantiated cases of excessive force. Given that in 2011 the NYPD had nearly 35,000 uniformed officers, Crime in the United States: 2011, DOJ, Criminal Justice Information Services Division, https://ucr.fbi.gov/crime-in-the-u.s/2011/crime-in-the-u.s.-2011/ tables/table-78-state-cuts-2011/ table_78_full-time_law_enforcement_employees_new_york_by_city_2011. (last visited July 26, 2017), 18 substantiated cases of excessive force over a fifteen-month period is not sufficient to (1) have put the City on

notice that its police force was engaged in a pattern or practice of using excessive force against arrestees; or (2) demonstrate that the NYPD's use of excessive force had become a "custom or practice."

Id. at *32-33 (footnote omitted).

This analysis applies with equal force here: the number of instances of excessive physical force do not suggest a pattern. See also Boddie v. City of New York, 15 Civ. 4275 (GHW), 2016 WL 1466555, at *2 n. 2 (S.D.N.Y. Apr. 13, 2016) ("In this case, the [OIG] Report attached to the complaint examined '207 allegations of force in 179 cases between 2010 and 2014,' which the [OIG] Report itself characterizes as 'a notably modest number, given the size of the NYPD.' The facts alleged by [Plaintiff] – consisting only of the allegations surrounding [his arrest] and the [OIG] Report – are insufficient to support a 'custom or practice' Monell claim." (internal citations omitted)); Delorbe-Bell v. City of New York, 15 Civ. 2344 (LGS), 2016 WL 1451581, at *3 (S.D.N.Y. Apr. 12, 2016) ("Plaintiff's attempts to establish Monell liability through the use of the OIG report are unavailing, as the report's findings – standing alone – are insufficient to create a plausible inference of the City's deliberate indifference. The OIG Report concludes that the 207 substantiated allegations of excessive force between 2010 and 2014 represent 'a relatively modest number, given the size of the NYPD, and a positive indication of the NYPD's restraint.' "). Because Plaintiff has not proffered evidence that raises a material issue of fact as to whether there is a pattern of excessive use of force by NYPD officers, Plaintiffs' failure to train and or supervise, and failure to discipline claims fail. [11]

[11]  Plaintiff also cites to a 2007 New York Civil Liberties Union report (the "2007 NYCLU Report") that relies on CCRB data from the 1994 to 2006 time period. (N.Y. CIVIL LIBERTIES UNION, MISSION FAILURE: CIVILIAN REVIEW OF POLICING IN NEW YORK CITY 2 (2007), http://www.nyclu.org/publications/report-mission-failure-civilian-review-of-policing-nyc-2007 (last visited Mar. 30, 2018) (the "NYCLU Report")) Even assuming arguendo that the data show that excessive force was a custom or policy during those years, the data are too stale

to demonstrate conditions as of February 2011. See Moses, 2017 WL 4386362, at *12 ("Where such a gap in time exists between findings in an official report and Plaintiff's allegations, the events are too disconnected in time and personnel to plausibly allege a policy, practice, or custom....").

**\*8**  Although proffering the 2010 CCRB Report and the 2015 OIG Report to the Court as evidence of a pattern of excessive force (see Pltf. Br. (Dkt. No. 119) at 9-12, 20-21), Plaintiff nonetheless contends that these reports are unreliable, because the CCRB review process is deficient, and does not capture all incidents of excessive force. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 121) ¶¶ 9-11; Pltf. Br. (Dkt. No. 119) at 21 ("[T]he reporting requirements regarding force incidents are not comprehensive."))

It is not enough, however, for Plaintiff to suggest that there might be instances of excessive force that are not captured in the 2010 CCRB and 2015 OIG reports. Plaintiff must come forward with evidence establishing a pattern of excessive force. Absent such evidence, Plaintiff has not met his burden to create a genuine issue of material fact as to whether there is a pattern of excessive force.

In Moses v. Westchester County Department of Correction, for example, an inmate claimed that a correction officer had used excessive force against him in 2000, and proffered a disciplinary log from the Westchester County Jail for the 1998 to 2002 time period showing that only two correction officers had been disciplined for the use of excessive force during this period. Moses, 2017 WL 4386362, at *13. The court rejected plaintiff's argument that this evidence demonstrated a pattern of excessive force:

> Plaintiff suggests that the fact that only two officers were disciplined for excessive force is itself evidence of an indifference to constitutional protections and a failure on the part of [defendants] to adequately discipline officers. That is, Plaintiff argues it is 'common knowledge' that force is regularly used at a jail with 1500 inmates and that use of force by correction officers would be a daily occurrence. However, to be entitled to make that inference, Plaintiff would need to show, at

minimum, some number of incidents of use of excessive force that were not prosecuted during that time. This he cannot do on this record without resorting to mere conjecture. Absent actual evidence that [defendants] had a pattern or practice of using excessive force or failure to discipline officers for inappropriate use of force during the time period in question, the Court can draw no such conclusion. Moreover, Plaintiff would need to present the factual bases and the context for the disciplinary actions listed in the log for the Court to draw any conclusions about a pattern or practice of excessive force.

Id.

Similarly here, Plaintiff cannot establish a pattern of excessive force by "mere conjecture" – he must present "actual evidence" that there was a pattern of excessive force in or about February 2011. See also Dettelis v. City of Buffalo, 3 F. Supp. 2d 341, 348 (W.D.N.Y. 1998) (challenge to policy regarding body cavity searches; held that "the burden is on plaintiff to demonstrate specific instances where a misdemeanor arrestee was unconstitutionally body-cavity-searched in order to demonstrate a 'custom' or 'policy' under Brown and Monell"). [12]

[12]    Murphy and Ocasio's disciplinary records do not support an inference that the City was deliberately indifferent to officers' use of excessive force. As noted above, there were no force or violence complaints against Ocasio before this incident. (Def. R. 56.1 Stmt. (Dkt. No. 100) ¶ 19; Pltf R. 56.1 Counterstmt. (Dkt. No. 121) ¶ 19) As to Murphy, although there were complaints against him alleging excessive use of force, none were substantiated. Under the circumstances here, the unsubstantiated complaints against Murphy do not provide a basis for a Monell claim against the City. See Torres v. City of New York, 4 Civ. 3311 (RWS), 2007 WL 1314622, at *1 (S.D.N.Y. May 3, 2007) ("[U]nsubstantiated CCRB complaints are generally insufficient to establish a Monell

claim ...."); Pacheco v. City of New York, 234 F.R.D. 53, 55 (E.D.N.Y. 2006) ("[I]t is doubtful whether unsubstantiated instances of any kind of misconduct can ever be used to prove a Monell claim."); Marcel v. City of New York, 88 Civ. 7017 (LLS), 1990 WL 47689, at *9 (S.D.N.Y. Apr. 11, 1990) ("Unsubstantiated CCRB reports do not demonstrate a breach of a municipality's duty to train or supervise its police.").

*9   In sum, Plaintiff has not established a pattern of misconduct similar to the incident at issue here. Accordingly, Plaintiff's failure to train and supervise, and failure to discipline theories fail. See Connick, 563 U.S. at 62 ("A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." (quoting Board of Cty. Comm'rs. 520 U.S. at 409)); Reynolds v. Giuliani, 506 F.3d 183, 192 (2d Cir. 2007) ("Monell's policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions.")

**B. Whether the City Was on Notice that Its Training and Supervision Were Deficient**

Plaintiff's failure to train and supervise theory also fails because there is no evidence that the City was on notice that its training and supervision of NYPD officers was deficient as of February 2011. Absent such notice, the City cannot be found to have been deliberately indifferent. See Rodriguez, 2018 WL 1276831, at *15 ("A municipality may ... be deliberately indifferent, and thus liable, where 'city policy makers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights.' " (quoting Connick, 563 U.S. at 61)).

The only evidence Plaintiff cites on this point is the 2015 OIG Report. The OIG Report was issued in October 2015, however, more than four years after the February 2011 incident at issue here. The 2015 OIG Report thus could not have put the City on notice that police officers were deficiently trained and supervised as to their use of force. See Boddie, 2016 WL 1466555, at *4 ("Even assuming that existing de-escalation training is deficient, [plaintiff] does not plausibly allege that the City was on actual or constructive notice that its de-escalation training was lacking at the time he was arrested. The [2015 OIG Report] recommending additional training was published months after Boddie's

Davis v. City of New York, Slip Copy (2018)

2018 WL 10070540

arrest....”); see also Dixon, 2017 U.S. Dist. LEXIS 119042, at *35-36 (applying the same reasoning).

In sum, Plaintiff has proffered no evidence that the City was on notice – in February 2011 – that its training and supervision regarding the use of force was deficient. Accordingly, Plaintiff's failure to train and supervise claim fails.

**C. Whether Ocasio and Murphy Were Presented With a Difficult Choice**

To establish Monell liability for a failure to train and supervise, inter alia, “the situation [must] either present[ ] the employee with ‘a difficult choice of the sort that training or supervision will make less difficult’ or ‘there [must be] a history of employees mishandling the situation.’ ” Wray, 490 F.3d at 195 (quoting Walker, 974 F.2d at 297 (2d Cir. 1992)).

Here, the City and Plaintiff agree that Ocasio and Murphy followed Plaintiff after he left the 46th Precinct on February 17, 2011; that the officers took him into an alley; and that the officers then assaulted him in the alley. (Pltf. R. 56.1 Counterstmt. (Dkt No. 121) ¶¶ 9-14) Ocasio and Murphy were prosecuted and found guilty of Attempted Assault and Harassment. (Id. ¶ 17) The City contends that the police officers' decision to commit these crimes is not the sort of “difficult choice” that gives rise to Monell liability. (See Def. Br. (Dkt. No. 99) at 10-11 (citing Noonan v. City of New York, 14 Civ. 4084 (LTS), 2015 WL 3948836, at *3 (S.D.N.Y. June 26, 2015) (“The decision to commit a sexual assault – a blatantly criminal act – cannot reasonably be seen as posing the type of ‘difficult choice’ contemplated by the Second Circuit in Walker.”)))

*10  Plaintiff argues, however, that

> encounters occurring during and following arrest “present the employee with a difficult choice of the sort that training or supervision will make less difficult.” Managing an emotionally charged policing encounter successfully – in order to de-escalate and, if possible, prevent a retaliatory response by the officer is exactly the type of behavior that training and supervision could and should address.

