UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ANDREA LAPIETRA and DEASHON TARVER,

                                    Plaintiffs,

v.                                                            9:19-CV-1527
                                                              (TJM/TWD)

OFFICER JAN MIKA, et al.,

                                    Defendants.
_____

APPEARANCES:                                    OF COUNSEL

ANDREA LAPIETRA
DEASHON TARVER
*Plaintiffs, pro se*
1030 Washington Ave.
#2
Albany, New York 12203

EUGENIA K. CONDON, ESQ.                 KEVIN M. CANNIZZARO, ESQ.
ALBANY COUNTY ATTORNEY                  Assistant Albany County Attorney
*Attorneys for Defendants C.O. Burns,*
*C.O. Durocher, C.O. Haley, and Sgt. Remillard*
112 State Street, Room 600
Albany, New York 12207


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

          Andrea LaPietra ("LaPietra") and Deashon Tarver ("Tarver") (together, "Plaintiffs")

commenced this action pursuant to 42 U.S.C. § 1983 claiming that law enforcement personnel,

officers at different correctional facilities, and medical professionals violated their constitutional

rights in a variety of ways, including through illegal searches, excessive force, and deliberate

indifference to serious medical needs.  (Dkt. No. 33 (the "amended complaint").)  This Court

reviewed the amended complaint in accordance with 28 U.S.C. § 1915, and found the following

claims required a response:

> (1) LaPietra's Fourth Amendment claims for illegal search and
> seizure against Officer Johnson, John Does 1-5, Jane Does 1
> and 2, Sergeant Doe 8, and Officer Mika;
>
> (2) Tarver's Fourth Amendment claims for false arrest and false
> imprisonment and related state-law claims against Officer
> Johnson, John Does 2-5, Jane Does 1 and 2, Sergeant Doe 8,
> and Officer Mika;
>
> (3) Tarver's Fourteenth Amendment claims for excessive force
> and state-law claims for negligent infliction of emotional
> distress against Officer Iannacito and John Does 10 and 11; and
>
> (4) Tarver's Fourteenth Amendment excessive force and failure to
> protect claims against C.O. Burns, C.O. Durocher, C.O. Haley,
> and Sgt. Remillard.

(Dkt. No. 37[1]; *see also* Dkt. Nos. 39, 45, 51.[2])  Officers Johnson, Mika, and Iannacito have

answered the amended complaint.  (Dkt. No. 50.)

Rather than answering, C.O. Burns, C.O. Durocher, C.O. Haley, and Sgt. Remillard

(together, "Defendants") have moved to dismiss Tarver's Fourteenth Amendment excessive

force and failure to protect claims.  (Dkt. No. 53.)  Plaintiffs opposed the motion.  (Dkt. No. 60.)

Defendants replied.  (Dkt. No. 61.)

Defendants' motion has been referred for a Report-Recommendation by the Honorable

Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.3(c).  For the reasons that follow, the Court recommends that Defendants' motion

be denied.

---

[1]  The Court assumed for purposes of initial review that Tarver was a pretrial detainee.

[2]  Plaintiff's motion for reconsideration of the Decision and Order adopting this Court's Report-
Recommendation regarding the initial review of the amended complaint remains pending and
will be decided in due course.  (Dkt. No. 51.)

## I.    RELEVANT BACKGROUND[3]

On March 13, 2018, Tarver was assaulted at Albany County Correctional Facility ("ACCF") while certain officers performed a "shakedown" and "a squat and cough" in Tarver's cell. (Dkt. No. 33 at 2, 137, 217-218.[4]) C.O. Burns punched Tarver in the face, pushed Tarver onto the bed, and sprayed him with mace. *Id*. at 218, 222. At the time of the assault, Tarver was naked and in a squat position, with his back facing the officers. *Id*. at 222. Sgt. Remillard, C.O. Durocher, and C.O. Haley were present during the assault and did not intervene on Tarver's behalf. *Id*. at 218, 222. As a result of being sprayed with mace, Tarver suffered swelling and burning in his eyes. *Id*. at 219.

After the incident, Tarver was placed in "lockdown" without any writing utensils or access to his mail, was "blocked from and denied grievances" and denied phone calls. *Id*. at 2, 137. He was "kept in solitary confinement 24 hours a day." *Id*. at 154. On April 5, 2018, Tarver was released from solitary confinement and subsequently transferred to Downstate Correctional Facility on April 21, 2018. *Id*. at 2.

Based on these allegations, as noted above, Tarver asserts Fourteenth Amendment excessive force and failure to protect claims against C.O. Burns, C.O. Durocher, C.O. Haley, and Sgt. Remillard.

Defendants principally argue Tarver's Fourteenth Amendment claims must be dismissed for failure to exhaust administrative remedies. (Dkt. No. 53-1 at 7-10.) C.O. Durocher, C.O.

---

[3] The background section is derived from relevant allegations in Plaintiffs' amended complaint and accepted as true for the purpose of Defendants' motion.
[4] Page references to docket entries are to the page number the Court's CM/ECF system automatically assigns.

Haley, and Sgt. Remillard also seek dismissal for lack of personal involvement and failure to state a claim upon which relief can be granted.  *Id*. at 10-13.

## II.    MOTION TO DISMISS

### A.    Standard of Review

A defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The motion tests the legal sufficiency of the complaint and whether it conforms to Rule 8(a)(2) of the Federal Rules of Civil Procedure.  To survive a motion to dismiss, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief."  *Id*. at 679 (internal citation and punctuation omitted).  "Factual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears there are not "enough facts to state a claim to relief that is plausible on its face."  *Id*. at 570.  While Rule 8(a)(2) "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me-accusation."  *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted).  In other words, a complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice.  *Id*. (citation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly*). Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "[t]he problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Id*.

### B.    Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "The PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and

whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

To properly exhaust his administrative remedies, an inmate must complete the administrative review process in accord with the applicable state procedural rules. *Jones v. Bock*, 549 U.S. 199, 218-19 (2007). The PLRA contains one "textual exception to mandatory exhaustion." *Ross v. Blake*, 578 U.S. 632, 642 (2016). "Under § 1997e(a), the exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones." *Id*. The Second Circuit has explained that "an administrative remedy may be unavailable when": (1) "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) "an administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123-24 (2d Cir. 2016) (quoting *Ross*, 578 at 643).

Because "[f]ailure to exhaust administrative remedies is an affirmative defense," it is "not a pleading requirement." *Id*. at 122. Thus, "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Id*. (quoting *Jones*, 549 U.S. at 216). "However, a district court still may dismiss a complaint for failure to exhaust administrative remedies if it is clear on the face of the complaint that the plaintiff did not satisfy the PLRA exhaustion requirement." *Id*.

Here, Defendants argue Tarver's Fourteenth Amendment excessive force and failure to protect claims must be dismissed because it is clear from the face of the amended complaint, and it is entirely implausible, that Tarver exhausted his administrative remedies prior to commencing

6

this action.  (Dkt. No. 53-1 at 7-10.)  To that end, Defendants point to Plaintiff's "numerous

contradictory allegations regarding the availability of the inmate grievance process at ACCF."

*Id*. at 7.

    For example, Plaintiffs claim that after the alleged excessive force incident, he was

placed in "lockdown", denied access to writing materials and his mail, and was "blocked from

grievance."  (Dkt. No. 33 at 137.[5])  However, Plaintiffs claim Tarver submitted a "kite" on a

"plain piece of paper as a formal grievance for his assault."  *Id*. at 253.  Then, Plaintiffs claim

Tarver "was unaware there even were grievance procedures because they never advised him in

writing."  *Id*. at 255.  Thus, according to Defendants, the amended complaint, "explicitly

concedes by its own allegations that Plaintiff [Tarver] did not in reality attempt to properly

follow the existing procedures because at the time Tarver was entirely unaware of the grievance

procedure itself."  (Dkt. No. 53-1 at 8.)  In sum, Defendants argue Plaintiffs' conflicting

allegations are the "essence of implausibility and are in reality a smokescreen for the fact that the

[amended] [c]omplaint taken together establishes one thing: Plaintiff [Tarver] did not exhaust his

administrative remedies because he was unaware of either the ACCF grievance procedure or his

responsibility to follow it."  *Id*. at 10.

    Based upon the face of the amended complaint, it is not clear that Plaintiff failed to

satisfy the PLRA exhaustion requirement.  Not only is there no discussion whatsoever of the

grievance procedures at ACCF,[6] but taking Plaintiffs' allegations as true and drawing all

---

[5]  Defendants also note that Tarver's claim that he had no access to a pen and paper is further
contradicted by the allegations contained in the amended complaint indicating that he "dropped"
"multiple slips" for toothache pain during the relevant time frame yet somehow was denied
writing materials and mail.  (Dkt. No. 53-1 at 9 n.3.)

[6]  Courts typically examine a facility's grievance procedures to determine whether a claim has
been exhausted.  *See Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009).

reasonable inferences in Plaintiffs favor as the Court must at this stage, Tarver was "blocked from and denied grievances" at ACCF and the grievance process was unavailable to him. (Dkt. No. 33 at 2, 137.) To be sure, as Defendants highlight, there are many conflicting claims regarding the availability of the grievance process. *See, e.g.*, *id.* at 254 ("The CO [Tarver] handed the kite to probably never even submitted the grievance"), 255 (Tarver "was unaware there were even grievance procedures"); *but see id.* at 253 ("Commission of Corrections had already been contacted and investigated the matter"). Nevertheless, "[w]here, as here, a plaintiff claims that the grievance process was unavailable to him, . . . it would be improper to grant [d]efendants' motion to dismiss." *Henry v. Liberty*, 9:15-cv-01108 (MAD/DEP), 2016 WL 5462825, at *2 (N.D.N.Y. Sept. 29, 2016).

Therefore, at this early stage of the proceedings, the Court recommends denying Defendants' motion to dismiss on exhaustion grounds. The Court expresses no opinion on the viability of a dispositive motion for failure to exhaust following discovery on that issue.

### B.    Fourteenth Amendment Excessive Force and Failure to Protect Claims

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (internal quotation marks and citation omitted); *accord Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). Thus, "[w]hen a citizen is subjected to excessive force, 'an officer who fails to intervene where he or she observes or has reason to know that excessive force is being used or a constitutional violation has been committed by a fellow officer is liable for the preventable harm caused by that officer.'" *Boyde v. Deputy Uzunoff*, No. 9:21-CV-0741 (TJM/ATB), 2021 WL 3185472, at *6 (N.D.N.Y. July 28, 2021) (quoting *Portillo v. Webb*, No. 16-CV-4731, 2017 WL

8

4570374, at *4 (S.D.N.Y. Oct. 11, 2017) (collecting cases), *report-recommendation adopted*,

2018 WL 481889 (S.D.N.Y. Jan. 17, 2018)).

      "As opposed to deliberate indifference claims brought by post-conviction prisoners—

which arise under the Eighth Amendment—claims for deliberate indifference brought by state

pretrial detainees arise under the Fourteenth Amendment." *Blake v. Kelly*, No. 12 Civ.

7245(ER), 2014 WL 4230889, at *4 (S.D.N.Y. Aug. 26, 2014).  The Second Circuit recently

altered the analysis used in Fourteenth Amendment deliberate indifference cases following the

Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015).[7]  Under current

Second Circuit law, when a pretrial detainee plaintiff brings § 1983 claims alleging deliberate

indifference, including claims alleging failure to protect or intervene, the plaintiff must satisfy a

two-prong test by showing: (1) "he is incarcerated under conditions posing a substantial risk of

serious harm," *Hayes v. N. Y. C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996), and (2) "the

defendant-official acted intentionally . . . or recklessly failed to act with reasonable care to

mitigate the risk . . . even though the defendant-official knew, or should have known, that the

condition posed an excessive risk to health or safety." *Darnell v. Pineiro*, 849 F.3d 17, 30, 35

(2d Cir. 2017); *see, e.g.*, *Taylor v. City of New York*, No. 16 Civ. 7857 (NRB), 2018 WL

1737626, at *11 (S.D.N.Y. Mar. 27, 2018) ("Although *Darnell* involved a Fourteenth

---

[7]  In *Kingsley*, the Supreme Court distinguished between Eighth and Fourteenth Amendment excessive force claims and held that a pretrial detainee need not demonstrate that an officer accused of using excessive force was subjectively aware that his use of force was unreasonable. *Kingsley*, 576 U.S. at 396-97.  Rather, "to prove an excessive force claim, a pretrial detainee must show . . . only that the officers' use of that force was objectively unreasonable." *Id*.  In making that objective determination, the court must view the matter from "the perspective of a reasonable officer on the scene," and consider "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id*. at 397.

Amendment challenge to a prisoner's conditions of confinement, its holding applies with equal measure to failure to protect claims."); *Corley v. City of New York*, No. 1:14-cv-3202-GHW, 2017 WL 4357662, at *12 (S.D.N.Y. Sept. 28, 2017) ("[T]he second prong of this claim is measured by an objective standard: whether [the defendants] 'knew or should have known' that a substantial risk [of] serious harm would result from their failure to intervene." (citing *Darnell*, 849 F.3d at 35)); *Molina v. Cty. of Westchester*, No. 16 CV 3421 (VB), 2017 WL 1609021, at *2-3 (S.D.N.Y. Apr. 28, 2017) (applying the deliberate indifference standard articulated in *Darnell* to a failure to protect claim).

"An officer who fails to intervene is 'liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know that excessive force is being used.'" *Gochnour v. Burri*, No. 6:15-CV-06174 EAW, 2018 WL 10944594, at *3 (W.D.N.Y. July 9, 2018) (quoting *Anderson v. Branen*, 17 F.3d at 557). "Thus, liability attaches where (1) the officer had a realistic opportunity to intervene to prevent the harm; (2) a reasonable person in the officer's position would have known that the victim's constitutional rights were being violated; and (3) the officer did not take reasonable steps to intervene." *Id*. (citing *Jean-Laurent v. Wilkerson*, 438 F. Supp. 2d 318, 327 (S.D.N.Y. 2006), *aff'd*, 461 F. App'x 18 (2d Cir. 2012)); *see Vann v. Sudranski*, No. 16-cv-7367 (VB), 2020 WL 3001072, at *6 (S.D.N.Y. June 4, 2020) ("[F]or liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring.") (quoting *Jean-Laurent v. Wilkerson*, 461 F. App'x 18, 21 (2d Cir. 2012)). "Whether the officer had a 'realistic opportunity' to intervene is normally a question for the jury, unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Sloley v. Vanbramer*, 945 F.3d 30, 47 (2d Cir. 2019 ) (citation omitted).

Here, Defendants contend Plaintiffs have "utterly failed to assert sufficient factual allegations" that Sgt. Remillard, C.O. Durocher, and/or C.O. Haley "acted with the necessary deliberate indifference to render" a failure to protect or failure to intervene claim plausible. (Dkt. No. 53-1 at 10-11.)  The Court disagrees and notes the deliberate indifference cases relied upon by Defendants are inapposite.  *See Leckie v. City of New York*, No. 18-CV-3917, 2021 WL 84234, at *5 (E.D.N.Y. Jan. 11, 2021) (granting summary judgment to defendant officer on Fourteenth Amendment failure to protect/failure to intervene claim where the undisputed facts showed the officer responded to the altercation "by promptly activating the alarm, summoning a Probe Team, and separating Leckie from the other inmates."); *Clark v. Gardner*, 256 F. Supp. 3d 154, 167-68 (N.D.N.Y. 2017) (dismissing Eighth Amendment failure to protect/intervene claims on initial review where plaintiff failed to plead the defendant officer knew of any risk or danger the inmate may have faced, let alone that he acted with deliberate indifference thereto).

Contrary to Defendants' assertion, "[a]t the [motion to dismiss] stage, the issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims.  Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test." *McGuire v. Warren*, 207 F. App'x 34, 35 (2d Cir. 2006) (citations and quotation marks omitted).  Here, the Court finds the amended complaint plausibly alleges Sgt. Remillard, C.O. Durocher, and C.O. Haley "acted intentionally . . . or recklessly failed to act with reasonable care to mitigate the risk . . . even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d 17 at 35.  As such, the Court recommends denying Defendants' motion on this ground.

Defendants further contend the amended complaint fails to plausibly establish Sgt. Remillard, C.O. Durocher, and C.O. Haley would have had a reasonable opportunity to intervene during the alleged March 13, 2018, incident.  (Dkt. No. 53-1 at 11.)  According to Defendants, the alleged incident between Tarver and C.O. Burns "was sudden and there was no reasonable opportunity for officers to prevent the incident."  (Dkt. No. 53-1 at 11.)  Again, the Court disagrees.  The Second Circuit has rejected the notion that there is any "bright-line" for the amount of time under which a failure to intervene claim is not actionable.  *Figueroa v. Mazza*, 825 F.3d 89, 107 (2d Cir. 2016).  Instead it has emphasized that:

> Failure-to-intervene claims can arise out of a limitless variety of factual circumstances.  In each case, the question whether a defendant had a realistic chance to intercede will turn on such factors as the number of officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other considerations.  Among these considerations, of course, the assault's duration will always be relevant and will frequently assume great importance.

*Id*.

Here, although the exact duration of the alleged excessive force incident is unclear, Plaintiffs allege C.O. Burns engaged in a series of violent acts: first punching Tarver, then pushing him to the bed, and finally spraying him with mace.  (Dkt. No. 33 at 218.)  These allegations plausibly suggest that entire incident was of long enough duration that Sgt. Remillard, C.O. Durocher, and C.O. Haley, all of whom were alleged to be present and participated in the "shakedown" of Tarver's cell and witnessed C.O. Burns' actions, could interceded at some point.[8]  Accordingly, the Court recommends that Defendants' motion be denied on this ground.

---

[8]  Moreover, "[w]hether the officer had a realistic chance to intervene is normally a question for the jury, unless, considering all the evidence, a reasonable jury could not possibly conclude

Defendants next contend Plaintiffs have failed to establish the personal involvement of Sgt. Remillard, C.O. Durocher, and C.O. Haley in the excessive force claim. (Dkt. No. 53-1 at 13.)

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional depravations is a prerequisite to an award of damages under § 1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffit v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). Thus, "[i]n order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation and that particular defendant." *Green v. Walsh*, No. 9:05-CV-00327 (TJM/DEP), 2008 WL 4517975, at *5 (N.D.N.Y. Sept. 29, 2008).

Here, Defendants argue the Fourteenth Amendment excessive force claims must be dismissed against Sgt. Remillard, C.O. Durocher, and C.O. Haley because there are "absolutely no factual allegations that could be plausibly read to suggest these officers engaged in excessive force against" Tarver. (Dkt. No. 53-1 at 13.) However, when the alleged constitutional violation is excessive force, "an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even when he had the opportunity to so." *Jordan v. Fischer*, 773 F. Supp. 2d 255, 274 (N.D.N.Y. 2010). As noted, all three of officers were alleged to be present and failed to intervene to protect Tarver from C.O. Burns' use of excessive force. *See,*

---

otherwise." *Terebesi v. Torreso*, 764 F.3d 217, 244 (2d Cir. 2014) (cleaned up); *see, e.g.*, *Mason v. Moore*, No. 9:17-CV-1086 (GLS/DJS), 2020 WL 555943, at *5 (N.D.N.Y. Jan. 13, 2020) (rejecting the defendant officers' argument that because the excessive force incident in question lasted only approximately fifteen to twenty seconds, summary judgment was appropriate on the ground that the defendants would not have had an opportunity to intervene), *report-recommendation adopted*, 2020 WL 554816 (N.D.N.Y. Feb. 4, 2020).

*e.g.*, Dkt. No. 33 at 137 ("Tarver . . . was assaulted by C.O. Burns, Sgt. Remillard, and the C.O.s

listed in the incident report on March 13, 2018."), 217 ("Each C.O. participated in the

shakedown of Mr. Tarver's cell and the squat and cough.  Mr. Tarver was assaulted as part of

that squat and cough on March 13, 2018[,] and C.O. Durocher, C.O. Haley failed to stop what

was happening to Mr. Tarver and to protect him.  C.O. Burns punched Mr. Tarver, pushed Mr.

Tarver on the bed, and maced/pepper sprayed him.  [Sgt.] Remillard stood outside the cell

watching.").  At this stage, Plaintiffs have plausibly alleged the personal involvement of Sgt.

Remillard, C.O. Durocher, and C.O. Haley in the excessive force incident.  Therefore, the Court

recommends denying Defendants' motion on this ground.

Moreover, in their response to Defendants' motion, Plaintiffs state that Sgt. Remillard,

C.O. Durocher, and C.O. Haley were "participating" in the "squat and cough" and "these same

several officers" pushed Tarver onto the bed and "then continued to mace him ever after he was

down on the bed."  (Dkt. No. 60 at 11.)  Plaintiffs further state that Sgt. Remillard and C.O.

Burns provided "statements in the incident report where [C.O.] Burns admitted to restraining Mr.

Tarver on the bed and handcuffing him.  He also admits in a statement that Sgt. Remillard

applied pepper spray to Mr. Tarver."  *Id*. at 17.  Plaintiffs further claim the officers "were

responsible for restraining [Tarver] on the bed after he had been maced by C.O. Burns, and they,

as a group, continued to mace him while Mr. Tarver was already restrained on the bed.  So they

were involved in his assault."  *Id*.

Here, the Court agrees with Defendants that Plaintiffs have supplemented the factual

allegations of the amended complaint by adding additional facts in their opposition papers.  (Dkt.

No. 61 at 5; *compare* Dkt 60 at 10-11, 17 *with* Dkt. No. 33 at 217-219.)  Nevertheless, Plaintiffs

are not "bound by the allegations contained in the four corners" of their pleading.  (Dkt. No. 61

at 5.)  To be sure, while some of this information was not initially pleaded in the amended

complaint, which this Court previously described as a rambling, disjointed mix of allegations,

legal articles, statutes, and caselaw, (Dkt. No. 36 at 3), "where a *pro se* plaintiff has submitted

other papers to the Court, such as legal memoranda, the Court may consider statements in such

papers to supplement or clarify the plaintiff's pleaded allegations."  *Sommersett v. City of New*

*York*, No. 09-cv-5916, 2011 WL 2565301, at *3 (S.D.N.Y. June 28, 2011); *see Walker v. Schult*,

717 F.3d 119, 122 n.1 (2d Cir. 2013) ("A district court deciding a motion to dismiss may

consider factual allegations made by a *pro se* party in his papers opposing the motion."); *Brooks*

*v. Jackson*, No. 11-cv-6627, 2013 WL 5339151, at *3 (S.D.N.Y. Sept. 23, 2013) ("[B]ecause a

*pro se* plaintiff's allegations must be construed liberally, it is appropriate for a court to consider

factual allegations made in a *pro se* plaintiff's opposition memorandum, as long as the

allegations are consistent with the complaint.").

      In sum, drawing "all reasonable inferences" in Plaintiffs' favor, as required in ruling on a

motion to dismiss, *see Interworks Sys. Inc. v. Merchant Fin. Corp.*, 604 F.3d 692, 699 (2d Cir.

2010), the Court finds the amended complaint plausibly alleges Fourteenth Amendment

excessive force and failure to protect claims against Defendants.

      Accordingly, the Court recommends denying Defendants' motion for failure to state a

claim.  It bears repeating that this recommendation is based on the relatively lenient standard

applicable to Rule 12(b)(6) motions.  It remains to be seen whether, after discovery, summary

judgment may be appropriate.

III.     **CONCLUSION**

For the reasons stated above, the Court finds Plaintiffs' amended complaint plausibly alleges unavailability of administrative procedures and states Fourteenth Amendment excessive force and failure to protect claims against Defendants.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion to dismiss (Dkt. No. 53) be **DENIED**; and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[9]  Such objections shall be filed with the Clerk of the Court.  <u>**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS**</u> <u>**WILL PRECLUDE APPELLATE REVIEW**</u>.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: November 9, 2021
        Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[9]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

2016 WL 5462825

2016 WL 5462825
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Paul HENRY, Plaintiff,
v.
C.O. Matthew L. LIBERTY; C.O. Justin M.
Reil; and C.O.S John Doe, Respondent.

9:15-cv-01108 (MAD/DEP)
|
Signed 09/29/2016

**Attorneys and Law Firms**

PAUL HENRY, 07-A-1752, Attica Correctional Facility, Box 149, Attica, New York 14011, Plaintiff pro se.

ERIC T. SCHNEIDERMAN, ATTORNEY GENERAL OF, THE STATE OF NEW YORK, The Capitol, OF COUNSEL: RACHEL M. KISH, AAG, Albany, New York 12224, Attorneys for Respondent.

**ORDER**

Mae A. D'Agostino, U.S. District Judge.

 **\*1** Paul Henry ("Plaintiff"), currently incarcerated at Attica Correctional Facility in Attica, New York, brings this civil rights action as a *pro se* litigant, pursuant to 42 U.S.C. § 1983. *See* Dkt. No. 1 at ¶ 1. Correction Officers Matthew L. Liberty and Justin M. Reil (collectively "Defendants") have moved to dismiss Plaintiff's complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)") for failure to state a claim upon which relief can be granted. *See* Dkt. No. 16. On July 18, 2016, Magistrate Judge David E. Peebles issued a Report and Recommendation, recommending that Defendants' motion to dismiss be denied without prejudice to renew at a later procedural juncture. *See* Dkt. No. 20. The Parties have not filed any objections to the Report and Recommendation.

Plaintiff alleges that, on October 28, 2012, Defendants and ten other correction officers assaulted him at the Clinton Correctional Facility, which caused traumatic injuries to his head, chest, back, torso, lower extremities, and genitalia. *See* Dkt. No. 1 at ¶ 6. Plaintiff's injuries required hospitalization for several days. *See id.* Plaintiff commenced this action

on September 14, 2015. *See* Dkt. No. 1. In his complaint, Plaintiff claims that Defendants' actions violated his Eighth Amendment rights to be free from cruel and unusual punishment. *See id.* at ¶ 7. Plaintiff states in the complaint that he did not file a grievance regarding the alleged assault. *See id.* at ¶ 4. Defendants move to dismiss Plaintiff's complaint contending that Plaintiff failed to exhaust his administrative remedies. *See* Dkt. No. 16-1. According to Defendants, Plaintiff did not utilize the prison grievance procedure that was available to him prior to commencing this Section 1983 action, which is in violation of the Prison Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a). *See* Dkt. No. 16-1 at 2-6. Plaintiff opposed the motion claiming that he was not required to grieve the incident because it was "non-grievable" pursuant to "DOCCS Directive Number 3375R." [1] *See* Dkt. No. 18 at 7-8. Plaintiff also argued that, during the grievance period, he was hospitalized due to his injuries from the assault and then transferred to the special housing unit ("SHU"). *See id.* While in SHU, the correction officers would not provide him with forms upon his request, according to Plaintiff. *See id.*

---

[1]    "[T]he mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint." *Cusamano v. Sobek*, 604 F. Supp. 2d 416 461 (N.D.N.Y. 2009).

In his Report and Recommendation, Magistrate Judge Peebles recommends that Defendants' motion be denied without prejudice to renew at a later procedural juncture. *See* Dkt. No. 20. Specifically, Magistrate Judge Peebles found that there is no merit to Plaintiff's first argument that a "DOCCS Directive" excuses Plaintiff's failure to exhaust administrative remedies because the directive cited is specific to City of New York Department of Correction, which is not inclusive of Attica Correctional Facility. *See id.* However, Magistrate Judge Peebles found that, accepting Plaintiff's statements as true, Plaintiff was denied access to the Inmate Grievance Program ("IGP") when the correction officers would not provide him with the grievance forms in SHU. *See id.* (citing *Manon v. Albany County*, No. 11–CV–1190, 2012 WL 6202987, \*5 (N.D.N.Y. Oct. 9, 2012) (Hummel, M.J.), *adopted by* 2012 WL 6202984 (Suddaby, J.)). Accordingly, Magistrate Judge Peebles concluded that, at this early stage in the proceeding, Defendants are unable to establish that the

Case 9:19-cv-01527-TJM-TWD    Document 64    Filed 11/09/21    Page 18 of 124
Henry v. Liberty, Not Reported in Fed. Supp. (2016)
2016 WL 5462825

IGP was available to Plaintiff prior to the commencement of this action. *See id.* at 16.

**\*2** In reviewing a report and recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When a party makes specific objections to a magistrate judge's report, the district court engages in *de novo* review of the issues raised in the objections. *See id.*; *Farid v. Bouey*, 554 F. Supp. 2d 301, 307 (N.D.N.Y. 2008). When a party fails to make specific objections, the court reviews the magistrate judge's report for clear error. *See Farid*, 554 F. Supp. 2d at 307; *see also Gamble v. Barnhart*, No. 02-CV-1126, 2004 WL 2725126, \*1 (S.D.N.Y. Nov. 29, 2004). Failure to object timely to any portion of a magistrate judge's report operates as a waiver of further judicial review of those matters. *See Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (quoting *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989)). Here, the Parties have not filed any objections to the Report and Recommendation.

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 30 L.Ed. 2d 652 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond*, 00 CIV. 3725, 2001 WL 527484, \*1 (S.D.N.Y. May 16, 2001)).

In the present matter, having carefully reviewed Magistrate Peebles' Report and Recommendation, the Parties' submissions, and the applicable law, the Court concludes that Magistrate Judge Peebles correctly determined that Defendants are unable to establish their affirmative defense that Plaintiff did not exhaust his administrative remedies prior to commencing this action. To be sure, PLRA "requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action." *Brooks v. Rock*, No. 9:11-cv-1171, 2014 WL 1292232, \*8 (N.D.N.Y. Mar. 28, 2014); *see also* 42 U.S.C. § 1997e(a); *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). However, there is "one significant qualifier: the remedies must indeed be 'available' to the prisoner." *See Ross*, 136 S. Ct. at 1856, 1858 (stating that, under PLRA, an inmate must exhaust available remedies, "but need not exhaust unavailable ones."). Where, as here, a plaintiff claims that the grievance process was unavailable to him, the Court agrees with Magistrate Judge Peebles that it would be improper to grant Defendants' motion to dismiss.

Accordingly, the Court hereby

**ORDERS** that Magistrate Judge Peebles' Report and Recommendation is **ADOPTED** in its entirety; and the Court further

**ORDERS** that Defendants' motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is **DENIED without prejudice**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on all parties in accordance with the Local Rules; and the Court further

**IT IS SO ORDERED.**

Dated: September 29, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5462825

---

**End of Document**    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3185472
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Johnny William BOYDE, Plaintiff,

v.

Deputy UZUNOFF, Defendant.
Johnny William Boyde, Plaintiff,

v.

Deputy Sheriff Quigley, Defendant.
Johnny William Boyde, Plaintiff,

v.

Onondaga County Justice Center, Defendant.
Johnny William Boyde, Plaintiff,

v.

Sergeant L. McCarty, et al., Defendants.

9:21-CV-0741 (TJM/ATB), 9:21-
CV-0742 (TJM/ATB), 9:21-
CV-0748 (TJM/ATB), 9:21-CV-0837 (TJM/ATB)
|
Signed 07/28/2021

**Attorneys and Law Firms**

JOHNNY WILLIAM BOYDE, Plaintiff, pro se, 07001284, Onondaga County Justice Center, 555 South State Street, Syracuse, NY 13202.

**DECISION and ORDER**

THOMAS J. McAVOY, Senior United States District Judge

**I. INTRODUCTION**

**\*1** The Clerk has sent to the Court for review four complaints filed by pro se plaintiff Johnny William Boyde in the above-captioned actions, along with a letter request for a "speedy release" filed in two of these actions. Plaintiff, who is confined at the Onondaga County Justice Center and has not paid the filing fee in any of these actions, seeks leave to proceed in forma pauperis ("IFP"). [1]

---

[1]    In addition to the four complaints recited in the caption, plaintiff recently filed two other civil rights actions in this District. *See Boyde v. Onondaga County Justice Center et al.*, 9:21-CV-0796 (TJM/ATB), Dkt. No. 1 (N.D.N.Y. filed

July 13, 2021); *Boyde v. Onondaga County Justice Center et al.*, 9:21-CV-0797 (TJM/ATB), Dkt. No. 1 (N.D.N.Y. filed July 13, 2021). As a result of plaintiff's failure to comply with the filing fee requirements, these two actions were both administratively closed.

**II. CONSOLIDATION**

Rule 42(a) of the Federal Rules of Civil Procedure provides for the consolidation of actions pending before the court which involve "a common question of law or fact." Fed. R. Civ. P. 42(a)(2). As the Second Circuit has recognized, "[t]he trial court has broad discretion to determine whether consolidation is appropriate," *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284-85 (2d Cir. 1990), and may consolidate actions sua sponte. *Devlin v. Transportation Commc'ns Intern. Union*, 175 F.3d 121, 130 (2d Cir. 1999). The Court must consider in each case the possible risks and benefits of consolidation. "The paramount concern is whether savings of expense and gains of efficiency can be accomplished without sacrifice of justice." *Wolm v. Ahern*, Nos. 14-CV-3978, 14-CV-4177, 2014 WL 5171763, at \*1 (E.D.N.Y. Oct. 8, 2014).

Upon review of the four complaints filed by plaintiff, the Court finds that common questions of law and fact exist in these cases. In three of these actions, plaintiff asserts claims arising out of the same incident that allegedly occurred on May 14, 2021, at the Onondaga County Justice Center. *See Boyde v. Uzunoff*, 9:21-CV-0741 ("*Boyde I*"), Dkt. No. 1 (N.D.N.Y. filed June 29, 2021); *Boyde v. Quigley*, 9:21-CV-0742 ("*Boyde II*"), Dkt. No. 1 (N.D.N.Y. filed June 29, 2021); and *Boyde v. Onondaga County Justice Center*, 9:21-CV-0748 ("*Boyde III*"), Dkt. No. 1 (N.D.N.Y. filed June 30, 2021). Moreover, the allegations in the body of the pleadings in *Boyde I*, *Boyde II*, and *Boyde III* are virtually identical. *See Boyde I*, Dkt. No. 1 at 2-4; *Boyde II*, Dkt. No. 1 at 2-4; *Boyde III*, Dkt. No. 1 at 2-4. Indeed, the only difference between the three pleadings is that each names a different defendant. In addition, plaintiff attached the same exhibits to each of these complaints. *See Boyde I*, Dkt. No. 1-2; *Boyde II*, Dkt. No. 1, at 5-11; *Boyde III*, Dkt. No. 1, at 5-11.

In the fourth action, plaintiff names Sergeant McCarty as a defendant, along with Uzunoff, Quigley, and the Onondaga County Justice Center, and the body of the complaint, in addition to citing case law, vaguely alleges only that Sergeant McCarty was involved in wrongdoing with Uzunoff and Quigley. *See Boyde v. McCarty*, 9:21-0837 ("*Boyde IV*"), Dkt. No. 1 (N.D.N.Y. filed July 23, 2021). [2]

2    Two almost identical versions of this pleading are docketed as amended complaints in *Boyde I* and *Boyde II. See Boyde I*, Dkt. No. 8; *Boyde II*, Dkt. No. 7. Because the Court has decided to consolidate the four above-captioned actions, and consider the allegations in *Boyde IV* as part of its sufficiency review herein, the Court need not and will not separately address the amended complaints in *Boyde I* and *Boyde II*, which suffer from the same deficiencies as the complaint in *Boyde IV*, as discussed more fully below.

**\*2** Based upon the foregoing, the Court hereby consolidates these actions. Fed. R. Civ. P. 42(a). *Boyde I* shall be referred to and treated as the "lead" case, and all subsequent orders of this Court and papers that are submitted by the parties hereto that pertain to any of the foregoing actions shall be filed in *Boyde I*. Because the complaints in *Boyde II, Boyde III*, and *Boyde IV* include claims against Deputy Sheriff Quigley, Sergeant McCarty, and the Onondaga County Justice Center, copies of these pleadings shall be filed in *Boyde I*, immediately following the signature page of that pleading, and these four complaints shall collectively be considered the operative pleading (hereinafter cited as "Compl."), subject to the Court's review in accordance with 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A. 3

3    Because the exhibits filed in *Boyde I, Boyde II*, and *Boyde III* are identical, the Clerk need not file the exhibits to *Boyde II* and *Boyde III* as part of the consolidated pleading.

## III. IN FORMA PAUPERIS APPLICATION

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, No. 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010). 4 "Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Id.* (citing 28 U.S.C. § 1915(b) and *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

4    Section 1915(g) prohibits a prisoner from proceeding in forma pauperis where, absent a showing of "imminent danger of serious physical injury," a prisoner has filed three or more actions or appeals that were subsequently dismissed as frivolous, malicious, or failing to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(g). Based upon the Court's review of plaintiff's litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service, it does not appear that plaintiff has accumulated three strikes for purposes of 28 U.S.C. § 1915(g).

Upon review, the Court finds that plaintiff has submitted a completed in forma pauperis application in *Boyde I* which has been certified by an appropriate official at his facility, *see* Dkt. No. 4, and which demonstrates economic need. *See* 28 U.S.C. § 1915(a)(2). Plaintiff has also filed the inmate authorization required in the Northern District. Dkt. No. 5.

Accordingly, plaintiff's application in *Boyde I* to proceed with this action in forma pauperis is granted. The in forma pauperis applications filed in *Boyde II and Boyde III* are denied as moot. 5

5    Plaintiff did not file a separate in forma pauperis application with the complaint that he filed in *Boyde IV*. While ordinarily, this would necessitate administrative closure for failure to comply with the filing fee requirement, the Court's decision to consolidate the above-captioned actions moots the need for a separate application to proceed in forma pauperis in *Boyde IV*.

## IV. SUFFICIENCY OF THE CONSOLIDATED COMPLAINT

### A. Governing Legal Standard

Having found that plaintiff meets the financial criteria for commencing this action in forma pauperis, and because plaintiff seeks relief from a governmental entity or an officer or employee of a governmental entity, the Court must consider the sufficiency of the allegations set forth in his consolidated complaint in light of 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b).

Section 1915(e) directs that, when a plaintiff seeks to proceed in forma pauperis, "(2) ... the court shall dismiss the case at any time if the court determines that – ... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against

a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [6] Thus, even if a plaintiff meets the financial criteria to commence an action in forma pauperis, it is the court's responsibility to determine whether the plaintiff may properly maintain the complaint that he filed in this District before the court may permit the plaintiff to proceed with this action in forma pauperis. *See id.*

[6]     To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

**\*3** Likewise, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A; *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (Section 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee); *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (stating that both sections 1915 and 1915A are available to evaluate prisoner pro se complaints).

In reviewing a pro se complaint, the court has a duty to show liberality toward pro se litigants, *see Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and should exercise "extreme caution ... in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted). Therefore, a court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Although the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Thus, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id.* (internal quotation marks and alterations omitted).

### B. Summary of the Consolidated Complaint

Plaintiff asserts allegations of wrongdoing that occurred during his confinement at the Onondaga County Justice Center. *See generally* Compl. The consolidated complaint is extremely brief. The following facts are set forth as alleged by plaintiff in his consolidated complaint, or indicated in documents attached thereto.

On May 14, 2021, plaintiff was "observed laying on [his] cell floor kicking the chair repeatedly." Compl. at 2; Dkt. No. 1-1 at 2-3. "Mental health then came to speak to the plaintiff, [who was] ordered by two [corrections sergeants] to move cells[.]" Compl. at 2. Plaintiff refused to move because his "legs [were] all twisted," and he could not "stand up." *Id.*

Plaintiff names Deputy Sheriff Uzunoff, Deputy Sheriff Quigley, Sergeant McCarty, and the Onondaga County Justice Center as defendants. *See* Compl. at 1-2, 5-6, 9-10, 13-15.

Although no further facts are alleged in the body of the consolidated complaint, the documents attached thereto include a disciplinary hearing report, which contains written statements from defendants Uzunoff and Quigley. *See* Dkt. No. 1-1 at 2-3. The statements from defendants Uzunoff and Quigley indicate as follows: (1) on May 14, 2021, defendant Uzunoff witnessed plaintiff laying on his mattress on the floor of his cell without pants on; (2) defendant Uzunoff ordered plaintiff to stand and place his mattress on his bunk; (3) plaintiff first stated that he could not feel his legs, then stood up and began asking questions; (4) a group of officials arrived at the cell to assist defendant Uzunoff; (5) defendant Uzunoff again asked plaintiff to pick up his mattress, place it on the bunk, and face the rear wall; (6) plaintiff failed to comply with the directive; (7) defendant Uzunoff then opened plaintiff's cell door and the team of officials, which included defendant Quigley, entered; (8) upon entering the cell, defendant Quigley grabbed plaintiff's right wrist and

Case 9:19-cv-01527-TJM-TWD   Document 64   Filed 11/09/21   Page 22 of 124

2021 WL 3185472

placed it behind his back while guiding him to the floor; (9) defendant Quigley then placed handcuffs around plaintiff's wrists, an emergency response belt was placed around his torso, and he was then moved out of his cell and placed on a gurney. *Id.*

**\*4** Based on the documents attached to the consolidated complaint, the Court liberally construes the pleading to assert Fourteenth Amendment excessive force and failure-to-intervene claims against each of the defendants. [7]

[7]  The consolidated complaint does not indicate plaintiff's incarceration status. However, for purposes of this Decision and Order only, the Court has assumed that plaintiff was a pretrial detainee at the time of the events giving rise to his claims. Because the consolidated complaint lacks any allegations which plausibly suggest that plaintiff was denied medical or mental health treatment by any of the named defendants, the Court has not construed the consolidated complaint to assert any medical indifference claims.

Plaintiff seeks monetary damages. Compl. at 4. For a complete statement of plaintiff's claims, reference is made to the consolidated complaint.

### C. Analysis

Plaintiff brings this action pursuant to 42 U.S.C. § 1983 ("Section 1983"), which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortg. Corp.*, 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)) (footnote omitted); *see also Myers v. Wollowitz*, No. 6:95-CV-0272 (TJM/RWS), 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (stating that "§ 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights." (citation omitted)). "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted).

### 1. Onondaga County Justice Center

"[U]nder New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and therefore, cannot sue or be sued." *Davis v. Lynbrook Police Dep't*, 224 F. Supp. 2d 463, 477 (E.D.N.Y. 2002); *In re Dayton*, 786 F. Supp. 2d 809, 818 (S.D.N.Y. 2011); *see also Lukes v. Nassau Cnty. Jail*, No. 12-CV-1139, 2012 WL 1965663, at *2 (E.D.N.Y. May 29, 2012) (dismissing claims against defendant Nassau County Jail because it "is an administrative arm of Nassau County, without a legal identity separate and apart from the County"). Since the Onondaga County Justice Center is an administrative arm of Onondaga County, without a legal identity separate and apart from the County, it lacks the capacity to be sued. However, in deference to plaintiff's pro se status, the Court will consider whether plaintiff has stated constitutional claims against Onondaga County, who is the real party in interest. *See Solis v. Cnty. of Westchester*, No. 94-CV-5102, 1995 WL 14072, at *1 (S.D.N.Y. Jan. 10, 1995) (noting that the Westchester County Department of Corrections is not a legal entity and that the County of Westchester is the real party in interest); N.Y. County Law § 51 ("Actions or proceedings by or against a county shall be in the name of the county.").

Municipal liability is limited under Section 1983 by *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). In *Monell*, the Supreme Court found that municipal liability existed "where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). A municipality may not be held liable solely because it employs a tortfeasor. *LaVertu v. Town of Huntington*, No. 13-CV-4378, 2014 WL 2475566, at *3 (E.D.N.Y. Apr. 4, 2014) (Report and Recommendations) (citing *inter alia Los Angeles Cnty., Cal. v. Humphries*, 562 U.S. 29, 35 (2010)), *adopted in relevant part*, 2014 WL 2506217 (E.D.N.Y. June 2, 2014). Only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights, is it liable for the injury. *Monell*, 436 U.S. at 694.

**\*5** Thus, to successfully state a claim for *Monell* liability, a plaintiff must "make factual allegations that support a plausible inference that the constitutional violation took place pursuant either to a formal course of action officially promulgated by the municipality's governing authority or the act of a person with policy making authority for the municipality." *Missel v. Cnty. of Monroe*, 351 Fed. App'x 543,

545 (2d Cir. 2009) (citing *Vives v. City of N.Y.*, 524 F.3d 346, 350 (2d Cir. 2008)).

Here, plaintiff names the Onondaga County Justice Center as a defendant in the caption of the consolidated complaint, but has not alleged facts which plausibly suggest that any of the wrongdoing alleged in the consolidated complaint occurred pursuant to a formal or informal policy or custom of Onondaga County, or the Onondaga County Justice Center. Insofar as the consolidated complaint may allege that employees at the Onondaga County Justice Center violated plaintiff's constitutional rights, those allegations fail to state a claim against Onondaga County because a municipality may not be liable on the basis of respondeat superior. *See Monell*, 436 U.S. at 691.

Accordingly, plaintiff's claims against the Onondaga County Justice Center are dismissed in their entirety with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. Moreover, and notwithstanding a very liberal interpretation of the consolidated complaint, to the extent that plaintiff's claims could be construed to be asserted against Onondaga County as the real party in interest, those claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 2. Defendants Uzunoff, Quigley, and McCarty

Assuming that plaintiff was a pretrial detainee at the time of the events giving rise to his claims, he "receive[d] protection against mistreatment at the hands of prison officials under ... the Due Process Clause of the Fourteenth Amendment[.]" *Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009), *overruled on other grounds by Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).

In *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the Supreme Court distinguished between Eighth and Fourteenth Amendment excessive force claims, and held that a pretrial detainee need not demonstrate that an officer accused of using excessive force was subjectively aware that his use of force was unreasonable. *Id.* at 396-97. Rather, "to prove an excessive force claim, a pretrial detainee must show ... only that the officers' use of that force was objectively unreasonable." *Id.* In making that objective determination, the court must view the matter from "the perspective

of a reasonable officer on the scene," and consider "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* at 397.

"[C]laims for excessive force under the Fourteenth Amendment must involve force that is either 'more than de minimis' or 'repugnant to the conscience of mankind.' " *Lewis v. Huebner*, No. 17-CV-8101, 2020 WL 1244254, at *5 (S.D.N.Y. Mar. 16, 2020) (quoting *United States v. Walsh*, 194 F.3d 37, 48 (2d Cir. 1999) (citation and quotation marks omitted); *see also Lynch v. City of New York*, 952 F.3d 67, 77-78 (2d Cir. 2020) (explaining that "there is a de minimis level of imposition with which the Constitution is not concerned," and therefore holding that a protestor who was detained for five hours and punitively denied food, drink, and access to a bathroom failed to state a Fourteenth Amendment claim (citation and quotation marks omitted)); *see also Graham v. Connor*, 490 U.S. 386, 396-98 (1989) (explaining that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment[,]" and that "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional").

*6 When a citizen is subjected to excessive force, "an officer who fails to intervene where he or she observes or has reason to know that excessive force is being used or a constitutional violation has been committed by a fellow officer is liable for the preventable harm caused by that officer." *Portillo v. Webb*, No. 16-CV-4731, 2017 WL 4570374, at *4 (S.D.N.Y. Oct. 11, 2017) (collecting cases), *report and recommendation adopted by* 2018 WL 481889 (S.D.N.Y. Jan. 17, 2018); *see also Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." (internal quotation marks and citation omitted)).

In this case, plaintiff alleges that he was "laying on [his] cell floor kicking [a] chair repeatedly" when defendants Uzunoff and Quigley (and apparently others) arrived at his cell, and he refused to comply with orders to stand up. Compl. at 2.

Based on these limited allegations, the Court has no basis to plausibly infer that it was objectively unreasonable to enter plaintiff's cell and place him in restraints in order to then remove him from the cell. Moreover, the consolidated complaint lacks any allegations regarding the nature of the force used against plaintiff when he was placed in restraints and removed from his cell, as well as any injuries plaintiff may have suffered during this process. Thus, the consolidated complaint lacks allegations which plausibly suggest that defendant Quigley (or any other official) subjected plaintiff to an objectively unreasonable use of force on May 14, 2021.

Accordingly, plaintiff's Fourteenth Amendment claims against defendants Uzunoff, Quigley, and McCarty are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. [8]

[8]    Although the consolidated complaint names Sergeant McCarty as a defendant, and appears to allege that she assisted defendants Uzunoff and Quigley in some unidentified way, neither the allegations in the consolidated complaint nor the documents attached thereto indicate that defendant McCarty was involved in the events that occurred on May 14, 2021. Thus, it is entirely unclear to the Court why this official is named as a defendant.

### D. Opportunity to Amend

The Second Circuit has held that a district court "should not dismiss [a pro se plaintiff's complaint] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (internal quotation omitted). Thus, the Court will afford plaintiff an opportunity to present a proposed amended complaint with respect to his claims that have been dismissed without prejudice.

Any amended complaint submitted by plaintiff in response to this Decision and Order must set forth a short and plain statement of the facts he relies on in support of his claim that specific individuals named as defendants in that pleading engaged in acts of misconduct or wrongdoing which violated his constitutional rights. Plaintiff's amended complaint, which shall supersede and replace in its entirety the original complaint, must be a complete pleading which sets forth all of the claims that plaintiff wants this Court to consider as a basis for awarding relief herein.

Plaintiff is advised that his failure to file an amended complaint **within thirty (30) days** of the filing date of this Decision and Order will result in dismissal of this action without prejudice without further Order of the Court.

### V. LETTER REQUEST FOR "SPEEDY RELEASE"

**\*7**  In *Boyde I* and *Boyde III*, the Clerk has docketed a letter filed by plaintiff wherein he seeks a "speedy release" from incarceration. *See Boyde I*, Dkt. No. 11; *Boyde III*, Dkt. No. 7.

In *Wilkinson v. Dotson*, the Supreme Court addressed the relationship between Section 1983 and federal habeas corpus law. 544 U.S. 74 (2005). In analyzing its jurisprudence – from *Preiser v. Rodriguez*, 411 U.S. 475 (1973), and *Wolff v. McDonnell*, 418 U.S. 539 (1974), to *Edwards v. Balisok*, 520 U.S. 641 (1997) – the Court stated as follows:

> Throughout the legal journey from *Preiser* to *Balisok*, the Court has focused on the need to ensure that state prisoners use only habeas corpus (or similar state) remedies when they seek to invalidate the duration of their confinement-either **directly** through an injunction compelling speedier release or **indirectly** through a judicial determination that necessarily implies the unlawfulness of the State's custody. Thus, *Preiser* found an implied exception to § 1983's coverage where the claim seeks-not where it simply 'relates to'-'core' habeas corpus relief, i.e., where a state prisoner requests present or future release....*Wolff* makes clear that § 1983 remains available for procedural challenges where success in the action **would not** necessarily spell immediate or speedier release for the prisoner.

> ... And *Balisok*, like *Wolff*, demonstrates that habeas remedies do not displace § 1983 actions where success in the civil rights suit would not necessarily vitiate the legality of (not previously invalidated) state confinement. These cases, taken together, indicate that a state prisoner's § 1983 action is barred (absent prior invalidation)-no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings)-if success in that action would necessarily demonstrate the invalidity of confinement or its duration.

544 U.S. at 81-82 (emphasis in original). "Thus, if the inmate's success in his action would necessarily result in immediate or speedier release, the sole procedure available is a habeas corpus proceeding; if not, section 1983 remains

available." *Becker v. Paterson*, No. 1:09-CV-392 (NAM/DRH), 2010 WL 1186521, at *3 (N.D.N.Y. Mar. 23, 2010).

As far as the Court can tell, the allegations in the consolidated complaint relate to a discrete event at the Onondaga County Justice Center, for which plaintiff seeks money damages. Plaintiff's letter request, which vaguely references his criminal conviction in 2014, does not explain why he is currently incarcerated, why he believes he is entitled to a "speedy release", or how his request for a "speedy release" is in any way related to the claims asserted in the consolidated complaint. Furthermore, the relief sought in the letter request is unavailable in a Section 1983 action. *See Preiser*, 411 U.S. at 500.

For these reasons, the letter request is denied without prejudice to plaintiff filing a proper habeas corpus proceeding. In an effort to assist plaintiff in this regard, the Clerk is directed to provide him with a blank habeas corpus petition.

**VI. CONCLUSION**

 **\*8 WHEREFORE**, it is hereby

**ORDERED** that in accordance with Fed. R. Civ. P. 42(a)(2), *Boyde I* (9:21-CV-0741), *Boyde II* (9:21-CV-0742), *Boyde III* (9:21-CV-0748), and *Boyde IV* (9:21-CV-0837) are hereby consolidated. *Boyde I* shall be referred to and treated as the "lead" case, and all subsequent orders of this Court and papers that are submitted by the parties hereto that pertain to any of the foregoing actions shall be filed in *Boyde I*; and it is further

**ORDERED** that the Clerk file copies of the pleadings in *Boyde II, Boyde III*, and *Boyde IV*, without exhibits, immediately following the signature page of the pleading in *Boyde I*. The Clerk need not file the exhibits to *Boyde II* and *Boyde III* as part of the consolidated pleading; and it is further

**ORDERED** that plaintiff's application to proceed in forma pauperis in *Boyde I* (Dkt. No. 4) is **GRANTED**;[9] and it is further

[9]     Although his in forma pauperis application has been granted, plaintiff will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

**ORDERED** that plaintiff's applications to proceed in forma pauperis in *Boyde II* and *Boyde III* are **DENIED** as moot; and it is further

**ORDERED** that the Clerk provide the superintendent of the facility, designated by plaintiff as his current location, with a copy of plaintiff's inmate authorization form (Dkt. No. 5), and notify the official that this action has been filed and that plaintiff is required to pay to the Northern District of New York the entire statutory filing fee of $350 in installments, over time, pursuant to 28 U.S.C. § 1915; and it is further

**ORDERED** that the Clerk provide a copy of plaintiff's inmate authorization form (Dkt. No. 5) to the Financial Deputy of the Clerk's Office; and it is further

**ORDERED** that plaintiff's claims against the Onondaga County Justice Center are **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted;[10] and it is further

[10]     Generally, when a district court dismisses a pro se action sua sponte, the plaintiff will be allowed to amend his action. *See Gomez v. USAA Fed. Savings Bank*, 171 F.3d 794, 796 (2d Cir. 1999). However, an opportunity to amend is not required where the defects in the plaintiff's claims are substantive rather than merely formal, such that any amendment would be futile. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Pucci v. Brown*, 423 Fed. App'x 77, 78 (2d Cir. 2011). Amendment of these claims would be futile.

**ORDERED** that plaintiff's remaining Section 1983 claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted; and it is further

**ORDERED** that if plaintiff wishes to proceed with this action he must file an amended complaint as set forth above within thirty (30) days of the filing date of this Decision and Order; and it is further

**ORDERED** that upon the filing of an amended complaint as directed above, the Clerk shall return the file to this Court for further review; and it is further

2021 WL 3185472

 **\*9 ORDERED** that in the event plaintiff fails to file a signed amended complaint within thirty (30) days of the filing date of this Decision and Order, the Clerk shall enter judgment dismissing this action without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) due to plaintiff's failure to state a claim upon which relief can be granted and to comply with the terms of this Decision and Order, without further order of this Court; and it is further

**ORDERED** that plaintiff's letter request for a "speedy release" (*Boyde I*, Dkt. No. 11; *Boyde III*, Dkt. No. 7) is **DENIED** without prejudice to plaintiff filing a proper habeas corpus proceeding. In an effort to assist plaintiff in this regard, the Clerk is directed to provide him with a blank habeas corpus petition; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this consolidated action must bear the case number of the lead case (*Boyde I*, No. 9:21-CV-0741) and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket.** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; his failure to do so will result in the dismissal of this action**; and it is further

**ORDERED** that the Clerk of the Court serve a copy of this Decision and Order on plaintiff.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 3185472

---

**End of Document**                                   © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Portillo v. Webb, Not Reported in Fed. Supp. (2017)

2017 WL 4570374

2017 WL 4570374
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jamie PORTILLO, Plaintiff,
v.
Jennifer WEBB, Manuel Aldir,
and Lycha Gasanov, Defendants.

16 Civ. 4731 (VEC) (GWG)
|
Signed October 11, 2017

**Attorneys and Law Firms**

Jamie Portillo Coxsackie, NY, pro se.

Agnetha Elizabeth Jacob, New York City Law Department,
New York, NY, for Defendants.

REPORT AND RECOMMENDATION

GABRIEL W. GORENSTEIN, UNITED STATES
MAGISTRATE JUDGE

 **\*1** Plaintiff Jamie Portillo, currently an inmate at the
Coxsackie Correctional Facility in Coxsackie, New York,
brings this lawsuit pro se pursuant to 42 U.S.C. § 1983,
making claims regarding an incident that occurred while he
was being transported from a medical clinic at Rikers Island
to East Elmhurst Hospital. The defendants have moved to
dismiss the complaint for failure to state a claim pursuant to
Federal Rule of Civil Procedure 12(b)(6). [1] For the reasons
stated below, the motion to dismiss should be granted, with
Portillo given leave to file an amended complaint as to his
claim of excessive force.

[1]   See Notice of Motion, filed Mar. 3, 2017 (Docket
      # 23); Defendants' Memorandum of Law in
      Support of Their Motion to Dismiss the Amended
      Complaint, filed Mar. 3, 2017 (Docket # 24);
      Plaintiff Opposition to Defendant's Motion [to]
      Dismiss Action, filed May 11, 2017 (Docket # 29)
      ("Pl. Opp'n"); Defendants' Reply Memorandum
      of Law in Further Support of Their Motion to
      Dismiss the Amended Complaint, filed June 1,
      2017 (Docket # 32) ("Defs. Reply").

I. BACKGROUND

For the purpose of deciding the defendants' motion to dismiss,
the Court assumes the allegations in Portillo's complaint are
true and draws all reasonable inferences in his favor. See, e.g.,
Brown Media Corp. v. K & L Gates, LLP, 854 F.3d 150, 156–
57 (2d Cir. 2017).

On a motion to dismiss for failure to state a claim, a court's

> consideration is limited to the factual
> allegations in [the complaint], which
> are accepted as true, to documents
> attached to the complaint as an exhibit
> or incorporated in it by reference, to
> matters of which judicial notice may
> be taken, or to documents either in
> plaintiff['s] possession or of which
> plaintiff[ ] had knowledge and relied
> on in bringing suit.

Brass v. Am. Film Tech., 987 F.2d 142, 150 (2d Cir.
1993) (citing Cortec Indus., Inc. v. Sum Holding L.P., 949
F.2d 42, 47–48 (2d Cir. 1991)); accord Halebian v. Berv,
644 F.3d 122, 130 n.7 (2d Cir. 2011). Furthermore, in
light of Portillo's pro se status, the Court has considered
factual allegations contained in his submissions opposing
the defendants' motion where they amplify claims made
in the complaint. See, e.g., London v. N.Y. State Dep't of
Homeless Servs., 2014 WL 3720401, at \*1 (S.D.N.Y. July 29,
2014) (considering factual allegations from pro se plaintiff's
opposition submissions when deciding motion to dismiss);
Woods v. Goord, 2002 WL 731691, at \*1 n.2 (S.D.N.Y. Apr.
23, 2002) (considering pro se prisoner's factual allegations
in briefs as supplementing complaint); Burgess v. Goord, 1999
WL 33458, at \*1 n.1 (S.D.N.Y. Jan. 26, 1999) ("In general,
a court may not look outside the pleadings when reviewing
a Rule 12(b)(6) motion to dismiss. However, the mandate
to read the papers of pro se litigants generously makes it
appropriate to consider plaintiff's additional materials, such
as his opposition memorandum.") (citations and internal
quotation marks omitted) (quoting Gadson v. Goord, 1997
WL 714878, at \*1 n.2 (S.D.N.Y. Nov. 17, 1997)).

 **\*2** On October 13, 2015, while detained at the Anna M.
Kross Correctional Facility ("A.M.K.C.") on Rikers Island,
New York, Portillo collapsed in the hallway from "a mild

2017 WL 4570374

stroke." Amended Complaint, filed Nov. 28, 2016 (Docket # 17) ("Am. Compl."), at 4; Jamie Portillo Medical Records, dated Oct. 13, 2015 (attached to Pl. Opp'n) ("Medical Records"). A doctor who reported to the scene said Portillo had lost consciousness and had facial numbness, "facial droop", and weakness in his right leg. Medical Records. Portillo says that, despite explaining to corrections officers that he could not walk, he was forced to walk to the medical clinic at A.M.K.C., which caused him to fall and injure himself. Am. Compl. at 4. Portillo does not explain who was present during this incident, who forced him to walk, or how he was injured.

Portillo was then placed in shackles and handcuffs and taken to East Elmhurst Hospital, escorted by Corrections Officers ("C.O.s") Jennifer Webb, Manuel Aldir, and Lycha Gasanov. Id. Portillo claims that he was again forced to walk, despite repeatedly telling the officers and a doctor at the hospital that he was unable to do so. Id.; Pl. Opp'n at 1. [2] Portillo said that he was dizzy, his vision was blurry, and all he remembered was being dragged by his arms in the hospital. Am. Compl. at 4. He asserts that a doctor and C.O. Webb picked Portillo up by the arms and "let him go," which caused Portillo to fall face-first and injure himself. Id. He alleges the fall caused him to injure his ankles, face, arms, nose, stomach, temple, back, and neck. Pl. Opp'n at 1–2. He alleges that x-rays and other tests were conducted, and that he was given medication for his injuries. Am. Compl. at 5. Portillo later complained that his ankles were "swollen and bruised from being shackled when he was transported to the hospital on October 13," and that "[h]e ha[d] had trouble walking from the ankle injuries since that date." See Email from Agnes Baik, undated (attached to Pl. Opp'n) ("Baik Letter"). He alleges that C.O.s Aldir and Gasanov "did nothing to help [Portillo] or the situation" while he was forced to walk or when he was dropped by C.O. Webb, "they just watched and laughed." Am. Compl. at 4–5.

[2]     Portillo's motion papers do not specify which of the officers "forced him to walk." Pl. Opp'n at 1, 4.

Construed liberally, Portillo's claims are that (1) C.O. Webb used excessive force against him, based on his fall in the hospital; and (2) C.O.s Gasanov and Aldir either failed to intervene while he being "forced to walk" by C.O. Webb or were deliberately indifferent to his medical needs.

## II. APPLICABLE LAW

### A. Standard for Motion to Dismiss

A defendant may move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) where the plaintiff "fail[s] to state a claim upon which relief can be granted." To survive such a motion, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks omitted) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). As the Supreme Court noted in Iqbal,

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.

Id. (citations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is insufficient under Federal Rule of Civil Procedure 8(a) because it has merely "alleged—but it has not shown—that the pleader is entitled to relief." Id. at 679, 129 S.Ct. 1937 (brackets and internal quotation marks omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

 **\*3**  Pro se plaintiff filings are liberally construed, and "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (per curiam) (citations and internal quotation marks omitted); accord Littlejohn v. City of New York, 795 F.3d 297, 322 (2d Cir. 2015); see also Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011) (review of pro se complaint for sufficiency requires "special solicitude, interpreting the complaint to raise the strongest claims that it suggests") (citation, brackets, and internal quotation marks omitted). However, even the pleadings of these plaintiffs "must contain factual allegations sufficient to raise a right to relief above the speculative level." Dawkins v. Gonyea, 646 F.Supp.2d 594, 603 (S.D.N.Y. 2009) (internal quotation marks omitted) (quoting Twombly, 550 U.S. at 555, 127 S.Ct. 1955); accord Ford v. Rodriguez, 2016 WL 6776345, at *2 (S.D.N.Y. Nov. 16, 2016).

Case 9:19-cv-01527-TJM-TWD   Document 64   Filed 11/09/21   Page 29 of 124
Portillo v. Webb, Not Reported in Fed. Supp. (2017)
2017 WL 4570374

**B. [42 U.S.C. § 1983](#)**

"To state a claim under [§ 1983](#), a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." [West v. Atkins](#), 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988); see [42 U.S.C. § 1983](#). Section 1983 does not create any federal rights; rather, it provides a mechanism to enforce rights established elsewhere. [Gonzaga Univ. v. Doe](#), 536 U.S. 273, 285, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002); accord [Ross v. Woods](#), 412 Fed.Appx. 392, 393 (2d Cir. 2011) (summary order). Additionally, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [§ 1983](#)." [Victory v. Pataki](#), 814 F.3d 47, 67 (2d Cir. 2016) (internal quotation marks omitted) (quoting [Farrell v. Burke](#), 449 F.3d 470, 484 (2d Cir. 2006)); see also [Iqbal](#), 556 U.S. at 672, 129 S.Ct. 1937 ("In a [§ 1983](#) suit .... Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.").

### 1. Excessive Force

"[T]he right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment." [United States v. Walsh](#), 194 F.3d 37, 47 (2d Cir. 1999) (citing [Bell v. Wolfish](#), 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)).[3] At one time, a pretrial detainee asserting an excessive force claim had to satisfy a subjective and objective element similar to what is required to prove an Eighth Amendment claim. [Id. at 47–48](#). Specifically, a plaintiff had to show that the alleged wrongdoing was "objectively sufficiently serious or harmful enough" to cause a constitutional violation, "contrary to contemporary standards of decency and repugnant to the conscience of mankind," [id. at 50](#) (citations and internal quotation marks omitted), and that the alleged wrongdoer subjectively "had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct," [Sims v. Artuz](#), 230 F.3d 14, 21 (2d Cir. 2000) (citations and internal quotation marks omitted).

---

[3]    We assume that Portillo was a pretrial detainee and not a convicted prisoner on the date of the incident,

October 13, 2015, because he made no assertion that he was "convicted" in his original complaint but did make such an assertion when he filed his amended complaint on November 18, 2016. Am. Compl. at 2, 6. Defendants additionally do not appear to oppose this assumption. See Defs. Reply at 4 n.1 (acknowledging that "[i]t is unclear ... whether Plaintiff was a pretrial detainee" when the incident occurred).

**\*4** In [Kingsley v. Hendrickson](#), —— U.S. ——, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015), however, the Supreme Court held that when force is "purposefully or knowingly" used against a pretrial detainee, the detainee must show only that the force "was objectively unreasonable." [Id. at 2473](#). Kingsley thus altered the test previously used in the Second Circuit for claims arising under the Fourteenth Amendment. See [Ross v. Corr. Officers John and Jane Does 1–5](#), 610 Fed.Appx. 75, 76 n.1 (2d Cir 2015) (summary order); [Vargas v. City of New York](#), 2017 WL 1214434, at \*12 (E.D.N.Y. Mar. 31, 2017); [Carmona v. City of New York](#), 2016 WL 4401179, at \*2 (S.D.N.Y. Mar. 1, 2016); see also [Darnell v. Pineiro](#), 849 F.3d 17, 35 (2d Cir. 2017) (recognzing that [Kingsley](#) has overruled Second Circuit law in the Fourteenth Amendment "deliberate indifference" context).

[Kingsley](#) held that

> objective reasonableness turns on the facts and circumstances of each particular case. A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. A court must also account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security.

[Kingsley, 135 S.Ct. at 2473](#) (citations, brackets, and internal quotation marks omitted) (quoting [Graham v. Connor](#), 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); and

2017 WL 4570374

Bell, 441 U.S. at 540, 547, 99 S.Ct. 1861). Factors to consider in judging the objective reasonableness of a use of force include:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

Id.; accord Perez v. Ponte, 236 F.Supp.3d 590, 621 (E.D.N.Y. 2017); Carmona, 2016 WL 4401179, at *2.

### 2. Failure to Intervene

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Terebesi v. Torreso, 764 F.3d 217, 243 (2d Cir. 2014) (internal quotation marks omitted) (quoting Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)). As such, an officer who fails to intervene where he or she observes or has reason to know that excessive force is being used or a constitutional violation has been committed by a fellow officer is liable for the preventable harm caused by that officer. Anderson, 17 F.3d at 557; accord Porter v. Goord, 467 Fed.Appx. 21, 23 (2d Cir. 2012) (summary order); Baines v. City of New York, 2017 WL 3425746, at *2 (S.D.N.Y. Aug. 9, 2017). Although liability may attach only where there was "a realistic opportunity to intervene to prevent the harm occurring," Anderson, 17 F.3d at 557, "[w]hether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise," id.; accord Terebesi, 764 F.3d at 243–44; Stephens v. Venettozzi, 2016 WL 929268, at *11 (S.D.N.Y. Feb. 24, 2016); Bowen v. Patrick, 2012 WL 3743409, at *7 (S.D.N.Y. Aug. 29, 2012).

### 3. Deliberate Indifference

**\*5**  A prisoner may make a constitutional claim arising out of medical treatment where he or she can show "deliberate indifference" to his or her medical needs.

> [D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed in the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.

Estelle v. Gamble, 429 U.S. 97, 104–05, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (citations, footnotes, and internal quotation marks omitted); accord Spavone v. N.Y. State Dep't of Corr. Servs., 719 F.3d 127, 138 (2d Cir. 2013).

A pretrial detainee enjoys similar protections under the Due Process Clause of the 14th Amendment. See Darnell, 849 F.3d at 29. To establish that a prison official was deliberately indifferent toward an inmate's health, a pretrial detainee must satisfy two prongs: (1) "an 'objective prong' showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process"; and (2) "a 'subjective prong'—perhaps better classified as a 'mens rea prong' or 'mental element prong'—showing that the officer acted with at least deliberate indifference to the challenged conditions." Id.

Under the objective prong, the alleged medical need must be "sufficiently serious." Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (citation and internal quotation marks omitted). A "sufficiently serious" medical need is "a condition of urgency, one that may produce death, degeneration, or extreme pain." See id. (citation and internal quotation marks omitted). "Factors that have been considered include the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects

an individual's daily activities; or the existence of chronic and substantial pain." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (citations, brackets, and internal quotation marks omitted).

As with claims of excessive use of force, the Supreme Court's decision in Kingsley altered the subjective prong where a claim is made by a pretrial detainee. See Darnell, 849 F.3d at 34–35 ("Following the Supreme Court's analysis in Kingsley, there is no basis for the reasoning ... that the subjective intent requirement for deliberate indifference claims under the Eighth Amendment ... must apply to deliberate indifference claims under the Fourteenth Amendment."). Now,

> to establish a claim for deliberate indifference to conditions of confinement under the Due Process Clause of the Fourteenth Amendment, the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety. In other words, the "subjective prong" (or "mens rea prong") of a deliberate indifference claim is defined objectively.

*6  Id. at 35; accord Brown v. City of New York, 2017 WL 1390678, at *11 (S.D.N.Y. Apr. 17, 2017). As was previously true, there is no liability for "negligently inflicted harm." Kingsley, 135 S.Ct. at 2472 (emphasis and internal quotation marks omitted) (quoting Cty. of Sacramento v. Lewis, 523 U.S. 833, 849, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)); accord Darnell, 849 F.3d at 36.

## III.  DISCUSSION

Portillo's description of the circumstances in which he fell is vague and not entirely consistent. In his amended complaint he states that he was in shackles and handcuffs when he reached the hospital, and that after he explained to C.O. Webb

and a doctor at the hospital that he could not walk, "they picked me up, let me go and I immediately fell causing me to injure myself" and that at this time he was being "dragged" by his arms. Am. Compl. at 4. In his opposition to defendants' motion he claims that the officers escorting him "forcefully took plaintiff against his will by the arms while shackled by the hands and feet, and 'forced him to walk', to wit, then plaintiff fell face forward." Pl. Opp'n at 1.

The circumstances under which Portillo fell to the floor are critical to determining whether he has stated an excessive force claim. At the time he was being transported, Portillo had a "minor stroke." See Am. Compl. at 4. The external symptoms of the stroke and the officers' knowledge of the diagnosis are not clear from the complaint, however. Thus it is not clear that "forcing [Portillo] to walk" would cause him any serious harm. Cf. Jones v. Westchester Cty., 182 F.Supp.3d 134, 141, 151 (S.D.N.Y. 2016) (excessive force claim stated where plaintiff had suffered injury to knee, hip, and lower back from fall and corrections officers forced him to walk though they knew he was in severe pain). Without the officers' having knowledge that being forced to walk could cause serious harm, the mere act of "forcing" plaintiff to walk could not support a claim of excessive force. See, e.g., D'Attore v. City of New York, 2013 WL 1180395, at *6 (S.D.N.Y. Mar. 15, 2013) (no excessive force claim where officer transported wheelchair-bound inmate down hallway in reckless and violent manner), appeal dismissed, No. 15–1722 (2d Cir. Jul. 28, 2015); Prescott v Riker Island Med. Staf., 2011 WL 1435218, at *6 (S.D.N.Y. Apr. 12, 2011) (motion to dismiss granted where plaintiff "at most" showed shoves, pushes, and shackling during transport from hospital to Rikers "may have caused some aggravation to [plaintiff's] pre-existing injuries").

Of more significance are the circumstances under which C.O. Webb and the doctor were responsible for Portillo falling to the ground. Portillo's allegations, however, do not show that C.O. Webb and the doctor deliberately or even recklessly dropped Portillo to the floor. See, e.g., Jones, 182 F.Supp.3d at 152; Goodwine v. Nat'l R.R. Passenger Corp., 2014 WL 795756, at *2, *9 (E.D.N.Y. Feb. 27, 2014); Pooler v. Hempstead Police Dep't, 897 F.Supp.2d 12, 26 (E.D.N.Y. 2012). Portillo's descriptions of the incident say only that he was "let ... go" or that because he was forced to walk, "to wit, then plaintiff fell face forward." Am. Compl. at 4. Pl. Opp'n at 1. To be sure, Portillo's allegations that the fall caused "injuries" to his head, neck, face, arm, and leg distinguish Portillo's claim from cases in which no discernible

Case 9:19-cv-01527-TJM-TWD   Document 64   Filed 11/09/21   Page 32 of 124

Portillo v. Webb, Not Reported in Fed. Supp. (2017)

2017 WL 4570374

physical injury resulted from the use of force. Cf. Arnold v. Westchester Cty., 2012 WL 336129, at *7 (S.D.N.Y. Feb. 3, 2012) ("forced fall" allegedly caused by officers making shackled pretrial detainee walk quickly down hallway not constitutional violation where inmate did not claim the fall caused him any notable physical injury). Portillo, however, gives no explanation of the nature of his injuries. See Am. Compl. at 4.

 *7  In light of these deficiencies, the Court cannot conclude that the complaint shows that C.O. Webb used excessive force.

It is clear, however, that Portillo has not stated a failure to intervene claim against C.O.s Aldir and Gasanov. Even if Portillo's pleading showed that the fall to the ground was the result of excessive force—a prerequisite to a failure to intervene claim, see, e.g., Walker v. City of New York, 2014 WL 12652345, at *12 (E.D.N.Y Sept. 3, 2014) ("To prevail on a failure to intervene claim a plaintiff must demonstrate the existence of an underlying constitutional violation in which the defendant officer failed to intervene.") (collecting cases), aff'd, 638 Fed.Appx. 29 (2d Cir. 2016)— the allegations do not suggest that C.O.s Aldir and Gasanov had "a realistic opportunity to intervene to prevent the harm from occurring," Anderson, 17 F.3d at 557. In the absence of such an opportunity, they cannot be liable for any failure to intervene.

To the extent that Portillo intended to raise a claim that C.O.s Webb, Aldir, or Gasanov were deliberately indifferent to his medical needs, such a claim must also be dismissed. Portillo concedes that the officers were taking him to a hospital to receive treatment for his stroke. See generally Am. Compl. at 4. It may be that Portillo intended to claim that defendants failed to offer him "adequate medical attention" for his inability to walk. See Pl. Opp'n at 2. Assuming arguendo that the temporary inability to walk is a sufficiently serious medical condition, Portillo's pleadings do not allege facts from which a reasonable person could believe defendants knew or should have known that a "substantial risk of serious harm" existed simply because they required Portillo to walk to a hospital bed after a mild stroke. To the extent Portillo claims defendants should have provided him with a wheelchair, see Pl. Opp'n at 2, this is best characterized as a disagreement as to the method of addressing his inability to walk, and thus not grounds for a section 1983 claim. See Chance, 143 F.3d at 703 ("It is well-established that mere disagreement over the proper treatment does not create

a constitutional claim."); accord Washington v. Artus, 708 Fed.Appx. 705, 709, 2017 WL 3911573, at *2 (2d Cir. Sept. 7, 2017). To the extent defendants were negligent, no Eighth or Fourteenth Amendment claim can arise from such negligence. See Farmer v. Brennan, 511 U.S. 825, 835–36, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); accord Darnell, 849 F.3d at 36.

Notwithstanding the defects in the complaint, the Second Circuit has stated that courts should not dismiss pro se complaints "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000) (citations and internal quotation marks omitted); accord Pearson v. Reid–Robinson, 632 Fed.Appx. 19, 19 (2d Cir. 2016) (summary order); see also Milanese v. Rust–Oleum Corp., 244 F.3d 104, 110 (2d Cir. 2001) (leave to file amended complaint should not be denied absent evidence of undue delay, bad faith, undue prejudice to non-movant, or futility) (citing Foman v. Davis, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). Although Portillo has amended his complaint once, he did so at a time when he was unaware of the potential defects in his claims. While the Court sees no cure that can be made to the failure-to-intervene and deliberate indifference claims, it is possible that the excessive force claim could withstand a motion to dismiss if pled with appropriate facts.

## IV. CONCLUSION

 **8  For the reasons stated above, defendant's motion to dismiss (Docket # 23) should be granted. Portillo should be permitted 21 days to file a second amended complaint in the event he believes that he can cure the defects in his excessive force claim.

The Court notes also that a record attached by plaintiff to his motion papers states that he is a "monolingual Spanish Speaker." Baik Letter. Any amended filing must contain a clear explanation that the new amended complaint was composed by Portillo and that it has been accurately translated.

## PROCEDURE FOR FILING OBJECTIONS TO
## THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days (including weekends and holidays) from service of

2017 WL 4570374

this Report and Recommendation to file any objections. <u>See also</u> Fed. R. Civ. P. 6(a), (b), (d). A party may respond to any objections within 14 days after being served. Any objections and responses shall be filed with the Clerk of the Court, with copies sent to the Hon. Valerie E. Caproni at 40 Foley Square, New York, New York 10007. Any request for an extension of time to file objections or responses must be directed to Judge Caproni. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. <u>See Thomas v. Am.</u>, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); <u>Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.</u>, 596 F.3d 84, 92 (2d Cir. 2010).

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4570374

---

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Portillo v. Webb, Not Reported in Fed. Supp. (2018)

2018 WL 481889

2018 WL 481889
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jamie PORTILLO, Plaintiff,
v.
Jennifer WEBB, Manuel Aldir,
and Lycha Gasanov, Defendants.

16-CV-4731 (VEC)(GWG)
|
Signed 01/17/2018

**Attorneys and Law Firms**

Jamie Portillo, Coxsackie, NY, pro se.

Agnetha Elizabeth Jacob, New York City Law Department, New York, NY, for Defendants.

ORDER ADOPTING REPORT & RECOMMENDATION

VALERIE CAPRONI, United States District Judge

**\*1** Plaintiff Jamie Portillo, proceeding *pro se*, alleges that excessive force was used against him while he was incarcerated at the Anna M. Kross facility on Rikers Island in October 2015. Am. Compl. (Dkt. 17) at 4. Plaintiff alleges that he suffered a "minor stroke" on October 13, 2015. Am. Compl. at 4. The Defendants, corrections officers at the Kross facility, responded to Plaintiff and escorted him to the Kross medical clinic and then to the East Elmhurst Hospital. Am. Compl. at 4. Plaintiff alleges that defendant Webb twice forced him to stand and attempt to walk, causing him to fall and injure himself. Am. Compl. at 4. Seeking redress for injuries sustained in his falls, Plaintiff alleges claims for excessive force against Webb and failure to intervene against defendants Aldir and Gasanov.

The Defendants moved to dismiss on the grounds that Portillo's amended complaint does not plausibly allege that excessive force was used by Webb or that the other defendants had a duty to intervene and failed to do so. Dkts. 23, 24. The Court referred this case to Magistrate Judge Gorenstein for general pretrial and for preparation of a report and recommendation on any dispositive motions. Dkt. 10; *see also* Dkt. 27 (amended order of referral). The Defendants filed their motion to dismiss on March 3, 2017. Dkts. 23,

24. Portillo opposed the motion on May 11, 2017. Dkt. 29. Defendants replied on June 1, 2017. Dkt. 32.

On October 12, 2017, Magistrate Judge Gorenstein issued a report and recommendation (the "R&R"). Dkt. 34. Judge Gorenstein concluded that the Amended Complaint did not sufficiently allege facts from which the Court could infer that it was objectively unreasonable for defendant Webb to force Portillo to stand and walk. R&R at 10-11. Judge Gorenstein also found that the Amended Complaint did not allege that defendants Aldir and Gasanov had a realistic opportunity to intervene and prevent excessive force from being used. R&R at 12. Judge Gorenstein recommended that the Court grant Portillo leave to amend. R&R at 12-13. In lieu of filing objections to the R&R, Plaintiff filed a second amended complaint. [1] Dkt. 37.

[1]     On November 13, 2017, in response to Plaintiff's request for more time to object to the R&R, the Court extended until November 27, 2017, Plaintiff's deadline to file objections. Dkt. 36. Because Plaintiff's amended complaint had not yet been dismissed, the Court did not set a deadline for Plaintiff to file a second amended complaint. Nonetheless, Plaintiff filed his second amended complaint on November 28, 2017, and did not file any objections to the R&R.

**DISCUSSION**

In reviewing a report and recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C). When no objections are made to a magistrate judge's report, a district court may adopt the report so long as "there is no clear error on the face of the record." *Phillips v. Reed Grp., Ltd.*, 955 F. Supp. 2d 201, 211 (S.D.N.Y. 2013) (citing *Nelson v. Smith*, 618 F. Supp. 1186, 1189 (S.D.N.Y. 1985)). Failure to file timely objections to the magistrate judge's report constitutes a waiver of those objections in the district court and on later appeal to the United States Court of Appeals. *See Small v. Sec'y of Health & Human Servs.*, 892 F. 2d 15, 16 (2d Cir. 1989) (*per curiam*); *see also Thomas v. Arn*, 474 U.S. 140, 149–50 (1985) (holding that Section 636 does not require review of a magistrate's findings if no party objects).

2018 WL 481889

**\*2** Because no objections to the R&R were filed, the Court reviews for "clear error." *Phillips*, 955 F. Supp. 2d at 211. Upon careful review, the Court finds no clear error in Magistrate Judge Gorenstein's well-reasoned decision. Accordingly, the Court adopts the R&R in full.

## CONCLUSION

Defendants' motion to dismiss is GRANTED and Plaintiff is given leave to file a second amended complaint. As noted above, Plaintiff has already filed a second amended complaint. The Court will issue a new referral to Magistrate Judge Gorenstein relative to Plaintiff's second amended complaint.

The Clerk of Court is respectfully requested to close the open motion at docket entry 23. The Clerk of Court is further requested to mail a copy of this Order and the R&R to Plaintiff and to note mailing on the docket.

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purposes of an appeal. *Cf. Coppedge v. United States*, 369 U.S. 438, 444-45 (1962) (holding that appellant demonstrates good faith when seeking review of a non-frivolous issue).

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2018 WL 481889

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-01527-TJM-TWD    Document 64    Filed 11/09/21    Page 36 of 124
Blake v. Kelly, Not Reported in F.Supp.3d (2014)
2014 WL 4230889

KeyCite Overruling Risk - Negative Treatment

Overruling Risk   Darnell v. Pineiro,   2nd Cir.,   February 21, 2017

2014 WL 4230889
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Charles BLAKE, Plaintiff,

v.

Raymond KELLY, Commissioner, New
York City Police Department, Israel Sexton,
Sergeant, New York City Police Department,
and The City of New York, Defendants.

No. 12 Civ. 7245(ER).
|
Signed Aug. 26, 2014.

*OPINION AND ORDER*

RAMOS, District Judge.

**\*1** *Pro se* Plaintiff Charles Blake (the "Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 against former New York Police Department Commissioner Raymond Kelly ("Kelly"), Sergeant Israel Sexton ("Sexton"), and the City of New York (the "City," and together with Kelly and Sexton, the "Defendants"). The Plaintiff alleges that he was assaulted and injured while awaiting arraignment in the holding cell of the New York State Supreme Court, Kings County. Am. Compl. 1–6, Doc. 18.

Presently before the Court is Defendants' motion to dismiss the Complaint under Rule 12(c) of the Federal Rules of Civil Procedure. *See* Doc. 33. For the reasons set forth below, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

**I. Factual Background**
The following facts are based on the allegations in the Amended Complaint, which the Court accepts as true for purposes of the instant motion. *See, e.g., Walker v. Schult,* 717 F.3d 119, 124 (2d Cir.2013).

On August 26, 2010 Plaintiff was held as a pretrial detainee at the Brooklyn County Court's Central Booking Detention Holding Facility in Brooklyn, New York. Am. Compl. 3.[1] Overcrowding forced multiple detainees, including Plaintiff, to sit or lie on the floor, rather than in seats, within the holding cell. *Id.* Detainees made several complaints to the holding cell officers regarding the overcrowding and shortage of seats. *Id.* At 6:45 p .m., approximately fifteen detainees left the holding cell to receive their dinner. *Id.* Plaintiff sat in a seat that opened up as a result. *Id.* One of the detainees returned to find Plaintiff sitting in the seat and demanded that he move. *Id.* at 4. When Plaintiff refused, the detainee began to physically assault Plaintiff. *Id.* A second detainee then joined Plaintiff's assailant, and started to severely beat Plaintiff. *Id.*

[1]   The Court notes that Plaintiff's Amended Complaint did not include page numbers. As a result, the Court will refer to the page numbers provided by the Court's electronic filing system (ECF).

Because the detainee holding cell was left unmonitored, Plaintiff was subjected to beatings for ten minutes before the first officer—Sergeant Sexton—arrived. *Id.* Initially, Sexton verbally demanded that the assailants stop beating Plaintiff, but Sexton "did not physically intercede to prevent further physical abuse upon [Plaintiff]." *Id.* After his verbal demands failed, Sexton went to seek assistance. *Id.* Sexton then returned approximately five minutes later with two other officers who helped break up the altercation. *Id.* After Sexton observed that Plaintiff had facial swelling, "defensive cuts" to his back, and a potentially fractured right ankle, he sent for emergency medical personnel; they arrived approximately fifteen minutes later. *Id.* Staff then transported Plaintiff to Kings County Hospital. *Id.*

Plaintiff claims that, as a result of Defendants' actions, he suffered serious injuries, including: closed dislocation of his right ankle, a right ankle fracture, blunt trauma, and facial lacerations, severe headaches, dizziness, difficulty sleeping, depression and mental anguish. *Id.* at 6. Plaintiff attached to his Amended Complaint various medical records, designated as Exhibit A,[2] which corroborate the allegations that he suffered a long-term or permanent physical injury. Plaintiff underwent two surgical operations on his right ankle, and was referred to physical therapy afterwards. Am. Compl. Ex. A. The records provided also indicate that Plaintiff may need further surgical work done in the future. *Id.* Plaintiff claims he is unable to stand for long periods of time, cannot run and is

unable to climb stairs without holding on to a rail for support. *Id.* at 6.

2    In a Rule 12(b)(6) analysis, a district court generally must confine itself to the four corners of the complaint and look only to the allegations therein. *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007). However, a court may also consider allegations in documents that are either attached to the complaint, incorporated by reference or integral to the complaint, provided that there is no dispute regarding their authenticity, accuracy or relevance. *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir.2010) (citations omitted). The Court finds that the medical records contained in Exhibit A may properly be considered in connection with the instant motion.

**\*2** Plaintiff alleges that the conditions of his confinement on August 26, 2010 violated his rights under the Eighth Amendment on several grounds. *Id.* at 5. First, Plaintiff asserts that the Defendants' deliberate indifference to the conditions of his confinement violated his civil rights. *Id.* The overcrowding in the holding cell caused excessive noise and anxiety, and ultimately created an unsupervised "den of violence." *Id.* Plaintiff also asserts that Sexton failed to exercise adequate care for Plaintiff's safety by failing to prevent reasonably foreseeable physical abuse. *Id.* at 4. Lastly, Plaintiff claims that Defendants deliberately and negligently exceeded the design capacity requirements for the holding cell. *Id.* at 5. Accordingly, Plaintiff seeks a total $10,000,000 judgment against the Defendants jointly and severally. *Id.* at 9.

### A. Procedural History

On September 24, 2012, Plaintiff commenced this action by filing the Complaint. Compl., Doc. 3. The Complaint included Commissioner Kelly and a John Doe Defendant. *Id.* Given Plaintiff's *pro se* status, the Court directed the Clerk of the Court to amend the caption of this action to include Defendant New York City and ordered the New York City Law Department to provide the identity and service address of the John Doe Defendant. Doc. 7. On February 22, 2012, the New York City Law Department ascertained the identity of the John Doe Defendant to be Sergeant Sexton. Doc. 12. Plaintiff then filed an Amended Complaint against Defendants on April 10, 2013. Doc. 18. The case was transferred to the undersigned from the Honorable Judge Colleen McMahon on July 17, 2013.

Defendants construe Plaintiff's Amended Complaint as raising claims under the due process clause of the Fourteenth Amendment for deliberate indifference to his safety and conditions of confinement. Through the instant motion, Defendants seek dismissal of Plaintiff's claims on the grounds that Plaintiff (1) fails to state a claim under 42 U.S.C. § 1983 for deliberate indifference against Sexton; and (2) fails to allege personal involvement by Kelly in a constitutional violation. Defs.' Mem. 1, 6, Doc. 35. On May 28, 2014, Plaintiff filed his memorandum of law in opposition to Defendants' motion. Pl.'s Opp., Doc. 38. Rather than file a reply brief, on June 9, 2014, Defendants submitted a letter to the Court indicating their intention to rely on the arguments set forth in their opening papers. [3]

3    The Court notes that Defendants' memorandum of law solely refers to Sexton and Kelly, and does not advance any arguments to dismiss the City from the instant action. Accordingly, the City will not be dismissed.

### II. Discussion

### A. Legal Standard

Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). The Court applies the same standard of review to a Rule 12(c) motion as it does to a motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6). *Cleveland v. Caplaw Enters.,* 448 F.3d 518, 521 (2d Cir.2006).

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), district courts are required to accept as true all factual allegations in the complaint and to draw all reasonable inferences in the plaintiff's favor. *Walker,* 717 F.3d at 124; *see also, e.g., Famous Horse Inc. v. 5th Ave. Photo Inc.,* 624 F.3d 106, 108 (2d Cir.2010). However, this requirement does not apply to legal conclusions, bare assertions or conclusory allegations. *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In order to satisfy the pleading standard set forth in Rule 8 of the Federal Rules of Civil Procedure, a complaint must contain sufficient factual matter to state a claim to relief that is plausible on its face. *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 570). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Accordingly,

2014 WL 4230889

a plaintiff is required to support its claims with sufficient factual allegations to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly,* 550 U.S. at 557) (internal quotation marks omitted).

**\*3** The same standard applies to motions to dismiss *pro se* complaints. *Mancuso v. Hynes,* 379 F. App'x 60, 61 (2d Cir.2010) (summary order) (citing *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009)). However, the Court remains obligated to construe a *pro se* complaint liberally, *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir.2011), and to interpret a *pro se* plaintiff's claims as raising the strongest arguments that they suggest. *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474–75 (2d Cir.2006). In order to survive a motion to dismiss, a plaintiff's pleadings must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 556 U.S. at 678. A complaint that "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id.* (quoting *Twombly,* 550 U.S. at 557) (internal quotation marks and alterations omitted); *see also Triestman,* 470 F.3d at 477 ("[*P* ]*ro se* status 'does not exempt a party from compliance with relevant rules of procedural and substantive law.' " (quoting *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983)).

**B. Plaintiff Fails to Allege Defendant Kelly's Personal Involvement**

Defendants argue that Plaintiff has failed to allege Kelly's personal involvement in any of the alleged constitutional deprivations. Defs.' Mem. 7–8. As a general matter, a prisoner who brings a § 1983 claim against individual defendants must allege that they were directly and personally involved in the alleged constitutional deprivations. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991); *see also Shomo v. City of New York,* 579 F.3d 176, 184 (2d Cir.2009) ( "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."). [4]

[4]    In *Colon v. Coughlin,* the Second Circuit held that a plaintiff may adequately allege personal involvement by showing that the defendant: (1) participated directly in the alleged constitutional violation; (2) after being informed of the violation through a report or appeal, failed to remedy the

wrong; (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) was grossly negligent in supervising subordinates who committed the wrongful act; or (5) exhibited deliberate indifference to rights of inmates by failing to act on information indicating that unconstitutional acts were occurring. 58 F.3d 865, 873 (2d Cir.1995). "Only two *Colon* categories survive after *Iqbal*—(1) a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation, and part of (3) if that supervisor creates a policy or custom under which unconstitutional practices occurred. The other *Colon* categories impose the exact types of supervisory liability that *Iqbal* eliminated —situations where the supervisor knew of and acquiesced to a constitutional violation committed by a subordinate." *McNair v. Kirby Forensic Psychiatric Ctr.,* No. 09 Civ. 6660(SAS), 2010 WL 4446772, at *6 (S.D.N.Y. Nov.5, 2010); *but see Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009) ("Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standard[ ] of the ... Eighth Amendment[ ], the personal involvement analysis set forth in *Colon v. Coughlin* may still apply.").

Moreover, a defendant cannot be held liable based solely upon his supervisory capacities or under a theory of *respondeat superior. See Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003). "Mere presence in the 'prison chain of command' is not sufficient to demonstrate personal involvement for purposes of [§ ] 1983." *Rivera v. Bloomberg,* No. 11 Civ. 629(PGG), 2012 WL 3655830, at *8 (S.D.N.Y. Aug.27, 2012) (citing *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (per curiam)).

Here, Plaintiff's sole allegation in the Amended Complaint regarding Kelly asserts that he "operated" and "controlled the safety of" the Brooklyn County Court's Central Booking Detention Holding Facility "through his supervisors, agents, servants, officers, and employees." Am. Compl. 3. In his original complaint, Plaintiff additionally alleges that Kelly failed to exercise ordinary care because the practice of permitting overcrowded holding cells in the Brooklyn Detention Center created a foreseeable risk that pretrial detainees would be attacked, and that Kelly was "grossly negligent" in failing to protect Plaintiff. Compl. ¶ 23. [5]

5    Given Plaintiff's status as a *pro se* litigant, "it is appropriate for the court to consider materials outside of the complaint." *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (quotation marks omitted) (collecting district court cases); *see also Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering allegations in *pro se* plaintiff's opposition to motion to dismiss).

**\*4** Nevertheless, even construing the allegations in the light most favorable to him, the Court finds that Plaintiff fails to adequately allege Kelly's personal involvement. As in *Colon,* Plaintiff claims that Kelly was grossly negligent in failing to train or supervise his subordinates, but fails to set forth facts about Kelly within his own knowledge; his allegations "certainly contain[ ] nothing that would support a claim that [Kelly] either knew or should have known of the events of which [Plaintiff complains." 58 F.3d at 873–74. Indeed, "[a]side from the entirely conclusory allegation" that Kelly may have been "aware of and acquiesced to the unlawful practices," Plaintiff "offers no factual allegations against [Kelly], assuming, erroneously, that his mere status as DOCS Commissioner is enough to sustain this claim." *Collins v. Goord,* 438 F.Supp.2d 399, 420 (S.D.N.Y.2006). It is not. Because Plaintiff merely seeks to hold Kelly liable based on his supervisory capacity or place within the chain of command, his allegations thus merit dismissal. *See Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987) (approving dismissal of § 1983 claim where "plaintiff does no more than allege that [defendant] was in charge of the prison.") (internal quotation marks omitted). The Court therefore GRANTS Defendants' motion to dismiss with respect to Plaintiff's claims against Kelly.

## C. Plaintiff's Eighth Amendment Claim for Deliberate Indifference to Safety

Defendants also argue that Plaintiff fails to state a claim against Sexton for deliberate indifference to his safety. Defs.' Mem. 3–7. To state a claim under § 1983, a plaintiff must allege "that the conduct complained of was committed by a person or entity acting under color of state law, and that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution." *Newton v. City of New York,* 566 F.Supp.2d 256, 270 (S.D.N.Y.2008) (citing *Palmieri v. Lynch,* 392 F.3d 73, 78 (2d Cir.2004)). As opposed to deliberate indifference claims brought by post-conviction prisoners—which arise under the Eighth Amendment— claims for deliberate indifference brought by state pretrial

detainees arise under the Fourteenth Amendment. *See Caiozzo v. Koreman,* 581 F.3d 63, 69–72 (2d Cir.2009). However, this Circuit has found that "[c]laims for deliberate indifference ... should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment." *Id.* at 72; *see also Coronado v. Goord,* No. 99 Civ. 1674(RWS), 2000 WL 1372834, at \*7 (S.D.N.Y. Sept.25, 2000) (stating that the standard for bring a Fourteenth Amendment claim is the same as under the Eighth Amendment). Accordingly, the Eighth Amendment provides the applicable framework here. *Caiozzo,* 581 F.3d at 72.

The Eighth Amendment requires that prison officials take "reasonable measure to guarantee the safety of inmates in their custody." *Hayes v. New York City Dep't of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *see also Gilmore v. Rivera,* 13 CIV. 6955 RWS, No. 13 Civ. 6955, 2014 WL 1998227, at \*2 (S.D.N.Y. May 14, 2014) ("Prison officials may neither deprive a prisoner of 'basic human needs, *e.g.,* food, clothing, shelter, medical care, and reasonable safety,' nor expose an inmate to conditions that 'pose an unreasonable risk of serious damage to his future health.' " (citations omitted)).

**\*5** Accordingly, a prison official's failure to protect a prisoner from harm may form the basis of a § 1983 claim. *Farmer v. Brennan,* 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). "[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Id.* However, negligence is not sufficient in itself to allege a § 1983 claim. *Hayes,* 84 F.3d at 620; *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988). A prison official may have a duty to protect an inmate when two requirements are satisfied: "First, the deprivations [of rights] alleged must be, objectively, 'sufficiently serious' ... and [second] a deliberate indifference to inmate health or safety." *Farmer,* 511 U.S. at 834 (citations omitted); *accord Coronado,* 2000 WL 1372834, at \*3. Therefore, in order for a plaintiff to allege a constitutional deprivation of his Eighth Amendment rights on the basis of a failure to protect, he must show that a prison official acted unreasonably when aware of a "significant risk of serious injury." *Jones v. Goord,* 435 F.Supp.2d 221, 235–36 (S.D.N.Y.2006) (quoting *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997)).

The analysis under the Eighth Amendment requires courts to apply a two prong test. First, under the objective prong, the alleged deprivation must be "sufficiently serious." *Jones,* 435 F.Supp.2d at 234–35 (citing *Farmer,* 511 U.S. at 834). A plaintiff must, therefore, allege facts that amount to a denial of

"the minimal civilized measure of life's necessities." *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 347, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Second, under the subjective prong, a plaintiff must demonstrate that the charged defendants acted with a "sufficiently culpable state of mind." *Jones,* 435 F.Supp.2d at 235 (citing *Helling v. McKinney,* 509 U.S. 25, 33, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993)). The required state of mind is "deliberate indifference." *Wilson,* 501 U.S. at 303. Accordingly, to state a claim, a plaintiff must allege facts showing that a defendant knew of and disregarded an "excessive risk of inmate health and safety" or that he was aware of facts from which it could reasonably be inferred that a substantial risk of serious harm existed. *Farmer,* 511 U.S. at 837; *Caiozzo,* 581 F.3d at 71. "Evidence that a risk was 'obvious or otherwise must have been known to a defendant' may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk." *Walker,* 717 F.3d at 125 (citation omitted).

With respect to the objective element, conditions that place a prisoner at a "substantial risk of serious harm" from other inmates may constitute cruel and unusual punishment. *Walker,* 717 F.3d at 128 (citing *Jones,* 435 F.Supp.2d at 238). Generally, "[i]n assessing whether the risk of an inmate's violence against other inmates is 'sufficiently serious,' to trigger constitutional protection, the focus of inquiry must be, not the extent of the physical injuries sustained in an attack, but rather the existence of a 'substantial risk of serious harm.'" *Heisler,* 981 F.Supp. at 837 (S.D.N.Y.1997) (quoting *Wilson,* 501 U.S. at 298), *aff'd,* 164 F.3d 618 (2d Cir.1998). The Defendants assert that courts may find a substantial risk of serious harm only where there is "evidence of a previous altercation between a plaintiff and their attacker, coupled with a complaint by plaintiff regarding the altercation or a request by plaintiff to be separated from the attacker." Defs.' Mem. 5. In *Heisler,* however, the court determined that a substantial risk of serious harm may exist in the absence of any allegation of a history of altercations between the plaintiff and his attacker. 981 F.Supp. at 837. There, in deciding a motion for summary judgment, the court found that the plaintiff's allegations raised a genuine issue of material fact where the plaintiff alleged that another inmate attacked him while he was being held as a pretrial detainee, and that officers witnessed the assault, but failed to intercede to stop it. *Id.* So too here, Plaintiff's allegations raise a factual question as to whether a "substantial risk of serious harm" existed based upon the alleged conditions of overcrowding and a "den of violence." *Id.; see also Walker,* 717 F.3d at 128–29.

**\*6** Under the subjective prong, "a prison official acts with deliberate indifference and thus 'has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measure to abate the harm.' " *See Lee v. Artuz,* No. 96 Civ. 8604(JGK), 2000 WL 231083, at \*4 (S.D.N.Y. Feb.29, 2000) (quoting *Hayes,* 84 F.3d at 620). Plaintiff alleges that Sexton "failed to exercise adequate care for the Plaintiff's safety and to prevent further reasonably foreseeable physical harm, abuse, and violence." Am. Compl. 4. Allegedly, after Sexton arrived at the assault, he stood outside the cell and ordered the inmates to stop. *Id.* When they continued, he left to get help and did not come back for "about five minutes." *Id.* Sexton returned with two other officers, who stopped the assault. *Id.* From these allegations, even though Sexton returned to the holding cell, Plaintiff sufficiently alleges that he had knowledge of the "substantial risk of serious harm" in that Sexton actually witnessed the assault at the hands of two other detainees. Therefore, the question becomes whether Sexton's response to Plaintiff's assault was reasonable. The fact intensive nature of this question cannot be decided on a motion to dismiss. *See Braxton v. Nichols,* No. 08 Civ. 08568(PGG), 2010 WL 1010001, at \*5 (S.D.N.Y. Mar.18, 2010); *see also Rosen v. City of New York,* 667 F.Supp.2d 355, 360–61 (S.D.N.Y.2009) (finding that the question of whether a prison supervisor had a reasonable opportunity to intervene was an "issue of fact for the jury") (quoting *Pearson v. Correction Officer Principe,* No. 97 Civ. 3746(HB), 1999 WL 66521, at \*1 (S.D.N.Y. Feb.9, 1999)).

Defendants argue that the Court should focus on whether Plaintiff has shown "evidence that [the defendant] could have prevented the attack or injury," rather than on the reasonableness of Sexton's response. Defs.' Mem. 7 (quoting *Avincola v. Maldonado,* No. 04–3529–PR, 2005 WL 3116760, at \*1 (2d Cir. Nov.22, 2005) (summary order)). However, the cases cited by Defendants involve evidence adduced by the parties at the summary judgment stage, whereas here, the record is insufficient to allow the Court to make a comparable determination. *See Walker,* 717 F.3d at 129 (reversing district court's dismissal of *pro se* complaint concerning deliberate indifference to inmate safety and finding, *inter alia,* that the cases cited by defendants could be distinguished because they "were decided after development of the factual record").

2014 WL 4230889

Accordingly, the Court DENIES Defendants' motion to dismiss Plaintiff's claim against Sexton for deliberate indifference to his safety.

### III. Conclusion

For the reasons set forth above,

(1) Defendants' motion to dismiss is GRANTED as to all claims against Defendant Kelly;

(2) Defendants' motion to dismiss is DENIED as to Plaintiff's claims against Defendant Sexton; specifically, the Court finds that Plaintiff has adequately stated a

Section 1983 claim against Sexton based on his alleged failure to protect Plaintiff.

**\*7** The Clerk of Court is respectfully directed to terminate Kelly as a Defendant in this case, to mail a copy of this Opinion and Order to Plaintiff, and to terminate the motion (Doc. 33). The parties are further directed to appear before the Court for a conference on September 17, 2014 at 9:30 a.m.

It is SO ORDERED.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 4230889

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-01527-TJM-TWD    Document 64    Filed 11/09/21    Page 42 of 124
Taylor v. City of New York, Not Reported in Fed. Supp. (2018)
2018 WL 1737626

2018 WL 1737626
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Warren TAYLOR, Plaintiff,

v.

The CITY OF NEW YORK; Department of
Correction Commissioner Joseph Ponte; Bureau
Chief of Security Brian Suprenant; Captain Harper;
Deputy Warden Cort; Correction Officer Anderson
#3597; Correction Officer Stevenson; GRVC
Warden Yolanda Canty; Assistant Deputy Warden
Sardia Lewis #97; Correction Officer John Doe
Supervising and Policy Making Officials, ##1-8;
John Doe Correction Official Responsible for
Detainee Placement in Housing Areas ##1-4;
John Doe Correction Officers ##1-8, Defendants.

16 Civ. 7857 (NRB)
|
Signed 03/27/2018

**Attorneys and Law Firms**

Leo Glickman, Stoll, Glickman & Bellina, LLP, Brooklyn,
NY, for Plaintiff.

Brachah Goykadosh, New York City Law Department, New
York, NY, for Defendants.

**MEMORANDUM AND ORDER**

NAOMI REICE BUCHWALD, UNITED STATES
DISTRICT JUDGE

**I. Introduction**

**\*1** Plaintiff Warren Taylor alleges that he was attacked by
another inmate, resulting in the loss of his eye, while he was
detained at the George R. Vierno Center ("GRVC") on Rikers
Island. Plaintiff brings this action against the City of New
York, several supervisory defendants from the New York City
Department of Correction ("DOC"), and several Correction
Officers from GRVC pursuant to 42 U.S.C. § 1983, asserting
violations of his Eighth and Fourteenth Amendment rights.
Defendants move to dismiss the complaint pursuant to Fed.
R. Civ. P. 12(b)(6). For the reasons set forth below, the motion
to dismiss is granted in part and denied in part.

**II. Allegations in the Complaint**

The following facts are adopted from plaintiff's complaint
(ECF No. 19). For the purposes of this motion to dismiss, the
court accepts plaintiff's factual allegations as true and draws
all reasonable inferences in his favor. See City of Providence
v. BATS Glob. Mkts., Inc., 878 F.3d 36, 48 (2d Cir. 2017).

**A. Plaintiff's Imprisonment**

Plaintiff was, at all times relevant to this case, incarcerated
in the custody of the DOC in the GRVC on Rikers Island.
Compl. ¶ 7. While plaintiff's criminal case was pending in
Kings County Supreme Court, he was remanded to Rikers
Island, where he "was placed in protective custody for his own
safety due to the sexual nature of the charges" against him.
Compl. ¶ 27. [1]

[1]     The Court takes judicial notice that plaintiff was
        charged with committing a criminal sexual act
        in the first degree, a class B felony (N.Y.P.L. §
        310.50), and criminal impersonation in the first
        degree, a class E felony (N.Y.P.L § 190.26).
        Goykadosh Decl. Ex. J, ECF No. 49-1 at 2;
        see, e.g., Williams v. City of New York, No.
        07 Civ. 3764 (RJS), 2008 WL 3247813, at *2
        (S.D.N.Y. Aug. 7, 2008) (taking judicial notice of
        the plaintiff's crime of conviction).

In 2013, plaintiff was removed from protective custody over
his stated objections. Compl. ¶ 28. On March 12, 2014,
plaintiff was assaulted and seriously injured by another
inmate because of the charges against him. Compl. ¶ 29.
Plaintiff alleges that on or about April 28, 2014, "Judge Chung
of Brooklyn Supreme Court" issued an order that "plaintiff be
held in protective custody due to safety concerns," and gave
him a "court card" that said he was required to be held in
protective custody. Compl. ¶¶ 31-32. [2]

[2]     Defendants challenge the existence of such an
        order, noting that it is not in Plaintiff's Inmate File.
        ECF No. 45 at 3 n.3. For the purposes of this motion
        to dismiss, we accept as true plaintiff's factual
        allegation that he was granted a court order that he
        be held in protective custody. See BATS, 878 F.3d
        at 50 ("We must, at this stage, accept as true the
        factual allegations in the complaint and draw all
        reasonable inferences in favor of plaintiffs.").

Case 9:19-cv-01527-TJM-TWD    Document 64    Filed 11/09/21    Page 43 of 124

Taylor v. City of New York, Not Reported in Fed. Supp. (2018)
2018 WL 1737626

Plaintiff was detained in a medium security housing area for a time, but was subsequently moved to the general population in GRVC 15A, which houses detainees known to be members of security risk groups. Compl. ¶¶ 14, 33-34. While plaintiff was housed in GRVC 15A, correction officers, including defendant Correction Officer Stevenson, told other detainees in the unit about the nature of plaintiff's crimes, which plaintiff believed exposed him to hostility from detainees and guards. Compl. ¶ 37.

**\*2** On January 10, 2015, a large fight involving multiple detainees broke out in GRVC 15A. Compl. ¶ 38. Plaintiff alleges that he kept a safe distance from the fight at first, but was then instructed by probe team correction officers to "go to the location of the fight and get on the floor." Compl. ¶ 39. With multiple officers standing by, plaintiff was attacked by another detainee, Jose Grijalva. Compl. ¶ 40. Defendant Correction Officer Anderson told plaintiff and Mr. Grijalva to stop fighting, but did not take further action when they did not comply with his order. Compl. ¶ 41. Mr. Grijalva stabbed plaintiff in the eye, "cit[ing]" plaintiff's sex crimes while doing so. Compl. ¶ 40. Plaintiff lost his eye in the attack. Compl. ¶ 42.

### B. Allegations Against the Supervisory Defendants and the City

Plaintiff alleges that since at least August 5, 2013, GRVC 15A has housed detainees identified by DOC officials as gang members affiliated with two rival gangs, the Crips and the Trinitarios. Compl. ¶¶ 14-16. Gang riots broke out between members of the Crips and Trinitarios in GRVC 15A on several occasions between August 2013 and January 2015, including on August 5, 2013, December 25, 2013, May 12, 2014, May 20, 2014, and June 5, 2014. Compl. ¶¶ 18-26. These riots resulted in multiple injuries and at least one death. Compl. ¶¶ 18-26. On June 11, 2014, DOC Captain Claudel Jean-Pierre submitted an investigation report of the incident that occurred on May 12, 2014. Compl. ¶ 24. In that report, Captain Jean-Pierre indicated that these riots were part of an "ongoing power struggle" to control the housing unit and that "there have been clear statements made by inmates affiliated with both the Crips and Trinitarios that this conflict will go on and acts of retaliation are imminent." Id. No corrective measures were taken to address these ongoing issues, but Captain Jean-Pierre was disciplined by defendant Assistant Deputy Warden Sardia Lewis for his report. Compl. ¶ 25.

### III. Procedural History

Plaintiff filed a complaint on October 7, 2016, asserting that defendants violated 42 U.S.C. § 1983 by "act[ing] under color of law and with intent and/or deliberate indifference to deprive Plaintiff of his civil, constitutional and statutory rights to be free from cruel and unusual punishment pursuant to the Eighth and Fourteenth Amendments to the United States Constitution." Compl. ¶¶ 45-47. Specifically, plaintiff alleges violations of his constitutional rights based on Officer Stevenson and John Doe Officers publishing plaintiff's criminal charges to detainees, Captain Harper and Deputy Warden Cort ignoring the order of the Kings County Supreme Court to place plaintiff in protective custody and instead placing him into GRVC 15A, and Officer Anderson and John Doe Officers observing the attack on plaintiff but failing to prevent the assault and/or permitting the assault to occur. Compl. ¶¶ 44-47. Plaintiff also alleges municipal and supervisory liability against the City of New York, Commissioner Ponte, Chief of Security Suprenant, Warden Canty, Assistant Deputy Warden Lewis, and John Doe Supervising and Policy Making Officials for adopting polices, customs, and practices, and failing to train or supervise that amounted to deliberate indifference to the constitutional rights of inmates at GRVC 15A. Compl. ¶¶ 50-63.

Defendants filed a "partial"[3] motion to dismiss on May 25, 2017, asserting that (1) this action is barred by the Prison Litigation Reform Act ("PLRA"); (2) plaintiff failed to adequately plead municipal liability; (3) plaintiff failed to plead the involvement of certain named defendants; and (4) plaintiff failed to state a claim for any constitutional violation. ECF No. 45.

[3]     While defendants labeled their motion a "partial" motion to dismiss, (ECF Nos. 43-46, 49-50), the entire action would be dismissed if the Court granted defendants' requested relief in full.

### IV. Discussion

### A. Motion to Dismiss

**\*3** On a motion to dismiss under Rule 12(b)(6), the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in plaintiff's favor. BATS, 878 F.3d at 48. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) ).

Case 9:19-cv-01527-TJM-TWD    Document 64    Filed 11/09/21    Page 44 of 124

Taylor v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1737626

A district court may not consider matters outside the pleadings on a motion to dismiss. See *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000). [4] "A complaint 'is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.' " *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) ). Matters of which the Court takes judicial notice are also not considered matters outside the pleadings. *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 426 (2d Cir. 2008). The Court may take judicial notice of documents that are publicly available and whose accuracy cannot reasonably be questioned. See *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 60 (2d Cir. 2016).

[4]    Every paragraph of the Declaration of Brachah Goykadosh in Support of Defendants' Partial Motion to Dismiss ("Goykadosh Decl."), ECF No. 44, contains legal argument, in violation of Local Civil Rule 7.1(a). See *Hughes v. Lebron*, No. 14 Civ. 9479 (PAE), 2016 WL 5107030, at \*5 n.5 (S.D.N.Y. Sept. 19, 2016) ("[U]nder Local Civil Rule 7.1, legal argument must be set forth in a memorandum of law, not in an attorney affirmation." (quoting *Dejana Indus., Inc. v. Village of Manorhaven*, No. 12 Civ. 5140 (JS), 2015 WL 1275474, at \*3 (E.D.N.Y. Mar. 18, 2015) ) ). The Court will not consider any legal argument set forth by counsel in this Declaration, nor will we consider any of the exhibits attached thereto, except to the extent that they are matters of which the Court is entitled to take judicial notice, as described herein.

### B. PLRA

Defendants argue that the Court should dismiss this lawsuit in its entirety because plaintiff failed to comply with the exhaustion requirement of the PLRA, which provides: "No action shall be brought with respect to prison conditions under section 1983 of this title ... until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "An inmate ... must exhaust available remedies, but need not exhaust unavailable ones." *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016) (holding that dismissal under the PLRA "hinges on the 'availability' of administrative remedies"). Properly exhausting administrative remedies requires compliance with the applicable procedural rules, which "are defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006) ).

The Supreme Court and Second Circuit have identified three circumstances "in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Ross v. Blake*, 136 S. Ct. at 1859.

> First, an administrative remedy may be unavailable when 'it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates.' Second, 'an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use.' In other words, 'some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it.' Third, an administrative remedy may be unavailable 'when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation.'

**\*4** *Williams v. Priatno*, 829 F.3d 118, 123–24 (2d Cir. 2016) (citations omitted) (quoting *Ross v. Blake*, 136 S. Ct. at 1859-60).

Failure to exhaust under the PLRA is an affirmative defense: "[I]nmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones v. Bock*, 549 U.S. at 216. A district court may only "dismiss a complaint for failure to exhaust administrative remedies if it is clear on the face of the complaint that the plaintiff did not satisfy the PLRA exhaustion requirement." *Williams*, 829 F.3d at 122. When a suit alleges multiple claims, the Court must analyze exhaustion on a claim-by-claim basis. See *Jones v. Bock*, 549 U.S. at 222 ("A typical PLRA suit with multiple claims ... may combine a wide variety of discrete complaints, about interactions with guards, prison conditions, generally applicable rules, and so on, seeking different relief on each claim. There is no reason failure to exhaust on one necessarily affects any other."); *Tartt v. City of New York*, No. 12 Civ. 5405 (VEC), 2014 WL 3702594, at \*4 (S.D.N.Y. July 16, 2014) ("[C]ourts analyze exhaustion independently for each claim in a complaint....").

Here, plaintiff does not allege that he made any attempt to file an administrative complaint prior to filing this lawsuit. Rather, he contends that no administrative remedy was available to him under the applicable prison grievance process, the Inmate Grievance and Request Program ("IGRP"), because "[i]nmate allegations of physical or sexual assault or harassment by either staff or inmates are not subject to the IGRP process." Pl.'s Mem. of Law in Opp'n, ECF No. 47 at 7 (quoting The City of New York Department of

Case 9:19-cv-01527-TJM-TWD   Document 64   Filed 11/09/21   Page 45 of 124

Taylor v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1737626

Correction Directive: Inmate Grievance and Request Program ("IGRP Directive") at 6, Goykadosh Decl., Ex. C, ECF No. 44-3). [5]

[5]        "Consistent with common practice in this District," the Court takes judicial notice of the IGRP Directive. Leneau v. City of New York, No. 16 Civ. 893 (RA), 2018 WL 583120, at *2 n.3 (S.D.N.Y. Jan. 26, 2018); see also Myers v. City of New York, No. 11 Civ. 8525 (PAE), 2012 WL 3776707, at *4 & n. 6 (S.D.N.Y. Aug. 29, 2012) (collecting cases), aff'd, 529 Fed.Appx. 105 (2d Cir. 2013).

Because assault claims are explicitly excluded from the IGRP process, several courts have held that prisoners do not fail to exhaust administrative remedies when they file claims in federal court related to allegations of assault before attempting to complete the IGRP process. See Drew v. City of New York, No. 16 Civ. 594 (AJP), 2016 WL 4533660, at *7-8 (S.D.N.Y. Aug. 29, 2016) (staff-on-inmate assault claim not subject to IGRP); Tartt, 2014 WL 3702594, at *4-5 (excessive force claim against correction officers not subject to IGRP); Taylor v. Swift, 21 F. Supp. 3d 237, 241-44 (E.D.N.Y. 2014) (Weinstein, J.) (claim "that prison officials stood idly by while [plaintiff] suffered an 'assault ... by [other] inmates' " not subject to IGRP) (second alteration in original), appeal dismissed, No. 14-3382 (2d Cir. Mar. 10, 2015). Indeed, defendants do not contest that plaintiff was not required to exhaust his remedies in the IGRP process to the extent his claims relate to the assault he suffered. See ECF No. 50 at 6-7.

 *5  Instead, defendants argue that plaintiff's grievances regarding housing at GRVC 15A would be subject to the IGRP process, and urge the Court to dismiss any portion of plaintiff's claims based on those grievances. Id. In so arguing, defendants attempt to slice plaintiff's claims too thinly. The IGRP Directive provides simply that "[i]nmate allegations of physical ... harassment by either staff or inmates are not subject to the IGRP process." IGRP Directive at 6. The IGRP Directive does not require inmates to parse out and exhaust any grievable aspects of their assault complaints before filing suit. If we were to adopt defendants' interpretation of the PLRA, victims of assault at Rikers Island (the vast majority of whom have no training in the law) would be required to consider whether any of the contributing factors to their assault are grievable, file a grievance related to those factors and pursue all available appeals (while not referencing their assault allegations in those grievances, lest they be deemed ungrievable), and would be barred from filing suit in this

court until they complete this process. That mechanism for relief would be so complex that "no ordinary prisoner [could] discern or navigate it." Ross, 136 S. Ct. at 1859-60 ("Remedies that rational inmates cannot be expected to use are not capable of accomplishing their purposes and so are not available.") (quoting Turner v. Burnside, 541 F.3d 1077, 1084 (11th Cir. 2008) ).

Defendants next argue that by failing to address the details of his grievance history, plaintiff is improperly "rely[ing] on deliberate vagueness and obscurity to defeat a defense of non-exhaustion," quoting Landron v. City of New York, No. 14 Civ. 1046 (NRB), 2014 WL 6433313 (S.D.N.Y. Nov. 7, 2014). Here, however, plaintiff has plausibly alleged that his non-exhaustion was excusable because the IGRP process was not available for his complaint. To the extent defendants are arguing that plaintiff was required to provide more specific allegations of exhaustion in his complaint, their argument is foreclosed by Supreme Court precedent. See Jones v. Bock, 549 U.S. at 218 ("[I]nmates are not required to specially plead or demonstrate exhaustion in their complaints.").

In sum, defendants have not met their burden to show that "it is clear on the face of the complaint that the plaintiff did not satisfy the PLRA exhaustion requirement," Williams, 829 F.3d at 122, because plaintiff's claims are inmate allegations of physical assault by inmates, and are therefore not grievable, see, e.g., Taylor v. Swift, 21 F. Supp. 3d at 243. Accordingly, we deny defendant's motion to dismiss for failure to exhaust under the PLRA.

### C. Municipal Liability / Monell Claim

A municipality cannot be liable under section 1983 under the doctrine of respondeat superior; "plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the alleged injury." Roe v. City of Waterbury, 542 F.3d 31, 37 (2d Cir. 2008) (internal quotation marks omitted). To hold a municipality liable under 42 U.S.C. § 1983, a plaintiff must establish (1) the existence of a municipal policy, custom, or practice, which (2) caused the alleged violation of the plaintiff's constitutional rights. Jones v. Town of East Haven, 691 F.3d 72, 80 (2d Cir. 2012).

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." Connick v. Thompson, 563 U.S. 51, 61 (2011). To plead a claim for failure to train, a plaintiff must allege: "(1) that a

2018 WL 1737626

policymaker of the municipality knows to a moral certainty that its employees will confront a given situation; (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and (3) that the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights." Young v. Cty. of Fulton, 160 F.3d 899, 904 (2d Cir. 1998) (internal quotation marks and alterations omitted) (quoting Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992) ).

"[A] § 1983 plaintiff need not prove that his injury was caused by an explicitly stated municipal rule or regulation.... [A] municipality may be liable even for its inaction if, in its failure to act, it 'exhibit[ed] deliberate indifference to constitutional deprivations caused by subordinates.' " Outlaw v. City of Hartford, Nos. 16-480, 16-635, ―― F.3d ――, 2018 WL 1177403, at *17 (2d Cir. Mar. 7, 2018) (third alteration in original) (quoting Cash v. County of Erie, 654 F.3d 324, 334 (2d Cir. 2011) ). "[A] municipal policy of deliberate indifference ... may be shown by evidence that the municipality had notice of complaints ... but repeatedly failed to make any meaningful investigation into such charges." Id. at *23.

 **6** Plaintiff asserts two municipal policies or customs that violated his constitutional rights. First, he alleges that the City had a policy or custom of housing rival gang members in the same facility. Compl. ¶ 53. However, plaintiff cites no facts that support this theory. He merely alleges that "15A housed detainees identified by DOC officials as members of the Crips gang and member of the Trinitarios gang...." Compl. ¶ 15. No allegation in the complaint suggests that these rival gang members were placed in the same housing unit intentionally or based on any official municipal policy. As alleged in the complaint, there were an average of 11,408 inmates in DOC custody in 2014, Compl. ¶ 53, some of whom had gang affiliations, and some of whom may have gang affiliations that are unknown to the DOC. Based on this state of affairs, it is unsurprising that members of rival gangs might end up in the same prison facilities. At most, plaintiff alleges that the DOC had no policy about separating gangs.

Plaintiff has not in any way evaluated the alternative. That is not surprising—the notion of enacting a policy of housing together all Crips, for example, is untenable. Nor does counsel consider whether requiring pre-trial detainees to answer questions about their gang affiliations raises any potential

Fifth Amendment issues. Moreover, given that membership in gangs is often divided along racial lines, such a policy could potentially implicate concerns of racial discrimination. See Johnson v. California, 543 U.S. 499, 505 (2005) (holding that strict scrutiny applies to racial classifications in the prison context); Lee v. Washington, 390 U.S. 333 (1968) (per curiam) (striking down Alabama's policy of segregation in its prisons). Without any support from any specific allegation, it is too great a leap to conclude that rival gang members are neighbors in GRVC based on City policy to deliberately house rival gangs in the same facility.

Second, plaintiff alleges that the City had a policy or custom of placing detainees who should be in protective custody in high security risk housing units. Compl. ¶ 54. However, the complaint identifies only one example of such a detainee: the plaintiff himself. [6] Aside from bald allegations that "detainees who should be or are mandated by courts to be in protective custody in the general population of high security risk housing units," plaintiff offers no other facts that would identify any widespread pattern of misbehavior. In short, the complaint alleges nothing more than a single violation of a protective order, which is not enough to state a Monell claim. See Williams v. City of New York, No. 14 Civ. 5123 (NRB), 2015 WL 4461716, at *5–7 (S.D.N.Y. July 21, 2015).

6        Moreover, plaintiff did not describe the content of the protective order with any specificity, nor did he file it with his complaint.

Plaintiff's failure to train theory is supported by specific facts alleged in the complaint, and therefore fares better. Plaintiff alleges that the City knew that gang violence plagued GRVC 15A, citing at least five prior incidents of violence involving rival gangs in GRVC 15A in the eighteen months before the attack on plaintiff. Compl. ¶¶ 14-26, 51-52. Plaintiff alleges that although the City was aware of this problem, it failed to stop the violence and failed to train correction officers regarding gangs and gang riots and how to assist detainees who were trying to avoid the violence. Compl. ¶¶ 55-59.

Taken as true and making all inferences in plaintiff's favor, these allegations render plausible that there was a failure to properly train or supervise correction officers to stop fights between rival gangs or to intercede on behalf of inmates attacked by gang members that amounted to deliberate indifference to the rights of inmates detained in GRVC 15A. See Edwards v. City of New York, No. 14 Civ. 10058 (KBF), 2015 WL 5052637, at *5-7 (S.D.N.Y. Aug. 27, 2015)

Case 9:19-cv-01527-TJM-TWD   Document 64   Filed 11/09/21   Page 47 of 124

Taylor v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1737626

(denying motion to dismiss failure to train claim based on evidence from government reports, news articles, and prior lawsuits); Battle v. City of New York, No. 11 Civ. 3599 (RMB), 2012 WL 112242, at *6 (S.D.N.Y. Jan. 12, 2012) (denying motion to dismiss failure to train claims). The cited incidents of gang violence and Captain Jean-Pierre's report plausibly suggest that policymakers knew to a "moral certainty" that correction officers in GRVC 15A routinely confronted gang violence, had mishandled these incidents in the past, and would continue to do so without proper training. See Walker, 974 F.2d at 297-98; Edwards, 2015 WL 5052637, at *5-7.

**\*7** Defendants primarily challenge the first element of the failure to train claim, arguing that plaintiff failed to plead facts giving rise to a plausible inference that "a policymaker of the municipality kn[ew] 'to a moral certainty' that its employees will confront a given situation." Young, 160 F.3d at 904; see Walker, 974 F.2d at 297-98. Defendants first cite An v. City of New York, 230 F. Supp. 3d 224 (S.D.N.Y. 2017), where the court held that six lawsuits and a newspaper article alleging that NYPD officers arrested individuals who recorded police activity in violation of the First Amendment were insufficient to plausibly allege that the need to act was obvious. While An bears some superficial numerical resemblance to the present case, none of the lawsuits in An resulted in a finding of liability against the NYPD officers. Id. at 230. Those unsubstantiated allegations of misconduct are readily distinguishable from the repeated acts of gang violence in GRVC 15A alleged here. Cf. Global Comm'cs Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006) (documents filed in another court may be used to establish the fact of other litigation, not for the truth of the matters asserted in the other litigation). Moreover, an internal report identifying "that this conflict will go on and acts of retaliation are imminent," Compl. ¶ 24, much more clearly states an obvious need for corrective action than does a single news article.

Defendants next cite Walker v. City of New York, No. 14 Civ. 808 (ER), 2015 WL 4254026 (S.D.N.Y. July 14, 2015), where the plaintiff based his Monell claim on the number of lawsuits filed in Richmond County for false arrest against the NYPD and the individual officers named as defendants in his case. Id. at *5-10. These lawsuits, none of which attributed liability to the City or the officers, id. at *9, similarly do not compare to the allegations here. [7]

[7] The cases cited for the first time in defendants' reply bear even less resemblance to the present case. The "forty discrete incidents of misconduct" in Webb v. Goord, 340 F.3d 105, 107 (2d Cir. 2003), described a diverse array of abuses that occurred at 14 separate correctional facilities over the course of a decade, not repeated incidents of the same type at the same facility over an 18-month timespan. Smith v. Martuscello, 602 Fed.Appx. 550, 552 (2d Cir. 2015), is similarly distinguishable because it also involved "a series of discrete incidents taking place ... over a long period of time." In Aquino v. City of New York, No. 16 Civ. 1577 (GHW), 2017 WL 384354, at *4 (S.D.N.Y. Jan. 25, 2017), the plaintiff relied on reports describing incidents that occurred at a different facility from the one where he was in custody, and in Edwards v. City of New York, No. 03 Civ. 9407 (PAC), 2005 WL 3466009, at *10-11 (S.D.N.Y. Dec. 19, 2005), the plaintiff asked the court to extrapolate a practice of discrimination based solely on allegations that he personally had been discriminated against.

Plaintiff alleges repeated gang fights occurring within an eighteen-month period and a report warning that these attacks would continue, and asserts that the City failed to take any corrective action in response. These allegations, with all inferences made in plaintiff's favor, plausibly support municipal liability under a failure to train theory.

While these allegations may ultimately be difficult to prove, plaintiff has adequately alleged liability at this stage in the litigation. Accordingly, defendants' motion to dismiss plaintiff's municipal liability claim is denied.

### D. Claims Against the Individual Defendants in Their Official Capacities

Plaintiff sued all defendants "in their individual and official capacities as officials of the City of New York's Department of Corrections [sic]." Compl. ¶ 13. Plaintiff's claims against the individual defendants in their official capacities are duplicative of their claims against the City and therefore must be dismissed. McMillian v. Monroe Cty., 520 U.S. 781, 785 n.2 (1997) ("[A] suit against a governmental officer in his official capacity is the same as a suit against the entity of which the officer is an agent.") (internal quotation marks omitted and alterations incorporated); Kentucky v. Graham, 473 U.S. 159, 166 (1985); Davis v. Stratton, 360 Fed.Appx. 182, 183 (2d Cir. 2010) ("[I]n a suit against

Case 9:19-cv-01527-TJM-TWD   Document 64   Filed 11/09/21   Page 48 of 124

Taylor v. City of New York, Not Reported in Fed. Supp. (2018)
2018 WL 1737626

a public entity, naming officials of the public entity in their official capacities add[s] nothing to the suit." (internal quotation marks omitted) ); Brown, 2017 WL 1390678, at *5; Phillips v. Cty. of Orange, 894 F. Supp. 2d 345, 384 n.35 (S.D.N.Y. 2012) ("Within the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims as redundant.").

### E. Personal Involvement of Named Defendants

**\*8** "To establish a section 1983 claim, 'a plaintiff must establish a given defendant's personal involvement in the claimed violation in order to hold that defendant liable in his individual capacity.' " Warren v. Pataki, 823 F.3d 125, 136 (2d Cir. 2016) (quoting Patterson v. Cty. of Oneida, 375 F.3d 206, 229 (2d Cir. 2004) ). Defendants argue that plaintiff fails to allege the personal involvement of defendants Ponte, Suprenant, Canty, Cort, Harper, Lewis, and Anderson, and that the claims against these defendants should therefore be dismissed.

### 1. Ponte, Suprenant, and Canty

According to the complaint, defendant Joseph Ponte was the Commissioner of the DOC, defendant Brian Suprenant was the Bureau Chief of Security for the DOC, and defendant Yolanda Canty was the Warden of GRVC at all times relevant to the Complaint. Compl. ¶¶ 9-11. Under § 1983, liability for a supervisor, such as Ponte, Suprenant, and Canty, may be shown in any of the following ways: "(1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." Hernandez v. Keane, 341 F.3d 137, 145 (2d Cir. 2003); see Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995). [8]

[8]    The Second Circuit has recognized that the Supreme Court's holding in Iqbal that "vicarious liability is inapplicable to ...§ 1983 suits," 556 U.S. at 676, created ambiguity as to the 'continued validity' of some of the five Colon factors, see Raspardo v. Carlone, 770 F.3d 97, 117 (2d Cir.

2014); Reynolds v. Barrett, 685 F.3d 193, 205 n.14 (2d Cir. 2012). Courts in this district have reached different conclusions as to whether all or merely some of the Colon factors survive Iqbal. Compare Aponte v. Fischer, No. 14 Civ. 3989 (KMK), 2018 WL 1136614, at *8 n.5 (S.D.N.Y. Feb. 28, 2018) ("[A]ll five categories under Colon are still valid unless and until the Second Circuit holds otherwise."), and El Hanafi v. United States, No. 13 Civ. 2072 (GHW), 2015 WL 72804, at *13 (S.D.N.Y. Jan. 6, 2015) ("The majority of the district courts, however, have held that, absent any contrary directive from the Second Circuit, all five Colon factors survive."), with Bellamy v. Mount Vernon Hosp., No. 07 Civ. 1801 (SAS), 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) ("Only the first and part of the third Colon categories pass Iqbal's muster...."), aff'd, 387 Fed.Appx. 55 (2d Cir. 2010).

While divisions persist, "neither sect ... disputes the viability of the 'direct participation' and 'policy or custom' factors." Marom v. City of New York, No. 15 Civ. 2017 (PKC), 2016 WL 916424, at *15 (S.D.N.Y. Mar. 7, 2016), reconsideration granted on other grounds, 2016 WL 5900217 (July 29, 2016). In any event, it is clear that a supervisor may be liable where his "own individual actions ... violated the Constitution," Iqbal, 556 U.S. at 676, but that supervisory liability may not be premised on "allegations indicating nothing more than a defendant's passive acquiescence in the misconduct of subordinates," J.S. v. T'Kach, No. 11 Civ. 103 (NRB), 2014 WL 4100589, at *9 (S.D.N.Y. Aug. 20, 2014).

Here, plaintiffs allege that defendants Ponte and Suprenant developed DOC policies, were responsible for the training and supervision of DOC officers, and were regularly provided with reports of applications of force and other breaches of security in DOC facilities, while defendant Canty was responsible for the policy, conduct, and implementation of security within GRVC. Compl. ¶¶ 9-11. Plaintiff alleges that defendants Ponte, Suprenant, and Canty knew that there had been repeated incidents of gang violence in GRVC 15A in the months prior to this incident, and took no action to address these problems. Compl. ¶¶ 51-52. Plaintiffs also allege that these defendants failed to discipline, train or supervise their correction officers regarding gangs and gang riots, failed to take corrective actions to stop weapons from being transported into GRVC, and virtually never disciplined

Case 9:19-cv-01527-TJM-TWD   Document 64   Filed 11/09/21   Page 49 of 124

Taylor v. City of New York, Not Reported in Fed. Supp. (2018)
2018 WL 1737626

officers for not reporting fellow officers' misconduct. Compl.
¶¶ 55-61.

**\*9** These allegations survive a motion to dismiss.
Proceeding, as we must, "on the assumption that all the
allegations in the complaint are true (even if doubtful in fact),"
Twombly, 550 U.S. at 555, plaintiff adequately pleads these
defendants' personal involvement based on the allegations
that they created policies and/or allowed policies to continue
under which unconstitutional practices occurred, failed to
remedy wrongs that were brought to their attention, and failed
to act on information indicating that such violations were
occurring, see Colon, 58 F.3d at 873.

## 2. Cort and Harper

Plaintiff alleges that defendants Deputy Warden Cort and
Captain Harper violated his constitutional rights "when they
ignored the Order of the Kings County Supreme Court to
place him in protective custody" and assigned him to GRVC
15A. Compl. ¶¶ 35, 47. Plaintiff's allegations related to
defendants Cort and Harper lack certain pertinent details—
plaintiff does not indicate what role these defendants played
in his protective custody determination, nor when they took
any such relevant action. Defendants therefore assert that
these spare allegations do not rise to a level of plausibility
because the DOC's Protective Custody Directive, Goykadosh
Decl., Ex. H, ECF No. 44-8 ("Protective Custody Directive"),
states that deputy wardens and captains, such as defendants
Cort and Harper, are not responsible for housing assignments
as a matter of practice. We take judicial notice of the
Protective Custody Directive, which is publicly available and
the accuracy of which cannot reasonably be questioned.[9] See
Apotex, 823 F.3d at 60.

[9]   The Court takes judicial notice of the fact that the
policy exists and the provisions thereof; we make
no assumptions as to whether defendants followed
the Protective Custody Directive as to plaintiff.

Examining the Protective Custody Directive reveals that both
captains and deputy wardens have important responsibilities
in protective custody determinations, and therefore renders
plausible plaintiff's allegations that Cort and Harper were
personally involved in his case. The Protective Custody
Directive details procedures for (1) an inmate's initial
assignment to temporary protective custody; (2) the review
of this initial assignment and the determination to keep an

inmate in protective custody; and (3) the on-going review of
protective custody assignments. Captains play an integral role
in the first and third of these procedures; deputy wardens are
involved in the third procedure.

Captains are tasked with assessing whether inmates should
receive an initial assignment to protective custody. If an
inmate requests protection or if any staff member receives
information that an inmate may require protective custody,
the area captain is responsible for interviewing the inmate and
explaining the conditions of protective custody. Protective
Custody Directive at 5. The captain must document detailed
reasons for the inmate's assignment to protective custody and
immediately forward it to the tour commander for review. Id.
at 5, 19. During an initial review period, "the captain must
ensure that the inmate is kept separate from all other inmates."
Id. at 5. If an inmate receives an initial assignment to
protective custody, the tour commander reviews the captain's
reasoning and determines whether to keep the inmate there.
Id. at 5-6, 19. Given the captain's role in interviewing the
inmate, keeping the inmate separate from other prisoners
during an initial review period, and recommending whether
the inmate should receive an initial assignment to protective
custody, it is plausible that a captain such as defendant Harper
would have been personally involved in an inmate being
denied protective custody.

**\*10** After an inmate is assigned to temporary protective
custody housing, the Operations Security Intelligence
Unit ("OSIU") ultimately determines whether continued
assignment to protective custody is necessary. Id. at 6-8.
The OSIU then periodically reviews protective custody
assignments. The deputy warden for security is responsible
for facilitating that review and transmitting the inmate's
request for continued protective custody to the OSIU. Id.
at 11. In determining whether the inmate should remain in
protective custody, the OSIU considers the recommendation
of the adjudication captain, who states whether the inmate
should continue his current housing designation and the basis
for his decision. Id. at 11-12, 22. Therefore, both deputy
warden and captain plausibly play a role in the decision
whether to remove an inmate from protective custody.

At this stage, plaintiff has adequately, though not as
specifically as might be desired, alleged the personal
involvement of Deputy Warden Cort and Captain Harper. See
Brown, 2017 WL 1390678, at \*10 (holding that allegations
that defendants' actions caused plaintiff "to be improperly

Taylor v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1737626

placed in the general prison population" survives a motion to dismiss premised on lack of personal involvement).

### 3. Lewis

Plaintiff alleges that defendant Assistant Deputy Warden Sardia Lewis initiated disciplinary charges against DOC Captain Claudel Jean-Pierre for his report on a May 12, 2014 gang riot, eight months before plaintiff was injured by a gang member in a fight. Compl. ¶¶ 24-25, 57. Plaintiff alleges that, by doing so, Lewis "helped create an environment of intimidation and retaliation against Correction employees who honestly report security problems in the facility" which leads to "a culture of cover-up and actual cover-ups in the system, leading to official impunity and constitutional violations against detainees." Compl. ¶ 57.

These allegations are too attenuated from the alleged harm to form a plausible basis for Lewis's personal involvement. Plaintiff does not allege that Lewis had any direct involvement in the constitutional violations he purportedly suffered. To the extent plaintiff asserts claims against Lewis under a theory of supervisory liability, these claims fail because his constitutional injuries were not a reasonably foreseeable consequence of Lewis's actions. See Marom, 2016 WL 916424, at *16 ("[I]f the constitutional deprivation at issue was not a foreseeable consequence of any alleged policy or custom, or the deprivation was caused by some unforeseeable intervening event, plaintiffs have not stated a plausible claim against a supervisory defendant." (citing Victory v. Pataki, 814 F.3d 47, 69 (2d Cir. 2016) ) ).

Here, the only time Lewis is mentioned in the complaint is in the context of the disciplinary action she took against Captain Jean-Pierre. Unlike defendants Ponte, Suprenant, and Canty, Lewis is not alleged to have had any specific policy-making authority or to have had a role in the policies or customs at issue in this case. Thus, even accepted as true, the allegations about Lewis's conduct do not amount to a violation of plaintiff's constitutional rights.

Randle v. Alexander, 960 F. Supp. 2d 457 (S.D.N.Y. 2013), cited by plaintiff, is inapposite. In Randle, a supervisor allegedly "played a direct role in covering up an illegal forced fight within the prison" by filing a false report to cover up the actions of guards. Id. at 478. Here, however, Lewis did not play any direct role in the incident at the heart of plaintiff's complaint, but instead allegedly took disciplinary

action against a Correction Officer several months earlier, which "helped create an environment of intimidation and retaliation," Compl. ¶ 57, and "tacitly permitted other officials ... to continue in the unconstitutional conduct," Mem. of Law in Opp'n at 14, purportedly leading to plaintiff's constitutional injuries. This chain of events is too attenuated to hold Lewis liable under § 1983, and is therefore too speculative to survive a motion to dismiss.

### 4. Anderson

**\*11** Plaintiff clearly pleads the direct personal involvement of Correction Officer Anderson, who defendants concede was "present at the scene of the attack," Defs.'s Reply, ECF No. 50 at 13, and who allegedly failed to take action to prevent it. Compl. ¶¶ 41, 46; see Walker v. Schult, 717 F.3d 119, 128 (2d Cir. 2013) ("[P]rison officials have a duty ... to protect prisoners from violence at the hands of other prisoners.") (quoting Farmer v. Brennan, 511 U.S. 825, 833 (1994) ). Defendants' argument that Officer Anderson was not personally involved in the alleged attack relies on an Incident Report, Goykadosh Decl., Ex. I, ECF No. 44-9, that is not properly before the Court on this motion to dismiss. See Friedl, 210 F.3d at 83. Even if we were to consider the Incident Report at this stage in the litigation, it at most creates dueling narratives between plaintiff and Officer Anderson, which would not merit dismissal. See Fin. Guar. Ins. Co. v. Putnam Advisory Co., 783 F.3d 395, 405 (2d Cir. 2015) (resolution of a factual dispute is inappropriate on a motion to dismiss).

### F. Failure to State a Claim

Finally, defendants argue that plaintiff failed to state a claim for any constitutional violation, focusing primarily on plaintiff's purported failure to state a claim for deliberate indifference to safety under the Fourteenth Amendment.

"[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." Walker, 717 F.3d at 128 (quoting Farmer, 511 U.S. at 833). Therefore, "[a]llowing an attack on an inmate to proceed without intervening is a constitutional violation in certain circumstances." Rosen v. City of New York, 667 F. Supp. 2d 355, 359 (S.D.N.Y. 2009). Not every injury that a prisoner suffers at the hands of another results in constitutional liability for the officials responsible for that prisoner's safety. Farmer, 511 U.S. at 834.

Case 9:19-cv-01527-TJM-TWD   Document 64   Filed 11/09/21   Page 51 of 124

Taylor v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1737626

Rather, an official must act with " 'deliberate indifference' to a substantial risk of serious harm to an inmate." Id. at 828.

When such claims are made by a pretrial detainee such as Mr. Taylor, [10] they "are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment," which applies to convicted prisoners. Darnell v. Pineiro, 849 F.3d 17, 35 (2d Cir. 2017). To state a claim for deliberate indifference, plaintiff's allegations must satisfy a two-prong test, referred to as the "objective prong" and the "subjective prong" (this prong has more recently been referred to as the mens rea or mental element prong). See id. at 30-32.

[10]     Although the Complaint is slightly ambiguous, see Compl. ¶ 27, counsel agree that Mr. Taylor was a pre-trial detainee at the time of the alleged attack, see ECF No. 44 at 19; ECF No. 47 at 15 ("Plaintiff in the instant case was a pre-trial detainee."). Courts in this district have taken judicial notice of a prisoner's status, and we do the same here. See, e.g., Narvaez v. City of New York, No. 16 Civ. 1980 (GBD), 2017 WL 1535386, at *5 n.6 (S.D.N.Y. Apr. 17, 2017).

Under the first prong, the inmate must show that the alleged violation was "sufficiently serious to constitute objective deprivations of the right to due process." Id. at 29. Defendants do not contest that plaintiff has met this prong, and for good reason. Making all inferences in plaintiff's favor, he alleges that he was exposed to a gang riot facilitated by actions of the defendant-officers, during which a defendant-officer had the opportunity to prevent and/or stop an attack on plaintiff that resulted in the loss of his eye.

The second prong requires the defendant's deliberate indifference to the objective deprivation. See id. at 32. The Second Circuit's analysis of this second prong has oscillated between a more easily met objective test of the defendant's deliberate indifference and a subjective test that requires assessment of the defendant's state of mind. Compare Benjamin v. Fraser, 343 F.3d 35, 51 (2d Cir. 2003) (objective test), and Liscio v. Warren, 901 F.2d 274, 276 (2d Cir. 1990) (objective test), with Caiozzo v. Koreman, 581 F.3d 63, 69-72 (2d Cir. 2009) (subjective test, overruling Benjamin and Liscio), with Darnell, 849 F.3d 17, 36 (objective test, overruling Caiozzo). In Darnell, decided in 2017, the Second Circuit redefined the applicable standard for this prong:

*12   [T]he pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety. In other words, the 'subjective prong' (or 'mens rea prong') of a deliberate indifference claim is defined objectively.

Darnell, 849 F.3d at 35.

Although Darnell involved a Fourteenth Amendment challenge to a prisoner's conditions of confinement, its holding applies with equal measure to failure to protect claims. See 849 F.3d at 33 n.9 ("[D]eliberate indifference means the same thing for each type of claim under the Fourteenth Amendment."). Indeed, Darnell explicitly endorsed the Ninth Circuit's en banc decision applying the objective test to failure to protect claims. Id. at 35-36 (citing Castro v. Cty. of Los Angeles, 833 F.3d 1060, 1070 (9th Cir. 2016) (en banc), cert. denied, No. 16-655, 137 S. Ct. 831 (2017) ).

Applying Darnell's objective test to the second prong eviscerates defendants' argument that plaintiff's failure to protect claim should be dismissed because "[n]o Defendants, including Defendant Anderson, had the necessary state of mind or were on notice that an attack on Plaintiff by another inmate was imminent." Mem. of Law at 20, ECF No. 45. Under Darnell, defendants' subjective state of mind is no longer part of the test for the mens rea prong of a deliberate indifference claim. 849 F.3d at 35 ("[T]he 'subjective prong' (or 'mens rea prong') of a deliberate indifference claim is defined objectively."). Similarly, defendants' reliance on pre-2017 cases applying the subjective test is unavailing. Darnell "significantly altered the judicial landscape," Little v. Mun. Corp., City of New York, No. 12 Civ. 5851 (KMK), 2017 WL 1184326, at *8 (S.D.N.Y. Mar. 29, 2017), and any decision applying the subjective test for the mens rea prong has little persuasive power under the current state of the law.

Taylor v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1737626

Defendants also argue that "[a]bsent clear notice of a risk of harm to the prisoner, [c]ourts routinely deny deliberate indifference claims based upon surprise attacks," citing Brown, 2017 WL 1390678, at *11, and Fernandez v. N.Y.C. Dep't of Corr., No. 08 Civ. 4294 (KMW), 2010 WL 1222017 (S.D.N.Y. Mar. 29, 2010). Fernandez illustrates the type of incident that courts define as a "surprise attack": there, the plaintiff was attacked from behind while brushing his teeth with no officers present. Fernandez, 2010 WL 1222017, at *1. By contrast, in Brown, the plaintiff properly alleged deliberate indifference claims against two correction officers who allegedly witnessed an attack on the plaintiff but failed to intervene. 2017 WL 1390678, at *1, 11-12. Likewise, plaintiff here has stated a claim for deliberate indifference to safety against Officer Anderson, who witnessed the attack on plaintiff and allegedly failed to take action to prevent it.

Defendants also seek to dismiss what they characterize as plaintiff's due process claim regarding his transfer to GRVC 15A, but plaintiff did not assert any such claim. To the extent he had, the parties agree that the "mere transfer of a pretrial detainee within a prison population or between prisons does not give rise to a protected liberty interest under the Due Process Clause." Perez v. Ponte, 236 F. Supp. 3d 590, 614 (E.D.N.Y. 2017) (quoting Corley v. City of New York, No. 14 Civ. 3202 (GHW), 2015 WL 5729985, at *7 (S.D.N.Y. Sept. 30, 2015) ).

### G. Officer Stevenson

**\*13** A review of the docket indicates that plaintiff still has not served the complaint on defendant Correction Officer Stevenson. See ECF No. 38, p. 3 (Affidavit of Attempted Service as to Officer Stevenson stating, "Your deponent verily believes that he will be unable to effect personal service upon the above named person(s) herein, although your Deponent made due and diligent effort to effect same."). Plaintiff filed his complaint on October 12, 2016. ECF No. 19. On December 7, 2016, the Court sent a letter to counsel stating that unless plaintiff "achieve[s] service or can show good cause why your time to serve should be extended, this matter will be dismissed without prejudice on January 11, 2017," 90 days after the complaint was filed. See Fed. R. Civ. P. 4(m). Plaintiff's complaint is therefore dismissed without prejudice as to defendant Officer Stevenson unless plaintiff can show that he already served defendant Officer Stevenson within that 90-day window or had good cause for his failure to do so.

### V. Conclusion

For the foregoing reasons, defendants' motion to dismiss is granted in part and denied in part. Plaintiff's claims against Assistant Deputy Warden Sardia Lewis are dismissed for lack of personal involvement. Plaintiff's claims against Officer Stevenson are dismissed under Fed. R. Civ. P. 4(m). All claims against the individual defendants in their official capacities are dismissed. Defendants' motion to dismiss is denied in all other respects. The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 43. The parties are directed to appear for a conference on April 18, 2018 at 3:00 p.m.

As this case continues, counsel are expected to act in a professional and civil manner with each other and with the Court. See New York Rules of Professional Conduct, Rule 3.3(f)(2) ("In appearing as a lawyer before a tribunal, a lawyer shall not. engage in undignified or discourteous conduct."); Local Civil Rule 26. 4 (a) ("Counsel are expected to cooperate with each other, consistent with the interests of their clients, in all phases of the discovery process and to be courteous in their dealings with each other.").

**SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2018 WL 1737626

---

End of Document      © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-01527-TJM-TWD   Document 64   Filed 11/09/21   Page 53 of 124

Corley v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 4357662

2017 WL 4357662
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Royce CORLEY, Plaintiff,

v.

CITY OF NEW YORK, Edmund Duffy (Warden),
Dora B. Schriro, Deborah Moultrie, Captain
Wynn, Captain McQuade, Captain Randy Merrill,
Captain Desmond Myers, Captain Darnley
Proverbs, Deputy Warden Texeira, Rabbi
Richtman, and Scott Thompson, Defendants.

1:14-cv-3202-GHW
|
Signed 09/28/2017

**Attorneys and Law Firms**

Royce Corley, Danbury, CT, pro se.

Andrew James Rauchberg, New York City Law Department,
New York, NY, for Defendants.

## MEMORANDUM OPINION AND ORDER

GREGORY H. WOODS, United States District Judge:

 *1  Plaintiff, Mr. Royce Corley, was a pre-trial detainee on
Rikers Island in 2012. While housed there, Mr. Corley asserts
that he suffered a litany of abuses at the hands of prison
officials. He contends that prison officials violated his due
process rights in various ways, showed deliberate indifference
to his conditions of confinement, and retaliated against him
for filing grievances about the prison. He also asserts that the
prison staff initially refused his request to change his religious
preference and prohibited him from obtaining kosher food
in violation of his religious liberties. The Court previously
dismissed Mr. Corley's Second Amended Complaint in part,
but granted him leave to amend the complaint. Defendants
have now moved to dismiss the Third Amended Complaint
under Rule 12(b)(6) of the Federal Rules of Civil Procedure.
Because many of Plaintiff's claims either fail to state a legally
cognizable claim or are inadequately pleaded, Defendants'
motion to dismiss is DENIED in part and GRANTED in part.

## I. BACKGROUND [1]

[1]    The following facts are taken from Plaintiff's
third amended complaint, and are accepted as true
for purposes of this opinion. *See* Third Amended
Complaint ("TAC" or "complaint"), Dkt. No. 73.

Mr. Corley was a pre-trial detainee who entered the custody
of the City of New York's Department of Correction ("DOC")
on January 26, 2012. He was briefly detained at the Manhattan
Detention Complex ("MDC"), a medium-security facility.
TAC ¶ 15. While at the MDC, Mr. Corley was assessed and his
security risk was classified as a five—the lowest security risk
category. *Id.* Nevertheless, on February 2, 2012, Mr. Corley
was "transferred without notice or a hearing" to the George
R. Vierno Center ("GRVC"), a jail on Rikers Island, known as
"The Beacon." TAC ¶ 16. According to Mr. Corley, the GRVC
is designed for the "most violent high-classification inmates,"
and is used to house such inmates; in particular, members of
violent street gangs are concentrated there. TAC ¶ 17(a).

The complaint explains that in 2012, the GRVC had three
sections in which inmates were housed: the "Odd-Side,"
the "Even-Side," and "the Annex." TAC ¶ 17(b). In 2012,
members of the Bloods gang and affiliated groups were
housed in the Odd-Side and Even-Side, while the Annex was
known for its high concentration of Crips gang members.
Non-gang member "neutrals" were sprinkled throughout the
complex, based on their security risk group classification.
TAC ¶ 17(b). The complaint asserts that the GRVC rarely
housed non-violent, low-classification, non-gang members;
Mr. Corley alleges that housing such individuals at the
GRVC was "likely done as a means of harassment since
the conditions at the GRVC are the most oppressive and
restrictive of all DOC facilities." TAC ¶ 17(e). The complaint
alleges that Defendants Warden Duffy and Commissioner
Schriro knew that Mr. Corley was "improperly housed" at the
GRVC, but nevertheless denied Mr. Corley's requests to be
transferred from the facility. TAC ¶¶ 19, 27(f).

 *2  Mr. Corley alleges that prison officials provided too few
chairs and tables, allowing gang members to "monopolize"
the space at the GRVC, thereby "permitt[ing] a hostile living
environment to fester among inmates." TAC ¶ 17(f). He also
alleges that the high concentration of gang members and other
high security risk prisoners in the GRVC exposed him to gang
violence. He recites two incidents relevant to this case. First,
he says that once, while waiting alone in the Annex holding
pen, five Bloods members entered and, upon learning that Mr.
Corley was housed in the Annex, "incorrectly assumed he was
a Crip." Sensing danger, Mr. Corley stood up, "which sparked
the gang to physically attack him. Fortunately, Plaintiff was

Case 9:19-cv-01527-TJM-TWD   Document 64   Filed 11/09/21   Page 54 of 124

Corley v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 4357662

able to exit the [ ]area with minor injuries." TAC ¶ 18(a). Mr. Corley had another lucky escape from possible gang violence later during his stay in the GRVC. One day, while in the "Dangerzone," an "exclusive" stairwell "known for violence," he was cornered by six Crips, who had learned that he had been transferred from a "Blood Unit." TAC ¶ 17(l). Fortunately, the incident ended calmly: Mr. Corley was able to convince the gang members that he was not a Blood, and they left him alone. *Id.*

The complaint also alleges that the customs and policies of the GRVC were excessive as applied to him, and were "uncommon to similarly-situated low-classification inmates at other DOC facilities." TAC ¶ 18. For example, Mr. Corley states that he was subject to over twenty facility-wide lockdowns, during which he was confined to his cell for twenty-four hours a day. Some of the lock-downs lasted for more than seventy-two hours, during which time he could not leave his cell. TAC ¶ 18(c). Mr. Corley also asserts that he was confined to an individual cell for over three additional hours per day at the facility, beyond "the minimum standards promulgated by the N.Y.C. Board of Correction ("BOC")." TAC ¶ 18(b). He does not allege that he was the only prisoner at the facility subject to these lock-downs, or that this confinement was punitive.

Mr. Corley also asserts that he was scanned by a "SecurPass" x-ray machine more than forty times from May 2012 through January 2013. TAC ¶ 20. He contends that each scan exposed him to "harmful non-natural radiation" and asserts that his "risk and fear of developing cancer increased each time he was arbitrarily exposed to radiation." *Id.* He asserts no specific injury from the scans. Mr. Corley alleges that he was selected for scanning "arbitrarily," and not on account of suspicion that he harbored contraband. TAC ¶ 21. He alleges that Defendants Duffy, Schriro, and "the general public" were "apprehensive of exposure to non-natural radiation" from the SecurPass machines, but nevertheless refused to respond to Mr. Corley's grievances about the use of the machine. TAC ¶¶ 21-22.

Mr. Corley filed a number of grievances about prison conditions during his time at the GRVC. The alleged inflammatory responses to those grievances form the basis of Mr. Corley's retaliation claims here. For example, after Mr. Corley complained about lack of coffee in his meals, Deputy Warden Texeira stormed into the unit screaming "Corley Corley! I hear you['re] not getting your coffee, don't worry your [sic] gonna get it, Corley!" TAC ¶ 27(a). According to the complaint, Deputy Warden Texeira knew inmates were stealing the coffee, and her shouted comments were intended to suggest that Mr. Corley was informing on the thieves. *Id.* Mr. Corley alleges that the comments provoked a verbal altercation between him and a kitchen worker. *Id.*

Mr. Corley also filed grievances with Defendant Deborah Moultrie, a supervisor who oversaw the Inmate Grievance Resolution Committee ("IGRC"). The complaint alleges she "harbored ill-feelings" towards Mr. Corley, and "knowingly encouraged both inmates and GRVC officers to harass and intimidate him." TAC ¶ 24. Mr. Corley explains that Ms. Moultrie "dominated the grievance program" by coercing inmates to withdraw complaints and by "controlling all of the inmate votes" on the IGRC. TAC ¶ 25. In one instance recounted in the complaint, Mr. Corley tried to file a grievance against Ms. Moultrie. After exiting Ms. Moultrie's office, she shouted after him "you want to complain about me? Huh, you better worry about what that judge is gonna do to you after what you did to those little girls." TAC ¶ 27(c). This comment, overheard by several officers and inmates, resulted in several days of harassment by inmates, who accused Mr. Corley of being a child molester. The harassment ended after inmates asked Mr. Corley for his paperwork, presumably regarding the true nature of his alleged crime. The paperwork cleared the misimpression caused by Ms. Moultrie's comment, but "[s]ome inmates still held resentments as they soon learned he was a 'pimp.' " *Id.* Mr. Corley also attempted to file a grievance with Ms. Moultrie on December 3, 2012 concerning "suicide prevention aides." TAC ¶ 27(i). The complaint alleges that Ms. Moultrie refused to accept this grievance and became hostile towards Mr. Corley. *Id.* Ms. Moultrie demanded that Mr. Corley leave her office, which prompted nearby officers to physically remove him from the office.

**\*3** In addition to the grievances described in detail in the complaint, Mr. Corley also states that he filed "numerous grievances, 3-1-1 complaints, [and] letters to politicians and prisoner organizations" concerning the conditions at GRVC. TAC ¶ 24. Mr. Corley believes that his repeated complaints about the conditions at the prison led him to be " 'blackballed' as a 'serial grievant' " by GRVC officials; Mr. Corley alleges that, as a result of this, he faced significant harassment and retaliation at the facility. TAC ¶¶ 24, 27. For instance, he claims that he was subjected to over thirty "excessive" cell searches in the span of one year, which resulted in damage to and disorganization of his legal papers, the loss of various commissary items, and included a body cavity search. TAC

Corley v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 4357662

¶ 18(d). Mr. Corley contends that most of these searches were to harass "the inmate population" for complaining about conditions at the GRVC. *Id.*

Mr. Corley specifically notes that a March 29, 2012 search of his cell took place while he was in court, during which commissary items of his were discarded. TAC ¶ 27(b). The complaint also details a "unit search" on September 8, 2012, during which Defendants Captain McQuade and Intelligence Officer Scott Thompson allegedly harassed and intimidated Mr. Corley by searching his cell and reading his paperwork. TAC ¶ 27(e). In that incident, Mr. Thompson read selections from Mr. Corley's legal papers over a walkie-talkie. Mr. Corley asserts that the Defendants' "intent was to intimidate the Plaintiff for filing grievances," and that no other inmates faced a similar level of scrutiny. TAC ¶ 27(e). Mr. Corley also alleges that his cell was searched on December 6, 2012, while he was being treated for health issues, and that the search resulted in the loss of notes and records associated with both this lawsuit and his criminal case. TAC ¶ 27(j). The complaint contends that "on numerous occasions during cell searches," his papers were deliberately dumped on the floor and disorganized, requiring hours of his time to reorganize them. TAC ¶ 27(k). The complaint repeatedly contends that such cell searches "were for harassment" and were conducted "at the direction of Captain Wynn or Ms. Moultrie." *Id.*

Finally, Mr. Corley alleges that he was twice moved to a different unit within the GRVC. First, on July 30, 2012, he was moved from Unit 15B to Unit 9A "for unknown reasons," causing him to lose his position as the Inmate Council representative for Unit 15B. TAC ¶ 27(d). [2] The complaint also contends that this transfer from the Annex to the Odd-Side was dangerous because inmates would assume that Mr. Corley was a Crip moving to a Bloods unit. *Id.* Mr. Corley was moved a second time on December 24, 2012, this time from Unit 9A back to Unit 15B. TAC ¶ 27(l). Mr. Corley alleges that he was moved by Defendant Captain Wynn "out of retaliation for [Plaintiff's] numerous complaints," because Captain Wynn knew that Mr. Corley would "face adversity" due to the transfer. *Id.* It was after this second transfer that the incident in the "Dangerzone" took place in which Mr. Corley was nearly assaulted by Crips gang members; Plaintiff does not allege that he faced any adversity beyond that confrontation as a result of the unit transfer.

[2] Elsewhere, however, Mr. Corley asserts that he was the Inmate Council representative for both Unit 15B and Unit 9A. TAC ¶ 24.

While at the GRVC, Mr. Corley experienced a religious conversion. On May 5, 2012, just over three months after his arrival there, Mr. Corley, an African-American man, filed a form to change his religious preference from "None" to "Jewish." TAC ¶ 23(a). On June 26, 2012, the Jewish Chaplain at the GRVC, Rabbi Richtman, interviewed Mr. Corley. The Rabbi refused to accept Mr. Corley's change of religion form, stating that "he does not want to mistakenly grant an assumed 'gentile' ... with a 'Jewish Identity.' " TAC ¶ 23(b). The Rabbi also refused to provide Mr. Corley with a Torah, Tanakh, or any other religious materials. The complaint alleges that Mr. Corley filed grievances regarding the Rabbi's refusal to grant a religious preference change on July 11, 2012, and that the Rabbi's decision was later upheld by Defendants Moultrie, Warden Duffy, and Commissioner Schriro. TAC ¶ 23(c).

**\*4** Eventually, on November 19, 2012, the GRVC director of ministerial services approved Mr. Corley's change of religious preference. TAC ¶ 23(d). The director told Mr. Corley that he believed that "the hurdles Plaintiff went through to approve the form [were] outrageous...." *Id.* He went on to say much more. As the complaint asserts: "[The Director t]hen indicated [that] the Rabbi's refusals were likely due to racism, because the Plaintiff was Black and the mistreatment of Black inmates by the Rabbi was an on-going issue." *Id.*

Mr. Corley finally received a new inmate ID stating that Mr. Corley's religion was "Jewish" on November 30, 2012. Without the new ID, Mr. Corley was unable to receive kosher meals. TAC ¶ 23(e). From December 1 through December 6, 2012, even with the new ID, the GRVC continued to deny Mr. Corley kosher meals. Mr. Corley alleges that Defendants Captain Merrill, Captain Myers, and Captain Proverbs "knowingly encouraged or permitted" food service workers to deny Mr. Corley kosher meals. TAC ¶¶ 23(f); 27(h). While it is unclear what Mr. Corley ate or was willing to eat before he received his new ID card, from December 1 he refused to eat non-kosher food. On several occasions during that time, Captain Wynn would check with unit officers to see if Mr. Corley was eating, and instructed that they make a log if he ate any non-kosher foods. TAC ¶ 27(g). But Mr. Corley held fast, and fasted. On December 6, 2012, he was hospitalized due to his refusal to eat non-kosher meals "after fainting from starvation, caused by refusing to eat non-kosher

2017 WL 4357662

foods." TAC ¶ 23(f). Mr. Corley's detention at the GRVC ended on January 29, 2013 when he was transferred to federal custody. TAC ¶ 3.

## II. PROCEDURAL HISTORY

Mr. Corley commenced this action on April 28, 2014, and has since amended his complaint three times. On September 30, 2015, this Court denied in part and granted in part Defendant City of New York and Warden Edmund Duffy's motion to dismiss the Second Amended Complaint. Dkt. No. 41, *Corley v. City of New York, et al.*, No. 14-cv-3202-GHW, 2015 WL 5729985 (S.D.N.Y. Sept. 30, 2015) ("2015 Opinion").

On May 26, 2016, Mr. Corley filed his Third Amended Complaint ("TAC"). Dkt. No. 73. Defendants moved to dismiss the TAC on September 15, 2016. Dkt. No. 90 (Defs.' Mot.). On October 18, 2016, Plaintiff opposed the Defendants' motion. Dkt. No. 92 (Pl.'s Opp'n). Defendants filed a reply brief on November 9, 2016. Dkt. No. 97 (Defs.' Reply). For the reasons explained below, Defendants' motion is granted in part and denied in part.

## III. STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge" claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

**\*5** Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). However,

'[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' A complaint must therefore contain more than 'naked assertion[s] devoid of further factual enhancement.' Pleadings that contain 'no more than conclusions ... are not entitled to the assumption of truth' otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87-88 (2d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678-79). A complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555, 557). Further, despite the well-established rule in this circuit that *pro se* submissions are to be liberally construed and interpreted to raise "the strongest arguments they suggest," *see Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474-75 (2d Cir. 2006), the plausibility standard applies equally to *pro se* complaints. *See Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011).

## IV. DISCUSSION

Defendants move to dismiss the TAC in its entirety, arguing that Plaintiff fails to state any claim. As it did with the 2015 Opinion, the Court will generally adopt the organization of claims in Defendants' motion. Mr. Corley's TAC does not differ substantially from his previous complaints; as a result, the Court's conclusions as to the viability of Plaintiff's claims following Defendants' motion to dismiss do not differ substantially from the conclusions reached in the 2015 Opinion. Where noted below, the Court references and adopts its previous decision.

### A. Section 1983 Claims

Mr. Corley has asserted a number of claims under 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Thomas v. Roach*, 165 F. 2d 137, 142 (2d Cir. 1999) (citing *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993)). "To state a claim under Section 1983, a plaintiff must allege facts indicating that some official action has caused the plaintiff to be deprived of his or her constitutional rights." *Zherka v. Amicone*, 634 F.3d 642, 644 (2d Cir. 2011) (citing *Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002) (per curiam)). "A defendant's conduct must therefore be a proximate cause of the claimed violation in order to find that the individual defendant deprived the

plaintiff of his rights." *Ross v. Westchester Cty. Jail*, No. 10-cv-3937, 2012 WL 86467, at *9 (S.D.N.Y. Jan. 11, 2012) (citing *Martinez v. California*, 444 U.S. 277, 285 (1980)). Additionally, where, as here, a plaintiff is seeking money damages against the defendants, the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite" to recovery under Section 1983. *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) (citing *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)).

**\*6** Mr. Corley's 1983 claims are not neatly parsed or classified by type of claim, and he pleads the first six "counts" of his TAC as claims brought pursuant to section 1983. Liberally construed, Mr. Corley's complaint raises constitutional claims under the Fourteenth, Fourth, and First Amendments. First, Mr. Corley alleges that Defendants violated his due process rights under the Fourteenth Amendment by transferring him to the GRVC and between units within the facility, and by destroying his personal property and his legal paperwork. Next, Mr. Corley alleges that Defendants subjected him to unconstitutional conditions of confinement and showed deliberate indifference to his health and safety, also in violation of the Fourteenth Amendment. Mr. Corley's Fourth Amendment claims relate to his claims concerning unreasonable searches of his cell and the prison's use of the SecurPass machine. Finally, Mr. Corley brings 1983 claims under the First Amendment for retaliation.

### 1. Due Process Claims

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property without due process of law, and 'those who seek to invoke its procedural protection must establish that one of these interests is at stake.' " *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016), *as amended* (Feb. 24, 2016) (citing *Graziano v. Pataki*, 689 F.3d 110, 114 (2d Cir. 2012)). "[S]tandard analysis under that provision proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Id.* (citing *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011)). "Liberty interests may arise directly from the Due Process Clause itself or from statutes, regulations, or policies enacted by the state." *Victory*, 814 F.3d at 59 (citing *Wilkinson v. Austin*, 545 U.S. 209, 221-22 (2005)).

#### a. Transfer to the GRVC

Mr. Corley alleges that his transfer to the GRVC in February 2012 "without notice or hearing" violated his due process rights. TAC ¶ 16. In essence, he argues that his low security classification should have prevented his transfer to GRVC: he contends in his complaint that his transfer was therefore "likely done as a means of harassment," TAC ¶ 17(e), but in opposing Defendants' motion to dismiss he contends only that the transfer was done "arbitrarily," Pl.'s Opp'n at 2. He further alleges that his transfers between units in the GRVC were done "for unknown reasons." TAC ¶ 27(d). [3]

[3]   In his opposition, Mr. Corley asserts that he seeks "no independent claim based on his transfers within the facility. Such facts are alleged solely to express the harassment and retaliation Plaintiff experienced...." Pl.'s Opp'n at 3. Nevertheless, in liberally construing Plaintiff's complaint to "raise the strongest arguments that [it] suggest[s]," the Court finds it prudent to consider whether the intra-prison transfers alleged in the complaint state a separate claim for a deprivation of Plaintiff's due process rights. *Triestman*, 470 F.3d at 474-75.

The Constitution does not "grant[ ] a prisoner a liberty interest in the location of his place of confinement." *Fermin-Rodriguez v. Westchester Cty. Jail Med. Pers.*, 191 F. Supp. 2d 358, 363 (S.D.N.Y. 2002), *as amended* (Mar. 25, 2002) (citing *Persico v. Gunnell*, 560 F. Supp. 1128, 1132-33 (S.D.N.Y. 1983)). Moreover, New York law permits the transfer of inmates from one facility to another, and does not place conditions on the discretionary power of the commissioner of corrections to transfer prisoners. *Fermin-Rodriguez*, 191 F. Supp. 2d at 363; *see also Matiyn v. Henderson*, 841 F.2d 31, 34 (2d Cir. 1988) ("New York Law does not place conditions on interprison transfers."). Plaintiff therefore had no liberty interest under either federal or state law to be located at a particular prison facility, and his transfer therefore cannot be the basis of a due process claim. Similarly, Plaintiff had no liberty interest in an assignment to a particular unit within the GRVC. *See Covino v. Vermont Dep't of Corr.*, 933 F.2d 128, 129 (2d Cir. 1991) ("[T]he transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is not a right protected by the due process clause itself.") (internal citation and quotation marks omitted).

Case 9:19-cv-01527-TJM-TWD    Document 64    Filed 11/09/21    Page 58 of 124

Corley v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 4357662

**\*7** Mr. Corley's insistence that his due process rights were violated is not persuasive; as with the SAC, the TAC does not include any allegations that Plaintiff's transfers were done for punitive reasons. The case law Plaintiff cites to in opposing Defendants' motion is unavailing, as those cases refer to due process rights implicated by the imposition of "maximum security confinement" and "restrictive housing." *See Rhem v. Malcom*, 371 F. Supp. 594, 624 (S.D.N.Y. 1974), *supplemented*, 377 F. Supp. 995 (S.D.N.Y. 1974), *aff'd and remanded*, 507 F.2d 333 (2d Cir. 1974) (holding that the imposition of maximum security confinement, including lock-ins that lasted 16 hours per day, violated the due process rights of some pre-trial detainees); *People ex rel. Furde v. New York City Dep't of Correction*, 796 N.Y.S.2d 891, 900 (Bronx Sup. Ct. 2005) (holding that putative segregation wherein petitioner was separated from general population without a hearing and was "confined to his cell for 23 hours a day for over 6 months" violated the petitioner's due process rights). Mr. Corley does not assert that he was put into any kind of restricted or segregated housing or that his transfers were a form of punishment. Instead, he argues that his placement within the general population of the GRVC was not justified because the facility was "designed for housing the most violent high-classification inmates," whereas he was categorized "in the lowest security category." TAC ¶¶ 15; 17(a). Ultimately, Plaintiff does not have a protected liberty interest to be housed at a particular prison or unit, and therefore cannot state a due process claim based on his transfer to or within the GRVC.[4] That claim is therefore dismissed.

[4] To the extent Plaintiff contends that these transfers were done as retaliation for his filing of grievances, that claim is discussed below in connection with Plaintiff's First Amendment claims.

**b. Access to Inmate Grievance Resolution Program**

Mr. Corley alleges that Defendant Moultrie "knowingly manipulated the rules of the [Inmate] Grievance Program and coerced inmates to withdraw complaints ..." and that the IGRC was not properly staffed with inmate representatives. TAC ¶¶ 24-26. However, as the Court explained in its 2015 Opinion, Plaintiff did not have a liberty interest to access the GRVC's grievance program that would provide a basis for a constitutional due process claim here. *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003) ("Prison grievance procedures do not confer any substantive right upon an inmate requiring the procedural protections envisioned by the Fourteenth Amendment."); *Mimms v. Carr*, No. 09-cv-5740, 2011 WL 2360059, at \*10 (E.D.N.Y. June 9, 2011) *aff'd*, 548 Fed.Appx. 29 (2d Cir. 2013) ("It is well-established that prison grievance procedures do not create a due-process-protected liberty interest."). As a result, Defendant Moultrie's alleged failure to operate the grievance process "properly" does not state a claim for violation of Plaintiff's rights.

**c. Destruction of Personal Property**

As in his previous complaint, Mr. Corley raises claims in the TAC relating to the destruction of his personal property during "excessive" cell searches.[5] However, because Mr. Corley does not claim that he was denied adequate post-deprivation procedures by which to report the destruction of his property, and because the destruction of property alone does not give rise to a cognizable due process claim, that claim is dismissed. *Toliver v. City of New York*, No. 10-cv-5806, 2013 WL 6476791, at \*7 (S.D.N.Y. Dec. 10, 2013), *report and recommendation adopted*, No. 10-cv-5806, 2014 WL 549402 (S.D.N.Y. Feb. 11, 2014) ("Whether negligent or deliberate, the destruction of an inmate's property caused by a prison officer's unauthorized conduct does not give rise to a claim under the Due Process Clause if the state provides that inmate with an adequate postdeprivation remedy.... It is well established that New York provides inmates with the opportunity for a meaningful postdeprivation hearing through state law causes of action for negligence, replevin, or conversion which could fully compensate [the plaintiff] for his alleged property loss.") (internal citations and quotation marks omitted). As a result, Plaintiff has not stated a due process claim for the destruction of his property, and that claim is dismissed.

[5] As with this claim regarding intra-facility transfers, in opposing Defendants' motion, Mr. Corley contends that he "asserts no independent claim based on the 'destruction of commissary items.' Such facts are alleged solely to express the harassment and atypical conditions of confinement Plaintiff experienced." Pl.'s Opp'n at 3. The Court nevertheless examines the TAC to raise the strongest arguments that it suggests, and therefore addresses the extent to which Plaintiff's arguments concerning the destruction of his property states a claim under the Due Process Clause.

2017 WL 4357662

#### d. Destruction of Legal Papers

**\*8**  While Plaintiff cannot state a due process claim based on the destruction of his commissary items, his allegations concerning the destruction of his legal papers implicates a separate constitutional right of access to the courts: "a right alternately grounded in the Article IV Privileges and Immunities Clause, the First Amendment Petition Clause, the Fifth Amendment Due Process Clause, and the Fourteenth Amendment Equal Protection, and Due Process Clauses." *Christopher v. Harbury,* 536 U.S. 403, 414-415 & n.12 (2002). As the Second Circuit has explained,

> [l]egal documents have characteristics that differentiate them from mere "property" whose destruction can be adequately remedied by a generic property-deprivation state law. Their theft or destruction, for example, may irrevocably hinder a prisoner's efforts to vindicate legal rights.... It is now established beyond doubt that prisoners have a constitutional right of access to the courts.

*Willey v. Kirkpatrick,* 801 F.3d 51, 69 (2d Cir. 2015) (citing *Bounds v. Smith,* 430 U.S. 817, 821-22, (1977)).

Although the Court held that Plaintiff's SAC alleged sufficient facts regarding interference with his legal papers to survive Defendants' motion to dismiss that complaint, *see* 2015 Opinion, 2015 WL 5729985, at *10, with the benefit of additional briefing on this issue, the Court deviates from its previous conclusion here. To state a claim for denial of access to the courts, "a plaintiff must allege that the defendant took or was responsible for actions that hindered a plaintiff's efforts to pursue a legal claim." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir. 2003) (citing *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir. 1997)). Courts in this district have held that a plaintiff is required to "demonstrate actual injury and specify which legal matter Defendants' alleged tampering hindered him from pursuing." *Shepherd v. Fisher,* No. 08-cv-9297, 2017 WL 666213, at *39 (S.D.N.Y. Feb. 16, 2017); *see also Cancel v. Goord,* No. 00-cv-2042, 2001 WL 303713, at *4 (S.D.N.Y. Mar. 29, 2001) ("[I]n order to survive a motion to dismiss a plaintiff must allege not only that the

defendant's alleged conduct was deliberate and malicious, but also that the defendant's actions resulted in actual injury to the plaintiff such as the dismissal of an otherwise meritorious legal claim.") (internal citation omitted).

Mr. Corley has not alleged that the destruction or disorganization of his papers caused any such "actual injury." He merely claims that his papers were lost or disorganized, "requiring [Plaintiff] to spend hours to reorganize them." TAC ¶ 27(k). He does not allege any facts that indicate that this disorganization prevented him from pursuing a claim or filing a timely submission. In his opposition, Mr. Corley contends that any showing of an actual injury due to the destruction of his legal papers is "contingent upon an adverse or prejudicial disposition in the instant case and criminal case." Pl.'s Opp'n at 6. This argument is not persuasive. Plaintiff must plead an "actual injury" resulting from the destruction of his legal papers; the uncertain possibility of future harm does not satisfy the "actual harm" requirement. *See Lewis v. Casey,* 518 U.S. 343, 351 (1996) (holding that an "actual-injury" requirement is a "constitutional prerequisite" of an access-to-courts claim, and that as a result, "the inmate therefore must go one step further and demonstrate that the alleged [denial of access] hindered his efforts to pursue a legal claim."). Moreover, such a disposition would not necessarily arise out of the destruction of legal papers three years prior. Mr. Corley does not plead that his right of access to the court was chilled or impaired by the destruction of his legal papers, and his claim for denial of access to the courts therefore does not withstand Defendants' motion to dismiss.

#### e. Lock-Down and Lock-Out Practices

**\*9**  Mr. Corley alleges that while housed at the GRVC, he was kept in his cell for "three additional hours everyday [sic]" beyond what was allegedly permitted by the BOC, that the facility was "locked-down" on more than twenty occasions, and that those lock-downs kept Plaintiff in his cell for twenty four consecutive hours, with some lasting more than seventy-two hours. TAC ¶¶ 18(b), 18(c). In the 2015 Opinion, and *infra* § 2(c), the Court analyzed these facts as raising a claim for deliberate indifference to unconstitutional conditions of confinement. In opposing Defendants' motion to dismiss the TAC, however, Plaintiff contends that he asserts these facts "to express the atypical confinement that Plaintiff experienced ... Plaintiff possessed a state-created liberty interest in not being confined to a cell longer than required by policy." Pl.'s Opp'n at 5. Mr. Corley references the "minimum

Case 9:19-cv-01527-TJM-TWD    Document 64    Filed 11/09/21    Page 60 of 124

Corley v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 4357662

standards" promulgated by the BOC, and specifically directs the Court to one of the rules and regulations codifying those standards, which reads as follows:

No prisoner shall be required to remain confined to his or her cell except for the following purposes:

(1) At night for count or sleep, not to exceed eight hours in any 24-hour period;

(2) During the day for count or required facility business that can only be carried out while prisoners are locked in, not to exceed two hours in any 24-hour period. This time may be extended if necessary to complete an off count. This paragraph shall not apply to prisoners confined in enhanced supervision housing, who may be locked in during the day for up to nine hours in any 24-hour period.

N.Y. Comp. Codes R. & Regs., tit. 40 § 1-05(b). [6] As a result, the Court also construes these allegations as seeking to raise a due process claim.

[6]    The Court takes judicial notice of the entirety of the text of this provision of the DOC Minimum Standards. *See, e.g., Johnakin v. NYC Dep't of Corr.,* No. 11-cv-4807, 2013 WL 5519998, at *11 (E.D.N.Y. Sept. 30, 2013) (taking judicial notice of DOC Minimum Standards).

A liberty interest may arise "from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005) (internal citations omitted). The Second Circuit has explained that in order to demonstrate the existence of a state-created liberty interest, "a prisoner must show that state statutes or regulations require, in language of an unmistakably mandatory character, that a prisoner may not suffer a particular deprivation absent specified predicates." *McMahon v. Fischer,* 446 Fed.Appx. 354, 356 (2d Cir. 2011) (citing *Vega v. Lantz,* 596 F.3d 77, 83 (2d Cir. 2010)) (internal quotation marks omitted). "[T]he mere adoption of procedural guidelines governing day-to-day prison administration, without more, will not give rise to a state-generated liberty interest." *Maldonado v. Kinlock,* No. 09-cv-8435, 2012 WL 3597049, at *3 (S.D.N.Y. Aug. 21, 2012). Furthermore, if state-created procedural rules do not impose "substantive limitations on official discretion," then they do not result in a protected liberty interest. *See Walker v. Shaw,* No. 08-cv-10043, 2010 WL 2541711, at *6 (S.D.N.Y. June 23, 2010) (quoting *Korkola v. N.Y.C. Dep't of Corr.,* No. 84-cv-5740, 1986 WL 9798, at *4-5 (S.D.N.Y.

Sept. 4, 1986)); *see also Olim v. Wakinekona,* 461 U.S. 238, 249 (1983) ("[A] state creates a protected liberty interest by placing substantive limitations on official discretion. An inmate must show 'that particularized standards or criteria guide the State's decisionmakers.' ") (quoting *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 467 (1981) (Brennan, J., concurring). Moreover, even if such mandatory rules exist, "a prisoner who experiences a deprivation arising under mandatory rules has no actionable due process claim if other prisoners experience approximately the same deprivation in the ordinary administration of the prison with sufficient regularity that such deprivation is typical." *Vega,* 596 F.3d at 83 (citing *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir. 1999)). That is,

> **\*10** actions under the Due Process Clause are reserved for prisoners enduring a hardship that is substantially more grave than hardships they would be likely to endure simply as a consequence of the ordinary administration of the prison. Where a statute limits a prison's ability to impose a constraint as a punishment, but the prison makes a practice of imposing for non-punitive reasons a constraint endured under similar conditions and for a similar duration with sufficient regularity, then freedom from the deprivation is not a right of "real substance" which due process protects.

*Welch v. Bartlett,* 196 at 392-93 (citing *Sandin v. Connor,* 515 U.S. at 472, 478, 480 (1995)).

As an initial matter, as the Court observed in its 2015 Opinion, conditions that are in conflict with the Minimum Standard Guidelines are not automatically deemed to be violations of constitutional rights. *Johnakin,* 2013 WL 5519998, at *11 ("[A]llegations of a violation of the Minimum Standards, which reflect the New York City Board of Correction's views of 'the basic elements necessary to promote safe, secure and humane jail environments,' ... do not make out a violation of constitutional rights or federal law."). Regardless, even if the regulation did create a liberty interest, Plaintiff has not pleaded that any of the alleged conditions endured were

Case 9:19-cv-01527-TJM-TWD    Document 64    Filed 11/09/21    Page 61 of 124

Corley v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 4357662

different from what other prisoners experienced—indeed, the TAC states that the lock-downs were done on a facility-wide basis every day. TAC ¶ 18(b). As a result, the Court cannot conclude that Plaintiff has an actionable due process claim for the time he was required to remain in his cell, as he has not pleaded any facts to suggest that this deprivation was not part of the ordinary administration of the GRVC.

In addition, the Court heeds the Supreme Court's conclusion that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Bell v. Wolfish*, 441 U.S. 520, 546-47 (1979). The regulation Plaintiff contends was violated itself contemplates the importance of security and safety in its application. N.Y. Comp. Codes R. & Regs., tit. 40 § 1-05(a) ("The time spent by prisoners confined to their cells should be kept to a minimum and required only when necessary for the safety and security of the facility."). Ultimately, the complaint fails to plausibly suggest that either the lock-down or lock-in practices Plaintiff complains of were arbitrary, and remaining "mindful of ... the deference we owe prison officials in carrying out their daily tasks," the Court does not find that Plaintiff has adequately pleaded a due process claim. *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017).

**2. Conditions of Confinement Claims**

Mr. Corley pleads facts that the Court construes as the bases for a series of claims concerning allegedly unconstitutional conditions of confinement at the GRVC. In its 2015 Opinion, the Court dismissed all of Plaintiff's conditions of confinement claims. Since that opinion, and in light of the Supreme Court's decision in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), the Second Circuit has clarified the legal standard to be applied to claims for deliberate indifference under the Fourteenth Amendment.

"A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement by showing that the officers acted with deliberate indifference to the challenged conditions." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). Such a claim is typically analyzed under a two-pronged standard. First, the pretrial detainee must satisfy the "objective prong" showing that the conditions were "sufficiently serious" as to constitute objective deprivations of constitutional rights. *Id.* at 29. Second, the pretrial detainee

must satisfy what has been misleadingly referred to as the "subjective prong" by showing that the officer acted with deliberate indifference to the challenged conditions. *Id.* As the Second Circuit recently explained, this subjective "*mens rea* prong" must be analyzed objectively: rather than ask whether the charged official "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety," courts are to instead determine whether the official "knew, or should have known" that his or her conduct "posed an excessive risk to health or safety." *Id.* at 33, 35. The Court applies this framework to Mr. Corley's various allegations concerning his conditions of confinement at the GRVC.

**a. Use of SecurPass Machines**

**\*11** Mr. Corley alleges that from May 2012 to January 2013, the Defendants used a "SecurPass" full-body X-ray machine to subject him to over forty body scans, that these scans exposed him to "harmful non-natural radiation," and that as a result, his "risk and fear of developing cancer increased." TAC ¶ 20. In the 2015 Opinion, the Court held that Plaintiff failed to state a claim for deliberate indifference to his health because he did not allege any facts to support the second prong of the test for such a claim: he did not allege that Defendants knew or believed that the SecurPass machine posed any risk to Plaintiff's health. 2015 Opinion, 2015 WL 5729985, at \*10. In his amended complaint, Mr. Corley attempted to bolster his claims concerning the harm caused by the machines by first alleging that he was scanned more than forty times (as opposed to his previous allegation of thirty scans), and by contending that "Warden Duffy, Commissioner Schriro and the general public at large were apprehensive of exposure to non-natural radiation, given the uncertainty about the health and genetic consequences of even small emissions." TAC ¶ 20-22.

These additions to his complaint do not save Plaintiff's claim concerning the SecurPass machines, however, because he still fails to allege that Defendants "knew or should have known" that "an excessive risk to health or safety" would result from the scans. *Darnell*, 849 F.3d at 35. That Defendants were "apprehensive" about radiation exposure does not indicate that they should have known of an excessive risk to Plaintiff's safety; pleading that officials were apprehensive falls short of pleading that a reasonable officer should have known of a serious harm and Defendants nevertheless imposed that harm.

Case 9:19-cv-01527-TJM-TWD   Document 64   Filed 11/09/21   Page 62 of 124

Corley v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 4357662

In addition, the Court notes that courts in this district that have found that screenings from the SecurPass machine do not amount to an objectively serious harm for purposes of a deliberate indifference claim. *Middleton v. City of New York (In re RadPro SecurPass Scanner Cases)*, No. 13-cv-6095, 2014 WL 4054310, at *6 (S.D.N.Y. Aug. 13, 2014) ("[W]hile exposure to any amount of radiation poses some risk of harm —society chooses to, and indeed must, tolerate some level of radiation exposure."); *see also Walker v. Ponte*, No. 14-cv-8507, 2017 WL 2703560, at *3 (S.D.N.Y. June 21, 2017) (discussing an expert's findings after testing four SecurPass machines at Rikers Island, including one at GRVC, and explaining that the results led the expert to conclude "that the SecurPass machines used by DOC do not emit harmful levels of radiation to those scanned"), *but see Rahman v. Schriro*, 22 F. Supp. 3d 305, 313-14 (S.D.N.Y. 2014) (holding that when a plaintiff pleaded that he was subjected to at least two SecurPass scans a day and that each scan exposed him to a level of radiation higher than that emitted in airports, the complaint contained sufficiently plausible allegations such that the Plaintiff could demonstrate through discovery that a serious future risk of serious injury existed). The conclusions reached in these cases support the Court's conclusion that a reasonable officer should not have been expected to know that the SecurPass machine posed an excessive risk to Plaintiff's health.

Furthermore, the TAC fails to plausibly state facts to support a finding that the exposure to radiation caused by the SecurPass scans was "sufficiently serious." In order to allege facts to meet this objective test, a complaint must plead that the harm "the [detainee] suffered was 'sufficiently serious that he was denied the minimal civilized measure of life's necessities.' " *Darnell*, 849 F. 3d at 29. Here, Plaintiff states in a conclusory fashion that each scan increased his risk of cancer, but alleges no facts to support that claim. While it is true that prison officials may be found to be deliberately indifferent to future harm suffered by an inmate, even if the inmate shows no serious current symptoms, *see Helling v. McKinney*, 509 U.S. 25, 33 (1993), Plaintiff's pleading must still do more than "plead facts that are merely consistent with a defendant's liability," *Ashcroft v. Iqbal*, 556 U.S. 622, 678 (2009). Plaintiff's conclusory allegations that the scans increased his risk of future harm do not meet this pleading standard, and his claim concerning the SecurPass machine is therefore dismissed.

### b. Lock-Out and Lock-Down Practices

**\*12** Although the Court dismissed Plaintiff's allegations concerning various lock-out and lock-down practices at the GRVC to the extent Plaintiff alleged that these practices violated a liberty interest protected by the Due Process Clause, *see supra* § 1(e), those allegations may also be construed as raising a claim for unconstitutional conditions of confinement. However, for the same reasons explained in the 2015 Opinion, Plaintiff's allegations do not plead the necessary requirements for such a claim. Specifically, Plaintiff does not allege that the lock down practices resulted in an "objective deprivation" by showing that the conditions of his confinements "pose[d] an unreasonable risk of serious damage to his health." *Darnell*, 849 F.3d at 30. The TAC contains no facts to suggest that the lock-downs caused him any harm whatsoever. Plaintiff also fails to allege any facts to support the "mens rea" test of a conditions of confinement claim, as he does not allege that any Defendant "knew, or should have known" that the lock-down practices posed a risk to his health or safety. *Darnell*, 849 F.3d at 35. In fact, Mr. Corley does not allege any Defendants' personal involvement in instituting the lock-downs; he merely alleges that they took place. Plaintiff's allegations therefore do not contain a necessary prerequisite to plead a constitutional violation under section 1983. *Farid*, 593 F.3d at 249. Accordingly, Plaintiff's claims concerning lock-down and lock-out practices are dismissed to the extent they are pleaded as a conditions of confinement claim.

### c. Hostile Environment

Mr. Corley alleges that GRVC officials provided "too few chairs and tables, allowed select inmates to occupy multiple chairs, [and] allowed gangs to monopolize the food, telephones and televisions," thereby "permit[ing] a hostile living environment to fester among inmates." TAC ¶ 17(g). These facts are no different from what Mr. Corley alleged in his SAC, and therefore the Court again concludes that these allegations fail to meet the objective prong necessary for conditions of confinement claims. That is, these deprivations are merely minor inconveniences that do not pose sufficiently serious risks to an inmate's health or safety. *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999) ("Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim.").

Case 9:19-cv-01527-TJM-TWD   Document 64   Filed 11/09/21   Page 63 of 124

Corley v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 4357662

### d. Failure to Protect

The TAC contains a number of allegations that the Court construes as seeking to raise a claim for GRVC officials' failure to protect Mr. Corley from gang-related violence. In addition to alleging that prison officials "permitted a hostile living environment to fester among inmates," he contends that he faced a substantial risk of harm when Defendants labeled him a "snitch" and a "child molester" and when they transferred Mr. Corley within the GRVC "knowing he would face adversity by moving from a 'Blood Unit' to a 'Crip Unit.' " TAC ¶¶ 27(a) (labeled a snitch); 27(c) (labeled a 'child molester'); 27(d) (transfer between units was "dangerous"); 27(l) (same).

In general, "prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan,* 511 U.S. 825, 833 (1994) (quoting *Cortes-Quinones v. Jimenez-Nettleship,* 842 F.2d 556, 558 (1st Cir. 1988)). However, "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability for prison officials responsible for the victim's safety." *Farmer,* 511 U.S. at 834. A claim that alleges failure to protect or intervene "is a Fourteenth Amendment violation where the officer acted with 'deliberate indifference to a substantial risk of serious harm to an inmate.' " *Rosen v. City of New York,* 667 F. Supp. 2d 355, 359-60 (S.D.N.Y. 2009) (citing *Farmer v. Brennan,* 511 U.S. 825, 828 (1994)) (internal quotation marks omitted). As a result, the Court must apply the two-prong framework for claims of deliberate indifference. That is, the inmate must show (1) that the failure to intervene or protect the inmate was sufficiently serious such that it caused "an unquestioned and serious deprivation of basic human needs" and (2) that the defendant acted with a sufficiently culpable state of mind. *Rosen,* 667 F. Supp. 2d at 360 (citations omitted). As stated above, following the Second Circuit's decision in *Darnell,* the second prong of this claim is measured by an objective standard: whether Defendants "knew or should have known" that a substantial risk serious harm would result from their failure to intervene. *Darnell,* 849 F.3d at 35.

**\*13** Mr. Corley's allegations concerning the general existence of a "hostile environment" at the GRVC, which he contends was the result of a high concentration of gang members at the facility, do not rise to the level of a claim for failure to protect. Plaintiff does not plausibly allege that this hostile environment created a "substantial risk of serious harm." *Farmer,* 511 U.S. at 834. As the Court noted in its 2015 Opinion, violence is unfortunately a routine aspect of prison, and the fear of assault does not rise to the level of a constitutional harm. *See Jones v. Goord,* 190 F.R.D. 103, 108 (S.D.N.Y. 1999) ("Although no court approves of physical violence in the correctional system, the fact is that maximum security prisons house violent offenders, and confrontations between inmates are, to some extent, inevitable despite the best efforts of correction officers and prison officials to prevent them. Such incidents, standing alone, do not necessarily rise to the level of cruel and unusual punishment. Nor will 'fear of assault' by other inmates support a constitutional claim."). Mr. Corley only alleges two incidents of gang-related "violence" that occurred at the GRVC—one when he was waiting alone in an Annex holding pen and was confronted by five Bloods gang members who "physically attacked" him, and one when he was in the "Dangerzone" stairwell and was approached by six Crips gang members. TAC ¶¶ 18(a); 27(l). Plaintiff does not allege, however, that any Defendant was aware of these confrontations. As the Court held in its 2015 Opinion, as a result, neither of these incidents supports an inference that any Defendant knew or should have known about the potential danger to Mr. Corley's safety and was thereby deliberately indifferent to his safety.

Mr. Corley's allegations concerning being labeled a "snitch" and a "child molester" also fail to state a claim for failure to protect. Courts in this circuit have held that a claim for deliberate indifference may lie when a prison official identifies an inmate as being an informant or a "snitch" in front of other inmates. *See, e.g.,* *Allah v. Juchnewioz,* 1999 WL 562100, \*3 (S.D.N.Y. 1999) ("Many courts have recognized ... in the context of Eighth Amendment analysis, the dangers a prisoner faces from his fellow inmates when labeled a snitch or informant."); *Hamilton v. Fischer,* 2013 WL 3784153, \*15 (W.D.N.Y. 2013) ("Courts have recognized that being labeled a snitch in the prison environment can indeed pose a threat to an inmate's health and safety in violation of the Eighth Amendment.") (internal quotations and citations omitted). However, to state a claim on this basis, a plaintiff must show that he suffered actual physical harm; "[v]erbal harassment and name calling, absent physical injury, are not constitutional violations cognizable under § 1983." *Bouknight v. Shaw,* No. 08-cv-5187, 2009 WL 969932, at \*3 (S.D.N.Y. Apr. 6, 2009). Mr. Corley alleges that as a result of being called a "snitch," Plaintiff had "a verbal altercation with a kitchen worker over the matter." TAC ¶ 27(a). As

Case 9:19-cv-01527-TJM-TWD   Document 64   Filed 11/09/21   Page 64 of 124

Corley v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 4357662

a result of Defendant Moultrie's comments about Plaintiff's criminal charges, Plaintiff was "harassed by inmates accusing him of being a 'pedophile,' " was approached by inmates requesting to see Plaintiff's paperwork, and contends that inmates "held resentments" about Plaintiff. These allegations, taken together, do not support a conclusion that Plaintiff faced actual or imminent harm as a result of being identified as a "snitch" or a "child molester." Mr. Corley's allegations concerning his intra-facility transfers fail for the same reason—although Mr. Corley alleges that Defendants knew that transfer from a "Blood Unit" to a "Crip Unit" was "dangerous," Mr. Corley concedes that he did not face actual physical harm during the post-transfer confrontation with six Crips. TAC ¶ 27(l) ("Fortunately, Plaintiff was not assaulted after convincing the group he was not a Blood."). Mr. Corley's complaint is devoid of factual allegations that give rise to an inference that he faced a substantial or serious risk of actual physical harm, and therefore has not met the objective prong of the deliberate indifference test. Any claim by Plaintiff for Defendants' failure to protect is therefore dismissed.

### e. "Personal Injury"

Mr. Corley brings a claim for "personal injury," alleging that Defendants denied him his religious diet for multiple days, which resulted in "hospitalization for starvation." TAC ¶ 41. Plaintiff contends that this claim is one of his state law tort claims, *see* Pl.'s Opp'n at 10, and the Court addresses it as such below in its analysis of Mr. Corley's state law claims. Although Mr. Corley expressly disclaims raising this issue as a constitutional claim, for the sake of completeness, the Court analyzes the issue as a claim related to the conditions of his confinement under federal law.

**\*14** In the 2015 Opinion, the Court held that Mr. Corley's hospitalization for starvation was more than *de minimis*, and as a result, that he had stated a claim for physical injury. 2015 Opinion, 2015 WL 5729985, at \*16. Many courts, however, view allegations concerning the deprivation of food as a claim concerning conditions of confinement. *See, e.g.*, *Robles v. Coughlin*, 725 F.2d 12, 15-16 (2d Cir. 1983) ("[T]he Eighth Amendment prohibition against cruel and unusual punishment [ ] require[s] that prisoners be served nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.") (citation omitted). The Court therefore applies the same framework that it has for Mr. Corley's other conditions of

confinement claims, and finds that he has failed to plead that the deprivation of food was objectively "sufficiently serious" to rise to the level of a constitutional violation.

Here, Mr. Corley's allegations do not suffice to state a claim. Mr. Corley alleges that he was denied "proper kosher meals" for six days in December 2012. TAC ¶ 23(f). He does not allege that he was deprived of *any* food or even edible food, but only that he was denied the food his religion required that he eat. The Court appreciates the impact of the prison's failure to provide Mr. Corley with his religion's required diet —he has, as stated below, pleaded a viable claim as a result. However, he has not stated a claim under the Fourteenth Amendment, which requires that he allege deprivation of "the measure of food necessary to maintain health," and he has not stated a claim based on the denial of food. *Little v. Mun. Corp.*, 51 F. Supp. 3d 473, 490 (S.D.N.Y. 2014) (citation omitted). Where courts have found such a deprivation to be actionable, the plaintiffs asserted a complete denial of food or were provided food that was inedible. *See, e.g.*, *Banks v. Annucci*, 48 F. Supp. 3d 394, 407 (N.D.N.Y. 2014) (finding a plaintiff had stated a claim for deprivation of food where he alleged that defendants placed dust and dirt in his meals); *Newman v. Zenk*, No. 05-cv-759, 2007 WL 6888112, at \*4 (E.D.N.Y. Mar. 29, 2007), *aff'd*, 309 Fed.Appx. 535 (2d Cir. 2009) (plaintiff was served "uncooked, raw, spoiled or undercooked food items"). This claim is therefore dismissed.

### 3. Unreasonable Searches

Mr. Corley's complaint contains allegations that he was subjected to over thirty "excessive" cell searches, which resulted in damage to his property, as well as to a body cavity search. TAC ¶ 18(d). [7] He also complains of two searches in particular: one during a "unit search" on September 8, 2012, when Defendants McQuade and Thompson read his legal papers over a walkie-talkie, and another on December 6, 2012, when Plaintiff's cell was searched "at the direction of Captain Wynn or Ms. Moultrie" while Mr. Corley was receiving medical treatment. TAC ¶¶ 27(e), 27(j). In his opposition, Plaintiff also contends that he has pleaded a Fourth Amendment violation "based on being arbitrarily exposed to radiation with a reasonable expectation of finding contraband in his internal organs." Pl.'s Opp'n at 5. The Court construes these allegations as seeking to state claims under the Fourth Amendment. However, for substantially the same reasons these claims were dismissed in its 2015 Opinion, these claims are again dismissed.

Case 9:19-cv-01527-TJM-TWD   Document 64   Filed 11/09/21   Page 65 of 124

Corley v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 4357662

7

In opposing Defendants' motion, Plaintiff contends he "asserts no independent claim based on the 'unconstitutional cell searches.' Such facts are alleged solely to express the harassment and atypical conditions of confinement Plaintiff experienced." Pl.'s Opp'n at 6. Nevertheless, in construing Plaintiff's papers with the special solicitude required for *pro se* litigants, the Court analyzes these factual allegations as seeking to raise a separate claim under the Fourth Amendment.

**\*15** The Supreme Court has held that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell" because "[t]he recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." *Hudson v. Palmer,* 468 U.S. 517, 526 (1984). In analyzing the claims of a pre-trial detainee, the Second Circuit has explained that if a search was conducted by a prison official, "established decisional law holds that the search would not be subject to constitutional challenge, regardless of whether the security needs could justify it." *U.S. v. Cohen,* 796 F.2d 20, 24 (2d Cir. 1988) (pretrial detainee retained sufficient expectation of privacy within his cell to challenge search ordered by the *prosecutor* for investigatory reasons rather than by a prison official for institutional security related reasons). As such, Mr. Corley's claim that he was subject to thirty cell searches does not state a claim under the Fourth Amendment. Regardless, as the Court explained in its 2015 Opinion, "[t]he Fourth Amendment prohibits only unreasonable searches," and "[t]he test of reasonableness ... requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." *Bell v. Wolfish,* 441 U.S. 520, 558-59 (1979). Plaintiff offers only his conclusion that the searches were "excessive," but provides no facts substantiating this assertion that would suggest that any of these searches were unreasonable. As a result, even if Mr. Corley maintained a privacy right in his cell, he has not stated a claim that the thirty cell searches were unreasonable in violation of the Fourth Amendment.

The Second Circuit has nevertheless recognized "that maintenance of prison security is not burdened unduly by the recognition that inmates do retain a limited right to bodily privacy." *Covino v. Patrissi,* 967 F.2d 73, 78 (2d Cir. 1992). In assessing an inmate's claim that this limited right was infringed, the Court must determine (1) "whether the inmate

has exhibited an actual, subjective expectation of bodily privacy," and (2) "whether the prison officials had sufficient justification to intrude on the inmate's fourth amendment rights." *Harris v. Miller,* 818 F.3d 49, 57-58 (2d Cir. 2016) (citing *Covino,* 967 F.2d at 77-78) (internal quotation marks omitted). Mr. Corley alleges facts concerning two alleged intrusions on his bodily privacy: the body cavity search that was the result of one of the searches of his cell, and the use of the SecurPass scanner. Mr. Corley has articulated his subjective expectation of privacy in both searches. *See Covino,* 967 F.2d at 78 ("[W]e have little doubt that society is prepared to recognize as reasonable the retention of a limited right of bodily privacy even in the prison context.").

In considering whether prison officials were justified in intruding on Plaintiff's bodily privacy, courts must consider whether the claim challenges a prison regulation or policy, or instead challenges an isolated search. Here, the Court construes Mr. Corley challenge to what he describes as a "policy" of using these body scanners. TAC ¶ 22. If an inmate challenges a prison policy, courts apply the four-factor test set out in *Turner v. Safley,* 482 U.S. 78 (1987), which held that "the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. The four *Turner* factors are:

> "(i) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it; (ii) whether there are alternative means of exercising the right in question that remain open to prison inmates; (iii) whether accommodation of the asserted constitutional right will have an unreasonable impact upon guards and other inmates, and upon the allocation of prison resources generally; and (iv) whether there are reasonable alternatives available to the prison authorities."

*Covino,* 967 F.2d at 78-79 (citing *Turner,* 482 U.S. at 89-90).

Here, a valid, rational connection exists between using a body-scanning machine to search inmates and the safety and security interests of a prison. The third and fourth *Turner* factors also favor Defendants here. Using a body scanner —which requires no physical contact between prison guard and prisoner—is a reasonable alternative to other kinds of searches that would be more intrusive, such as body cavity searches or pat-down searches. *See United States v. Ghailani,* 751 F. Supp. 2d 508, 514 n.35 (S.D.N.Y. 2010) (citing a government declaration noting that "no ready alternatives" existed to a policy of visual body cavity searches, "other than possibly the use of a body-scan machine," which was not

2017 WL 4357662

available to the federal prison system at the time). The use of the SecurPass machine therefore does not state a claim under the Fourth Amendment.

**\*16** Even body cavity searches, which are arguably a more intrusive way of searching prisoners for contraband, have withstood Fourth Amendment challenges. *See, e.g., Castro-Sanchez v. N.Y. State Dep't of Corr. Servs.,* No. 10-cv-8314, 2011 WL 6057837, at \*9 (S.D.N.Y. Dec. 6, 2011) ("Routine random strip searches of inmates, including body cavity inspections, do not violate the Fourth Amendment."); *Bell,* 441 U.S. at 558-60 (holding that a visual body cavity strip-search was reasonable in light of the "serious security dangers" in prison). Mr. Corley does not allege any facts about his body cavity search except that it took place, and therefore the TAC does not raise any inference that the body cavity search was not done in a reasonable manner. Accordingly, Mr. Corley's claims concerning unreasonable searches are dismissed.

### 4. Religious Liberty Claims and Equal Protection

Mr. Corley alleges that he "suffered harassment and discrimination" on the basis of race and religion when his request to change religious preference from "None" to "Jewish" was denied, when his request to obtain religious texts was denied, and when he was denied kosher meals for six days in December 2012. The Court construes these allegations as raising claims under the Free Exercise Clause of the First Amendment, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and the Equal Protection Clause of the Fourteenth Amendment.

#### a. Free Exercise & RLUIPA

"Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz,* 283 U.S. 342, 348 (1987); *Jackson v. Mann,* 196 F.3d 316, 320 (2d Cir. 1999) ("Prisoners retain their right to religious freedom even when incarcerated."). However, recognizing that a prisoner's free exercise rights may necessarily be limited by virtue of being incarcerated, the Supreme Court has explained that a regulation burdening a prisoner's religious freedom will be constitutional so long as the regulation "is reasonably related to a legitimate penological interest." *O'Lone,* 482 U.S. at 349 (citations omitted). Under the Free

Exercise Clause, Courts evaluate the reasonableness of a prison regulation using the four-factor test articled in *Turner,* articulated above by the Court in evaluating Plaintiff's Fourth Amendment claims. *Salahuddin v. Goord,* 467 F.2d 263, 274 (2d Cir. 2006). On the other hand, "the RLUIPA imposes duties on prison officials that exceed those imposed by the First Amendment." *Jova v. Smith,* 582 F.3d 410, 415 (2d Cir. 2009) (citing *Cutter v. Wilkinson,* 544 U.S. 709, 714-16 (2005)). RLUIPA protects inmates by providing that a government shall not "impose ... a substantial burden on the religious exercise" on persons in certain institutions "unless the government demonstrates that imposition of the burden ... is in furtherance of a compelling interest and is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1(a)(1).

"The prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." *Id.* at 274-75. Defendants are correct that "inmates enjoy no constitutional or legal right to receive religious materials at government expense." *Lloyd v. City of New York,* 43 F. Supp. 3d 254, 265 (S.D.N.Y. 2014) (citing *Cruz v. Beto,* 405 U.S. 319, 323 (1972)). Mr. Corley's allegations concerning the Rabbi's refusal to provide him with a Torah therefore do not state a claim. The Second Circuit has long held that the free exercise of religion does include, however, "the right of prisoners to receive diets consistent with their religious scruples." *Kahane v. Carlson,* 527 F.2d 492, 495-96 (2d Cir. 1975).

**\*17** Defendants contend that because Plaintiff does not explicitly allege that he sincerely holds Jewish religious beliefs, that he has also not stated a claim that the denial of kosher food or the initial rejection of his request to change his religious preference substantially burdened his religious exercise. Defs.' Mot. at 22. The Court declines to adopt Defendants' narrow reading of Mr. Corley's pleadings. Plaintiff pleads that he filed a form to change his religious preference, and that he "was hospitalized after fainting from starvation, caused by refused to eat non-kosher foods." TAC ¶¶ 23(a), 23(f). These allegations, taken together and construed liberally, sufficiently allege that Mr. Corley sincerely held religious beliefs that required him to eat kosher food, and that Defendants significantly interfered with those religious beliefs by initially preventing him from acquiring a "Jewish ID" that would give his access to kosher meals, and by denying him kosher meals once he received that ID.

Case 9:19-cv-01527-TJM-TWD   Document 64   Filed 11/09/21   Page 67 of 124

Corley v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 4357662

Plaintiff has sufficiently pleaded the personal involvement of a number of Rikers officials in this deprivation; in addition to Rabbi Richtman, Defendants Captain Merrill, Captain Myers, and Captain Proverbs took part in restricting Plaintiff's receipt of kosher meals. Mr. Corley's allegations meet his initial burden under the Free Exercise Clause and RLUIPA, and Defendants' motion is denied as to those claims. Plaintiff's allegations as to Defendants Moultrie, Duffy, and Schriro's personal involvement in this alleged deprivation, however, are insufficient to state a claim under Section 1983. The TAC vaguely alleges that these supervisory Defendants "later upheld" Rabbi Richtman's decision, but provides no context or factual support for this assertion. TAC ¶ 23(c). Without more, the Court cannot conclude that these three Defendants were personally involved in this incident. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under *§ 1983*.") (citation omitted). Additionally, courts in this Circuit have held that personal involvement is also a necessary component of a valid RLUIPA claim. *See Joseph v. Fischer,* 2009 WL 3321011, at *18 (S.D.N.Y. Oct. 8, 2009); *Pilgrim v. Artus,* No. 9:07-cv-1001, 2010 WL 3724883, at *14 (N.D.N.Y. Mar. 18, 2010), *report and recommendation adopted,* No. 9:07-cv-1001, 2010 WL 3724881 (N.D.N.Y. Sept. 17, 2010) ("RLUIPA protects inmates against *actions taken* by a governmental entity or person acting under color of state law; in other words, there must be some personal involvement on the part of an individual defendant or government agency in the alleged RLUIPA violation."). Defendants Moultrie, Duffy, and Schriro are therefore dismissed as to Plaintiff's religious liberty claims.

**b. Equal Protection**

Mr. Corley alleges that the denial of his request to change his religion was "likely due to racism, because the Plaintiff was Black and the mistreatment of Black inmates by the Rabbi was an on-going [sic] issue." TAC ¶ 23(d). The Court construes this allegation as a claim under the Equal Protection Clause. The Supreme Court has explained that the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 439 (1985). "To state a claim for an equal protection violation, [a plaintiff] must allege that a government actor intentionally discriminated against them

on the basis of race, national origin or gender." *Hayden v. Cty. of Nassau,* 180 F.3d 42, 48 (2d Cir. 1999).

Although Mr. Corley does not explicitly state that there was a similarly situated group that was treated differently, reading the complaint to raise the strongest claims it suggests, the comments concerning the reasons for Rabbi Richtman's denial of Plaintiff's change-of-religion request sufficiently allege that a state actor discriminated against Plaintiff on the basis of his race. As such, Mr. Corley has stated a claim for race-based discrimination in violation of the Fourteenth Amendment. Further, because the New York State Constitution also contains an equal protection clause, N.Y. Const. art. I, § 6, which is "comparable to the Fourteenth Amendment Equal Protection Clause of the Federal Constitution," the Court also finds that Mr. Corley has stated a claim for violation of that state constitutional provision. *Fortress Bible Church v. Feiner,* 734 F. Supp. 2d 409, 519 (S.D.N.Y. 2010), *aff'd,* 694 F.3d 208 (2d Cir. 2012) (citing *United Fence & Guard Rail Corp. v. Cuomo,* 878 F.2d 588, 592 (2d Cir. 1989)).

 **\*18** To the extent Mr. Corley contends that he has a "class-of-one" equal protection claim, however, that claim fails. A class-of-one claim exists "where the plaintiff alleges that [ ]he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000). The Second Circuit has held that to succeed on such a claim, a plaintiff must establish that:

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

*Neilson v. D'Angelis,* 409 F.3d 100, 104 (2d Cir. 2005), *abrogated on other grounds, Appel v. Spiridon,* 531 F.3d 138 (2d Cir. 2008). The first requirement is exacting; class-of-one plaintiffs must "prove 'intentional disparate treatment,'

Case 9:19-cv-01527-TJM-TWD    Document 64    Filed 11/09/21    Page 68 of 124

Corley v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 4357662

that is, demonstrate the decisionmakers were aware that there were other similarly-situated individuals who were treated differently." *Analytical Diagnostic Labs, Inc. v. Kusel,* 626 F.3d 135, 143 (2d Cir. 2010) (citing *Giordano v. City of New York,* 274 F.3d 740, 751 (2d Cir. 2001)). Mr. Corley does not allege that there were similarly-situated individuals who were treated differently from him, or any facts to suggest that the Rabbi intentionally treated him differently than anyone else, and therefore Plaintiff fails to state a class-of-one equal protection claim. [8]

[8]    Although Mr. Corley contends that he asked the Rabbi "how non-Jews already have a 'Jewish ID' for kosher meals," this does not satisfy the requirement that a plaintiff plead that other similarly-situated individuals were treated differently. TAC ¶ 23(b). Mr. Corley does not allege that the Rabbi made any decision whatsoever about those "non-Jews." In fact, the complaint alleges that the Rabbi commented that he had "no control" over the other inmates who received kosher food. TAC ¶ 23(b). Plaintiff has therefore not plausibly pleaded facts that would support a finding that Rabbi Richtman intentionally treated Plaintiff differently than any other inmates.

### 5. Harassment & Retaliation Claims

Mr. Corley's TAC includes a number of claims that he groups under the umbrella description of "Harassment and Retaliation." He asserts that during his time at the GRVC, he filed "numerous" grievances, complaints, and letters about the living conditions at the facility, and that as a result, he was retaliated against and harassed by GRVC officials. TAC ¶¶ 24, 27. To prevail on a First Amendment retaliation claim brought under 42 U.S.C. § 1983, a prisoner must demonstrate "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir. 2009) (internal quotation marks omitted). "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Dawes v. Walker,* 239 F.3d 489, 493 (2d Cir. 2001) *overruled on other grounds, Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 508 (2002). The allegations "must support an inference that the protected conduct was a 'substantial

or motivating factor for the adverse actions taken by prison officials.' " *Dorsey v. Fisher,* 468 Fed.Appx. 25, 27 (2d Cir. 2012) (quoting *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir. 2003)).

**\*19**   The Second Circuit requires that such claims be "supported by specific and detailed factual allegations," not stated "in wholly conclusory terms." *Dolan v. Connolly,* 794 F.3d 290, 295 (2d Cir. 2015), *overruled on other grounds by Swierkiewicz,* 534 U.S. at 506) (quoting *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir. 1983)); *see also Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir. 1997) (retaliation claims that are "unsupported, speculative, and conclusory" may be dismissed on the pleadings). "[B]ecause virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act," the Second Circuit has cautioned district courts to "approach prisoner retaliation claims with skepticism and particular care." *Dolan,* 794 F.3d at 295 (internal quotation marks omitted); *see also Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir. 1996) ("Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike.") (internal quotation marks omitted).

"It is well established that 'retaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.' " *Dolan,* 794 F.3d at 294 (citing *Graham,* 89 F.3d at 80). Mr. Corley has alleged that he filed "numerous" grievances, thereby satisfying the first prong of a retaliation claim. The Court must next determine whether any of the actions Plaintiff complains of as retaliation constitute an adverse action. Analysis of this factor "must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is considered adverse." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir. 2003) (quoting *Thaddeus-X v. Blatter,* 175 F.3d 378, 398 (6th Cir. 1999) (internal quotation marks and brackets omitted)).

Mr. Corley alleges that a number of Defendants' acts were done in retaliation for his filing of grievances: Deputy Warden Texeira yelled at Plaintiff about his coffee-related grievance and suggested that Plaintiff was a "snitch" in front of other inmates; Plaintiff's cell was searched multiple times,

Case 9:19-cv-01527-TJM-TWD    Document 64    Filed 11/09/21    Page 69 of 124

Corley v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 4357662

causing the destruction and disorganization of his papers; the contents of his legal papers were read over a walkie-talkie by Defendant Thompson; Defendant Moultrie insinuated that Plaintiff was a "pedophile" when he attempted to file a grievance against her; Plaintiff was physically removed from Defendant Moultrie's office after attempting to file a grievance; and Plaintiff was moved from Unit 15B to Unit 9A and back again.

"Insulting or disrespectful comments directed at an inmate generally do not rise" to the level of a constitutional violation. *Davis,* 320 F.3d at 353. As such, Defendant Texeira's alleged insinuation that Plaintiff was a "snitch" was not an adverse action for purposes of a claim for retaliation. *See, e.g., Dorsey,* 468 Fed.Appx. at 27 ("[Plaintiff's] claims of retaliatory verbal abuse by [Defendant] do not include any allegations of physical harm, nor are they alleged with any specificity to suggest that they would deter a prisoner of ordinary firmness from exercising his constitutional rights."); *Morales v. Mackalm,* 278 F.3d 126, 131-32 (2d Cir. 2002), *abrogated on other grounds by Porter v. Nussle,* 534 U.S. 516, 532 (2002) (finding that an officer's reference to plaintiff as a "stoolie," intended to stigmatize plaintiff as an informant, was insufficient to support a retaliation claim); *Dawes,* 239 F.3d at 493 (concluding that an officer's references to plaintiff as a "rat" and an "informant" were insufficient to support a retaliation claim). Similarly, Plaintiff's allegations that he was "repeatedly harassed" about kosher meals and that unit officers observed the food he ate, without more, are too vague to amount to an adverse action, however rude or upsetting they might have been. *See Bumpus v. Canfield,* 495 F. Supp. 2d 316, 326 (W.D.N.Y. 2007) ("[V]ague intimations of some unspecified harm generally will not rise to the level of adverse action for the purpose of a First Amendment retaliation claim.").

**\*20** However, "verbal threats may constitute adverse action ... depend[ing] on their specificity and the context in which they are uttered." *Lunney v. Brureton,* No. 04-cv-2438, 2007 WL 1544629, at \*23 (S.D.N.Y. May 29, 2007). Here, Mr. Corley has pleaded sufficient detail surrounding the comments made by Defendant Moultrie after Plaintiff attempted to file a grievance against her: she "screamed out" comments about Plaintiff's criminal charges while he was exiting her office, such that other people in the vicinity could hear her comments. Those comments resulted in other inmates harassing and threatening Plaintiff, although he was eventually able to assure his harassers that he was merely a "pimp" and not a "child molester." Ms. Moultrie's comments

were made with the kind of specificity that would deter an individual of ordinary firmness from filing more grievances, as there is evidence that the comments actually risked inciting other inmates against Mr. Corley. The comments therefore constitute an adverse action. Furthermore, the comments were made immediately following Plaintiff's attempt to engage in the protected activity in question, supporting an inference that the adverse action was substantially motivated by Plaintiff's attempt to engage in the protected activity of using the prison grievance system.

However, Mr. Corley's allegation that he was yelled at and "physically remove[d]" from Ms. Moultrie's office by unnamed officers does not contain a similar level of specificity. Even where a Plaintiff alleges physical harm, Courts have held that the harm must be more than *de minimis* to state a constitutional claim. Being physically removed from an administrative office only amounts to such *de minimis* harm, and is not the kind of action that would deter a person of ordinary firmness from continuing to exercise his or her constitutional rights. *See Rivera v. Goord,* 119 F. Supp. 2d 327, 340 (S.D.N.Y. 2000) (dismissing a retaliation claim against a defendant who "shoved" an inmate on the ground that the harm was *de minimis*).

Similarly, Mr. Corley's allegations that various cell searches were retaliatory do not state a claim, as courts in this circuit generally hold that cell searches cannot be the basis of a retaliation claim. *See Carl v. Griffin,* No. 08-cv-4981, 2011 WL 723553, at \*5 (S.D.N.Y. Mar. 2, 2011) ("A cell search is not considered to be an adverse action.") (citation omitted); *Salahuddin v. Mead,* No. 95-cv-85881, 2002 WL 1968329, at \*5 (S.D.N.Y. Aug. 26, 2002); *Walker v. Keyser,* 98-cv-5217, 2001 WL 1160588, at \*9 (S.D.N.Y. Oct. 2, 2001) ("[R]etaliatory searches are not actionable under § 1983."); *Bey v. Eggleston,* 96-cv-3302, 1998 WL 118158, at \*4 (S.D.N.Y. Mar. 17, 1998) ("A search of an inmate—even for retaliatory reasons—does not implicate a constitutional right."); *Gadson v. Goord,* 96-cv-7544, 1997 WL 714878, \*7 (S.D.N.Y. Nov. 17, 1997) ("[S]earches of cells implicate no constitutional rights, even if the search is arbitrary or retaliatory in nature."). Moreover, Mr. Corley's allegations that the searches he complains of "were for harassment and no other legitimate purpose" are conclusory and are not supported by the "specific and detailed factual allegations" required to state a retaliation claim. *Dolan,* 794 F.3d at 295; *see also Soto v. Iacavino,* No. 01-cv-5850, 2003 WL 21281762, at \*2 (S.D.N.Y. June 4, 2003) ("Alleging

Case 9:19-cv-01527-TJM-TWD    Document 64    Filed 11/09/21    Page 70 of 124

Corley v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 4357662

the ultimate fact of retaliation in a conclusory manner is insufficient.").

Courts have held, however, that confiscation or destruction of an inmate's legal documents can constitute an adverse action for purposes of a retaliation claim. *See, e.g., Roache v. Hogan*, No. 9:13-cv-0253, 2015 WL 5316209, at *14 (N.D.N.Y. Sept. 11, 2015) (precluding inmate from accessing legal papers in storage constituted an adverse action); *Edwards v. Horn*, No. 10-cv-6194, 2012 WL 473481, at *15 (S.D.N.Y. Feb. 14, 2012), *report and recommendation adopted*, No. 10-cv-6194, 2012 WL 760172 (S.D.N.Y. Mar. 8, 2012) (finding an adverse action where defendants' allegedly retaliatory destruction of plaintiff's legal documents prevented him from prosecuting an action that was subsequently dismissed for failure to prosecute); *Smith v. City of New York*, No. 03-cv-7576, 2005 WL 1026551, at *3 (S.D.N.Y. May 3, 2005) ("The action was specifically directed against plaintiff ... [and] the conduct appears designed specifically to deter plaintiff's exercise of his constitutional rights through the destruction of his legal papers.").

 *21 Here, Mr. Corley alleges that his legal papers were damaged or discarded when he was seeking medical treatment after he was denied kosher food, that officers who read his legal papers over a walkie-talkie, and that his papers were "deliberately dump[ed]" and disorganized. In order to state a claim for retaliation, however, Plaintiff must allege a causal connection between the protected activity of filing prison grievances and the adverse action of the destruction of his legal papers. Plaintiff alleges he filed multiple grievances—some of which were against Defendant Moultrie —within the year before the alleged destruction of his legal paperwork while he was seeking medical treatment—acts that alleged took place at the direction of Ms. Moultrie. *See Espinal*, 558 F.3d at 129 (holding that a six-month lapse between plaintiff's protected First Amendment activity and the allegedly retaliatory conduct supported an inference of causation); *Lindner v. Int'l Business Machines Corp.*, No. 06-cv-4751, 2008 WL 2461934, at *7 (S.D.N.Y. June 18, 2008) ("[R]etaliation claims are rarely dismissed pursuant to Rule 12(b)(6) where the plaintiff has alleged a time period of less than one year between the protected activity and the alleged retaliatory conduct"). The complaint does not plead a causal connection between Mr. Corley's filing of grievances about prison conditions generally and the actions of Defendants McQuade and Thompson, who allegedly read portions of Plaintiff's legal paperwork out loud. The TAC does not allege that Plaintiff ever filed grievances complaining about these

particular individuals, or moreover that these individuals were aware of the multitude of complaints Plaintiff had made. Absent such allegations, even in construing Plaintiff's papers with special solicitude, the Court cannot conclude that the TAC adequately alleges that Plaintiff's grievances were a "substantial or motivating factor" in McQuade and Thompson's actions. Mr. Corley's retaliation claims for the destruction of his legal papers therefore survive, but only as to Defendant Moultrie.

Finally, Plaintiff alleges that his two intra-facility transfers were retaliatory. While "[p]rison officials ... have broad discretion in making transfer determinations[, t]hey may not, however, transfer prisoners solely in retaliation for the exercise of constitutional rights." *Salahuddin v. Perez*, No. 99-cv-10431, 2006 WL 266574, at *5 (S.D.N.Y. Feb. 2, 2006) (quotation marks and internal citations omitted). Mr. Corley was transferred twice in the year that he was housed at the GRVC, once from Unit 15B to Unit 9A for "unknown reasons," and again from Unit 9A back to Unit 15B "out of retaliation for his numerous complaints." TAC ¶¶ 27(d); 27(l). Mr. Corley provides no evidence beyond this conclusory statement that supports an inference that his filing of grievances was "a substantial or motivating factor for the adverse actions taken by prison officials." *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003). The TAC is devoid of allegations indicating who made the first decision to transfer Plaintiff, and although it does allege that Defendant Wynn made the decision for the second transfer, the TAC does not allege that this Defendant was the subject of—or was even aware of—any of Plaintiff's numerous grievances. The TAC itself states that the reason for the transfer was "unknown." TAC ¶ 27(d). Plaintiff's claims concerning these alleged retaliatory transfers are therefore dismissed.

### 6. Municipal Liability Under Section 1983

In addition to the various constitutional claims raised in the TAC, Mr. Corley asserts liability against Defendant the City of New York. A municipality is not vicariously liable for its employees' actions under 42 U.S.C. § 1983. *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing *Monell*, 436 U.S. 658, 691 (1978)). Municipalities are, however, liable for "their own illegal acts." *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)). A plaintiff seeking to hold a municipality liable under § 1983 must plead "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Rodriguez*

Case 9:19-cv-01527-TJM-TWD   Document 64   Filed 11/09/21   Page 71 of 124

Corley v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 4357662

*v. Winski*, 973 F. Supp. 2d 411, 425 (S.D.N.Y. 2013) (citing *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007)). A plaintiff may satisfy the "policy or custom" prong in one of four ways: by alleging the existence of (1) a formal policy, *see Monell*, 436 U.S. at 690; (2) actions taken or decisions made by final municipal policymakers that caused the violation of plaintiff's rights, *see Pembaur*, 475 U.S. at 483-84; (3) a practice so persistent and widespread that it constitutes a "custom or usage" and implies the constructive knowledge of policymakers, *see Monell*, 436 U.S. at 690-91; or (4) a failure to properly train or supervise municipal employees that amounts to "deliberate indifference to the rights of those with whom municipal employees will come into contact." *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989); *see also Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996).

**\*22** "[T]he City cannot be liable under *Monell* where plaintiff cannot establish a violation of his constitutional rights." *Holland v. City of New York*, 197 F. Supp. 3d 529, 552 (S.D.N.Y. 2016) (citing *Askins v. Doe No. 1*, 727 F.3d 248, 253 (2d Cir. 2013) (internal punctuation omitted)). The Court has dismissed all of Mr. Corley's allegations of constitutional harm except for his religious liberty claims, his equal protection claims, and his retaliation claims as they pertain to Ms. Moultrie's comments insinuating Plaintiff was a "pedophile" and the alleged destruction of his legal papers. Mr. Corley has not pleaded any specific facts support the contention that that these remaining alleged constitutional deprivations were the result of City customs or policies. He contends only that the City "created customs and implemented or upheld unconstitutional policies which ... denied Plaintiff his constitutional right to practice his faith." TAC ¶ 29(d). That is the type of conclusory allegation that, even when read with solicitude, does not state a claim for municipal liability. *See Plair v. City of New York*, 789 F. Supp. 2d 459, 469-70 (S.D.N.Y. 2011) (finding allegations that the City "permitted, tolerated and was deliberately indifferent to a pattern and practice of staff brutality and retaliation" were conclusory and failed to state a *Monell* claim); *see also Abreu v. City of New York,* 657 F. Supp. 2d 357, 360-61 (E.D.N.Y. 2009) ("[The plaintiff's] complaint succinctly states one of the core legal concepts animating *Monell* liability. But it does absolutely nothing else."). Plaintiff's *Monell* claims are therefore dismissed.

## B. State Law Claims

Mr. Corley also purports to bring state law claims for gross negligence and negligent infliction of emotional distress. Although the Court held in its 2015 Opinion that Plaintiff's claim for negligence survived Defendants' motion to dismiss the SAC, it does not reach the same conclusion in analyzing the TAC.

### 1. Emotional Distress

For the same reasons as stated in the Court's 2015 Opinion, Plaintiff's claim for negligent infliction of emotional distress is dismissed. Under New York law, such a claim requires allegations of conduct that are "so extreme in degree and outrageous in character as to go beyond all possible bounds of decency, so as to be regarded as atrocious and utterly intolerable in a civilized community." *Wilson v. City of New York*, 743 N.Y.S.2d 30, 34 (N.Y. App. Div. 2002) (citations omitted). Mr. Corley's vague allegations that he suffered "severe emotional distress" due to Defendants' acts or omissions do not meet this exacting standard, and furthermore are conclusory. Accordingly, this claim is dismissed.

### 2. Negligence and Gross Negligence

Finally, Mr. Corley claims that all Defendants owed him various duties and breached those duties, including the duty to protect him from harm, to preserve his legal papers, to provide a religious diet and literature, to prevent harm to future health, and to prevent retaliation. To the extent Mr. Corley alleges that his hospitalization from starvation constitutes a state law claim, the Court also analyzes that allegation as a claim for negligence. "In order to prevail on a negligence claim, a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom." *Pasternack v. Lab. Corp. of Am. Holdings*, 27 N.Y.3d 817, 825, *reargument denied*, 28 N.Y.3d 956 (N.Y. 2016) (internal citation omitted). In the prison context, the New York Court of Appeals has concluded "that the State owes a duty of care to inmates for foreseeable risks of harm," meaning what the State "knew or had reason to know" or what the State "is or should be aware" of. *Sanchez v. State of New York*, 99 N.Y.2d 247, 255 (2002).

Even if the Court assumed that Defendants owed these enumerated duties to Plaintiff, the Court does not find that Mr. Corley's conclusory allegations are sufficient to state a claim for negligence. As an initial matter, Mr. Corley's allegations simply state that these duties were owed, the "failure of which" resulted in various harms. TAC ¶ 40. Such "[t]hreadbare recitals of the elements of a cause of action,

Case 9:19-cv-01527-TJM-TWD   Document 64   Filed 11/09/21   Page 72 of 124

Corley v. City of New York, Not Reported in Fed. Supp. (2017)

2017 WL 4357662

supported by mere conclusory statements," do not state a claim for relief. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Furthermore, the Court has already analyzed the entirety of Mr. Corley's TAC in the context of his claims brought under Section 1983 and found that no reasonable officer knew or should have known of a sufficiently serious harm posed to Plaintiff. That conclusion applies with equal force when examined within the framework of a state law negligence claim. For instance, Mr. Corley's allegations that Defendants should have protected him from gang violence caused by other prisoners does not state a claim because Plaintiff has not alleged that any Defendants were aware of the incidents of violence complained of. *Sanchez*, 99 N.Y.2d at 256 ("The mere occurrence of an inmate assault, without credible evidence that the assault was reasonably foreseeable, cannot establish the negligence of the State."). Similarly, Plaintiff has not alleged facts to support a conclusion that any Defendant knew or should have known that the SecurPass scanners increased Plaintiff's risk of cancer. Simply put, none of Plaintiff's allegations contain sufficient factual support for the Court to conclude that any of these harms were proximately caused by Defendants' acts or omissions. Plaintiff's state law claims are therefore dismissed.

## V. CONCLUSION

**\*23**  For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part. As set forth above, Mr. Corley's claims for violation of his religious liberty, race-based discrimination, and retaliation based on the destruction of his legal papers and on Ms. Moultrie's comments about Mr. Corley's criminal record survive. All of Plaintiff's other claims are dismissed. Defendants Duffy,

Schriro, Wynn, McQuade, Texeira, Thompson, and the City of New York are dismissed, given that all claims against them have been dismissed.

The Court does not grant Plaintiff leave to amend his complaint, as he has already had two opportunities to cure deficiencies raised in his previous pleading. *See Rutolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) ("Leave to amend, though liberally granted, may properly be denied for ... repeated failure to cure deficiencies by amendments previously allowed ...").

The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Court requests that counsel for Defendants provide Plaintiff with copies of unpublished cases cited in this decision pursuant to Local Rule of the United States District Courts for the Southern and Eastern Districts of New York 7.2.

The Clerk of Court is instructed to terminate the motion pending at docket number 89 and to mail Plaintiff a copy of this order by certified mail.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4357662

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:19-cv-01527-TJM-TWD    Document 64    Filed 11/09/21    Page 73 of 124

Molina v. County of Westchester, Not Reported in Fed. Supp. (2017)

2017 WL 1609021

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by  Davis v. McCready,   S.D.N.Y.,   October 23, 2017

2017 WL 1609021
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Arthur R. MOLINA, Plaintiff,

v.

The COUNTY OF WESTCHESTER; Correction
Officer Saraireh, Shield No. 1580; and C.O.
Santora, Shield No. 1598, Defendants.

16 CV 3421 (VB)
|
Signed 04/28/2017

**Attorneys and Law Firms**

Arthur R. Molina, Valhalla, NY, pro se.

David Polizzi, Westchester County Attorney's Office, White
Plains, NY, for Defendants.

**OPINION AND ORDER**

Vincent L. Briccetti, United States District Judge

*1  Plaintiff Arthur R. Molina, proceeding pro se and in
forma pauperis, brings this action under 42 U.S.C. § 1983,
alleging defendants violated his constitutional rights while
he was incarcerated at Westchester County Jail, by failing to
protect him from assault by another inmate.

Now pending is defendants' motion to dismiss the complaint
pursuant to Rule 12(b)(6). [1] (Doc. #17).

[1]     Defendants filed their motion to dismiss on
        September 22, 2016. Plaintiff filed his opposition,
        after the Court sua sponte extended his time to do
        so (Doc. #24), on November 14, 2016. (Doc. #25).
        Defendants never submitted a reply or a request
        for an extension of time, and their deadline to do so has
        long passed. The Court therefore deems the motion
        to be fully submitted.

For the reasons set forth below, the motion is GRANTED.
However, plaintiff is granted leave to file an amended
complaint, with the limitations explained below.

This Court has subject matter jurisdiction pursuant to 28
U.S.C. § 1331.

**BACKGROUND**

For purposes of ruling on a motion to dismiss, the Court
accepts all factual allegations of the complaint as true, and
draws all reasonable inferences in plaintiff's favor.

On March 8, 2016, while plaintiff was an inmate at
Westchester County Jail, he was attacked by another inmate,
"Mr. Tucker," who had recently been moved from the
Special Housing Unit ("SHU") to the cell next to plaintiff's.
Specifically, plaintiff alleges while he was "walking the
yard," Tucker "ran up from behind ... and attacked [him,]
hitting [him], with closed[ ] fists," and that Tucker's "intention
[was] to cause plaintiff serious bodily harm."(Compl. at S), [2]
Plaintiff alleges Tucker carried out this assault because, five
minutes earlier, another inmate told Tucker that if he attacked
someone, he would be moved to another cell block.

[2]     Citations to the complaint refer to the page numbers
        stamped by the ECF filing system at the top of the
        page.

Plaintiff alleges correction officers Saraireh and Santora were
"not walking the rec/yard and sitting in the doorway that
enters the rec/yard therefor[e] could not see or hear what was
going on in the rec/yard." (Compl. at 11). In addition, he
alleges Saraireh and Santora "knew of the risk to [plaintiff']s
safety and [were] negligent for not tryin[g] to prevent the
assault before it happen[ed]." (Compl. at 9). He alleges they
"had reasonable knowledge to know that an incident was
tak[ing] place," but "waited to the last minute to defuse the
incident." (Id.).

Plaintiff suffered several injuries and was taken to the
emergency room, where he received medical care. When he
returned to Westchester County Jail, he was told he "would
not face any disciplinary action," and that the inmate who
attacked him would be put back in SHU. (Compl. at 9).
He was also told that "the facility [was going to] press[ ]
charges." (Id. at 10).

Molina v. County of Westchester, Not Reported in Fed. Supp. (2017)

2017 WL 1609021

**DISCUSSION**

I. Standard of Review

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under the "two-pronged approach" articulated by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). First, plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss. Id. at 678; Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010). Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Ashcroft v. Iqbal, 556 U.S. at 679.

*2 To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility." Id. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544, 564 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id.

The Court must liberally construe submissions of pro se litigants, and interpret them "to raise the strongest arguments that they suggest." Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474 (2d Cir. 2006) (per curiam) (internal quotation marks and citation omitted). Applying the pleading rules permissively is particularly appropriate when, as here, a pro se plaintiff alleges civil rights violations. See Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191 (2d Cir. 2008). "Even in a pro se case, however ... threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Chavis v. Chappius, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation marks and citation omitted). Nor may the Court "invent factual allegations" plaintiff has not pleaded. Id.

II. Failure to Protect Claim

Defendants argue plaintiff has failed to state a constitutional violation for failure to protect him against assault by another inmate.

The Court agrees.

A claim for deliberate indifference brought by a convicted prisoner "is analyzed under the Eighth Amendment," Caiozzo v. Koreman, 581 F.3d 63, 69 (2d Cir. 2009) (overruled on other grounds by Darnell v. Pineiro, 849 F.3d 17 (2d Cir. 2017)), whereas "[a] pretrial detainee's claims ... are governed by the Due Process Clause of the Fourteenth Amendment." Darnell v. Pineiro, 849 F.3d at 29.

To to state a claim for deliberate indifference, whether under the Eighth or Fourteenth Amendment, plaintiff's allegations must satisfy a two-prong test. First, the plaintiff must plausibly allege he suffered a sufficiently serious constitutional deprivation. Second, the plaintiff must plausibly allege that the defendant acted with deliberate indifference. Taylor v. Goorde, 548 Fed. Appx. 696, 698 (2d Cir. 2013) (summary order) (convicted prisoner); [3] Darnell v. Pineiro, 849 F.3d at 29 (pretrial detainee).

[3]     Plaintiff will be provided with copies of all unpublished opinions cited in this decision. See Lebron v. Sanders, 557 P.3d 76, 79 (2d Cir. 2009).

With respect to the first prong, the standard is the same whether the claim is brought by a convicted prisoner or a pretrial detainee, "Under both the Eighth and Fourteenth Amendments, to establish an objective deprivation, 'the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health.' " Darnell v. Pineiro, 849 F.3d at 30 (quoting Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013)). "There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.' " Id. (quoting Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995)).

With respect to the second prong, however, the legal standards are different for convicted prisoners and pretrial detainees. See Darnell v. Pineiro, 849 F.3d at 32-36.

*3 For convicted prisoners, to whom the Eighth Amendment applies, a corrections officer acts with deliberate indifference when he subjectively "has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm." Hayes v. N.Y.C. Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996). The

officer "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Cuoco v. Moritsugu, 222 F.3d 99, 107 (2d Cir. 2000).

However, for pretrial detainees, to whom the Fourteenth Amendment applies, the second prong "of a deliberate indifference claim is defined objectively." Darnell v. Pineiro, 849 F.3d at 35 (emphasis added). A "pretrial detainee must prove that the defendant-official acted intentionally ... or recklessly failed to act with reasonable care to mitigate the risk ... even though the defendant-official knew, or should have known," of the risk of harm. Id. Thus, unlike the Eighth Amendment, the Due Process Clause of the Fourteenth Amendment "can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." Id.

Here, defendants presume, without explaining, that plaintiff was a convicted prisoner, not a pretrial detainee, during the relevant period. Because neither party has clearly articulated whether plaintiff was a convicted prisoner or a pretrial detainee at the time of the alleged incident, the Court will evaluate plaintiff's complaint under both standards.

Applying the applicable standards, the Court concludes plaintiff's allegations are sufficient with respect to the first prong of the deliberate indifference claim, but are insufficient as to the second prong.

### A. Sufficiently Serious Constitutional Deprivation

Plaintiff alleges defendants Saraireh and Santora did not "walk" the area where he was attacked, and instead sat "in the doorway" and that they "therefor[e] could not see or hear what was going on in the rec/yard,'" (Compl. at 11). In addition, in his opposition papers, plaintiff states there was an "absence of any correctional officers ... present or within any plain visible view at any time in the recreational yard[,] thus violating the procedures." (Opp. Br. ¶ 7).

The failure of a correction officer to oversee prisoners, intervene in an attack, or otherwise fail to abide by prison safety protocols may under certain circumstances create a condition which poses a substantial risk of serious harm thus constituting a sufficiently serious constitutional violation. See, e.g., Fernandez v. N.Y.C. Dep't of Corr., 2010 WL 1222017, at *4 (S.D.N.Y. Mar. 29, 2010) (finding complaint sufficiently alleged substantial risk of harm where it was

"possible that had [a corrections officer] been in the dorm area at the time of [plaintiff's] attack, he could have prevented or interrupted the attack"); Rennalls v. Alfredo, 2015 WL 5730332, at *4 (S.D.N.Y. Sept. 30, 2015) (the Court was "willing to assume, given the early stage in th[e] Action, Plaintiff ha[d] plausibly alleged that [defendant's] actions may have put Plaintiff at a substantial risk of serious harm," where plaintiff alleged one of the defendants failed to comply with a safety protocol).

Therefore, construing plaintiff's allegations liberally and drawing all reasonable inferences in his favor, the Court concludes plaintiff has plausibly alleged facts from which a sufficiently serious constitutional violation could be inferred.

### B. Deliberate Indifference

 *4 As mentioned previously, the second prong of a deliberate indifference claim differs depending on whether plaintiff is a convicted prisoner or a pretrial detainee. To survive a motion to dismiss, a convicted prisoner must plausibly allege the defendant(s) subjectively knew what they had done—here, their failure to intervene in the inmate-on-inmate attack—was unreasonable. A pretrial detainee, on the other hand, must plausibly allege the conduct complained of was objectively unreasonable, i.e., not reasonable under the circumstances.

Here, plaintiff alleges defendants Saraireh and Santora "knew of the risk to [his] safety and [were] negligent for not tryin[g] to prevent the assault before it happen[ed]." (Compl. at 9). He further alleges the corrections officers "had reasonable knowledge to know that an incident was tak[ing] place," but "waited to the last minute to defuse the incident." (Id.). However, plaintiff does not allege or explain how Saraireh or Santora learned of this risk or how plaintiff knows they became aware of this risk. These allegations are insufficient to show either objective or subjective deliberate indifference for several reasons.

First, such conclusory allegations of defendants' knowledge are insufficient. See Houston v. Nassau Cty., 2012 WL 729352, at *6 (E.D.N. Y. Mar. 7, 2012) ("Although plaintiff alleges that the County was [a]ware of plaintiff being at risk of being attacked,' ... this conclusory allegation is insufficient to maintain a Section 1983 deliberate indifference claim.").

Second, plaintiff alleges defendants were merely "negligent" in their actions. (Compl. at 9). Negligence is insufficient to state a Section 1983 violation under either the subjective or

Case 9:19-cv-01527-TJM-TWD   Document 64   Filed 11/09/21   Page 76 of 124

Molina v. County of Westchester, Not Reported in Fed. Supp. (2017)

2017 WL 1609021

objective standard. Hayes v. N.Y.C. Dep't of Corr., 84 F.3d at 620 ("to state a cognizable section 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice").

Finally, and most significantly, the allegations of the complaint suggest the attack happened quickly and with very little warning. Specifically, plaintiff alleges "at 9:50 AM" the inmate who attacked him was advised "to attack someone in the yard so he [would] be moved" to another housing block. (Compl. at 8). Plaintiff alleges the attack then took place five minutes later, at 9:55 a.m. (See id. at 2). Plaintiff does not allege any defendant corrections officer heard this advice or was otherwise aware or should have been aware of this advice. It is implausible defendants themselves, or reasonable corrections officers in their place, would have learned of the likelihood of an attack and been able to do something to prevent it within such a short period of time. Moreover, plaintiff does not allege he expressed fear for his safety prior to the attack or provide any other reason why any correction officer should have known there was danger of an attack. "Absent clear notice of a risk of harm to the prisoner, courts routinely deny deliberate indifference claims based upon surprise attacks." Fernandez v. N.Y.C. Dep't of Corr., 2010 WL 1222017, at *4 (internal quotation marks omitted). In addition, plaintiff does not say how long the alleged attack lasted. He states only that he "t[ook] multiple blows to the head and face causing a concussion," and that he "awoke to find the attacker being held on the wall by C.O. Santora." (Compl at 9). There are therefore insufficient allegations to suggest defendants Saraireh and Santora waited an unreasonable amount of time before they intervened.[4]

[4]    As part of his opposition papers, plaintiff also submitted the affidavit of Kevin Alvarez, a fellow inmate at Westchester County Jail. (Doc. #26). Mr. Alvarez writes in his affidavit that he witnessed the events and that "[i]t was not until much later that the prison inmate attacker was subdued and [plaintiff] was ... attended to." (Id. ¶¶ 6-9). However, "much later" is vague, and without additional factual context, this is insufficient to suggest defendants acted unreasonably.

*5  Under the circumstances alleged, it is not plausible either that defendants subjectively knew, or that a reasonable corrections officer in their place should have known, of any substantial risk to plaintiff, or would have been able to take actions that would have prevented the attack.

As a result, plaintiff has failed plausibly to allege the second prong of the failure to protect standard under either the Eighth or the Fourteenth Amendment, Accordingly, plaintiff's Section 1983 failure to protect claim against defendants Saraireh and Santora is dismissed.

III. Monell Liability

Defendants argue plaintiff has failed to state a claim against Westchester County ("the County") under Monell v. Department of Social Services, 436 U.S. 658 (1978).[5]

[5]    Defendants also argue the Westchester County Department of Corrections ("DOCs") should be dismissed "because it is not a suable entity." (Defs.'s Br. at 1, n. 1). By Order dated June 7, 2016, the Court dismissed all claims against DOCs for that reason. (Doc. #7). In addition, defendants argue they are entitled to qualified immunity. (Defs.'s Br. at 9). The Court need not address qualified immunity at this time, as it dismisses all of plaintiffs' federal claims on the merits.

The Court agrees.

A municipality like the County is liable under Section 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [plaintiff's] injury." Monell v. Dep't of Soc. Servs., 436 U.S. at 694. To state a Monell claim, a plaintiff need not allege the policy or custom itself is unconstitutional; rather, liability exists when a municipal policy is valid but the municipality's actual practice is not. Amnesty America v. Town of W. Hartford, 361 F.3d 113, 125-26 (2d Cir. 2004) (practice of using excessive force can be basis for municipal liability even though city's policy on use of force is itself constitutional).

"While Monell claims are not subject to a 'heightened' pleading standard beyond that defined in Rule 8(a)(2), such claims nevertheless must meet the plausibility requirements of Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 572 (2007), and Ashcroft v. Iqbal, 556 U.S. 662, 678, (2009)." Guzman v. United States, 2013 WL 5018553, at *4 (S.D.N.Y. September 13, 2013) (quoting Leatherman v. Tarrant Cty. Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168 (1993)). "In other words, boilerplate allegations will not suffice." Id. (internal quotation marks omitted). In sum,

2017 WL 1609021

without more, "[t]he allegations [a defendant] acted pursuant to a 'policy,' without any facts suggesting the policy's existence, are plainly insufficient." Missel v. Cty. of Monroe, 351 Fed.Appx. 543, 545-46 (2d Cir. 2009) (summary order) (citing Dwares v. City of New York, 985 F.2d 94, 100-02 (2d Cir. 1993)).

Here, plaintiff alleges only that the individual defendants' failure to "walk[ ] the rec-yard" and "wait[ ] to the last minute to defuse the incident" were "part of a policy[,] practice, and custom." (Compl. at 9).

Applying the legal standards just outlined, plaintiff's boilerplate allegations against the County are plainly insufficient. Accordingly, plaintiff's claims against the County are dismissed.

## IV. State Law Claims

**\*6** Defendants argue any state law tort claims liberally construed from plaintiff's complaint—such as causes of action for negligence or negligent infliction of emotional distress—should be dismissed for failure to file a notice of claim.

The Court agrees.

"[I]n a federal court, state notice-of-claim statutes apply to state-law claims." Hardy v. N.Y.C. Health & Hosps. Corp., 164 F.3d 789, 793 (2d Cir. 1999). "In New York, filing a [n]otice of [c]laim with a municipality is a condition precedent to commencing a tort claim against any employee of that municipality." Chamberlain v. City of White Plains, 986 F. Supp. 2d 363, 396 (S.D.N.Y. 2013). "Failure to comply with [this] requirement[ ] ordinarily requires a dismissal for failure to state a cause of action." Hardy v. N.Y.C. Health & Hosps. Corp., 164 F.3d at 794.

In addition, "General Municipal Law § 50-e makes unauthorized an action against individuals who have not been named in a notice of claim." DC v. Valley Cent. Sch. Dist., 2011 WL 3480389, at \* 1 (S.D.N.Y. June 29, 2011) (internal quotation marks omitted).

Here, plaintiff acknowledges he did not file a notice of claim. (See Opp. Br. ¶ 10). In an effort to overcome this deficiency, plaintiff requests permission to file a late notice of claim. This Court does not have the authority to grant plaintiff's request, however. New York General Municipal Law Section 50-e(7) "makes clear that [a]ll applications under this section shall be

made to the supreme court or to the county court." Horvath v. Daniel, 423 F. Supp. 2d 421, 424-25 (S.D.N.Y. 2006) (internal quotations omitted). "Accordingly, federal district courts are without jurisdiction to hear these applications." Id.

Plaintiff's state law claims are therefore dismissed.

## V. Leave to Amend

Rule 15(a)(2) instructs that courts "should freely give leave" to amend a complaint "when justice so requires." Liberal application of Rule 15(a) is warranted with respect to pro se litigants who "should be afforded every reasonable opportunity to demonstrate that [they have] a valid claim.'" Matima v. Celli, 228 F.3d 68, 81 (2d Cir. 2000) (quoting Satchel v. Dilworth, 745 F.2d 781, 785 (2d Cir. 1984)). District courts "should not dismiss [pro se complaints] without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." Cuoco v. Moritsugu, 222 F.3d 99, 112 (2d Cir. 2000) (quoting Gomez v. USAA Fed. Sav. Bank, 171 F.3d 794, 795 (2d Cir. 1999)).

However, leave to amend may "properly be denied for ... 'futility of amendment.' " Ruotolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2008) (quoting Foman v. Davis, 371 U.S. 178, 182(1962)). This is true even when plaintiff is proceeding pro se. See Martin v. Dickson, 100 Fed.Appx. 14, 16 (2d Cir. 2004) (summary order).

Here, as explained above, the Court does not have the authority to grant plaintiff's request to file a late notice of claim with respect to his state law claims. In addition, plaintiff's Monell claim against the County is plainly insufficient to state a claim, and nothing in the complaint suggests he might have a valid claim against the County. Thus, granting plaintiff leave to amend his state law claims or his Monell claim against the County would be futile.

**\*7** However, a liberal reading of plaintiff's complaint suggests he may have a valid Section 1983 claim for failure to protect against defendants Saraireh and Santora. Moreover, plaintiff has not previously been provided an opportunity to amend his complaint.

Accordingly, plaintiff is granted leave to amend only the claim that Saraireh and Santora violated his constitutional rights by failing to protect him against the inmate attack.

Molina v. County of Westchester, Not Reported in Fed. Supp. (2017)

2017 WL 1609021

Plaintiff is reminded that any factual allegation in the amended complaint must be true to the best of his knowledge, information, and belief. See Fed. R. Civ. P. 11(b)(3). In the amended complaint, plaintiff shall clearly set forth the facts that give rise to failure to protect claim, including the dates, times, and places of the alleged underlying acts. See Lee v. Graziano, 2013 WL 4426447, at *8 (N.D.N.Y. Aug. 15, 2013). Plaintiff must also state whether he was a pretrial detainee or a convicted prisoner at the time of the alleged attack on March 8, 2016.

**The amended complaint will completely replace, not supplement, the existing complaint. Therefore, plaintiff must include in the amended complaint all information necessary for his failure to protect claim.**

## CONCLUSION

Defendants' motion to dismiss GRANTED.

Plaintiff is granted leave to amend only as to his Section 1983 failure to protect claim against the individual defendants Saraireh and Santora. Plaintiff shall file his amended complaint by no later than June 1, 2017. Plaintiff is directed to utilize the Amended Complaint form attached hereto. If plaintiff fails to comply with this order, his complaint may be dismissed for failure to prosecute or failure to comply with a court order. Fed. R. Civ. P. 41(b).

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

The Clerk is instructed to terminate the County of Westchester as a defendant.

The Clerk is further instructed to terminate the motion. (Doc. #17).

SO ORDERED.

Attachment

Molina v. County of Westchester, Not Reported in Fed. Supp. (2017)

2017 WL 1609021

---

## IV.   DEFENDANT INFORMATION

To the best of your ability, provide the following information for each defendant. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are identical to those listed in the caption. Attach additional pages as necessary.

**Defendant 1:**

| First Name | Last Name | Shield # |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
|---|---|---|

**Defendant 2:**

| First Name | Last Name | Shield # |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
|---|---|---|

**Defendant 3:**

| First Name | Last Name | Shield # |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
|---|---|---|

**Defendant 4:**

| First Name | Last Name | Shield # |
|---|---|---|

Current Job Title (or other identifying information)

Current Work Address

| County, City | State | Zip Code |
|---|---|---|

## V.   STATEMENT OF CLAIM

Place(s) of occurrence:

Date(s) of occurrence:

**FACTS:**

State here briefly the FACTS that support your case. Describe what happened, how you were harmed, and how each defendant was personally involved in the alleged wrongful actions. Attach additional pages as necessary.

## INJURIES:

If you were injured as a result of these actions, describe your injuries and what medical treatment, if any, you required and received.

## VI.   RELIEF

State briefly what money damages or other relief you want the court to order.

## VII.   PLAINTIFF'S CERTIFICATION AND WARNINGS

By signing below, I certify to the best of my knowledge, information, and belief that: (1) the complaint is not being presented for an improper purpose (such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are supported by existing law or by a nonfrivolous argument to change existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Federal Rule of Civil Procedure 11.

I understand that if I file three or more cases while I am a prisoner that are dismissed as frivolous, malicious, or for failure to state a claim, I may be denied *in forma pauperis* status in future cases.

I also understand that prisoners must exhaust administrative procedures before filing an action in federal court about prison conditions, 42 U.S.C. § 1997e(a), and that my case may be dismissed if I have not exhausted administrative remedies as required.

I agree to provide the Clerk's Office with any changes to my address. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| Dated | Plaintiff's Signature |
|---|---|

| First Name | Middle Initial | Last Name |
|---|---|---|

Prison Address

| County, City | State | Zip Code |
|---|---|---|

Date on which I am delivering this complaint to prison authorities for mailing:

## All Citations

Not Reported in Fed. Supp., 2017 WL 1609021

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 10944594
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Michael John GOCHNOUR, Plaintiff,

v.

J. BURRI, et al., Defendants.

6:15-CV-06174 EAW
|
Signed 07/06/2018
|
Filed 07/09/2018

**Attorneys and Law Firms**

Michael John Gochnour, Vestal, NY, pro se.

Gary M. Levine, New York State Office of the Attorney
General, Rochester, NY, for Defendants.

**DECISION AND ORDER**

ELIZABETH A. WOLFORD, United States District Judge

**INTRODUCTION**

*1  Plaintiff Michael Gochnour ("Plaintiff"), a prisoner
previously confined at Five Points Correctional Facility
("Five Points"), filed a *pro se* complaint asserting claims
under 42 U.S.C. § 1983. (Dkt. 1). The Court appointed
counsel for Plaintiff on December 30, 2015. (Dkt. 21).
Presently before the Court is a motion for summary judgment
by Defendants Sidel and Shaver (collectively, "Defendants").
(Dkt. 41). For the following reasons, Defendants' motion is
granted and Defendants are dismissed from this action.

**BACKGROUND**

**I. Complaint and Procedural History**

Plaintiff brought this action on March 31, 2015, alleging
violations of his Eighth and Fourteenth Amendment rights.
(Dkt. 1). Plaintiff filed requests for appointment of counsel
on November 16, 2015 (Dkt. 12), November 20, 2015 (Dkt.
13), and December 2, 2015 (Dkt. 15). On December 30, 2015,
the Court granted Plaintiff's motion and appointed counsel.
(Dkt. 21). Plaintiff filed an amended complaint on June 29,

2016 (Dkt. 29), and filed a second amended complaint on
July 19, 2016 (Dkt. 31). The second amended complaint (the
"complaint") is the operative complaint at this stage of the
proceedings.

On November 17, 2017, Defendants filed the instant motion
for summary judgment. (Dkt. 41). Plaintiff filed a letter
response on December 12, 2017, indicating that he does not
oppose the dismissal of Defendants Sidel and Shaver from
this action. (Dkt. 43).

Plaintiff's complaint alleges Eighth Amendment claims for
excessive force and failure to protect based on an event that
occurred on April 5, 2012, at Five Points. (Dkt. 31). Plaintiff
alleges that he covered the window of his cell door with
a towel and was instructed to remove the towel. (*Id.* at ¶¶
25-26). Thereafter, a number of the defendants in this action
entered Plaintiff's cell, drove him into the wall with a cell
extraction shield, and repeatedly struck Plaintiff's head and
body with their fists and/or batons. (*Id.* at ¶¶ 30-32). Plaintiff
then fell to the ground and was pinned in a spread-eagle
position. (*Id.* at ¶ 33). Defendant Burri entered the cell, placed
his knee on Plaintiff's left elbow, and pulled Plaintiff's wrist,
shattering his left humerus. (*Id.* at ¶ 34). The defendants
thereafter placed Plaintiff on a stretcher to be escorted to the
medical unit for treatment, and, on the way there, one or more
of the defendants struck Plaintiff's injured left arm with their
batons, intentionally causing extreme pain and suffering. (*Id.*
at ¶ 37).

Plaintiff alleges that as a result of the excessive and unjustified
force, Plaintiff experienced severe physical pain and suffering
and sustained injuries including, but not limited to, a shattered
left humerus, which required surgery and from which Plaintiff
may never fully recover. (*Id.* at ¶ 39).

**II. Summary Judgment Evidence**

The following facts are taken from Defendants' Rule 56
statement and Defendants' summary judgment evidence.

Defendant Shaver was not present at the scene of the incident.
(Dkt. 41-1 at ¶ 25; Dkt. 41-2 (Shaver Decl. ¶¶ 4-5); Ex.
A (video footage of incident (manually filed))).[1] During
the incident, Defendant Sidel was leaning against the wall
away from Plaintiff's cell. (Dkt. 41-1 at ¶ 26; Ex. A (video
footage of incident (manually filed))). Sidel could see only
the back of the officers inside the cell and did not see anyone
strike Plaintiff or break Plaintiff's arm. (*Id.*; Dkt. 41-3 (Sidel

Decl. ¶¶ 6-9)). Sidel, as an officer, was not responsible for supervising the cell extraction; a supervising sergeant was present at the scene. (Dkt. 41-1 (Sidel Decl. ¶ 10)).

1      Defendants have submitted a CD containing video footage of the incident. (Ex. A (manually filed)). Defendants state in their affidavits that Shaver does not appear in the video (Dkt. 41-2 at ¶ 5), and that Sidel is "the male officer leaning against the wall (not the officer in the cap)" (Dkt. 41-3 at ¶ 8). Although the Court has no means of verifying the identities of the individuals who appear in the footage, as explained below, because Plaintiff does not oppose Defendants' motion for summary judgment, the Court will accept the truth of Defendants' factual allegations regarding the video recording. *See Allaway v. McGinnis*, 473 F. Supp. 2d 378, 381 (W.D.N.Y. 2007); *see also Lin v. City of New York*, No. 14 CIV. 9994 (PAE), 2016 WL 7439362, at *2 (S.D.N.Y. Dec. 21, 2016) ("Insofar as the Video does depict events, the Video is reliable objective evidence on which the Court may rely on summary judgment.").

## DISCUSSION

### I. Standard of Review

**\*2** Federal Rule of Civil Procedure 56 provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec*, 475 U.S. at 586-87). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

Rule 56 also provides that if a nonmoving party fails to oppose a summary judgment motion, the court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]" Fed. R. Civ. P. 56(e)(3). However, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). The court may not grant the motion without first determining that the moving party has met its burden of demonstrating that no material issue of fact remains for trial. *See id.* If the evidence submitted in support of the motion for summary judgment does not meet the movant's burden of production, "summary judgment must be denied *even if no opposing evidentiary matter is presented.*" *Amaker v. Foley*, 274 F.3d 677, 681 (2d Cir. 2001).

"Moreover, in determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's [Local Rule 56] statement. It must be satisfied that the citation to evidence in the record supports the assertion." *Vermont Teddy Bear Co.*, 373 F.3d at 244; *see also Jackson v. Fed. Exp.*, 766 F.3d 189, 194 (2d Cir. 2014).

Although Plaintiff does not oppose Defendants' motion for summary judgment, "the Court will not simply grant [D]efendants' motion automatically, but will accept the truth of [D]efendants' factual allegations, and determine whether [D]efendants are entitled to summary judgment." *Allaway v. McGinnis*, 473 F. Supp. 2d 378, 381 (W.D.N.Y. 2007).

### II. Section 1983 Claims

Defendants argue that the Court should dismiss all claims against them. (Dkt. 41-5 at 7). Defendants do not explicitly argue that the excessive force claim should be dismissed, but instead seem to assume that Plaintiff has not alleged that claim with respect to Sidel and Shaver. (*See id.*). As to the failure to protect claim, Defendants contend that Shaver was not at the scene of the incident and therefore was not personally involved, and that there is no evidence that Sidel had actual knowledge of the alleged excessive force and an opportunity to intervene. (*Id.* at 2-3).

### A. Excessive Force Claim

2018 WL 10944594

It is well settled in this Circuit that personal involvement of a defendant in an alleged constitutional deprivation is a prerequisite to an award of damages under § 1983. *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994); *see Case v. City of New York*, 233 F. Supp. 3d 372, 398 (S.D.N.Y. 2017) (granting summary judgment on excessive force claim where the plaintiff provided no facts suggesting plausible basis for the defendant's involvement in alleged use of force). Here, the evidence in the record demonstrates that Defendants were not personally involved in the alleged excessive use of force. Defendant Shaver was not present at the scene of the incident, (Dkt. 41-1 at ¶ 25; Dkt. 41-2 (Shaver Decl. ¶¶ 4-5); Ex. A (video footage of incident (manually filed))), and Defendant Sidel was leaning against the wall away from Plaintiff's cell. (Dkt. 41-1 at ¶ 26; Dkt 41-3 (Sidel Decl. ¶ 8); Ex. A (video footage of incident (manually filed))).

**\*3** Thus, the Court concludes that to the extent that Plaintiff has alleged an excessive force claim against Defendants, there is no genuine dispute as to any material fact, and that claim should be dismissed.

### B. Failure to Protect Claim

Plaintiff styles his second cause of action as an Eighth Amendment failure-to-protect claim. However, Defendants address that cause of action as an Eighth Amendment claim for failure to intervene (Dkt. 41-5 at 4), and the Court agrees that that is the proper styling of Plaintiff's second cause of action.

A claim for failure to protect arises when an inmate is incarcerated under conditions posing a substantial risk of serious harm and prison officials exhibit deliberate indifference to that risk. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Such a claim often arises under circumstances in which prison officials fail to protect prisoners from violence at the hands of other prisoners. *Id.* A claim for failure to intervene, on the other hand, arises when a prison official fails to "intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in [his or her] presence." *Samuels v. Fischer*, 168 F. Supp. 3d 625, 646 (S.D.N.Y. 2016). Based on the facts in the complaint, Plaintiff appears to be asserting a claim for failure to intervene, although he styled it as a claim for failure to protect. The Court will evaluate Plaintiff's second cause of action under the standard that applies to claims based on failure to intervene.

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). An officer who fails to intervene is "liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know that excessive force is being used." *Id.* Thus, liability attaches where (1) the officer had a realistic opportunity to intervene to prevent the harm; (2) a reasonable person in the officer's position would have known that the victim's constitutional rights were being violated; and (3) the officer did not take reasonable steps to intervene. *Jean–Laurent v. Wilkerson*, 438 F. Supp. 2d 318, 327 (S.D.N.Y. 2006), *aff'd*, 461 F. App'x 18 (2d Cir. 2012).

Here, it is undisputed that Defendants are not liable for failing to intervene. Shaver was not at the scene of the incident, either inside or outside the cell. (Dkt. 41-1 at ¶ 25; Dkt. 41-2 (Shaver Decl. ¶¶ 4-5); Ex. A (video footage of incident (manually filed))). Shaver did not have a realistic opportunity to intervene, and had no reason to know of the alleged excessive use of force. *See Jean-Laurent*, 438 F. Supp. 2d at 327. Although Sidel was present at the scene of the incident, the record demonstrates that he was outside the cell and could see only the back of the officers who were inside the cell. (Dkt. 41-1 at ¶ 26; Ex. A (video footage of incident (manually filed))). Sidel did not witness anyone strike Plaintiff or break Plaintiff's arm. (*Id.*; Dkt. 41-3 (Sidel Decl. ¶¶ 6-9)). There is no genuine dispute of fact with respect to whether a reasonable person in Sidel's position would have known that Plaintiff's constitutional rights were being violated. *See Jean-Laurent*, 438 F. Supp. 2d at 327. The Court concludes that summary judgment is appropriate.

### CONCLUSION

**\*4** For the foregoing reason, Defendants' motion for summary judgment (Dkt. 41) is granted. The Clerk of Court is directed to terminate Defendants Shaver and Sidel from this action with prejudice.

SO ORDERED.

### All Citations

Slip Copy, 2018 WL 10944594

**Gochnour v. Burri, Slip Copy (2018)**

2018 WL 10944594

---

**End of Document**                                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

Vann v. Sudranski, Slip Copy (2020)

2020 WL 3001072

2020 WL 3001072
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Kouriockein VANN, Plaintiff,
v.
Correction Officer Y. SUDRANSKI
and Lieutenant S. Hann, Defendants.

16 CV 7367 (VB)
|
Signed 06/04/2020

**Attorneys and Law Firms**

Kouriokein Vann, Fallsburg, NY, pro se.

Jennifer Rose Gashi, State of New York Office of the Attorney General, White Plains, NY, Neil Shevlin, New York State Office of the Attorney General, New York, NY, for Defendants.

## OPINION AND ORDER

Briccetti, J.:

 **\*1** Plaintiff Kouriockein Vann, proceeding pro se and in forma pauperis, brings this action under 42 U.S.C. § 1983, alleging Correction Officer ("C.O.") Y. Sudranski and Lieutenant ("Lt.") S. Hann, employees of the New York State Department of Corrections and Community Supervision, violated plaintiff's Eighth Amendment rights while he was incarcerated at Green Haven Correctional Facility ("Green Haven"). [1]

[1]    Plaintiff also brought claims against several other Green Haven employees. By Opinion and Order dated December 20, 2017, the Court dismissed those claims and terminated those defendants from this action. (Doc. #64).

Before the Court is defendants' motion for summary judgment. (Doc. #145).

For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN PART.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## BACKGROUND

Defendants have submitted memoranda of law, a statement of material facts pursuant to Local Civil Rule 56.1, declarations, and supporting exhibits. Plaintiff has submitted memoranda of law with an incorporated statement of material facts, and a collection of documents in support of his position. Together, the parties' submissions reflect the following factual background.

On July 12, 2015, in a Green Haven recreational yard, a fight broke out between two inmates, during which one of the two inmates sustained a laceration to his left arm. On-duty medical personnel determined the injury was caused by an unrecovered weapon. Thereafter, for safety and security reasons, the yard was ordered closed and several Green Haven officers performed pat frisks on all inmates who were in the yard, including plaintiff, in an attempt to recover any weapons.

C.O. Sudranski was tasked with frisking plaintiff and several other inmates who were in the yard. According to plaintiff, upon patting plaintiff's clothed inner and outer legs, C.O. Sudranski "struck plaintiff forcefully with a 'reverse karate chop' to his testicle and groin area, and then, reached around and groped plaintiff's penis." (Doc. #158 ("Pl. Mem.") at 1). Plaintiff says C.O. Sudranski told plaintiff to walk to his housing block following the pat frisk.

C.O. Sudranski denies using excessive force against plaintiff, assaulting plaintiff, or touching plaintiff in an inappropriate manner. According to C.O. Sudranski, the frisk was performed without incident, after which plaintiff walked to his housing block.

Lt. Hann supervised the frisks on July 12, 2015, which were performed by several correction officers. Plaintiff claims that while walking toward his housing block, he attempted to speak with Lt. Hann about C.O. Sudranski's alleged misconduct. According to plaintiff, C.O. Sudranski then shouted: "[Y]ou can't stop and talk to her. You must proceed back to your block." (Pl. Mem. at 2). Plaintiff acknowledges Lt. Hann did not directly participate in the frisk of plaintiff, and that because Lt. Hann was supervising several officers

conducting frisks, plaintiff does not know whether Lt. Hann witnessed C.O. Sudranski's allegedly improper frisk.

**\*2** Plaintiff claims that after he returned to his housing unit, he told non-party C.O. Blackmon about the incident with C.O. Sudranski, and that C.O. Blackmon then told Lt. Hann. According to plaintiff, Lt. Hann instructed C.O. Blackmon to provide plaintiff a sick call slip so that plaintiff could be seen by medical personnel. Plaintiff was evaluated by a nurse the following day, July 13, 2015.

According to plaintiff, upon speaking with C.O. Blackmon on July 12, 2015, and learning of plaintiff's complaints, Lt. Hann should have interviewed plaintiff immediately, created a report of the incident, and sent plaintiff for a medical evaluation.

On July 20, 2015, plaintiff submitted a grievance respecting C.O. Sudranski's alleged misconduct. Plaintiff wrote: "C.O. Sudranski deliberately hit me in the testicle area. Then, [h]e fondled my groin area in the front with his left hand. Causing great discomfort and pain. I tried to speak with the Lieutenant on [s]ite. But was immediately told to keep going, there's no stopping." (Doc. #148 ("Gashi Decl.") Ex. C at 1).

## DISCUSSION

### I. Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). [2]

[2] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby,

Inc., 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010). It is the moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party fails to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 322–23. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury reasonably could find for him. Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in the non-movant's favor on the issue on which summary judgment is sought, summary judgment is improper. Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).

**\*3** In deciding a motion for summary judgment, the Court need consider only evidence that would be admissible at trial. Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998). The burden to proffer evidence admissible pursuant to the Federal Rules of Evidence applies "equally to pro se litigants." Varughese v. Mt. Sinai Med. Ctr., 2015 WL 1499618, at \*4 (S.D.N.Y. Mar. 27, 2015) (citing Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001)). [3] Accordingly, bald assertions, completely unsupported by admissible evidence, are not sufficient to overcome summary judgment. Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).

[3] Plaintiff will be provided copies of all unpublished opinions cited in this decision. See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

## II. Excessive Force Claim

Defendants argue plaintiff fails as a matter of law to establish an Eighth Amendment excessive force claim with respect to C.O. Sudranski's pat frisk of plaintiff.

The Court agrees inasmuch as plaintiff alleges an excessive force claim against Lt. Hann, but disagrees as to plaintiff's excessive force claim against C.O. Sudranski.

### A. Legal Standard

There are two components to a claim of cruel and unusual punishment in violation of the Eighth Amendment: one objective and one subjective. Wright v. Goord, 554 F.3d 255, 268 (2d Cir. 2009). The objective inquiry focuses on the harm done in light of "contemporary standards of decency." Wright v. Goord, 554 F.3d at 268 (quoting Hudson v. McMillian, 503 U.S. 1, 8 (1992)). An inmate must show "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." Id. (quoting Hudson v. McMillian, 503 U.S. at 8). "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated.... This is true whether or not significant injury is evident.' " Id. at 268–69 (quoting Hudson v. McMillian, 503 U.S. at 9).

> Although not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights, a showing of extreme injury is not required to bring an excessive force claim if the alleged conduct involved unnecessary and wanton infliction of pain.

Toliver v. N.Y.C. Dep't of Corr., 202 F. Supp. 3d 328, 334–35 (S.D.N.Y. 2016).

To establish the subjective inquiry, an inmate must show the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." Wright v. Goord, 554 F.3d at 268. "The test of whether use of force in prison constitutes excessive force contrary to the Eighth Amendment is whether the force was used in a good-faith

effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Scott v. Coughlin, 344 F.3d 282, 291 (2d Cir. 2003) (citing Hudson v. McMillian, 503 U.S. at 7).

> To determine whether defendants acted maliciously or wantonly, a court must examine several factors including: the extent of the injury and the mental state of the defendant, as well as "the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response."

**\*4** Id. (quoting Romano v. Howarth, 998 F.2d 101, 105 (2d Cir. 1993)).

### B. C.O. Sudranski

There are genuine issues of material fact as to whether C.O. Sudranski used excessive force while performing a pat frisk on plaintiff on July 12, 2015. With respect to the first prong of the Eighth Amendment analysis, plaintiff has presented evidence that the alleged wrongdoing was objectively harmful. Indeed, plaintiff testified at his deposition that during the frisk, C.O. Sudranski "forcibly reverse[ ] karate chopped and hit me in my groin, my testicles and then he leaned on my back with his right arm and he reached with his left hand around and fondled my groin area and shook it." (See Doc. # 148-2 ("Pl. Dep.") at 40). Plaintiff further testified he told C.O. Blackmon about the alleged incident immediately after it occurred (id. at 44), and on July 20, 2015, plaintiff filed a grievance respecting C.O. Sudranski's alleged misconduct. (See Doc. #148-3). Moreover, attached to plaintiff's opposition are records of plaintiff's complaints to medical personnel of testicular pain following the incident, one of which, dated July 13, 2015—the day after the frisk—notes tenderness in plaintiff's testicles and minor trauma. (Pl. Mem. at ECF 62).[4] Whether plaintiff's story is true is for a jury to determine.

[4]    Citations to "ECF __" refer to page numbers automatically assigned by the Court's Electronic Case Filing system.

Defendants nevertheless argue the record evidence demonstrates C.O. Sudranski's use of force was de minimis and applied for the legitimate, penological purpose of performing a routine pat frisk to ensure safety and maintain order at Green Haven. Even still, the material factual

dispute respecting what occurred on July 12, 2015, precludes summary judgment in C.O. Sudranski's favor. Defendants would have the Court overlook plaintiff's testimony and instead rely only on defendants' factual recitation of the incident—that the force used was de minimis and appropriate under the circumstances. But "as a general rule, a district court may not discredit a witness's deposition testimony on a motion for summary judgment, because the assessment of a witness's credibility is a function reserved for the jury." Fincher v. Depository Tr. & Clearing Corp., 604 F.3d 712, 725 (2d Cir. 2010). Again, plaintiff's credibility is a jury question.

With respect to the subjective prong of the inquiry, a triable issue of fact exists regarding whether the alleged force was used in a good-faith effort to conduct a routine frisk, or maliciously and sadistically to cause harm. The record is devoid of evidence suggesting C.O. Sudranski needed to use any amount of force to maintain plaintiff's compliance during the frisk, or evidence suggesting plaintiff failed to follow C.O. Sudranski's orders during same. In other words, there appears to have been no need for C.O. Sudranski to employ a forceful strike or motion during the frisk, if in fact that is what he did. Moreover, defendants do not convincingly suggest that such force, if used, would have been justified under the circumstances.

**\*5** Instead, defendants contend no reasonable jury could find that C.O. Sudranski's alleged use of force was malicious or sadistic because he and plaintiff had no prior relationship, and because C.O. Sudranski was unaware plaintiff took issue with the frisk when it occurred. This argument fails. First, it presupposes that an excessive force claim cannot lie absent retaliatory intent, and second, it inappropriately deflects focus of the inquiry to plaintiff's reaction to the allegedly unconstitutional conduct.

In short, genuine issues of material fact preclude summary judgment on the excessive force claim against C.O. Sudranski.

### C. Lt. Hann

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983." Wright v. Smith, 21 F.3d 496, 501 (2d. Cir. 1994).

Supervisor liability under § 1983 can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

Richardson v. Goord, 347 F.3d 431, 435 (2d Cir. 2003) (citing Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995)). [5] Moreover, Section 1983 liability cannot be predicated on a theory of respondeat superior. See City of Canton v. Harris, 489 U.S. 378, 385 (1989). Indeed, "[t]he bare fact that [a defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain [a] claim." Colon v. Coughlin, 58 F.3d at 874.

[5]
> After Ashcroft v. Iqbal, district courts within the Second Circuit have been divided as to whether claims alleging personal involvement under the second, fourth, and fifth of these factors remain viable. See Marom v. City of New York, 2016 WL 916424, at \*15 (S.D.N.Y. Mar. 7, 2016) (collecting cases). The Second Circuit has yet to resolve this dispute. Id.

Here, plaintiff concedes Lt. Hann did not directly participate in the frisk conducted by C.O. Sudranski. In fact, according to plaintiff, he (plaintiff) attempted to discuss the incident with Lt. Hann after the incident had occurred. Accordingly, because Lt. Hann had no personal involvement in the alleged constitutional violation, she is entitled to summary judgment on the excessive force claim.

### III. Sexual Abuse Claim

Defendants next argue plaintiff, as a matter of law, cannot establish an Eighth Amendment sexual abuse claim against C.O. Sudranski.

The Court agrees.

"Instances of sexual contact by prison officials violate the constitution if they disturb 'contemporary standards of decency' and are 'objectively, sufficiently serious enough." Cole v. Suffolk Cty. Corr. Facility, 2020 WL 2113205, at *3 (E.D.N.Y. May 4, 2020) (quoting Boddie v. Schneider, 105 F.3d 857, 861 (2d Cir. 1997)). "In determining whether an Eighth Amendment violation has occurred, the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." Crawford v. Cuomo, 796 F.3d 252, 258 (2d Cir. 2015) (citing Whitley v. Albers, 475 U.S. 312, 320–21 (1986)). Courts in the Second Circuit have consistently held that "brief contact with an arrestee's ... genital area during a pat-down, without more, is insufficient" to state a constitutional claim. Scalpi v. Amorim, 2018 WL 1606002, at *18 (S.D.N.Y. Mar. 29, 2018) (collecting cases).

**\*6** Here, the undisputed record evidence demonstrates C.O. Sudranski made, at most, brief contact with plaintiff's genital area during a routine and necessary pat frisk. "Slight contact of this sort is to be expected during a frisk," Cole v. Suffolk Cty. Corr. Facility, 2020 WL 2113205, at *4, and is inherent in an officer's pat-down of an inmate's person to search for contraband. The undisputed evidence demonstrates the contact was not lengthy, and plaintiff's legs, pelvic, and groin areas were clothed during the frisk. Moreover, the frisk was conducted in the presence of several other officers, inmates, and at least one supervisor, and was incidental to legitimate penological duties. Simply, there is no evidence to suggest C.O. Sudranski frisked plaintiff in a sexually inappropriate manner, even though, as noted above, there is a material issue of fact respecting the amount of force C.O. Sudranski used during the frisk.

Thus, defendants are entitled to summary judgment on the sexual abuse claim.

IV. Failure to Intervene Claim

Defendants further argue plaintiff, as a matter of law, cannot establish an Eighth Amendment failure to intervene claim against Lt. Hann.

The Court agrees.

"[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994). "Failure to intercede results in liability where an officer observes excessive force is being used or has reason to know that it will be." Jean-Laurent v. Wilkerson, 461 F. App'x 18, 21 (2d Cir. 2012) (summary order) (citing Curley v. Village of Suffern, 268 F.3d 65, 72 (2d Cir. 2001)). "However, 'in order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring.' " Id. (citing Anderson v. Branen, 17 F.3d at 557).

Here, the record evidence, including plaintiff's testimony, demonstrates the complained-of force involved, at most, "one strike" to plaintiff's groin area. (See Pl. Dep. at 85; see also Pl. Mem. at 1 ("Sudranski struck plaintiff forcefully with a 'reverse karate chop' to his testicle and groin area.")). The evidence does not support any claim that Lt. Hann witnessed the allegedly unlawful conduct, encouraged or acquiesced in such conduct, or had a realistic opportunity to prevent the alleged use of excessive force from occurring.

For these reasons, Lt. Hann is entitled to summary judgment on this claim. [6]

[6]   Because plaintiff's failure to intervene claim against Lt. Hann fails as a matter of law, the Court need not address whether plaintiff exhausted this claim.

V. Qualified Immunity

Finally, C.O. Sudranski argues that, to the extent the record supports an Eighth Amendment excessive force claim, such claim should be dismissed on the basis of qualified immunity. [7]

[7]   Because plaintiff's claims against Lt. Hann fail as a matter of law, the Court need not address whether Lt. Hann is entitled to qualified immunity.

The Court disagrees.

Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996). "Where a factual issue exists on the issue of motive or intent, a defendant's motion for summary judgment on the basis of qualified immunity must fail." Johnson v. Ganim, 342 F.3d 105, 117 (2d Cir. 2003); see also Atkins v. County of Orange, 372 F. Supp. 2d 377, 403–04 (S.D.N.Y. 2005) (precluding summary judgment on defense of qualified immunity as to plaintiff's excessive force claim), aff'd sub nom. Bellotto v. County of Orange, 248 F. App'x 232 (2d Cir. 2007) (amended summary order).

*7 Here, there is a genuine factual dispute concerning whether C.O. Sudranski used excessive force against plaintiff during the July 12, 2015, frisk. Plaintiff's Eighth Amendment right to be free from the use of excessive force was clearly established at the time of the allegedly unlawful conduct, and it would not have been objectively reasonable for C.O. Sudranski to have believed he could lawfully violate that right by forcefully striking plaintiff in the groin during a routine pat frisk.

Accordingly, factual issues preclude summary judgment in favor of C.O. Sudranski on basis of qualified immunity.

## CONCLUSION

The motion for summary judgment is GRANTED IN PART and DENIED IN PART.

Plaintiff's Eighth Amendment excessive force claim against C.O. Sudranski shall proceed. All other claims are dismissed.

Plaintiff and defense counsel are directed to appear for a telephone status conference on July 8, 2020, at 11:00 a.m., at which time the Court will discuss the scheduling of a trial. Defense counsel shall make all necessary arrangements for plaintiff to appear by telephone. Plaintiff and defense counsel shall attend the conference by calling the following number and entering the access code when requested:

**Dial-In Number:**    **(888) 363-4749 (toll free) or (215) 446-3662**

**Access Code:**    **1703567**

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this order would not be taken in good faith, and therefore in forma pauperis status is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444–45 (1962).

The Clerk is instructed to terminate the motion (Doc. #145) and terminate Lt. Hann as a defendant in this action.

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 3001072

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.    6

2021 WL 84234
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Naquan M. LECKIE, Plaintiff,

v.

The CITY OF NEW YORK, Captain Jones,
and Correction Officer Ling, Defendants.

18-CV-3917 (RRM) (LB)
|
Signed 01/11/2021

**Attorneys and Law Firms**

Naquan M. Leckie, Brooklyn, NY, pro se.

Stefano Perez, New York City Law Department Office of the
Corporation Counsel, New York, NY, for Defendants.

**MEMORANDUM AND ORDER**

ROSLYNN R. MAUSKOPF, Chief United States District
Judge.

**\*1** Plaintiff Naquan M. Leckie, proceeding *pro se*, brings
this action pursuant to 42 U.S.C. § 1983, against defendants
City of New York, Captain Ashley Jones ("Jones"), and
Correction Officer Chi Ling ("Ling"), alleging deliberate
indifference to his safety in connection with an allegedly
homophobic inmate-on-inmate attack on December 25, 2017.
(Compl. (Doc. No. 2).) Defendants now move for summary
judgment. (Mot. (Doc. No. 59).) For the reasons stated below,
defendants' motion is granted in part and denied in part.

**BACKGROUND**

Factual Background
The relevant facts outlined below are drawn from defendants'
Local Rule 56.1 Statement of Material Facts, to the extent
that those facts are supported by evidence submitted by
defendants in connection with the motion for summary
judgment. [1] Unless otherwise noted, the facts are undisputed.

[1]   Defendants' motion is unopposed. In the case of
an unopposed motion for summary judgment, "in

determining whether the moving party has met
[its] burden of showing the absence of a genuine
issue for trial, the district court may not rely solely
on the statement of undisputed facts contained in
the moving party's Rule 56.1 statement. It must
be satisfied that the citation to evidence in the
record supports the assertion." *Vt. Teddy Bear Co.
v. 1-800 BEARGRAM Co.*, 373 F.3d 241, 244 (2d
Cir. 2004); *see also Giannullo v. City of New York*,
322 F.3d 139, 143 n.5 (2d Cir. 2003) (stating that
not verifying in the record the assertions in the
motion for summary judgment "would derogate the
truth-finding functions of the judicial process by
substituting convenience for facts").

On December 25, 2017, Naquan Leckie was a pre-
trial detainee incarcerated at Brooklyn Detention Complex
("BKDC"), a New York City Department of Correction
("DOC") facility located at 275 Atlantic Avenue in Brooklyn.
(Defendants' Rule 56.1 Statement of Undisputed Facts
("Defs.' SOF") (Doc. No. 61) at ¶ 3.) Prior to being
housed at BKDC, Leckie was held at Manhattan Detention
Center ("MDC"), but was transferred out of that complex
on December 14, 2017, because "the guys in there felt like
[Leckie] was gay because [he] had took a shower, but [he] had
[his] drawers on." (Excerpt from Leckie Deposition, Exhibit
B (Doc. No. 60-3) at 5.) [2]

[2]   All page numbers refer to ECF pagination.

In accordance with the Prison Rape Elimination Act
("PREA") and DOC policy, upon his arrival at BKDC, Leckie
participated in an initial intake interview and was asked
whether he considered himself to be lesbian, gay, bisexual,
transgender, intersex or gender nonconforming. (Defs.' SOF
at ¶ 7.) During the intake interview, Leckie indicated that he
did not identify as such and said that he was straight. (*Id.* at
¶ 8.) At no point did Leckie inform Ling, Jones, or any other
correctional staff of his sexual orientation or alert them of any
risks to his safety due to his sexual orientation. (*Id.* at ¶ 9.)
However, Leckie told correction officials that he feared for
his life due to his previous gang affiliation and was placed
in protective custody at BKDC. (*Id.* at ¶ 5.) Leckie testified
that he submitted a signed statement that he feared for his life
because he "did not want to be around the people that he was
around." (*Id.* at ¶ 6.) Leckie testified that prior to the incident
on December 25, 2017, he did not fear for his life, did not
fear any particular individual, and did not believe he was in
danger, nor had any inmates made any threats against him.
(*Id.* at ¶ 4.)

2021 WL 84234

**\*2** At BKDC, Leckie was housed in a protective custody housing area located on the sixth floor, Housing Area 6B. (*Id.* at ¶ 10.) A protective custody housing area is a housing area where inmates can be placed on a voluntary or involuntary basis to protect them from fears or threats pertaining to their physical safety concerns. (*Id.* at ¶ 11.) Inmates placed in protective custody are afforded the same lock-in/lock-out privileges and access to mandated services and programs as general population inmates but are segregated from the rest of the inmate population. (*Id.* at ¶ 12.) The Housing Area Supervisor is not informed of the reason that an inmate is placed in protective custody. (Declaration of Correction Captain Ashley Jones ("Jones Dec.") (Doc. No. 64) at ¶ 4.) There are four housing areas located on the sixth floor: Housing Areas 6A, 6B, 6C, and 6D. (Defs.' SOF at ¶ 14.) Each housing area consists of two tiers, a dayroom, and houses approximately 20–28 inmates. (*Id.* at ¶ 15.) The dayroom is a common area recreation room where inmates can unwind, watch television, play games, and/or talk on the phone. (*Id.* at ¶ 16.)

On the day of the incident, as the Housing Area Supervisor, Jones was responsible for conducting tours of approximately eight housing areas, including Housing Area 6B. (*Id.* at ¶ 17.) Sometime prior to 6:15 p.m. that day, Jones conducted a security inspection of Housing Area 6B. (*Id.* at ¶ 18.) During the security inspection, Jones did not have any communication with Leckie and Leckie could not hear any communication that Jones may have had with any other inmates. (*Id.* at ¶ 19.)

At that same time, Ling was manning the control post for Housing Areas 6A, 6B, 6C, and 6D, where he was responsible for communicating with other parts of the facility, such as the Control Room, the Area Supervisor, Law Library, Social Services, Commissary, and the Kitchen. (*Id.* at ¶ 20.) The control post for Housing Areas 6A, 6B, 6C, and 6D was approximately 20 feet away from the Housing Area 6B dayroom; Housing Areas 6A, 6B, 6C, 6D, and their respective dayrooms were in partial view from the control post. (*Id.* at ¶ 21.)

The parties disagree as to the details of the incident. At his deposition, Leckie testified that Jones entered the dayroom while he was playing chess, looked around the room, and then said, "come on, guys, let's have an exciting day." (Deposition of Naquan Leckie ("Leckie Dep.") (Doc. No. 60-2) at 9.) Jones states in her declaration that she did not "have any

communication with" Leckie "at any point" during her security inspection in Housing Area 6B. (Jones Dec. at ¶ 7.) According to Leckie, Jones then stepped out of the dayroom, and several inmates followed her. (Leckie Dep. at 9.) They spoke, but Leckie could not hear what was said. (*Id.*) Then, those inmates re-entered the room and pointed at Leckie, with at least one of them referring to him as a "faggot" and telling him to go "lock ... in now." (*Id.* at 9–10.) Leckie testified that he stood up and asked why he was required to lock in when several inmates started to "jump" him. (*Id.*) He testified that the attack lasted between a minute and "three or four" minutes and he did not fight back because "when they see you fight back that's when they try to cut you," though he stated that he did not see any of his attackers with a weapon. (*Id.* at 18.) Defendants assert that the fight lasted about one minute. (Declaration of Correction Officer Chi Ling ("Ling Dec.") (Doc. No. 63) at ¶ 9.)

Ling was sitting at the control post "when he heard a commotion coming from Housing Area 6B dayroom" and he "immediately responded." (Defs.' SOF at ¶¶ 22, 24.) Ling responded by calling the Probe Team and notifying the Area Supervisor by pressing the "personal body alarm on his belt which activated the institutional alarm." (*Id.* at ¶ 26.) Ling simultaneously issued verbal commands directing the inmates to stop fighting and gained compliance. (*Id.* at ¶ 27.) During this incident, Jones was conducting a security inspection of Housing Area 6C, a different housing area on the same floor that is approximately six feet away from Housing Area 6B but separated by a concrete wall, and so she did not witness the incident. (*Id.* at ¶¶ 31–32.) After Ling activated the institutional alarm, Jones left Housing Area 6C and immediately returned to Housing Area 6B. (*Id.* at ¶ 33.)

**\*3** Upon Jones's arrival to the Housing Area 6B dayroom, Ling reported that Leckie was involved in a physical altercation with inmates Jonathan Sanchez, Christopher Rodriguez, and Lumumba Moss, and further reported that his instructions and direct orders to the inmates to stop fighting had terminated the incident. (*Id.* at ¶ 34.) The Probe Team, which arrived within ten minutes of being called by Ling, escorted Leckie, Sanchez, Rodriguez, and Moss outside of the housing area. (*Id.* at ¶ 35.) All four inmates were taken to the clinic and subsequently rehoused in different housing areas. (*Id.* at ¶ 36.)

Leckie was treated at the clinic by Dr. Iosif Shpits, M.D. (*Id.* at ¶ 37.) An "injury to inmate" report and medical record were generated, to reflect that Leckie complained

of arm pain, denied loss of consciousness or blurry vision, was diagnosed with a left-hand contusion, and was given 800mg of Ibuprofen for the pain. (*Id.*; *see also* Injury to Inmate Report Ex. D; *see also* Medical Records Exhibit E.) The Injury to Inmate Report, which is handwritten and only partially legible, also indicates "lump on scalp" but "no bleeding no wound." (Exhibit D.) The Medical Records indicate that Leckie had "no scalp lesions" and that his nose had normal pink mucosa. (Exhibit E at 2.)

Ling issued Notices of Infraction to Sanchez, Rodriguez, and Moss, charging them with fighting and refusing to obey direct orders. (*Id.* at ¶ 39.) After generating these Notices of Infraction and submitting them to Jones, Ling's involvement in the incident concluded. (*Id.* at ¶ 40.) Upon receiving these Notices of Infraction, Jones investigated each infraction, completed an Investigation Report, and referred Sanchez, Rodriguez, and Moss to the Adjudication Unit for a hearing. (*Id.* at ¶ 41.) Jones recommended the maximum penalty indicated. (*Id.*)

When asked at his deposition whether any of the inmates who had attacked him had previously threatened him, Leckie said, "they just looked and stared at me but they never said nothing ... they looked at me but they never did nothing physically to make it look like they were trying to harm me." (Leckie Dep. at 10.)

The Complaint

Leckie timely filed his complaint on June 26, 2018, as a form § 1983 complaint that does not allege any causes of action. Rather, the complaint attaches a narrative. Leckie asserts that while his assailants were kicking him in the face, punching him in the head and arms, and calling him a "faggot" a "gay ass nigga" and saying "I hate you you fucking homo," Ling was outside of the room but "didn't bother to come in and help. He just watched from the outside and [Leckie] was screaming for them to stop but they didn't listen." (Compl. at 6–7.) Leckie further alleges that Jones, who was initially "across the room on the other side patro[l]ling," "never came to diffuse the situation" when she returned to Housing Area 6B, but "just walk[ed] the other way as though nothing was happening." (*Id.* at 7–8.) Leckie also states that it is "very suspicious" that the assault occurred immediately after Jones had a conversation with the inmates who attacked him. (*Id.* at 8.) Finally, Leckie asserts that the cameras in the facility were not operable, placing the facility "out of compliance." (*Id.* at 7.) For the injuries he suffered in the attack, including a bloody nose and bruises and bumps to his head an arms,

as well as the mental anguish and discriminatory conduct, unsafe environment, and the threats to his life and safety, Leckie seeks $30 million in damages. (*Id.* at 4, 10.) The Court construes this narrative as raising two deliberate indifference claims against all defendants, for failure to protect Leckie prior to the attack and failure to intervene during the ongoing attack, as well as an excessive force claim against Jones for inciting the attack.

The Instant Motion

**\*4** Defendants now bring the instant motion for summary judgment. Defendants construe Leckie as bringing only deliberate indifference to safety claims under § 1983, and do not brief the excessive force claim. Defendants first argue that Leckie has failed to demonstrate a sufficiently serious condition, as Leckie had not notified Jones, Ling, or anyone else at BKDC that he felt unsafe or that he anticipated a threat to his safety due to his sexual orientation or the conditions of his confinement in Housing Area 6B, nor did Leckie inform anyone at BKDC that he was bisexual. (Mem. (Doc. No. 62) at 12–16.) Next, Defendants argue that Leckie's injuries do not satisfy the objective standard for deliberate indifference because they were not sufficiently serious. (*Id.* at 17–18.) Further, Defendants argue that Leckie also fails to demonstrate that either Ling or Jones were deliberately indifferent, as he cannot show that the Defendants were aware of the risk of attack by other inmates or that they failed to intervene to stop it. (*Id.* at 18–19.) Additionally, Defendants argue that the surprise attack is insufficient to support a claim of deliberate indifference. (*Id.* at 20–21.) Moreover, Defendants assert that the claim against Jones must fail as she was not present for the attack and thus Leckie cannot show personal involvement. (*Id.* at 21–22.)

Defendants also argue that Ling and Jones are entitled to qualified immunity because neither of them violated a clearly established right, nor were they on notice to any risk of harm due to Leckie's sexual orientation. (*Id.* at 24.) Viewing Ling's actions in the light most favorable to him, his actions could be construed as a reasonable officer's determination of the safest and most effective way to intervene in the fight. (*Id.* at 24–25.) Finally, Defendants argue that Leckie has failed to state a claim against the City of New York because he has failed to provide any evidence that a policy or custom exists that resulted in the deprivation of a constitutional right. (*Id.* at 25–27.)

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, interrogatories, and affidavits demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is "material" if it may impact the "outcome of the suit under the governing law." *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

In determining whether a genuine issue of material fact exists, the evidence of the non-movant "is to be believed," and the Court must draw all "justifiable" or reasonable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (citation omitted); *see also Rodriguez v. City of New York*, 72 F.3d 1051, 1061 (2d Cir. 1995) ("[T]he court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions ... in the light most favorable to the party opposing the motion." (citations omitted)).

The same standards for summary judgment apply where, as here, the non-movant is proceeding *pro se. Williams v. Savory*, 87 F. Supp. 3d 437, 451 (S.D.N.Y. 2015). However, "special solicitude should be afforded *pro se* litigants generally, when confronted with motions for summary judgment." *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988).

## DISCUSSION

### I. Deliberate Indifference

42 U.S.C. § 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable." To state a § 1983 claim brought under the Due Process Clause of the Fourteenth Amendment, a pre-trial detainee must allege two elements, one subjective and one objective. First, to establish

an objective deprivation, the pre-trial detainee "must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health, which includes the risk of serious damage to physical and mental soundness." *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (internal quotations and citations omitted). "There is no static test to determine whether a deprivation is sufficiently serious; instead, the conditions themselves must be evaluated in light of contemporary standards of decency." *Id.* at 30 (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995) (internal quotations omitted)). Second, the pre-trial detainee must "prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.*, at 35.

### a. Failure to Protect

**\*5** "[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). However, "not every injury that a prisoner suffers at the hands of another [prisoner] results in constitutional liability." *Taylor v. City of New York*, No. 16-CV-7857 (NRB), 2018 WL 1737626, 2018 U.S. Dist. LEXIS 52308, at \*29 (S.D.N.Y. Mar. 27, 2018) (citing *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970). To establish a failure to protect claim under the Fourteenth Amendment, an inmate must satisfy a two-pronged test demonstrating that (1) he was incarcerated under conditions posing a substantial risk of serious harm, and (2) that prison officials demonstrated deliberate indifference to plaintiff's safety. *See Molina v. County of Westchester*, No. 16-CV-3421, 2017 WL 1609021, 2017 U.S. Dist. LEXIS 65195, at \*2–3 (S.D.N.Y. Apr. 28, 2017) (applying the *Farmer* test to Fourteenth Amendment failure to protect claim). When the claim is based on an alleged failure to prevent harm or provide safety, the inmate must show that he "[was] incarcerated under conditions posing a substantial risk of harm." *Lynch v. Jane Doe Corr. Officer Blue*, No. 14-CV-6919 (VB), 2016 WL 831969, 2016 U.S. Dist. LEXIS 24683, at \*7 (S.D.N.Y. Feb. 29, 2016) (quoting *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970).

Defendants are entitled to summary judgment with respect to Leckie's claims of deliberate indifference as to Jones and Ling. Leckie does not demonstrate that he was incarcerated

in conditions that posed a substantial risk of harm, because prior to this attack he testified that he did not fear for his life or safety; further, Leckie had not complained about his attackers, raised concerns about his safety in Housing Area 6B, or otherwise provided notice to Ling or Jones that he was at a substantial risk of harm.

### b. Failure to Intervene

Leckie's complaint also appears to allege a deliberate indifference claim against both Ling and Jones for failing to intervene when the fight broke out. "The failure of a correction officer to oversee prisoners, intervene in an attack, or otherwise fail to abide by prison safety protocols may under certain circumstances create a condition which poses a substantial risk of serious harm thus constituting a sufficiently serious constitutional violation." *See Molina*, 2017 WL 1609021, 2017 U.S. Dist. LEXIS 65195 at *7 (collecting cases). Specifically, "failing to intervene is a Fourteenth Amendment violation where the officer acted with deliberate indifference to a substantial risk of serious harm to an inmate." *Rosen v. City of N.Y.*, 667 F. Supp. 2d 355, 359–60 (S.D.N.Y. 2009) (quoting *Farmer*, 511 U.S. at 828, 114 S.Ct. 1970 (internal quotation marks omitted)). "In the context of a failure to intervene claim, an officer displays deliberate indifference when he has adequate time to assess a serious threat against an inmate and a fair opportunity to protect the inmate without risk to himself, yet fails to intervene." *Id.* at 360.

Here, the undisputed facts show that Ling responded to the altercation – which both Leckie and Ling estimated lasted about a minute – by promptly activating the alarm, summoning a Probe Team, and separating Leckie from the other inmates. Additionally, the undisputed record establishes that Jones was not in the immediate vicinity of the altercation but responded promptly to the institutional alarm. There is nothing in the record to indicate that either Ling or Jones failed to intervene in the incident, let alone that they did so with deliberate indifference. Accordingly, Defendants are entitled to summary judgment with respect to Leckie's deliberate indifference claims against Ling and Jones.

### II. Excessive Force

Though Defendants construe Leckie's complaint as stating only a deliberate indifference claim under § 1983, Leckie's complaint can also be construed as alleging a § 1983

excessive force claim pursuant to the Due Process Clause of the Fourteenth Amendment. "[T]he Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 576 U.S. 389, 397, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015). Though for excessive force claims brought under the Eighth Amendment "the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm," *Cole v. Fischer*, 379 F. App'x 40, 42 (2d Cir. 2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 6-7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992)), "pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less maliciously and sadistically," *Kingsley*, 576 U.S. at 400, 135 S.Ct. 2466 (internal quotation marks omitted). Accordingly, to prevail in a Fourteenth Amendment excessive force claim, a pre-trial detainee must demonstrate only that the challenged actions "are not rationally related to a legitimate nonpunitive governmental purpose or that the actions appear excessive in relation to that purpose." *Id.* at 398, 135 S.Ct. 2466.

**\*6** Here, Defendants have failed to show that no reasonable juror could find in Leckie's favor with respect to his excessive use of force claim against Jones. In Leckie's deposition testimony, he states that after Jones announced they were going to have an exciting day, she brought several other inmates out into the hallway and spoke to them, then brought them back into the day room where they immediately attacked Leckie while using homophobic slurs. Jones's own affidavit does not contradict this account: she states only that she did not speak to Leckie during her security check but is silent regarding whether she spoke with other inmates. A reasonable juror could conclude, based on the record, that when Jones spoke with those inmates outside of the day room, she incited them to assault Leckie, and that her statement about having "exciting day" was an allusion to the attack she intend to instigate. Inciting violence is not rationally related to any legitimate government purpose. Accordingly, Leckie's § 1983 excessive use of force claim against Jones survives summary judgment.

### III. Qualified Immunity

Defendants argue only that Ling and Jones are entitled to qualified immunity with respect to the deliberate indifference claims but are silent regarding the claim of excessive force. An individual defendant is entitled to qualified immunity if 1) his or her actions did not violate clearly established law, or 2) it was objectively reasonable to believe that his or her actions did not violate such law. *Warren v. Keane*, 196 F. 3d 330 (2d

Cir. 1999); *see also Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996) (same). "A right is clearly established if the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *LaBounty v. Coughlin*, 137 F.3d 68, 73 (2d Cir. 1998) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (internal quotation marks omitted)). Where a right is clearly established, "the defendants may nonetheless establish immunity by showing that reasonable persons in their position would not have understood that their conduct was within the scope of the established prohibition." *Id.* (quoting *In re State Police Litig.*, 88 F.3d 111, 123 (2d Cir. 1996)).

Jones is not entitled to qualified immunity for her alleged application of excessive force. It is well established that pre-trial detainees cannot be subject to punitive force under the Fourteenth Amendment, and no reasonable official would believe that inciting violence against a bisexual detainee, as Jones is alleged to have done here, falls within the scope of acceptable activity under the Due Process Clause. Accordingly, this argument must fail.

### IV. Municipal Liability

A municipality cannot be held liable as a "person" within the meaning of 42 U.S.C. § 1983 unless the municipality itself was somehow at fault. *Oklahoma City v. Tuttle*, 471 U.S. 808, 810, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *see also Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). "The plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries.... Second, the plaintiff must establish a causal connection—an 'affirmative link'—between the policy and deprivation of his constitutional rights.' " *Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985), *cert. denied*, 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 685 (1987) (citing *Tuttle*, 471 U.S. at 824 n.8, 105 S.Ct. 2427). Here, Leckie does not identify a policy or custom in his complaint, nor does he provide any other basis for finding the City of New York liable for the allegations contained therein. Summary judgment is therefore granted with respect to Leckie's claims against the City of New York.

### CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is granted with respect to the deliberate indifference claims against Jones and Ling, and all claims against the City of New York. This action is recommitted to Magistrate Judge Bloom for all remaining pre-trial matters, including settlement discussions if appropriate.

 **\*7**  SO ORDERED.

**All Citations**

Slip Copy, 2021 WL 84234

---

**End of Document**          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 4517975
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Steffon GREENE, Plaintiff,
v.
Kevin WALSH, et al., Defendants.

Civil Action No. 9:05–CV–00327 (TJM/DEP).
|
Sept. 29, 2008.

West KeySummary

1    **Civil Rights** 🔑 Criminal law enforcement; prisons

An inmate's claim against the sheriff for the alleged failure to protect the inmate from harm was subject to summary judgment in favor of the sheriff where he had no personal involvement. The inmate and another inmate had been locked in separate cells following a verbal altercation. A correctional officer opened the cells to allow another inmate to move about. When the cells were opened, the other inmate immediately rushed into the inmate's cell and punched him in the face. The correctional officer immediately sounded an alarm and the situation was quickly terminated. The sheriff had no personal involvement in the incident at all. 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**Attorneys and Law Firms**

Steffon Greene, pro se.

Hon. Gordon J. Cuffy, Onondaga County Attorney, Michael McCarthy, Esq., Deputy County Attorney, of Counsel, Syracuse, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred by this Court to the Hon. David E. Peebles, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S .C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). The Report and Recommendation dated June 24, 2008 recommended that the pending motion for summary judgment be granted and the action be dismissed. No objections to the Report and Recommendation have been filed and Plaintiff's time to do so has expired. Furthermore, after examining the record, this Court has determined that the Report and Recommendation is not subject to attack for plain error or manifest injustice. Accordingly, the Court adopts the Report and Recommendation for the reasons stated therein.

It is therefore,

**ORDERED** that Defendant's motion (Dkt. No. 44) is **GRANTED** and Plaintiff's claims against defendant Kevin Walsh are **DISMISSED, with prejudice,** and Plaintiff's claims against Corrections Sergeant LeBoeuf and Dr. Mark Johnstone are **DISMISSED, without prejudice.** The Clerk of the Court is instructed to mark this case closed.

**IT IS SO ORDERED.**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, United States Magistrate Judge.

Plaintiff Steffon Greene, a former prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this civil rights action pursuant to 42 U.S.C. § 1983 against the Onondaga County Sheriff and various other employees of the County, including a medical doctor, complaining of constitutional violations alleged to have occurred during the time of his confinement in a prison facility operated by the County. In his complaint, as amended, plaintiff asserts claims stemming from the failure of corrections officers to protect him from a fellow inmate known to be antagonistic toward him, as well as the alleged failure of medical personnel to properly diagnose and treat injuries suffered at the hands of that other inmate. Plaintiff seeks recovery of compensatory damages in the amount of $18 million based upon the assault, and $1 million based upon the defendants' failure to properly diagnose and treat his resulting injuries, and additionally

seeks punitive damages in the sum of $250,000 against each of the named defendants.

Now that pretrial discovery has concluded, the sole defendant served and appearing in the action, Onondaga County Sheriff Kevin Walsh, has moved for summary judgment requesting dismissal of plaintiff's claims against him, arguing that they are substantively deficient and additionally asserting his entitlement to qualified immunity.[1] Because neither plaintiff's complaint nor the remaining portions of the record now before the court disclose any evidence of his personal involvement in the constitutional deprivations alleged, I recommend that the defendant's motion for summary judgment be granted.

[1]     In his motion defendant also seeks, in the alternative, an order precluding the plaintiff from offering expert medical testimony at trial in light of his failure to properly disclose his intention to do so during the course of pretrial discovery. In light of my recommendation with regard to the substantive portion of defendant's motion it is unnecessary to address this alternative request for relief.

I. *BACKGROUND*[2]

[2]     As will be seen, in light of the plaintiff's failure to respond to the defendant's motion, the facts recited in defendant's Local Rule 7.1(a)(3) Statement of Material Facts are deemed to have been established, for purposes of the instant motion. *See* pp. 9–11, *post.* In light of the procedural posture of the case, however, all inferences will be drawn, and any residual ambiguities resolved, in favor of the plaintiff. *See Wells–Williams v. Kingsboro Psychiatric Ctr.,* No. 03–CV–134, 2007 WL 1011545, at *2 (E.D.N.Y. Mar. 30, 2007) (citations omitted)

At the times relevant to this proceeding the plaintiff, who was subsequently transferred into the custody of the New York State Department of Correctional Services ("DOCS"), and later released from prison altogether, was an inmate at the Onondaga County Justice Center ("OCJC"), located in Syracuse, NY. Defendant's Local Rule 7 .1(a)(3) Statement (Dkt. No. 44–10) ¶ 8; *see also* Amended Complaint (Dkt. No. 8). On May 30, 2004, while housed at the OCJC, plaintiff and Joseph O'Donnell, another inmate, became involved in a verbal altercation concerning use of the jail phone. Defendant's Local Rule 7.1.(a)(3) Statement (Dkt. No. 44–

10) ¶ 9. As a result of the incident both of the participants in the argument were locked into separate cells, and a "no contact" order was issued for each inmate. *Id.;* Defendant's Motion (Dkt. No. 44) Exh. B.

**\*2**  At or about 11:30 am on the following day Corrections Sergeant LeBeouf, who had arrived to relieve the deputy on duty in the pod for lunch, noted the "locked in" status of the plaintiff and O'Donnell, but briefly unlocked the two inmates' cells in order to allow a steward inmate to retrieve their lunch trays.[3] Defendant's Local Rule 7.1.(a)(3) Statement (Dkt. No. 44–10) ¶ 10; Defendant's Motion (Dkt. No. 44) Exh. C. When the two cells were unlocked, inmate O'Donnell immediately rushed into the plaintiff's cell and punched him. Defendant's Local Rule 7.1.(a)(3) Statement (Dkt. No. 44–10) ¶¶ 11, 13; Defendant's Motion (Dkt. No. 44) Exh. C. Upon witnessing the incident, Corrections Sergeant LeBoeuf signaled a "code orange" alert, indicating the existence of an emergency on the pod. Defendant's Local Rule 7.1.(a)(3) Statement (Dkt. No. 44–10) ¶ 11; Defendant's Motion (Dkt. No. 44) Exh. C. Several corrections workers responded to the "code orange", and the incident was ultimately terminated with the return of inmate O'Donnell to the first floor of the pod, and of the plaintiff to his cell. Defendant's Local Rule 7.1.(a)(3) Statement (Dkt. No. 44–10) ¶¶ 13–14.

[3]     It is apparent from defendant's papers, although not expressly so stated, that the plaintiff has incorrectly spelled that corrections sergeant's name as "LeBeaf". The clerk is hereby requested to adjust his records to reflect the correct spelling of that individual's name as "LeBoeuf."

Shortly following the incident the plaintiff was examined by Mary Beth Ranier, a nurse at the facility. Defendant's Local Rule 7.1.(a)(3) Statement (Dkt. No. 44–10) ¶ 14; Defendant's Motion (Dkt. No. 44) Exhs. C and E (Plaintiff's Medical Records).[4] Upon examination it was determined that plaintiff had suffered a hematoma to his left eye, with "moderate swelling noted." Defendant's Local Rule 7.1.(a)(3) Statement (Dkt. No. 44–10) ¶ 15; Defendant's Motion (Dkt. No. 44) Exh. E. Ice was administered and Motrin 800 prescribed for plaintiff's pain, and Greene was placed on a physician's assistant sick call list for further evaluation. Defendant's Local Rule 7.1. (a)(3) Statement (Dkt. No. 44–10) ¶15; Defendant's Motion (Dkt. No. 44) Exh. E at pp. 4–5.

[4]     Plaintiff's medical records, which were compiled and forwarded to the court in hard copy, have been

filed under seal pursuant to an order issued on October 17, 2007. *See* Dkt. No. 45.

On June 1, 2004, plaintiff was seen by Physician's Assistant ("PA") Sara Austin–Wilson. Defendant's Local Rule 7.1.(a)(3) Statement (Dkt. No. 44–10) ¶ 16. PA Austin–Wilson observed that the area affected by plaintiff's reported injury "puffed up" when he blew his nose, and further noted mild left periorbital ecchymosis and palpable swelling, recommending an outside evaluation to rule out the existence of any fracture. *Id.* ¶ 16; Defendant's Motion (Dkt. No. 44) Exh. E at pp. 4–5.

Plaintiff was transferred later that same day to the Upstate Medical Center emergency room for evaluation. Defendant's Local Rule 7.1(a)(3) Statement ¶ 17. There, Greene was examined by Dr. Peter J. Mariani, and x-rays of his left supraorbital region were taken. *Id.* ¶ 18; Defendant's Motion (Dkt. No. 44) Exh. E at pp. 15–19. As a result of Dr. Mariani's examination and review of plaintiff's x-rays, "[n]o obvious osseous abnormality" was discerned. *Id.* Plaintiff was ultimately discharged from Upstate at approximately 3:00 pm on the following day, and returned to the OCJC. *Id.* ¶ 19; Defendant's Motion (Dkt. No. 44) Exh. E at pp. 11–12. A consultation return form completed at the hospital's emergency room listed a diagnosis of plaintiff's condition as a head injury with an assessment of mild to moderate pain, with no dizziness or blurred vision, and recommended neurological checks quarterly for a twenty-four hour period. *Id.* ¶ 19; Defendant's Motion (Dkt. No. 44) Exh. E at p. 12.

**\*3** Plaintiff was transferred into DOCS custody on June 4, 2004 and initially designated to the Elmira Correctional Facility ("Elmira"). Defendant's Local Rule 7.1.(a)(3) Statement (Dkt. No. 44–10) ¶ 21. Upon that transfer Greene's medical records were transmitted to the DOCS with a note on the cover sheet indicating "Recent Injury to Eye—Punched in Eye—See Report." *Id.* ¶ 22; Defendant's Motion (Dkt. No. 44) Exh. E at p. 3. In his complaint plaintiff asserts that on June 15, 2004, following his transfer into Elmira, he underwent a CAT scan at the Arnot Ogden Medical Center, located in Elmira, New York, revealing a "depressed orbital floor fracture" in his left eye with "associated blood in the left maxillary sinus." Amended Complaint (Dkt. No. 8) Section 6(b) ¶¶ 7–8. Plaintiff subsequently underwent corrective surgery on June 24, 2004 to repair the damage to his left orbital bone, and now alleges that he has a vitallium plate in the floor of his left orbit and suffers from a variety of resulting symptoms, including "scarring, numbness of his left cheek and upper lip area, chronic rhinitus ... and the need now for corrective eye glasses ." *Id.* at ¶ 11.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on March 15, 2005, and later filed an amended complaint—the operative pleading now before the court—on April 25, 2005. [5] Dkt. Nos. 1, 8. In his complaint, as amended, plaintiff asserts that the defendants failed to adequately protect him from harm while incarcerated in the OCJC, and additionally that the corrections and medical officials involved were deliberately indifferent to his medical needs stemming from the incident. Named as defendants in plaintiff's complaint are Onondaga County Sheriff Kevin Walsh, Corrections Sergeant LeBoeuf, Dr. Mark Johnstone, M.D., and a single John Doe defendant.

[5]     While plaintiff applied for and was granted leave to amend his complaint to identify the defendant previously sued only as "Officer John Doe", *see* Dkt. No. 31, he failed to do so, later advising the court in writing that he was opting to proceed based on the earlier-filed amended complaint. *See* Dkt. No. 41.

On October 15, 2007 defendant Walsh, the only one of the named defendants who has been served and appeared in the action, filed a motion seeking summary judgment dismissing plaintiff's complaint or, alternatively, an order precluding the admission of expert medical testimony on plaintiff's behalf at trial. Dkt. No. 44. In his motion, defendant Walsh offers a variety of grounds for dismissal of plaintiff's claims including, *inter alia,* lack of personal involvement, additionally seeking a finding that he is entitled to qualified immunity. Defendant's motion, to which plaintiff has not responded, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). [6] *See also* FED. R. CIV. P. 72(b).

[6]     Defendant's notice of motion contains language advising the plaintiff of the potential consequences of failing to properly oppose the motion, and in that regard generally complies with the requirements of N.D.N.Y. L.R. 56.2.

## III. *DISCUSSION*

A. *Plaintiff's Failure to Oppose Defendant's Motion for Summary Judgment*

2008 WL 4517975

Before turning to the merits of plaintiff's claims, a threshold issue to be addressed is the legal significance, if any, of his failure to oppose defendant's summary judgment motion, and specifically whether that failure automatically entitles the defendant to dismissal of plaintiff's complaint, based upon his motion.

**\*4** This court's rules provide that

> [w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as required by this Rule shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3). Undeniably, *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions. See *Jemzura v. Public Serv. Comm'n, 961 F.Supp. 406, 415 (N.D.N.Y.1997)* (McAvoy, C.J.)). Despite this measure of deference, the failure of an unrepresented plaintiff to oppose a summary judgment motion does not preclude the court from granting the motion. *Robinson v. Delgado, No. 96–CV–169, 1998 WL 278264, at \*2 (N.D.N.Y. May 22, 1998)* (Pooler, J. & Hurd, M.J.); *Cotto v. Senkowski, No. 95–CV–1733, 1998 WL 278264, at \*1 (N.D.N.Y. Oct. 23, 1997)* (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian, 980 F.Supp. 106, 106–07 (N.D.N.Y.1997)* (Pooler, J. & Hurd, M.J.). As can be seen by the face of Local Rule 7.1(b)(3), however, before summary judgment can be granted under such circumstances the court must review the motion to determine whether it is facially meritorious. See *Allen v. Comprehensive Analytical Group, Inc., 140 F.Supp.2d 229, 231–32 (N.D.N.Y.2000)* (Scullin, C.J.); *Leach v. Dufrain, 103 F.Supp.2d 542, 545–46 (N.D.N.Y.2000)* (Kahn, J.).

While a plaintiff's failure to properly oppose a defendant's motion does not assure that the motion, however lacking in merit, will be granted, that failure is not without consequences. By choosing not to submit papers in opposition to his motion, plaintiff has left the facts set forth in defendant's Local Rule 7.1(a)(3) Statement unchallenged. Courts in this

district have routinely invoked Local Rule 7.1(a)(3) and its predecessor, Local Rule 7.1(f), thereby deeming facts set forth in a statement of material facts not in dispute to have been admitted based upon an opposing party's failure to properly respond to that statement.[7] See, e.g., *Elgamil v. Syracuse Univ., No. 99–CV–611, 2000 WL 1264122, at \*1 (N.D.N.Y. Aug. 22, 2000)* (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs., 214 F.3d 275, 292 (2d Cir.2000)* (discussing district courts' discretion to adopt local rules like 7.1(a)(3)). I recommend that the court follow this well-established practice and, notwithstanding plaintiff's *pro se* status, accept defendant's assertion of facts as set forth in his Local Rule 7.1(a)(3) Statement as uncontroverted, in light of plaintiff's failure to respond to that statement, when reviewing the pending motion for facial sufficiency.

7        According to Local Rule 7.1(a)(3), "any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." See N.D.N.Y.L.R. 7.1(a)(3).

### B. Summary Judgment Standard

Summary judgment is governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir.2004)*. A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson, 477 U.S. at 248, 106 S.Ct. at 2510; see also Jeffreys v. City of New York, 426 F.3d 549, 553 (2d Cir.2005)* (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, 477 U.S. at 248, 106 S.Ct. at 2510*. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); but see Vital v. Interfaith Med. Ctr., 168 F.3d 615, 620–21 (2d*

Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*5** When summary judgment is sought, the moving party bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). Summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

### C. *Personal Involvement*

The only defendant appearing to date in this action is Onondaga County Sheriff Kevin Walsh. In his motion, defendant Walsh urges dismissal of plaintiff's claims against him based upon the plaintiff's failure to establish the requisite personal involvement on his part in the constitutional deprivations alleged.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

Neither plaintiff's complaint nor the record now before the court implicates any awareness on the part of, or involvement by, Sheriff Walsh in either the alleged failure to protect or in connection with the medical services provided to the plaintiff following the May 30, 2004 incident. It is true that in his amended complaint, plaintiff does assert that Sheriff Walsh was negligent in training the other defendants in proper procedures regarding keep-lock and work "no contact" procedures. *See* Amended Complaint (Dkt. No. 8), Third Cause of Action. Plaintiff also asserts that defendant Walsh was deliberately indifferent to his needs and "failed to make inquires into the activities of his subordinates." *Id.* § 6(c)(3). Such conclusory allegations, unsupported by anything of evidentiary value, are insufficient to avoid dismissal of civil rights claims on a motion for summary judgment for lack of personal involvement. *See Deluca v. Bank of Tokyo–Mitsubishi UFJ, LTD.,* No. 06 Civ. 5474, 2008 WL 857492, at \*7 (S.D.N.Y. Mar. 31, 2008); *Brown v. Goord,* No. 04–CV–0785, 2007 WL 607396, at \*4 (N.D.N.Y. Feb. 20, 2007) (McAvoy, J.).

**\*6** It appears likely that plaintiff is asserting liability on Sheriff Walsh's part based upon his capacity as the supervisor of the jail facility in which the incident occurred. It is well-established, however, that this does not provide a sufficient basis for finding liability in a case such as this; a supervisor cannot be held liable for damages under section 1983 solely by virtue of being a supervisor—there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. A supervisory official can, however, be liable in one of several ways: 1) the supervisor may have directly participated in the challenged conduct; 2) the supervisor, after learning of the violation through a report or appeal, may have failed to remedy the wrong; 3) the supervisor may have created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) the supervisor may have been grossly negligent in managing the subordinates who caused the unlawful event; or 5) the supervisor may have failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007); *see also Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986).

The record contains no evidence that would support liability on the part of Sheriff Walsh under any of these alternative theories. The actions of Corrections Sergeant LeBoeuf, which form the underpinning of plaintiff's failure to protect claim,

Case 9:19-cv-01527-TJM-TWD    Document 64    Filed 11/09/21    Page 101 of 124
Greene v. Walsh, Not Reported in F.Supp.2d (2008)
2008 WL 4517975

appear to have occurred not pursuant to any established policy or practice at the OCJC, instead at most constituting an isolated act of negligence or lapse in judgment. The alleged failure on the part of medical personnel to properly diagnose plaintiff's injuries, once again, does not appear to have been the result of any policy or practice at the facility leading to the denial or deprivation of proper medical care. Under these circumstances, I recommend the entry of summary judgment dismissing plaintiff's claims against Sheriff Walsh for lack of personal involvement.

### D. *Dismissal of Claims Against Remaining Named Defendants*

In addition to Sheriff Walsh, plaintiff's complaint also asserts claims against Sergeant LeBoeuf and Dr. Mark Johnstone. [8] Neither of these defendants has either been served in the action or appeared voluntarily. Although defendant's motion does not explicitly request this relief, I have *sua sponte* determined to raise the question of whether plaintiff's claims should proceed against the two remaining, unserved defendants.

[8]    Plaintiff has also sued an unknown corrections officer as a "John Doe" defendant. Because plaintiff has failed to take measures necessary to identify and join that individual by his or her correct name, his claim against the Doe defendant is subject to dismissal. As a practical matter, a plaintiff who fails to identify "John Doe" defendants within the statute of limitations risks losing the opportunity to sue those defendants. *See Barrow v. Wethersfield Police Dep't,* 66 F.3d 466, 469 (2d Cir.1995); *Cole v. Miraflor,* No. 99 CIV 0977, 2001 WL 138765, at *4–5 (S.D.N.Y. Feb. 19, 2001).

The decision to raise this issue is bottomed upon the requirement, imposed by Rule 4(m) of the Federal Rules of Civil Procedure, that service in a case be made within 120 days of issuance of the summons, absent a court order extending that period. [9] "[W]here good cause is shown, the court has no choice but to extend the time for service, and the inquiry is ended." *Panaras v. Liquid Carbonic Indus. Corp.,* 94 F.3d 338, 340 (7th Cir.1996). "If, however, good cause does not exist, the court may, in its discretion, either dismiss the action without prejudice or direct that service be effected within a specified time." *Id.* (citing Fed.R.Civ.P. 4(m)); *Zapata v. City of New York,* 502 F.3d 192, 196 (2d Cir.2007)

("[D]istrict courts have discretion to grant extensions even in the absence of good cause."); *Romandette v. Weetabix Co., Inc.,* 807 F.2d 309, 311 (2d Cir.1986). When examining whether to extend the prescribed period for service, a district court is afforded ample discretion to weigh the "overlapping equitable considerations" involved in determining whether good cause exists and whether an extension may be granted in the absence of good cause. *See Zapata,* 502 F.3d at 197.

[9]    That rule provides that

[i]f a defendant is not served within 120 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period....

Fed.R.Civ.P. 4(m). This court's local rules shorten the time for service from the 120 day period under Rule 4(m) to sixty days. *See* N.D.N.Y.L.R. 4.1(b).

**\*7** A plaintiff's *pro se* status entitles him or her to a certain degree of leniency insofar as service of process is concerned; courts generally favor resolution of a case on its merits rather than on the basis of a procedural technicality. *Poulakis v. Amtrak,* 139 F.R.D. 107, 109 (N.D.Ill.1991). When a plaintiff proceeds *in forma pauperis,* such as is the case in this instance, the court is obligated to issue the plaintiff's process to the United States Marshal, who must in turn effect service upon the defendants, thereby relieving the plaintiff of the burden to serve process once reasonable steps have been taken to identify for the court the defendants named in the complaint. *Byrd v. Stone,* 94 F.3d 217, 219 (6th Cir.1996). That does not mean, however, that a *pro se* plaintiff may stand idly by upon being notified that efforts by the U.S. Marshals Service to serve a particular defendant have been unsuccessful. *VanDiver v. Martin,* 304 F.Supp.2d 934, 938–43 (E.D.Mich.2004). In such instances it is incumbent upon the plaintiff to develop, though pretrial discovery or otherwise, any additional information necessary to permit service by the United States Marshals Service. *See VanDiver,* 304 F.Supp.2d at 942.

In this case the two defendants at issue have not been served or otherwise appeared in the action within the appropriate time period. Based upon a review of the record I am unable to find good cause justifying plaintiff's failure to effectuate timely service, and discern no sufficient basis presented to exercise my discretion in favor of extending the governing

period of service. Accordingly, since this court has never acquired jurisdiction over them, plaintiff's complaint should be dismissed as against those defendants, without prejudice. *See, e.g., Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 709 F.Supp. 1279, 1282 (S.D.N.Y.1989) (citing *Mississippi Publishing Corp. v. Murphree,* 326 U.S. 438, 444–45, 66 S.Ct. 242, 245–46, 90 L.Ed. 185 (1946)) (court lacks jurisdiction until defendants properly served with summons and complaint).

## IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's failure to effectuate service and obtain jurisdiction over two of the named defendants, including Corrections Sergeant LeBoeuf and Dr. Mark Johnstone, provide ample basis for dismissal of plaintiff's claims against those defendants, without prejudice. Turning to plaintiff's claims against the sole defendant who has been served and appeared in the action, Onondaga County Sheriff Kevin Walsh, while defendant Walsh has raised several arguments challenging the merits of plaintiff's failure to protect and deliberate indifference claims—and there is considerable facial merit to his arguments regarding those claims—in light of the present posture of the case I find it unnecessary to make a recommendation regarding those arguments or the additional assertion of entitlement to qualified immunity. Neither plaintiff's complaint nor the record before the court discloses any basis for finding personal involvement on the part

of Sheriff Walsh in the constitutional deprivations alleged. Defendant Walsh is therefore entitled to summary judgment dismissing plaintiff's claims against him on this basis, with prejudice.

**\*8** Accordingly, it hereby

RECOMMENDED, that the defendant's motion (Dkt. No. 44) be GRANTED and that plaintiff's claims against defendant Kevin Walsh be DISMISSED, with prejudice, and that his claims against Corrections Sergeant LeBoeuf and Dr. Mark Johnstone additionally be DISMISSED, without prejudice

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within TEN days. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

### All Citations

Not Reported in F.Supp.2d, 2008 WL 4517975

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 2565301
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Joy Eyvonne SOMMERSETT, Plaintiff,

v.

The CITY OF NEW YORK et al., Defendants.

No. 09 Civ. 5916(LTS)(KNF).
|
June 28, 2011.

### MEMORANDUM OPINION AND ORDER

LAURA TAYLOR SWAIN, District Judge.

**\*1**  Joy Eyvonne Sommersett ("Plaintiff"), proceeding *pro se,* brings this action against the City of New York and the New York City Department of Probation ("Probation Department") (collectively, "Defendants"), alleging disparate treatment, failure to promote, and a hostile work environment due to age discrimination and retaliation for having filed previous race- and age-discrimination complaints with the New York State Division of Human Rights ("SDHR") (in 1991 and 2005) and the Equal Employment Opportunity Commission ("EEOC") (in 2005). The claims against Defendants are brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621, *et seq* . ("ADEA"), and the New York State Human Rights Law, N.Y. Exec. L. §§ 290, *et seq.* ("NYSHRL"). The Court has jurisdiction of Plaintiff's federal-law claims pursuant to 28 U.S.C. § 1331, and exercises supplemental jurisdiction of the state-law claims pursuant to 28 U.S.C. § 1367(a).

Defendants urge that all of Plaintiff's claims under Title VII and the ADEA must be dismissed because Plaintiff failed to exhaust her administrative remedies for the acts complained of; that Plaintiff's claims under the NYSHRL are barred by the doctrine of election of remedies; and the complaint should be dismissed in its entirety, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted.

The Court has considered thoroughly the parties' submissions. For the following reasons, Defendants' motion is granted in part and denied in part.

### BACKGROUND

According to the form complaint ("Compl.Form") and the attached exhibit ("Compl. Ex." and, with the Compl. Form, the "Complaint") outlining her Complaint for Employment Discrimination, Plaintiff is an African–American woman (Compl. Form at 1), was born in 1945 (Compl. Form at 3), and has worked for the Probation Department as a probation officer since 1984. (*Id.*) Plaintiff has filed race and age discrimination complaints with administrative agencies against the Probation Department twice, in 1991 and 2005.

*Plaintiff's 1991 Complaint to SDHR*
According to the Recommended Findings of Fact, Opinion and Decision, and Order issued in 2008 by an administrative law judge pursuant to Plaintiff's 2005 complaint ("2005 SDHR Opinion"), Plaintiff had filed a prior complaint ("1991 Admin Complaint") of racial discrimination with the SDHR (2005 SDHR Opinion ¶ 4), regarding an incident in which Arthur Levitt, a "white, Jewish male supervisor," now deceased, allegedly called her a "black bitch" in connection with a dispute over a parking space (Compl. Form at 2). The 1991 Admin Complaint was settled by the parties in 2003. (2005 SDHR Opinion ¶ 5.)

*Plaintiff's 2005 Complaints to SDHR and EEOC*
In 2005, Plaintiff filed a second complaint with the SDHR ("2005 Admin Complaint"), alleging unfair treatment because of her age and race, and retaliation for having filed the 1991 Admin Complaint. (2005 Admin Complaint ¶ 3.) This complaint was also concurrently submitted to the EEOC (*id.,* at 3; *see also* EEOC Letter to Department of Probation), and was amended in 2006 ("Amended Admin Complaint") to include additional allegations (*see generally* Amended Admin Complaint).

**\*2**  In April 2008, following an investigation by the SDHR, an administrative law judge made a recommendation that all of Plaintiff's discrimination claims be dismissed. In June 2008, this recommendation was adopted in its entirety by the SDHR in a Notice and Final Order. In March 2009, the EEOC issued a letter to Plaintiff ("EEOC Right–to–Sue Letter"), notifying her that the Commission had adopted the SDHR's

Case 9:19-cv-01527-TJM-TWD   Document 64   Filed 11/09/21   Page 104 of 124
Sommersett v. City of New York, Not Reported in F.Supp.2d (2011)
2011 WL 2565301

findings and dismissed the Amended Admin Complaint, and that Plaintiff was entitled to file a lawsuit in federal or state court based on those Title VII and ADEA claims which had been raised in her administrative complaint.

*Filing and Factual Background of Plaintiffs' Instant Claims*
In the instant suit, Plaintiff complains primarily of numerous incidents that allegedly occurred subsequent to her 2005 Admin Complaint, in which her superiors and co-workers at the Department of Probation allegedly treated her improperly due to age discrimination, or in retaliation for her previous discrimination complaints, or both. In her Complaint, she states that the alleged discriminatory acts occurred on "1/1/08 —present. (additionally, the past 25 years)." (Compl. Form ¶ IIB.) However, the Complaint identifies only post–2007 events.

In the Exhibit to the Complaint, Plaintiff alleges that, in December 2008, she was falsely accused of mishandling a probation case in a manner which led to the deaths of three people. (Compl.Ex. ¶¶ 2–4.) As a result, Plaintiff was suspended (*id.* at 2); placed on probation (*id.*); and transferred to an assignment in Queens which was distant from her home in the Bronx, and which required her to perform "high-risk" duties (*id.* ¶¶ 9–11). Plaintiff further alleges, generally, that this transfer was part of a pattern in which employees were terminated in retaliation for filing complaints against the Probation Department (*id.* ¶ 1), and older probation officers with health problems were deliberately given assignments that were "inconvenient or risky because of their health" in order to encourage them to resign (*id.* ¶ 24), or were otherwise transferred to high-risk duties "as a punitive measure" (*id.* ¶ 32).

Plaintiff also complains that the Probation Department wrongfully failed to promote her (*id.* ¶ 25), that multiple supervisors have given her undeserved reprimands (*id.* ¶¶ 6, 17–18), that she was not evaluated properly immediately after the transfer to Queens (*id.* ¶¶ 8–10, 13), and that superiors have manipulated her working conditions in various ways in order to hamper her successful job performance—e.g., failing to provide her with proper duty instructions (*id.* ¶ 11), training (*id.* ¶ 29), case documentation (*id.* ¶ 12), field partners (*id.* ¶¶ 14–16), and computer equipment (*id.* ¶ 20)—while also sending her to unnecessary training sessions which took away from time needed to manage her workload (*id.* ¶¶ 19, 28).

*3 Additionally, Plaintiff alleges that several incidents which occurred both before and after her 2005 Admin

Complaint demonstrate hostility towards her based on her age and prior discrimination complaints—including a comment by a supervisor indicating that the Department was "just waiting for [Plaintiff] to retire" (*id.* ¶ 8); a supervisor's complaint about the cost of having to appear in court pursuant to Plaintiff's prior discrimination case (*id.* ¶ 27); comments by unspecified employees calling her a "troublemaker" following her complaints (*id.* ¶ 23); and loud statements by a supervisor that a discrimination complaint had been filed and a comment by the same supervisor that "[W]e have to get [Plaintiff]" (*id.* ¶ 22).

Finally, Plaintiff complains of a number of other incidents involving negative treatment by co-workers or superiors. She alleges that she frequently suffered "unprofessional and verbally abusive" treatment when meeting with a branch chief (Compl.Ex.¶ 5); and that she was: cursed at by a supervisor (*id.* ¶ 7); falsely accused of referring probationers to the wrong employment programs (*id.* ¶ 17); incorrectly criticized for the wording of one of her reports (*id.* ¶ 18); inappropriately questioned as to the contents of a bag containing personal items (*id.* ¶ 18); repeatedly told by a branch chief that "[i]f [he] didn't want [Plaintiff] to work here, [she] would not be here" (*id.*); targeted with glares and angry faces (*id.* ¶ 22); avoided by supervisors in the hallways (*id.*); criticized in front of others by a supervisor who said that "[Plaintiff] didn't do anything for five years" and ignored when she complained about this incident to the departmental EEO office (*id.* ¶ 26); harassed with false accusations of failing to read office emails, and told "in a loud harsh manner before staff in the immediate area" that she needed to attend computer training (*id.* ¶ 28); ignored by a supervisor who would avoid eye contact, frown, and mutter whenever Plaintiff asked a question; told not to "open[ ] up a can of worms" by filing reports of potential child abuse by probationers (*id.* ¶ 31); and forced to miss a doctor's appointment in order to avoid being disciplined (*id.* ¶ 33).

*DISCUSSION*

In deciding a Rule 12(b)(6) motion to dismiss, the Court accepts as true the non-conclusory factual allegations in the complaint and draws all reasonable inferences in the plaintiffs favor. *Roth v. Jennings,* 489 F.3d 499, 501 (2d Cir.2007); *see also Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009). In adjudicating the motion, the Court may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in [the complaint] by

reference." *Rothman v. Gregor,* 220 F.3d 81, 89 (2d Cir.2000). Furthermore, "where a *pro se* plaintiff has submitted other papers to the Court, such as legal memoranda, the Court may consider statements in such papers to supplement or clarify the plaintiff's pleaded allegations." *Milano v. Astrue,* No. 05 Civ. 6527(KMW)(DF), 2007 WL 2668511, at \*2 (S.D.N.Y. Sept. 7, 2007) (Freeman, M.J.) (collecting cases).

**\*4** With respect to the pleading standards of Rule 8, "[t]o survive a motion to dismiss, a. complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal,* 129 S.Ct. at 1949. This plausibility standard does not amount to a "probability requirement," but it calls for more than a "sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks and citation omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between plausibility and plausibility of entitlement to relief." *Id.* (internal quotation marks and citation omitted). "[A] complaint need not establish a *prima facie* case of employment discrimination to survive a motion to dismiss; however, the claim must be facially plausible and must give fair notice to the defendants of the basis for the claim," *Barbosa v. Continuum Health Partners, Inc.,* No. 09 Civ. 6572(SAS), 2010 WL 768888, at \*3 (S.D.N.Y. Mar. 8, 2010) (internal quotation marks omitted).

"A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers[.]" *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (internal quotation marks and citations omitted); *see also Boykin v. KeyCorp,* 521 F.3d 202, 213–14 (2d Cir.2008). Such a complaint should be interpreted to raise the strongest arguments that it suggests, *Weixel v. Bd of Educ.,* 287 F.3d 138, 145–46 (2d Cir.2002), although it is not appropriate to assume that a plaintiff can prove facts or establish claims that she has not alleged in the complaint. *Assoc. Gen. Contractors of Cal. Inc. v. Cal. State Council of Carpenter,* 459 U.S. 519, 526 (1983).

*Administrative Exhaustion of Title VII and ADEA Claims*
Before seeking redress in federal court under Title VII or the ADEA for alleged instances of employment discrimination, a plaintiff must first address the alleged discrimination in a timely complaint to the EEOC or a state agency with equivalent authority. *See* 42 U.S.C, § 2000e–5(e) (Title VII); 29 U.S.C. §§ 626(d), 633(b) (ADEA). Defendants argue that Plaintiff's Complaint, which does not assert any of the claims

specifically described in Plaintiff's administrative complaints, must be dismissed as unexhausted to the extent Plaintiff seeks to pursue Title VII and ADEA claims.

The Second Circuit recognizes an exception to this "exhaustion" requirement where a plaintiff's claims in a discrimination suit are "reasonably related" to the allegations raised in her prior EEOC complaint, since allowing such a suit to be brought would not frustrate the statutory purpose of preserving an opportunity for administrative investigation, mediation, and redress of the complaint. *Butts v. New York Dep't of Hous. Preservation & Dev.,* 990 F.2d 1397, 1401–02 (2d Cir.1993). For the purposes of this exception, a claim is deemed to be "reasonably related" to a prior EEOC complaint (1) "where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination;" (2) where the claim alleges "retaliation by an employer against an employee for filing an EEOC charge;" or (3) where the claim "alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." *Id.* at 1402–03. These exceptions apply with equal force to claims brought under the ADEA, whose exhaustion requirement is identical to that of Title VII. *Terry v. Ashcroft,* 336 F.3d 128, 151 (2d Cir.2003). The first of these exceptions is inapplicable to conduct which takes place after the EEOC has completed its investigation. *Perez,* 2009 WL 3634038 at \*16.

**\*5** None of the conduct alleged in the Complaint was addressed in Plaintiff's previous administrative complaints. Thus, Plaintiff's claims under the ADEA and Title VII may proceed only to the extent they are reasonably related to the 2005 administrative complaints on the basis of which her EEOC Right–to–Sue Letter was granted.

None of the post–2007 conduct specifically alleged in the current Complaint would have fallen within the scope of an EEOC investigation that would have grown out of the 2005 administrative complaints, nor does any of the conduct described in the Complaint constitute discrimination allegedly carried out in precisely the same manner alleged in the EEOC charge. Accordingly, to the extent Plaintiff seeks to pursue the instant claims as ones of age- or other non-retaliation based disparate treatment or hostile work environment under ADEA or Title VII based on post–2007 conduct the Complaint must be dismissed as unexhausted. Plaintiff's allegations of retaliation suffice, however, to frame the requisite reasonable relationship with the year 2005 administrative complaints.

Case 9:19-cv-01527-TJM-TWD    Document 64    Filed 11/09/21    Page 106 of 124
Sommersett v. City of New York, Not Reported in F.Supp.2d (2011)
2011 WL 2565301

*Preclusion of Certain Claims Brought Under the NYSHRL*
In contrast with the federal statutes addressing employment discrimination, which require that plaintiffs *exhaust* their administrative remedies before filing suit, equivalent employment discrimination claims under New York state law are subject to an administrative *preclusion* rule, under which a party who has pursued an administrative complaint of discrimination with a state agency forfeits the right to sue upon the same claims. N.Y. Exec. Law § 297(9) (McKinney Supp.2011). The statutory preclusion rule does not, however, bar NYSHRL lawsuits based on claims that the state agency dismissed as untimely. *Id.*

Plaintiff is barred from pursuing her NYSHRL claims in this action to the extent the claims were raised in her 2005 administrative complaints, except any claims relating to the period prior to December 12, 2004, which were dismissed by the SDHR as untimely. [1] Plaintiff's NYSHRL claims regarding post–2007 conduct were not raised with the SDHR and thus are not precluded by the prior administrative proceedings.

[1]  As noted above, the Complaint in this action refers specifically only to post–2007 events.

*Whether Plaintiff's Remaining Claims are Plead Sufficiently*
Although Plaintiff need not allege facts sufficient to make out a *prima facie* case for any of her discrimination claims in her Complaint, the elements thereof provide an outline of what is necessary to render her claims for relief plausible. The same analysis is generally applied to claims brought under Title VII and the ADEA alleging disparate treatment, *Smith v. Xerox Corp.,* 196 F.3d 358, 367 (2d Cir.1999), a hostile work environment, *Brennan v. Metropolitan Opera Ass'n,* 192 F.3d 310, 318 (2d Cir.1999), or retaliation, *Manzi v. DiCarlo,* 62 F.Supp.2d 780, 793–94 (E.D.N .Y.1999). Furthermore, "claims under the NYSHRL are analyzed identically to claims under the ADEA and Title VII," and thus "the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under the ADEA and Title VII." *Smith,* 196 F.3d at 363 n. 1. Consequently, the Court will only discuss Plaintiff's federal and state claims separately where the distinct administrative and procedural requirements of the respective statutes differ.

**\*6** A plaintiff alleging disparate treatment discrimination must establish a *prima facie* case by showing "(1) she

was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Leibowitz v. Cornell Univ.,* 584 F.3d 487, 498 (2d Cir.2009). Where the complaint alleges a failure to promote, the plaintiff must ultimately show that "1) she is a member of a protected class; 2) her job performance was satisfactory; 3) she applied for and was denied promotion to a position for which she was qualified; and 4) the position remained open and the employer continued to seek applicants." *Cruz v. Coach Stores, Inc.,* 202 F.3cl 560, 565 (2d Cir.2000) (internal quotation marks omitted).

Title VII also makes it unlawful for an employer "to discriminate against ... any individual ... because he has ... made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title." 42 U.S.C. § 2000e–3(a). The ADEA includes a nearly identical anti-retaliation provision. 29 U.S.C. § 623(d); *see also Manzi,* 62 F.Supp.2d at 793–94. In order to prove a *prima facie* case of retaliation, a plaintiff must show that "(1) the employee was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action." *Gregory,* 243 F.3d at 700 (internal quotation marks omitted).

*Disparate Treatment*
As Plaintiff's federal disparate treatment claims are barred as unexhausted, Plaintiff's only remaining disparate treatment claim is the NYSHRL claim. Determining what constitutes an "adverse employment action" for the purposes of a discrimination claim requires a careful case-by-case analysis. *Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 466 (2d Cir.1997). In general,

> [a] plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might

be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.

*Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (alteration in original) (internal quotation marks and citations omitted). However, while a court must carefully consider the unique circumstances of each claim, employment-discrimination laws are not intended to establish a "general civility code for the American workplace." *See Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 80 (1998) (discussing Title VII). Mere unfair criticism or reprimands unaccompanied by more serious results, such as probation or a decrease in pay, cannot by themselves support a discrimination claim. *Bennett v. Watson Wyatt & Co.,* 136 F.Supp.2d 236, 248 (S.D.N.Y.2001).

**\*7** Plaintiff alleges in her Complaint and/or proffers in her opposition papers that she was wrongfully suspended; placed on probation; and transferred to a distant assignment which required a four-hour commute and involved high-risk duties. Plaintiff additionally alleges that she applied for a promotion twice by taking a civil service exam designed for that purpose, but was not promoted; although she does not state whether she passed the exam, she does allege that other probation officers achieved or retained the same or higher positions despite failing the same exam multiple times. Plaintiff further points to incidents suggesting discriminatory animus on the part of at least one supervisor, and alleges a systematic pattern of concerted ill-treatment of older Probation Department employees intended to encourage their resignation. Taken together, these allegations suffice minimally, when read liberally and in the light most favorable to Plaintiff, to state a claim of unlawful age-based discriminatory treatment with respect to her allegations of wrongful suspension, probation status, transfer, and failure to promote, with which Plaintiff may proceed under the NYSHRL.

*Retaliation*

By contrast, a plaintiff alleging retaliation against protected activity need only show that her employer's actions were "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 57 (2006). For example, a shift in job responsibility involving an increased emphasis on "more arduous" duties might be considered adverse by a trier of fact, even where those duties are included in the plaintiff's job description. *Id.* at 70–71. This relaxed requirement is equally applicable to retaliation claims brought under the ADEA. *Boland v. Town of Newington,* 304 F. App'x 7, 9 (2d Cir.2008).

In addition to allegations of discriminatory animus, Plaintiff also refers to several incidents which raise a plausible, albeit barely, inference of retaliatory animus on the part of her co-workers and several supervisors, including one incident—a vocal expression of apparent intent, on the part of a supervisor, to retaliate against Plaintiff due to her administrative complaint—which clearly suggests a direct causal connection between the alleged animus and abusive conduct. Her allegations of retaliatory conduct include allegations of conduct that, when read liberally and in the light most favorable to her, could have deterred a reasonable employee from filing a discrimination complaint (e.g., wrongful demotion to probationary status, transfer to more arduous duty with significantly increased travel time, failure to provide necessary training). Plaintiff has thus pleaded sufficiently her Title VII, ADEA and NYSHRL retaliatory discriminatory treatment claims.

*Hostile Work Environment Claim*

A plaintiff's civil rights are violated where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris,* 510 U.S. at 21 (internal quotation marks and citations omitted).

**\*8** [W]hether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the

2011 WL 2565301

employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required.

*Id.* at 23.

The Court finds that Plaintiff's allegations are sufficient, at this pleading stage, to state a claim for age- or retaliation-based hostile work environment. However, insofar as it is premised upon age discrimination rather than retaliation, Plaintiff's claim of a hostile work environment may only proceed under the NYSHRL, as the conduct alleged was neither addressed in, nor reasonably related to, her prior complaint to the EEOC.

*CONCLUSION*

For the foregoing reasons, Defendants' motion to dismiss the Complaint is granted to the extent noted above. The case will go forward with respect to Plaintiff's retaliation claims under the ADEA and Title VII and her NYSHRL age- and retaliation-based disparate treatment and hostile work environment claims.

This Memorandum Opinion and Order resolves docket entry no. 9.

This matter continues to be referred to Magistrate Judge Fox for general pretrial management purposes.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 2565301

---

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5339151

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by  Montgomery v. Town of Colonie,  N.D.N.Y.,  October 30, 2017

2013 WL 5339151
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Emanuel M. BROOKS, Plaintiff,

v.

Correction Officer K. JACKSON, et al., Defendants.

No. 11 Civ. 6627(JMF).
|
Sept. 23, 2013.

OPINION AND ORDER

JESSE M. FURMAN, District Judge.

**\*1**  Plaintiff Emanuel M. Brooks, a state prisoner proceeding *pro se,* brings this action pursuant to Title 42, United States Code, Section 1983, claiming violations of his constitutional rights during his incarceration at Sing Sing Correctional Facility ("Sing Sing") and Attica Correctional Facility ("Attica"). He also brings a claim pursuant to the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.* Brooks sues Correctional Officers K. Jackson, M. Darden (incorrectly identified as "Darken" in the Amended Complaint), D. McCurdy, and B. Carver—all current and former employees of the New York State Department of Correctional Services ("DOCS")—in their individual and official capacities. [1] He also names DOCS as a defendant in his opposition papers. (Opp'n 15 (Docket No. 56)). Defendants move to dismiss the Complaint in its entirety pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons discussed below, Defendants' motion is GRANTED in part and DENIED in part.

[1]     Brooks also names Correctional Officer Tomson as a Defendant in the Amended Complaint, but there is no record that he has served Tomson.

BACKGROUND

Although Brooks is presently incarcerated at Clinton Correctional Facility, his allegations relate to his previous incarceration at Sing Sing and Attica. In particular, most concern an alleged incident with Officer Jackson at Sing Sing on or about April 17, 2009. [2]  According to Brooks, Officer Jackson questioned him in the C Gallery of Building 5 as to what he had in his pants. She also told him to lift his pant-legs and open the crotch area of his pants, and conducted two pat-and-frisks on him—at least one of which (and perhaps both of which, as the record is not clear) occurred after he had informed her that he was Muslim and preferred to be searched by a male officer. (Am. Compl. § II.A (Docket No. 24); Opp'n 9). Brooks alleges that Officer Jackson later called him to her office, ordered him against the wall, and sexually and physically abused him. (Opp'n 9–10; Am. Compl. § II.A). Specifically, Brooks alleges that Officer Jackson hit him in his groin, grabbed and pulled his genitals, and put her finger in his anus. (Am.Compl. § III). After Brooks asked Officer Jackson for her name, Brooks claims that she told him not to tell anyone about the incident and threatened to "get" him if he reported her. (Opp'n 10). Nevertheless, he returned to his cell and filed a grievance against her. (*Id.*)

[2]     At one point in his original Complaint, Brooks identifies the date as May 17, 2009. (Compl. § III (Docket No. 2)).

Brooks claims that, later the same day, in retaliation for the grievance he had filed against Officer Jackson, three officers—Defendant Officers McCurdy and Darden, as well as another unidentified individual—assaulted, threatened, and harassed him. (Am. Compl. § II.C–D; Opp'n 12). Brooks claims that this incident caused him physical and emotional injuries, including two lumps on his back and chronic pain in his upper and lower back and neck. (*Id.* § III). He further alleges that he did not receive adequate medical attention for this incident or for the incident with Officer Jackson. (*Id.* § II.D). He also asserts that he has not received adequate mental health care at Attica. (Am.Compl. § V).

**\*2**  On or about April 23, 2009, Officer Jackson filed a misbehavior report against Brooks, alleging that Brooks stared at Officer Jackson through a mirror, exposed himself, and masturbated. (Opp'n 11, 33–36). Brooks contends that this incident never took place and that the misbehavior report defamed his character. (*Id.* at 11; Am. Compl. § II.D). A

2013 WL 5339151

disciplinary hearing stemming from the allegations contained in the report was held on May 19, 2009. (Opp'n 33). Brooks alleges that at that hearing, Hearing Officer Carver violated his due process rights. (Opp'n 13, 33–35). In particular, he states that Officer Carver denied him the opportunity to call witnesses, failed to conduct an adequate mental health capacity assessment, and did not hold the hearing within fourteen days of the filing of the misbehavior report as required. (*Id.*). As a result of the hearing, Brooks was placed in keeplock, where he was allegedly held in an unsanitary cell and denied food and showers. (Am. Compl. § II.D; Opp'n 14). Brooks also claims that on an unspecified date, some of his personal property, including books, family pictures, and letters, was destroyed. (Am.Compl.§ II.D). Finally, Brooks claims that Officers Carver and Jackson conspired to retaliate and discriminate against him. (*Id.* § II.D).

Brooks seeks $5,000,000 in damages to compensate for his physical and emotional injuries. (*Id.* § V). He also seeks to be transferred to Sing Sing to receive certain unspecified mental health treatment. (*Id.*).

### STANDARD OF REVIEW

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See, e.g., Holmes v. Grubman,* 568 F.3d 329, 335 (2d Cir.2009). To survive a Rule 12(b)(6) motion, however, the plaintiff must plead sufficient facts "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. Further, if the plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570.

Plaintiff here is proceeding *pro se.* Accordingly, his submission must be held "to less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (internal quotation marks omitted); *see also Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009) (stating that a court must "construe a *pro se* complaint liberally"). Nevertheless, *pro se* plaintiffs are not excused from the normal rules of pleading, and "dismissal under Rule 12(b)(6) is proper if the complaint lacks an allegation regarding an element necessary to obtain relief." *Geldzahler v. N.Y. Med. Coll.,* 663 F.Supp.2d 379, 387 (S.D.N.Y.2009) (internal quotation marks and alteration omitted). In other words, the " 'duty to liberally construe a plaintiff's complaint [is not] the equivalent of a duty to re-write it.' " *Id.* (alteration in original) (internal quotation marks omitted).

**\*3** Generally, in considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), courts are limited to the facts alleged in the complaint and are required to accept these facts as true. *See, e.g., LaFaro v. N.Y. Cardiothoracic Grp., PLLC,* 570 F.3d 471, 475 (2d Cir.2009); *Newman & Schwartz v. Asplundh Tree Expert Co.,* 102 F.3d 660, 662 (2d Cir.1996). A court may, however, consider documents attached to the complaint, statements or documents incorporated into the complaint by reference, matters of which judicial notice may be taken, public records, and documents that the plaintiff either possessed or knew about, and relied upon, in bringing the suit. *See, e.g., Kleinman v. Elan Corp., plc,* 706 F.3d 145, 152 (2d Cir.2013); *see also Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (applying rule to district courts). In addition, because a *pro se* plaintiff's allegations must be construed liberally, it is appropriate for a court to consider factual allegations made in a *pro se* plaintiff's opposition memorandum, as long as the allegations are consistent with the complaint. *See, e.g., Braxton v. Nichols,* No. 08 Civ. 08568(PGG), 2010 WL 1010001, at \*1 (S.D.N.Y. Mar.18, 2010); *cf. Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering a *pro se* plaintiff's affidavit in opposition to a motion to dismiss in addition to those in the complaint).

### DISCUSSION

Liberally construed, Brooks's Amended Complaint includes a veritable potpourri of claims against different combinations of Defendants, including claims under the Eighth Amendment, a claim of First Amendment retaliation, due process claims, defamation and defamation-type claims, conspiracy claims, and religious free exercise claims under both the First

Amendment and RLUIPA. The moving Defendants (that is, all Defendants other than Officer Tomson, who has not appeared in this action) contend that each claim fails as a matter of law.[3] The Court will address each set of claims in turn.

[3]    Defendants also argue that Brooks's claims should be dismissed for failure to exhaust administrative remedies. (Mem. Law Supp. Defs.' Mot. Dismiss Am. Compl. 5–7 (Docket No. 45); Hale Decl. ¶¶ 7– 8 & Ex.A (Docket No. 46)). The failure to exhaust is an affirmative defense, however, which may be raised on a motion to dismiss only where the defense "appears on the face of the complaint." *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d Cir.1998). Because it is not clear from the face of Brooks's Amended Complaint that he failed to exhaust his administrative remedies, and because Brooks plausibly alleges that at least some Defendants—namely, Officers Jackson, McCurdy, and Darden—engaged in conduct that may estop them from raising the defense of nonexhaustion, *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004) (holding defendants may be estopped from arguing non-exhaustion when "[their] own actions inhibit[ ] the inmate's exhaustion of remedies"), the Court concludes that dismissal on this basis is not warranted at this stage. As discussed below, however, the Court converts Defendants' motion to dismiss for failure to exhaust to a motion for summary judgment with respect to the due process claim asserted against Officer Carver, and dismisses that one claim under the summary judgment standard.

**A. Eleventh Amendment Immunity**

As an initial matter, Brooks has sued all individual Defendants in both their official and individual capacities, seeking both injunctive relief and monetary damages. (Am.Compl.1, § V). He also names DOCS as a defendant in his opposition papers. (Opp'n 15). It is well established that, absent abrogation by Congress, a state is immune from suit in federal court. *See Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 54– 56, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). This sovereign immunity extends to "arms of the state," including agencies such as DOCS. *Morgan v. N.Y.S. Atty. Gen. Office,* No. 11 Civ. 9389(PKC), 2013 WL 491525, at *11 (S.D.N.Y. Feb.8, 2013); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 70, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Congress

has not abrogated states' sovereign immunity with respect to claims brought under Section 1983, *see Quern v. Jordan,* 440 U.S. 332, 340–42, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), nor has it done so with respect to claims brought under RLUIPA, *see Sossamon v. Texas,* —— U.S. ——, ——, 131 S.Ct. 1651, 1658, 179 L.Ed.2d 700 (2011). Further, a state officer may not be sued for damages in his official capacity under Section 1983 because he is not considered a "person" within the meaning of the statute. *See Reynolds v. Barrett,* 685 F.3d 193, 204 (2d Cir.2012); *see also Koehl v. Dalsheim,* 85 F.3d 86, 88–89 (2d Cir.1996) (holding that a Section 1983 suit for money damages against a state official in his official capacity was barred by sovereign immunity). Thus, Brooks's claims against DOCS and his claims seeking monetary damages against the individual Defendants in their official capacities are dismissed with prejudice.

**B. Eighth Amendment Claims**

**\*4** Section 1983 provides a civil cause of action against a person who, acting under the color of state law, deprives another person of any of the rights, privileges, or immunities secured by the Constitution or laws of the United States. *See* 42 U.S.C. § 1983; *Cornejo v. Bell,* 592 F.3d 121, 127 (2d Cir.2010). Brooks's Amended Complaint, liberally construed, suggests four possible violations by Defendants of the Eighth Amendment's prohibition on cruel and unusual punishment. First, Brooks claims that, on or about April 17, 2009, Officer Jackson sexually and physically abused him during a pat-and-frisk. (Am.Compl.§§ II.A, III). Second, Brooks contends that, shortly thereafter, Officers McCurdy and Darden physically assaulted him. (Am.Compl.§ II.C). Third, Brooks's papers suggest an Eighth Amendment violation based on the alleged conditions of his confinement while he was in keeplock. (Am. Compl. § II.D; Opp'n 14). Fourth, Brooks alleges that he did not receive adequate medical attention for the injuries he sustained from the assaults by Officers Jackson, McCurdy, and Darden, and that he has failed to receive adequate mental health treatment (Am. Compl. §§ II.D, III; Opp'n 11).

In order to successfully make out any Eighth Amendment claim, a prisoner must satisfy a two-part test, composed of an objective and subjective element. *See, e.g., Jabbar v. Fischer,* 683 F.3d 54, 57 (2d Cir.2012). Objectively, the conduct at issue, evaluated "in light of contemporary standards of decency," *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (internal quotation marks omitted), must be "sufficiently serious ... to reach constitutional dimensions," *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993) (internal quotation marks omitted). The subjective element requires the prison

2013 WL 5339151

official accused of violating the Eighth Amendment to have possessed a "wanton state of mind" in carrying out the conduct at issue. *Branham v. Meachum,* 77 F.3d 626, 630 (2d Cir.1996) (internal quotation marks omitted).

### 1. The Pat–and–Frisk Incident with Officer Jackson

Brooks alleges that, on April 17, 2009, Officer Jackson hit him in his groin, grabbed and pulled his genitals, and put her finger in his anus, resulting in severe pain to his groin, as well as emotional injuries. (Am.Compl.§ III). Liberally construed, these allegations raise an Eighth Amendment claim based on excessive force, where the "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins v. Gaddy,* 559 U.S. 34, 37, 130 S.Ct. 1175, 175 L.Ed.2d 995 (2010) (internal quotation marks omitted); *accord Wright,* 554 F.3d at 268. Here, there is no indication that Officer Jackson's alleged use of force was for disciplinary purposes; Brooks alleges that she assaulted him for no particular reason. Such claims, if true, could indeed constitute a malicious and sadistic use of force, which would satisfy both the objective and subjective elements of the test. *See, e.g., Wright,* 554 F.3d at 268–69 ("[W]hen prison officials use force to cause harm maliciously and sadistically, contemporary standards of decency always are violated." (internal quotation marks omitted)); *Sims v. Artuz,* 230 F.3d 14, 21–22 (2d Cir.2000) ("The malicious use of force to cause harm constitutes an Eighth Amendment violation *per se.*" (brackets omitted)). Additionally, because Brooks alleges physical as well as emotional injury from this assault, he would be entitled to recover compensatory damages for both types of injury. *See Thompson v. Carter,* 284 F.3d 411, 417 (2d Cir.2002) (holding that 42 U.S.C. § 1997e(e), which, in certain circumstances, bars prisoners from recovering from mental or emotional injuries, does not apply where there is a "showing of actual physical injury"). Defendants' motion to dismiss is therefore denied with regard to Officer Jackson's alleged assault.

### 2. The Assault by Officers McCurdy and Darden

**\*5** Brooks alleges that, later the same day, Officers McCurdy, Darden, and another unidentified individual assaulted him. (Am. Compl. § II.C; Opp'n 12). In particular, he alleges that Officer Darden first came to his cell and began to verbally harass him. (Opp'n 12.) He states that two more officers, including Officer McCurdy, then came to his cell and joined in the verbal harassment. (*Id.*) Brooks alleges that afterwards, while he was being escorted to the prison's

mental health facility, the three officers who had been verbally harassing him approached him and punched him in the back of his head, neck, and back, while the officer who was escorting him walked away. (*Id.*) As a result of this assault, Brooks alleges, he developed permanent lumps on, and severe pain in, his back and neck. (Am.Compl.§ III).

These allegations also state an Eighth Amendment claim for excessive force. As discussed above, Eighth Amendment claims based on the excessive use of force turn on "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Wilkins,* 559 U.S. at 37 (internal quotation marks omitted). As with the alleged incident with Officer Brooks, there is no indication that Officers Darden and McCurdy were using force for any disciplinary purposes; according to Brooks, they did so in response to Brooks "fucking with C.O. Jackson." (Opp'n 12). Brooks has pleaded sufficient facts to state a claim of use of excessive force by Officers McCurdy and Darden, and Defendants' motion to dismiss this claim is therefore also denied. Again, if proved true, Brooks would be entitled to recover for both his physical and emotional injuries stemming from this incident. *See Thompson,* 284 F.3d at 417.

### 3. Conditions of Confinement

Next, Brooks alleges that, while in keeplock, he was denied food trays, showers, and medical attention (Am.Compl.§ II.D), and was placed in a cell without a mattress, with a clogged toilet and sink, with a light bulb that blinked on and off, and with urine, feces, and blood on the floor. (Opp'n 14). As with any other Eighth Amendment claim, a conditions-ofconfinement claim requires the prisoner to satisfy the objective and subjective prongs of the two-part test. In the conditions-of-confinement context, that means that "(1) objectively, the deprivation the inmate suffered [must have been] sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) subjectively, the defendant official [must have] acted with a sufficiently culpable state of mind, such as deliberate indifference to inmate health or safety." *Walker v. Schult,* 717 F.3d 119, 125 (2d Cir.2013) (alteration and internal quotation marks omitted).

The conditions that Brooks alleges are arguably sufficiently serious to satisfy the objective prong of the Eighth Amendment analysis. *See id.* at 127 (noting that "unsanitary conditions in a prison cell can, in egregious circumstances, rise to the level of cruel and unusual punishment"); *Robles v. Coughlin,* 725 F.3d 12, 15 (2d Cir.1983) ("[U]nder

2013 WL 5339151

certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension."). Nevertheless, Brooks fails to allege deliberate indifference on the part of any moving Defendant. Deliberate indifference requires the prisoner to allege that the official "knows of and disregards an excessive risk to inmate health or safety." *Phelps v. Kapnolas,* 308 F.3d 180, 185–86 (2d Cir.2002). The only prison official alleged to have known of Brooks's conditions of confinement, however, is Officer Tomson (Am.Compl.§ II.D), and he has not appeared in this action. Accordingly, all of Brooks's Eighth Amendment conditions-ofconfinement claims against the moving Defendants are dismissed.

### 4. The Denial of Medical Treatment

**\*6** Finally, Brooks claims that he did not receive adequate medical attention for the injuries he sustained from the sexual assault by Officer Jackson and the physical assault by Officers McCurdy and Darden. (Am.Compl.§ III). Liberally construed, his papers also suggest a claim that he has been denied adequate mental health care treatment. (Am. Compl. § II.D; Opp'n 11).

To establish an Eighth Amendment violation for inadequate medical care, a prisoner must make a showing of "deliberate indifference to his serious medical needs," *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), which also involves a two-part objective and subjective test. The first, objective prong asks (1) whether the prisoner " 'was actually deprived of adequate medical care,' keeping in mind that only 'reasonable care' is required," and (2) " 'whether the inadequacy in medical care is sufficiently serious' by examining 'how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner.' " *Sledge v. Fein,* No. 11 Civ. 7450(PKC), 2013 WL 1288183, at \*5 (S.D.N.Y. Mar.28, 2013) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). The second, subjective prong requires the plaintiff to establish that the defendant acted with "a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280.

Here, Brooks's complaint lacks the detail necessary to establish a plausible deliberate indifference claim with respect to either his physical or mental health. Brooks alleges that he suffered chronic pain in his groin, neck, and back, and that the "[D]epartment of Correction[s][was] not giving [him] the adequate medical attention [he] need[ed]." (Am.Comp. § III). Although a prisoner's chronic pain may be sufficiently

serious to support an Eighth Amendment claim, *see Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003), Brooks fails to allege how the treatment he received was inadequate. Brooks admits that he was provided pain medication; he merely asserts, without elaboration, that this treatment was insufficient. (Am.Comp. § III). Such allegations do not give rise to a legal claim. *See Joyner v. Greiner,* 195 F.Supp.2d 500, 504 (S.D.N.Y.2002) ("It is well established that a difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference."); *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998) ("So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."). Brooks does not explain why the pain medication he was provided was not satisfactory, what alternate treatment he would have preferred, or how such alternate treatment was necessary. With respect to the allegedly inadequate mental health care treatment, Brooks's papers are similarly devoid of any details regarding what mental illness afflicts him or what type of treatment he requires. His claims regarding the denial of medical care are thus dismissed against all Defendants.

## C. First Amendment Retaliation Claim

**\*7** As noted, Brooks claims that, as a result of his filing a grievance against Officer Jackson after the alleged sexual assault, Officers McCurdy, Darden, and another unidentified individual retaliated against him by assaulting, threatening, and harassing him. (Am.Compl.§§ II.C–D). He also suggests that Officer Jackson instructed them to do so. (Opp'n 12–13). Construed liberally, these facts are also sufficient to state a First Amendment retaliation claim.

To sustain such a claim, "a prisoner must demonstrate the following: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (internal quotation marks omitted). "The protected conduct must be 'a substantial or motivating factor for the adverse actions taken by prison officials.' " *Key v. Toussaint,* 660 F.Supp.2d 518, 525 (S.D.N.Y.2009) (quoting *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003)). In light of "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated," courts must "examine prisoners' claims of retaliation with skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

2013 WL 5339151

Consequently, "the plaintiff bears a heightened burden of proof." *Key,* 660 F.Supp.2d at 525 (internal quotation marks omitted).

Brooks's allegations satisfy all three elements required for a First Amendment retaliation claim. With respect to the first element, it is well established that the filing of a grievance is constitutionally protected behavior. *See, e.g., Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) ("[R]etaliation against a prisoner for pursuing a grievance violates the right to petition government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under [Section] 1983."). With respect to the second element, physical assault plainly constitutes adverse action, as it is "conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003); *see, e.g., Varela v. Demmon,* 491 F.Supp.2d 442, 445, 450 (S.D.N.Y.2007) (noting the defendants' concession that a prisoner's allegation of assault by correction officers, if true, would meet the adverse action element of a retaliation claim).

Finally, Brooks adequately alleges a nexus between the protected speech and the alleged retaliatory action. In particular, Brooks claims that "C.O. Darden ... said she was going to kick my ass threat[en]ing to get me for C.O. K. Jackson" (Opp'n 12), and that "C.O. McC[u]rdy said he was going to fuck me up for fucking with C.O. K. Jackson." (*Id.*). He also alleges that Officer Tomson told him that Officer Jackson "inform[ed] her [co]workers to ret[al]iate against me." (*Id.*). These allegations (which are consistent with, even if slightly more detailed than, the allegations in the Amended Complaint) are sufficiently specific to survive even the heightened pleading standards for retaliation claims. Defendants' motion to dismiss the First Amendment retaliation claim against Officers McCurdy, Darden, and Jackson is therefore denied.

**D. Due Process Claims**

 **\*8** Next, Brooks's papers raise two separate claims arising from the Due Process Clause of the Fourteenth Amendment. First, Brooks claims various procedural defects in his disciplinary hearing of May 19, 2009, including a denial of his right to call witnesses at the hearing, the failure of Officer Carver to conduct an adequate mental health capacity assessment, and the failure of Officer Carver to secure proper authorization to hold the hearing more than fourteen days after the misbehavior report was filed. (Opp'n 33–36). Second, Brooks claims that Officers Carver and Jackson

destroyed certain items of his personal property, including books, family pictures, and letters. (Am. Compl § II.D).

"To present a due process claim, a plaintiff must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process." *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (brackets and internal quotation marks omitted). An inmate's liberty interest may be implicated when prison discipline "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* (internal quotation marks omitted); *accord Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

 **1. The May 19, 2009 Disciplinary Hearing**
First, Brooks alleges that the procedures at the May 19, 2009 hearing, where he was accused of staring at Officer Jackson through his mirror, exposing himself, and masturbating, were constitutionally deficient. (Opp'n 33–36). In particular, Brooks contends that Officer Carver denied his request to call a correctional officer who was present at the site of the incident as a witness. (*Id.* 34). Brooks was found guilty at this disciplinary hearing and, as a consequence, was sent to keeplock for three months. (*Id.* 30). In keeplock, Brooks alleges he was denied food trays, showers, and medical attention (Am.Compl.§ II.D), and was placed in a cell without a mattress, with a clogged toilet and sink, with a light bulb that blinked on and off, and with urine, feces, and blood on the floor (Opp'n 14).

This claim is easily dismissed against all Defendants other than Officer Carver. It is a "prerequisite to an award of damages" under Section 1983 that any constitutional violations be tied to the "personal involvement of defendants in [the] alleged constitutional deprivations." *Spavone v. N.Y. State Dept. of Corr. Servs.,* 719 F.3d 127, 135 (2d Cir.2013) (internal quotation marks omitted). "[P]ersonal involvement of a ... defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant ... failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, ... (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). [4] Brooks fails to allege that any Defendant other than Officer Carver was personally involved in the disciplinary hearing in any of these ways.

4    Although there is some uncertainty with respect to whether, or to what extent, the *Colon* categories remain good law following the Supreme Court's decision in *Iqbal, see, e.g., Zappula v. Fischer,* No. 11 Civ. 6733(JMF), 2013 WL 1387033, at *9 (S.D.N.Y. Apr.5, 2013), the Court need not address that issue in this case.

**\*9** The Court dismisses the due process claims against Officer Carver as well, but for a different reason: Brooks failed to exhaust his administrative remedies. Under the Prison Litigation Reform Act (the "PLRA"), a prisoner must exhaust his administrative remedies before he can bring an action with respect to prison conditions. *See* 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 93–103, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). In New York State, that means taking advantage of a three-tiered grievance procedure. *See, e.g., Bennett v. Wesley,* No. 11 Civ. 8715(JMF), 2013 WL 1798001, at *4–5 (S.D.N.Y. Apr.29, 2013). In order to exhaust administrative remedies, a prisoner must complete all three tiers, up to and including an appeal to the Central Office Review Committee (the "CORC"). *See* 7 N.Y.C.R.R. § 701.5; *Bennett,* 2013 WL 1798001, at *4–5. The inmate must also comply with the agency's deadlines and other procedural rules. *See Woodford,* 548 U.S. at 93.

Although it may not be clear from the face of Brooks's Amended Complaint that he failed to exhaust his administrative remedies with respect to the due process claims against Officer Carver, the Court exercises its discretion to convert Defendants' motion to dismiss on this limited issue to a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and thus considers materials beyond the scope of the pleadings. *See e.g., Williams v. Metro. Det. Ctr.,* 418 F.Supp.2d 96, 101–02 (E.D.N.Y.2005); *Rivera v. Pataki,* No. 01 Civ. 5179(MBM), 2003 WL 21551939, at *5 (S.D.N.Y. July 1, 2003). Conversion is proper because Defendants provided Brooks with notice that the Court might treat Defendants' motion to dismiss as a motion for summary judgment, and informed him that if he did not respond "by filing sworn affidavits and other papers as required by Rule 56(e)," his "COMPLAINT MAY BE DISMISSED." (*See* Docket No. 47). *See, e.g ., Hernandez v. Coffey,* 582 F.3d 303, 308 n. 2 (2d Cir.2009) (citing cases finding that a Local Rule 12.1 Notice provides sufficient notice to pro se parties). Further, Brooks himself submitted evidence outside of the pleadings. (Opp'n 21–75). And converting Defendants' motion in this limited way "is likely to facilitate the disposition of the action" with respect to Officer Carver.

*Stephens v. Bayview Nursing & Rehab. Ctr.,* No. 07 Civ. 596(JFB)(AKT), 2008 WL 728896, at *2 (E.D.N.Y. Mar. 17, 2008) (internal quotation marks omitted). After all, the record makes clear that Officer Carver is entitled to judgment as a matter of law on the ground that Brooks failed to exhaust his administrative remedies. *See* Fed. R. Civ. P 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). [5]

5    The Court notes that, at least in some cases, courts in the Second Circuit have considered administrative records in the exhaustion context on a motion to dismiss without converting the motion to one for summary judgment. *See, e.g., Smart v. Goord,* 441 F.Supp.2d 631, 637–38 (S.D.N.Y.2006), *on reconsideration in part,* 04 CIV. 8850 RWS, 2008 WL 591230 (S.D.N.Y. Mar.3, 2008); *Abney v. McGinnis,* No. 01 Civ. 8444(SAS), 2002 WL 1461491, *3–4, 2002 U.S. Dist. LEXIS 12180, at *6–7 (S.D.N.Y. July 2, 2002), *reversed and vacated on other grounds,* 380 F.3d 663 (2d Cir.2004). Here, however, because Plaintiff was on notice that Defendants' motion might be converted to one for summary judgment, and because Plaintiff himself submitted extrinsic materials with his Opposition Memorandum, the Court finds it appropriate to convert this motion to one for summary judgment, at least for this limited purpose.

In particular, the record makes clear that Brooks failed to appeal any grievance relating to his due process claim against Officer Carver to the CORC. The CORC, for example, has no record of any appeal by Brooks. (Hale Decl. ¶¶ 7–8 & Ex.A). And Brooks himself appears to concede in his opposition papers that he failed to appeal his grievances to the highest stage. (Opp'n 18–19). Brooks does submit a copy of one grievance that appears to reflect an attempt to appeal to the CORC (Opp'n 52–53), but it did not satisfy the exhaustion requirement for several reasons. First, Brooks does not allege, let alone show, that he filed Form # 2133, which is required to properly file an appeal with the CORC. *See* 7 N.Y.C.R.R. § 701.5(d)(1)(i) ("If the grievant or any direct party wishes to appeal to the CORC, he or she must complete and sign Form # 2133 and submit it to the grievance clerk within seven calendar days after receipt of the superintendent's written response to the grievance."). Second, the date of the appeal was more than one year after the alleged incident, so it was plainly untimely. *See id; see also* 7 N.Y.C.R.R. § 701.5(a)

(1), (c) (setting out time limits in which inmates must file grievances to the lower tiers). Third and in any event, the grievance makes no mention of anything regarding Officer Carver's conduct at the disciplinary hearing.

**\*10** In short, the record shows that Brooks failed to exhaust his administrative remedies with respect to his due process claim against Officer Carver. Additionally, Brooks makes no allegations, and has submitted no evidence, with respect to Officer Carver that could support any exception to the administrative exhaustion requirement. *See supra* n. 3; *Bennett,* 2013 WL 1798001, at \*6. Under the PLRA, therefore, Brooks's due process claim against Officer Carver must be dismissed for failure to exhaust. *See Bennett,* 2013 WL 1798001, at \*5 (converting a motion to dismiss into a motion for summary judgment and dismissing on the ground that the plaintiff had failed to appeal to the CORC).

### 2. The Destruction of Personal Property

As noted, Brooks also alleges that certain of his personal property was destroyed, including song books, family pictures, letters, books, and legal documents. (Am.Compl.§ II.D). "An unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). The Second Circuit has specifically held that the availability of an action in the New York Court of Claims constitutes such a remedy. *See, e.g., Davis v. New York,* 311 F. App'x 397, 401 (2d Cir.2009); *Love v. Coughlin,* 714 F.2d 207, 209 (2d Cir.2009); *see also Jones v. Harris,* 665 F.Supp.2d 384, 401 (S.D.N.Y.2009). As Brooks does not allege that he is unable to file such an action, Defendants' motion to dismiss this claim is granted.

### E. Misbehavior Report

Next, Brooks claims that the misbehavior report filed against him by Officer Jackson on April 23, 2009, was fabricated. (Am.Compl.§ II.D). Read liberally, Brooks's papers allege that by filing this allegedly false report, Officer Jackson violated his constitutional rights and defamed his character. Both claims fail as a matter of law.

First, it is well established that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report.' " *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997); *see Freeman v. Rideout,* 808 F.2d

949, 951 (2d Cir.1986). Thus, the only way in which the filing of a false misbehavior report can violate a prisoner's constitutional rights is if the report is filed in retaliation for the exercise of some other constitutional right, such as the filing of a grievance. *See Boddie,* 105 F.3d at 862*; see also Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) ("An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under § 1983."). Here, however, Brooks makes no claim that the filing of the misbehavior report was done in response to his filing of a grievance; in fact, at the disciplinary hearing, Brooks apparently testified that Jackson fabricated the allegations "for reasons unknown to [him]." (Opp'n 33). Therefore, Brooks's allegation that Officer Jackson filed a false misbehavior report against him is insufficient to state a claim for the violation of his constitutional rights.

**\*11** Brooks's defamation claim also falls short. Generally speaking, state law, not Section 1983, provides the remedy for a defamation claim. *See, e.g., Lauro v. Charles,* 219 F.3d 202, 207 (2d Cir.2000). Federal constitutional relief may be available for defamation under the Due Process Clause—through what is known as a "stigma plus" claim—when a plaintiff can demonstrate that the government has (1) made an "utterance of a statement sufficiently derogatory to injure [the plaintiff's] reputation, that is capable of being proved false, and that [the plaintiff] claims is false," and (2) imposed a "material ... burden or ... alteration of the plaintiff's status or rights." *Vega v. Lantz,* 596 F.3d 77, 81 (2d Cir.2010) (internal quotation marks omitted). Further, the "statement must be sufficiently public to create or threaten a stigma." *Velez v. Levy,* 401 F.3d 75, 87 (2d Cir.2005). Here, Brooks makes no allegations that Defendants (or anyone else) publicized the misbehavior report. It follows that his defamation claim must be dismissed.

### F. Conspiracy

Next, Brooks claims that Officers Carver and Jackson conspired together to unlawfully confine him, violate his mental health patient rights, retaliate against him, and discriminate against him. (Am.Compl.§ II.D). To establish a claim for conspiracy under Section 1983, Brooks must demonstrate "(1) an agreement between two or more state actors ... (2) to act in concert to inflict an unconstitutional injury; [and] (3) an overt act done in furtherance of that goal causing damages." *Jean–Laurent v. Wilkinson,* 540 F.Supp.2d 501, 507 (S.D.N.Y.2008) *aff'd sub nom. Jean–Laurent v. Wilkerson,* 461 F. App'x 18 (2d Cir.2012). "Because

2013 WL 5339151

of the relative ease with which conspiracy allegations may be brought, and the substantial disruption of governmental function that they can cause, federal courts require 'more than conclusory allegations to avoid dismissal of a claim predicated on a conspiracy to deprive [the plaintiff] of his constitutional rights.' " *Nwanze v. Philip Morris Inc.,* 100 F.Supp.2d 215, 219 (S.D.N.Y.2000) (alteration in original) (quoting *Polur v. Raffe,* 912 F.2d 52, 56 (2d Cir.1990)). To avoid dismissal, therefore, Brooks "must plead facts that show an agreement or some form of joint or concerted action." *Id.* (internal quotation marks omitted). Brooks must "make an effort to provide some details of time and place and the alleged effect of the conspiracy." *Id.* (internal quotation marks omitted).

Here, Brooks fails to allege any facts that might support an inference that Officers Jackson and Carver conspired to deprive him of his constitutional rights. Brooks makes only the conclusory allegation that "Carver work[ed] with K. Jackson" to unlawfully confine him, violate his mental health patient rights, destroy his personal property, and retaliate against him, but provides no other details to support his allegation of a conspiracy. (Am. Compl. § II . D). As Brooks has not pleaded facts that show an agreement or some form of joint or concerted action, Defendants' motion to dismiss this claim is granted.

### G. Religious Liberty Claims

**\*12** Finally, liberally construed, Brooks's papers also allege a violation of his rights under both the Free Exercise Clause of the First Amendment and RLUIPA. Brooks's papers suggest that he is a follower of the Muslim faith, and that being subjected to a pat-and-frisk by a member of the opposite sex violates his religious beliefs. (Am. Compl. § II.D; Opp'n 9). He alleges his rights were violated when Officer Jackson conducted two pat-and-frisks on him, at least one of which (and perhaps both of which) occurred after Brooks had informed her that he was Muslim and preferred to be frisked by an officer of the same sex. (Am. Compl. § II.D; Opp'n 9).

Brooks's RLUIPA claim is easily dismissed, as the Second Circuit recently held that the statute does not provide a private cause of action against state officials in their individual capacities (at least where, as here, there is no allegation that the officials' purported restriction on religious rights had an effect on interstate or foreign commerce). *See Washington v. Gonyea,* No. 11–980–cv, ––– F.3d ––––, 2013 WL 4792375, at *2–3 (2d Cir. Sept.10, 2013).

At this stage, however, the Court will not dismiss Brooks's Free Exercise claim. To assess a claim under the Free Exercise Clause, a court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (2) whether the challenged practice of the prison officials furthers some legitimate penological objective." *Farid v. Smith,* 850 F.2d 917, 926 (2d Cir.1988). The first and the third elements are non-issues at this stage of the litigation. As to the first element, Brooks has alleged that he is a Muslim and thus prefers to be searched by male officers; the Court has no basis now to question the sincerity of these beliefs. (Am. Compl. § II.D; Opp'n 9). As to the third element, whether there is some legitimate penological objective served by cross-gender pat-and-frisks (or, more precisely, by not honoring an inmate's religious-based request to be frisked by an officer of the same gender) is not something that can be assessed on the current record.

Whether the allegations in the Amended Complaint are sufficient to satisfy the second element—that is, whether Brooks plausibly alleges that the disputed conduct "substantially burden[ed]" his "sincerely held religious beliefs," *Salahuddin,* 467 F.3d at 274–75—is a closer issue. Although the case law on point is limited, there is little question that cross-gender patand-frisks *can* substantially burden a prisoner's Free Exercise rights. *See, e.g., Forde v. Baird,* 720 F.Supp.2d 170, 176 (D.Conn.2009); *Forde v. Zickefoose,* 612 F.Supp.2d 171, 175–78 (D.Conn.2009). But the line between what constitutes a substantial burden and what does not—and on which side of that line Brooks's allegations of two pat-and-frisk incidents would fall—is less clear. Given that lack of clarity, and mindful of Plaintiff's *pro se* status, the Court declines to hold that the allegations in the Amended Complaint fail as a matter of law. It would be more appropriate to address the issue, if ever, based on a more developed record.

### CONCLUSION

**\*13** For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part. All of Brooks's claims against the moving Defendants (that is, all Defendants other than Officer Tomson) are dismissed except for (1) his Eighth Amendment claim against Officer Jackson in her individual capacity relating to the April 17, 2009 incident; (2) his Eighth Amendment claim against

Officers Darden and McCurdy in their individual capacities relating to the alleged assault around that same date; (3) his First Amendment retaliation claim against Officers Jackson, McCurdy, and Darden in their individual capacities; and (4) his First Amendment Free Exercise claim against Officer Jackson in her individual capacity.

As noted, Officer Tomson has not appeared in this action. Because Officer Tomson was not served within 120 days of the filing of the Complaint, it is hereby ORDERED that Brooks show cause in writing as to why he has failed to serve the summons and Complaint within the 120 days prescribed by Rule 4(m) of the Federal Rules of Civil Procedure or, if Brooks believes that Office Tomson has been served, that he submit a letter to the Court stating when and in what manner such service was made. If the Court does not receive any communication from Brooks within **thirty days,** showing good cause why such service was not timely made, the Court will dismiss the case against Officer Tomson.

**The Clerk of Court is directed to terminate as parties Officer Carver and all other Defendants to the extent they have been sued in their official capacities, to terminate Docket No. 44, and to mail a copy of this Memorandum Opinion and Order to Plaintiff.**

This Court certifies, pursuant to Title 28, United States Code, Section 1915(a)(3), that any appeal from this Order would not be taken in good faith, and *in forma pauperis* status is thus denied. *See Coppedge v. United States,* 369 U.S. 438, 444–45, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5339151

---

End of Document

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 555943
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Christopher MASON, Plaintiff,

v.

M. MOORE, T. Lamica, E. Velie, D. Rondeau,
D. Gagne, and B. Truax, Defendants.

Civ. No. 9:17-CV-1086 (GLS/DJS)
|
Signed 01/13/2020

**Attorneys and Law Firms**

CHRISTOPHER MASON, Plaintiff Pro Se, 12-A-0162, Cape
Vincent Correctional Facility, Rte. 12E, PO Box 739, Cape
Vincent, New York 13618.

HON. LETITIA JAMES, Attorney General of the State of
New York, OF COUNSEL: ERIK BOULE PINSONNAULT,
ESQ., Assistant Attorney General, Attorney for Defendants,
The Capitol, Albany, New York 12224.

**REPORT-RECOMMENDATION and ORDER**

DANIEL J. STEWART, United States Magistrate Judge

**I. INTRODUCTION**

**\*1** Plaintiff, an inmate in the custody of the New York
State Department of Corrections and Community Supervision
("DOCCS"), commenced this action pursuant to 42 U.S.C.
§ 1983 alleging the violation of his constitutional rights.
Dkt. No. 1, Compl. The Complaint was initially reviewed by
Senior District Judge Gary L. Sharpe pursuant to 28 U.S.C. §
1915(e) and 28 U.S.C. § 1915A. Dkt. No. 5. Following that
review, the only claims that remain in this action are Eighth
Amendment excessive force and failure to intervene claims.
*Id.* at p. 11.

Presently before this Court is a partial Motion for Summary
Judgment seeking dismissal of any Eighth Amendment
excessive force claim regarding the use of chemical agents
and the dismissal of the failure to intervene claims against
Defendants Moore and Truax. Dkt. Nos. 45 & 45-1, Defs.'
Mem. of Law. Plaintiff opposes the Motion. Dkt. No. 47.
Defendants have filed a Reply in further support of the

Motion. Dkt. No. 48. For the reasons that follow, the Court
recommends that the Motion be granted in part and denied in
part.

**II. BACKGROUND**

**A. Plaintiff's Failure to File a Response
to Defendants' Rule 7.1 Statement**

Pursuant to this District's Local Rules, "[t]he Court shall
deem admitted any properly supported facts set forth in
the Statement of Material Facts that the opposing party
does not specifically controvert." N.D.N.Y.L.R. 7.1(a)(3). As
required by the Local Rules, Defendants' counsel advised
Plaintiff of the consequences of failing to file a response to
Defendants' Rule 7.1 Statement of Material Facts. Dkt. No.
45 at p. 3. Plaintiff, however, did not file a direct response
to Defendants' Statement of Material Facts. Although a *pro
se* litigant is entitled to a liberal construction of his filings,
*see Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir.
2013), his *pro se* status does not relieve him of his obligation
to comply with the relevant procedural rules, *see Marino v.
Watts*, 2018 WL 3121612, at \*1 (N.D.N.Y. Mar. 7, 2018),
*report and recommendation adopted sub nom. Marino v.
Schult*, 2018 WL 1578163 (N.D.N.Y. Mar. 30, 2018). The
Court therefore will deem the facts as set forth in Defendants'
Statement of Material Facts admitted, to the extent they are
properly supported and not inconsistent with other record
evidence offered by Defendants in support of their Motion.

**B. Factual Background**

This case arises out of a cell extraction that took place at
Upstate Correctional Facility on October 3, 2014. On that
date, Plaintiff's cellmate, an inmate named Hyatt, was to be
removed from his cell, but refused. Dkt. No. 45-4, Truax Decl.
at ¶ 4; Dkt. No. 45-4, Moore Decl. at ¶ 4. Inmate Hyatt was
non-compliant with numerous orders from correctional staff
to exit the cell. Dkt. No. 45-3, Ex. A, Pl.'s Dep. at p. 37.
Correctional staff made multiple attempts to convince Hyatt
to voluntarily leave his cell, including bringing five or six
different staff members in to speak with him. *Id.* at p. 27.
Ultimately, the use of a chemical agent was authorized by the
Superintendent of Upstate, Moore Decl. at ¶ 5, and extraction
teams were brought in to remove Hyatt and Plaintiff from
the cell. *Id.* at ¶ 9; Truax Decl. at ¶ 6. Prior to the chemical

agent being sprayed into the cell, Plaintiff was directed by Defendant Moore to get in the cell's shower "[t]o prevent Plaintiff's being affected by the CS aerosol." Moore Decl. at ¶ 11; Pl.'s Dep. at pp. 41 & 107-108. Moore claims that Plaintiff refused to do so, but Plaintiff alleges that he complied with this direction. Moore Decl. at ¶ 11; Pl.'s Dep. at pp. 94 & 108. The chemical agent was sprayed into the cell multiple times and correctional staff then entered to extract the inmates. Moore Decl. at ¶ 11. Plaintiff claims that during the extraction he was repeatedly punched and kicked by corrections officers and that neither Moore nor Truax intervened to stop the attack. Pl.'s Dep. at pp. 55-56. Defendants deny that any improper force was used and instead contend that Plaintiff was fully compliant once officers entered his cell. Moore Decl. at ¶ 13; Truax Decl. at ¶ 8. Plaintiff was brought to be decontaminated following the use of the chemical agent. Moore Decl. at ¶ 14; Truax Decl. at ¶ 9.

### III. LEGAL STANDARD FOR SUMMARY JUDGMENT

**\*2** Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289

(citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read his supporting papers liberally, and [ ] interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *accord, Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### IV. ANALYSIS

#### A. Claims Regarding the Use of Chemical Agents

Defendants first seek summary judgment on any Eighth Amendment claim that may be presented in the case regarding the use of chemical agents in Plaintiff's cell. Defs.' Mem. of Law at pp. 6-9. For the reasons that follow, it is recommended that this part of Defendants' Motion be granted.

First, the Court agrees with Defendants that the Complaint as pled does not present any excessive force claim based simply on the use of chemical agents. Plaintiff's Complaint specifically states that "*upon entry* [ ] is when the 'Excessive Force'" took place. Compl. at p. 6 (emphasis added). It then discusses the actions of the Defendants who entered Plaintiff's cell and allegedly assaulted him. *Id.* There is no dispute that Defendant Moore was responsible for spraying the chemical agent into the cell and that this occurred *before* officers entered the cell. Moore Decl. at ¶¶ 12-13. As such, the Complaint's excessive force allegations do not encompass the use of the chemical agent itself.

**\*3** In the alternative, summary judgment would be appropriate on the merits of such a claim in any event. "The Eighth Amendment prohibition on cruel and unusual punishments precludes the unnecessary and wanton infliction of pain and protects inmates against the use of excessive force." *Jones v. Rock*, 2013 WL 4804500, at *17 (N.D.N.Y. Sept. 6, 2013) (internal quotations omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 9-10 (1992); *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). Eighth Amendment excessive force claims have both objective and subjective elements. *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "The objective component of a claim of cruel and unusual punishment focuses on the harm done, in light of 'contemporary standards of decency.' " *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (quoting *Hudson v. McMillian*, 503 U.S. at 8). "The subjective component of the claim requires a showing that the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct." *Harris v. Miller*, 818 F.3d 49, 63 (2d Cir. 2016) (quoting *Wright v. Goord*, 554 F.3d at 268).

Viewing the evidence in the light most favorable to Plaintiff, the Court presumes, without deciding, that Plaintiff's testimony regarding the breathing difficulties and burning sensations he endured following the use of the chemical agent, *see* Pl.'s Dep. at pp. 46-47, are sufficient to establish the objective prong of the Eighth Amendment claim at this stage of the proceedings. *See, e.g.*, *El-Massri v. New Haven Corr. Ctr.*, 2018 WL 4604308, at *10 (D. Conn. Sept. 25, 2018) (citing cases).

Plaintiff cannot, however, raise factual questions sufficient to withstand summary judgment with regard to the subjective component of an Eighth Amendment claim. The record is clear that Sgt. Moore was the individual who sprayed the chemical agent into Plaintiff's cell. Moore Decl. at ¶ 12. He alone, therefore, could be the proper Defendant to such a claim. As to him the record fails to establish any degree of the wantonness required to assert an Eighth Amendment claim. The cell extraction resulted from the refusal of Plaintiff's cellmate, inmate Hyatt, to leave the cell. Pl.'s Dep. at p. 24. By Plaintiff's own account, his cellmate, inmate Hyatt, was "belligerent," screaming and yelling, and "very hostile" to security staff attempting to get Hyatt to leave the cell. *Id.* at pp. 24 & 26. Plaintiff also testified that Hyatt repeatedly refused to leave the cell and told security personnel to get staff to remove him. *Id.* at p. 24. The record further establishes that security staff made numerous attempts to discuss the matter with inmate Hyatt before resorting to an extraction, including having "roughly about five, six people" speak with Hyatt. *Id.* at p. 27. Plaintiff also testified that prior to the chemical agents being sprayed into his cell he was told by Defendant Moore to go into the cell shower. Pl.'s Dep. at pp. 41 & 107-108; *see also* Moore Decl. at ¶ 11. After the incident Plaintiff was immediately taken to a decontamination shower. Truax Decl. at ¶ 10. "In evaluating the use of a chemical agent in a prison setting, courts have refused to find actionable conduct where, as here, the deployment was used 'in a good-faith effort to maintain or restore discipline.' " *Anderson v. Darby*, 2017 WL 933085, at *5 (E.D.N.Y. Feb. 13, 2017), *report and recommendation adopted*, 2017 WL 927611 (E.D.N.Y. Mar. 6, 2017) (quoting *Little v. Mun. Corp.*, 51 F. Supp. 3d 473, 501 (S.D.N.Y. 2014)). The fact that inmate Hyatt, not Plaintiff, was the disruptive inmate does not change the analysis. *Cruz-Droz v. Marquis*, 2018 WL 1368907, at *3 (D. Conn. Mar. 16, 2018) ("Courts considering this issue have held that the exposure of non-disruptive inmates to a chemical agent is not cognizable under section 1983."); *White v. City of New York*, 2017 WL 3575700, at *4 (S.D.N.Y. Aug. 17, 2017).

**\*4** For these reasons, summary judgment is appropriate as to any Eighth Amendment claim regarding the use of chemical agents.

### B. Plaintiff's Failure to Intervene Claim

The Complaint alleges that Defendants Moore and Truax failed to intervene to stop excessive force that was being used against Plaintiff. Compl. at pp. 7-8. "A corrections officer who does not participate in, but is present when an assault on an inmate occurs may still be liable for any resulting constitutional deprivation." *Henry v. Dinelle*, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011). A failure to intervene claim requires that Plaintiff prove that "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Konovalchuk v. Cerminaro*, 2014 WL 272428, at *23 (N.D.N.Y. Jan. 24, 2014) (quoting *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008)).

Defendants seek summary judgment on this claim on the ground that Plaintiff failed to show that either Defendant witnessed any improper use of force against Plaintiff or that, even if they had, that given the short time span of the incident

in question they had no opportunity to intervene. Defs.' Mem. of Law at pp. 10-11. On the record before the Court questions of fact preclude a grant of summary judgment.

First, there are clear questions of fact about whether any improper use of force took place at all.[1] Plaintiff alleges that despite being compliant with staff direction he was punched between seven and eight times and kicked seven or eight times by correctional staff. Pl.'s Dep. at pp. 55-56. Defendant Truax's Declaration states that Plaintiff followed staff direction and that he was not subjected to excessive physical force. Truax Decl. at ¶¶ 8 & 13. Defendant Moore similarly states that when officers entered the cell Plaintiff was compliant and was not subjected to inappropriate force. Moore Decl. at ¶¶ 13 & 19. Moore does, however, state that prior to entering the cell Plaintiff failed to comply with orders about where to go within his cell. *Id.* at ¶ 11. The declarations, therefore, establish that the Defendants were aware of what was happening in Plaintiff's cell. As a result, viewed in the light most favorable to Plaintiff, Defendants presumably could have seen if improper force was used.

[1]    The existence of such factual questions is perhaps best shown by the fact that the Defendants accused of improperly using force have not sought summary judgment as to that claim.

This case is thus unlike *Clark v. Gardner*, 256 F. Supp.3d 154 (N.D.N.Y. 2017) upon which Defendants rely. In *Clark*, the plaintiff was allegedly assaulted by an unknown group of individuals and the supervisory staff member of the unit where the assault allegedly took place was sued for failure to protect. 256 F.Supp.3d at 167. There, the mere allegation that that the defendant was the supervising officer was not sufficient to establish liability for failure to protect. *Id.* at 168. Here, however, Defendants are on record as having been able to witness the event in question. *See generally* Moore Decl.; Truax Decl. Given the question of fact about whether Plaintiff was punched or kicked while allegedly compliant with staff direction, *see* Pl.'s Dep. at pp. 55-56, summary judgment is inappropriate on Plaintiff's claim.

**\*5**  The Court also recommends rejecting Defendants' argument that because the incident in question lasted only approximately fifteen to twenty seconds, Pl.'s Dep. at p. 81, summary judgment is appropriate on the ground that Defendants would have had not an opportunity to intervene. *See* Defs.' Mem. of Law at p. 11. The Second Circuit has rejected the notion that there is any "bright-line" for the

amount of time under which a failure to intervene claim is not actionable. *Figueroa v. Mazza*, 825 F.3d 89, 107 (2d Cir. 2016). Instead it has emphasized that:

> Failure-to-intervene claims can arise out of a limitless variety of factual circumstances. In each case, the question whether a defendant had a realistic chance to intercede will turn on such factors as the number of officers present, their relative placement, the environment in which they acted, the nature of the assault, and a dozen other considerations. Among these considerations, of course, the assault's duration will always be relevant and will frequently assume great importance.

*Id.* Here, again viewing the evidence in the light most favorable to Plaintiff, the allegation is that Plaintiff, while in the view of Defendants Moore and Truax, was compliant with staff directions, but was nonetheless punched and kicked multiple times. Pl.'s Dep. at pp. 55-56; Moore Decl. at ¶ 13. This, if true, may provide a basis for failure to protect liability. Under the circumstances, this question is best left to a jury to resolve the factual dispute. *Figueroa v. Mazza*, 825 F.3d at 108; *see also Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (discussing factual nature of inquiry into whether there was sufficient time to intercede to prevent harm).

## V. CONCLUSION

**WHEREFORE**, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 45) be **GRANTED as to claims regarding the use of chemical agents and DENIED as to Plaintiff's failure to intervene claim**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) [2] days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

[2]     If you are proceeding *pro se* and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. FED. R. CIV. P. 6(a)(1)(C).

**All Citations**

Slip Copy, 2020 WL 555943

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2021 Thomson Reuters. No claim to original U.S. Government Works.    5

2020 WL 554816
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Christopher MASON, Plaintiff,

v.

M. MOORE et al., Defendants.

9:17-cv-1086 (GLS/DJS)
|
Signed 02/04/2020

## Attorneys and Law Firms

FOR PLAINTIFF: Christopher Mason, Pro Se, 12-A-0162, Cape Vincent Correctional Facility, Rte. 12E, PO Box 739, Cape Vincent, NY 13618.

FOR DEFENDANTS: HON. LETITIA JAMES, New York State Attorney General, OF COUNSEL: ERIK BOULE PINSONNAULT, Assistant Attorney General, The Capitol, Albany, NY 12224.

## ORDER

Gary L. Sharpe, Senior District Judge

**\*1** The above-captioned matter comes to this court following a Report-Recommendation and Order (R&R) by Magistrate Judge Daniel J. Stewart duly filed on January 13, 2020. (Dkt. No. 51.) Following fourteen days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

No objections having been filed, [1] and the court having reviewed the R&R for clear error, it is hereby

[1] On January 28, 2020, plaintiff *pro se* Christopher Mason filed a letter indicating that he does not have any objections to the R&R. (Dkt. No. 52.) Instead,

he requests a telephone conference to settle this case. (*Id.*) The court refers this request to Judge Stewart for his review and consideration.

**ORDERED** that the Report-Recommendation and Order (Dkt. No. 51) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for partial summary judgment [2] (Dkt. No. 45) is **GRANTED IN PART** and **DENIED IN PART** as follows:

> **GRANTED** as to plaintiff *pro se* Christopher Mason's Eight Amendment excessive force claim regarding the use of chemical agents, which claims is **DISMISSED**; and
>
> **DENIED** as to Mason's Eight Amendment failure to intervene claim against defendants M. Moore and B. Truax; and it is further

[2]   Defendants did not move for summary judgement as to Mason's Eight Amendment excessive force claim other than to the extent that it pertained to the use of chemical agents, and, accordingly, the claim survives to the extent that it pertains to the use of physical force during the cell extraction on October 3, 2014. (Dkt. No. 45, Attach. 1 at 1.)

**ORDERED** that this case is now deemed trial ready and a trial date and deadlines will be set in due course; and it is further

**ORDERED** that Mason's letter motion (Dkt. No. 52) is **REFERRED** to Magistrate Judge Daniel J. Stewart for his review and consideration; and it is further

**ORDERED** that the Clerk provide a copy of this Order to the parties in accordance with the Local Rules of Practice.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 554816

---

**End of Document**                 © 2021 Thomson Reuters. No claim to original U.S. Government Works.