(Pltf. Opp. Br. (Dkt. No, 119) at 18) The decision about whether or not to assault Plaintiff did not present a “difficult choice,” however. As the Supreme Court has cautioned, “a municipality may not be held liable under § 1983 solely because it employs a tortfeasor.... We have consistently

refused to hold municipalities liable under a theory of respondeat superior.” Brown, 520 U.S. at 403. Making the City liable for police officers who commit unprovoked assaults and commit crimes such as those at issue here, however, would do just this. See Marquez v. Town of Dewitt 11 Civ. 750, 2015 WL 401023, at *5 (N.D.N.Y. Jan. 28, 2015) (“[T]here is no allegation in Plaintiff's pleadings that [court security officers] in the Town of DeWitt are likely to confront difficult choices involving civil rights while they supervise visitors in the courtroom gallery. There is no allegation that the officers in such a situation would have to use anything more than their common sense in deciding whether to remove individuals from the gallery.”); Kogut v. Cty. of Nassau, 6 Civ. 6695 (JS), 2012 WL 3704710, at *4 n.2 (E.D.N.Y. Aug. 27, 2012) (“[T]o the extent that Plaintiffs rely on the expert report to show that the County was deliberately indifferent to the need to train its detectives not to physically abuse suspects in pursuit of a confession, this type of misconduct is so beyond the pale that – absent notice to the contrary – the County was entitled to rely on a common sense assumption that its officers would not behave this way.”).

As discussed above, there is no evidence of a history of police officers committing unprovoked assaults and crimes of this nature. Because Ocasio and Murphy were not presented with a “difficult choice” that more training or supervision would have made less difficult, Plaintiff has not satisfied the second prong of a failure to train and supervise Monell claim.

**D. The NYPD's Disciplinary Policies Do Not Demonstrate Deliberate Indifference**

In support of his failure to discipline theory, Plaintiff relies on the same sources discussed above: the 2015 OIG Report, the 2010 CCRB Report, and the 2007 NYCLU Report. (See Pltf. R. 56.1 Counterstmt (Dkt. No. 121) (Dkt. No. 121) ¶¶ 10-14, 24-25; Pltf Opp. Br. (Dkt. No. 119) at 7-12) The City argues that these reports do not establish that the NYPD's disciplinary policies demonstrate deliberate indifference to officers' use of excessive force. (Def. Reply (Dkt. No. 101) at 6-9) This Court agrees.

**1. Overview of the Disciplinary Process**

After the CCRB forwards a substantiated complaint to the NYPD, three types of discipline may be imposed. “Instructions” – is “a non-punitive measure of discipline, which requires the subject officer to receive instruction

from their commanding officer on proper conduct and procedures with respect to any substantiated allegations. Sometimes the member is sent to the Police Academy for retraining." (Goldman Decl., Ex. M (Dkt. No. 120-13) (2015 OIG Report) at 48) Command Discipline "is a more serious but non-judicial punishment that will be adjudicated at an informal hearing by a commanding officer. The penalties range from a warning" to the loss of up to 10 vacation days. (Id.) Charges and Specifications are "the most serious disciplinary measure, which can be filed against an officer who commits serious misconduct. Charges and Specifications may result in an Official Department Trial prosecuted by the Department Advocate's Office ... or by CCRB's Administrative Prosecution Unit.... If an officer is found guilty of misconduct, the penalties may range from the forfeiture of vacation days to termination." (Id.)

**\*11** In 2010, the CCRB recommended that Charges be brought against 261 officers (69%); that Command Discipline be imposed on 74 (20%); that 19 officers (5%) receive Instructions; and that no discipline be imposed on 23 (6%). (Id., Ex. L (Dkt. No. 120-12) (2010 CCRB Report) at 16) That year, the NYPD disposed of complaints against 275 officers. (Id.) Command Discipline was imposed in *66* cases (24%); Instructions were given in 137 cases (50%); and no discipline was imposed on 48 cases (17%). In eleven cases, an officer was found not guilty after trial or the charges were dismissed; eleven officers were found guilty at trial or pleaded guilty. (Id.) In sum, the NYPD pursued some form of discipline in connection with 78% of complaints that the CCRB found were substantiated. (Id. at 17)

### 2. The 2015 OIG Report

The 2015 OIG Report states that the "NYPD frequently failed to impose discipline even when provided with evidence of excessive force." (Id., Ex. M (Dkt. No. 120-13) (2015 OIG Report) at 49) Between 2010 and 2015, no discipline was imposed in 35.6% of cases (37 out of 104) involving substantiated allegations of excessive force. (Id. at 49-50) In 62 out of 92 excessive force cases referred to the NYPD by the CCRB between 2010 and 2015 (67.4%), [13] the NYPD departed downward from CCRB's disciplinary recommendation or imposed no discipline. (Id. at 51)

[13]    The 2015 OIG Report excludes three allegations where the CCRB made no recommendation as to

discipline, and nine cases where an administrative judge recommended a "not guilty" disposition. (Id. at 49 n.75)

These data do not support a Monell claim based on a theory of failure to discipline for excessive force.

In Dixon v. City of New York, Plaintiff alleged that when she was arrested on March 15, 2011, she was grabbed, bear hugged around the waist, picked up into the air, and slammed down to the sidewalk. Dixon, 2017 U.S. Dist. LEXIS 119042, at *2-3. Relying on the 2015 OIG Report, she brought a Monell claim against the City alleging a failure to train and a failure to discipline. Id. at *23. In rejecting Dixon's Monell claim, this Court found that

> [w]hile the OIG Report suggests that – in one-third of these [approximately] 18 cases [of excessive physical force from January 2010 to March 2011], the circumstances of which are unknown – the NYPD chose to impose no discipline (OIG Report at 47-48), the numbers are too small to support an inference that the City was deliberately indifferent to the NYPD's use of excessive force. In any event, "the data from the [2015 OIG] report shows that the NYPD imposed discipline in the majority of cases where allegations of excessive force were substantiated." Delorbe-Bell, 2016 WL 1451581, at *3.

Id. at *33. Given that Murphy and Ocasio's assault on Plaintiff occurred on February 17, 2011 (Pltf. R. 56.1 Counterstmt. (Dkt. No. 121) (Dkt. No. 121) ¶ 4), the analysis in Dixon applies with equal force here. In sum, the 2015 OIG Report does not demonstrate that the NYPD has failed to discipline officers who use excessive force.

Similarly, in Delorbe-Bell v. City of New York, the court held that

> [w]ith respect to the failure to discipline claim, the data from the [2015 OIG Report] shows that the NYPD imposed discipline in the majority of cases where allegations of excessive force were substantiated. Of the 104 allegations reviewed in the report's review of the NYPD's disciplinary system, approximately one-third resulted in the officer receiving "the most serious disciplinary measure [that] can be filed against an officer." The frequency and severity of discipline described in the OIG Report undermine Plaintiff's assertion that "[t]he NYPD's failure to discipline officers who use force without justification is tantamount to deliberate indifference, because ... it is the same as the City tacitly endorsing this behavior."

**\*12** Delorbe-Bell, 2016 WL 1451581, at \*3. The reasoning in Delorbe-Bell likewise applies with equal force here.

### 3. The 2010 CCRB Report and 2007 NYCLU Report

Plaintiff argues that the 2007 NYCLU Report (and related testimony by NYCLU representatives before the City Council) and the 2010 CCRB Report demonstrate that the NYPD has been deliberately indifferent to officers' use of excessive force. (Pltf. Opp. Br. (Dkt. No. 119) at 7-10)

As to the NYCLU report and related testimony, as discussed above, these materials address data too remote in time to be probative here, The 2007 NYCLU Report is premised on data from the 1994 to 2006 time period, while the incident at issue here took place in February 2011. See N.Y. CIVIL LIBERTIES UNION, MISSION FAILURE: CIVILIAN REVIEW OF POLICING IN NEW YORK CITY 2 (2007), http://www.nyclu.org/publications/report-mission-failure-civilian-review-of-policing-nyc-2007 (last visited Mar. 30, 2018); Moses, 2017 WL 4386362, at \*12 (finding that where there was a six or seven year gap in time "between findings in an official report and [p]laintiff's allegations, the events are too disconnected in time and personnel to plausibly allege a policy, practice, or custom").

As to the 2010 CCRB report, Plaintiff notes that the CCRB substantiated 54 complaints related to the use of force in 2010. (See Goldman Decl., Ex. L (Dkt. No. 120-12) (2010 CCRB Report) at 12) The report states that,

> [i]n 2010, there was a notable change in the rate at which the Department declined to seek any discipline in substantiated CCRB complaints. In 2006, the Department declined to seek discipline in just 12 cases or 3%. By 2007, the rate grew considerably. In 2007, 2008, and 2009 the Department declined to seek discipline in 104, 88, and 71 cases (33%, 31%, and 27%), respectively, The trend reversed in 2010, with the Department declining to seek discipline in 48 cases (17%), a big drop from the prior three years.

(Id.) The Court concludes that these data do not demonstrate that the NYPD is deliberately indifferent to officers' use of excessive force. Indeed, the CCRB Report demonstrates that in 2010 – the year preceding the February 2011 incident at issue – the NYPD imposed discipline in 78% of the cases involving substantiated CCRB complaints. See Delorbe-Bell, 2016 WL 1451581, at \*3 (rejecting Monell claim premised on 2015 OIG Report; noting that "the NYPD imposed discipline in the majority of cases where allegations of excessive force were substantiated"; see also Dixon, 2017 U.S. Dist. LEXIS 119042, at \*33 (applying the same reasoning).

The 2010 CCRB Report also does not support an inference that the City has inadequately investigated allegations of excessive force. While the CCRB does not investigate a majority of complaints, the reasons for this are that "the civilian withdraws the complaint; the civilian cannot be located; the civilian is uncooperative; [or] the civilian is unidentified." (Goldman Deck, Ex. L (Dkt. No. 120-12) (2010 CCRB Report) at 11; see also N.Y. CIVIL LIBERTIES UNION, MISSION FAILURE: CIVILIAN REVIEW OF POLICING IN NEW YORK CITY 2 (2007), http://www.nyclu.org/publications/report-mission-failure-civilian-review-of-policing-nyc-2007 (last visited Mar. 30, 2018), at 10 ("[T]he CCRB truncates most complaints because the complainant cannot be contacted or because he or she is unable or unwilling to appear at the CCRB for an interview, the first step in an investigation.")) A decision not to investigate a complaint where the complainant is unable or unwilling to assist in the investigation does not raise an inference of "deliberate indifference" to officers' use of force. Moreover, although the substantiation rate for use of force complaints was only 2% in 2010 – approximately one-third of the overall rate of 6% (Goldman Deck, Ex. L (Dkt. No. 120-12) (2010 CCRB Report) at 12) – there is no reason to draw a negative inference from this data. The evidence shows that the CCRB investigates thousands of complaints and allegations against officers every year and regularly recommends sanctions to the NYPD. There is no "evidence that [the City's] 'response to complaints of use of excessive force by City police officers [is] uninterested and superficial,' Fiacco v. City of Rensselaer, 783 F.2d 319, 331 (2d Cir. 1986), [nor is there evidence] of a 'persistent failure to discipline subordinates who violate civil rights.' Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983)." Perry, 2011 WL 5978544, at \*5.

**\*13** To the extent Plaintiff's Monell claim is premised on a failure to discipline theory, Plaintiff's claim fails.

### III. PLAINTIFF'S FAILURE TO SUBMIT A TIMELY NOTICE OF CLAIM

Plaintiff did not file a timely Notice of Claim. (Def. R. 56.1 Stmt. (Dkt. No. 100) ¶ 2; Pltf. R. 56.1 Counterstmt. (Dkt. No. 121) ¶ 2) Plaintiff filed a petition for an extension of time to file a Notice of Claim, but his petition was denied on September 7, 2011. (Pltf. R. 56.1 Counterstmt. (Dkt. No. 121) ¶¶ 1, 4; Def. R. 56.1 Reply (Dkt. No. 103) ¶¶ 1, 4) Plaintiff filed a second petition to file a late Notice of Claim on December 23, 2011. (Def. R. 56.1 Reply (Dkt. No. 103) ¶ 5) On April 7, 2015, the petition was dismissed without prejudice. (Id. ¶ 7)

Under New York's General Municipal Law, federal courts are not authorized to grant a request to extend the time to serve a notice of claim. While General Municipal Law § 50-e(5) provides that, "[u]pon application, the court, in its discretion, may extend the time to serve a notice of claim," this provision states that "[a]ll applications under this section shall be made to the supreme court or to the county court" where the action may be brought for trial, the county where the action is pending, or if there is no motion term available, in any adjoining county. N.Y. Gen. Mun. L. § 50-e(7). In sum, New York has given the power to extend deadlines for serving notice of claim to state supreme courts and county courts, and federal courts are not authorized to grant such extensions. See, e.g., Dayton. v City of Middletown, 786 F. Supp. 2d 809, 824-825 (S.D.N.Y. 2011) ("[T]his Court lacks jurisdiction, pursuant to § 50-e(7), to deem Plaintiff's 5/30/09 Amended Notice of Claim for their state law claims against Orange County timely filed, or to grant an extension of time to file a

late notice of claim.") (collecting cases); Harris v. Howard, 8 Civ. 4837 (CM), 2010 WL 2404293, at *1 (S.D.N.Y. June 15, 2010) ("A federal judge does not have the power to authorize the filing of a late notice of claim against the City of New York."); Humphrey v. Cty. of Nassau, 6 Civ. 3682, 2009 WL 875534, at *21 (E.D.N.Y. Mar. 30, 2009) ("This Court agrees with the overwhelming weight of authority among district courts in the Second Circuit and finds that Section 50-e(7) permits only certain state courts – 'the supreme court or ... the county court' in certain counties — to consider and to grant an application for an extension of time in this context." (citations omitted)).

Accordingly, Plaintiff's negligence claim against the City will be dismissed. See Faruki, 2012 WL 1085533, at *9 (" 'Filing a notice of claim is a mandatory condition precedent to suit against the City and its employees; failure to comply with the notice of claim warrants dismissal.' " (quoting Pettus, 2011 WL 4458901, at *11)).

### CONCLUSION

For the reasons stated above, the City's motion for summary judgment is granted in its entirety. The Clerk of Court is directed to terminate the motions (Dkt. Nos. 90, 97, 118).

SO ORDERED.

**All Citations**

Slip Copy, 2018 WL 10070540

---

**End of Document**                © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 5823116
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Edwin FERNANDEZ, Plaintiff,

v.

Vicky TURETSKY, et al., Defendants.

No. 12–cv–4092 (SLT)(MDG).
|
Signed Nov. 5, 2014.
|
Filed Nov. 7, 2014.

**Attorneys and Law Firms**

Edwin Fernandez, Staten Island, NY, pro se.

Kathleen Anne Mahoney, United States Attorneys Office, Elizabeth A. Forman, Attorney General of the State of New York, Gloria Mihee Yi, NYC Law Department, Omar Hani Tuffaha, New York City Law Department Office of the Corporation Counsel, New York, NY, for Defendants.

**MEMORANDUM & ORDER**

TOWNES, District Judge.

**\*1** Plaintiff Edwin Fernandez, proceeding *pro se,* alleges that his constitutional right to due process was violated by (1) federal defendants: Vicki Turetsky and Joyce A. Thomas, respectively, the Commissioner and Regional Administrator of the U.S. Department of Health and Human Services, Office of Child Support Enforcement; (2) state defendants: Thomas H. Mattox and C. Duncan Kerr, respectively, the Commissioner and Deputy Tax Commissioner of the New York State Department of Taxation and Finance, Office of Child Support Enforcement; and three Tax Compliance Agents employed by the New York State Department of Taxation and Finance, Child Support Enforcement Section–Patty Whitford, Georgia Brown, and Margaret Ramsay; and (3) a municipal defendant: Robert Doar, a former Commissioner of the New York City Human Resources Administration. Plaintiff alleges that his vehicles and funds were seized, wages garnished, and tax refunds intercepted in order to collect child support arrears even though "Plaintiff was in compliance paying child support arrears." [Dkt. 4,

Amd. Compl. ¶ 26.] This action was reassigned to this Court on March 18, 2014, after Judge Mauskopf entered a recusal order on March 17, 2014. Currently before the Court is state defendants' ("Defendants") motion to dismiss for, *inter alia,* lack of subject matter jurisdiction.[1]

1     Defendants also seeks to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that Plaintiff's claims are time-barred. This Court need not reach the issue because it lacks subject matter jurisdiction over the case.

**Legal Standard**

Defendants move to dismiss on the grounds that this Court lacks subject matter jurisdiction. *Remy v. New York State Dep't of Taxation & Fin.,* 507 F. App'x 16, 18 (2d Cir.2013) ("A challenge under the *Rooker–Feldman* doctrine is for lack of subject matter jurisdiction.") (quoting *Moccio v. N.Y. State Office of Court Admin.,* 95 F.3d 195, 198 (2d Cir.1996)). "A case may properly be dismissed for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) 'when the district court lacks the statutory or constitutional power to adjudicate it.' " *Sobel v. Prudenti,* 12 CV 3258 DRH WDW, 2014 WL 2750364, at \*10 (E.D.N.Y. June 18, 2014) (quoting *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000)). Unlike on a motion to dismiss for failure to state a claim under Rule 12(b)(6), a "plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." ' *Mac Pherson v. State St. Bank & Trust Co.,* 452 F.Supp.2d 133, 136 (E.D.N.Y.2006) *aff'd,* 273 F. App'x 61 (2008) (quoting *Makarova,* 201 F.3d at 113). In resolving a motion to dismiss under Rule 12(b)(1), the Court is not limited to the face of the complaint, but may also consider evidence such as affidavits submitted by the parties. *Robinson v. Government of Malaysia,* 269 F.3d 133, 141 (2d Cir.2001).

**Factual History**

According to the factual recitation in the May 13, 2008 Decision and Order of the Honorable Francois A. Rivera, Justice of the Supreme Court of the State of New York, Kings County dismissing Plaintiff's CPLR Article 78 petition, Plaintiff's obligation to pay child support to his ex-wife, custodial parent of their child, arises out of a June 7, 1990 divorce decree. After Plaintiff did not comply with his child support obligations, in June 1999, his ex-wife requested that

the New York City Support Collection Unit assist her in enforcing Plaintiff's support obligations. Justice Rivera's May 13, 2008 Order finds that although the child support order was terminated *nunc pro tunc* to January 9, 2007, the day that the subject child turned 21 Plaintiff still owed outstanding support arrears. Subsequently, a Supreme Court of the State of New York, Kings County Family Court Support Magistrate, at an October 23, 2007 hearing, set Plaintiff's child support arrears at $33,468.80. Justice Rivera's Order rejects Plaintiff's contention "that he has paid the required child support and now that the child is emancipated, he no longer owes any money," because "[i]n actuality, though Mr. Fernandez' [*sic*] paid child support through an income execution of his wages, and the child in question is now emancipated, *he is still in arrears for prior child support payments that he never paid.*" (emphasis added). Accordingly, Justice Rivera dismissed Plaintiff's CPLR Article 78 petition.

**\*2** Plaintiff filed the instant lawsuit pursuant to 42 U.S.C. § 1983 against employees of federal, state, and municipal child support enforcement agencies alleging that, because his ongoing support obligations were terminated *nunc pro tunc* to January 9, 2007 when his child turned 21, he had no further support obligations and all subsequent child support collection efforts were unconstitutional. [2] In his papers, Plaintiff challenges the October 23, 2007 decision of a Family Court Support Magistrate setting Plaintiff's child support arrears at $33,468.80. Although he does not mention his unsuccessful CPLR Article 78 petition in his pleadings, he, in effect, asks this Court to reconsider Justice Rivera's May 13, 2008 Order finding that Plaintiff owed money under a valid child support arrears decree. Defendants have moved to dismiss Plaintiff's action for, *inter alia,* lack of subject matter jurisdiction based on the domestic relations exception to federal jurisdiction and the *Rooker–Feldman* doctrine.

[2]  *Pro se* complaints "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006) (internal quotation marks omitted).

### Discussion

#### A. *Domestic Relations Exception to Jurisdiction*
Defendants contend that this Court lacks subject matter jurisdiction over the action under the domestic relations exception to federal court jurisdiction. *See Ankenbrandt v.*

*Richards,* 504 U.S. 689, 703, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992). The so-called "domestic relations exception" dates back to 1858, when the Supreme Court announced that federal courts have no jurisdiction over suits for divorce or the allowance of alimony. *Barber v. Barber,* 62 U.S. 582, 584, 21 How. 582, 16 L.Ed. 226 (1858); *Ankenbrandt,* 504 U.S. at 703 (explaining that exception "divests the federal courts of power to issue divorce, alimony, and child custody decrees.") Although courts frequently use broad language when characterizing the exception, the Supreme Court has clarified that, in actuality, the exception is narrow, and "encompasses *only* cases involving the issuance of a divorce, alimony, or child custody decree." *Ankenbrandt,* 504 U.S. at 704 (emphasis added). Thus, where a lawsuit "in no way seeks such a decree," the exception's invocation is inappropriate. *Id.; Williams v. Lambert,* 46 F.3d 1275, 1283 (2d Cir.1995) ("[T]he exception is very narrow."); *but see McKnight v. Middleton,* 699 F.Supp.2d 507, 516–17 (E.D.N.Y.2010) *aff'd,* 434 F. App'x 32 (2d Cir.2011) (observing that in *Schottel v. Kutyba,* 06–1577–CV, 2009 WL 230106 (2d Cir. Feb.2, 2009), the Second Circuit expanded the exception to claims that, in fact, challenge domestic relations decrees, even where they are recast as actions seeking monetary relief).

The domestic relations exception is rooted in an understanding that "[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States." *In re Burrus,* 136 U.S. 586, 593–94, 10 S.Ct. 850, 34 L.Ed. 500 (1890). "[T]he exception is grounded, not in the Constitution, but as a matter of 'statutory construction' of the federal diversity statute." *Tilley v. Anixter Inc.,* 283 F.Supp.2d 729, 733–34 (D.Conn.2003) (citing *Ankenbrandt,* 504 U.S. at 703). Despite its origins in the federal diversity statute, courts in this district routinely apply the exception to cases brought under the federal courts' federal question jurisdiction. *See Mitchell–Angel v. Cronin,* 101 F.3d 108 (2d Cir.1996) ("District courts in this Circuit have held that the exception includes civil rights actions directed at challenging the results of domestic relations proceedings.") (citing *McArthur v. Bell,* 788 F.Supp. 706, 708 (E.D.N.Y.1992)); *see also Sobel,* 2014 WL 2750364, at \*11 (finding exception strips federal court of jurisdiction where "Plaintiff's complaint is, in effect, a civil rights action directed at challenging the results of domestic relations proceedings, and, in particular, a state court's decisions regarding child support."); *Sullivan v. Xu,* No. 10–CV–3626 (ENV), 2010 WL 3238979, at \*2 (E.D.N.Y. Aug.13, 2010) ("Although plaintiff invokes his constitutional rights, the substance of his claims concern state law domestic

relations matters."). That said, the Second Circuit recently noted in a summary order that the Circuit "expressly decline[s] to address whether the domestic relations exception to federal subject matter jurisdiction applies to federal question actions." *See Ashmore v. Prus,* 12–2760–CV, 2013 WL 362998, at \*2 (2d Cir. Jan.31, 2013) (summary order); *see also Ahlawat v. State of Connecticut Superior Court,* 3:12–CV–1042 JBA, 2013 WL 3338572, at \*1 n. 2 (D.Conn. July 2, 2013) (noting that "the Second Circuit has not resolved whether [the domestic relations] exception would provide a further bar to Plaintiff's federal question lawsuit.").

**\*3** Here, if Plaintiff's claim is read to challenge the enforcement of a child support decree on the grounds it is erroneous, his lawsuit, even though framed as a civil rights action, would be barred by the domestic relations exception. However, reading *pro se* Plaintiff's complaint to "raise the strongest arguments that they suggest," *Triestman,* 470 F.3d at 474, Plaintiff's complaint can be read more narrowly-to seek monetary damages for violations of his due process rights that occurred during the enforcement of a *valid* child support decree. *Ankenbrandt,* 504 U.S. at 704 (noting that the exception has no application where the lawsuit "in no way seeks [a domestic relation] decree"). Even so, some courts in this district have held that lawsuits seeking monetary relief for purportedly unlawful conduct undertaken to enforce valid support decrees are also barred by the domestic relations exception. *See Joseph v. Stewart,* 13–CV–1678 NGG LB, 2013 WL 3863915, at \*2 (E.D.N.Y. July 24, 2013) (applying domestic relations exception where "Plaintiff challenges the enforcement and effect of his child support obligations, and although he invokes his constitutional rights, the essence of his allegations concern state law domestic relations matters.").[3] This Court need not resolve whether such a narrow challenge would be barred by the domestic relations exception because the Court lacks subject matter jurisdiction over this action under, *inter alia,*[4] the *Rooker–Feldman* doctrine.

3    *But see King v. Comm'r & New York City Police Dep't,* 60 F. App'x 873, 874–75 (2d Cir.2003) (summary order) ("The instant appeal is brought pursuant to the court's federal question jurisdiction, not its diversity jurisdiction. Nevertheless, the City argues that the domestic relations exception is not limited to diversity cases. Although this seems contrary to precedent, the city does cite language to support its argument. We need not

examine this question, however, because even under the broadest interpretation of the exception, it applies only to cases that seek issuance or modification of divorce, alimony, or child custody decrees. Appellant is not seeking a domestic relations award, and he is not asking that his parental rights be reinstated. Instead, his complaint seeks monetary damages. The domestic relations exception to federal jurisdiction is therefore irrelevant to this action.") (citation and parenthetical explanation omitted).

4    Even if this Court has jurisdiction, "[a] federal court presented with matrimonial issues or issues 'on the verge' of being matrimonial in nature should abstain from exercising jurisdiction so long as there is no obstacle to their full and fair determination in state courts." *Am. Airlines, Inc. v. Block,* 905 F.2d 12, 14 (2d Cir.1990).

**B.** *Rooker–Feldman Doctrine*

The so-called *Rooker–Feldman* doctrine divests federal courts of jurisdiction to consider suits which seek to overturn state court judgments. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280, 284, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005). Additionally, the doctrine "bars federal courts from considering claims that are 'inextricably intertwined' with a prior state court determination." *Johnson v. Smithsonian Inst.,* 189 F.3d 180, 185 (2d Cir.1999) (citations and internal quotation marks omitted). In *Exxon Mobil,* the Supreme Court reined in the use of the doctrine, explaining that the doctrine "is confined to cases ... brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Id.* In the wake of *Exxon Mobil,* the Second Circuit revisited its prior precedents and limited the application *of Rooker–Feldman* to cases satisfying four "requirements":

First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must "complain[ ] of injuries caused by [a] state-court judgment [.]" Third, the plaintiff must "invit[e] district court review and rejection of [that] judgment[ ]." Fourth, the state-court judgment must have been "rendered before the district court proceedings commenced"-i.e., *Rooker–Feldman* has no application to federal-court suits proceeding in parallel with ongoing state-court litigation. The first and fourth of

these requirements may be loosely termed procedural; the second and third may be termed substantive.

**\*4** *Hoblock v. Albany Cnty. Bd. of Elections,* 422 F.3d 77, 85 (2d Cir.2005) (quoting *Exxon Mobil,* 544 U.S. at 284); *see also McKit hen v. Brown,* 626 F.3d 143, 154 (2d Cir.2010).

Courts have repeatedly invoked the doctrine in cases, like the one currently before the Court, in which plaintiffs challenge family court decrees setting child support arrears. *See Sorenson v. Suffolk Cnty. Child Support Enforcement Bureau,* 07–CV–03755JFBAKT, 2009 WL 580426, at \*6– 7 (E.D.N.Y. Mar.5, 2009) (finding plaintiff, who previously unsuccessfully sought to have child support "arrears vacated ... in state court" cannot "utilize the federal courts to, in essence, challenge the existing judgment regarding child support arrears, or the County's enforcement of that judgment."); *Remy,* 507 F. App'x at 18–19 (finding that court was barred under *Rooker–Felman* from exercising jurisdiction over suit challenging "Family Court's arrears order[, where plaintiff] ... had a full and fair opportunity to litigate [the arrears order in state court]."); *Chestnut v. Gabler,* No. 06 Civ. 34E(F), 2007 WL 529556, at \*3 (W.D.N.Y.Feb.13, 2007) ("Construed liberally, the complaint essentially alleges that plaintiff's constitutional rights were violated during the course of the Family Court proceedings and plaintiff now seeks, in part, to challenge in this Court the orders issued in those proceedings. To the extent plaintiff is asking this Court to review the proceedings before the Allegany County Family Court, said review by this Court is barred by the *Rooker–Felman* doctrine and the complaint must be dismissed accordingly."). In *Sorenson,* the Court explained that although the plaintiff attempted to recast his claims as alleging "improper enforcement of the Family Court judgment rather than [challenging] the judgment itself[,] ... *Rooker–Felman* also bars such claims because the enforcement is inextricably intertwined with the state court judgment." *Sorenson,* 2009 WL 580426, at \*7 (collecting cases).

Plaintiff expressly asks this Court to review the October 23, 2007 family court order setting arrears on the grounds that the decision was erroneous because he had complied with all previous child support obligations and thus could not be liable for arrears. Under the *Rooker–Felman* doctrine, this Court may not do so. As in *Sorenson,* to the extent Plaintiff recasts his claims as alleging improper enforcement of the

child support arrears decree, under these circumstances, the enforcement of the arrears decree is inextricably intertwined with the validity of the decree, itself. Thus this Court is barred under the *Rooker–Felman* doctrine from reviewing the claim. Additionally, this Court is precluded from reviewing Plaintiff's claims for the separate reason that Plaintiff has already brought an Article 78 petition in state court raising these exact arguments. Thus, the instant lawsuit, in effect, challenges not only the October 23, 2007 arrears order, but also the May 13, 2008 decision of Justice Rivera dismissing the Article 78 petition. Plaintiff's attempts to appeal to this Court the decisions of the Family Court Support Magistrate and Justice Rivera are barred by the *Rooker–Felman* doctrine. Accordingly, Defendant's motion to dismiss is granted.

**\*5** The above reasoning applies with equal force to Plaintiff's claims against the other defendants who allegedly enforced the child support arrears decree. Thus, this Court lacks subject matter jurisdiction to adjudicate Plaintiff's claims against all of the remaining defendants in the action. Given that this Court has determined that it lacks subject matter jurisdiction over the entire action, the Court, *sua sponte,* dismisses Plaintiff's claims against the remaining defendants and dismisses Plaintiff's complaint in its entirety. *Morris v. Rosen,* 12–3143–CV, ––– F. App'x ––––, 2014 WL 4233392, at \*1 (2d Cir. Aug.28, 2014) (affirming district court's *sua sponte* dismissal of *pro se* plaintiff's complaint for lack of subject matter jurisdiction under the *Rooker–Felman* doctrine.)

### Conclusion

For the foregoing reasons, the State Defendant's motion to dismiss is granted on the grounds that this Court lacks subject matter jurisdiction over the instant action under the *RookerFelman* doctrine. For the same reasons, the Court *sua sponte* dismisses the action against all other defendants. The Clerk of Court is respectfully directed to enter judgment accordingly and close the case.

### SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 5823116

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.   4

2014 WL 3858398
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Shariff ABBAS, Plaintiff,
v.
UNITED STATES of America, Defendant.

No. 10–CV–0141S.
|
Signed Aug. 1, 2014.

**Attorneys and Law Firms**

Shariff Abbas, Flushing, NY, pro se.

**DECISION and ORDER**

WILLIAM M. SKRETNY, Chief Judge.

**INTRODUCTION**

*1 Plaintiff Shariff Abbas commenced this *pro se* action pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671 et seq., and other federal laws, alleging violation of his rights while detained at the Buffalo Federal Detention Facility ("BFDF") in Batavia, the Albany County Jail and the Perry County Correctional Center ("PCCC") in Uniontown, Alabama. Currently before the Court for review pursuant to 28 U.S.C. § 1915(e)(2)(B) is plaintiff's amended complaint [1], submitted in response to the Court's Order filed on August 16, 2013 ("August 16 Order") (Docket No. 6), which reviewed plaintiff's original complaint (Docket No. 4), dismissed several of the claims asserted therein, and granted plaintiff leave to file an amended complaint. For the reasons set forth below, plaintiff's FTCA claims against the United States related to his treatment at the BFDF may proceed and his remaining claims will be dismissed.

[1] Plaintiff's amended complaint is accompanied by two voluminous bound volumes of exhibits captioned "Exhibit[ sic] Part 1", containing a Table of Contents and exhibits 1–18 and "Exhibit Part 2", containing a Table of Contents and exhibits 19–40. Given the voluminous nature of the exhibits, numbering hundreds of pages, and

the manner in which they are bound, which would make scanning them very difficult, the Court has not required the Clerk's Office to scan them into the court's electronic filing system. They will instead be maintained in paper form in a separate file in the Clerk's Office. *See* note to Docket No. 6.

**DISCUSSION**

A. *Bivens Claims*

The August 16 Order directed, *inter alia,* that plaintiff's FTCA claims stemming from his detention at the Albany County Jail and the PCCC be dismissed; that plaintiff be granted leave to file an amended complaint adding *Bivens* [2] or other federal claims against individual deportation officers and other personnel at BFDF who he alleges violated his rights; and that in the even he failed to timely file an amended complaint as directed, the Court would issue an Order directing service of the complaint upon the United States as the sole defendant to his medical malpractice claims brought under the FTCA. (Docket No. 5).

[2] *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

The August 16 Order noted that in addition to his FTCA claims, plaintiffs original complaint asserted a variety of violations of his constitutional rights by individual deportation officers and other personnel during his periods of detention at BFDF and that these claims would be actionable against individual defendants under the *Bivens* doctrine, which allows a plaintiff to pursue constitutional claims against federal officials in their individual capacities for actions taken under color of federal law. *See Lombardi v. Whitman,* 485 F.3d 73, 78 (2d Cir.2007) ("[W]here an individual 'has been deprived of a constitutional right by a federal agent acting under color of federal authority,' the individual may bring a so-called *Bivens* action for damages against that federal agent in an individual capacity, provided that Congress has not forbidden such an action and that the situation presents 'no special factors counseling hesitation in the absence of affirmative action by Congress.' ") (internal citations omitted) (*quoting Thomas v. Ashcroft,* 470 F.3d 491, 496 (2d Cir.2006). The Court determined, however, that the *Bivens* claims could not proceed because of plaintiff's failure to name the individual custody officers and other officials who are alleged to have violated his rights as defendants in

the caption of the complaint, as required by Rule 10(a) of the Federal Rules of Civil Procedure:

> **\*2** The Court cannot allow such *Bivens* claims to proceed, however, because of plaintiff's failure to name the individual custody officers and other officials who are alleged to have violated his rights as defendants in the caption of the complaint. Rule 10 of the Federal Rules of Civil Procedure provides that "[t]he title of the complaint must name all the parties" Fed.R.Civ.P. 10(a). Therefore, a party that is not named in the caption of a complaint or amended complaint is not a party to the action.

(August 16 Order at 16) (citations omitted). The Court proceeded to note that plaintiff's failure to name in the caption of the complaint the individual defendants against whom he wished to assert *Bivens* claims would make it infeasible for the Court to determine which of the individual custody officers mentioned in the body of the complaint should be deemed to be defendants to such claims, given the often ambiguous nature of his reference to such individuals. (*Id.* at 16–17). The Court therefore concluded that "[t]he way to remedy plaintiff's failure to name as defendants in the caption of his complaint those individuals against whom he may seek to assert *Bivens* claims, as suggested by the allegations set forth in the body of the complaint, is to afford him leave to file an amended complaint which conforms to the requirements of Rule 10(a)." (*Id.* at 17) (citations omitted). "Accordingly, plaintiff will be afforded the opportunity to file, as directed below, an amended complaint in which he shall name in the caption of the complaint, each of the individuals against whom he intends to assert a *Bivens* claim or claims, in a manner that conforms to the requirements of Rules 8(a) and 10(a) of the Federal Rules of Civil Procedure." (*Id.*).

The Court accordingly directed, in the Conclusion of the August 16 Order, that plaintiff be given leave to file an amended complaint conforming to the requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure, and the Court again explicitly advised plaintiff of his duty to list all defendants in the caption of the complaint:

> Plaintiff is reminded, as explained above, that if he wishes to assert *Bivens* or other claims against defendants other than the United States in the amended complaint, *he must name those individuals in the caption of the amended complaint* and set forth

specific allegations with respect to how those individuals violated his rights.

(*Id.* at 21). (emphasis added).

While plaintiff's amended complaint contains allegations that would support *Bivens* claims (*see* Amended Complaint, ¶¶ 17–42 *passim* ),[3] it does not name in the caption of the complaint any individuals against whom plaintiff is seeking to assert *Bivens* clams, nor does the section of the complaint captioned "PARTIES" list any individual defendants. While plaintiff does, in the section of the amended complaint captioned "CONCLUSION", set forth a list of "Federal Employees from (BFDF) Health Division" (Amended Complaint ¶ 57), which includes individuals mentioned elsewhere in the amended complaint in connection with plaintiff's allegations that would be relevant to *Bivens* claims, the individuals named therein are not listed as defendants in the caption of the amended complaint or in plaintiff's recital of the parties to this action at the beginning of the amended complaint; as noted *supra,* plaintiff lists only one defendant-the United States-in the complaint caption and in his recital of the parties. Moreover, plaintiff's statement of relief sought at the end of the amended complaint (captioned "PRAYER") demands judgment "against *the defendant.*" (*Id.* at p. 16) (emphasis added).[4]

3    Plaintiff divides his claims into two sections of the amended complaint, namely "Medical Malpractice" (Amended Complaint, p. 3–5, ¶¶ 8–16), which contains allegations supportive of his FTCA claims, and "U.S. D.H.S.-ICE Federal Agency and Custody Officers Abuses" (*Id.* at p. 5–14, ¶¶ 17–56), which contains allegations supportive of his *Bivens* constitutional claims. The Court notes, however, that a number of the allegations set forth in the "Federal Agency and Custody Officers Abuses" section of the complaint are relevant to his FTCA malpractice claims. *See, e.g.,* Amended Complaint, ¶ 21.

4    Plaintiff's failure to include in the caption of the amended complaint the names of any defendants against whom he is asserting *Bivens* claims is not the only instance of his disregard of the Court's directives regarding the form and content of his

amended complaint. The August 16 Order noted that many of the *Bivens* claims that plaintiff's allegations would support against individuals identified in the body of the complaint appeared to be barred by the statute of limitations. August 16 Order at 18. The Court accordingly directed as follows:

> In the amended complaint that plaintiff will be given leave to file, as provided below, in which he must demonstrate either that his *Bivens* claims stemming from his incarceration at BFDF are timely or, if any such Bivens claims are untimely, he must allege facts demonstrating why equitable tolling should be applied to the statute of limitations periods for such claims.

(August 16 Order at 19). As noted *supra,* the August 16 Order provided that plaintiff would be given leave to file an amended complaint with respect to his *Bivens* claims, and plaintiff was further advised, in this regard, "that he should address the timeliness of any *Bivens* claims that he asserts in the amended complaint and any argument as to why the limitations period applicable to such claims should be equitably tolled." (August 16 Order at 21). However, plaintiff's amended complaint does not address the timeliness issue or offer any basis for equitable tolling of the limitations period. Given the Court's dismissal herein of the *Bivens* claims based upon plaintiff's failure to identify the defendants against whom he seeks to assert such claims, the Court need not further address the timeliness issue.

Plaintiff further disregarded the August 16 Order to the extent that he reasserts claims stemming from his detention at the Albany County Jail from February 21, 2006–March 21, 2006, and the Perry County Correctional Center ("PCCC") in Uniontown Alabama from August 5, 2006–February 9, 2007. (Amended Complaint at ¶¶ 14, 15, 28–40). The August 16 Order dismissed the claims stemming from plaintiff's incarceration at those facilities pursuant to [28 U.S.C. § 1406(a)](#) for improper venue. (August 16 Order at 13–14). Those claims remain dismissed.

**\*3**  The Court's duty to construe liberally the pleadings of *pro se* litigants does not absolve *pro se* litigants from the duty to comply with the requirements of the Federal Rules

of Civil Procedure and court orders issued pursuant to those rules. *See, e .g., [Caidor v. Onondaga County,](#)* [517 F.3d 601, 605 (2d Cir.2008)](#) (noting that *pro se* litigants are required to familiarize themselves with procedural rules and comply with such rules); *[McDonald v. Head Criminal Court Supervisor](#) [Officer,](#)* [850 F.2d 121, 124 (2d Cir.1988)](#) ("[W]hile *pro se* litigants may in general deserve more lenient treatment than those represented by counsel, all litigants, including *pro ses,* have an obligation to comply with court orders. When they flout that obligation they, like all litigants, must suffer the consequences of their actions.")). As discussed *supra,* this Court's previous order explained to plaintiff the requirement of [Rule 10(a)](#) that all defendants to an action be named and identified as such in the caption of the complaint, and the Court afforded him the opportunity to cure the defect in his initial complaint by filing an amended complaint naming all defendants. Plaintiff has inexplicably failed to comply with the Court's order and the requirement of [Rule 10(a).](#) Accordingly, to the extent that plaintiff seeks to bring *Bivens* claims against individual Custody Officers and other BFDF officials, *see* Amended Complaint, ¶ 58 ("Plaintiff want [sic] this Court to bring Justice against Federal Agency Employees who Violate constitutional law against Plaintiff's rights"), such claims must be dismissed in light of his failure to name those individuals as defendants in the caption of the amended complaint. *See, e.g., [Ferdik v. Bonzelet,](#)* [963 F.2d 1258, 1262–63 (9th Cir.1992)](#) (dismissing action for refusal to comply with court orders to name defendants in the caption as required by [Rule 10(a)](#)).

Moreover, as explained in the August 16 Order (pp. 14–15), constitutional claims under *Bivens* cannot be brought against the only defendant named in the complaint, the United States. *See [Robinson v. United States Bur. Of Prisons,](#)* [244 F.Supp.2d 57, 66 (N.D.N.Y.2003)](#) ("[A] *Bivens* action may not be maintained against the United States.") (citing *[Washington v. DEA,](#)* [183 F.3d 868, 872 n. 8 (8th Cir.1999).](#) Nor can constitutional claims be asserted against the United States under the FTCA. *See [Washington,](#)* [183 F.3d at 873;](#) *[Russ v. United States,](#)* [62 F.3d 201, 204 (7th Cir.1995)](#) ("[C]onstitutional wrongs cannot be remedied through the FTCA,") (citing *[FDIC v. Meyer,](#)* [510 U.S. 471, 476, 114 S.Ct. 996, 1001–02, 127 L.Ed.2d 308(1994)](#)).

Plaintiff having thus having failed to name a proper defendant to his *Bivens* claims, the Court concludes that his *Bivens* claims must be dismissed pursuant to [28 U.S.C. § 1915(e)(2) (B)](#) for failure to state a claim on which relief can be granted.

### B. *Treaty Claims*

The Conclusion section of the amended complaint invokes, as a basis for relief against defendant United States not raised in plaintiff's original complaint, treaties to which the United States is a signatory. Specifically, the amended complaint states "At such time and places the United States violates International Laws as A[sic] result the United States are not in compliance with Refugee Convention Requirements or The United Nations Convention against Torture Prohibitions." (Amended Complaint, § 57). It is well established that the United Nations Convention Against Torture and Other Cruel, Inhumane or Degrading Treatment or Punishment, Dec. 10, 1984, 1465 U.N.T.S. 85, 23 I.L.M. 1027, ("CAT") does not give rise to a private right of action. *Renkel v. United States,* 456 F.3d 640, 644 (6th Cir.2006) ("As the Articles [of CAT] are not self-executing, they do not create private rights of action; therefore, any private lawsuit seeking to enforce the United States' obligations under the Convention must be based on domestic law."); *Wolinski v, Junious,* 2012 U.S. Dist. LEXIS 65889, at *18–19,2012 WL 1657576 (E.D.Cal. May 10, 2012) ("The CAT does not give rise to a private right of action because it is not self-executing.) (citing *Akhtar v. Reno,* 123 F.Supp.2d 191, 196 (S.D.N.Y.2000),

**\*4** The United Nations Convention Relating to the Status of Refugees, adopted July 28, 1951, art. 26, 19 U.S.T. 6259, 6576, 189 U.N.T.S. 150, 172 ("Refugee Convention") likewise does not create a private right of action. *United States v. Casaran–Rivas,* 311 Fed. Appx. 269, 272 (11th Cir.2009) (unpublished) ("[A]rgument that the indictment violated the refugee Convention and CAT Treaty is without merit, as the Refuge[e] Convention and CAT Treaty are not self-executing, or subject to relevant legislation, and, therefore, do not confer upon aliens a private right of action to allege a violation of their terms."); *Reyes–Sanchez v. Ashcroft,* 261 F.Supp.2d 276, 288–89 (S.D.N.Y.2003) ("Because the Refugee Convention is not self-executing, it does not create individual rights.").

Accordingly, plaintiff's claims against the United States under CAT and Refugee Convention are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim on which relief may be granted.

### C. *FTCA Claims*

The medical malpractice-related claims under the FTCA asserted by plaintiff in the amended complaint and stemming from his detention at BFDF may go forward against defendant United States. [5]

[5]    As explained in the August 16 Order, plaintiff's allegations of medical malpractice and the failure to properly treat his serious medical condition are clearly cognizable under the FTCA when asserted against the United States. (August 16 Order at 6).

### *ORDER*

IT IS HEREBY ORDERED, that plaintiff's *Bivens* claims are dismissed with prejudice;

FURTHER, that plaintiff's claims under CAT and the Refugee Convention are dismissed with prejudice;

FURTHER, that the Clerk of the Court is directed to complete, on plaintiff's behalf, and to issue, a summons for service of process on defendant United States of America;

FURTHER, the Clerk of the Court is directed to send copies of the Summons, Amended Complaint, [6] and this Order by certified mail to the following, pursuant to Rule 4(i) of the Federal Rules of Civil Procedure:

[6]    As explained in n. 1, *supra,* plaintiff's voluminous exhibits to the amended complaint are maintained in paper form in a separate file folder in the Clerk's Office.

• Attorney General of the United States, Main Justice Building, 10th and Constitution Avenues N.W., Washington, DC 20530;

• Civil Process Clerk, United States Attorney for the Western District of New York, United States Attorney's Office, USAO/WDNY, 138 Delaware Avenue, Buffalo, New York 14202.

SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 3858398

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-01527-TJM-TWD Document 24 Filed 10/05/20 Page 250 of 259

2007 WL 2375814
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Vidal WHITLEY, Plaintiff,
v.
Major KRINSER, Sgt. Robin Brown, Captain
Winters, Corporal Conklin, Deputy Johnson,
Lt. Prinzi, Corporal Carlo, Lt. Santillo,
Sgt. Garcia, Major Kasacey, Corporal
Peck, and Deputy Galling, Defendants.

No. 06-CV-0575F.
|
Aug. 15, 2007.

**Attorneys and Law Firms**

Vidal Whitley, Willard, NY, pro se.

**DECISION and ORDER**

WILLIAM M. SKRETNY, United States District Judge.

**INTRODUCTION**

\*1 By an Order dated February 8, 2007, plaintiff *pro se* Vidal Whitley was granted permission to file a second amended complaint in this action pursuant to 42 U.S.C. § 1983 to specifically address issues relating to defendants Kasacey, Krinser and Peck. For the reasons stated below, plaintiff's second amended complaint is dismissed and the amended complaint is allowed to go forward at this stage against all named defendants except as to defendants Krinser, Kasacey and Peck.

**DISCUSSION**

Section 1915(e) (2)(B) of 28 U.S.C. provides that the Court shall dismiss a case in which *in forma pauperis* status has been granted if, at any time, the Court determines that the action "(ii) fails to state a claim upon which relief may be granted." Based on its evaluation of the complaint, the Court finds that plaintiff's claims against defendants Krinser, Kasacey and Peck must be dismissed pursuant to 28 U.S.C. § 1915(e)(2)

(B)(ii) because they fail to state a claim upon which relief may be granted. Despite direction to specify what Krinser, Kasacey and Peck were responsible for, plaintiff's second amended complaint does not allege sufficient facts to state claims against Krinser, Kasacey and Peck.

In addition, plaintiff was directed that his second amended complaint "should name in the caption all of the people plaintiff wishes to hold responsible for each violation. Plaintiff has alleged that people who are not named in the caption were responsible for violation his rights. However, if these people are not also named in the caption of the second amended complaint, they will not be defendants in the case." (Docket No. 11.) Because plaintiff has not named any additional defendants in the second amended complaint, has not included the allegations against the remaining defendants named in his amended complaint, and has failed to state a claim against Krinser, Kasacey and Peck, the second amended complaint is dismissed in its entirety. However, because of plaintiff's *pro se* status and his minimal literacy, the Court will deem the amended complaint the operative pleading in this case and allow it to proceed against all named defendants except Krinser, Kasacey and Peck.

**CONCLUSION**

For the reasons set forth above, plaintiff's claims against defendants Krinser, Kasacey and Peck are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and the amended complaint shall be served on the remaining defendants set forth in the caption above.

**ORDER**

IT HEREBY IS ORDERED, that the claims against Krinser, Kasacey and Peck are dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B); and,

FURTHER, the Clerk of the Court is directed to correct the docket to reflect that Sgt. Robin Brown, Captain Winters, Corporal Conklin, Deputy Johnson, Lt. Prinzi, Corporal Carlo, Lt. Santillo, Sgt. Garcia and Deputy Galling are defendants in this action; and,

FURTHER, the Clerk of the Court is directed to cause the U.S. Marshal to serve the amended complaint (Docket No. 10) and this Order upon the remaining defendants, Sgt. Robin Brown,

2007 WL 2375814

Captain Winters, Corporal Conklin, Deputy Johnson, Lt. Prinzi, Corporal Carlo, Lt. Santillo, Sgt. Garcia and Deputy Galling.

**\*2**  SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2375814

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 752857
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Eddie ROBLES

v.

John ARMSTRONG, et al.

No. 3:03 CV 1634(DFM).
|
March 17, 2006.

*RULING ON DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT*

MARTINEZ, Magistrate J.

**\*1** The plaintiff, Eddie Robles, has filed this civil rights action *pro se* and *in forma pauperis* pursuant to 28 U.S.C. § 1915 against Former Commissioner of Correction John Armstrong, Warden Brian K. Murphy, Nurse Barbara LaFrance and Dr. Tatyana Katsnelson. [1] He alleges *inter alia* that defendants LaFrance and Katsnelson failed to inform him of his elevated liver function tests in January 2002 and the possibility that he was infected with Hepatitis C. Pending is a motion for summary judgment filed by the defendants. For the reasons that follow, the motion for summary judgment is granted.

[1]   John Armstrong, Brian K. Murphy, Barbara LaFrance and Tatyana Katsnelson are the only defendants named in the caption of the amended complaint. The plaintiff refers to John Doe/ Jane Doe of the Correctional Managed Health Care Program and John Doe/Jane Doe Members of the Revitalization Committee in the body of the amended complaint. Rule 10(a) of the Federal Rules of Civil Procedure requires that all defendants be listed in the caption of the complaint. Because the John and Jane Does are not listed in the caption of the amended complaint, they are not defendants and the court does not consider claims against them. However, even if the plaintiff had included the John/Jane Does in the caption of the complaint, he never identified them by name or served them with the complaint. Thus, any claims against them would be subject to dismissal pursuant to Rule 4(m), Fed.R.Civ.P.

### I. *Standard of Review*

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See* Rule 56(c), Fed.R.Civ.P.; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *White v. ABCO Engineering Corp.,* 221 F.3d 293, 300 (2d Cir.2000). A court must grant summary judgment " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact....' " *Miner v. Glen Falls,* 999 F.2d 655, 661 (2d Cir.1993) (citation omitted). A dispute regarding a material fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." ' *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.) (quoting *Anderson,* 477 U.S. at 248), *cert. denied,* 506 U.S. 965 (1992). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

When a motion for summary judgment is supported by documentary evidence and sworn affidavits, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Anderson,* 477 U.S. at 256. The nonmoving party must present "significant probative evidence to create a genuine issue of material fact." *Soto v. Meachum,* Civ. No. B–90–270 (WWE), 1991 WL 218481, at \*6 (D.Conn. Aug. 28, 1991). A party may not rely "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986), *cert. denied,* 480 U.S. 932 (1987).

The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich,* 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849 (1991). *See also Suburban Propane v. Proctor Gas, Inc.,* 953 F.2d 780, 788 (2d Cir.1992). A party may not create a

genuine issue of material fact by presenting contradictory or unsupported statements. *See Securities & Exchange Comm'n v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir.1978).* Nor may he rest on the "mere allegations or denials" contained in his pleadings. *Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir.1995). See also Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir.1993)* (holding that party may not rely on conclusory statements or an argument that the affidavits in support of the motion for summary judgment are not credible).

 **\*2** Where one party is proceeding pro se, the court reads the pro se party's papers liberally and interprets them to raise the strongest arguments suggested therein. *See Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Despite this liberal interpretation, however, a "bald assertion" unsupported by evidence, cannot overcome a properly supported motion for summary judgment. *Carey v.. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

II. *Facts* [2]

[2]     The facts are taken from defendants' Local Rule 56(a) 1 Statement [doc. # 20–2] and the Affidavits of Dr. Edward Blanchette [doc. # 20–3], the Affidavit of Dr. Tatyana Katsnelson [doc. # 20–4] and the Affidavit of Barbara LaFrance [doc. # 20–5]. The defendants filed their motion for summary judgment on June 14, 2005. On June 21, 2005, the court provided the plaintiff with notice of his obligation to respond to the motion and of the contents of a proper response. The plaintiff has failed to respond to the motion. Because the plaintiff has not responded with evidence or submitted a Local Rule 56(a) 2 Statement, defendants' facts are deemed admitted. *See* D. Conn. L. Civ. R. 56(a)1 ("All material facts set forth in said statement will be deemed admitted unless controverted by the statement required to be served by the opposing party in accordance with Rule 56(a) 2.")

Dr. Tatyana Katsnelson is a physician licensed to practice medicine in the State of Connecticut. In 2002, she was employed part-time with the Correctional Managed Health Care Program and assigned to Walker Correctional Institution ("Walker") in Suffield, Connecticut.

Barbara LaFrance is an Advanced Practice Registered Nurse licensed to practice in the State of Connecticut. She was employed with the Correctional Managed Health Care Program and assigned to Walker from July 1998 through March 2004.

Dr. Edward Blanchette has been licensed to practice medicine in the State of Connecticut since 1975 and is board certified in Internal Medicine and Infectious Diseases. In 1984, Dr. Blanchette began working for the State of Connecticut Department of Correction and has held various medical positions within the Department since then. He is currently the Director of Clinical and Professional Services for the Department of Correction.

Brian Murphy is currently the Deputy Commissioner of the Operations Division of the Department of Correction. Between May 2001 and April 2003, he was employed as the Lead Warden at the MacDougall–Walker Correctional Complex in Suffield, Connecticut. Defendant Murphy had no written or verbal contact with the plaintiff and was not involved in any medical treatment provided to him during his incarceration in either MacDougall Correctional Institution ("MacDougall") or Walker during the months from January to March 2002.

On December 26, 2001, the plaintiff was re-admitted to the Department of Correction and confined to the New Haven Correctional Center after having been released on bond in April 2001. On January 7, 2002, prison officials transferred the plaintiff to Walker. Upon plaintiff's admission to Walker, a nurse noted plaintiff's prior drug use and that the medical personnel at New Haven Correctional Center had prescribed the plaintiff Zantac and Maalox Plus to be taken on a daily basis. The plaintiff reported no complaints.

On January 17, 2002, the plaintiff underwent routine blood tests which revealed elevated liver enzyme levels. The elevated enzyme levels could have been attributed to a number of factors such as prior alcohol or drug abuse or the ingestion of the medication the plaintiff had been prescribed at New Haven Correctional Center.

On January 22, 2002, Dr. Katsnelson examined the plaintiff to determine the cause of his stomach pain. Dr. Katsnelson noted that the plaintiff had a history of peptic ulcer disease. Dr. Katsnelson re-ordered Zantac and Maalox for the plaintiff, ordered a H Pylori titer test to determine whether the plaintiff had bacteria that might be the cause of an ulcer and issued a new order for routine blood work because the first blood work results had not yet been forwarded to the prison from

2006 WL 752857

the lab. The plaintiff's test results were positive for H. Pylori infection.

**\*3** On February 14, 2002, the plaintiff was examined by Nurse LaFrance. The plaintiff reported that he was experiencing less pain in his stomach. Nurse LaFrance discussed with the plaintiff the option of treating the H Pylori infection with antibiotics. The plaintiff agreed to start the antibiotic treatment.

In 2002, the Correctional Managed Health Care Program followed guidelines recommended by the National Institute for Health in managing and treating chronic Hepatitis C. To determine whether an inmate who had tested positive for Hepatitis C was a candidate for Hepatitis C therapy, medical personnel were required to perform two or more liver enzyme tests spaced at least six months or more apart.

The results of the second round of blood work revealed elevated liver enzyme levels, but lower levels than the results of the first round of blood work. Less than two months after the plaintiff's arrival at Walker, on March 4, 2002, prison officials transferred the plaintiff to MacDougall. Neither Nurse LaFrance nor Dr. Katsnelson had any contact with the plaintiff after March 4, 2002. On March 14, 2002, prison officials transferred the plaintiff to the Corrigan Correctional Institution.

On April 14, 2003, the plaintiff was incarcerated at Cheshire Correctional Institution ("Cheshire"). He complained about his cellmate who had tested positive for Hepatitis C. Lab tests performed that same day revealed that the plaintiff was positive for Hepatitis C. In August 2003, a physician at Cheshire completed initial paperwork to permit the plaintiff to complete a diagnostic evaluation to determine his eligibility for Hepatitis C therapy. On March 24, 2004, the Hepatitis C Utilization Review Board ("Hep CURB") approved the plaintiff for a liver biopsy. The liver biopsy performed in April 2004 showed very mild liver disease. On May 12, 2004, Hep CURB approved the plaintiff for Hepatitis C Therapy.

### III. *Discussion*

The defendants raise three grounds in support of their motion for summary judgment. They argue that (1) the Eleventh Amendment bars any claims for monetary damages against them in their official capacities; (2) they were not deliberately indifferent to plaintiff's medical needs; (3) the court should not exercise supplemental jurisdiction over any state law claims and (4) they are entitled to qualified immunity.

### A. *Claims Barred By Eleventh Amendment*

The plaintiff names the defendants in their individual and official capacities. The defendants contend that the Eleventh Amendment bars a damage award against the defendants in their official capacities.

Generally, a suit for recovery of money may not be maintained against the state itself, or against any agency or department of the state, unless the state has waived its sovereign immunity under the Eleventh Amendment. *See Florida Dep't of State v. Treasure Salvors,* 458 U.S. 670, 684 (1982). Section 1983 does not override a state's Eleventh Amendment immunity. *See Quern v. Jordan,* 440 U.S. 332, 342 (1979). The Eleventh Amendment immunity which protects the state from suits for monetary relief also protects state officials sued for damages in their official capacity. *See Kentucky v. Graham,* 473 U.S. 159 (1985). A suit against a defendant in his official capacity is ultimately a suit against the state if any recovery would be expended from the public treasury. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 101 n. 11 (1984).

**\*4** The plaintiff's claims for monetary damages against the defendants in their official capacities are barred by the Eleventh Amendment. Defendants' motion for summary judgment is granted as to all claims for damages against the defendants in their official capacities.

### B. *Failure to State a Claim of Deliberate Indifference to Medical Needs*

The defendants argue that the plaintiff did not suffer from a serious medical need as a result of the alleged failure of Dr. Katsnelson and Nurse LaFrance to refer him for a Hepatitis C evaluation in January 2002. They also contend that even if plaintiff's condition was serious, they were not deliberately indifferent to that condition.

The Eighth Amendment protects inmates from deliberate indifference by prison officials to their serious medical needs. *See Estelle v. Gamble,* 429 U.S. 97, 104 (1976). To prevail on such a claim, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106. A prisoner must show intent to either deny or unreasonably delay access to needed medical care or the wanton infliction of unnecessary pain by prison personnel. *See id.* at 104–05. Mere negligence will not support a section 1983 claim; the conduct complained of must "shock the conscience" or constitute a "barbarous act."

*McCloud v. Delaney,* 677 F.Supp. 230, 232 (S.D.N.Y.1988) (citing *United States ex rel. Hyde v. McGinnis,* 429 F.2d 864 (2d Cir.1970)). A treating physician will be liable under the Eighth Amendment only if his conduct is "repugnant to the conscience of mankind." *Tomarkin v. Ward,* 534 F.Supp. 1224, 1230 (S.D.N.Y.1982) (quoting *Estelle,* 429 U.S. at 105–06).

The civil rights statute was not meant to redress medical malpractice claims that can be adequately resolved under state tort law. *Tomarkin,* 534 F.Supp. at 1230–31. Thus, a claim of misdiagnosis, faulty judgment, or malpractice without more to indicate deliberate indifference, is not cognizable under section 1983. *See McCabe v. Nassau County Medical Center,* 453 F.2d 698, 704 (2d Cir.1971); *Tomarkin v. Ward,* 534 F.Supp. 1224, 1230 (S.D.N.Y.1982). In addition, mere disagreement with prison officials about what constitutes appropriate medical care does not state a claim cognizable under the Eighth Amendment. *See Hyde v. Mcinnis,* 429 F.2d 864, 868 (2d Cir.1970); *Corby v. Conboy,* 457 F.2d 251, 254 (2d Cir.1972); *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.), *cert. denied,* 506 U.S. 1040 (1992).

There are both subjective and objective components to the deliberate indifference standard. *See Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied sub nom. Foote v. Hathaway,* 513 U.S. 1154 (1995). The alleged deprivation must be "sufficiently serious" in objective terms. *Wilson v. Seiter,* 501 U.S. 294, 298 (1991). Thus, "a prisoner must first make [a] threshold showing of serious illness or injury in order to state an Eighth Amendment claim for denial of medical care." *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003)(quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). *See also Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J., dissenting) (" 'serious medical need' requirement contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain"). The Second Circuit has identified several factors that are highly relevant to the inquiry into the seriousness of a medical condition: " '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." ' *Chance v. Armstrong,* 143 F.3d 698, 702 (2d. Cir.1998) (citation omitted). In addition, where the denial of treatment causes plaintiff to suffer a permanent loss or life-long handicap, the medical need is considered serious. *See Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000).

**\*5** In addition to demonstrating a serious medical need to satisfy the objective component of the deliberate indifference standard, an inmate also must present evidence that, subjectively, the charged prison official acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." ' *Id.* (quoting *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)).

The defendants first argue that the plaintiff did not suffer from a serious medical need or condition during the time period that he was incarcerated at Walker from January 7, 2002 to March 4, 2002. There is no evidence in plaintiff's medical records that medical personnel diagnosed him as suffering from Hepatitis C at any time during this period. The plaintiff did not test positive for Hepatitis C until April 2003. Routine blood tests performed on January 17, 2002, showed that the plaintiff's AST and ALT liver enzyme levels were higher than the normal range. On January 24, 2002, routine blood tests revealed elevated AST and ALT liver enzyme levels, but those levels were lower than the levels measured on January 17, 2002. The medical records reveal no comments by a physician or nurse concerning the plaintiff's elevated liver enzyme levels. The only complaints by the plaintiff during the time period in question related to a sore throat and pain in his stomach due to an ulcer. The plaintiff has failed to submit any evidence to suggest that he suffered from a serious medical condition during his incarceration at Walker from January 7, 2002 to March 4, 2002 or at MacDougall from March 4, 2002 to March 14, 2002.

Even if the plaintiff could prove that he suffered from Hepatitis C during the period in question, he would not have been a candidate for treatment under the Correctional Managed Health Care Program Guidelines in effect at that time. In 2002, the Correctional Managed Health Care Program followed guidelines recommended by the National Institute for Health in managing and treating chronic Hepatitis C. To determine whether an inmate who had tested positive for Hepatitis C was a candidate for Hepatitis C therapy, medical personnel were required to perform two or more liver enzyme tests spaced at least six months or more apart. The plaintiff was incarcerated at Walker for less than two months and MacDougall for less than two weeks. Thus, there was no

basis for the defendants to refer the plaintiff for evaluation and treatment of Hepatitis C during those time periods.

The plaintiff has not met his burden of demonstrating that there are genuine issues of material fact as to whether he suffered from a serious medical condition during his incarceration at Walker, when blood tests performed in January 2002 revealed elevated liver enzyme levels. Thus, the plaintiff has failed to state a claim of deliberate indifference to a serious medical need. The defendants' motion for summary judgment is granted as to all federal claims against the defendants.

### C. *State Law Claims*

**\*6** The defendants argue that the court should decline to exercise jurisdiction over plaintiff's state law claims. The plaintiff asserts claims that in June 2003, the defendants denied his requests for copies of recent laboratory reports in violation of Connecticut General Statutes § 4–193. The plaintiff also claims that the defendants violated Connecticut General Statutes § 19a–103 when they failed to treat him for Hepatitis C.

Supplemental or pendent jurisdiction is a matter of discretion, not of right. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 715–26 (1966). Where all federal claims have been dismissed before trial, pendent state claims should be dismissed without prejudice and left for resolution by the state courts. *See* 28 U.S.C. § 1367(c)(3); *Giordano v. City of New York,* 274 F.3d 740, 754 (2d Cir.2001) (collecting cases). Because the court has dismissed all federal law claims, it declines to exercise supplemental jurisdiction over the plaintiff's state law claims.

### IV. *Conclusion*

The Motion for Summary Judgment [Doc. # 20] is GRANTED. The court declines to exercise supplemental jurisdiction over plaintiff's state law claims. The Clerk is directed to close this case.

This is not a recommended ruling. The parties have consented to the exercise of jurisdiction by a magistrate judge and the case was transferred to the undersigned for all purposes on March 1, 2005. (*See* Doc. # 18.)

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2006 WL 752857

---

     © 2020 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4863161
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court,
E.D. New York.

Ervin B. ROGERS, Plaintiff,

v.

NEW YORK CITY POLICE DEPARTMENT;
New York District Attorneys Office; and John
Doe, Shield # 1275, 67th Precinct, Defendants.

No. 12 CV 3042(CBA)(MG).
|
Oct. 12, 2012.

**Attorneys and Law Firms**

Ervin B. Rogers, East Elmhurst, NY, pro se.

### MEMORANDUM & ORDER

AMON, Chief Judge.

**\*1** Plaintiff Ervin B. Rogers, then detained at Rikers Island, brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 on June 13, 2012. Plaintiff's application to proceed *in forma pauperis* is granted pursuant to 28 U.S.C. § 1915. The New York City Police Department ("N.Y.P.D."), and the District Attorney's Office [1] are dismissed as defendants. Plaintiff's claims against the officer identified as defendant John Doe, Shield # 1275, may proceed.

[1]     Although plaintiff names the "New York District Attorneys Office," he gives the address for the Kings County District Attorney, located in Brooklyn. As the incidents are alleged to have occurred in Brooklyn, the Court surmises that plaintiff means to name the Kings County District Attorney and not the New York County District Attorney located in Manhattan.

### BACKGROUND

Plaintiff alleges that he was in his apartment at 1605 Nostrand Avenue on May 31, 2012, when he called 9–1–1 and asked to have a "guest" removed from his apartment. (Complaint

at 3.) [2] He states that he began to experience chest pains and took a nitroglycerin pill. (*Id.*) The police called EMTs, who placed plaintiff in an ambulance. (*Id.*) Plaintiff states that he began to feel better, so he left the ambulance and returned to his apartment. (*Id.*) Shortly thereafter, he left the building, and as he was walking back to his apartment, he was approached by a police vehicle. (*Id.* at 3, 4) According to plaintiff, the officer, identified as Shield # 1275, asked plaintiff to come to his car, and plaintiff refused. (*Id.*) The officer then exited his vehicle and told plaintiff to turn around and place his hands on a gate. (*Id.* at 4.) When plaintiff questioned the officer's instructions, the officer put him in a head lock, while another officer hit him in the head. (*Id.*) Plaintiff claims that he then passed out. (*Id.*). After he regained consciousness, plaintiff was handcuffed and taken to the police station. (*Id.*) Plaintiff claims that Officer # 1275 held his cuffed hands in an uncomfortable position. (*Id.*). Plaintiff also alleges that he informed the officers that he suffered from congestive heart failure, but they ignored his repeated requests for medical attention. (*Id.* at 4–5.) Plaintiff alleges that he passed out a second time and awoke in a cell. (*Id.* at 5) Shortly thereafter, plaintiff was taken to Kings County Hospital Center, where he was examined for his chest pains, but "not the injurise [*sic*] I suffered at the hand of Officer # 1275." (*Id.*)

[2]     As the pages are not consecutively paginated, the Court refers to the pages assigned by the Electronic Case Filing system.

Although it is not entirely clear, plaintiff appears to allege that the Brooklyn District Attorney's Office maliciously prosecuted him by holding him on a charge of resisting arrest for seven extra days after dismissing underlying charges. (*Id.*) Plaintiff wants to "clear my name" and seeks "compensatory and punitive damages for the beating I took at the hands of N.Y.P.D. office[r]# 1275." (*Id.* at 7)

### DISCUSSION

#### A. Standard of Review

Title 28 of the United States Code, § 1915A requires this Court to review the complaint in a civil action in which a prisoner seeks redress from a governmental entity or from officers or employees thereof, and to "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint is frivolous, malicious, or fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915A(b); *see Abbas v. Dixon,* 480 F.3d 636, 639

(2d Cir.2007). [3]  Similarly, pursuant to the *in forma pauperis* statute, the court must dismiss a complaint if it determines that the action is "(i) frivolous or malicious, (ii) fails to state a claim upon which relief may be granted, or (iii) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).

[3]      Although plaintiff has been released from custody, he was incarcerated at the time he filed his complaint and so is considered a "prisoner" under Section 1915A. *See* *Gibson v. Comm'r of Mental Health,* No. 04–cv–4350 (SAS), 2006 WL 1234971, *3 (S.D.N.Y. May 8, 2006) ("[C]ourts have determined that the PLRA does apply to a prisoner who filed suit during his confinement and thereafter was released from prison.").

**\*2**  A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim will be considered "plausible on its face" "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). Although a *pro se* complaint must contain sufficient factual allegations to meet the plausibility standard, it is still held to less stringent standards than pleadings drafted by lawyers. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *DiPetto v. U.S. Postal Serv.,* 383 F. App'x 102, 103 (2d Cir.2010). The court is obliged to construe plaintiff's pleadings liberally and interpret them as raising the strongest arguments they suggest, *Abbas,* 480 F.3d at 639. If a liberal reading of the complaint "gives any indication that a valid claim might be stated," the court should grant leave to amend. *See Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000); *Gomez v. USAA Fed. Sav. Bank,* 171 F.3d 794, 795 (2d Cir.1999).

### B. Claims against the N.Y.P.D. and the District Attorney's Office

The N.Y.P.D. and the Kings County District Attorney's Office are not themselves suable entities. The police department is an agency of New York City, and the New York City Charter provides that suits "shall be brought in the name of the City of New York and not in that of any agency." N.Y. City Charter § 396; *see also Jenkins v. City of New York,* 478 F.3d 76, 93 n. 19 (2d Cir.2007). A district attorney's office also is not a separate legal entity capable of being sued pursuant to § 1983. *See*

*Southerland v. Garcia,* No. 09–cv–2230 (JBW)(LB), 2010 WL 1849286, at *1 (E.D.N.Y. May 5, 2010); *Conte v. County of Nassau,* No. 06–CV–4746, 2008 WL 905879, at *1 n. 2 (E.D.N.Y. Mar. 31, 2008); *Hall v. Marshall,* 479 F.Supp.2d 304, 314 (E.D.N.Y.2007). Accordingly, the N.Y.P.D. and the District Attorney's Office are both dismissed as defendants.

Even construing plaintiff's claims against the N.Y.P.D. and Kings County D.A.'s office as claims against the City of New York, plaintiff still fails to state a claim. Municipalities such as the City of New York can be liable under 42 U.S.C. § 1983 only if a plaintiff can show that a municipal policy or custom caused the deprivation of his or her constitutional rights. *See Monell v. Dep't of Soc. Servs.,* 436 U.S., 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Walker v. City of New York,* No. 07–cv–1543 (JG), 2007 WL 1340252, at *2 (E.D.N.Y. May 4, 2007) ("A plaintiff is required to allege both the existence of a policy or custom and a causal connection between that policy and the unconstitutional conduct"). Proof of a single incident of unconstitutional activity is not sufficient to impose liability on a municipality unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy that can be attributed to a municipal policymaker. *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *Hartnagel v. City of New York,* No. 10–cv–5637 (TLM), 2012 WL 1514769, at *4 (E.D.N.Y. Apr. 30, 2012).

**\*3**  Plaintiff does not allege a valid *Monell* claim against the City. With respect to plaintiff's claim for excessive force, plaintiff has not alleged that his arrest or the officer's treatment of him resulted from a policy or custom attributable to the City. Similarly, regarding the claim for malicious prosecution, plaintiff has not alleged that the District Attorney's decision to charge plaintiff with resisting arrest and to hold plaintiff in custody for an additional week related to this charge was the result of a municipal policy. The isolated incidents described in the complaint are not sufficient to support an inference that any individual acted pursuant to a municipal policy or custom. *See Walker v. City of New York,* No. 07–cv–1543 (JG), 2007 WL 1340252, at *2 (E.D.N.Y. May 4, 2007) (dismissing complaint against City of New York where "even liberally construing plaintiff's claim, nothing suggest[ed] that the alleged constitutional violations were attributable to any municipal policy or custom").

Accordingly, the N.Y.P.D. and Kings County District Attorney's Office are both dismissed as defendants, with no substitution of the City of New York or another municipal

defendant. Plaintiff also may not name an individual prosecutor from the District Attorney's Office as a substitute defendant. Prosecutors are entitled to absolute prosecutorial immunity for "performing prosecutorial activities that are 'intimately associated with the judicial phase of the criminal process,' " including the decision whether or not to commence or maintain a prosecution. *Ying Jing Gan v. City of New York,* 996 F.2d 522, 530 (2d Cir.1993) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)).

### C. Identifying the John Doe Defendant

Plaintiff has provided the badge number and precinct assignment of the John Doe police officer whom he alleges used excessive force during his arrest on May 31, 2012. In *Valentin v. Dinkins,* 121 F.3d 72 (2d Cir.1997) (*per curiam* ), the Second Circuit made clear that a *pro se* litigant is entitled to assistance from the district court in identifying a defendant. *See Walker,* 2007 WL 1340252, at *2. Accordingly, the Court hereby requests the Corporation Counsel for the City of New York, within 45 days of the date of this Order, to ascertain the full name of the individual whom plaintiff has partially identified as John Doe, Shield # 1275, of the 67 th Precinct, and to provide the address where this defendant can currently be served. Once this information is provided, plaintiff's complaint shall be deemed amended to reflect the full name of this officer, a summons shall be issued, and the Court shall direct service on the defendant.

### CONCLUSION

For the reasons set forth above, all of the claims against the N.Y.P.D. and the Kings County District Attorney's Office are dismissed pursuant to 28 U.S.C. § 1915A(b) and 28 U.S.C. § 1915(e) (2)(B). No summonses shall issue against these agencies. The Clerk of Court is directed to amend the caption to reflect the dismissal of those defendants.

**\*4** Plaintiff's claims shall proceed against the remaining individual John Doe defendant. The Clerk of Court is respectfully directed to mail a copy of this Order and the Complaint to the New York City Law Department. Once Corporation Counsel has provided the requested information for the John Doe defendant, the Clerk is directed to amend the caption of the Complaint to reflect that information and to issue a summons. The United States Marshals Service is directed to serve a copy of the Complaint as amended by the Clerk, this Order, and the summons on the defendant. The Court refers this matter to Magistrate Judge Marilyn Go for pretrial supervision.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for purpose of an appeal. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4863161